## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CITY OF PHILADELPHIA,

                Plaintiff,

      v.

DOUG BURGUM, SECRETARY OF THE INTERIOR,

UNITED STATES DEPARTMENT OF THE INTERIOR,

JESSICA BOWRON, ACTING DIRECTOR OF THE NATIONAL PARK SERVICE,

              and

NATIONAL PARK SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR,

              Defendants.

Civil Action No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTION RELIEF

### I.    INTRODUCTION

1.    The President's House is the product of collaboration between the City and the United States, which entities worked together to build a monument recognizing the complexity inherent in the fact that some of the individuals instrumental to the founding of our country and its commitment to freedom themselves owned other human beings at the same time.

2.    The recognition of this complexity, and the work to develop the President's House, spanned several federal administrations culminating in a Cooperative Agreement in 2006 between the City of Philadelphia and the federal government that, through a series of

amendments, detailed the design of the President's House Project as well as the rights and responsibilities of the parties.

3.      In March 2025, Executive Order No. 14253 called for, among other things, the Interior Department to "ensure that [materials under the jurisdiction of the department] do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times)."

4.      Without notice to the City of Philadelphia, the National Park Service has removed artwork and informational displays at the President's House site referencing slavery, presumably pursuant to the mandate in the Executive Order.

## II.      JURISDICTION AND VENUE

5.      The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202, and the Administrative Procedure Act, 5 U.S.C. §§ 704-706.

6.      Venue properly lies within the Eastern District of Pennsylvania because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiff City of Philadelphia resides in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e).

## III.      PARTIES

7.      Plaintiff City of Philadelphia (the "City") is a municipal corporation and charter city organized and existing under the laws of the Commonwealth of Pennsylvania. The City is the birthplace of our Nation, home to Independence Hall, and served as the Nation's first capital.

8.      Defendant Doug Burgum is the Secretary of the Interior, a cabinet level position.

9.    Defendant United States Department of the Interior is a cabinet level agency of the United States.

10.    Defendant National Park Service is an agency of the Department of the Interior and manages the property at Independence National Historical Park, where the President's House is located.

## IV.    FACTUAL ALLEGATIONS

11.    The President's House is a monument built at the location where Presidents Washington and Adams resided with their households and worked as leaders of the fledgling country.

12.    Together with their families, both Presidents owned slaves who lived in the home. One of those slaves was Oney Judge, a longtime slave of the Washington family, who escaped from the President's House in May 1796 after Martha Washington informed Judge that she would be given to Washington's granddaughter as a wedding gift.

13.    Though the presence of enslaved people at the President's House was known for many years, the movement to recognize "The House and the People Who Worked and Lived In It" gained traction at the turn of this century.  In 2003, "given the historical significance of this issue," the United States House of Representatives "urge[d] the NPS to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy." That congressional charge led the City and NPS in 2006 to embark on the restoration of the President's House and to begin designing exhibits with enslaved people at the forefront.

14.    This intention was reflected in the legal agreements that govern the President's House and the exhibits.

15.     In 2006, the City and NPS entered into an agreement to establish an exhibit at the site of the former President's House (the "2006 Cooperative Agreement"), located on Independence Mall next to the Liberty Bell Center, to commemorate "all those who lived in the house while it was used as the executive mansion, ***including the nine enslaved Africans brought by George Washington***" (the "President's House Project").  (A true and correct copy of the 2006 Cooperative Agreement is attached hereto as **Exhibit 1**.)

16.     The 2006 Cooperative Agreement was amended in 2007, 2008, and 2009. (True and correct copies of these amendments are attached hereto as **Exhibits 2, 3, and 4**.)

17.     Under the 2009 Third Amendment, the City was responsible for the "design, fabrication, installation, and completion" of the President's House Project, titled "Freedom and Slavery in Making a New Nation," and upon its completion the exhibit was to be "owned, maintained, managed, and interpreted" by the NPS. (Ex. 4, Third Amendment, Article I, Sections B and C; Attachment A, Section IV, Paragraph 4.)

18.     The 2006 Cooperative Agreement and its subsequent amendments provide that the President's House together with the interpretative displays in it are all part of a single exhibit. (2006 Agreement, Background Paragraphs E and F; also, Third Amend., Attachment C, Section B.).

19.     The 2006 Cooperative Agreement and its Third Amendment also expressly call for explaining the lives of enslaved people living at the President's House.  (*See*, *e.g.*, Ex. 1, 2006 Agreement, Background Paragraph E; Ex. 4, Third Amend., Attachment A, Sections I—II). The agreements acknowledged that the exhibits not only "will commemorate the home of George Washington and John Adams during the first ten years of the federal government," but that equally important was the intention to "commemorate the enslaved Africans who resided in

the Washington household."  (2009 Agreement, Attachment C, Section B).  Further, the Project

Summary Sheet describes the project as an exhibit that will "commemorate all those who lived in

the house while it was used as the executive mansion, including the nine enslaved Africans

brought by George Washington from Mt. Vernon." (2009 Agreement, Attachment A, Section II).

20.    Additionally, the City has an equal right with the NPS under these agreements to

approve the final design of the President's House Project.  (Third Amend. Attachment A, Section

IV(4) (stating that NPS "will participate in the final review and approval of the Project")).  A

"core design requirement" mandated that "the footprint of the Slave Quarters must be

conspicuously highlighted and a solemn 'sense of place' clearly established."  In addition, five of

the six jointly agreed upon themes "that must be reflected in the final design" all centered on

enslaved persons to highlight "how knowledge of the President's House and the presence of

slavery was forgotten and recovered; why we must remember." (2009 Agreement, Attachment C,

Section F, subsection D).

21.    In addition to shared design vision, the City has made significant financial

contributions to the President's House, due to the large national and local public interest in this

exhibit.  The City paid $3.5 million toward the overall project in addition to securing grant

funding from the Delaware River Port Authority and congressional appropriation in the

SAFETY-LU Transportation Bill.  Further, the rationale behind the City's contribution is spelled

out in the agreement: "Providing funds for the Project and Research Dig fulfills the public

purpose requirement because it enables the City to commemorate the symbolic and historical

importance of the President[']s House for the City of Philadelphia, its citizens and all Americans

nationwide, and by doing so, there is a public benefit inuring to the City." (2006 Agreement,

Background Paragraph K.)  Any attempt to remove the exhibits would cut away from the public benefit the City expected when it committed and secured the funds.

22.     The 2009 Agreement includes a provision requiring the NPS and City to "promptly use their best efforts to resolve the dispute in an informal fashion through communication and consultation, or other forms on non-binding alternative despite resolution that are mutually acceptable to the parties." (2009 Agreement, Article IX, Section A).

23.     The President's House exhibit opened in 2010, featuring a number of display panels depicting slavery and enslaved people, including Oney Judge. Pictures of the display panels can be viewed here: https://www.ushistory.org/presidentshouse/plans/exhibition.php.

24.     Additionally, in July and December 2015, the City entered into agreements assigning the intellectual property rights of the President's House Project to the NPS (the "2015 IP Assignment Agreements"). (A true and correct copy of the 2015 IP Assignment Agreements is attached hereto as **Exhibit 5**.)

25.     Specifically, the 2015 IP Assignment Agreements include an assignment for the "Interpretative Works" of the President's House Project. (July 2015 IP Assignment Agreement Recital (B); December 2015 IP Assignment Agreement Recital (B).)

26.     The Schedule of Interpretative Works, attached as Exhibit A to the July 2015 IP Assignment Agreement, reflects that many of the works expressly address slavery.

27.     The transfer of the copyrights under the 2015 IP Assignment Agreements did not include the authority to materially alter or destroy altogether the exhibit underlying the copyright.

28.     Several years after it opened, President's House was designated as a National Underground Railroad Network to Freedom site pursuant to the National Underground Railroad

Network to Freedom Act, Pub.L. 105–203, July 21, 1998, 112 Stat. 678, codified at 54 U.S.C. §§ 308301-308304; *see also* https://www.nps.gov/subjects/undergroundrailroad/ntf-listings.htm (listing all Network sites, including President's House) (last accessed Jan. 22, 2026).

29.    The purpose of the Act is "[t]o authorize the National Park Service to coordinate and facilitate Federal and non-Federal activities to commemorate, honor, and interpret the history of the Underground Railroad, its significance as a crucial element in the evolution of the national civil rights movement, and its relevance in fostering the spirit of racial harmony and national reconciliation." Pub. L. 105–203, July 21, 1998, 112 Stat 678 at Section 2(b)(2).

30.    President's House was designated as a Network site by the National Park Service.

31.    On January 22, 2026, the City learned that Defendants, through the National Park Service, had removed educational panels at the President's House site that reference slavery.

32.    These panels have been an integral part of the site since its opening and were included in the site upon its designation as a Network site by the National Park Service.


**V.    CAUSES OF ACTION**


### Count I – APA 5 U.S.C. § 706(2) – Arbitrary and Capricious
*(All Defendants)*

33.    Defendants Department of the Interior and National Park Service are "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). The removal of artwork and informational displays at the President's House site referencing slavery constitutes final agency action subject to review by this Court.

34.     Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

35.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

36.     "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

37.     "An agency acts arbitrarily and capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (*quoting State Farm*, 463 U.S. at 43).

38.     The agreements between Defendants and the City expressly call for explaining the lives of enslaved people living at President's House. (*See, e.g.*, Ex. 1, 2006 Agreement, Background Paragraph E; Ex. 4, Third Amend., Attachment A, Sections I—II).

39.    The interpretive displays relating to enslaved persons at President's House are an integral part of the exhibit and removing them would be a material alteration to the exhibit.

40.    The City had equal right with the NPS under these agreements to approve the final design of the President's House Project. (Ex. 4, Third Amend. Attachment A, Section IV(4) (stating that NPS "will participate in the final review and approval of the Project" (emphasis added))).

41.    The City's right to approve the exhibit's final design, including the interpretive displays, would be meaningless if the NPS could at any time later change or remove the displays without the City's approval.

42.    Moreover, the City's transference of its copyrights in President's House to the NPS did not include the authority to materially alter or destroy altogether the exhibit underlying the copyright.

43.    Although the 2009 Agreement includes a provision requiring the NPS and City to "promptly use their best efforts to resolve the dispute in an informal fashion through communication and consultation, or other forms on non-binding alternative despite resolution that are mutually acceptable to the parties," theDefendants did not engage with the City and do not have the City's approval to make unilateral changes to the President's House exhibit, removing the panels referencing the history of slavery at the property.

44.    Defendants failed to consider their agreements with the City and failed to consider factors that Congress intended them to consider regarding the Underground Railroad Network.

45.    Defendants violated the agreements with the City and have not provided any rationale for their abrupt change in course, rendering their actions arbitrary and capricious and not in accordance with law.

46.    Plaintiff therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other  applicable law, including Defendants' agreements with the City.

## Count II - APA 5 U.S.C. § 706(2) – Arbitrary and Capricious
### *(All Defendants)*

47.    Defendants' actions to remove the panels referencing slavery are arbitrary and capricious because they depart from the National Park Service's longstanding position that the paradox of both slavery and freedom at President's House is worth of preservation and recognition.

48.    Defendants Department of the Interior and National Park Service are "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). The removal of artwork and informational displays at the President's House site referencing slavery constitutes final agency action subject to review by this Court.

49.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

50.    The removal of educational panels referencing slavery is final agency action because it reflects final decisions—in accord with presidential directives—to unilaterally rewrite history to suit the current Administration's preferred narrative.

51.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

52.     "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

53.     "An agency acts arbitrarily and capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (*quoting State Farm*, 463 U.S. at 43).

54.     Defendants have provided no explanation at all for their removal of the historical, educational displays at the President's House site, let alone a reasoned one.

55.     Defendants' actions are contrary to their own "Foundation Document," which describes the plan to manage and preserve the Independence National Historical Park, as well as the content on their own website, both of which expressly state the historical value of the recognizing the paradox between slavery and liberty exemplified by the President's House.

56.     Defendants' actions are also contrary to all evidence before the agency; there is no dispute that slaves resided at President's House or that one of President Washington's slaves escaped from that site.

57.     Plaintiff therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law.

### Count III – APA 5 U.S.C. § 706(2) – Action In Excess of Authority
#### *(All Defendants)*

58.     Defendants' actions to remove the panels referencing slavery are arbitrary and capricious because they lack the authority to remove the panels and the removal directly contradicts Congress's express purpose to preserve and recognize important historical sites of the Underground Railroad.

59.     Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

60.     Defendants may exercise only authority granted to them by statute or the Constitution.

61.     Congress enacted the National Underground Railroad Network to Freedom Act with the express purpose to "recognize the importance of the Underground Railroad, the sacrifices made by those who used the Underground Railroad in search of freedom from tyranny

and oppression, and the sacrifices made by the people who helped them." PL 105–203, July 21, 1998, 112 Stat 678 at Section 2(b)(1).

62.     Congress additionally stated that the purpose of the Act is to "authorize the National Park Service to coordinate and facilitate Federal and non-Federal activities to commemorate, honor, and interpret the history of the Underground Railroad, its significance as a crucial element in the evolution of the national civil rights movement, and its relevance in fostering the spirit of racial harmony and national reconciliation." PL 105–203, July 21, 1998, 112 Stat 678 at Section 2(b)(2).

63.     The Act requires the Secretary of the Interior to "establish" the National Network by designating sites for inclusion and to "produce and disseminate appropriate educational materials, such as handbooks, maps, interpretive guides, or electronic information." 54 USC § 308302.

64.     There is no statutory or other authority for the Secretary to remove and destroy Network sites after designation and doing so runs counter to the express purpose of the Act.

65.     Plaintiff therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants' removal of the interpretative panels referencing slavery at the President's House violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from removing the interpretative panels without complying with the APA.

## VI.     RELIEF SOUGHT

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and grant the following relief:

A.      A declaratory judgment declaring that Defendants' removal of the interpretative panels referencing slavery violates the APA;

B.      An order restoring the President's House Site to its status as of January 21, 2026.

C.      A preliminary injunction enjoining Defendants from taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site and requiring Defendants to take all necessary steps to ensure the safety, security, and preservation of any such items removed from the President's House Site on January 22, 2026.

D.      A permanent injunction prohibiting Defendants from removing the interpretative panels referencing slavery without complying with the APA and all applicable law; and

E.      Any other relief the Court deems just and proper.

Respectfully submitted,


Date:  January 22, 2026                    Renee Garcia, City Solicitor
                                           Anne Taylor, Chair | Litigation
                                           Lydia Furst, Chief Deputy City Solicitor

                                           /s/ Ryan B. Smith
                                           Ryan B. Smith, Divisional Deputy City Solicitor
                                           Bailey Axe, Deputy City Solicitor
                                           City of Philadelphia Law Department
                                           1515 Arch Street, 15th Floor
                                           Philadelphia, PA 19102
                                           (215) 410-8264
                                           Ryan.Smith@phila.gov

                                           Attorneys for Plaintiff City of Philadelphia