# EXHIBITS TO PLAINTIFF THE CITY OF PHILADELPHIA'S COMPLAINT

**Exhibit 1: 2006 Cooperative Agreement**

**Exhibit 2: 2007 First Amendment To Cooperative Agreement**

**Exhibit 3: 2008 Second Amendment To Cooperative Agreement**

**Exhibit 4: 2009 Third Amendment To Cooperative Agreement**

**Exhibit 5: 2015 Assignment Of Intellectual Property Rights**

# EXHIBIT 1

Contract No. 07-6001

# COOPERATIVE AGREEMENT BETWEEN

# THE CITY OF PHILADELPHIA

# AND

# THE NATIONAL PARK SERVICE

## FOR THE PRESIDENT'S HOUSE PROJECT AND ARCHEOLOGICAL RESEARCH DIG

*September 1,*    This COOPERATIVE AGREEMENT (the **"Agreement"**) is made as of this ___ ~~day of~~ 2006 (the **"Commencement Date"**), by and between **THE CITY OF PHILADELPHIA** (the **"City"**), acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA,** acting through the National Park Service of the United States Department of the Interior (the **"NPS"**).

## BACKGROUND

**A.**    On May 24, 1950, the City Council of Philadelphia approved an ordinance authorizing the City to enter into an agreement with the United States of America, by and through the Secretary of the Interior, to establish Independence National Historical Park and to transfer custody of the Independence Hall group of historic structures owned by the City and comprised of Independence Hall, Congress Hall, Old City Hall, and associated historic objects including the Liberty Bell, located in Independence Square in the City, to NPS.

**B.** On July 14, 1950, the City and the Secretary of the Interior entered into an agreement whereby the City authorized the Secretary to occupy the structures exclusively, except as otherwise provided in the July 14, 1950 Agreement, for the purpose of preserving, exhibiting and interpreting the structures and the historic objects to the public and utilizing them and the adjacent grounds for national historic park purposes. A copy of the Agreement dated July 14, 1950, is attached hereto and marked as Exhibit "A".

**C.**    The July 14, 1950 Agreement provides that the purpose of the parties is to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Park and in order to assist in the long term preservation and enhanced interpretation of the Independence National Historical Park and the Liberty Bell (collectively the **"Park"**), the City and NPS have engaged in a variety of cooperative activities including the design and construction of the Liberty Bell Center and related improvements to the Park.

**D.**    The Park (including Independence Hall, classified as a World Heritage Site in 1978) is an international treasure and icon that attracts visitors to Philadelphia from all over the

world and the profile generated by the Park plays a major role in the awareness and economic vitality of the region.

    **E.**    In accordance with the Intergovernmental Cooperation Act, 31 U.S.C. §§ 6501-6508, the City of Philadelphia and the National Park Service desire to establish an exhibit at the Park  that illuminates the history of the site of the former President's House, located directly north of the Liberty Bell Center, (where Presidents George Washington and John Adams lived and where at least nine enslaved Africans – kept by George Washington- also lived) and its symbolic importance to  the founding of the United States (the **"President's House Exhibit"**). The President's House Exhibit, upon completion will be a part of the Liberty Bell Center.

    **F.**    The City and NPS intend to work together to complete the following: i) select a team of artists, designers, historians and other professionals (the **"Exhibit Team"**) to design, fabricate and install the President's House Exhibit; and, ii) construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the **"East West Walkway"**) (collectively referred to herein as the **"Project"**) and have agreed that the City will fund the Project to the extent set forth in this Agreement and contract for the President's House Exhibit.  The City and NPS acknowledge that final Project designs  are subject to the approval of the Superintendent of the Park and the Mayor of the City of Philadelphia, or their designees.

    **G.**    The City has committed One Million Five Hundred Thousand ($1,500,000.00) dollars in capital funding to support the Project (the **"City Funding"**) and One Hundred Forty-Three Thousand Dollars will be transferred to NPS for the East West Walkway.

    **H.**    Prior to installation of the President's House Exhibit, the City and NPS desire to conduct an archeological research excavation (the **"Research Dig"**) at the foot of the Liberty Bell Center at the Presidents' House site within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the Premises for installation of the President's House Exhibit and to determine if any archeological artifacts or features remain from the era in which Presidents Washington and Adams occupied the house and the City and NPS are committed to cooperate in the funding and selection of a qualified professional to conduct such Research Dig in accordance with this Agreement and applicable NPS policy and federal regulations including all applicable federal legislative mandates and agency policy concerning the protection and treatment of cultural resources.

    **I.**    To the extent necessary, the City shall provide funding in addition to the City Funding for the Research Dig and the NPS shall use such funding to conduct the Research Dig in accordance with Section 7 and Exhibit "C".

    **J.**    Any operation of the NPS, with either appropriated or donated funds, must preserve and protect the Park's resources for future generations, consistent with federal law and regulations, 16 U.S.C. §§ 1-3, 407m-8, 407n-407s.

K.    Providing funds for the Project and Research Dig fulfills the public purpose requirement because it enables the City to commemorate the symbolic and historical importance of the Presidents' House for the City of Philadelphia, its citizens and all Americans nationwide, and by doing so, there is a public benefit inuring to the City.

**NOW, THEREFORE,** in consideration of the mutual promises contained in this Agreement, and intending to be legally bound by this Agreement, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16, U.S.C. 407(m) et seq., 16 U.S.C. 461, et seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

1.    **Background.**

The Background is incorporated into the Agreement as though fully set forth herein.

2.    **Ownership of Exhibit.**

Upon completion of the Exhibit in accordance with this Agreement, ownership of the Exhibit shall transfer to the NPS.  NPS ownership of the Exhibit shall survive any termination of this Agreement.  Ownership of the sidewalk and surrounding areas of the Exhibit shall remain with the current property holder.

3.    **Cooperation between NPS and the City.**

a.    The City and NPS shall cooperate in the planning, development and preparation of the design, fabrication and installation of the Exhibit including, but not limited to; (i) the selection of community leaders to assist City and NPS in the Exhibit, (ii) the selection of the Exhibit Team, and (iii) the preparation of completed design, fabrication and installation specifications and budgets, (iv) funding and selection of an archeological firm to conduct the Research Dig, and (v) funding of the East West Walkway. The City and NPS shall be in mutual agreement before issuing any RFP or other solicitation for consultants or design services under this Agreement.

b.    The City shall contract for, fund and pay the costs of the design, fabrication and installation for the Exhibit and provide funding for the East West Walkway except that the City's obligations under this Agreement with respect to the Project shall not exceed, in the aggregate, the City Funding. The City shall provide in any contract it enters into under this provision that the contracting party name the United States of America as an additional insured on any insurance policy and to the extent the City is provided an indemnity by a contracting party then the City shall take all reasonable steps to require that the contracting party extend to the United States of America such indemnity.

4.     **Management & Maintenance of the President's House Exhibit.**

a.     NPS agrees that it shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, interpret and administer the Exhibit, which shall become property of the NPS in accordance with this Agreement and part of the Liberty Bell Center, in accord with current NPS policies and guidelines.

b.     The City, with cooperation of NPS will look for opportunities to utilize the President's House Exhibit for educational purposes.

5.     **Term.**

The initial term of this Agreement shall be for one year beginning upon the date of this Agreement set forth above (**"Initial Term"**).  The City may, at its sole option, amend the contract to add, on an annual basis, up to three (3) successive one-year terms (the **"Additional Term(s)"**).  Unless otherwise stated in any amendment to this Agreement, the same terms and conditions applicable in the Initial Term shall be applicable in the Additional Term(s).  The City shall give the NPS thirty (30) days written notice of its intent to amend the Agreement to add an Additional Term prior to each annual Additional Term.

6.     **Project Funding.**

The City has committed to making the City Funding available for the Project subject to all limitations on the allowability of cost items imposed by the City of Philadelphia Contract Cost Principles and Guidelines.

7.     **Research Dig and East West Walkway Cooperation and Funding.**

a.     Funding:

(i) Research Dig Funding:  The City shall transfer to NPS an initial Six Hundred Seventy-Four Thousand Nine Hundred and Ninety-Three Dollars and Fifty-Seven Cents ($674,993.57) to be used exclusively for the Research Dig (the **"Initial Research Dig Funding"**).  Upon written request and proper documentation provided to the City from NPS, the City shall make an additional Sixty-Seven Thousand Four Hundred Ninety-Nine Dollars ($67,499.00) available to NPS for the Research Dig (the **"Additional Research Funding"**).  The Initial and Additional Research Dig Funding shall be collectively referred to herein as the **"Research Dig Funding"**.  Such Research Dig Funding shall not exceed Seven Hundred Forty-Two Thousand Four Hundred Ninety-Two Dollars and Fifty-Seven Cents ($742,492.57).

(ii) East West Walkway Funding:  Upon written request and proper documentation provided to the City by NPS, the City shall transfer to NPS up to One Hundred Forty-Three Thousand Dollars ($143,000.00) (the **"East West Walkway Funding"**) for the

East West Walkway of the Liberty Bell Center.

(iii) The City shall transfer the Initial Research Dig Funding and East West Walkway Funding to NPS each in separate one lump sums and NPS shall maintain the Initial Research Dig Funding and East West Walkway funding in separate accounts and shall only disburse funds from said accounts in accordance with the terms hereof. The Additional Research Funding, if transferred to NPS, shall be maintained in the Initial Research Dig Funding account.

b.    NPS shall conduct the Research Dig in accordance with the plans and specifications set forth in Exhibit "C" and this Section 7. NPS recognizes the City's expectation to be apprised of all phases of the Research Dig, and the NPS and City acknowledge that the following elements of the Research Dig will require review, comment and mutual agreement by NPS and the City: (i) the archeological firm selected for the Research Dig and their subcontractors; and (ii) the archeologist(s) conducting the Research Dig. Further, NPS shall provide the following to the City for review and comment: (i) descriptions, inventories, and analytic reports concerning any artifacts of historical significance discovered as a result of the Research Dig as such products become available during the course of the project; (ii) draft and final reports, and all other documents resulting from the Research Dig. In the event of a disagreement between the parties concerning the Project, the City and NPS agree to meet and resolve the disagreement between the parties.

c.    NPS shall use reasonable efforts to commence the excavation phase of the Research Dig within ninety (90) days of receipt of the Research Dig Funding and diligently pursue substantial completion of the excavation phase of the Research Dig within one hundred sixty (160) days of receipt of the Research Dig Funding (unless otherwise agreed to by the City). The excavation phase of the Research Dig shall be deemed completed upon the last date that NPS has furnished the following to City: (i) a written statement from the lead archeologist monitoring the Research Dig that the excavation phase of the Research Dig has been completed in accordance with the plans approved by the City and in compliance with Applicable Laws; and (ii) a written statement from NPS's archeologist certifying that the excavation phase has been completed substantially in accordance with the plans.

d.    The City and NPS acknowledge that NPS will enter into various contracts for the Research Dig and East West Walkway, and said contracts will obligate NPS to pay sums to third parties. NPS shall provide to the City a copy of each such fully executed contract related to the Research Dig and East West Walkway. NPS and the City acknowledge and agree that the City's obligation to allocate, transfer, or make disbursements shall be limited to the Research Dig Funding and East West Walkway Funding, and NPS shall disburse such funding in strict accordance with the following terms, conditions and procedures:

(i)  In accordance with NPS payment procedures, NPS shall provide to the City each request for payment (**"Payment Request"**) made to NPS together with all bills, invoices, and/or other documents explaining the services or materials supplied for the Research Dig and East West Walkway and their costs, and such other supporting documents as the City may reasonably request from time to time, and NPS shall not make any payments which exceed the amounts of such bills, invoices and supporting documents;

(ii)  All bills, invoices, or other documents submitted with a Payment Request must be accompanied with a certification signed by the project managers of the Research Dig and East West Walkway stating: (a) the services and materials described in the bill, invoice, or document were satisfactorily received by NPS; (b) the listed price of such services and materials is accurate; and (c) the bill, invoice, or document is accurate and true in all other respects; and

(iii)  No Payment Request may exceed the total dollar amount of all bills, invoices and other supporting documents submitted to the City.  Upon completion of the Research Dig and East West Walkway, NPS shall provide access to the City and the Office of the Controller of the City of Philadelphia ("Office of the Controller") to inspect the work performed and to perform a final audit with respect to the Research Dig Funding and East West Walkway Funding.

e.      NPS shall not use the Research Dig or East West Walkway Funding in any way other than for payment of costs and expenses associated with the Research Dig and East West Walkway that are approved by the City, except insofar as the line item expenditures may be modified by mutual written agreement of the parties. NPS shall use the Research Dig and East West Walkway Funding in conformance with the City's Capital Eligibility Policy, in effect upon execution of this Agreement, a copy of which is attached as Exhibit B and is made a part hereto. The provisions of Exhibit B require the written approval of the City of Philadelphia Capital Program Office for the use and prior to the obligation of City capital funds for expenditures not clearly eligible according to the criteria of the City's Capital Eligibility Guidelines. Execution of this Agreement by the City shall constitute such written approval for the Research Dig and East West Walkway.

f.      The City and NPS understand and agree that the Research Dig Funding is solely available for the Research Dig, and any modifications to the scope of the Research Dig may be made only after obtaining written approvals from the City.

g.      Promptly following the substantial completion of the Research Dig or expiration or termination of this Agreement, NPS shall promptly return to City any Research Dig Funding not actually spent by NPS on the Research Dig.

h.      The City and NPS understand and agree that the East West Walkway Funding is solely available for the East West Walkway, and any modifications to the scope of

the East West Walkway may be made only after obtaining written approvals from the City.

        i.     Promptly following the substantial completion of the East West Walkway or expiration or termination of this Agreement, NPS shall promptly return to City any East West Walkway Funding not actually spent by NPS on the East West Walkway.

## 8.    Review and/or Concurrence of Plans.

        The City's review, concurrence, and/or acceptance of any plans and specifications shall not constitute any representation, warranty or guaranty by City as to the substance or quality of the documents, or other matter or work reviewed, approved or accepted with respect to the Project or Research Dig. No person or firm should rely in any way on such approval, and at all times, NPS, its agents, contractors and subcontractors, must use their own independent judgment as to the accuracy and quality of all such documents and other matters.

## 9.    Research Dig Records and Reports.

        a.    Maintenance of Records. NPS shall keep full, complete, and accurate books of account and other records in accordance with generally accepted accounting principles and promptly make them available for inspection and audit by the City or its designee, within the City of Philadelphia upon the City's request. Without limiting this Section 9, NPS shall keep detailed accounts of all its expenditures on the Research Dig, including but not limited to itemization of all costs related to the Project.

        b.    Inspection by City. The City or its duly authorized representative shall have the right at all reasonable times and places to inspect and audit the NPS' books of account and other records maintained as required by this Agreement.

        c.    Annual Account, Reports. NPS shall submit to the City, within 60 days after the completion of the Research Dig in accordance with this Agreement, a report which includes a description of the activities undertaken by NPS on, or with respect to, the Research Dig. In addition, NPS shall promptly submit to the City written reports regarding the activity and progress of the Research Dig. NPS shall submit minutes of regular progress meetings conducted during the design and construction phases of the Research Dig to the City to satisfy this reporting requirement.

## 10.    Assignment; Third Party Beneficiaries.

        a.    Assignment. NPS may not assign any of its rights or delegate any of its responsibilities under this Agreement to any entity without the express written consent of the City.

        b.    Third Party Beneficiaries. In no event shall anything in this Agreement confer upon any other person or entity third party beneficiary rights against the City.

11.    **Default; Remedies.**

    a.    NPS shall be in default of this Agreement if it shall:

    (i)  fail to comply with any of the terms and conditions of this Agreement, including but not limited to utilizing the Research Dig Funding solely as required and set forth in this Agreement. If such failure continues for twenty (20) days after written notice thereof to NPS, provided, however, that if the nature of the default is such that the same cannot reasonably be cured within such twenty (20) day period, NPS shall not be deemed to be in default if NPS shall within such period commence such cure and thereafter diligently prosecutes the same to completion, but in no event for longer than forty-five (45) days after written notice to NPS; or

    (ii)  vacate or abandon the Research Dig prior to its completion.

    b.    Upon the occurrence of any event of default set forth in this Section or elsewhere in this Agreement, the City may take all or any of the following actions:

    (i)  immediately declare this Agreement terminated;

    (ii)  suspend all allocations, disbursements and payments of the Research Dig Funding to NPS; and/or

    (iii)  exercise any and all other remedies available at law, equity, and/or under this Agreement.

    c.    Within ten (10) days of the termination or cancellation of this Agreement by the City for any reason, NPS shall remit to the City a complete accounting of all Research Dig Funding monies received pursuant to this Agreement by NPS, and NPS will return to City all Research Dig Funding which has not been actually spent on or invoiced for the Research Dig. Final statements for payment must be submitted within sixty (60) days of termination.

    d.    No failure by the City to insist upon the strict performance of any term, covenant, agreement, provision, condition or limitation of this Agreement or to exercise any right or remedy consequent upon a breach of this Agreement, and no acceptance by the City of full or partial performance during the continuance of any such breach, shall constitute a waiver of any such breach or of such term, covenant, agreement, provision, condition or limitation. No breach may be waived except by a written instrument signed by the City. This Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach of this Agreement notwithstanding any waiver or a breach by the City.

## 12.    Indemnification.

a.    NPS shall cause its contractors, subcontractors, invitees or consultants to indemnify and hold harmless the City, and its officers, directors, employees and agents from and against any and all losses, claims, actions, damages, costs, expenses (including but not limited to court costs and attorney's fees), liabilities, and judgments, including but not limited to those in connection with loss of life, bodily injury, personal injury, or damage to property including but not limited to the Research Dig, directly or indirectly related to this Agreement, including without limitation the violation of any Applicable Law (defined below in Section 16), and/or occasioned wholly or in part by the negligence or fault of NPS's agents, contractors, subcontractors, invitees or consultants, relating to or arising from the Research Dig, and/or this Agreement. NPS contractors, subcontractors, invitees or consultants shall not be required to indemnify or hold harmless the City, its officers, directors, employees or agents from any claim resulting solely and exclusively from the independent negligent acts or omissions of the City, its officers, directors, employees or agents acting within the scope of their official duties.

b.    If any action or proceeding is brought against City by reason of any such claim, NPS shall cause its contractors, subcontractors, invitees or consultants, upon written notice from the City, at their sole cost and expense, including without limitation attorneys' fees and court costs, resist or defend such action or proceeding by counsel approved by the City in writing. No approval of counsel shall be required where the claim is resisted or defended by counsel of an insurance carrier obligated to resist or defend such claim.

c.    The indemnification obligations set forth in this Section 11 and the release by NPS set forth below in Section 12 survive the termination or expiration of this Agreement. These indemnification obligations and the release indemnification shall not be limited, reduced or modified by the types or amounts of insurance required by this Agreement.

## 13.    Research Dig Release.

a.    Except to the extent set forth herein, NPS shall release City, its officers, officials, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, or liabilities of every kind which NPS may have at any time arising in connection with the Research Dig.

b.    The City shall have no liability arising in connection to the Research Dig to NPS or any one claiming through or under NPS, except for the negligent acts of the City or for the City's failure to transfer or disburse Research Dig Funding to NPS.

## 14.    Insurance & Bonds.

a.    During the Research Dig, NPS shall cause its contractors and suppliers to maintain in full force the types and minimum limits of insurance specified below. All

insurance shall be obtained from reputable insurers authorized to do business in the Commonwealth of Pennsylvania and, except for professional liability insurance, shall be written on an "occurrence" basis and not a "claims made" basis. No work shall be performed pursuant to this Agreement until the required evidence of insurance has been furnished. The insurance company(ies) shall provide, by United States registered or certified mail, return receipt requested, postage paid, at least thirty (30) days prior written notice to the City in the event coverage is materially changed, canceled, or non-renewed. Certificates of insurance evidencing the required coverage shall be submitted to the Capital Program Director (1515 Arch Street, 11th Floor, Philadelphia, PA 19102) and the City's Risk Manager (1515 Arch Street, 14th Floor, Philadelphia, Pennsylvania 19102) upon execution of any of the contracts relating to the Research Dig. The City reserves the right to require NPS to furnish certified copies of the original policies of all insurance required under this Agreement at any time upon ten (10) days prior written notice to NPS. The City shall be named as additional insured on all the insurance policies required by this Agreement except the Workers Compensation and Employers Liability.

    (i)    <u>Workers Compensation And Employers Liability</u>

        (1)    Workers Compensation Statutory limits.
        (2)    Employer's Liability:
            (i)    One hundred thousand dollars ($100,000.00)
            (ii)    One hundred thousand dollars ($100,000.00) each employee - bodily injury by disease.
            (iii)    Five hundred thousand dollars ($500,000.00) policy limit - bodily injury by disease.

    (ii)    <u>Comprehensive General Liability Insurance</u>

        (1)    Limit of Liability - One Million Dollars ($1,000,000.00) per occurrence combined single limit for bodily injury (including death) and property damage liability.

        (2) Coverage: Premises operations; blanket contractual liability; personal injury liability (employee exclusion deleted); products and completed operations; independent contractors; employees as additional insureds; cross liability; broad form property damage (including loss of use) liability; and explosion, collapse, and underground hazards, care custody and control exemption excluded.

    (iii)    <u>Automobile Liability</u>

        (1) Limit of Liability - One Million Dollars ($1,000,000.00) per

occurrence combined single limit for bodily injury (including death) and property damage liability.

   (iv)   <u>Umbrella Liability</u>

       (1) Limit of liability: Minimum limits of Five Million Dollars ($5,000,000.00) per occurrence combined single limit for bodily injury (including death) and property damage liability in excess of subsections (ii) comprehensive general liability and (iii) automobile liability to bring total limit of liability to Six Million Dollars ($6,000,000.00).

   (v)   <u>Professional Liability Insurance for Architectural and Engineering Services</u>

       (1)   Limit of Liability: Two Million ($2,000,000) with a deductible not to exceed Fifty Thousand Dollars ($50,000).

       (2)   Coverage: Errors and omissions including liability assumed under contract.

       (3)   Coverage for occurrences happening during the performance of the services required under this Agreement shall be maintained in full force and effect under the policy or "tail" coverage for a period of at least two (2) years after completion of the services.

       (4)   This insurance shall be obtained and maintained by the architects and engineers only, and each shall so obtain and maintain such insurance for the amount of its contract.

   (vi)   <u>Builders Risk Insurance</u>

       (1)   During the period of the Project, NPS shall require its contractor to maintain "all risk" builder's risk insurance in an amount equal to the anticipated completion value of the Project under construction or the amount of each contractor's or subcontractor's contract. The coverage will be required to remain in full force and effect during the construction of the Project.

    b.   Performance and Payment Bonds. In addition to the insurance requirements as provided in this Section, NPS shall require its contractor(s) to maintain individual and corporate performance and payment bonds commensurate with the value of the work to be completed prior to the commencement of construction and value of all wages for labor and services and all bills for materials, supplies and equipment used in the performance of any such construction contract.

c. The requirements of this Section 14 may be modified at the discretion of NPS and the City.

15.    **Binding on Successors.**

The terms, covenants and conditions contained in this Agreement shall extend to and be binding upon the parties hereto and their respective successors and assigns.

16.    **Governing Law: Waiver of Jury Trial.**

a.    This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania and the United States of America.

b.    City and NPS mutually waive the right to a jury trial in any action under this Agreement.

17.    **Compliance with Applicable Law.**

Throughout the term of this Agreement, NPS will observe and comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, courts, departments, commissions, boards or any other body exercising functions similar to those of any of the foregoing (the "Applicable Law"), which may be applicable to NPS, the National Park System, the Project, or the Agreement.

18.    **Anti-Deficiency Act.**

This Agreement and the obligations of the NPS hereunder shall be subject to the availability of funding, and nothing contained herein shall be construed as binding the NPS to expend in any one fiscal year any sum in excess of appropriations made by Congress or administratively allocated for the purpose of this Agreement for the fiscal year, or to involve NPS in any contract or other obligation for the further expenditure of money in excess of such appropriations or allocations.

19.    **Notices.**

All notices, requests, and other communications under this Agreement shall be in writing and shall be sent by United States registered or certified mail, return receipt requested, postage prepaid, or by overnight or hand delivery service with receipt requested, or by facsimile followed by hard copy forwarded as aforesaid and addressed as follows:

If addressed to the City:

>Office of the Mayor
>City Hall
>Philadelphia, PA 19102
>Attention: Chief of Staff

with copies to:

>City Solicitor
>City of Philadelphia
>1515 Arch Street, 17th Floor
>Philadelphia, Pa 19102
>Attention: Divisional Deputy - Real Estate and Economic Development Notices for Construction Related Matters

and

>Capital Program Office
>City of Philadelphia
>1515 Arch Street, 11th Floor
>Philadelphia, PA 19102
>Attention: Richard Tustin, Director

If addressed to NPS:

>Superintendent of National Park Services
>313 Walnut Street
>Philadelphia, PA 19106

Or such other individual and/or address as the party to receive notice may from time to time designate by written notice to the other party in the manner above described.

20.    **Entire Agreement.**

This Agreement represents the entire agreement between the parties regarding the Project and Research Dig. Nothing contained herein shall be interpreted as amending or modifying the terms and conditions of the Agreement dated July 14, 1950, between the City and the Secretary of the Interior. This Agreement may be amended only by a written instrument mutually agreed upon and signed by the City and NPS.

21.    **Nondiscrimination.**

The City and NPS agree that neither party shall discriminate, nor permit discrimination, against any person because of race, color, religion, national origin or sex.  In the event of such discrimination, this agreement may be terminated by the non discriminating party forthwith.

{SIGNATURE PAGE ON FOLLOWING PAGE.}

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this Agreement, the City and NPS have caused this Agreement to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Romulo L. Diaz, Jr.

Per: _____
Assistant City Solicitor

**THE CITY OF PHILADELPHIA:**
**THE OFFICE OF THE MAYOR**

By: _____
Joyce Wilkerson, Chief of Staff
Office of the Mayor

**CAPITAL PROGRAM OFFICE**

By _____
Richard Tustin, Director
Capital Program Office

**NATIONAL PARK SERVICE:**

By: _____
Dennis Reidenbach, Superintendent
Independence National Historical Park

# EXHIBIT "A"

**1950 Agreement**

THIS AGREEMENT, made and entered into this ____ 14th ____ day of ____ July ____, 1950, by and between the United States of America, acting in this behalf by Oscar L. Chapman, Secretary of the Interior, hereinafter referred to as the "Secretary," party of the first part, and the City of Philadelphia, Commonwealth of Pennsylvania, hereinafter referred to as the "City," party of the second part.

WITNESSETH:

WHEREAS, the Independence Hall group of historic structures comprising Independence Hall, Congress Hall, Old City Hall, and associated historic objects, located in Independence Square in the City of Philadelphia, Commonwealth of Pennsylvania, are recognized as possessing national significance as associated with, or the scene of, the adoption of the Declaration of Independence by the Continental Congress, the meeting place of that Congress, and seat of Government of the United States during the Revolution and during the period 1790-1800, as well as the meeting place of the Constitutional Convention of 1787; and

WHEREAS, the act of Congress approved June 28, 1948 (62 Stat. 1061) has provided for the establishment of the Independence National Historical Park for the purpose of preserving for the benefit of the American people the above-named and other nationally important historic lands and structures in Philadelphia, Pennsylvania, associated with the American Revolution and the founding and growth of the United States; and

WHEREAS, the Council of the City of Philadelphia by ordinance approved the 24th day of May 1950, has authorized the Mayor to execute and deliver this agreement on behalf of the City; and

WHEREAS, the Secretary in all matters hereinafter referred to will act through the National Park Service or such other body as may be legally substituted therefor; and

WHEREAS, it is the desire of the City to bring about the preservation of the said historic structures, objects, and grounds in Independence Square as a national historical park that they may be devoted to public use and to the perpetuation of the greatest traditions of the United States of America: and

WHEREAS, it is the desire of the Secretary to cooperate with the City in preserving the integrity of the above-mentioned historic structures, objects, and area, and to interpret them to the American people as a great national heritage:

NOW, THEREFORE, in consideration of the foregoing and pursuant to the authority contained in the act of Congress approved August 21, 1935 (49 Stat. 666), entitled "An Act to Provide for the Preservation of Historic American Buildings, Objects, and Antiquities of National Significance, and for Other Purposes," and the act of Congress approved June 28, 1948 (62 Stat. 1061), entitled "An Act to Provide for the Establishment of the Independence National Historical Park, and for Other Purposes," the said parties have covenanted and agreed, and by these presents do covenant and agree to and with each other and in consideration of the mutual promises herein expressed, as follows:

ARTICLE I.  The City will retain ownership of the Independence Hall group of structures and of the land whereon they are erected, and the park area adjacent thereto known as Independence Square, but hereby agrees:

(a)  To permit the Secretary to occupy them exclusively, except as otherwise provided herein, during the term of this agreement for the purpose of preserving, exhibiting, and interpreting them to the American people and otherwise utilizing them and their adjacent grounds for national historical park purposes.

(b)  To permit the Secretary to have curatorial responsibility for the care and display of such museum objects, furnishings, or exhibits of historic interest as may be available in the Independence Hall group of buildings for exhibit and interpretive purposes, including the right to rearrange furniture and exhibits and to determine accession policy for items to be utilized in the museum or interpretive program.

(c)  To supply customary municipal services, including police and fire protection, and water and sewer facilities without charge therefor.

ARTICLE II.  The Secretary hereby agrees, on behalf of the United States:

(a)  That he will occupy the grounds and buildings for the purposes set forth in Article I of this agreement, and for no other purposes, and that he will not sublet or assign to another person or organization any part of the grounds or buildings without prior approval in writing by the City; that he will (as funds become available through appropriations by the Congress) operate and maintain the grounds and buildings and make all repairs thereto; remedy all defects in the buildings or their equipment which may arise from any cause whatsoever,

including ordinary wear and tear; and undertake such work of restoration
or major alteration as may be mutually agreed upon under the provisions
of Article III (c).

The Secretary may apply such reasonable rules and regulations
therein as may be necessary properly to perform his functions.

(b) That he will exercise reasonable care to prevent damage
to, or destruction of, any part of the grounds and buildings or their
appurtenances.

(c) That he will provide public access to the museum room
of the buildings at all reasonable times, and will provide the serv-
ices of a competent person, or persons, to furnish information to the
visiting public.

ARTICLE III.  It is mutually understood and agreed:

(a)  That nothing herein contained shall be construed as
binding the Secretary to expend in any one fiscal year any sum in
excess of appropriations made by Congress for that fiscal year, or
to involve the United States in any contract or other obligation for
the future expenditure of money in excess of such appropriations.

(b)  That it is desirable to maintain, insofar as practicable,
the existing personnel of the City of Philadelphia which has for many
years exhibited and interpreted the Independence Hall group of struc-
tures and has acquired an intimate knowledge of the history of the
buildings as well as visitor reactions to them; that toward this end
the Secretary and the City will seek such legislation, ordinances, or
other authority necessary to facilitate the continued employment of
this experienced staff without serious loss of retirement benefits to
the individuals concerned.

In order to effectuate this objective when the necessary authority shall have been obtained:

(1)  The Secretary will employ such members of the present staff as are then below the age provided for automatic separation under the Federal Civil Service Retirement Act, and who have paid into the Municipal Pension Fund less than ten years or more than fifteen years.

(2)  Those members of the present staff who are then above the age provided for automatic separation under the Federal Civil Service Retirement Act and who have paid into the Municipal Pension Fund less than ten years or more than fifteen years shall be retired.

(3)  Those members of the present staff who have paid into the Municipal Pension Fund not less than ten years and not more than fifteen years shall continue to be employed by the City until they shall have severally completed fifteen years employment.  As each arrives at such point, he shall be retired if beyond the age provided for automatic separation under the Federal Civil Service Act, but otherwise he shall be employed by the Secretary: Provided that during the period of employment by the City, the City will place these employees at the disposal of the Secretary, who will reimburse the City for their salaries: Provided, further, that nothing herein contained shall obligate the City or the Secretary to retain the services of an incompetent or unfaithful employee.  Any future replacements of, or additions to, the existing personnel will be made by the employment of persons directly by the Secretary and at his option.

(c)  Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon.

(d)  That neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the buildings or grounds without the written consent of the other.  This section shall not be construed as prohibiting the placing of signs within the buildings for the information and direction of the public.  The design and location of any signs upon the exterior of the buildings to indicate that they are occupied and operated by the National Park Service acting in cooperation with the City, shall be subject to the approval of the City.

(e)  That it is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States, and to secure this result a high degree of cooperation is necessary with each other and with other bodies participating in the project, to wit, the Commonwealth of Pennsylvania, Christ Church, Carpenters' Company of Philadelphia, and Independence Hall Association, and the parties hereto pledge themselves to consult on all matters of importance to the program.

(f)  That nothing herein contained shall be held to deprive the Commonwealth of Pennsylvania or the City of Philadelphia of its civil and criminal jurisdiction in and over the said grounds and buildings.

(g)  That wherever in this agreement the Secretary is referred to, the term shall include his duly authorized representative or representatives.

sioner shall be admitted to any share or part of this agreement or to any benefit that may arise therefrom, but this restriction shall not be construed to extend to this agreement if made with a corporation or company for its general benefit.

(i) Upon the execution of this agreement, the present agreement between the parties hereto, dated March 25, 1943, providing for the designation of the Independence Hall Group as a national historic site, shall be terminated: Provided that the designation shall remain in effect until the establishment of the Independence National Historical Park.

(j) This agreement shall become effective upon its execution, but occupation, operation, and maintenance by the Secretary in accordance with Article II shall begin on July 1, 1950, or as soon thereafter as practicable. It shall continue in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination.

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals (in quintuple) the day, month, and year aforesaid.

UNITED STATES OF AMERICA

By /s/ Oscar L. Chapman
Secretary of the Interior

CITY OF PHILADELPHIA

By /s/ Bernard Samuel
Mayor

COMMONWEALTH OF PENNSYLVANIA )
                                                          :          SS:
CITY AND COUNTY OF PHILADELPHIA )

BE IT REMEMBERED, That on this          day of          A.D.
1950, before me, the subscriber, a notary public in and for the Common-
wealth of Pennsylvania, residing in the City of Philadelphia, personally
appeared Bernard Samuel, personally known to me and to me known to be:
the Mayor of the City of Philadelphia, who being duly sworn according to
law, deposes and says that he resides in the City of Philadelphia and is
the Mayor of the said City; that he affixed the seal of the said City of
Philadelphia hereto; that the seal so affixed hereto is the common or
corporate seal of the said City of Philadelphia; that the said agreement
was duly sealed and delivered by him as and for the act and deed of the
City of Philadelphia for the uses and purposes therein set forth; that
the said agreement was executed by him and the seal of the City of
Philadelphia affixed thereto under and by the authority of the ordinance
of Council approved on the 6th day of July A.D. 1949; that he signed his
name thereto by the same authority, and that the name of this deponent
subscribed to the said agreement as Mayor of the said City of Phila-
delphia in attestation of the due execution thereof is in deponent's
own proper handwriting.

/s/ Bernard Samuel
BERNARD SAMUEL

Sworn and subscribed before me the day and year aforesaid.
Witness my hand and notarial seal.

/s/ John W. Summers
Notary Public

Notary Public
My Commission Expires April 23rd, 1953

# EXHIBIT "B"

**City of Philadelphia Capital Expenditure Eligibility Guidelines**

POLICY STATEMENT          Issued March, 1992
EXPENDITURE ELIGIBILITY GUIDELINES
FOR CAPITAL FUNDING

The following guidelines provide criteria for determining whether expenditures or obligations can be funded through capital budget loan funds. They do not apply to capital appropriations funded from other than loan sources.

If a department/agency contemplates the use of capital funding for any expenditure that is not clearly eligible according to these criteria, it must contact the Capital Program Office for written approval prior to obligating funds. The Capital Program Office will review the request in conjunction with the City Controller's Office and the Accounting Bureau.

Generally, expenditures that result in the acquisition, construction or improvement of City owned tangible assets are eligible for capital funding:

- **Acquisition** refers to the purchase of land, buildings, equipment or machinery for City ownership:

  1. The cost of preparing plans and specifications, obtaining appraisals and legal assistance directly related to acquisition is an eligible capital expenditure. Planning studies, including master plan studies and feasibility studies, may be considered to be eligible for capital funding when such studies are an intrinsic part of a design or appraisal process which is required prior to acquisition of a tangible asset. Generally, studies funded through the capital budget must generate preliminary plans and acquisition cost estimates. Studies which are primarily focused upon improving operating performance are to be funded through the operating budget. Although a study may have a bearing on the ultimate design or specifications of a capital project, if its goal is to improve, consolidate, expand or otherwise change operations, it should not be funded through the capital budget.

  2. Equipment or machinery purchased with capital funds must have a useful life of at least 5 years and must cost at least $7,500. This requirement will normally exclude the use of capital funds to purchase office supplies and equipment. For example, stand alone personal computers (microcomputers or PC's) could not be purchased through loan funds. However, capital funds may be used to purchase minicomputers, mainframes and local area network (LAN) systems.

  3. Although vehicles might ordinarily be considered as equipment that is eligible for capital funding, current City policy requires that these purchases be made through The Philadelphia Municipal Authority.

2

**POLICY STATEMENT**                    Issued March, 1992
**EXPENDITURE ELIGIBILITY GUIDELINES**
**FOR CAPITAL FUNDING**

- **Construction** refers to building, erecting or installing tangible assets that are owned by the City:

  1. Construction funded by the capital budget must result in the creation of a tangible asset with a useful life that is at least 5 years and cost at least $7,500.

  2. The cost of preparing plans and specifications that are required for construction purposes is an eligible capital expenditure. Planning studies, including master plan studies and feasibility studies, may be considered to be eligible for capital funding when such studies are an intrinsic part of a design process which is required prior to construction of a tangible asset. Generally, studies funded through the capital budget must generate preliminary plans and construction cost estimates. Studies which are primarily focused upon improving operating performance are to be funded through the operating budget. Although a study may have a bearing on the ultimate design or specifications of a capital project, if its goal is to improve, consolidate, expand or otherwise change operations it should not be funded through the capital budget.

  3. The cost of soil tests, borings and other architectural or engineering tests required to assure competent construction is an eligible capital expenditure.

  4. When constructing new facilities, the necessary cost of purchasing furniture and equipment to operate the facility may be an eligible capital expenditure. In these cases, the furniture and equipment must be durable items with a life expectancy in excess of 5 years and the department must obtain Capital Program Office approval prior to the purchase.

  5. Site preparation expenditures, such as demolition, that are directly attendant to a construction project, are eligible for capital funding. The removal of and/or testing for hazardous materials (including, but not limited to, PCB's and asbestos) is eligible for capital funding when directly related to an otherwise eligible construction project.

- **Improvements** refers to renovation, rehabilitation or reconstruction of buildings, structures, parkland, machinery, equipment or other tangible assets owned by the City. This includes landscape and pathway improvements to City owned public space.

  1. Improvements funded by the capital budget must result in extending the useful life of a building, structure, equipment, machinery or other tangible

3          **POLICY STATEMENT**          Issued March, 1992
      **EXPENDITURE ELIGIBILITY GUIDELINES**
           **FOR CAPITAL FUNDING**

asset by at least 5 years and cost at least $7,500. This would exclude
expenditures for routine maintenance and repairs which may not be funded
through loan funds. For an improvement to be eligible for capital funding,
it must substantially increase the asset value of the improved tangible asset
and the improvement must have an expected life of at least 5 years. Projects
which merely maintain or repair an asset cannot be funded through loan
funds. This definition would specifically exclude the use of loan funds to
clean and seal buildings. It would also exclude the use of capital funds to
repair tangible assets even when those repairs require major expenditures.
The project must substantially improve the asset and extend its useful life,
beyond that inherent in its original design. Periodic overhauls or
maintenance, as required to maintain the equipment or machinery as
originally designed, are not eligible for capital funding.

2.  Generally, improvement projects on property not owned by the City are not
    eligible for capital funding. However, under existing laws, the City is
    permitted to use capital funds for reconstruction or replacement of curbs and
    sidewalks located within the legally open right of way in conformance with
    The City Plan. Although the City has an interest in the sidewalks which
    allows it to use loan funds for their reconstruction or replacement, the City,
    given its limited resources, must establish reasonable criteria to determine
    when it will use its capital funds to reconstruct or replace pedestrian
    pathways on property not owned by the City. The following criteria have
    been established as a policy matter to determine when a sufficient public
    purpose, beyond the public interest served by reconstructing or replacing the
    pedestrian right of way, would be served by a curb and sidewalk project to
    warrant its funding through the capital budget:

    a.  The site improvement project must be an integral component of
        a housing development or redevelopment project which has been
        approved by OHCD, or a commercial development or
        redevelopment project, which has been approved by the
        Commerce Department, or a street improvement project approved
        by the Streets Department or a water/sewer improvement project
        approved by the Water Department. To be eligible for capital
        funding, the site improvements must be incidental to a project
        which calls for revitalization of streets, water utilities, housing or
        commercial development and, ideally, eligible projects will
        leverage significant state, federal and/or private investment. Site
        improvements on property that is not owned by the City will not

4

**POLICY STATEMENT**                                      Issued March, 1992
**EXPENDITURE ELIGIBILITY GUIDELINES**
**FOR CAPITAL FUNDING**

be eligible for capital funding unless they are incidental to a much
broader public improvement project as indicated above. Site
improvements that are part of a normal maintenance or repair
activity cannot be funded through the capital budget. Pursuant to
Section 11-503 of The Philadelphia Code the cost for normal
maintenance or repair of sidewalks and curbs is generally
assessed to the abutting land owner.

and

b. The site improvement project and its attendant housing, streets,
water/sewer, or commercial development or redevelopment plan
must be reviewed and approved by both the Capital Program
Office and the City Controller's Office. In order to be approved,
the plan must, as a minimum, describe how the area or
neighborhood targeted by the plan has previously deteriorated and
how implementation of the plan will arrest and reverse that
deterioration.

c. During the capital budget development process, when departments
are requesting site improvement project funding through the City
Planning Commission, the development or redevelopment plan
referred to above must be included for consideration. In order to be
included in the annual Recommended Capital Budget, the plan must
as a minimum describe how the area or neighborhood targeted by
the plan has previously deteriorated and how implementation of the
plan will arrest and reverse that deterioration.

3. The cost of preparing plans and specifications that are required for
improvement purposes is an eligible capital expenditure. Planning studies,
including master plan studies and feasibility studies, may be considered to
be eligible for capital funding when such studies are an intrinsic part of a
design process which is required prior to improving a tangible asset.
Generally, studies funded through the capital budget must generate
preliminary plans and construction cost estimates. Studies which are
primarily focused upon improving operating performance are to be funded
through the operating budget. Although a study may have a bearing on the
ultimate design or specifications of a capital project, if its goal is to
improve, consolidate, expand or otherwise change operations it cannot be
funded through the capital budget.

5

POLICY STATEMENT      Issued March, 1992
EXPENDITURE ELIGIBILITY GUIDELINES
FOR CAPITAL FUNDING

4. The cost of soil tests, borings and other architectural or engineering tests required to assure competent improvement implementation is an eligible capital expenditure.

5. When completing a major facility rehabilitation or renovation, the necessary cost of purchasing furniture and equipment to operate the facility may be an eligible capital expenditure. In these cases, the furniture and equipment must be durable items with a life expectancy in excess of 5 years and the department must obtain Capital Program Office approval prior to the purchase..

6. Site preparation expenditures, such as demolition, that are directly attendant to an improvement project, are eligible for capital funding. The removal of and/or testing for hazardous materials (including, but not limited to, PCB's and asbestos) is eligible for capital funding when directly related to making an otherwise eligible capital improvement. Finally, demolition may be eligible for capital funding when it is undertaken to create or expand available public space for park or recreation purposes.

If a department/agency wishes to request modifications to the above guidelines, it should submit a written request specifying the change to the Capital Program Office, the Accounting Bureau and the City Controller's Office.

# EXHIBIT "C"

## Detailed Summary of NPS use of Research Dig Funding for the Research Dig

# GOVERNMENT ESTIMATE
# ARCHEOLOGICAL SERVICES
# INDEPENDENCE NATIONAL HISTORICAL PARK
# ARCHEOLOGICAL INVESTIGATION OF THE
# PRESIDENT'S HOUSE SITE

## A. LABOR

| Labor Category | Wage Rate | Hours | Cost | |
|---|---|---|---|---|
| **Task 1: Logistics and Planning** | | | | |
| Senior Archeologist - GS 13/5 | $59.08 | 72 | $4,253.76 | |
| Project Archeologist - GS12/5 | $49.69 | 90 | $4,471.74 | |
| Civil Engineer - GS 14/5 | $69.82 | 144 | $10,054.08 | |
| Task Sub-Total | | 306 | ===> | $18,779.58 |
| | | | | |
| **Task 2: Bulk Excavation** | | | | |
| Senior Archeologist - GS 13/5 | $59.08 | 36 | $2,126.88 | |
| Project Archeologist - GS12/5 | $49.69 | 32 | $1,589.95 | |
| Civil Engineer - GS 14/5 | $69.82 | 36 | $2,513.52 | |
| Field Tech. Archeologist - GS11/5 | $41.45 | 144 | $5,969.38 | |
| Surveyor - GS 11/5 | $41.45 | 36 | $1,492.34 | |
| Task Sub-Total | | 284 | ===> | $13,692.07 |
| | | | | |
| **Task 3: Controlled Excavation** | | | | |
| Senior Archeologist - GS 13/5 | $59.08 | 216 | $12,761.28 | |
| Project Archeologist - GS12/5 | $49.69 | 108 | $5,366.09 | |
| Civil Engineer - GS 14/5 | $69.82 | 108 | $7,540.56 | |
| Field Tech. Archeologist - GS11/5 | $41.45 | 864 | $35,816.26 | |
| Surveyor - GS 11/5 | $41.45 | 378 | $15,669.61 | |
| CAD Operator - GS12/5 | $49.69 | 72 | $3,577.39 | |
| Task Sub-Total | | 1746 | ===> | $80,731.19 |
| | | | | |
| **Task 4: Site Restoration** | | | | |
| Project Archeologist - GS12/5 | $49.69 | 36 | $1,788.70 | |
| Field Tech. Archeologist - GS11/5 | $41.45 | 54 | $2,238.52 | |
| Civil Engineer - GS 14/5 | $69.82 | 36 | $2,513.52 | |
| Task Sub-Total | | 126 | ===> | $6,540.73 |
| | | | | |
| **Task 5: Laboratory Processing, Cataloging, and Analysis** | | | | |
| Senior Archeologist - GS 13/5 | $59.08 | 180 | $10,634.40 | |
| Project Archeologist - GS12/5 | $49.69 | 396 | $19,675.66 | |
| Photographer - GS12/5 | $49.69 | 135 | $6,707.61 | |

| | | | |
|---|---|---|---|
| Materials Specialist - GS 12/5 | $49.69 | 828 | $41,140.01 |
| Lab Tech. Archeologist - GS 11/5 | $41.45 | 828 | $34,320.60 |
| **Task Sub-Total** | | 2367 | ======> $112,478.27 |

**Task 6: Technical Report Preparation**

| | | | |
|---|---|---|---|
| Senior Archeologist - GS 13/5 | $59.08 | 216 | $12,761.28 |
| Project Archeologist - GS12/5 | $49.69 | 486 | $24,147.40 |
| Photographer - GS12/5 | $49.69 | 72 | $3,577.39 |
| Materials Specialist - GS 12/5 | $49.69 | 486 | $24,147.40 |
| Lab Tech. Archeologist - GS 11/5 | $41.45 | 486 | $20,144.70 |
| Editor - 12/5 | $41.45 | 108 | $4,476.60 |
| CAD Operator - GS12/5 | $49.69 | 144 | $7,154.78 |
| Graphics - 12/5 | $49.69 | 216 | $10,732.18 |
| **Task Sub-Total** | | 2214 | ======> $107,141.72 |

| | | | |
|---|---|---|---|
| **Labor Sub-Total** | | | ======> **$339,363.57** |

## B. DIRECT EXPENSES

| Category | Unit Cost | Units | Cost | |
|---|---|---|---|---|
| **Task 1: Logistics and Planning** | | | | |
| Reproduction | $0.35 | 500 | $175.00 | |
| Express Shipping (per package) | $12.00 | 10 | $120.00 | |
| **Task Sub-Total** | | | ======> | $295.00 |
| | | | | |
| **Task 2: Bulk Excavation** | | | | |
| Film & Processing (per roll) | $38.00 | 7 | $266.00 | |
| Field Supplies (per week) | $50.00 | 3 | $150.00 | |
| Excavation/Shoring Sub-Contract | | | $183,000.00 | |
| **Task Sub-Total** | | | ======> | $183,416.00 |
| | | | | |
| **Task 3: Controlled Excavation** | | | | |
| Conservation Services | | | $3,950.00 | |
| Film & Processing (per roll) | $38.00 | 34 | $1,292.00 | |
| Field Supplies (per week) | $75.00 | 6 | $450.00 | |
| Excavation/Shoring Sub-Contract | | | $54,000.00 | |
| **Task Sub-Total** | | | ======> | $59,692.00 |
| | | | | |
| **Task 4: Site Restoration** | | | | |
| Film & Processing (per roll) | $38.00 | 3 | $114.00 | |
| Field Supplies (per week) | $75.00 | 1 | $75.00 | |
| Lanscaping Sub-Contract | | | $18,000.00 | |
| Excavation Sub-Contract | | | $36,000.00 | |
| **Task Sub-Total** | | | ======> | $54,189.00 |
| | | | | |
| **Task 5: Laboratory Processing, Cataloging, and Analysis** | | | | |
| Funal Consultant | | | 11,500 | |
| Parasitology Consultant | | | 7750 | |

| | | | | |
|---|---|---|---|---|
| Floral Consultant | | | 8000 | |
| Conservation Services | | | 7200 | |
| Film & Processing (per roll) | $38.00 | 36 | $1,368.00 | |
| Expendable Lab Supplies | | | $935.00 | |
| | | | ====> | $36,753.00 |
| **Task 6: Technical Report Preparation** | | | | |
| Reproduction | $0.35 | 3,500 | $1,225.00 | |
| Express Shipping (per package) | $12.00 | 5 | $60.00 | |
| **Task Sub-Total** | | | ====> | $1,285.00 |
| **Sub-Total Direct Cost** | | | ====> | **$335,630.00** |
| **TOTAL LABOR COST** | | | ====> | $339,363.57 |
| **TOTAL DIRECT COST** | | | ====> | $335,630.00 |
| **GRAND TOTAL** | | | | **$674,993.57** |

Draft estimate: 08/07/2006

# EXHIBIT 2

# FIRST AMENDMENT
## TO THE COOPERATIVE AGREEMENT
### BETWEEN
### THE CITY OF PHILADELPHIA
### AND
### THE NATIONAL PARK SERVICE
### FOR THE PRESIDENT'S HOUSE PROJECT AND
### ARCHEOLOGICAL RESEARCH DIG

**THIS FIRST AMENDMENT TO THE COOPERATIVE AGREEMENT** ("First Amendment") is made this _19_ day of July, 2007, by and between **THE CITY OF PHILADELPHIA** (the "**City**") acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA**, acting through the national park Service of the United States Department of the Interior (the "**NPS**").

## BACKGROUND

A.      On or about September 1, 2006, the City and NPS entered into the Cooperative Agreement (the "Agreement") to design, fabricate and install an exhibit at the Independence National Historic Park and the Liberty Bell Center (collectively, the "**Park**") to illuminate the history of the site of the former President's House, located directly north of the Liberty Bell Center (the "**President's House Exhibit**"), construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the "**East West Walkway**"), and conduct an archeological research excavation (the "**Research Dig**") at the foot of the Liberty Bell Center at the President's House within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the site for the installation of the President's House Exhibit.

B.      The City and NPS wish to amend certain sections of the Agreement, to extend the Term of the Agreement, and provide additional funding to complete the Research Dig.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this First Amendment, and intending to be legally bound by this First Amendment, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16 U.S.C. 407(m) et seq., 16 U.S.C. 461, et

seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

## 1. Background

The Background is incorporated into this First Amendment as though fully set forth herein.

## 2. Term

In accordance with the terms of Section 5 of the Agreement, the Term of the Agreement is hereby extended for one (1) additional one (1) year Term, under the same terms and conditions as those found in the Agreement, except as modified by this First Amendment.

## 3. Additional Funding

The City shall transfer to NPS an additional Twenty-five Thousand Nine Hundred and Forty-eight Dollars ($25,948.00) (the "**Additional Funding**") for the completion of the Research Dig. The Additional Funding shall be used in accordance with Exhibit "A", attached hereto.

## 4. No Further Modifications

Except as modified by this First Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this First Amendment, the City and NPS have caused this First Amendment to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Romulo L. Diaz, Jr., City Solicitor

Per: _____
      Gemela N. McClendon
      Assistant City Solicitor

**THE CITY OF PHILADELPHIA**
**THE OFFICE OF THE MAYOR**

Per: _____
      Joyce Wilkerson, Chief of Staff
      Office of the Mayor

**CAPITOL PROGRAMS OFFICE**

By: _____
      Richard Tustin, Director
      Capitol Programs Office

**NATIONAL PARK SERVICE**

By: _____
      For Dennis Reidenbach, Superintendent
      Independence National Historic Park

# EXHIBIT "A"

## SCOPE OF SERVICES
## AND
## GOVERNMENT ESTIMATE

**MODIFICATION 2**

**ARCHEOLOGICAL SERVICES**
**INDEPENDENCE NATIONAL HISTORICAL PARK**
**ARCHEOLOGICAL INVESTIGATION OF THE PRESIDENT'S HOUSE**
**SITE**
**06/26/07**

**SCOPE OF SERVICES**

Please provide labor and materials to keep the archeological site open and available to the public from July 9 through July 31, 2007.

Provide 2 field technicians to open and close the site by removing and replacing tarpaulins over the ruins and inspecting them for condition. In addition, the technicians will close the site during the day at any time weather becomes inclement.

Provide the services of Dr. Cheryl LaRoche for a maximum of 56 hours for any necessary liason work between the archeology team and our various partners.

Update signage on the viewing platform.

Repair the viewing platform.

Continue to provide and service the temporary fence and the Porta Johns.

GOVERNMENT ESTIMATE

# MODIFICATION 2

## ARCHEOLOGICAL SERVICES
## INDEPENDENCE NATIONAL HISTORICAL PARK
## ARCHEOLOGICAL INVESTIGATION OF THE
## PRESIDENT'S HOUSE SITE
## 6/21/2007

## Charge to Accounts: 4450-PRES-600

URS GROUP, INC, Contract GS-10F-0105K
Att. Eric S. McLaurin
URS Group, Inc.
9901 IH 10 West
Suite 350
San Antonio, TX 78230

### A. LABOR

| Labor Category | Wage Rate | Hours | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Program Manager (S. Tull) | $136.50 | 4 | $546.00 | |
| Senior Env. Professional / Field Director (D. Mooney) | $89.30 | 40 | $3,572.00 | |
| Dr. Cheryl LaRoche | $100.00 | 56 | $5,600.00 | |
| Field Technicians (2) | $45.00 | 184 | $8,280.00 | |
| **Task Sub-Total** | | 284 | =====> | $17,998.00 NTE |
| | | | | |
| **Labor Sub-Total** | | | =====> | **$17,998.00** NTE |

## B. DIRECT EXPENSES

| Category | Unit Cost | Units | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Travel | $400.00 | 3 | $1,200.00 | |
| Update Signs | | | $2,500.00 | |
| Repair Platform | | | $3,000.00 | |
| Rent/Service Fence & Porta Johns | | | $1,000.00 | |
| Field Supplies (per week) | $50.00 | 5 | $250.00 | |
| **Task Sub-Total** | | | =====> | $7,950.00 |
| | | | | |
| **Sub-Total Direct Cost** | | | =====> | **$7,950.00** |
| | | | | |
| **TOTAL  LABOR COST** | | | =====> | $17,998.00 |
| **TOTAL DIRECT COST** | | | =====> | $7,950.00 |
| **GRAND TOTAL** | | | | **$25,948.00** CEILING PRICE |

# FIRST AMENDMENT
## TO THE COOPERATIVE AGREEMENT
### BETWEEN
## THE CITY OF PHILADELPHIA
### AND
## THE NATIONAL PARK SERVICE
## FOR THE PRESIDENT'S HOUSE PROJECT AND
## ARCHEOLOGICAL RESEARCH DIG

**THIS FIRST AMENDMENT TO THE COOPERATIVE AGREEMENT** ("First Amendment") is made this _19_ day of July, 2007, by and between **THE CITY OF PHILADELPHIA** (the "**City**") acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA**, acting through the national park Service of the United States Department of the Interior (the "**NPS**").

## BACKGROUND

A.      On or about September 1, 2006, the City and NPS entered into the Cooperative Agreement (the "Agreement") to design, fabricate and install an exhibit at the Independence National Historic Park and the Liberty Bell Center (collectively, the "**Park**") to illuminate the history of the site of the former President's House, located directly north of the Liberty Bell Center (the "**President's House Exhibit**"), construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the "**East West Walkway**"), and conduct an archeological research excavation (the "**Research Dig**") at the foot of the Liberty Bell Center at the President's House within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the site for the installation of the President's House Exhibit.

B.      The City and NPS wish to amend certain sections of the Agreement, to extend the Term of the Agreement, and provide additional funding to complete the Research Dig.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this First Amendment, and intending to be legally bound by this First Amendment, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16 U.S.C. 407(m) et seq., 16 U.S.C. 461, et

seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

1. **Background**

   The Background is incorporated into this First Amendment as though fully set forth herein.

2. **Term**

   In accordance with the terms of Section 5 of the Agreement, the Term of the Agreement is hereby extended for one (1) additional one (1) year Term, under the same terms and conditions as those found in the Agreement, except as modified by this First Amendment.

3. **Additional Funding**

   The City shall transfer to NPS an additional Twenty-five Thousand Nine Hundred and Forty-eight Dollars ($25,948.00) (the "**Additional Funding**") for the completion of the Research Dig.  The Additional Funding shall be used in accordance with Exhibit "A", attached hereto.

4. **No Further Modifications**

   Except as modified by this First Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this First Amendment, the City and NPS have caused this First Amendment to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Romulo L. Diaz, Jr., City Solicitor

Per: _Gemela N. McClendon_

Gemela N. McClendon
Assistant City Solicitor

**THE CITY OF PHILADELPHIA**
**THE OFFICE OF THE MAYOR**

Per: _Joyce Wilkerson_

Joyce Wilkerson, Chief of Staff
Office of the Mayor

**CAPITOL PROGRAMS OFFICE**

By: _Richard Tustin_

Richard Tustin, Director
Capitol Programs Office

**NATIONAL PARK SERVICE**

By: _Dennis Reidenbach_

Dennis Reidenbach, Superintendent
Independence National Historic Park

# EXHIBIT "A"

## SCOPE OF SERVICES
## AND
## GOVERNMENT ESTIMATE

**MODIFICATION 2**

**ARCHEOLOGICAL SERVICES**
**INDEPENDENCE NATIONAL HISTORICAL PARK**
**ARCHEOLOGICAL INVESTIGATION OF THE PRESIDENT'S HOUSE**
**SITE**
**06/26/07**

**SCOPE OF SERVICES**

Please provide labor and materials to keep the archeological site open and available to the public from July 9 through July 31, 2007.

Provide 2 field technicians to open and close the site by removing and replacing tarpaulins over the ruins and inspecting them for condition.  In addition, the technicians will close the site during the day at any time weather becomes inclement.

Provide the services of Dr. Cheryl LaRoche for a maximum of 56 hours for any necessary liason work between the archeology team and our various partners.

Update signage on the viewing platform.

Repair the viewing platform.

Continue to provide and service the temporary fence and the Porta Johns.

GOVERNMENT ESTIMATE

# MODIFICATION 2

## ARCHEOLOGICAL SERVICES
## INDEPENDENCE NATIONAL HISTORICAL PARK
## ARCHEOLOGICAL INVESTIGATION OF THE
## PRESIDENT'S HOUSE SITE
## 6/21/2007

## Charge to Accounts: 4450-PRES-600

URS GROUP, INC, Contract GS-10F-0105K
Att. Eric S. McLaurin
URS Group, Inc.
9901 IH 10 West
Suite 350
San Antonio, TX 78230

## A. LABOR

| Labor Category | Wage Rate | Hours | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Program Manager (S. Tull) | $136.50 | 4 | $546.00 | |
| Senior Env. Professional / Field Director (D. Mooney) | $89.30 | 40 | $3,572.00 | |
| Dr. Cheryl LaRoche | $100.00 | 56 | $5,600.00 | |
| Field Technicians (2) | $45.00 | 184 | $8,280.00 | |
| **Task Sub-Total** | | 284 | =====> | $17,998.00 NTE |
| | | | | |
| **Labor Sub-Total** | | | =====> | **$17,998.00** NTE |

**B. DIRECT EXPENSES**

| Category | Unit Cost | Units | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Travel | $400.00 | 3 | $1,200.00 | |
| Update Signs | | | $2,500.00 | |
| Repair Platform | | | $3,000.00 | |
| Rent/Service Fence & Porta Johns | | | $1,000.00 | |
| Field Supplies (per week) | $50.00 | 5 | $250.00 | |
| **Task Sub-Total** | | | =====> | $7,950.00 |
| | | | | |
| **Sub-Total Direct Cost** | | | =====> | $7,950.00 |
| | | | | |
| **TOTAL LABOR COST** | | | =====> | $17,998.00 |
| **TOTAL DIRECT COST** | | | =====> | $7,950.00 |
| **GRAND TOTAL** | | | | **$25,948.00** CEILING PRICE |

# FIRST AMENDMENT
## TO THE COOPERATIVE AGREEMENT
### BETWEEN
## THE CITY OF PHILADELPHIA
### AND
## THE NATIONAL PARK SERVICE
## FOR THE PRESIDENT'S HOUSE PROJECT AND
## ARCHEOLOGICAL RESEARCH DIG

**THIS FIRST AMENDMENT TO THE COOPERATIVE AGREEMENT** ("First Amendment") is made this _19_ day of July, 2007, by and between **THE CITY OF PHILADELPHIA** (the "City") acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA**, acting through the national park Service of the United States Department of the Interior (the "**NPS**").

## BACKGROUND

A.      On or about September 1, 2006, the City and NPS entered into the Cooperative Agreement (the "Agreement") to design, fabricate and install an exhibit at the Independence National Historic Park and the Liberty Bell Center (collectively, the "**Park**") to illuminate the history of the site of the former President's House, located directly north of the Liberty Bell Center (the "**President's House Exhibit**"), construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the "**East West Walkway**"), and conduct an archeological research excavation (the "**Research Dig**") at the foot of the Liberty Bell Center at the President's House within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the site for the installation of the President's House Exhibit.

B.      The City and NPS wish to amend certain sections of the Agreement, to extend the Term of the Agreement, and provide additional funding to complete the Research Dig.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this First Amendment, and intending to be legally bound by this First Amendment, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16 U.S.C. 407(m) et seq., 16 U.S.C. 461, et

seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

### 1. Background

The Background is incorporated into this First Amendment as though fully set forth herein.

### 2. Term

In accordance with the terms of Section 5 of the Agreement, the Term of the Agreement is hereby extended for one (1) additional one (1) year Term, under the same terms and conditions as those found in the Agreement, except as modified by this First Amendment.

### 3. Additional Funding

The City shall transfer to NPS an additional Twenty-five Thousand Nine Hundred and Forty-eight Dollars ($25,948.00) (the "**Additional Funding**") for the completion of the Research Dig.  The Additional Funding shall be used in accordance with Exhibit "A", attached hereto.

### 4. No Further Modifications

Except as modified by this First Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this First Amendment, the City and NPS have caused this First Amendment to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Romulo L. Diaz, Jr., City Solicitor

Per: _____

      Gemela N. McClendon
      Assistant City Solicitor

**THE CITY OF PHILADELPHIA**
**THE OFFICE OF THE MAYOR**

Per: _____

      Joyce Wilkerson, Chief of Staff
      Office of the Mayor

**CAPITOL PROGRAMS OFFICE**

By: _____

      Richard Tustin, Director
      Capitol Programs Office

**NATIONAL PARK SERVICE**

By: _____

      Dennis Reidenbach, Superintendent
      Independence National Historic Park

# EXHIBIT "A"

## SCOPE OF SERVICES
## AND
## GOVERNMENT ESTIMATE

## MODIFICATION 2

### ARCHEOLOGICAL SERVICES
### INDEPENDENCE NATIONAL HISTORICAL PARK
### ARCHEOLOGICAL INVESTIGATION OF THE PRESIDENT'S HOUSE
### SITE
### 06/26/07

**SCOPE OF SERVICES**

Please provide labor and materials to keep the archeological site open and available to the public from July 9 through July 31, 2007.

Provide 2 field technicians to open and close the site by removing and replacing tarpaulins over the ruins and inspecting them for condition. In addition, the technicians will close the site during the day at any time weather becomes inclement.

Provide the services of Dr. Cheryl LaRoche for a maximum of 56 hours for any necessary liason work between the archeology team and our various partners.

Update signage on the viewing platform.

Repair the viewing platform.

Continue to provide and service the temporary fence and the Porta Johns.

GOVERNMENT ESTIMATE

# MODIFICATION 2

## ARCHEOLOGICAL SERVICES
## INDEPENDENCE NATIONAL HISTORICAL PARK
## ARCHEOLOGICAL INVESTIGATION OF THE
## PRESIDENT'S HOUSE SITE
## 6/21/2007

## Charge to Accounts: 4450-PRES-600

URS GROUP, INC, Contract GS-10F-0105K
Att. Eric S. McLaurin
URS Group, Inc.
9901 IH 10 West
Suite 350
San Antonio, TX 78230

### A. LABOR

| Labor Category | Wage Rate | Hours | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Program Manager (S. Tull) | $136.50 | 4 | $546.00 | |
| Senior Env. Professional / Field Director (D. Mooney) | $89.30 | 40 | $3,572.00 | |
| Dr. Cheryl LaRoche | $100.00 | 56 | $5,600.00 | |
| Field Technicians (2) | $45.00 | 184 | $8,280.00 | |
| **Task Sub-Total** | | 284 | =====> | $17,998.00 NTE |
| **Labor Sub-Total** | | | =====> | **$17,998.00** NTE |

**B. DIRECT EXPENSES**

| Category | Unit Cost | Units | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Travel | $400.00 | 3 | $1,200.00 | |
| Update Signs | | | $2,500.00 | |
| Repair Platform | | | $3,000.00 | |
| Rent/Service Fence & Porta Johns | | | $1,000.00 | |
| Field Supplies (per week) | $50.00 | 5 | $250.00 | |
| **Task Sub-Total** | | | =====> | $7,950.00 |
| | | | | |
| **Sub-Total Direct Cost** | | | =====> | **$7,950.00** |
| | | | | |
| **TOTAL  LABOR COST** | | | =====> | $17,998.00 |
| **TOTAL DIRECT COST** | | | =====> | $7,950.00 |
| | | | | |
| **GRAND TOTAL** | | | | **$25,948.00** CEILING PRICE |

# EXHIBIT 3

SECOND AMENDMENT
TO THE COOPERATIVE AGREEMENT
BETWEEN
THE CITY OF PHILADELPHIA
AND
THE NATIONAL PARK SERVICE
FOR THE PRESIDENT'S HOUSE PROJECT AND
ARCHEOLOGICAL RESEARCH DIG

THIS SECOND AMENDMENT TO THE COOPERATIVE AGREEMENT ("First Amendment") is made this 15 day of August, 2008, by and between **THE CITY OF PHILADELPHIA** (the "**City**") acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA**, acting through the national park Service of the United States Department of the Interior (the "**NPS**").

## BACKGROUND

A.    On or about September 1, 2006, the City and NPS entered into the Cooperative Agreement (the "Agreement") to design, fabricate and install an exhibit at the Independence National Historic Park and the Liberty Bell Center (collectively, the "**Park**") to illuminate the history of the site of the former President's House, located directly north of the Liberty Bell Center (the "**President's House Exhibit**"), construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the "**East West Walkway**"), and conduct an archeological research excavation (the "**Research Dig**") at the foot of the Liberty Bell Center at the President's House within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the site for the installation of the President's House Exhibit.

B.    The City and NPS executed that certain First Amendment to the Cooperative Agreement ("**First Amendment**"), dated July 19, 2007, to extend the term of the Agreement, and provide additional funding to complete the Research Dig.

C.    The City and NPS now wish to further extend the Term of the Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this Second Amendment, and intending to be legally bound by this Second Amendment, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16 U.S.C. 407(m) et seq., 16 U.S.C. 461, et seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

1. **Background**

    The Background is incorporated into this Second Amendment as though fully set forth herein.

2. **Term**

    In accordance with the terms of Section 5 of the Agreement, the Term of the Agreement is hereby extended for one (1) additional one (1) year Term, under the same terms and conditions as those found in the Agreement, as modified by the First Amendment.

3. **No Further Modifications**

    Except as modified by this Second Amendment, all other terms and conditions of the Agreement (as modified by the First Amendment) shall remain unchanged and in full force and effect.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this First Amendment, the City and NPS have caused this First Amendment to be executed by their duly authorized officers, under seal, as of the date first written above.


APPROVED AS TO FORM
Shelley R. Smith, City Solicitor

Per: _____

Gemela N. McClendon
Assistant City Solicitor


THE CITY OF PHILADELPHIA
THE OFFICE OF THE MAYOR

Per: _____

Clarence Armbrister, Chief of Staff
Office of the Mayor


CAPITOL PROGRAM OFFICE

By: _____

Richard Tustin, Director
Capitol Program Office


NATIONAL PARK SERVICE

By: _____

Cynthia Mac Leod, Superintendent
Independence National Historic Park

# EXHIBIT 4

Number _____

## THIRD AMENDMENT TO THE COOPERATIVE AGREEMENT

### BETWEEN

### NATIONAL PARK SERVICE
### UNITED STATES DEPARTMENT OF THE INTERIOR

### AND

### THE CITY OF PHILADELPHIA

### FOR

### PRESIDENT'S HOUSE PROJECT

This Third Amendment to the Cooperative Agreement (**"Third Amendment"**) is made this *12* day of May 2009, between the City of Philadelphia (**"City"**) and the National Park Service (**"NPS"**).

## ARTICLE I.          BACKGROUND

A.  A detailed summary of the Project is attached to this Third Amendment as **Attachment "A" ("Summary Sheet")**.

B.  In furtherance of the July 14, 1950 Agreement between the United States of America and the City to cooperate in the preservation of Independence National Historical Park, and the Cooperative Agreement between the City and NPS as such Cooperative Agreement has been amended, the NPS and City now desire to further extend the Term of the Cooperative Agreement and to establish the obligations and understandings of the City and the NPS from the Commencement Date forward regarding the design, fabrication and installation of the Project, such that the City may accomplish its goal of donating the completed Project to NPS in accordance with Section 2 of the Cooperative Agreement, within parameters acceptable to the NPS, and in compliance with applicable laws, regulations, government policies and Park management plans.

C.  The Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS.

## ARTICLE II.          DEFINITIONS; ATTACHMENTS

A.  Capitalized terms not otherwise defined in this Third Amendment, including the definitions set forth in the Summary Sheet, shall have the meanings set forth in the Cooperative Agreement as amended.

B.  The following are Attachments to this Third Amendment and incorporated herein by reference:

>**Attachment A:**  Project Summary Sheet
>**Attachment B:**  Funding Obligations
>**Attachment C:**  Project Development Plan
>**Attachment D:**  Exhibit Team Insurance Requirements

## ARTICLE III.    <u>COOPERATION OF THE PARTIES</u>

Beginning on the Commencement Date, City and NPS agree to cooperate in the following manner so that the City may cause the design, fabrication, installation and completion of the Project in a manner suitable for acceptance of the Project by the NPS:

A.  The NPS agrees to--

1.  Provide timely review, comment and input in accordance with the Project Development Plan attached to this Third Amendment as **Attachment "C" ("Project Development Plan")** and the Project schedule as it may be amended, and in writing, approve or deny:

    a.  Any contract between the City and any contractor, vendor, supplier, or professional services firm furnishing supplies or services to determine whether the contract is appropriate and consistent with the Cooperative Agreement as amended.

    b.  All design plans, interpretive works, construction drawings, samples, specifications, mockets, engineering documents, environmental compliance documents, change orders, and cost estimates generated by the City or the City's contractors.

2.  Monitor the general implementation of the Project, to include periodic inspection and tests for compliance with the requirements of the Cooperative Agreement as amended and the Commission Agreement as amended, any Project Design, Fabrication and Installation phases, project implementation plan or applicable special use permit, and relevant laws, regulations, and policies.

3.  Provide Final Inspection in accordance with the Cooperative Agreement as amended and the Project Development Plan.

4.  Notify the Partner of any change in NPS policy that may affect implementation of this Commission Agreement as amended.

5.  Subject to the availability of appropriations, undertake NPS activities identified in the Cooperative Agreement as amended and the Project Development Plan.

6.  Provide access to the Park in accordance with the Cooperative Agreement as amended and the Project Development Plan.

B.  The City agrees to--

1.  In reliance on review, comment and input required to be provided by NPS above, ensure that the Exhibit Team adheres to the Cooperative Agreement as amended including the Project Design Plan, the Programmatic Agreement between the NPS, City and others, dated March 15, 2006, and to donate to NPS the Project identified in the Cooperative Agreement as amended. This donation is made by the City on its own volition and without compensation.

2.  Contact, or cause the Exhibit Team to contact NPS in a timely manner with requests for access to the Park to accomplish the Project in accordance with law, the Cooperative Agreement as amended and the Project Design Plan.

3.  Undertake and complete in a timely manner, at its sole cost and expense, the Project identified in this Cooperative Agreement as amended.

4.  Submit copies of all plans, designs, and specifications and Project related materials to NPS for review, comment and approval or denial, in accordance with the Cooperative Agreement as amended and the Project Design Plan.

5.  Execute any Third-Party Contract only after receiving written NPS approval. "Third-Party Contract" shall mean any and all contracts between the City and a third-party executed after the Commencement Date, for work on the Project, including but not limited to design, engineering or interpretive services, and construction. Third-Party Contracts shall not include amendments to the Commission Agreement as amended.

6.  Provide, in advance of entering into any Third-Party Contract, written certification that--

    a.  The third-party:

        i.  Has all required licenses to do the work contemplated by the agreement as required by applicable law;

      ii.      Is not suspended or debarred from federal contracting; and

      iii.      Demonstrates relevant experience and competence to perform the work contemplated by in the Third-Party Contract.

   b.     The City:

      i.      Used competition in selecting the third-party to perform the work;

      ii.      Has taken measures to avoid or mitigate conflicts of interest; and

      iii.      Has incorporated provisions reflecting best practices in contract management and project administration into the Third-Party Contract.

7.     Make the NPS an express third-party beneficiary of all Third-Party Contracts, and require that all Third-Party Contracts contain the following clause:

     "The National Park Service is a third-party beneficiary of this contract, with all legal rights associated with that status, including the right to enforce the contract."

8.     Following the Commencement Date, include the following requirements in any Third-Party Contract for the performance of any work or for fulfilling any obligation related to the Project:

     "The Contractor agrees to—

   a.     Comply with all applicable laws, regulations, rules, orders, other legal requirements, and NPS policies;

   b.     Comply with the terms and conditions of any Project Development Plan, project implementation plan or special use permits relating to the Project;

   c.     Follow any NPS order to suspend work;

   d.     Obtain and provide all warranties that would be given in normal commercial practice from subcontractors, manufacturers or suppliers for work performed and materials furnished:

      i.      For a period of not less than one year; and

      ii.      Executed, in writing, for the benefit of the City and the United States;

e.      Be responsible for all damages to persons or property that occur as a result of the contractor's fault or negligence because of, or in any way growing out of or connected to the Project;

f.      Waive any defense to any claim of breach or negligence based on the contractor's alleged reliance on the Partner's or NPS' Project monitoring, inspections or tests. All monitoring, inspections or tests are for the sole benefit of the Partner and / or NPS and do not relieve the Contractor of responsibility for (i) providing adequate quality control measures, or (ii) ensuring against damage or loss prior to Project acceptance. In addition, such monitoring, inspections or test do not imply Project acceptance by either the Partner or NPS, nor does it affect the continuing rights of the Partner or NPS after Project acceptance.

g.      Neither the City's nor NPS' review, approval or acceptance of, nor City payment for, contractor services shall be construed to operate as a waiver of any rights of the City or NPS, nor of any cause of action that the City or NPS may have, and the Contractor shall be and remain liable to the City and the NPS in accordance with the terms of this contract and applicable law for all damages for which the Contractor is legally responsible.

h.      Have no recourse against the United States with respect to any aspect of construction activities and shall not lien any land, structures, fixtures, or improvements associated with this contract; and

i.      Be jointly and severally liable under this contract if the Contractor is comprised of more than one legal entity."

9.      Following the Commencement Date, in addition to the provisions of Section 8 (above), any Third-Party Contract for the provision of design or engineering services must contain the following provisions:

"The Contractor agrees--

a.      That it is solely responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the Contractor; and

    b.      To correct or revise any errors or deficiencies in its designs, drawings, specifications, and other services without any additional compensation.

    c.      That the final signed and sealed Final Construction Documents provided by the Contractor are the only true contract documents of record for this Project. By submission of the Final Construction Documents to the City, the Contractor warrants that all review comments have been resolved to the satisfaction of the Partner and incorporated into the Final Construction Documents."

10.    Cause the Exhibit Team to ensure that the Project's Final Design complies with:

    a.      All applicable laws, regulations, rules, orders, or other legal requirements;

    b.      All applicable building codes and environmental, cultural, safety, accessibility, and sustainable design requirements.

11.    Prior to initiating installation of the Project, demonstrate to NPS's reasonable satisfaction that all funds necessary to pay for the Project have been secured, and will remain available to pay City's expenses associated with the Project except that NPS acknowledges that, in accordance with Section III(A)(1) of the Project Summary Sheet attached as Attachment "A" hereto, funding for the Project, as designed as of the Commencement Date, has been fully secured.

12.    Undertake installation of the Project only when all necessary written NPS approvals required in the Cooperative Agreement as amended and the Project Design Plan have been obtained.

13.    Cause the Exhibit Team and as applicable, any entity or person entering into a Third-Party Contract, to maintain throughout the course of the Project the Performance and Payment Bonds requirements set forth in Attachment "D" of this Third Amendment, and immediately notify NPS in writing should any bond issued be canceled or withdrawn.

14.    Permit the NPS to monitor, inspect, and to at all times have access to the construction site and construction-related materials and documents.

15.    Promptly take reasonable steps at no cost to NPS, to address any concerns raised by NPS.  If reasonably requested by NPS, such reasonable steps may include suspension of the work on the Project.

16.    Certify in writing that upon NPS' acceptance of the Project as complete, all right, title, and interest to any completed construction, improvements, installations, fixtures, or associated donations, are free and clear of all debts, liabilities, or obligations.

17.    Consistent with the Partner's intent to donate the Project to the NPS as stated herein, waive any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS by or on behalf of the Partner.

18.    Comply with, and cause its contractors to comply with, the wage requirements of the Davis Bacon Act, 40 U.S.C. § 276(a) *et seq.*, and the relevant Department of Labor regulations, 29 C.F.R. Part 5.

19.    Act in accordance with any Project Development Plan that attached to this Third Amendment.

C.  The City and NPS jointly agree that--

1.    The Project's overall cost is estimated to be approximately $8.5 million. The City's financial obligations are detailed in **Attachment "B" ("Financial Obligations")**.

2.    In making certain programmatic and resource-related decisions, NPS is relying upon the City's promise to undertake and diligently pursue the Project in accordance with the Cooperative Agreement as amended.

3.    Project land and facilities shall not be subject to liens by the City or any third-parties.

4.    The attached Project Development Plan (Attachment C), as may be amended or supplemented by written agreement of the parties, addresses without limitation, deliverables, design elements, construction standards, mitigation measures, safety precautions, site access, construction monitoring, coordination between the parties, contractor requirements, and design modifications.

5.    The City and NPS are not establishing a joint venture, a joint enterprise or other entity by entering into this Cooperative Agreement as amended, and neither is liable for the contracts or actions of the other party relating to this Cooperative Agreement as amended or otherwise.

6.    NPS review and approval of documents pursuant to [Article III.A.1] of this Third Amendment shall not be construed to operate as a waiver of any rights of the NPS, nor a waiver of any cause of action that NPS may have arising under this Third Amendment or any Third-Party Contract.

7.    In consideration of the City's offer to complete and donate the Project described herein to the NPS, the NPS agrees to allow the City access to NPS property at the times and for purposes identified herein.  In reliance on this Third Amendment the NPS will not seek Federal appropriations for the Project to be constructed by the City. Further, NPS is using appropriated funds to work with the City and to implement the Project. It is the intent of both parties to be legally bound by this Cooperative Agreement as amended and both expressly waive the defense of lack of consideration. The waiver of the defense of lack or failure of consideration shall inure to any assign, surety or insurer of the parties hereto.

## ARTICLE IV.        AUTHORITY

NPS enters into this Third Amendment pursuant to (a) 16 U.S.C. § 6, which authorize NPS to accept donations for purposes of the National Park System; (b) 43 U.S.C. § 1473a, which gives the Secretary authority to accept and use contributions for cooperative projects with other Federal, State, or private agencies; (c)16 U.S.C. § 1f, which authorizes the Secretary to enter into agreements with individuals and entities to share costs and services in support of NPS projects; and (d) 16 U.S.C. §§ 1-4 (the NPS Organic Act), which authorizes NPS to take actions that in furtherance of the mission of the National Park Service.

## ARTICLE V.        KEY OFFICIALS

A. Key Officials:  The personnel specified below are considered essential to successful coordination and communication between the City and NPS for the work to be performed under this Third Amendment. Upon written notice to the other party, either party may designate an alternate to act in the place of the designated Key Official, or designate a new Key Official.

**City**
Joan Schlotterbeck
Commissioner of Department of Public Property
City of Philadelphia
City Hall, Room 790
Philadelphia, PA 19107
Ph: 215-686-4430
Fx: 215-686-4498
joan.schlotterbeck@phila.gov

**NPS**
Cynthia MacLeod
Superintendent
Independence National Historical Park
143 S 3rd Street, Philadelphia, PA 19106

Ph: 215-597-7120
Fx: 215-597-0042
Cynthia_MacLeod@nps.gov

B. Notices: Any notice from one party to the other party required or provided in association with this Third Amendment shall be delivered in writing, by mail, personal delivery, electronic delivery or other appropriate means, to the first listed Key Official of the other party, at the address or contact number indicated in this Article, or at such other address or contact number for such Key Official as may be provided from time to time, and shall be considered delivered upon receipt at the office of such Key Official.

## ARTICLE VI.  TERM OF THIRD AMENDMENT

Unless modified by the parties in writing, or unless terminated by operation of the terms of this Cooperative Agreement as amended, this Cooperative Agreement as amended shall be in effect for a period of one (1) year beginning May 1, 2009 ("**Commencement Date**").   Nothing in this Article shall alter or affect the term of any bond or insurance coverage obtained in furtherance of the Project.

## ARTICLE VII.  INSURANCE AND LIABILITY

Prior to beginning the work authorized herein, the City shall provide the NPS with copies of Certificates of Insurance demonstrating that the Exhibit Team has acquired all insurance required in Attachment "D" of this Third Amendment, and City shall cause Exhibit Team members to immediately notify NPS if an insurance policy is canceled or terminates for any reason.

## ARTICLE VIII.  INTELLECTUAL PROPERTY

A. Subject to applicable law, NPS shall be assigned any and all rights, titles, and interests, in any and all copyrights and trademarks created as a result of, arising from, or relating to the Project, including any copyrightable design elements utilized in the Exhibit Team's bid proposals and any pre-existing copyrightable design elements belonging to the City or the Exhibit Team that are included in the final Project design.  The preceding notwithstanding, the City is hereby given a non-exclusive, limited license to use such intellectual property for purposes related to the City's educational mission and to identify the Project in the City's marketing, advertisements and publicity about the City, the Project and the completed exhibit.  This provision shall survive expiration or termination of this Cooperative Agreement as amended.

B. The City shall fully cooperate with the NPS in the protection and enforcement of any copyright and trademark rights resulting from activities and services performed in connection with the Project. This obligation includes timely execution, acknowledgment, and delivery to the NPS of all documents and papers that may be necessary to enable the NPS to utilize in any manner such copyright and  trademark rights.

**ARTICLE IX.**          **DISPUTES; NONCOMPLIANCE; VENUE**

A.  The parties agree that in the event of a dispute between them, NPS and the City shall promptly use their best efforts to resolve the dispute in an informal fashion through communication and consultation, or other forms of non-binding alternative dispute resolution that are mutually acceptable to the parties.

B.  In the event that one party reasonably believes that the other party is not complying with the Cooperative Agreement as amended, notice of such alleged noncompliance must be provided to the allegedly noncompliant party. Such party shall have thirty (30) days (cure period) after receipt of the notice to cure such alleged noncompliance, or if the alleged noncompliance cannot be cured within the cure period, the alleged noncompliant party shall obtain approval of a written remedial plan specifying the intent to cure the alleged noncompliance as promptly as is reasonably practical and within a deadline determined by mutual agreement.

C.  In the event that the alleged noncompliant party fails to cure the alleged noncompliance within the cure period or to diligently pursue the action detailed in the remedial plan, the NPS may, without first obtaining a judgment or declaration of breach by any court, board, arbitrator or any other adjudicator, exercise its rights available under law or seek any alternative or additional remedies available to it including termination of this Third Amendment.

D.  The parties agree that the venue to commence litigation of any disputes stemming from this Third Amendment as amended shall be a Federal court located in the Eastern District of Pennsylvania.

**ARTICLE  X.**          **ACCOUNTING AND REPORTS**

The City and its contractors and subcontractors shall maintain accounting books and records under a system of accounts and financial controls meeting Generally Accepted Accounting Principles, and must permit the Department of the Interior or its designee, including the Comptroller General and Office of the Inspector General, to verify and audit the financial report from the books, correspondence, memoranda and other records of the City relating to this Third Amendment, during the period of this Third Amendment, and for such time thereafter as may be necessary to accomplish such verification. Such period shall be a minimum of three years after the Project is completed.

**ARTICLE XI.**          **COMPLIANCE WITH APPLICABLE LAW**

A.  This Third Amendment and performance hereunder is subject to all applicable laws and regulations whether now in force or hereafter enacted or promulgated. This Third Amendment and performance hereunder is also subject to applicable government policies. Nothing in this Third Amendment shall be construed as in any way limiting the general powers of the NPS for supervision, regulation, and control of its property under such applicable laws, regulations, and management policies. Nothing in this Third

Amendment shall be deemed inconsistent with or contrary to the purpose of or intent of any Act of Congress.

B.  In addition to other laws, regulations, and policies referenced in this Third Amendment, the City is on notice that, where applicable, it must comply with, and assist NPS in complying with additional laws, regulations, Executive Orders and policies including, but not limited to  the Americans with Disabilities Act (42 U.S.C. § 12101), Architectural Barriers Act (42 U.S.C. § 4151 *et seq.*), the Rehabilitation Act (29 U.S.C. § 701 *et seq.*, as amended), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, *et seq.*), the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. § 4801, *et seq.*), the National Environmental Policy Act (42 U.S.C. § 4321, *et seq.*), the Coastal Zone Management Act (16 U.S.C. § 1451 *et seq.)*, Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Safe Drinking Water Act (42 U.S.C. § 300, *et seq.)*, the Endangered Species Act (16 U.S.C. § 1531 *et seq.*), the Wild and Scenic Rivers Act (16 U.S.C. § 1271, *et seq.*), the National Historic Preservation Act (16 U.S.C. § 470), the Archaeological and Historic Preservation Act (16 U.S.C. § 469), Strengthening Federal Environmental, Energy and Transportation Management (Exec. Order No. 13423), Notification of Violating Facilities (Exec. Order No.11738), Wetlands Protection (Exec. Order No. 11990), and Flood Hazards in Floodplains (Exec. Order No. 11988).

## ARTICLE  XII.        <u>REQUIRED AND MISCELLANEOUS CLAUSES</u>

A.  Non-Discrimination:  All activities pursuant to or in association with this Third Amendment shall be conducted without discrimination on grounds of race, color, sexual orientation, national origin, disabilities, religion, age, or sex, as well as in compliance with the requirements of any applicable federal laws, regulations, or policies prohibiting such discrimination.

B.  NPS Appropriations:  Pursuant to 31 U.S.C. § 1341, nothing contained in this Third Amendment shall be construed to obligate the government to any current or future expenditure of funds in excess or advance of the availability of appropriations from Congress.  Nor does this Third Amendment obligate the government to spend funds on any particular project or purpose, even if funds are available.

C.  Lobbying with Appropriated Moneys (18 U.S.C. § 1913): No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy, or appropriation, whether before or after the introduction of any bill, measure, or resolution proposing such legislation, law, ratification, policy, or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to any such Member or official, at his request, or to Congress or such official, through the proper official channels, requests for any legislation, law, ratification, policy, or appropriations which they deem necessary for

the efficient conduct of the public business, or from making any communication whose prohibition by this section might, in the opinion of the Attorney General, violate the Constitution or interfere with the conduct of foreign policy, counter-intelligence, intelligence, or national security activities. Violations of this section shall constitute violations of section 1352(a) of title 31. In addition, the related restrictions on the use of appropriated funds found in applicable law also apply. In addition, related restrictions on the use of appropriated funds and related legislation also apply.

D.  Release of Information:  The City must obtain prior government approval through the NPS Key Official for any public information releases which refer to the Department of the Interior, any bureau, a park or park unit, a government employee (by name or title), or this Third Amendment.  The specific text, layout, photographs, etc., of the proposed release must be submitted with the request for approval.

E.  Merger: This Third Amendment, including any attachments hereto and documents incorporated by reference herein, contains the sole and entire agreement of the parties with respect to the subject matter of this Third Amendment.

F.  Modifications:  This Third Amendment may be extended, renewed or amended only when agreed to in writing by the NPS and the City.

G.  Waiver: If a party fails to exercise any right or to insist that the other party comply with any obligation, no such failure or insistence shall be a waiver of a right of a party to demand strict compliance with each duty or obligation.  No custom or practice of the parties which varies from this Third Amendment shall constitute a waiver of the right of a party to demand exact compliance.  Waiver by one party of any particular default by the other party shall not affect or impair a party's rights in connection with any subsequent default of the same or of a different nature, nor shall any delay or omission of a party to exercise any rights arising from such default affect or impair the rights of that party as to such default or any subsequent default.  All waivers of any duty or obligation by a party must be express and evidenced in writing.

H.  Effect of Approval:  Any approval or consent given by the NPS regarding any contract or contractor, or by operation of inspection, or any other consent or approval given by the NPS under this Third Amendment, does not relieve the City or the City's contractors of responsibility for any errors or omissions, or from the responsibility to comply with the requirements of this Third Amendment.

I.   Effect of Acceptance:  Any acceptance by the NPS of the Project or any component thereof does not relieve the City or the City's contractors from liability for any known defect, or any latent defect, fraud, or gross mistake or negligence.

J.  Assignment: No part of this Third Amendment shall be assigned to any other party without prior written approval of the NPS and the Assignee.

K. Counterparts. This Third Amendment may be executed in counterparts, each of which shall be deemed an original (including copies sent to a party by facsimile transmission) as against the party signing such counterpart, but which together shall constitute one and the same instrument.

L. No Lobbying for Federal Funds: The City must not seek appropriations from Congress to support any ongoing or proposed City activity or project relating to the subject matter of this Third Amendment or any amendments or sub-agreements hereto, including without limitation federal appropriations for construction, renovation, property acquisition, leasing, administration or operations. Nothing in this paragraph is intended to preclude the City from applying for and obtaining a competitive or non-competitive grant of federal financial assistance from a federal agency or from undertaking otherwise lawful activities with respect to any project or proposal included in the President's budget request to Congress; nor should this paragraph be construed as requesting, authorizing or supporting advocacy by nonfederal entities before Congress.

M. Member of Congress: Pursuant to 41 U.S.C. § 22, no Member of Congress shall be admitted to any share or part of any contract or agreement made, entered into, or adopted by or on behalf of the United States, or to any benefit to arise thereupon.

N. Agency: The City is not an agent or representative of the United States, the Department of the Interior, or NPS, or the Park, nor will the City represent its self as such to third parties. NPS employees are not agents of the City and will not act on behalf of the City.

O. Non-Exclusive Agreement: This Third Amendment in no way restricts the City or NPS from entering into similar agreements, or participating in similar activities or arrangements, with other public or private agencies, organizations, or individuals.

P. No Third-Party Beneficiaries: Unless expressly stated herein, nothing in this Third Amendment is intended to grant any rights or to provide any benefits to any third-party.

Q. Survival: Any and all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment. Any and all liabilities, actual or contingent, which have arisen during the term of and in connection with this Third Amendment shall survive expiration or termination of this Third Amendment.

R. Partial Invalidity: If any provision of this Third Amendment or the application thereof to any party or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Third Amendment or the application of such provision to the parties or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby and each provision of this Third Amendment shall be valid and be enforced to the fullest extent permitted by law.

S.  Captions and Headings:  The captions, headings, article numbers and paragraph numbers appearing in this Third Amendment are inserted only as a matter of convenience and in no way shall be construed as defining or limiting the scope or intent of the provision of this Third Amendment, nor in any way affecting this Third Amendment.

T.  Drug Free Workplace Act: The City shall cause Third Party's to take comprehensive action to ensure the workplace is drug-free.

U.  Jointly Drafted:  This Third Amendment shall be deemed to have been jointly drafted by both parties and, in the event of a dispute, shall not be construed against either party.

V.  Further Assurances:  If requested by one party, the other party shall execute and deliver such other documents and take such other action as may be necessary to effect the terms of this Third Amendment.


*{The remainder of this page left blank intentionally; signature page attached.}*

**ARTICLE XIII.    AUTHORIZING SIGNATURES**

**IN WITNESS WHEREOF,** the parties hereto have caused this Contract to be executed by their duly authorized representatives as of the respective dates indicated:

APPROVED AS TO FORM
Shelly R. Smith, City Solicitor

Per: _Douglas Kubinski_
Deputy City Solicitor

**THE CITY OF PHILADELPHIA:**
**THE OFFICE OF THE MAYOR**

By: _____
Clarence D. Armbrister
Chief of Staff

**DEPARTMENT OF PUBLIC**
**PROPERTY**

By: _____ 4/30/09
Joan Schlotterbeck
Commissioner

**NATIONAL PARK SERVICE:**

By: _____
Cynthia MacLeod
Superintendent
Independence National Historical
Park

**Attachment A – Project Summary Sheet**

## PROJECT SUMMARY SHEET
### April 16, 2009

I. **PARK NAME/PROJECT NAME:** Independence National Historical Park, exhibit called "Freedom and Slavery in Making a New Nation" on the President's House Site in Philadelphia

II. **PROJECT DESCRIPTION:** The project consists of planning, design, and construction of an outdoor exhibit on the site of the 1790-1800 President's House (Robert Morris Mansion) in Philadelphia. The exhibit will commemorate all those who lived in the house while it was used as the executive mansion, including the nine enslaved Africans brought by George Washington from Mt. Vernon. Washington lived here while serving as our First President. Our Second President, John Adams and his wife Abigail, also lived at this site prior to the capital moving to Washington, D.C. Unlike Washington, Adams never owned any slaves. The mansion was adjacent to what is now the new Liberty Bell Center in Block One of the Independence Mall. The project cost is estimated at $8.5 million, which is a design-build project that will incorporate archeological remains of the mansion into the exhibit; an additional $2 million endowment is planned and will be held by the Friends of Independence, our non-profit partner, for long-term maintenance.

III. **STAFF ASSESSMENT:**
### A. Summary of DO #21:

In December 2004, the City of Philadelphia confirmed its October 2003 offer of a $1.5 million donation for the President's House Site to cover the costs related to completing the project. The donation was vetted and approved by the Washington Partnership Office in May 2005. Subsequently, as part of the SAFETY-LU Transportation Bill, the project received a $3.6 million earmark primarily through the efforts of Congressman Chaka Fattah. The City has committed an additional $2 million from its Capital Funds for the project. On February 18, 2009, the Delaware River Port Authority, under the direction of Pennsylvania Governor Ed Rendell, approved a grant of $3.5 million. This grant will go toward the additional costs for incorporating archeological remnants found during a public investigation conducted March-July, 2007, which are $1.4 million. The city held a design competition and the winning design includes an extensive dependence upon electronic technology, for which the park has required a $2 million endowment, which will also be funded out of the DRPA grant. The Design Development Phase of the Partnership Construction Process is nearly completed.

1. General Agreement/Fundraising Agreement: The project is currently fully funded. The City of Philadelphia has taken the lead in an ongoing fundraising effort seeking public and private funds in a grassroots effort designed to raise awareness of the project as well as additional funds for the endowment. The City of Philadelphia will "float" the base cost of the project with reimbursement coming from DOT/ Penn DOT as the transportation funding may be spread out over 4 years.

2. Feasibility Study: Independence National Historical Park has submitted a feasibility study waiver request for the fundraising campaign.

3. Fundraising Plan: The Fundraising Plan is attached to the March, 2009, Fundraising Agreement. Funds raised will go toward the

endowment for maintenance of the site. The Agreement is for one year, renewable each year.

4. Donor Recognition Plan: The Independence National Historical Park Donor Recognition Plan is attached to the Fundraising Agreement.

B. **Legal & Ethics Review:** The non-federal donors, the City of Philadelphia and the Delaware River Port Authority, have been fully vetted.

C. **Planning & Compliance:** Phase I, II and III archeological excavations are complete. All Section 106 compliance and NEPA are complete. The City funded the archeological research dig, which occurred from March through July, 2007.

D. **Status in PMIS and Level of Review:** PMIS # 95291, region reviewed, previous update 2-25-05; current update in progress to reflect the $8.5 million scope, not including the endowment. (It is noted that the PMIS project was originally detailed as a $4.5 million project.

E. **Summary of Approved Budget Program:** As noted under III A. above, all funding needed for the project is now either in hand or committed. On August 1, 2008, the City issued a notice to proceed to the architect for the additional design work.

F. **Staffing and Operations Impact Analysis:** The exhibit will be a site fixture and will be a self guided experience. The park may occasionally create special programs, but there will be no requests for additional staff. There will be additional utility and maintenance costs, including maintaining the proper environment for the archeological remains.

G. **Summary of Development Advisory Board:** The project has been approved in concept by the Development Advisory Board in November 2005, which stated there was no requirement to return to the DAB.

H. **Congressional Review/Approval Process:** The project was encouraged by Congressional Staff comments in 2003.

IV. **OTHER INFORMATION:**

1. **History of the project:** In April 2003, the park submitted a report to the Interior Appropriations Committee per a request in House Report 107-564: "Therefore, given the historical significance of this issue, the Committee urges the NPS to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy." The report contained a conceptual design, interpretive themes and overview of planning and design process. In October, 2005, the City issued a Request for Qualifications that brought applications from 21teams. Each team included a designer/architect, general contractor, and interpretive specialists. A Selection Committee made up of City and NPS personnel including the Superintendent of Independence National Historical Park, the Division Chief of Cultural Resources Management of Independence National Historical Park, the Mayor of the City of Philadelphia and the Director of the City of Philadelphia Capital Program Office, with the counsel of a 10 person Oversight Committee representing community groups selected 6 teams to which a Request for Proposals ("**RFP**") was issued on June 15, 2006.

2.    These teams prepared models and presentation boards of their designs. The models were displayed for public comment. The City and NPS took comments of the public and the Oversight Committee into consideration when selecting the finalist. The Selection Committee selected the a team headed by Kelly/Maiello, Inc. Architects and Planners.

Based on selection of the Exhibit Team by the Selection Committee, the City entered into a Commission Agreement for Design, Fabrication and Installation of a Public Exhibit ("**Commission Agreement**") with Kelly/Maiello Management, LLC on October 5, 2007. The Commission Agreement included the insurance provisions attached to the Third Amendment as **Attachment "D"**. Following execution of the Commission Agreement, Kelly / Maiello, LLC subcontracted with entities and individuals on the Exhibit Team for design, fabrication and installation of the Project.

3.    **Public Awareness Process:** This project has significant visibility in the public, particularly in the African American community interested in expanding interpretation of slavery and memorialization of Washington's slaves. There was a rally in 2002 of about 500 people sponsored by the Avenging the Ancestors Coalition; in early 2003, about 300 people attended a public meeting to review the concept plan. According to the park briefing paper, "a substantial distrust of the NPS was exhibited." The park staff believes that this project will continue to require "significant input from both the general public and …this country's leading historians as it moves forward." NPS held a civic engagement forum in 2004 with about 300 in attendance. Public comment confirmed the validity of the 5 identified themes for the commemoration as well as the public's support for beginning the project. With the City, NPS held a forum in November 2005 to provide an update on the planning process. About 200 attended and again voiced support for moving the process forward. On June 5, 2006, NPS and the City held another public forum with noted African American historians to discuss the qualities of good interpretive sites and to introduce the 6 semi-finalist teams to the public. About 300 people attended and expressed concern for diversity in the design teams and for generating local jobs. In March, 2007 the public attended the opening ceremony for the archeological research dig. Mayor Street participated. There was a public component of the dig that included a viewing platform and a webcam. The platform was staffed by volunteers and NPS interpreters. The site had over 300,000 visitors to the platform during the dig. Archeologists found foundation remnants of the bow window of the main house, the kitchen dependency and a connecting service passage. The project concluded with another ceremony on July 31, 2007. Heeding public sentiments, the City and NPS had Kelly Maiello amend their design to incorporate the newly-discovered features. In December, 2007, NPS and the City held a public meeting to introduce the amended design. About 150 attended and approved the new design. July 3, 2008, the Park Superintendent participated with ATAC in a public commemorative ceremony on the site. NPS and the City have been issuing press releases to keep the public informed about the process. In August 2008, we announced that Kelly Maiello will perform test borings on the site.

4. **City/NPS Cooperation:**  On or about September 1, 2006, The City and NPS entered into a Cooperative Agreement ("**Cooperative Agreement**") to address the responsibilities of the parties for the Project.  The City and NPS entered into a First Amendment to the Cooperative Agreement, dated July 19, 2007 transferring additional funding to NPS for the Research Dig and to extend the term of the Cooperative Agreement for an additional year.  The City and NPS entered into a Second Amendment to the Cooperative Agreement, dated August 15, 2008 to extend the term of the Cooperative Agreement by an additional year.

   This project will be managed through a unique partnership with the City of Philadelphia.   It has jointly been determined that the City holds a contract with Kelly/Maiello Management, LLC for the work using a Design/Build approach.  In accordance with the Cooperative Agreement as amended, NPS will receive copies of all designs and for  the work product prior to final acceptance and will participate in the final review and approval of the Project.  NPS will own and manage the commemorative work at the conclusion of the process.  This approach is particularly beneficial as the City has the ability to advance the SAFETY-LU funds and then seek reimbursement from DOT/Penn DOT.

5. **Opening Date:**  The City of Philadelphia and NPS have agreed to dedication ceremony before the end of 2010.

**Attachment B – Financial Obligations**

## Attachment B: Financial Obligations

### Sources

City of Philadelphia             $3.5 million
- Initial funding for the project was jump-started by former Mayor John F. Street with a 2003 pledge of $2 million from Capital Funds
- The City of Philadelphia, under Mayor Michael Nutter, later committed an additional $1.5 million in Cultural Corridors Bonds.

Department of Transportation             $3.6 million
- In 2004, U. S. Congressmen Chaka Fattah and Robert A. Brady secured a multi-year federal grant of $3.6 million, intended to complete the funding for the project.

Delaware River Port Authority             $3.5 million
- $1.5 million will complete funds for design and construction work
- $2 million will be used to create a Project Maintenance Endowment (detailed in an agreement between the National Park Service and the Friends of Independence).

Total             $10.6 million

### Uses

Design and Construction

| | |
|---|---:|
| RFP Services | $ 10,000 |
| Owner's Representative | 547,500 |
| Design Competition | 74,000 |
| Feasibility Study on Arch. Dig | 25,000 |
| Archeological Excavation | 768,441 |
| Independence Park Sitework | 143,320 |
| Primary Design/Build Cost | 4,500,000 |
| Additional Design/Build Cost with Archeological Component | 2,468,000 |
| | $8,536,261 |

Endowment             $2,063,739

Total             $10,600,000

**Attachment C – Project Development Plan**

**Attachment C to the Third Amendment to the Cooperative Agreement**
**Between**
**The City of Philadelphia and**
**National Park Service**
**for the**
**The President's House:   Freedom and Slavery in Making a New Nation Project**

**PROJECT DEVELOPMENT PLAN**

**A.      Purpose**

The purpose of the Project Development Plan is to describe the process for the planning, design, development and construction of the Project beginning on the Commencement Date of the Third Amendment to the Cooperative Agreement.  The Plan sets forth standards for each stage of the Project and the roles and responsibilities of the National Park Service (NPS) and the City of Philadelphia (City) in this process.

**B.      Project Description**

The Project consists of design, fabrication and installation of the Exhibit an outdoor exhibit on the site of the 1790-1800 President's house (Robert Morris Mansion) in Philadelphia.  The exhibit will commemorate the home of George Washington and John Adams during the first ten years of the federal government, as well as commemorate the enslaved Africans who resided in the Washington household.  Site interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved. The Project will be owned, maintained, managed, and interpreted by the NPS. Collectively, the work, which is generally described below, will be known as the "Project."

1.  While the project does not seek to recreate the original President's House that once stood at this site, the design establishes the physical boundaries of the original house using architectural fragments such as masonry exterior and interior, ground-level walls and fireplaces, metal framed front door and windows, and bluestone and marble pavers.
2.  Also included, if a practical design can be achieved with no adverse impact on historic resources, is a 20' x 20' conditioned glass enclosure, framed around a submerged archeological excavation site approximately twelve feet below grade level, and a 10' x 15' metal and glass framed enclosure marking the site of the former "slaves' quarters."  LED screens, speakers and graphic panels are incorporated into the fragments to provide an interpretive experience for visitors.
3.  A small landscaped area occupies a portion of the site and in-ground, recessed and surface mounted light fixtures provide general and accent lighting for the entire site.

**C.    Selection of Professional Consultants**

1. The City has engaged an interdisciplinary Design Team for the project. The team is headed by an architecture firm, Kelly/Maiello, with subcontractors including but not limited to a Mechanical, Electrical and Plumbing (MEP) engineer. The MEP engineer has experience in designing and testing: HVAC, lighting, plumbing, and other systems to maximize energy performance, and has a working knowledge of American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) codes.

2. The selection of the architect, Kelly/Maiello, was through a competitive process of evaluation of responses to a Request For Proposal [RFP] which stipulated the terms of the project and the forms of the submissions.

3. The City and NPS also selected a team of community leaders (the Oversight Committee) who have participated in the selection and review process throughout the course of this project.

4. The NPS has reviewed and approved, and will retain the right to review and approve, the individual consultant firms and individuals included within the Design Team. The City and the NPS have collaborated throughout the design process to develop the Project. This collaboration is memorialized in a Cooperative Agreement executed on August 25, 2006 and amended July 19, 2007 and August 15, 2008, and is pending execution of the Third Amendment, which incorporates this Project Development Plan as Exhibit "C".

**D.    Programming and Design of the Project**

1. During NPS's commitment to provide review, comment and approvals in accordance with the Cooperative Agreement as amended, NPS will provide input and guidance to the City on information relevant to completing the Project, including applicable federal, state and local regulations, NPS Management Policies 2006 9.1 - 9.4, published NPS standards generally applicable to similar facilities, all relevant documents, including plans, planning studies and planning documents, historical studies and park-specific documentation and other mutually agreed criteria. Applicable published NPS standards include NPS-6, Interpretation and Visitor Services; the NPS-28, Cultural Resource Management; DO-42, Accessibility for Visitors with Disabilities in the NPS Programs, Facilities and Services; DO 50-B, Occupational Safety and Health; and, DO 52-A Communicating the National Park Service Mission.

2. The NPS will review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended. All review by the NPS will be reasonable and timely.

3. In addition to documents previously provided, the City will cause the Exhibit Team to prepare schematic design documents, including value analysis for the Project, in accordance with the approved program. The NPS will review all previously submitted and future schematic design documents, design development documents, and construction documents.

**E. Data and Materials to Be Provided By NPS**

1. The NPS will be responsible for all compliance as required by the National Environmental Policy Act (NEPA) and the National Historic Preservation Act.

2. The NPS will provide all relevant studies including but not limited to Surveys, Archeology Reports, NPS exhibit and interpretive criteria.

3. The NPS will provide professional expertise for review, information, assistance and facilitation of the project.

**F. Core Design Requirements**

1. The design will conform to the Independence Mall Design Guidelines as appended to the RFP.

2. The following Core Design Requirements will be used throughout all stages of the design process:

   a. The outer boundaries or footprint of the President's House must be clearly demarcated.

   b. The footprint of the Slave Quarters must be conspicuously highlighted and a solemn "sense of place" clearly established.

   c. Documented interior rooms or spaces may be included in the design's ground plan to a level of detail that the designer determines will be understood by the public. Additional interpretive elements may provide expanded explanation of historical use of the property.

   d. Six substantive themes must be reflected in the final design. The first five listed below emerged from the preliminary Conceptual Design, and the sixth became clear in a Public Forum held in October 30, 2004:

      i. The house and the people who lived and worked there

      ii. The Executive Branch of the U.S. Government

      iii. The system and methods of slavery

      iv. African-American Philadelphia (including an emphasis on free African-Americans)

      v. The move to freedom

      vi.  History lost and found (how knowledge of the President's House and the presence of slavery was forgotten and recovered; why we must remember"

  e.  Five cultural values also emerged from the October 30, 2004 Public Forum:

      i.  Identity – Interpretation at this site offers an opportunity to put names and faces on a small fraction of the enslaved and free people of African descent who were part of the fabric of the life in the President's House.  These enslaved individuals thus are symbols of the millions of people who were held in bondage during the 16th, 17th, 18th, and 19th centuries.  What is known of the lives of those who were enslaved and worked in the President's House will be a backdrop of the story.

      ii.  Memory (a sense of influence of the past on the present) – The nation's first Executive Branch conducts the affairs of the government in the rooms of the house.  At the same moment in the 18th century, the economic labor system that made it legal to enslave human beings was actively practiced in the house.  By describing and honoring the enslaved people who lived at the site, we are commemorating and honoring the many enslaved people whose stories will never be known and told.

      iii.  Agency – The 18th century system of slavery was a complete economic, cultural and social world with people of African descent as full participants in the affairs of the time.

      iv.  Dignity – The enslaved population retained their dignity.  George Washington's slaves adhered to an unwritten code of conduct that was as nuanced and demanding as the first president's well-known code of civility.

      v.  Truth – A factual account of how Washington's household used nuances of the Pennsylvania Gradual Abolition Act of 1780 to keep individuals in slavery while they were in Philadelphia rather than at the estate in Mt. Vernon, Virginia.  The condition of those in bondage was maintained in order to sustain the political and social strata of society during the post-revolutionary era.

  f.  As part of the landscaping of the first block of Independence Mall, an east-west walkway will be constructed that will connect the subway entrance on the southwest corner of Fifth and Market Streets to the President's House Site.  Although the Design Team will not be responsible for the actual construction of the walkway, the walkway must be incorporated into the design of the President's House Exhibit so that the Exhibit receives the western end of this walkway.

**G. Professional Standards Requirements.**

1. General

   a. This work shall consist of the preparation of Schematic Design, Design Development, and Construction Documents. All documents shall be prepared using the English System of Weights and Measurements, and requirements included in the RFP.

   b. All work performed shall comply with applicable laws, regulations and the NPS policies and guidelines.

   c. Design Team shall:

      (i) Prepare drawings for Design submissions using Auto-Cadd Systems, latest edition, and in accordance with the American Institute of Architects ("AIA") "CAD Layer Guidelines" or such other guidelines as reasonable determined by the City. Final drawings shall be provided on mylar as well as in electronic format. In addition to providing submissions in accordance with the Project Schedule, Design Team shall furnish four (4) sets of sealed plans for permitting purposes and permit applications, each with required supporting documentation.

      (ii) Incorporate appropriate energy conservation measures into its Design where applicable as reasonably determined by the City and consistent with the Final Design and Cost Proposal, and any agreed amendments thereto;

      (iii) Comply, to the extent applicable; with the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101-12213 and all applicable regulations promulgated thereunder;

      (iv) With the assistance of the City as necessary, obtain sign-off of all utility service providers and the National Park Service;

      (v) Furnish cost estimates with the Design submission for each phase, which shall be organized in accordance with CSI format and incorporate contingencies and escalations appropriate to the Design development and Project Schedule;

      (vi) When required by law, have the Design services provided hereunder performed or reviewed, approved and sealed by architects or engineers duly licensed to practice in the Commonwealth of Pennsylvania.

   d. The City will submit all hard and electronic deliverables to: Doris Fanelli, Chief, Division of Cultural Resources Management, Independence National Historical Park, 143 South Third Street, Philadelphia, PA 19106 for review distribution or for deposit in the park's archives.

   e. The City is to perform oversight of design, fabrication and installation of the Project. This includes but is not limited to the following:

      i.   Attendance at weekly construction meetings;
      ii.  Photo documenting work;
      iii. Reviewing shop drawings;
      iv. Reviewing test submittals;
      v.  Approving requests for payment;
      vi. Insuring that the property party responds to requests for information;
      vii. Causing Exhibit Team designers to issue addenda,
      viii Reviewing change orders; and
      ix. Overseeing mechanical system testing.

2. Quality Control

The City shall accomplish a Quality Control Review and shall cause Exhibit Team designers to make corrections prior to each submittal to the NPS. The NPS will review the drawing and specifications in a timely manner in accordance with the Cooperative Agreement as amended.

**H. Schematic Design Phase: The Schematic Design phase of the Project is completed.**

The City and NPS will confer on their review of Schematic Designs and convey said comments to Kelly/Maiello and incorporate resolutions into the Design Development phase of the project.

**I. Design Development Phase: The Design Development Phase of the Project is completed pending NPS concurrence.**

1. The Exhibit Team designers have developed Design Development Documents based on the Schematic Design.

4. The Exhibit Team designers will submit written responses to review commentswithin 15 calendar days of receipt of comments.

**J. Construction Document Phase**

1. Construction Documents will be reviewed at 90% and 100% completion. At a minimum, construction documents shall include:

    a.     Project Overview Site Plan
    b.     Abbreviation Sheet/Symbol Sheet
    c.     Demolition Plan (Removal of trees, walks, building, pipes);
    d.     Layout and Grading Plan
    e.     Erosion Control Plans
    f.     Pedestrian Control Plans
    g.     Overall Floor Plan
    h.     Overall Roof Plan
    i.     Exterior Elevations

j.      Site/Building Sections
k.      Site/Building Details
l.      Typical Details and Schedules
m.      Plumbing Plans
n.      Electrical Plans
o.      HVAC Plans
p.      Landscape Plan and Details
q.      Division 1 Construction Specifications
r.      Divisions 2 through 16 Construction Specifications. (The A-E shall utilize and modify their own Divisions 2 through 16 Construction Specifications templates. Divisions 2 through 16 Construction Specifications format shall match the NPS Division I Construction Specifications format.)
s.      Contract Price Schedule or Construction Bid Schedule
t.      Final Product File

2.  Design Team will prepare Class A Construction Cost Estimate based on the completed 100% Draft Construction Documents. Confirm that the project cost is within available funds.

3.  Design Team will prepare List of Required Submittals.

4.  Design Team will prepare Summary List of Operation and Maintenance Requirements as identified in individual construction specification sections.

5.  Design Team will finalize Constructability Analysis

6.  Deliverables - 100% Draft Construction Documents
    Design Team will submit 5 paper copies of the following documents for review:

    a.      Construction Drawings
    b.      Construction Specifications
    c.      Contract Price Schedule or Construction Bid Schedule
    d.      Product File
    e.      Class A Construction Cost Estimate
    f.      List of Submittals
    g.      List of Operation and Maintenance (O&M) Requirements
    h.      Constructability Checklist
    i.      Design Calculations

NPS will submit copyist review of the 100% Draft Construction Documents to the City.

7.  The City will submit 100% Complete Construction Documents for review, comment and final approval by the NPS in accordance with the Commission Agreement as amended.

**Attachment D – Exhibit Team Insurance Requirements**

## Exhibit Team Insurance Requirements

a.      Provider shall maintain such insurance as is specified in this Article X.  That insurance shall be maintained by the Exhibit Team member designated at its sole expense.  All insurance shall be subject to the reasonable approval of the City as to coverages, terms and insurance carriers.  All required coverages must be with companies with a Best's rating of A VIII or better.  No "cut-through" endorsements will be permitted.  The following are minimum coverage limits for insurance required to be maintained under this Agreement and the designation alongside each coverage indicates who shall secure and maintain that insurance:

    1.      Commercial General Liability on an occurrence form with the following limits:

        (a)      General Aggregate - $2,000,000
        (b)      Products/Completed Operations - $1,000,000
        (c)      Each Occurrence - $1,000,000
        (d)      Personal and advertising injury - $1,000,000
        (e)      Fire damage (any one fire) - $50,000
        (f)      Medical Expense (any one person) - $5,000

    The general aggregate must apply on a per location basis.  Such coverage shall include the following provisions:

        i.       coverage for operations and products/completed operations;
        ii.      coverage for liability arising from the acts of independent contractors;
        iii.     personal injury liability;
        iv.      coverage for property damage due to explosion, collapse or underground hazards(Excluded for KMI only);
        v.       broad form property damage coverage, including completed operations; and

    2.      Commercial Automobile Liability covering all owned, hired and non-owned vehicles with limits of $1,000,000 combined single limit each occurrence.  The Provider does not own any vehicles.

    3.      Commercial umbrella coverage of $5,000,000 which shall apply to the excess of Commercial General Liability (following form per project limit), commercial automobile liability and employer's liability coverages.

3.  Professional Errors and Omissions Liability with a $1,000,000 annual aggregate limit and a $50,000 annual aggregate deductible, covering claims arising from of professional services in connection with the management of the Project.

5.  Employers' liability insurance with limits of not less than:

$500,000 Each Accident - Bodily Injury by Accident
$500,000 Each Employee - Bodily Injury by Disease
$500,000 Policy Limit - Bodily Injury by Disease

6.  Builder's Risk/Installation Floater Insurance

(a) Coverage: "All risks" in an amount equal to not less than the full replacement cost of the work under the Agreement (meaning work in replacement which is of like kind and quality).

(b) Period of Coverage: Anything herein to the contrary notwithstanding, the Builder's Risk Insurance shall be procured and maintained during the entire period of performance of the Agreement until final acceptance of the Project by the City.

7.  Performance/Payment Bonds

As provided by the Act of 1967, December 20, P.L. 869 (8 P.S. § 193, et seq., as amended), the Provider shall cause DJK (Keating) to provide, at the time of execution of the Agreement, security for the faithful performance of the work and for compliance with the Agreement in the form of a performance bond, with a surety company approved by the City, in a sum equal to 100% of the amount of the construction portion of fabrication and installation including any contingency amount. In addition, as provided by the Act of 1967, December 20, P.L. 869 (8 P.S. § 193, as amended), the Provider shall cause DJK to provide, at the time of execution of the Agreement, a payment bond, with a surety company approved by the City, in a sum one hundred percent (100%) of the amount of the fabrication, installation and/or construction portion of the fabrication and installation cost including any contingency amount, conditioned for the full payment of its Subcontractors furnishing labor and materials in the performance of the Agreement.

b.    The insurance described in 1, 2 and 3 above shall include the endorsement as additional insureds, without liability by such additional insureds for

payment of the premiums thereof, and the following parties and each of their officers, directors, employees, agents and representatives:

> City of Philadelphia
> 1515 Arch Street, 14th Floor
> Philadelphia PA  19102
> Attention:  Risk Manager
>
> Department of the Interior
> National Park Service
> c/o Dennis Reidenbach, Superintendent
> Independence National Historic Park
> 313 Walnut Street
> Philadelphia, PA 19106

      c.     The Provider shall not cancel or permit to be canceled any of the insurance policies required without the prior written consent of City and the National Park Service (NPS).  The City, the NPS, and the other stakeholders identified by the City shall receive thirty (30) days prior written notice of cancellation, non-renewal or material reduction in coverage to any of the insurance policies required pursuant to this Agreement and each insurance policy and certificate thereof shall contain a valid provision or endorsement to that effect.  Not less than forty-five (45) days prior to the expiration of such policies, the Provider shall deliver to the City and NPS evidence that the relevant Exhibit Team member is seeking to have such policy/policies renewed or replaced in accordance with all of the provisions of this Agreement.

      d.     Original certificates of insurance must be submitted to the City's Risk Manager at the following address:

> City of Philadelphia
> Finance Department
> Division of Risk Management
> 1515 Arch Street, 14th Floor
> Philadelphia, PA 19102-1579
> (Fax No.: 215-686-1708).

A copy of the certificate of insurance shall be submitted to the Responsible Official. Both submissions must be made at least ten (10) days before work is begun.  The ten (10) day requirement for advance documentation of coverage may be waived in such situations where such waiver will benefit the City, but under no circumstances shall Provider actually begin work without providing the required evidence of insurance.

10. The NPS has the right to approve all design and construction work for the entire project in accordance with the Cooperative Agreement as amended.

## N.  Amendments to the Development Plan

The NPS and the City mutually understand and acknowledge that preparation of the comprehensive design for the project may cause either or both parties to recommend changes to this Development Plan.  Such revisions may be recommended by either party. Modifications, revisions, or additions to this Plan shall be made in writing and will become effective only upon the written approval of both parties.  Amendments must be dated and signed by the Key Official or other authorized representative to this Cooperative Agreement as amended.

# EXHIBIT 5

### ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS
### RELATING TO THE PRESIDENT'S HOUSE EXHIBIT

This Assignment Of Intellectual Property Rights Relating to the President's House Exhibit ("Assignment" or "Agreement") is made and is effective as of December 8, 2015 (the "Effective Date") by and between the United States of America, acting through the National Park Service of the United States Department of the Interior ( "NPS") and the City of Philadelphia ("City"), a municipal corporation under the laws of Pennsylvania (collectively, the "Parties" and each a "Party").

## RECITALS

A.  The City and NPS entered into that certain Cooperative Agreement for the President's House Project and Archeological Research Dig, dated September 1, 2006, as amended (the "Cooperative Agreement") to establish a public exhibit at Independence National Historic Park in Philadelphia relating to the site of the house occupied by former Presidents George Washington  and John Adams (the "President's House Exhibit," sometimes referred to herein as the "Exhibit" or the  "Project");

B.  The City and Kelly/Maiello Management, LLC ("Provider") entered into that certain Commission Agreement for Design, Fabrication and Installation of  Public Exhibit dated October 5, 2007, as amended (the "Commission Agreement") under which Provider furnished "Services" and "Materials" and "Installation" (all as defined in the Commission Agreement) to establish the President's House Exhibit, including, without limitation, the "Interpretive Works," as defined in the Commission Agreement, that were created for the Exhibit (collectively, the "President's House Services and Materials").  The President's House Services and Materials included certain "Interpretive Works" as defined in the Commission Agreement.

C.  Provider entered into an agreement (the "KMI Agreement") with Kelly/Maiello, Inc. ("KMI") according to which KMI, through itself and its sub-consultants, agreed to provide certain of the Services and Materials for the President's House Exhibit.

D.  KMI's sub-consultant Louis Massiah (fiscally sponsored by Scribe Video Center, Inc.) provided services and materials for and acted as producer of five (5) multi-media video productions for the Exhibit, as follows:  (i) Family Dining Room: Ona Maria Judge Staines-Oney Escapes; (ii) State Dining Room: Escape from Slavery and Rebellion Against it, and St. Domingue; (iii) Steward's Room: The Adams Years; (iv) Servant's Dining Room: Philadelphia & Mount Vernon; (v) Kitchen: Hercules (collectively, the "Multi-Media Works".

E.  KMI's sub-consultant Lorene Cary created and delivered certain dramatic scripts and related services and materials incorporated into the Multi-Media Works;

F.  Louis Massiah, Lorene Cary, KMI and Provider entered into transferable copyright assignment agreements with the City whereby each assigned any and all copyrights they own in the Multi-Media Works and Interpretive Works to the City, and granted the City a license to use any trademarks they may hold in the Multi-Media Works and Interpretive Works.  Such assignment agreements are attached hereto in Exhibit A (collectively, the "Copyright Assignment Agreements").

G.  The City wishes to assign to the NPS and NPS wishes to accept and assume each of the Copyright Assignment Agreements, in accordance with the Cooperative Agreement.

## *COVENANTS*

NOW, THEREFORE, in consideration of the mutual promises contained herein, the foregoing recitals A-G, all of which are incorporated by reference herein, and for other good and viable consideration, and intending to be legally bound hereby, the Parties hereto agree as follows:

1.  The City hereby assigns and transfers to NPS each of the Copyright Assignment Agreements and all rights, titles and interests of each assignor as set forth therein.

2.  NPS assumes and accepts the foregoing assignment and transfer of the Copyright Assignment Agreements.

3.  Miscellaneous Provisions

a.    *Governing Law; Forum Selection; Consent To Jurisdiction.* This Agreement shall be deemed to have been made in Philadelphia, Pennsylvania. This Agreement and all disputes arising under it shall be governed, construed and decided in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to principles of Pennsylvania law concerning conflicts of laws. The parties agree that any lawsuit, action, claim, or legal proceeding involving, directly or indirectly, any matter arising out of or related to this Agreement, or the relationship created or evidenced thereby, shall be brought exclusively in the United States District Court for the Eastern District of Pennsylvania or the Court of Common Pleas of Philadelphia County. It is the express intent of the parties that jurisdiction over any lawsuit, action, claim, or legal proceeding shall lie exclusively in either of these two forums.

b.    *Severability.* The provisions of this Agreement shall be severable. If any provision of this Agreement or the application thereof for any reason or circumstances shall to any extent be held to be invalid or unenforceable, the remaining provisions or the application of such provision to persons or entities other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and enforceable to the fullest extent permitted by law.

c.    *Notice.* Any notice required or permitted to be given under this Agreement shall be given in writing and shall be personally delivered by hand with receipt obtained, by a national overnight express carrier (such as Federal Express), by facsimile, or sent by registered or certified United States mail, return receipt requested, addressed as follows:

If to NPS:
Superintendent of National Park Services
143 South 3rd Street
Philadelphia, PA 19106

If to City:
Commissioner, Department of Public Property
Room 790
City Hall

Philadelphia, PA 19107

With copy to:
City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania, 19102

    d.    *Headings.* The headings in this Agreement do not in any way define, limit, describe or amplify the provisions of the Agreement or the scope or intent of the provisions, and are not a part of the Agreement.

    e.    *No Third Party Beneficiaries.* Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon or give to any person, firm, corporation, or legal entity, other than the parties and City, any rights, remedies, or other benefits under or by reason of the Agreement.

    f.    *Survival.* Any and all provisions set forth in this Agreement which, by its or their nature, would reasonably be expected to be performed after the termination or expiration of the Agreement shall survive and be enforceable after such termination.

    g.    *Authority to Execute.* Each of the Parties represents and warrants that it has caused this Agreement to be duly authorized, executed and delivered by and through persons authorized to execute this Agreement on its behalf; and each of the individuals signing below represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of the party for which he or she has executed it.

    h.    *Counterparts.* This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together, shall constitute one and the same instrument.

    i.    Entire Agreement. This Agreement, including all exhibits, contains all the terms and conditions agreed upon by the parties, constitute the entire agreement among the parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties (except to the extent specifically set forth herein). This Agreement may be modified only by written amendment executed by both parties.

**[Signature Page(s) Follow]**

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have executed this Agreement as of the Effective Date.

**THE CITY OF PHILADELPHIA**

Name/Title (print): _Bridget Collins-Greenwold_

Date: _12-16-15_


**THE NATIONAL PARK SERVICE**

Name/Title (print): _Cynthia MacLeod_    _Superintendent_
_Independence National_
Date: _JAN 0 6 2016_    _Historical Park_


Approved as to Form:
Shelley R. Smith, City Solicitor
By: _James P. Leonard_
Title: _Chief Deputy City Solicitor_

**Exhibit "A"**

**Copyright Assignment Agreements**

***TRANSFER AND ASSIGNMENT OF COPYRIGHTS***
***AND LICENSE TO USE TRADEMARKS RELATING TO THE PRESIDENT'S***
***HOUSE EXHIBIT AT INDEPENDENCE NATIONAL PARK***

This Transfer And Assignment Of Copyrights and License to Use Trademarks Relating To The President's House Exhibit At Independence National Park ("Transfer and Assignment" or "Agreement") is made and is effective as of July 7, 2015 (the "Effective Date") by and among Kelly Maiello Management, LLC, a (Pennsylvania limited liability corporation), Kelly Maiello, Inc., a Pennsylvania corporation, and the City of Philadelphia, a municipal corporation under the laws of Pennsylvania (collectively, the "Parties" and each a "Party").

## ***RECITALS***

A. The City of Philadelphia (the "City") entered into that certain Cooperative Agreement for the President's House Project and Archeological Research Dig, dated September 1, 2006, as amended (the "Cooperative Agreement") with the United States of America, acting through the National Park Service of the United States Department of the Interior ( "NPS") to establish a public exhibit at Independence National Historic Park in Philadelphia relating to the site of the house occupied by former Presidents George Washington  and John Adams  (the "President's House Exhibit," sometimes referred to herein as the "Exhibit" or the  "Project");

B. Kelly/Maiello Management, LLC (the "Provider") entered into that certain Commission Agreement for Design, Fabrication and Installation of  Public Exhibit dated October 5, 2007, as amended (the "Commission Agreement") with the City to provide "Services" and "Materials" and "Installation" (all as defined in the Commission Agreement) to establish the President's House Exhibit Provider's performance of the Commission Agreement resulted in the production of  Services and Materials for the Exhibit, including, without limitation, the "Interpretive Works," as defined in the Commission Agreement, that were created for the Exhibit (collectively, the "President's House Services and Materials").  The term "President's House Services and Materials " as used in this Agreement includes, without limitation, all copyrightable works created for the President's House Exhibit pursuant to the Commission Agreement, whether or not expressly identified in this Agreement, and includes, without limitation, the items identified in Exhibit A, *Schedule of Interpretive Works*, attached hereto.

C. Provider entered into an agreement (the "KMI Agreement") with Kelly/Maiello, Inc. ("KMI") according to which KMI, through itself and its sub-consultants, agreed to provide certain of the Services and Materials for the President's House Exhibit, with those certain Services and Materials defined collectively  as the "KMI Services and Materials;"

D. KMI and Louis Massiah (fiscally sponsored by Scribe Video Center, Inc.) entered into an agreement (the "Louis Massiah Agreement") according to which Louis Massiah agreed to provide certain of  Services and Materials for the President's House Exhibit required of KMI under the KMI Agreement.  The Services and Materials Louis Massiah provided under the Louis Massiah Agreement (collectively,  "Louis Massiah Services and Materials") included, but were not limited to, the production of five (5) multi-media video productions as identified in Exhibit A hereto, *Schedule of Interpretive Works*, under the heading "The President's House – Videos" (collectively referred to herein as the "Multi-Media Works");

1

E.  Louis Massiah entered into  an agreement with Dwight Andrews, pursuant to which Dwight Andrews agreed to provide certain musical compositions and musical scores and related services and materials to be incorporated into the Multi-Media Works (collectively, the "Dwight Andrews Services and Materials");

F.  Provider entered into an agreement with Lorene Cary, pursuant to which Lorene Cary agreed to create and deliver to Provider certain dramatic scripts and related services and materials to be incorporated into the Multi-Media Works (collectively, the "Lorene Cary Services and Materials");

G.  Louis Massiah, through his solely-owned corporation Seventh Ward Project, Inc., also entered into an Agreement (the "SAG Agreement") with the Screen Actors Guild – American Federation of Television and Radio Artists ("SAG"), through the paymaster Em Bee Productions/Penny Baker, to secure performances by various actors, including those required for the production of the  Multi-Media Works (those performances are hereinafter collectively referred to as the "President's House Performances");

H.  Provider entered into agreements (i) with American History Workshop and Eisterhold Associates, Inc. requiring them to furnish services and materials to create and/or modify certain Interpretive Works resulting in the production of those Interpretive Works identified under the headings "Porcelite Panels," "Glass Panels," and "Bronze Casts" in Exhibit A (collectively, the "AHW/Eisterhold Services and Materials"), (ii) with Ife Ni-Owoo requiring her to furnish services and materials to create an Interpretive Work resulting in the production of the Interpretive Work "The Memorial" identified under the heading "Other Interpretive Works" in Exhibit A (the "Ife Ni-Owoo Services and Materials"); (iii) with UJM Architects + Designers requiring it to provide services and/or materials related to design of the Exhibit (the "UJM Services and Materials"), and (iv) with Maglan Studios  requiring it to provide services and materials related to sound design for the Exhibit (the "Maglan Services and Materials").

I.  Under the Commission Agreement, Provider is obligated, *inter alia*, to obtain and transfer to the City all copyrights in and to all of the "Interpretive Works," as defined in the Commission Agreement, which "Interpretive Works," as finally produced, include, without limitation, all items identified in Exhibit A, *Schedule of Interpretive Works*, as well as all other intellectual property specified in the definition of "Interpretive Works" in the Commission Agreement.

J.  The President's House Exhibit was established and installed at the Independence National Historic Park with Services and Materials required in the Commission Agreement, which included, *inter alia*, KMI Services and Materials, Louis Massiah Services and Materials, Dwight Andrews Services and Materials, Lorene Cary Services and Materials, and the Multi-Media Works; however, as of the Effective date, the Interpretive Works and the Project in its entirety have not been accepted by the NPS pending, in part, transfer to the NPS of copyrights in and to the Interpretive Works and the right to use any trademarks and service marks incorporated in the Interpretive Works;

K.  The City intends to transfer (the "City Transfer") to the NPS certain rights, titles and interests in the President's House Exhibit, including rights, titles and interests in and to ownership of all copyrights in the Interpretive Works, and the right to use any trademarks and service marks incorporated in the Interpretive Works;

#1530239v1 3260-04

L.  The Provider and KMI have assisted the City in obtaining and securing this Agreement to enable the City Transfer;

M. In order to permit, promote and perfect the City Transfer, the parties hereto have agreed to enter into this Agreement.

## *COVENANTS*

NOW, THEREFORE, in consideration of the mutual promises contained herein, the foregoing recitals A.-M, all of which are incorporated by reference herein, and for other good and viable consideration and intending to be legally bound hereby, the Parties hereto agree as follows:

1. Provider, for good and valuable consideration, hereby grants, transfers, conveys and assigns to the City its entire right, title and legal and equitable interest in and to the President's House Services and Materials, including without limitation the Interpretive Works , and  without limitation, all copyrights and other intellectual property rights that it owns in and to the Multi-Media Works, the Louis Massiah Services and Materials, the Dwight Andrews Services and Materials,  the Lorene Cary Services and Materials, the AHW/Eisterhold Services and Materials, the Ife Ni-Owoo Services and Materials, the UJM Services and Materials and/or the Maglan Services and Materials (collectively, the "Provider Copyrights").  This assignment includes assignment of all such rights of Provider under Title 17, Section 106 of the United States Code including the right to reproduce, incorporate, embody, adapt, prepare derivative works, distribute copies to the public by sale or transfer of ownership, or by rental, lease or lending, display publicly, or otherwise use the Provider Copyrights; the right to obtain registrations of copyright for the President's House Services and Materials and the Interpretive Works and any copyright rights in the Louis Massiah, Dwight Andrews, Lorene Cary, AHW/Eisterhold, Ife Ni-Owoo, UJM and/or Maglan Services and Materials that are owned by Provider, in the City's sole name, in the United States and throughout the world; and the right to further grant, transfer and assign such rights, in whole or in part, to NPS or to others.

2. KMI, for good and valuable consideration, hereby grants, transfers, conveys and assigns to the City its entire right, title and legal and equitable interest in and to the President's House Services and Materials, including without limitation the Interpretive Works and  without limitation, all copyrights rights and other intellectual property rights that it owns in and to the Interpretive Works and/or the Louis Massiah Services and Materials, the Dwight Andrews Services and Materials,  the Lorene Cary Services and Materials, the AHW/Eisterhold Services and Materials, the Ife Ni-Owoo Services and Materials, the UJM Services and Materials and/or the Maglan Services and Materials (collectively, the "KMI Copyrights").  This assignment includes assignment of all such rights of KMI under Title 17, Section 106 of the United States Code including the right to reproduce, incorporate, embody, adapt, prepare derivative works, distribute copies to the public by sale or transfer of ownership, or by rental, lease or lending, display publicly, or otherwise use the KMI Copyrights; the right to obtain registrations of copyright for the Interpretive Works and any copyright rights in the Louis Massiah, Dwight Andrews, and/or Lorene Cary Services and Materials that are owned by KMI, in the City's sole name, in the United States and throughout the world; and the right to further grant, transfer and assign such rights, in whole or in part, to NPS or to others.

3

3. Provider warrants and represents (i) that it owns the Provider Copyrights and holds marketable title to the Provider Copyrights with there being no prior assignments, hypothecations, licenses or other encumbrances of any nature affecting them; (ii) that it has, without restriction and without obtaining the consent of any other party, the right to transfer the Provider Copyrights to the City as stated in this agreement; (iii) that the Provider Copyrights do not infringe the rights of any third parties and that there are not now and never have been any outstanding lawsuits, actions, claims or legal proceedings involving the Provider Copyrights other than claims asserted by the City; (iv) that the five (5) works identified in Exhibit A under the heading "The President's House – Videos" (a) comprise all of the videos produced by Louis Massiah for the Project, and (b) are correctly and uniquely identified, by title, in Exhibit A; (v) that the Interpretive Works identified in Exhibit A under the headings "Porcelite Panels," "Glass Panels," "Other Graphic Type" and "Bronze Casts" (a) comprise all of the Interpretive Works of their respective types (as stated in the applicable heading) that were produced for the Project, and (b) are correctly and uniquely identified, by title, in Exhibit A.

4. KMI warrants and represents (i) that it owns the KMI Copyrights and holds marketable title to the KMI Copyrights with there being no prior assignments, hypothecations, licenses or other encumbrances of any nature affecting them; (ii) that it has, without restriction and without obtaining the consent of any other party, the right to transfer the KMI Copyrights to the City as stated in this agreement; and (iii) that the KMI Copyrights do not infringe the rights of any third parties and that there are not now and never have been any outstanding lawsuits, actions, claims or legal proceedings involving the KMI Copyrights other than claims asserted by the City.

5. Neither KMI nor Provider shall have any responsibility whatsoever for the payment of any performance or other fees that may be required by SAG, acting on its behalf or on behalf of actors performing in the Multi-Media Works or otherwise, as a condition of posting the Multi-Media Works on the Internet or selling DVDs of the Multi-Media Works or any other use of the Multi-Media Works that is not permitted under the SAG Agreement.

6. Each of KMI and Provider (the "Licensors") hereby grants to the City and its assigns a perpetual, non-exclusive, royalty-free license to use any of their trademarks or service marks in connection with the Project and the Multi-Media Works. This license does not give rise to any payment or other obligations on the part of the City or its assigns. The City and its assigns shall have sole discretion in how these marks will be used in connection with the Project and the Multi-Media Works. Each of the Licensors warrants and represents that it has, without restriction and without obtaining the consent of any other party, the right to grant such license to use its trademarks and service marks.

7. The City assumes the assignments of copyrights made by KMI and Provider under this Agreement.

8. Miscellaneous Provisions

a.    *Governing Law; Forum Selection; Consent To Jurisdiction.* This Agreement shall be deemed to have been made in Philadelphia, Pennsylvania. This Agreement and all disputes arising under it shall be governed, construed and decided in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to principles of Pennsylvania law concerning conflicts of laws. The parties agree that any lawsuit, action, claim, or legal proceeding involving, directly or indirectly, any matter arising out of or related to this Agreement, or the relationship created or evidenced thereby, shall

4

be brought exclusively in the United States District Court for the Eastern District of Pennsylvania or the Court of Common Pleas of Philadelphia County. It is the express intent of the parties that jurisdiction over any lawsuit, action, claim, or legal proceeding shall lie exclusively in either of these two forums.

     b.    *Severability*. The provisions of this Agreement shall be severable. If any provision of this Agreement or the application thereof for any reason or circumstances shall to any extent be held to be invalid or unenforceable, the remaining provisions or the application of such provision to persons or entities other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and enforceable to the fullest extent permitted by law.

     c.    *Notice*. Any notice required or permitted to be given under this Agreement shall be given in writing and shall be personally delivered by hand with receipt obtained, by a national overnight express carrier (such as Federal Express), by facsimile, or sent by registered or certified United States mail, return receipt requested, addressed as follows:

If to City:
Commissioner, Department of Public Property
Room 790
City Hall
Philadelphia, PA 19107

With copy to:
City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania, 19102

If to Provider:

**Kelly/Maiello Management LLC**
1420 Walnut Street, 15th floor
Philadelphia PA 19102

If to KMI:

**Kelly/Maiello Inc.**
*Architects & Planners*
1420 Walnut Street, 15th floor
Philadelphia PA 19102

     d.    *Headings*. The headings in this Agreement do not in any way define, limit, describe or amplify the provisions of the Agreement or the scope or intent of the provisions, and are not a part of the Agreement.

5

e. *No Third Party Beneficiaries.* Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon or give to any person, firm, corporation, or legal entity, other than the parties and City, any rights, remedies, or other benefits under or by reason of the Agreement.

f. *Survival.* Any and all provisions set forth in this Agreement which, by its or their nature, would reasonably be expected to be performed after the termination or expiration of the Agreement shall survive and be enforceable after such termination.

g. *Amendments; Waiver.* This Agreement may not be changed, amended, augmented, rescinded, or discharged (other than by performance), in whole or in part, except by a written amendment signed by the City. Except to the extent that City may otherwise agree in writing, no waiver of any provision of the Agreement shall be deemed: (a) to be a waiver of any other provision in the Agreement; or (b) to be a waiver of any breach of the obligations under the Agreement. Any forbearance by a party in seeking a remedy for any noncompliance or breach by the other party shall not be deemed to be a waiver of rights and remedies with respect to such noncompliance or breach.

h. *Authority to Execute.* Each of the Parties represents and warrants that it has caused this Agreement to be duly authorized, executed and delivered by and through persons authorized to execute this Agreement on its behalf; and each of the individuals signing below represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of the party for which he or she has executed it.

i. *Counterparts.* This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together, shall constitute one and the same instrument.

j. Entire Agreement. This Agreement, including all Exhibits, contains all the terms and conditions agreed upon by the parties, constitute the entire agreement among the parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties (except to the extent specifically set forth herein). No other prior or contemporaneous agreements, covenants, representations or warranties, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any party or to vary any of the terms contained in this Agreement.

**[Signature Page(s) Follow]**

#1530239v1 3260-04

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have executed this Agreement as of the day first written above.

**KELLY MAIELLO MANAGEMENT, LLC**

*Emanuel Kelly*
Name/Title (print): *MANAGER*
Date: *Sept 3, 2014 5 SK*

**KELLY MAIELLO, INC.**

*Emanuel Kelly*
Name/Title (print): *Vice President, Treasurer*
Date: *Sept 3, 2015*

**THE CITY OF PHILADELPHIA**

_____

Name/Title (print): _____

Date: _____


Approved as to Form:
Shelley R. Smith, City Solicitor
By: _____
Title: _____

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have executed this Agreement as of the day first written above.


**KELLY MAIELLO MANAGEMENT, LLC**

_____

Name/Title (print): _____

Date: _____


**KELLY MAIELLO, INC.**

_____

Name/Title (print): _____

Date: _____


**THE CITY OF PHILADELPHIA**

_____

Name/Title (print): ___ Bridget Collins-Greenwald
                            Commissioner
Date: _11-6-15_____ Department of Public Property
                            City of Philadelphia


Approved as to Form:
Shelley R. Smith, City Solicitor
By: _____
Title: _____

**EXHIBIT A**
**SCHEDULE OF INTERPRETIVE WORKS**

<u>Porcelite Panels</u>
Gl.01 The Executive Branch
Gl.02 The House & the People Who Worked & Live In It
G 1.03 The Dirty Business of Slavery
Gl.04 Life Under Slavery
G 1.05 History Lost and Found - Reader Rail North - Archeology
Gl.06 History Lost and Found-Reader Rail South-Exposed/ Contradictions/ Discoveries
G 1.07 History Lost and Found - Reader Rail East - Making History/ Digging for History/ Conflict & Collaboration
Gl.08 Video 1 Label Panel- Oney Escapes
G 1.09 Video 2 Label Panel - Contagion and Liberty:
The Yellow Fever Epidemic and the Revolution in Saint Domingue
Gl.10 Video 3 Label Panel- Washington's Death and a Renewed Hope For Freedom
G 1.11 Video 4 Label Panel - Chef Hercules
G 1.12 Video 5 Label Panel - Mount Vernon to Philadelphia:
A Path to Freedom - For Some

<u>Glass Panels</u>
G2.01 Franklin Funeral- Promoting the Abolition of Slavery
G2.02 Burn this Treaty to Hell
G2.03 Thirst for Adam's Blood- "We shall come to a civil war"
G2.04 Fugitive Slave Law - "An Act respecting fugitives from Justice"
G2.05 Adams/ Sedition - Suppressing the Opposition
G2.06 Washington/ Fraunces-The Keeper of the House
G2.07 Upstairs - "I will fear no Evil"
G2.08 Oney Bids Adieu: "I am free now"
G2.09 Refugees from Haiti-The opener of the Way
G2.10 An Independent African Church - A Day of Reciprocity
G2.11 Fleeing the Fever - Refuge in the country
G2.12 Death Carts
G2.13 Threat of Kidnapping - " .. .is hereby empowered to Sieze such Fugitives"
G2. 1 4 Richmond Leaving -"Freedom might be too great a temptation"
G2.15 Adams/ Bunel: Strengthening Ties with the United States
G2.16 Washington/ Native Americans: Awarding a Peace Medal
G2.17 Washing Arriving: "I and my household"

<u>Other Graphic Type</u>
G3.01 The Memorial

<u>Bronze Casts</u>
G4.01 Bronze Footprint (Bronze Shoe Prints)

<u>The President's House - Videos</u>
1. Family Dining Room: Ona Maria Judge Staines -Oney Escapes
2. State Dining Room: Escape from Slavery and Rebellion Against it, and St. Domingue
3. Steward's Room: The Adams Years
4. Servant's Dining Room: Philadelphia & Mount Vernon
5. Kitchen: Hercules

### TRANSFER AND ASSIGNMENT OF COPYRIGHTS
### AND LICENSE TO USE TRADEMARKS RELATING TO THE PRESIDENT'S
### HOUSE EXHIBIT AT INDEPENDENCE NATIONAL PARK

This Transfer And Assignment Of Copyrights and License to Use Trademarks Relating To The President's House Exhibit At Independence National Park ("Transfer and Assignment" or "Agreement") is made and is effective as of July 7, 2015 (the "Effective Date") by and between the natural person Louis Massiah and the City of Philadelphia, a municipal corporation under the laws of Pennsylvania (collectively, the "Parties" and each a "Party").

### RECITALS

A.  The City of Philadelphia (the "City") entered into that certain Cooperative Agreement for the President's House Project and Archeological Research Dig, dated September 1, 2006, as amended (the "Cooperative Agreement") with the United States of America, acting through the National Park Service of the United States Department of the Interior ( "NPS") to establish a public exhibit at Independence National Historic Park in Philadelphia relating to the site of the house occupied by former Presidents George Washington and John Adams (the "President's House Exhibit," sometimes referred to herein as the "Project");

B.  Kelly/Maiello Management, LLC (the "Provider") entered into that certain Commission Agreement for Design, Fabrication and Installation of Public Exhibit dated October 5, 2007, as amended (the "Commission Agreement") with the City to provide "Services" , "Materials" and "Installation" (all as defined in the Commission Agreement) to establish the President's House Exhibit; provided, that the terms "Services" and "Materials" together include all copyrightable works created for the President's House Exhibit pursuant to the Commission Agreement, whether or not expressly identified in this Agreement);

C.  Provider entered into an agreement (the "KMI Agreement") with Kelly/Maiello, Inc. ("KMI") according to which KMI, through itself and its sub-consultants, agreed to provide certain of the Services and Materials for the President's House Exhibit, with those certain Services and Materials defined collectively in the KMI Agreement as "KMI Services and Materials;"

D.  KMI and Louis Massiah (fiscally sponsored by Scribe Video Center, Inc.) entered into an agreement (the "Louis Massiah Agreement") according to which Louis Massiah agreed to provide certain Services and Materials required of KMI under the KMI Agreement.

E.  The Services and Materials Louis Massiah provided under the Louis Massiah Agreement (collectively, the "Louis Massiah Services and Materials") included, but were not limited to, the production of five (5) multi-media video productions, as identified in Exhibit A hereto, titled "Schedule of Multi-Media Works," under the heading "The President's House – Videos" (collectively, the "Multi-Media Works");

F.  Louis Massiah entered into that certain agreement with Dwight Andrews, pursuant to which Dwight Andrews agreed to provide certain musical compositions and musical scores and related

1

services and materials to be incorporated into the Multi-Media Works (such musical compositions and musical scores and all other services and materials Dwight Andrews agreed to provide under such Agreement, are hereinafter referred to collectively as the "Dwight Andrews Services and Materials";

G.   Louis Massiah, through his solely-owned corporation Seventh Ward Project, Inc., also entered into that certain agreement (the "SAG Agreement") with the Screen Actors Guild – American Federation of Television and Radio Artists ("SAG"), through the paymaster Em Bee Productions/Penny Baker, to secure performances by various actors, including those required for the production of the Multi-Media Works (those performances are hereinafter collectively referred to as the "President's House Performances");

H.   The City intends to transfer (the "City Transfer") to the NPS certain rights, titles and interests in the President's House Exhibit, including rights, titles and interests in and to ownership of all copyrights in the Interpretive Works, and the right to use any trademarks and service marks incorporated in the Louis Massiah Services and Materials.

### *COVENANTS*

NOW, THEREFORE, in consideration of the mutual promises contained herein, the foregoing recitals A.-H, all of which are incorporated by reference herein, and for other good and viable consideration and intending to be legally bound hereby, the Parties hereto agree as follows:

1.   Louis Massiah, for good and valuable consideration, hereby grants, transfers, conveys and assigns to the City his entire right, title and legal and equitable interest in and to the Multi-Media Works, including, without limitation, all copyrights in and to the Multi-Media Works -, every component of the Multi-Media Works not in the public domain, and all other copyrightable works, individually or collectively, created by Louis Massiah as part of the Louis Massiah Services and Materials, and including any copyrights that Louis Massiah may own in the Dwight Andrews Services and Materials (collectively, the "Louis Massiah Copyrights"). This assignment includes assignment of all such rights of Louis Massiah under Title 17 Section 106 of the United States Code, including without limitation the right to modify, reproduce, incorporate, embody, adapt, prepare derivative works from, distribute copies to the public by sale or transfer of ownership, or by rental, lease or lending, display publicly, or otherwise to use the Louis Massiah Copyrights; the right to obtain registrations of copyright for the Multi-Media Works and other Louis Massiah Services and Materials in the City's sole name, in the United States and throughout the world; and the right to further grant, transfer and assign such rights, in whole or in part, to NPS or to others.

2.   Louis Massiah warrants and represents (i) that he owns the Louis Massiah Copyrights and holds marketable title to the Louis Massiah Copyrights with there being no prior assignments, hypothecations, licenses or other encumbrances of any nature affecting them; (ii) that he has, without restriction and without obtaining the consent of any other party, the right to transfer Louis Massiah Copyrights to the City as provided in this agreement; and (iii) that the Louis Massiah Copyrights do not infringe the rights of any third parties and that there are not now and never have been any outstanding lawsuits, actions, claims or legal proceedings involving the Louis Massiah Copyrights, other than claims asserted by the City; and (iv) that the five (5) works identified in Exhibit A under the heading "The President's House –

2

LJM
14 October 20_

Videos" (a) comprise all of the videos produced by Louis Massiah for the Project, and (b) are correctly and uniquely identified, by title, in Exhibit A.

3.  No part of this agreement shall preclude Louis Massiah from presenting his copyrightable services and materials incorporated in the Project as part of his work portfolio or in non-commercial exhibitions or presentations.

4.  Louis Massiah shall have no responsibility whatsoever for the payment of any performance or other fees that may be required by SAG, acting on its behalf or on behalf of actors performing in the Multi-Media Works or otherwise, as a condition of posting the Multi-Media Works on the Internet or selling DVDs of the Multi-Media Works or any other use of the Multi-Media Works that is not permitted under the SAG Agreement; provided, however, that nothing in this Section 4 is intended to excuse Louis Massiah from responsibility for any fees that may be due or owing to SAG for the uses permitted under the SAG Agreement, which fees were Louis Massiah's responsibility under the ~~Louis SAG Massiah~~ Agreement, or to make the City responsible for such fees.



5.  Louis Massiah hereby grants to the City and its assigns a perpetual, non-exclusive, royalty-free license to use his trademarks or service marks in connection with the Project and the Multi-Media Works. This license does not give rise to any payment or other obligations on the part of the City or its assigns. The City and its assigns shall have sole discretion in how these marks will be used in connection with the Project and the Multi-Media Works.  Louis Massiah warrants and represents that he has, without restriction and without obtaining the consent of any other party, the right to grant such license to use his trademarks and service marks.

6.  The City assumes the assignment of copyrights made by Louis Massiah under Section 1 of this Agreement.

7.  Miscellaneous Provisions

    a.  *Governing Law; Forum Selection; Consent To Jurisdiction.* This Agreement and all disputes arising under it shall be governed, construed and decided in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to principles of Pennsylvania law concerning conflicts of laws. The parties agree that any lawsuit, action, claim, or legal proceeding arising out of this Agreement shall be brought exclusively in the United States District Court for the Eastern District of Pennsylvania or the Court of Common Pleas of Philadelphia County.

    b.  *Severability.* The provisions of this Agreement shall be severable. If any provision of this Agreement or the application thereof for any reason or circumstances shall to any extent be held to be invalid or unenforceable, the remaining provisions or the application of such provision to persons or entities other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and enforceable to the fullest extent permitted by law.

    c.  *Notice.* Any notice required or permitted to be given under this Agreement shall be given in writing and shall be personally delivered by hand with receipt obtained, by a national overnight express carrier (such as Federal Express), by facsimile, or sent by registered or certified United States mail, return receipt requested, addressed as follows:

3



If to City:
Commissioner
Department of Public Property
790 City Hall
Philadelphia, PA 19107

With copy to:
City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania, 19102

If to Louis Massiah: [INSERT CONTACT INFORMATION]

Scribe Video
4213 Chestnut Street, 3rd Floor
Philadelphia 19104

d.      *Headings.* The headings in this Agreement do not in any way define, limit, describe or amplify the provisions of the Agreement or the scope or intent of the provisions, and are not a part of the Agreement.

e.      *No Third Party Beneficiaries.* Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon or give to any person, firm, corporation, or legal entity, other than the parties and City, any rights, remedies, or other benefits under or by reason of the Agreement.

f.      *Survival.* Any and all provisions set forth in this Agreement which, by its or their nature, would reasonably be expected to be performed after the termination or expiration of the Agreement shall survive and be enforceable after such termination.

g.      *Amendments; Waiver.* This Agreement may not be changed, amended, augmented, rescinded, or discharged (other than by performance), in whole or in part, except by a written amendment signed by the City. Except to the extent that City may otherwise agree in writing, no waiver of any provision of the Agreement shall be deemed: (a) to be a waiver of any other provision in the Agreement; or (b) to be a waiver of any breach of the obligations under the Agreement. Any forbearance by a party in seeking a remedy for any noncompliance or breach by the other party shall not be deemed to be a waiver of rights and remedies with respect to such noncompliance or breach.

h.      *Authority to Execute.* Each of the Parties represents and warrants that it has caused this Agreement to be duly authorized, executed and delivered by and through persons authorized to execute this Agreement on its behalf; and each of the individuals signing below represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of the party for which he or she has executed it.

4

LTM
14 oct 2015

i.    *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together, shall constitute one and the same instrument.

j.    *Entire Agreement.* This Agreement, including all Exhibits, contains all the terms and conditions agreed upon by the parties, constitute the entire agreement among the parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties (except to the extent specifically set forth herein).  No other prior or contemporaneous agreements, covenants, representations or warranties, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any party or to vary any of the terms contained in this Agreement.

**[Signature Page(s) Follow]**

**IN WITNESS WHEREOF,** the parties hereto, intending to be legally bound, have executed this Agreement as of the day first written above.

**LOUIS MASSIAH**,

Name/Title (print):   Louis J Massiah

Date:   14 October 2015

**THE CITY OF PHILADELPHIA**

Name/Title (print): _____

Date: _____

Approved as to Form:
Shelley R. Smith, City Solicitor
By: _____
Title: _____

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have executed this Agreement as of the day first written above.

**LOUIS MASSIAH**

_____

Name/Title (print): _____

Date: _____

**THE CITY OF PHILADELPHIA**

_____

Name/Title (print): _____ Bridget Collins-Greenwald
                                        Commissioner
Date: _1-6-15___        Department of Public Property
                                   City of Philadelphia

Approved as to Form:
Shelley R. Smith, City Solicitor
By: _____
Title: _____

**EXHIBIT A**

**SCHEDULE OF MULTI-MEDIA WORKS**

1. Family Dining Room: Ona Maria Judge Staines -Oney Escapes

2. State Dining Room: Escape from Slavery and Rebellion Against it, and St. Domingue

3. Steward's Room: The Adams Years

4. Servant's Dining Room: Philadelphia & Mount Vernon

5. Kitchen: Hercules

### *TRANSFER AND ASSIGNMENT OF COPYRIGHTS*
### *AND LICENSE TO USE TRADEMARKS RELATING TO THE PRESIDENT'S*
### *HOUSE EXHIBIT AT INDEPENDENCE NATIONAL PARK*

This Transfer And Assignment Of Copyrights and License to Use Trademarks Relating To The President's House Exhibit At Independence National Park ("Transfer and Assignment" or "Agreement") is made and is effective as of July 7, 2015 (the "Effective Date") by and between the natural person Lorene Cary and the City of Philadelphia, a municipal corporation under the laws of Pennsylvania (collectively, the "Parties" and each a "Party").

### *RECITALS*

A.  The City of Philadelphia (the "City") entered into that certain Cooperative Agreement for the President's House Project and Archeological Research Dig, dated September 1, 2006, as amended (the "Cooperative Agreement") with the United States of America, acting through the National Park Service of the United States Department of the Interior ( "NPS") to establish a public exhibit  at Independence National Historic Park in Philadelphia relating to the site of the house occupied by former Presidents George Washington  and John Adams  (the "President's House Exhibit," sometimes referred to herein as the "Project");

B.  Kelly/Maiello Management, LLC (the "Provider") entered into that certain Commission Agreement for Design, Fabrication and Installation of  Public Exhibit dated October 5, 2007 as amended (the "Commission Agreement") with the City to provide "Services", "Materials" and "Installation" (all as defined in the Commission Agreement) to establish the President's House Exhibit; provided, that the terms "Services" and "Materials" together  include all copyrightable works created for the President's House Exhibit pursuant to the Commission Agreement, whether or not expressly identified in this Agreement;

C.  Provider entered into that certain agreement (the "KMI Agreement") with Kelly/Maiello, Inc. ("KMI") according to which KMI, through itself and its sub-consultants, agreed to provide certain of the Services and Materials for the President's House Exhibit, with those certain Services and Materials defined collectively in the KMI Agreement as "KMI Services and Materials;"

D.  KMI and Louis Massiah (fiscally sponsored by Scribe Video Center, Inc.) entered into an agreement (the "Louis Massiah Agreement") according to which Louis Massiah agreed to provide certain of the Services and Materials required of KMI under the Commission Agreement;

E.  The Services and Materials Louis Massiah provided under the Louis Massiah Agreement (collectively, the "Louis Massiah Services and Materials") included, but were not limited to, the production of five (5) multi-media video productions, as identified in Exhibit A hereto, titled "Schedule of Multi-Media Works," under the heading "The President's House – Videos" (collectively, the "Multi-Media Works");

F.  Provider entered into that certain agreement with Lorene Cary, pursuant to which Lorene Cary agreed to create and deliver to Provider certain dramatic scripts and related services and materials to be incorporated into the Multi-Media Works (such dramatic scripts and all other services and materials Lorene Cary agreed to provide under such Agreement are hereinafter referred to collectively as the "Lorene Cary Services and Materials";

G.  Louis Massiah, through his solely-owned corporation Seventh Ward Project, Inc., also entered into that certain agreement (the "SAG Agreement") with the Screen Actors Guild – American Federation of Television and Radio Artists ("SAG"), through the paymaster Em Bee Productions/Penny Baker, to secure performances by various actors, including those required for the production of the Multi-Media Works (those performances are hereinafter collectively referred to as the "President's House Performances");

H.  The City intends to transfer (the "City Transfer") to the NPS certain rights, titles and interests in the President's House Exhibit, including rights, titles and interests in and to ownership of all copyrights in the Interpretive Works, and the right to use any trademarks and service marks incorporated in the Lorene Cary Services and Materials.

## *COVENANTS*

NOW, THEREFORE, in consideration of the mutual promises contained herein, the foregoing recitals A.-H, all of which are incorporated by reference herein, and for other good and viable consideration and intending to be legally bound hereby, the Parties hereto agree as follows:

1.  Lorene Cary, for good and valuable consideration, hereby grants, transfers, conveys and assigns to the City her entire right, title and legal and equitable interest in and to the Multi-Media Works, including, without limitation, all of her copyrights in and to the dramatic scripts incorporated in the Multi-Media Works and all other copyrightable works, individually or collectively, created by Lorene Cary as part of the Lorene Cary Services and Materials (collectively, the "Lorene Cary Copyrights"). This assignment includes assignment of all such rights of Lorene Cary under Title 17, Section 106 of the United States Code including the right to reproduce, incorporate, embody, adapt, prepare derivative works, distribute copies to the public by sale or transfer of ownership, or by rental, lease or lending, display publicly, or otherwise use the Lorene Cary Copyrights; the right to obtain registrations of copyright for the Multi-Media Works and other Lorene Cary Services and Materials in the City's sole name, in the United States and throughout the world; and the right to further grant, transfer and assign such rights, in whole or in part, to NPS or to others.

2.  Lorene Cary warrants and represents (i) that she owns the Lorene Cary Copyrights and holds marketable title to the Lorene Cary Copyrights with there being no prior assignments, hypothecations, licenses or other encumbrances of any nature affecting them; (ii) that he has, without restriction and without obtaining the consent of any other party, the right to transfer the Lorene Cary Copyrights to the City as provided in this agreement; and (iii) that the Lorene Cary Copyrights do not infringe the rights of any third parties and that there are not now and never have been any outstanding lawsuits, actions, claims or legal proceedings involving the Lorene Cary Copyrights other than claims asserted by the City.

2

3.  No part of this agreement shall preclude Lorene Cary from presenting her copyrightable services and materials incorporated in the Project as part of their work portfolio or in non-commercial exhibitions or presentations.

4.  Lorene Cary shall have no responsibility whatsoever for the payment of any performance or other fees that may be required by SAG, acting on its behalf or on behalf of actors performing in the Multi-Media Works or otherwise, as a condition of posting the Multi-Media Works on the Internet or selling DVDs of the Multi-Media Works or any other use of the Multi-Media Works that is not permitted under the SAG Agreement.

5.  Lorene Cary ( hereby grants to the City and its assigns a perpetual, non-exclusive, royalty-free license to use any of their trademarks or service marks in connection with the Project and the Multi-Media Works. This license does not give rise to any payment or other obligations on the part of the City or its assigns. The City and its assigns shall have sole discretion in how these marks will be used in connection with the Project and the Multi-Media Works.  Lorene Cary  warrants and represents that she has, without restriction and without obtaining the consent of any other party, the right to grant such license to use its trademarks and service marks.

6.  The City assumes the assignment of copyrights made by  Lorene Cary under this Agreement.

7.  Miscellaneous Provisions

a.  *Governing Law; Forum Selection; Consent To Jurisdiction.* This Agreement and all disputes arising under it shall be governed, construed and decided in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to principles of Pennsylvania law concerning conflicts of laws. The parties agree that any lawsuit, action, claim, or legal proceeding arising out of this Agreement shall be brought exclusively in the United States District Court for the Eastern District of Pennsylvania or the Court of Common Pleas of Philadelphia County.

b.  *Severability.* The provisions of this Agreement shall be severable. If any provision of this Agreement or the application thereof for any reason or circumstances shall to any extent be held to be invalid or unenforceable, the remaining provisions or the application of such provision to persons or entities other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and enforceable to the fullest extent permitted by law.

c.  *Notice.* Any notice required or permitted to be given under this Agreement shall be given in writing and shall be personally delivered by hand with receipt obtained, by a national overnight express carrier (such as Federal Express), by facsimile, or sent by registered or certified United States mail, return receipt requested, addressed as follows:

If to City:
Commissioner
Department of Public Property
790 City Hall
Philadelphia, PA 19107

3

With copy to:
City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, Pennsylvania, 19102

If to Lorene Cary: 2033 Bainbridge Street,
                 Philadelphia, PA 19146

       d.      *Headings*. The headings in this Agreement do not in any way define, limit, describe or amplify the provisions of the Agreement or the scope or intent of the provisions, and are not a part of the Agreement.

       e.      *No Third Party Beneficiaries*. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon or give to any person, firm, corporation, or legal entity, other than the parties and City, any rights, remedies, or other benefits under or by reason of the Agreement.

       f.      *Survival*. Any and all provisions set forth in this Agreement which, by its or their nature, would reasonably be expected to be performed after the termination or expiration of the Agreement shall survive and be enforceable after such termination.

       g.      *Amendments; Waiver*. This Agreement may not be changed, amended, augmented, rescinded, or discharged (other than by performance), in whole or in part, except by a written amendment signed by the City. Except to the extent that City may otherwise agree in writing, no waiver of any provision of the Agreement shall be deemed: (a) to be a waiver of any other provision in the Agreement; or (b) to be a waiver of any breach of the obligations under the Agreement.  Any forbearance by a party in seeking a remedy for any noncompliance or breach by the other party shall not be deemed to be a waiver of rights and remedies with respect to such noncompliance or breach.

       h.      *Authority to Execute*. Each of the Parties represents and warrants that it has caused this Agreement to be duly authorized, executed and delivered by and through persons authorized to execute this Agreement on its behalf; and each of the individuals signing below represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of the party for which he or she has executed it.

       i.      *Counterparts*.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together, shall constitute one and the same instrument.

       j.      *Entire Agreement*. This Agreement, including all Exhibits, contains all the terms and conditions agreed upon by the parties, constitute the entire agreement among the parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties (except to the extent specifically set forth herein).  No other prior or contemporaneous agreements, covenants, representations or warranties, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any party or to vary any of the terms contained in this Agreement.

the subject matter of this Agreement shall be deemed to exist or to bind any party or to vary any of the terms contained in this Agreement.

**[Signature Page(s) Follow]**

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have executed this Agreement as of the day first written above.

**LORENE CARY**

_[signature]_

Name/Title (print): _LORENE CARY_

Date: _22 SEPTEMBER 2015_

**THE CITY OF PHILADELPHIA**

_____

Name/Title (print): _____

Date: _____

Approved as to Form:
Shelley R. Smith, City Solicitor
By: _____
Title: _____

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have executed this Agreement as of the day first written above.


**LORENE CARY**

_____

Name/Title (print): _____

Date: _____


**THE CITY OF PHILADELPHIA**

_____

Name/Title (print): Bridget Collins-Greenwald
Commissioner
Date: _____ Department of Public Property
City of Philadelphia


Approved as to Form:
Shelley R. Smith, City Solicitor
By: _____
Title: _____

**EXHIBIT A**

**SCHEDULE OF MULTI-MEDIA WORKS**

1. Family Dining Room: Ona Maria Judge Staines -Oney Escapes

2. State Dining Room: Escape from Slavery and Rebellion Against it, and St. Domingue

3. Steward's Room: The Adams Years

4. Servant's Dining Room: Philadelphia & Mount Vernon

5. Kitchen: Hercules