CITY OF PHILADELPHIA,

               Plaintiff,

      v.

JESSICA BOWRON, ACTING DIRECTOR OF THE
NATIONAL PARKS SERVICE,

                                        **Civil Action No. 2:26-cv-434**

DOUG BURGUM, SECRETARY OF THE INTERIOR,
UNITED STATES DEPARTMENT OF THE
INTERIOR,

JESSICA BOWRON, ACTING DIRECTOR OF THE
NATIONAL PARKS SERVICE,

and
NATIONAL PARKS SERVICE, UNITED STATES
DEPARTMENT OF THE INTERIOR,
Defendants.

                    Defendants.

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2026, upon consideration of

Plaintiff the City of Philadelphia's Motion for Preliminary Injunction, and any response thereto,

it is **HEREBY ORDERED** that the Motion is **GRANTED**.  Defendants are hereby ordered to

restore the President's House Site to its status as of January 21, 2026.  Defendants are further

enjoined from taking any action to damage any exhibits, panels, artwork, or other items from the

President's House Site and are ordered to take all necessary steps to ensure the safety, security,

and preservation of any such items removed from the President's House Site on January 22,

2026.

BY THE COURT:

_____

| | |
|---|---|
| CITY OF PHILADELPHIA,<br><br>Plaintiff,<br><br>v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR,<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>JESSICA BOWRON, ACTING DIRECTOR OF THE NATIONAL PARKS SERVICE,<br><br>and<br><br>NATIONAL PARKS SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Civil Action No. 2:26-cv-434 |

## MOTION FOR PRELIMINARY INJUNCTION

On January 22, 2026, Defendants removed display panels depicting slavery and enslaved persons from the President's House Site in the Independence National Historic Park in Philadelphia. Plaintiff City of Philadelphia hereby moves, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction to restore the President's House Site to its status as of January 21, 2026 and to enjoin Defendants from taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site. Defendants' removal of the display panels is contrary to law and the longstanding contractual relationship between the parties and will cause immediate and irreparable harm to the City of Philadelphia. Both the balance of equities and public interest strongly favor entry of an injunction that enjoins the

United States from modifying the President's House as it has done and from harming the

exhibits, panels, artwork, or other items associated with that site.

Plaintiff requests that the Court set a hearing at which witness testimony and oral

argument will be presented.  This motion is supported by the attached Memorandum in Support

of the Motion for Preliminary Injunction, Plaintiff's Complaint and attached exhibits, as well as

any additional submissions and oral argument that may be considered by the Court.


Date:  January 22, 2026                    Renee Garcia, City Solicitor
                                                 Anne Taylor, Chair | Litigation
                                                 Lydia Furst, Chief Deputy City Solicitor

*/s/ Ryan B. Smith*
Ryan B. Smith, Divisional Deputy City Solicitor
Bailey Axe, Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
(215) 410-8264
Ryan.Smith@phila.gov

*Attorneys for Plaintiff City of Philadelphia*

| | |
|---|---|
| CITY OF PHILADELPHIA,<br><br>Plaintiff,<br><br>v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR,<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>JESSICA BOWRON, ACTING DIRECTOR OF THE NATIONAL PARKS SERVICE,<br><br>and<br><br>NATIONAL PARKS SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Civil Action No. 2:26-cv-434 |

**MEMORANDUM IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION**

Defendant the City of Philadelphia (the "City" or "Philadelphia"), by and through its undersigned counsel, hereby files this Memorandum of Law in Support of its Motion For Preliminary Injunction.

## I. INTRODUCTION

The President's House Site represents the best of collaboration between federal and local governments. It sits at the center of the celebration of and architecture illustrating the foundational history of the United States of America. The stewardship of these sites demonstrates a long history of partnership between the federal government and the City of Philadelphia. The President's House is the most recent addition to Independence National Historical Park, the development of which began in 2006, the construction of which completed

around 2015, and which was designated – in its entirety – as a Network to Freedom site under the terms of the National Underground Railroad Network To Freedom Act ("Underground Railroad Act"), P.L. 105-203, 105th Congress.

The United States now seeks to destroy this monument by summarily removing the artwork that comprises an integral part of the President's House display. This destruction of the designated monument is arbitrary and capricious, and the Court should direct that Defendants immediately restore panels depicting slavery and enslaved persons to the President's House Site, and prohibit them from damaging these integral parts of the President's House.

## II. BACKGROUND

### A. The Collaborative History of Independence National Historical Park

Independence Mall, together with Independence Square, Washington Square, Benjamin Franklin's house, and other buildings and areas in and near Old City Philadelphia comprise the Independence National Historical Park. Independence National Historical Park was created by Public Law 798, 80th U.S. Congress, approved on June 28, 1948. It was established for "the purpose of preserving for the benefit of the American people…certain historical structures and properties of outstanding national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States…" Its "administration, protection, and development" are to be "exercised under the direction of the Secretary of the Interior by the National Park Service."

Following the creation of Independence National Historical Park, the Secretary of the Interior entered into an agreement with the City on July 14, 1950 (the "1950 Agreement"), which includes provisions for communication and coordination of actions of the federal and municipal entities. Pursuant to the 1950 Agreement, the NPS occupies the Independence Square buildings

exclusively and is responsible for their stewardship and daily operations; the City retains ownership of the buildings and the site. The agreement describes its purpose as the development of "a unified, long-rage program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States." (Article III, Section (e).) The 1950 Agreement gives the NPS broad "curatorial responsibility for the care and display of such museum objects, furnishings, or exhibits of historical interest…including the right to rearrange furniture and exhibits…." (Article I, Section (b).) The agreement provides, however, that "major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon" (Article III, Section (c)). The agreement also limits both parties from placing markers or memorials on the buildings and grounds without the express consent of the other. (Article III, Section (d).)

B.      The History of the President's House Location

The President's House is an archeological site and exhibit at 6th and Market Streets on the Independence Mall in the Independence National Historical Park. The Federal Park Service describes the history of President's House location as follows:

> In the 1790s, at the President's House location at Sixth and Market Streets, Presidents George Washington and John Adams lived and conducted their executive branch business. Washington brought some of his enslaved Africans to this site and they lived and toiled with other members of his household during the years that our first president was guiding the experimental development of the young nation toward modern, republican government. Washington's large household, including enslaved African descendants, contrasted with Adams' small household. Adams never owned slaves.

> The President's house in the 1790s was a mirror of the young republic, reflecting both the ideals and contradictions of the new nation. The house stood in the shadow of Independence Hall, where the words "All men are created equal" and "We the

People" were adopted, but they did not apply to all who lived in the new United States of America.

*See* https://www.nps.gov/inde/learn/historyculture/places-presidentshousesite.htm.

### C.    The Genesis of the President's House Monument

The Smithsonian, in turn, explains the genesis of the commemorative site as follows:

> The 2002 revelation that George Washington kept slaves in his executive mansion at Philadelphia's Independence National Historical Park in the 1790s prompted an eight-year controversy about the role of slavery in America's commemorative landscape. When the President's House installation opened in 2010, it became the first federal property to feature a slave memorial.

https://www.si.edu/object/upon-ruins-liberty-slavery-presidents-house-independence-national-

historical-park-and-public-memory%3Asiris_sil_1090980.

### D.    The History of the City-Federal Collaboration to Develop the President's House

In 2006, the City and NPS entered into an agreement to establish an exhibit at the site of

the former President's House (the "2006 Cooperative Agreement"), located on Independence

Mall next to the Liberty Bell Center. The 2006 Cooperative Agreement and subsequent

amendments consistently highlighted the fact that enslaved people were present at our nation's

founding. The 2006 Agreement described the location as "where Presidents George Washington

and John Adams lived and where at least nine enslaved Africans—kept by George Washington—

also lived." (2006 Agreement, Background Paragraph E). The 2006 Cooperative Agreement was

amended in 2007, 2008, and 2009.

Under the 2009 Third Amendment, the City was responsible for the "design, fabrication,

installation, and completion" of the President's House Project, titled "Freedom and Slavery in

Making a New Nation." (Third Amendment, Article I, Sections B and C; Attachment A, Section

IV, Paragraph 4.) The 2009 Agreement expressly calls for exhibits that explain the lives of

enslaved people living at President's House. The agreements acknowledged that the exhibits not

only "will commemorate the home of George Washington and John Adams during the first ten years of the federal government," but that equally important was the intention to "commemorate the enslaved Africans who resided in the Washington household." (2009 Agreement, Attachment C, Section B). Further, the Project Summary Sheet describes the project as an exhibit that will "commemorate all those who lived in the house while it was used as the executive mansion, including the nine enslaved Africans brought by George Washington from Mt. Vernon." (2009 Agreement, Attachment A, Section II). A "core design requirement" mandated that "the footprint of the Slave Quarters must be conspicuously highlighted and a solemn 'sense of place' clearly established." In addition, five of the six jointly agreed upon themes "that must be reflected in the final design" all centered on enslaved persons to highlight "how knowledge of the President's House and the presence of slavery was forgotten and recovered; why we must remember." (2009 Agreement, Attachment C, Section F, subsection D).

The 2006 Cooperative Agreement and its subsequent amendments provide that the President's House together with the interpretative displays in it are all part of a single exhibit. (2006 Agreement, Background Paragraphs E and F; also, Third Amend., Attachment C, Section B.)  Additionally, the City has an equal right with the NPS under these agreements to approve the final design of the President's House Project.  (Third Amend. Attachment A, Section IV(4) (stating that NPS "will participate in the final review and approval of the Project")).

The President's House exhibit opened in 2010, featuring a number of display panels depicting slavery and enslaved people. Pictures of the display panels can be viewed here: https://www.ushistory.org/presidentshouse/plans/exhibition.php.

Additionally, in July and December 2015, the City entered into agreements assigning the intellectual property rights of the President's House Project to the NPS (the "2015 IP Assignment

Agreements"). Specifically, the 2015 IP Assignment Agreements include an assignment for the "Interpretative Works" of the President's House Project. (July 2015 IP Assignment Agreement Recital (B); December 2015 IP Assignment Agreement Recital (B).) The Schedule of Interpretative Works, attached as Exhibit A to the July 2015 IP Assignment Agreement, reflects that many of the works expressly address slavery. The transfer of the copyrights under the 2015 IP Assignment Agreements did not include the authority to materially alter or destroy altogether the exhibit underlying the copyright.

**E.      The National Underground Railroad Network to Freedom Act of 1998**

Congress enacted the National Underground Railroad Network to Freedom Act of 1998 "[t]o authorize the National Park Service to coordinate and facilitate Federal and non-Federal activities to commemorate, honor, and interpret the history of the Underground Railroad, its significance as a crucial element in the evolution of the national civil rights movement, and its relevance in fostering the spirit of racial harmony and national reconciliation."  PL 105–203, July 21, 1998, 112 Stat 678. Passed in 1998, the act created a program within the NPS known as the "National Underground Railroad Network to Freedom" and outlined actions the Interior Secretary must take in regard to sites deemed part of the network. Those requirements include that the Secretary must "produce and disseminate appropriate educational materials, such as handbooks, maps, interpretive guides, or electronic information" at sites pertaining to the Underground Railroad.  Sites are designated for inclusion in the Network to Freedom ("NTF") program through a nomination and application process. The President's House, following its nomination, acceptance, and consent of the Superintendent of Independence National Historical Park, was designated as a NTF site in 2022.

**F.      Executive Order and Removal of President's House Panels**

In March of 2025, Executive Order No. 14253 titled "Restoring Truth And Sanity To American History" (the "Executive Order"), called for, among other things, the Interior Department to "ensure that [materials under the jurisdiction of the department] do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times)." According to media reporting, certain displays across Independence National Historical Park, including President's House panels, were flagged for a content review in connection with the Executive Order due to their depiction of slavery or enslaved persons.

On January 22, 2026, the City learned that Defendants planned to remove all President's House panels depicting slavery. The same day, the Philadelphia City Solicitor sent a letter to the United States Attorney for the Eastern District of Pennsylvania requesting that Defendants refrain from removing the panels until representatives of the City and the Defendants had an opportunity to meet and confer. At approximately 3:00 p.m., employees of Defendants arrived at the Independence National Historic Park and quickly removed all President's House panels depicting slavery and enslaved persons. Defendants provided no notice to the City and did not seek to meet and confer with the City.

### G.    Procedural History

Philadelphia filed its Complaint in this action on January 22, 2026. By its Complaint, Philadelphia specifically alleged that the removal of the President's House panels violated the applicable Cooperative Agreement and amendments and was arbitrary and capricious in violation of the Administrative Procedures Act. Compl., ECF No. 1.

## III. LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities, considering the harm to be suffered by the other party if relief is granted, tips in its favor; and (4) preliminary relief is in the public interest. *Winter v. Nat. Res. Def Council, Inc.*, 555 U.S. 7, 20 (2008). In the Third Circuit, "[a] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors" - that is, "it must demonstrate that it can win on the merits" and "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief"-before the court moves on to the final two. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If both of "these gateway factors are met," the court will "consider the remaining two ... and determin[e] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*. Each factor weighs in favor of granting relief here.

## IV. ARGUMENT

### A. The City Is Likely To Succeed On The Merits Of Its Claims

Defendants' actions violate the Administrative Procedure Act ("APA") and are arbitrary, capricious and an abuse of discretion. Defendants Department of the Interior and National Parks Service are "agencies" under the Administrative Procedure Act (APA). 5 U.S.C. §§ 551(1), 701. Upon information and belief, Defendants took final agency actions that are subject to judicial review when they made decisions to remove all depictions of slavery and enslaved persons from the President's House, a NTF site.

The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2). An agency action is arbitrary or capricious where the agency fails to "articulate a

satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of US. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). When an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 30, 33 (2020). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). An action is also arbitrary and capricious if the agency "failed to consider ... important aspect[ s] of the problem" before it or did not take into account "legitimate reliance interests." *Regents*, 591 U.S. at 25 (quoting State Farm, 463 U.S. at 43).

Defendants' decision reflects an arbitrary and capricious action by failing to engage in reasoned analysis or weigh any interest against a competing policy concern. The "APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision." *Rhode Island*, at *11. Here, "the 'rational connections' are absent." *Id*.

Moreover, the agreements between Defendants and the City expressly call for explaining the lives of enslaved people living at President's House. (See, e.g., 2006 Agreement, Background Paragraph E; Third Amend., Attachment A, Sections I—II). The interpretive displays relating to enslaved persons at President's House are an integral part of the exhibit and removing them would be a material alteration to the exhibit. The City had an equal right with the NPS under these agreements to approve the final design of the President's House Project. (Third Amend. Attachment A, Section IV(4) (stating that NPS "will participate in the final review and approval

of the Project" (emphasis added))). The City's right to approve the exhibit's final design, including the interpretive displays, would be meaningless if the NPS could at any time later change or remove the displays without the City's approval. Defendants did not engage with the City and do not have the City's approval to make unilateral changes to the President's House exhibit, removing the panels referencing the history of slavery at the property. Defendants violated the agreements and have not provided any rationale for their abrupt change in course.

Therefore, because there is a likelihood that the City will succeed on the merits of its claims pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the City is entitled to a declaration that the Defendants' decision to remove the education panels – an integral part of the monument – was arbitrary and capricious. The panels should be restored to preserve the status quo that existed prior to the unlawful actions.

**B.**     **Irreparable Injury Will Result Absent Preliminary Relief**

District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief. *See Rhode Island* at \*15. "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial." *Doe 1* at 699.

The President's House has been designated by Congress as a Network to Freedom ("NTF") site. And as is described on NPS's website, "The President's House Site tells the story of the paradox of liberty and enslavement in one home - and in a nation." *See* https://www.nps.gov/inde/learn/historyculture/places-presidentshousesite.htm. The removal from the President's House Site of all panels, exhibits, and artwork that reference slavery will irreparably harm this NTF site.

**C.**     **The Balance Of Equities And The Public Interest Favor Granting Relief**

The final two preliminary injunction factors—balance of the equities and public interest— merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors also strongly favor preliminary injunctive relief in this case. When weighing these factors, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief ... pay[ing] particular regard for the public consequences" that would result from the emergency relief sought. *Rhode Island* at * 17 (quoting *Winter*, 555 U.S. at 24).

First, the actions challenged herein are contrary to law, as described above.  Second, on the other side of the balancing scale, Defendants cannot demonstrate how the public interest would be harmed by returning the President's House to its current state prior to the January 22, 2026 removal while the court determines whether such removal is legally permissible. Indeed, "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriquez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

V.     **CONCLUSION**

For all of the reasons set forth herein, the City requests that the Court grant preliminary injunction to preserve the status quo with respect to the President's House.

Date:  January 22, 2026                         Renee Garcia, City Solicitor
                                                Anne Taylor, Chair | Litigation
                                                Lydia Furst, Chief Deputy City Solicitor

                                                */s/ Ryan B. Smith*
                                                Ryan B. Smith, Divisional Deputy City Solicitor
                                                Bailey Axe, Deputy City Solicitor
                                                City of Philadelphia Law Department
                                                1515 Arch Street, 15th Floor
                                                Philadelphia, PA 19102
                                                (215) 410-8264
                                                Ryan.Smith@phila.gov

                                                *Attorneys for Plaintiff City of Philadelphia*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CITY OF PHILADELPHIA,<br><br>               Plaintiff,<br><br>          v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR,<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>JESSICA BOWRON, ACTING DIRECTOR OF THE NATIONAL PARKS SERVICE,<br><br>               and<br><br>NATIONAL PARKS SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>               Defendants. | **Civil Action No. 2:26-cv-434** |

## CERTIFICATE OF SERVICE

I, Ryan B Smith, do hereby certify that a true and correct copy of the foregoing Motion for Preliminary Injunction, and supporting documentation, will be served upon the following via U.S. mail:

| | |
|---|---|
| Jessica Bowron<br>Comptroller, Exercising the Delegated Authority of the Director<br>1849 C Street NW<br>Washington, DC 20240 | David Metcalf, Esq.<br>United States Attorney<br>Eastern District of Pennsylvania<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA 19106 |

Date: January 22, 2026       BY:    */s/ Ryan B. Smith*
                                   Ryan B. Smith, Divisional Deputy City Solicitor
                                   Bailey Axe, Deputy City Solicitor
                                   City of Philadelphia Law Department
                                   1515 Arch Street, 15th Floor

Philadelphia, PA 19102
(215) 410-8264
Ryan.Smith@phila.gov

*Attorneys for Plaintiff City of Philadelphia*