IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CITY OF PHILADELPHIA,

            Plaintiff,

      v.

DOUG BURGUM, SECRETARY OF THE
INTERIOR, *et al.*,

            Defendants.

Case No. 26-cv-434

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

DAVID METCALF
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

GREGORY B. IN DEN BERKEN
Assistant United States Attorney

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTS AND PROCEDURAL HISTORY ........................................................... 2

I.   Background ................................................................................................ 2

II.  Procedural History ................................................................................... 3

LEGAL STANDARD ......................................................................................... 4

ARGUMENT ...................................................................................................... 5

I.   The City Has Not Shown a Likelihood of Success on the Merits .................... 6

    A.   The City Lacks Standing .......................................................................... 6

    B.   The City Fails to State Cognizable APA Claims .................................... 12

        1.   The City fails to challenge "agency action" under the APA. ....... 12

        2.   The alleged agency action that the City challenges here is not final under the APA. .............................................................. 14

        3.   The City challenges conduct committed to agency discretion by law. .................................................................................... 15

    C.   The City's Claims Are Contractual and Thus Barred by the Tucker Act ........................................................................................... 18

II.  The City Has Not Established Irreparable Harm ........................................ 21

III. The Public Interest and Balance of the Equities Counsel Against Issuing An Injunction .................................................................................... 23

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acierno v. New Castle Cty.,*
40 F.3d 645 (3d Cir. 1994) ........................................................................ 5

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.,*
357 F.3d 62 (D.C. Cir. 2004) ................................................................... 19

*Almond Bros. Lumber Co. v. United States,*
721 F.3d 1320 (Fed. Cir. 2013) ............................................................... 16

*Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield,*
890 F.3d 445 (3d Cir. 2018) ..................................................................... 11

*Am. Sci. & Eng'g, Inc. v. Califano,*
571 F.2d 58 (1st Cir. 1978) ...................................................................... 20

*Bennett v. Spear,*
520 U.S. 154 (1997) .................................................................................. 14

*Chemours Co. FC, LLC v. United States Env't Prot. Agency,*
109 F.4th 179 (3d Cir. 2024) ................................................................... 14

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .................................................................................... 6

*Davis Enters. v. U.S. E.P.A.,*
877 F.2d 1181 (3d Cir.1989) ............................................................... 16, 17

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.,*
897 F.3d 518 (3d Cir. 2018) ....................................................................... 5

*Einhorn v. Penn Jersey Bldg. Materials, Inc.,*
739 F. App'x 97 (3d Cir. 2018) .................................................................. 9

*Ferring Pharms, Inc. v. Watson Pharms., Inc.,*
765 F.3d 205 (3d Cir. 2014) ....................................................................... 4

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
460 F.3d 13 (D.C. Cir. 2006) ................................................................... 13

*Guided Walking Tours v. Indep. Visitor Ctr. Corp.,*
454 F. App'x 118 (3d Cir. 2011) ......................................................... 16, 17

*Hahn v. United States,*
    757 F.2d 581 (3d Cir. 1985) ................................................................. 20

*HAPCO v. City of Phila.,*
    482 F. Supp. 3d 337 (E.D. Pa. 2020) ....................................... 4, 5, 21, 22

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ................................................................. 15, 16, 17

*Horne v. Dep't of Agric.,*
    576 U.S. 350 (2015) .................................................................... 11

*Indep. Equip. Dealers Ass'n v. E.P.A.,*
    372 F.3d 420 (D.C. Cir. 2004) ......................................................... 13

*Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) .......................................................... 21

*Kamdem-Ouaffo v. Task Mgmt. Inc.,*
    792 F. App'x 218 (3d Cir. 2019) ........................................................ 5

*Keller v. State Bar of Cal.,*
    496 U.S. 1 (1990) ...................................................................... 24

*Lance v. Coffman,*
    549 U.S. 437 (2007) ................................................................... 12

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ................................................................... 16

*Local 2855, AFGE (AFL-CIO) v. United States,*
    602 F.2d 574 (3d Cir. 1979) ........................................................... 16

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................... 7

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ................................................................. 12, 13

*M & G Polymers USA, LLC v. Tackett,*
    574 U.S. 427 (2015) .............................................................. 9, 10, 11

*Matal v. Tam,*
    582 U.S. 218 (2017) ................................................................... 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ................................................................... 18

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ............................................................... 4

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................ 4, 23

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ................................................................. 13

*Penn. ex rel. Creamer v. U.S. Dep't of Agric.,*
    469 F.2d 1387 (3d Cir. 1972)............................................... 23

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ...................................................... 1, 23, 24

*Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs,*
    343 F.3d 199 (3d Cir. 2003).................................................. 16

*Reilly v. City of Harrisburg,*
    858 F.3d 173 (3d Cir. 2017)................................................... 4

*Robbins v. U.S. Bureau of Land Mgmt.,*
    438 F.3d 1074 (10th Cir. 2006) ........................................... 19

*Sea-Land Serv., Inc. v. Brown,*
    600 F.2d 429 (3d Cir. 1979)............................................. 19, 20

*Shurtleff v. City of Bos., Massachusetts,*
    596 U.S. 243 (2022) .............................................................. 24

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................ 7

*Sprague Elec. Co. v. Tax Court,*
    340 F.2d 947 (1st Cir. 1965)................................................. 20

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.,*
    108 F.4th 194 (3d Cir. 2024) ............................................. 5, 23

*United States Conf. of Cath. Bishops v. U.S. Dep't of State,*
    770 F. Supp. 3d 155 (D.D.C. 2025) ...................................... 21

*United States v. Miller,*
    145 S. Ct. 839 (2025) ............................................................ 18

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................ 6

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ........................................................................... 12

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
    No. 25-cv-1643, 2025 WL 1865160 (D.D.C. July 7, 2025)...................... 20

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) ............................................................. 12

*Webster v. Doe*,
    486 U.S. 592 (1988) ......................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................... 4, 5, 8

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ............................................................................. 24

## STATUTES

5 U.S.C. § 551(13) ................................................................................ 12

5 U.S.C. § 701(a)(2) .............................................................................. 15

5 U.S.C. § 702.............................................................................. 12, 15, 18

5 U.S.C. § 704.................................................................................. 12, 14

17 U.S.C. § 202.................................................................................. 7, 8, 9

28 U.S.C. § 1491(a)(1) ......................................................................... 19

54 U.S.C. § 308302.............................................................................. 17

## OTHER AUTHORITIES

Aileen Clarke & Sam Morris, *Here Are the Signs the Trump Administration
    Removed from Independence Park*, PHILA. INQUIRER (Jan. 22, 2026),
    https://www.inquirer.com/news/philadelphia/inq2/independence-park-trump-
    signage-remove-presidential-house-20260122.html ............................... 22

## INTRODUCTION

The President's House Site is located at Sixth and Market Streets in Philadelphia and shows, through partial reconstruction of floors and exterior walls, the historic residence of Presidents George Washington and John Adams while Philadelphia was the capital of the United States. The President's House is part of Independence National Historical Park and is owned, managed, maintained, and operated by the National Park Service ("NPS"). As with any national park or museum, reasonable minds might differ about what to display in the limited space available. But this is fundamentally a question of Government speech. The Federal government "has the right to speak for itself" and "to select the view it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).

The Court should deny the City's motion for a preliminary injunction. First and foremost, the City is unlikely to succeed on the merits because it lacks standing, has not identified any final agency action, and the Tucker Act deprives this Court of jurisdiction over claims that rely on contractual rights—which the City's claims do. Even on the merits, the City has no legal right to compel government speech based on agreements that have already expired and by their own terms expressly transferred all ownership and control of the relevant exhibits to the Federal government. What's more, the City cannot meet its burden of showing irreparable harm. Defendants are preserving the exhibits at issue so they may always be re-displayed at the conclusion of this litigation should the Court so order. Finally, the public interest and balance of the equities strongly weigh against issuing any injunction censoring the Federal government's preferred speech. Such

interests are especially weighty where, as here, the City effectively seeks to compel the Federal government to engage in speech that it does not wish to convey. The Court should therefore deny the City's motion for a preliminary injunction.

## FACTS AND PROCEDURAL HISTORY

### I.    Background

On January 22, 2026, Steven Sims—the Acting Regional Director of the NPS and Superintendent of Independence National Historical Park, which includes the President's House—was directed by the Acting Director of the NPS to remove the video and exhibits on the interior and exterior of the walls of the President's House. *See* Declaration of Steven Sims (attached as Exhibit A) ¶ 4. Sims directed the Acting Superintendent of Independence National Historical Park to direct NPS staff to take this action. *Id.* ¶ 5. At or around 3:00 p.m., NPS employees removed all but one of the exhibits on the interior and exterior of the President's House walls using hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls. *Id.* ¶ 6. The removal took approximately two and a half hours. *Id.* The remaining sign will be removed once NPS has the necessary tools and the present snow emergency is over. *Id.* ¶ 7. The videos were turned off and the exhibits have been removed and secured. *Id.* ¶ 8. They are in NPS custody and have been secured and placed in storage at the National Constitution Center, where they will remain pending the outcome of this lawsuit. *Id.*

The panels and video exhibit for the President's House project were created as a result of a cooperative effort between the City and the NPS. *See* Compl. Exs. 1-

4. The cooperative agreements underlying this effort provide that the exhibits were to be funded by the City and donated to the NPS. *See, e.g.*, Compl. Ex. 1 Background Discussion & § 2; *see also* Compl. Ex. 4 art. I.C. The agreements contain no covenant or promise by the NPS to maintain the exhibit in perpetuity. And the City waived any claim or right to any property interest (including the right to use or receive compensation) for any project components donated to NPS. Compl. Ex. 4 art. III.B.17. The land on which the exhibit sits is subject to no lien by the City. *Id.* art. III.C.3. And the cooperative agreements, as amended, expired one year after May 1, 2009. *Id.* art. VI.

## II.    Procedural History

On January 22, 2026, the City of Philadelphia filed its Complaint for Declaratory and Injunctive Relief. ECF No. 1 (Compl.). The City also filed a Motion for Preliminary Injunction seeking an order directing Defendants to restore the President's House Site to its status as of January 21, 2026. *See* ECF No. 2 (Mot.). The City further seeks an order enjoining Defendants from "taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site" and ordering Defendants "to take all necessary steps to ensure the safety, security, and preservation of any such items removed from the President's House Site on January 22, 2026." ECF No. 2 (Proposed Order) at 1.

On January 23, 2026, this Court ordered Defendants to respond to the City's preliminary-injunction motion by 4:00 p.m. on January 27, 2026. ECF No. 8. The Court subsequently extended that deadline to January 28, 2026, at 4:00 p.m., and

scheduled a hearing on the motion for January 30, 2026, at 10:30 a.m. *See* ECF No. 16.

**LEGAL STANDARD**

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Instead, injunctions "may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must establish that (1) "he is likely to succeed on the merits" of his claim; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors "merge when"—as here—"the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"A movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *HAPCO v. City of Phila.*, 482 F. Supp. 3d 337, 348 (E.D. Pa. 2020) (Rufe, J.) (cleaned up) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). The court considers the remaining two factors only if the first two factors are met. *Id.* at 348-49. But "[t]he failure to establish any element renders a preliminary injunction inappropriate." *Ferring Pharms, Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (cleaned up).

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *HAPCO*, 482 F. Supp. 3d at 348 (cleaned up). The requisite feared injury or harm must be *irreparable*—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *Id.* at 360 (emphasis added) (citing *Kamdem-Ouaffo v. Task Mgmt. Inc.*, 792 F. App'x 218, 221 (3d Cir. 2019)). And "[t]he movant[] must establish entitlement to relief by clear evidence." *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (citing *Winter*, 555 U.S. at 22); *see also Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024) ("Because 'a preliminary injunction is an extraordinary and drastic remedy,' the movant bears the burden of making '*a clear showing*.'" (citation omitted)).

Where—as here—the movant seeks "a mandatory preliminary injunction that will alter the status quo," that party "bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994).

## ARGUMENT

This Court should deny the City's motion for a preliminary injunction because the City is unlikely to succeed on the merits. In particular, the City lacks standing, has not identified final agency action, and filed suit in a court that lacks jurisdiction over the City's contractual claims. Further, the City's contractual claims fail on the merits because the agreements it cites are no longer in effect and by their

express terms transferred all relevant ownership rights to the Federal government long ago. And the City cannot show any injury—much less irreparable harm. The City's motion should be denied for this independent reason. Finally, the public interest and balance of the equities counsel strongly against issuing injunctive relief here, where the City seeks to censor Government speech on a topic of national significance as the Federal government seeks to celebrate its 250th birthday. The City cannot compel the Federal government to convey a message against its will, and certainly not on the basis of expired agreements.

## I.    The City Has Not Shown a Likelihood of Success on the Merits[1]

### A.    The City Lacks Standing

Article III, Section 2 of the Constitution limits federal-court jurisdiction to "Cases" and "Controversies." A case or controversy exists only if a plaintiff has standing to sue—which is "a bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing doctrine "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system" and prevents "the judicial process from being used to usurp the powers of the political branches." *Id.* at 675-76 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

To establish standing, a plaintiff must show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and

---

[1]    In light of the expedited schedule under which this brief was prepared, Defendants anticipate that they may expand upon these arguments in support of a motion to dismiss.

(3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To show an "injury in fact," the plaintiff must establish that it "suffered an invasion of a legally protected interest" that is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Id.* at 339 (cleaned up). An injury is concrete if it is "real" and "actually exist[s]," and an injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* at 339-40.

Here, the City's own complaint and exhibits establish that it has not suffered an injury in fact and thus lacks standing. To establish injury, the City appears to rely entirely on the 2006 Cooperative Agreement (including its amendments) between the City and NPS. For example, the City alleges that it "had equal right" with the NPS under the 2006 Cooperative Agreement and amendments "to approve the final design of the President's House Project." Compl. ¶ 40; *see also* ¶ 20. The City now contends that the NPS's removal of the plaques without the City's approval violated that right *Id.* ¶¶ 38-41, 43-45. The City also asserts that it partially funded the project based on the 2006 Cooperative Agreement and alleges that "[a]ny attempt to remove the exhibits would cut away from the public benefit the City expected when it committed and secured the funds." *Id.* ¶ 21.[2]

---

[2]    The City also mentions the 2015 IP Agreements (which transferred the intellectual-property rights for the President's House Project and its works to the NPS), *id.* ¶¶ 24-27, and asserts that these transfers "did not include the authority to materially alter or destroy altogether the exhibit underlying the copyright," *id.* ¶ 42. But that is not in dispute. *See* 17 U.S.C. § 202 ("Ownership of a copyright, or of any

The City's preliminary-injunction brief further confirms that its asserted injury is predicated on these agreements. *See* ECF No. 2 at 7 ("By its Complaint, Philadelphia specifically alleged that the removal of the President's House panels violated the applicable Cooperative Agreement and amendments and was arbitrary and capricious in violation of the Administrative Procedures Act"); *see also id.* at 9-10 ("Defendants violated the agreements").

Fatal to the City's theory is that the relevant agreements expired over 15 years ago. Indeed, among the City's three causes of action, "breach of contract" is conspicuously absent. And, in any event, the terms of the agreements cannot be squared with the City's assertions that it retained any rights that were violated or that it can enforce here.

First, the agreements have expired. Section 5 of the 2006 Cooperative Agreement specified an "initial term" of one year from the effective date of the agreement, which was September 1, 2006. *See* Compl. Ex 1 (2006 Coop. Agmt.) § 5 & Preamble. It also gave the City the right to extend the agreement for "up to three (3) successive one-year terms." *Id.* The City exercised that right on July 19, 2007, August 15, 2008, and May 12, 2009. *See* Compl. Exs. 2-3 (First and Second Amendments) Preamble & § 2; Compl. Ex. 4 (Third Amendment) art. VI. The Third and final Amendment specified that the amended Cooperative Agreement "shall be in effect for a period of one (1) year beginning May 1, 2009." Compl. Ex. 4 art. VI.

_____

of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.").

There were no further amendments. Thus, the 2006 Cooperative Agreement automatically terminated on May 2, 2010. *See id.*

"One traditional principle of contract interpretation is that 'contractual obligations will cease, in the ordinary course, upon termination of the contract.'" *Einhorn v. Penn Jersey Bldg. Materials, Inc.*, 739 F. App'x 97, 99 (3d Cir. 2018) (citing *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015)). Applying that basic principle here dooms the City's reliance on the amended 2006 Cooperative Agreement—because any obligations within the agreement or its amendments have long since expired.

Second, the terms of the agreements cannot be squared with the City's assertion that the City retained any rights that were violated or that it can enforce here. Yes, the 2006 Cooperative Agreement specified that "[t]he City and NPS shall cooperate in the planning, development and preparation of the design, fabrication and installation of the Exhibit" and contemplated the parties' joint input in the project. Compl. Ex. 1 at § 3.a. But nothing in the 2006 Cooperative Agreement or amendments provided that the exhibit would stay in place in perpetuity or that the City would retain any authority over the exhibit after the project was completed.

Quite the opposite. The 2006 Cooperative Agreement unambiguously provided, under a section titled "Ownership of Exhibit," that, "[u]pon completion of the Exhibit in accordance with this Agreement, ownership of the Exhibit shall transfer to the NPS." *Id.* § 2 (quoted text highlighted in the City's filing). The same section specified that "NPS ownership of the Exhibit shall survive any termination

9

of this Agreement." *Id.* And a separate section titled "Management & Maintenance of the President's House Exhibit" provided that "NPS agrees that it shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, *interpret and administer* the Exhibit, which shall become property of the NPS in accordance with this Agreement." *Id.* § 4.a (emphasis added). Nor does the contract provide the City with any enforcement mechanism for any purported rights it claims here.

A host of other provisions further reflect the parties' agreement that the NPS would have complete control over the exhibit upon its completion—without any involvement by the City:

- "The Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS." Compl. Ex 4 art. I.C.

- The City agreed "to donate to NPS the Project identified in the Cooperative Agreement as amended. This donation is made by the City on its own volition and without compensation." *Id.* art. III.B.1

- The City agreed to "[c]ertify in writing that upon NPS' acceptance of the Project as complete, all right, title, and interest to any completed construction, improvements, installations, fixtures, or associated donations, are free and clear of all debts, liabilities, or obligations." *Id.* art. III.B.16.

- The City agreed to "waive any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS." *Id.* art. III.B.17.

- "NPS will own and manage the commemorative work at the conclusion of the process." *Id.* at attach. A (Project Summary Sheet) § IV.4

- "The Project will be owned, maintained, managed, and interpreted by the NPS." *Id.* at attach. C (Project Development Plan) § B.[3]

The agreements thus unambiguously establish that the NPS obtained complete and unconditional ownership of the exhibit. And ownership of property comes with the "rights to possess, use, and dispose of" the property. *Horne v. Dep't of Agric.*, 576 U.S. 350, 361-62 (2015). Here, the NPS's removal of the plaques was an exercise of those traditional ownership rights.

\*      \*      \*

The City thus has not identified any invasion of a legally protected interest by Defendants. Any contractual rights the City invokes either expired years ago or are contradicted by the agreements' express terms. And where a plaintiff's asserted injury depends on a contractual provision that it cannot enforce, dismissal for lack of standing is warranted. *See Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 455 (3d Cir. 2018).

In the absence of any purported contractual right, the City stands in the same position as any other member of the public who disagrees with the Government's curatorial decisions about what to display on exhibit. But as the Supreme Court has repeatedly clarified, members of the public lack standing to challenge government speech or compel the Federal government to speak a message

---

[3]    To its credit, the City acknowledges NPS's ownership of the exhibit in its complaint. *See* Compl. ¶ 17 ("upon its completion the exhibit was to be 'owned, maintained, managed, and interpreted' by the NPS" (quoting Compl. Ex. 4)). But the City never explains how that admission can be reconciled with its allegation that it somehow retained authority over the exhibit.

with which it disagrees. *See, e.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (no standing where only harm is "the psychological consequence . . . produced by observation of conduct with which one disagrees"); *Lance v. Coffman*, 549 U.S. 437, 441 (2007) (surveying the "lengthy pedigree" of courts' "refusal to serve as a forum for generalized grievances"). The City therefore lacks standing.

### B.    The City Fails to State Cognizable APA Claims

#### 1.    The City fails to challenge "agency action" under the APA.

In its Complaint, the City challenges the NPS's removal of the exhibit panels at the President's House site. But the APA allows only for review of "agency action." 5 U.S.C. §§ 702, 704. The NPS's curatorial decisions are not "agency action" within the meaning of the statute.

Under the APA, a plaintiff "must identify some 'agency action' that affects him in the specified fashion." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). The APA carefully defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see id.* § 701(b)(2). And each of the key terms within that definition ("rule," "order," "license," "sanction," and "relief") is likewise defined. *Id.* § 551(4), (5), (8), (10), (11). Significantly, the APA does not authorize "general judicial review of the [agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, or cover "all conduct such as, for example, constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps of*

*Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). After all, permitting judicial review of every decision made in the course of an agency's daily activities would bring the government to a standstill.

The City asserts that "[t]he removal of artwork and informational displays at the President's House site" qualifies as agency action under the APA. Compl. ¶¶ 33-34; *see also id.* ¶¶ 48-50. But the NPS routinely revises or removes art or informational displays at its sites. This falls under the "wide variety of activities that comprise the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). Such actions do not qualify as a rule, order, license, sanction, or relief under the APA and are thus not "agency action."

To hold otherwise would subject nearly everything an agency does to APA review. *Cf. Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency" (Roberts, J.) (cleaned up)). This would subject every change a Park Superintendent might make to Park signage or landscaping, or any change in the Government's speech about interpretation of its property, to challenge in court. The City's view of the law cannot be squared with the Supreme Court's admonition that the APA does not permit "general judicial review of the [agency's] day-to-day operations." *Lujan*, 497 U.S. at 899; *see also id.* at 894 (APA does not provide for judicially managed "systematic improvement" absent final agency action); *Norton v. S. Utah Wilderness*

*All.*, 542 U.S. 55, 67 (2004) (APA's limitations serve to prevent "injecting the judge into day-to-day agency management"). The City thus has not challenged cognizable "agency action" under the APA. The City's contrary legal interpretation would produce absurd consequences, potentially subjecting every curatorial decision—from displaying a painting to rotating a seasonal sculpture exhibit—to APA-style review.

### 2.    The alleged agency action that the City challenges here is not final under the APA.

Review under the APA is further limited to "*final* agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). But the NPS's actions here do not qualify as "final agency action" either.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court articulated two necessary conditions for agency action to be final under the APA: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 178 (cleaned up). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177-78 (citations omitted). To satisfy the second condition, the agency's action generally must impose "obligations, prohibitions, or restrictions" or "give rise to . . . direct and appreciable legal consequences." *Chemours Co. FC, LLC v. United States Env't Prot. Agency*, 109 F.4th 179, 184 (3d Cir. 2024) (cleaned up).

Here, the City's claims fail under *Bennett*'s second condition. Nowhere does the City explain how the NPS's removal of the panels determined any rights or obligations for or caused legal consequences to the City. As explained above, the

City lacks any contractual rights in light of the expiration of the agreements and the transfer of custody and rights to the Federal government. Further, the Federal government remains at liberty to take down or reinstall these displays—or make any other curatorial decisions at this or other parks. But a decision to take down an exhibit—whether to conduct restoration, install a different artwork, or communicate a different message—is not final agency action subject to judicial review under the APA.

### 3. The City challenges conduct committed to agency discretion by law.

Even if the removal of the panels qualified as final agency action, the City's claims would still not be cognizable under the APA. The APA's waiver of sovereign immunity in 5 U.S.C. § 702 does not apply (and courts thus lack jurisdiction over an APA claim) if the claim involves "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And the conduct challenged here—the NPS's removal of exhibit panels—falls squarely within § 701(a)(2)'s carve-out for discretionary action.

Section 701(a)(2) precludes review where the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Section 701(a)(2) applies if judicial review would require the court to substitute its own judgment for the agency's judgment on matters committed to professional, managerial, or policy discretion, and where Congress has supplied no judicially

manageable criteria. *Id.* at 830-32, 837-38; *see also Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (reaffirming *Heckler*'s "no meaningful standard").

The Third Circuit has further refined this standard and held that § 701(a)(2) applies if agency action (1) "involves broad discretion"; (2) "is the product of political or managerial choices that are not readily subject to judicial review"; and (3) does not "violate a constitutional, statutory, or regulatory command." *Const. Guided Walking Tours v. Indep. Visitor Ctr. Corp.*, 454 F. App'x 118, 122 n.2 (3d Cir. 2011) (cleaned up) (quoting *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 203, 205 (3d Cir. 2003)); *see also Davis Enters. v. U.S. E.P.A.*, 877 F.2d 1181, 1184 (3d Cir.1989); *Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574, 581 (3d Cir. 1979).

Consistent with this analysis, the Supreme Court has found agency action unreviewable where an agency exercised discretion over how best to advance broad statutory objectives. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (allocation of lump-sum appropriations was committed to agency discretion by law because it required a complicated balancing of factors that were particularly within an agency's expertise, including proper ordering of its priorities); *see also Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013) (authorization for the U.S. Trade Representative to enter into agreements with foreign countries was committed to agency discretion in part because the negotiation and determination of international agreements "is a paradigmatic example of 'a complicated balancing of a number of factors which are peculiarly within the USTR's expertise" (cleaned up)).

Here, interpretive signage at the President's House involves discretion, is the product of managerial choices that are not readily subject to judicial review, and does not "violate a constitutional, statutory, or regulatory command." *Const. Guided Walking Tours*, 454 F. App'x at 122 n.2. Interpretive signage reflects judgments about visitor experience, educational framing, and narrative scope.

The City identifies no statute, regulation, or binding policy that requires the NPS to present a particular historical narrative, retain specific interpretive themes, or maintain signage.[4] The absence of such constraints means there is no meaningful legal standard by which a court can evaluate the NPS's interpretive judgment here. Indeed, the City does not contend that Congress mandated particular content, that the NPS's regulations require inclusion of specific historical topics, that the NPS violated a binding rule or adopted policy, or that the NPS misinterpreted its legal authority. And the City cannot evade § 701(a)(2) by labeling a discretionary decision "arbitrary and capricious"—because a claim is cognizable under § 706 only if the action is reviewable in the first place. *Heckler*, 470 U.S. at 828. Accordingly, this is exactly the kind of action that is the product of "managerial choices that are not readily subject to judicial review." *Davis Enters.*, 877 F.2d at 1184.

The City's reliance on the expired contractual arrangements does not alter this analysis. As discussed above, those agreements expired years ago, impose no

---

[4]    Although the City references the National Underground Railroad Network to Freedom statute, 54 U.S.C. § 308302, it does not identify any provision requiring that sites designated under that statute have any interpretive component.

continuing obligations, were not incorporated into statute or regulation, and expressly transferred all ownership and management authority to the NPS. An expired contract does not constrain present agency discretion and does not constitute "law" for the purposes of § 701(a)(2). At most, those contracts provide historical background—but they do not provide enforceable standards capable of guiding judicial review. And as discussed below, to the extent the agreements impose continuing contractual obligations, the Tucker Act precludes review in any event.

### C. The City's Claims Are Contractual and Thus Barred by the Tucker Act

The Federal government enjoys sovereign immunity. Federal courts therefore generally lack jurisdiction over "suits against the United States absent Congress's express consent." *United States v. Miller*, 145 S. Ct. 839, 849 (2025). The APA provides a limited waiver of sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. But the APA's waiver "comes with an important carve-out": it does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.* One such limitation, applicable here, is the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any

claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

Specifically, the Tucker Act "impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted); *see also Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (holding the same); *Sea-Land Serv., Inc. v. Brown*, 600 F.2d 429, 433-43 (3d Cir. 1979) (holding that the APA does not waive sovereign immunity for claims that arise out of a contract and seek specific performance of the contract as relief).

The Tucker Act bars the City's APA claims. As detailed above, the City cannot prevail on its contractual claims because the cited agreements are no longer in effect and the City transferred any rights over curatorial decisions to the Federal government. But to the extent the City still seeks to rely on any purported rights grounded in contract, it must pursue these rights through the exclusive venue of the Court of Federal Claims. The availability of that forum necessarily precludes litigation under the guise of the APA in this Court.

In evaluating whether a plaintiff's claims sound in contract, courts look to substance rather than labels. Here, the Tucker Act forecloses the City's claims. Although they are *labeled* as APA claims, their *substance* is contractual. As discussed above, the Complaint relies extensively on the 2006 Cooperative Agreements with the NPS and amendments thereto. *See, e.g.*, Compl. ¶¶ 20-21, 38-

19

41, 43-45. And the relief the City seeks is quintessential contract enforcement (mandatory restoration and ongoing compliance). Indeed, the City explicitly seeks injunctive relief requiring Defendants' compliance with "the APA and all other applicable law, *including Defendants' agreements with the City*." *Id.* ¶ 46 (emphasis added). Such relief departs from the standard APA remedy of setting aside the agency's action or remanding for further consideration. Instead, the City seeks affirmative relief predicated on an alleged contractual right.

This kind of end-run around the Tucker Act is foreclosed. A plaintiff may not maintain an APA suit where, as here, "the essence of the action is in contract"—and a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Court*, 340 F.2d 947, 948 (1st Cir. 1965)); *see also Sea-Land*, 600 F.2d at 433 (endorsing *Califano*'s reasoning). In *Sea-Land*, the Third Circuit rejected the plaintiff's attempt to obtain specific-performance-type relief on a government contract via APA-styled pleading. 600 F.2d at 433-34. And the Third Circuit has stressed that plaintiffs may not, by creative APA pleading, "circumvent limitations on district court jurisdiction created by the Tucker Act." *Hahn v. United States*, 757 F.2d 581, 589 (3d Cir. 1985).

Applying these principles here confirms that the City's claims are barred by the Tucker Act. *See Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-cv-1643, 2025 WL 1865160, at *7 (D.D.C. July 7, 2025) (holding, in context of challenge involving cooperative agreements, that plaintiff's APA claims were "essentially contractual in

nature" and Tucker Act thus applied); *see also United States Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) ("Such a request for an order that the government 'must perform' on its contract is one that 'must be resolved by the Claims Court.'" (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985))). For this independent reason, the Court should deny the City's motion for a preliminary injunction.

## II. The City Has Not Established Irreparable Harm

A litigant seeking injunctive relief must "'articulate and adduce proof of actual or imminent harm which cannot otherwise be compensated by money damages . . . to sustain its substantial burden of showing irreparable harm.'" *HAPCO*, 482 F. Supp. at 360 (citation omitted). "The preliminary injunction standard requires the plaintiff to make a clear showing that 'it is more likely than not to suffer irreparable harm in the absence of preliminary relief.'" *Id.* at 360-61.

The City offers a scant two paragraphs in support of its argument that "irreparable injury will result absent preliminary relief." Pl.'s Br. at 10. The City asserts that:

> The President's House has been designated by Congress as a Network to Freedom ("NTF") site. And as is described on NPS's website, "The President's House Site tells the story of the paradox of liberty and enslavement in one home - and in a nation." (website citation omitted). The removal from the President's House Site of all panels, exhibits, and artwork that reference slavery will irreparably harm this NTF site.

*Id.* Beyond the conclusory statement that removal "of all panels, exhibits, and artwork" "will irreparably harm this NTF site," the City makes no attempt to articulate or adduce evidence of actual and irreparable harm. Nor can it do so.

As set forth in the declaration of the Acting Regional Director of the National Park Service, the removal of the interpretive panels was a straightforward task. A few NPS employees accessed the site with hand tools, including wrenches and crowbars, and loosened the fastening bolts to remove the exhibits. The NPS also turned off the video monitors. The entire removal took approximately two and a half hours. The exhibits are being held in storage and will remain there pending the outcome of this litigation.[5]

First, the NPS's statement that it is keeping the exhibits in storage and will continue to do so moots out one part of the City's motion, in which it requests an order requiring the government to take all necessary steps to ensure the safety, security, and preservation of any items removed from the President's House on January 22, 2026. As described by Acting Regional Director Sims, this was done before the motion was filed. The exhibits are in NPS custody and in storage at the National Constitution Center, where they will remain pending the outcome of this lawsuit.

---

[5]    In addition, high-resolution photographs of the exhibits are currently available to the public on the website of the Philadelphia Inquirer. *See* Aileen Clarke & Sam Morris, *Here Are the Signs the Trump Administration Removed from Independence Park*, PHILA. INQUIRER (Jan. 22, 2026), https://www.inquirer.com/news/philadelphia/inq2/independence-park-trump-signage-remove-presidential-house-20260122.html.

22

Second, the removal of the exhibits is not irreversible. At the conclusion of this lawsuit, and if ordered to do so, the NPS could re-hang the exhibits and turn the television monitors back on. Therefore, by definition, any damage is not irreparable. *See, e.g., Del. State Sportsmen's Ass'n*, 108 F.4th at 205 ("[C]hallengers have shown no harms beyond ones that can be cured after final judgment. That finding alone suffices to support the District Court's denial of a preliminary injunction." (citing *Penn. ex rel. Creamer v. U.S. Dep't of Agric.*, 469 F.2d 1387, 1388 (3d Cir. 1972) (per curiam))). This is independently fatal to the City's motion for a preliminary injunction.

## III. The Public Interest and Balance of the Equities Counsel Against Issuing An Injunction

Finally, the public interest and balance of the equities weigh strongly against the issuance of injunctive relief here. Where a plaintiff seeks preliminary relief against the Federal government, the last two factors—public interest and balance of the equities—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Plaintiff seeks extraordinary relief that would prohibit the Federal government from conveying its preferred message and, what is worse, compel the Federal government to speak a message it does not wish to convey.

"A government entity has the right to speak for itself." *Pleasant Grove*, 555 U.S. at 467 (internal quotation marks omitted). In choosing what message to convey in limited display space, the Government must necessarily make decisions about what to include and what to exclude. *Matal v. Tam*, 582 U.S. 218, 234 (2017) ("When a government entity embarks on a course of action, it necessarily takes a

particular viewpoint and rejects others."). Inevitably, others may disagree with these decisions. But "[i]f every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in private sector, and the process of government as we know it radically transformed." *Keller v. State Bar of Cal.*, 496 U.S. 1, 12-13 (1990). "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove*, 555 U.S. at 468.

If the City disagrees with the Federal government's speech, the appropriate solution is political. "The Constitution . . . relies first and foremost on the ballot box . . . to check the government when it speaks." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022). But courts are on dangerous ground when enjoining or compelling the speech of co-equal branches of government. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"). The Government is "ultimately accountable to the electorate and the political process for its advocacy," and "[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position." *Pleasant Grove*, 555 U.S. at 468-69.

Significantly, nothing prevents the City or any other State, local, or private entity from engaging in their own speech. For these reasons, the public interest and balance of the equities weigh strongly against issuing injunctive relief here.

## CONCLUSION

The City has not established a likelihood of suffering irreparable harm or succeeding on its claims and the public interest and balance of the equities counsel against issuing an injunction. Accordingly, the City's request for this extraordinary remedy should be denied.

Dated:  January 28, 2026                        Respectfully submitted,

BRETT A. SHUMATE                          DAVID METCALF
Assistant Attorney General                  United States Attorney
Civil Division

                                                    */s/ Gregory B. David*
MICHAEL VELCHIK                         GREGORY B. DAVID
Senior Counsel to the Assistant           Assistant United States Attorney
Attorney General                              Chief, Civil Division

                                                    */s/ Gregory B. in den Berken*
                                                    GREGORY B. IN DEN BERKEN
                                                    Assistant United States Attorney
                                                    Eastern District of Pennsylvania
                                                    615 Chestnut Street, Suite 1250
                                                    Philadelphia, PA 19106
                                                    Phone:   (215) 861-8505
                                                    Email:   gregory.indenberken@usdoj.gov

                                                    *Counsel for Defendants*

25

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 28, 2026, a true and correct copy of Defendants' foregoing Opposition to Plaintiff's Motion for Preliminary Injunction was filed electronically via the Court's CM/ECF system and served via CM/ECF on all counsel of record.

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN