**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CITY OF PHILADELPHIA,   :
            :
    *Plaintiff*,     :
            :
    v.       :   Civil Action No. 2:26-cv-434
            :
SECRETARY DOUG BURGUM, *et al.*, :
            :
    *Defendants.*    :

## AMICUS CURIAE BRIEF OF MEMBERS OF DEMOCRATIC CAUCUS OF THE SENATE OF PENNSYLVANIA IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

   Members of the Democratic Caucus of the Senate of Pennsylvania ("Senate Democratic Caucus") named below and on Attachment A appended hereto (collectively, "Amici Curiae") respectfully submit this amicus brief for consideration.

### INTRODUCTION AND INTERESTS OF AMICI CURIAE

   Amici Curiae are state senators representing districts spanning the Commonwealth of Pennsylvania. Specifically, the below named Amici Curiae represent the 1st, 2nd, 3rd, 4th, 7th, and 8th Senate Districts including the majority of the City of Philadelphia and whose constituencies live and work in City of Philadelphia, where the historical site of the President's House and removed displays depicting slavery and enslaved persons at issue in this case are located.

   State Senator Nikil Saval is a duly elected member of the Senate of Pennsylvania representing the 1st Senate District, that includes part of the City of Philadelphia. Senator Saval was selected by fellow members of the Senate Democratic Caucus serving parts of Philadelphia to serve as the Chair of the Philadelphia Delegation for the 2025-26 Legislative Session.

State Senator Vincent J. Hughes is a duly elected member of the Senate of Pennsylvania representing the 7th Senate District, that is, in part, within the boundaries of the City of Philadelphia and Montgomery County.  Senator Hughes was elected by members of the Senate Democratic Caucus to serve as the Democratic Chair of the Senate Appropriations Committee for the 2025-26 Legislative Session.

State Senator Christine M. Tartaglione is a duly elected member of the Senate of Pennsylvania representing the 2nd Senate District, that includes part of the City of Philadelphia. Senator Tartaglione was elected by members of the Senate Democratic Caucus to serve as the Democratic Whip for the 2025-26 Legislative Session.

State Senator Anthony H. Williams is a duly elected member of the Senate of Pennsylvania representing the 8th Senate District, that includes portions of the City of Philadelphia and Delaware County.

State Senator Art Haywood is a duly elected member of the Senate of Pennsylvania representing the 4th Senate District, that is, in part, within the boundaries of the City of Philadelphia.

State Senator Sharif Street is a duly elected member of the Senate of Pennsylvania representing the 3rd Senate District that includes part of the City of Philadelphia.

Amici Curiae have a special interest and unique perspective regarding the impact of the Court's ultimate disposition of Plaintiff's motion for a preliminary injunction as members of the General Assembly representing the City of Philadelphia and other districts that include locations, in addition to the President's House, designated as Underground Railroad Network to Freedom sites or facilities pursuant to the National Underground Railroad Network to Freedom Act, Pub.L. 105-203, July 21, 1998, 112 Stat. 678, codified at 54 U.S.C. §§ 308301-308304.  Amici

Curiae represent neighborhoods and business communities in the City that would be immediately affected by the loss of tourism due to the removal of the display panels from the President's House site in the Independence National Historic Park. And according to Amici Curiae's pleas from their constituents, this sudden loss of rich history and Defendants' rejection of the true historical narratives about Black history in America is causing deep constituent harm and anxiety.

Moreover, in 2010, the Delaware River Port Authority ("DRPA") agreed to provide up to $3,500,000 in grant funding to assist the City of Philadelphia in constructing commemorative installations at the President's House. *Grant Agreement By and Between The [DRPA] and the City of Philadelphia . . .* at 1 (June 25, 2010) (Exhibit 1). The DRPA derives its power from the 1931 Compact, which is an agreement between the Commonwealth of Pennsylvania and the State of New Jersey to effectuate the development of the Delaware River and Port District. 36 P.S. § 3503. While the Compact is a joint agreement between two states, the Supreme Court of Pennsylvania has explained that "the Compact . . . ha[s] the full force and effect of a statute of the Commonwealth." *Delaware River Port Authority v. Thornburgh*, 493 A.2d 1351, 1353 n.1 (Pa. 1985) (citing 36 P.S. § 3503). All the powers of the DRPA, including its power to raise, pledge, and disburse revenue as well as its requirement to report its receipts and disbursements back to the General Assembly, derive from the Compact. Accordingly, the General Assembly has a special interest in the removal of exhibits at the President's House by way of its statutory delegation of revenue raising and distribution power to a previously secured financier of the President's House—the DRPA.

Amici Curiae believe that return of the display panels and recovery of the President's House site to its January 21, 2026 status would resolve many of our constituents' concerns and align with the Pennsylvania General Assembly's longstanding support for the permanent placement of these displays.

## ARGUMENT

This case is not just about whether the federal government can make arbitrary and capricious decisions to ignore existing agreements with the States or their localities. It is not just about the reach of the President's executive orders to remove historical displays. It concerns the profound divisive effect that will result from gutting this nation's history of an entire people from the eyes of our constituencies and the minds of our children – many of which descend from enslaved persons – in order to rewrite some pie-in-the-sky narrative of America's history as the powerful and privileged wish to see it.

Author Chinua Achebe highlighted this very concern in a 1994 interview in which he described the African proverb of the lion: "There is that great proverb – that until the lions have their own historians, the history of the hunt will always glorify the hunter." *Whose History? How Textbooks Can Erase the Truth and Legacy of Racism*, LDF: THURGOOD MARSHALL INSTITUTE, https://tminstituteldf.org/books-censorship-black-history/ (last visited Jan. 28, 2026).

If we fail to take action now and restore our constituencies' access to these historical displays in the City of Philadelphia, those in power will continue to chip away at our American story. And this does not represent the General Assembly's longstanding intent.

I.     **THE PENNSYLVANIA GENERAL ASSEMBLY'S INTENT TO SUPPORT A PERMANENT COMMEMORATIVE DISPLAY RECOGNIZING THE SLAVE HISTORY AT THE HISTORICAL PRESIDENT'S HOUSE SITE HAS NOT WAVERED SINCE 2002.**

In 2002, the Pennsylvania House of Representatives passed House Resolution 490, which "[u]rg[ed] the National Park Service to erect a commemorative plaque in recognition of the slave quarters located on the site of the planned Liberty Bell Pavilion." H.R. 490, 2001-2002 Gen. Assemb., Reg. Sess. (Pa. 2002) ("Resolution") (Exhibit 2).

As resolutions are often used by each chamber as a mechanism for carrying out the legitimate business of the General Assembly, this Resolution simply made clear the General Assembly's intent with regard the history of slavery at this site. *See* 101 Pa.Code § 9.42 (defining a single chamber resolution and common uses thereof); *Cf. Freedom from Religion Foundation, Inc. v. Saccone*, 894 F.Supp.2d 573, 583 (M.D. Pa. 2012) (concluding that resolutions passed by one or both chambers, regardless of whether they are legally binding, serve legitimate public purposes and rise to the level of a "legislative act" falling with the "scope of legislative immunity."). In doing so, the Resolution urged this commemorative plaque because part of the proposed (at that time) Liberty Bell Pavilion was located at the President's House— the historic site of the residence of Presidents Washington and Adams prior to the construction of the White House. H.R. 490, 2001-2002 Gen. Assemb., Reg. Sess. (Pa. 2002). The Resolution observed that the President's House included slave quarters and other complexes. *Id.* Given the historical significance of the President's House, including the slave quarters that are inexorably tied to its history, the Resolution urged the National Park service "to facilitate the placement of a permanent commemorative plaque recognizing the site of the slave quarters and to work for continuing recognition of this historic site." *Id.*

The Pennsylvania House of Representatives transmitted copies of the Resolution to: the President of the United States, the National Park Service, the United States Senate, the presiding officers of each house of Congress; each member of Congress from Pennsylvania; and the Mayor of the City of Philadelphia. *Id.*

What is more, in 2004, the General Assembly's enacted capital budget act appropriated $1,200,000 in "[r]epairs and renovations [to the] President's House." Act of June 16, 2004, P.L. 40 § 3(5)(ii)(J). This appropriation of funds from the General Assembly to the President's house, in addition to the passage of the Resolution, demonstrates the General Assembly's ongoing commitment to the site and a special interest in a case involving the removal of exhibits within the President's House.

## II.     AMICI CURIAE WILL NOT TOLERATE THE ERASURE OF BLACK HISTORY IN THIS COMMONWEALTH AND THE IGNORANCE AND DIVISION THAT INEVITABLY COME WITH IT.

Amici Curiae's core values include addressing equality and social justice in Pennsylvania. *PA Senate Democrats: 2025-2026 Priorities*, https://pasenate.com/wp-content/uploads/2025/12/2025_Dem_Priorities.pdf (last visited Jan. 29, 2026). It is our stated priority to "fight racism in all forms and all its places;" thus, we seek to do that through our participation here. *Id*.

It is no secret that the injustices throughout American history led to systemic discrimination while also creating opportunities for change and equality in Pennsylvania and nationwide. The panels displayed at the President's House site were intentionally designed to acknowledge the injustice of slavery as part of America's and Pennsylvania's history. The very designation of the President's House site as a Network to Freedom Site under the National

Underground Railroad Network to Freedom Act in 2022 further confirmed that the panels help narrate the full story of America and Pennsylvania while also offering an opportunity to demonstrate their growth.

As we prepare to celebrate the Semiquincentennial anniversary of our nation, the Department of Interior's actions at issue here are in direct conflict with the intentional design and theme of the President's House site. As elected officials of Pennsylvania, we must preserve the history of this Commonwealth. The acknowledgement of slavery at the President's House site in Philadelphia is a poignant example of the City's, its residents' and Amici Curiae's shared commitment to never forget the role of Black history in Pennsylvania's and America's narrative, just as with the 2002 House passage of the Resolution.

At bottom, *Amici Curiae* will not tolerate the erasure of Black History from this Commonwealth. We will head the words of the first Black U.S. Supreme Court Justice Thurgood Marshall, when writing separately in *Regents of the University of California v. Bakke,* that the failure of our nation to recognize and learn from its history of slavery will only sow further division:

> For it must be remembered that, during most of the past 200 years, the Constitution, as interpreted by this Court, did not prohibit the most ingenious and pervasive forms of discrimination against he Negro. . . . The position of the Negro today in America is the tragic but inevitable consequence of centuries of unequal treatment. . . . The relationship between those figures and the history of unequal treatment afforded to the Negro cannot be denied. At every point from birth to death the impact of the past is reflected in the still disfavored position of the Negro. . . . In light of the sorry history of discrimination and its devastating impact on the lives of Negroes, bringing the Negro into the mainstream of American life should be a state interest of the highest order. To fail to do so is to ensure that America will forever remain a divided society.

*Regents of Univ. of California v. Bakke,* 438 U.S. 265, 387-96 (1978) (internal citations omitted) (Justice Marshall reviews the history of African Americans in American history to support his conclusion that the U.S. Supreme Court should uphold affirmative action policies in college admissions).

As Justice Marshall put it, we must learn from the past – the good, bad and ugly – to understand the present.  Otherwise, we are doomed to ignorance and division.  And so goes the African proverb of the lion: Until the lions have their own historians, the history of the hunt will always glorify the hunter.

## CONCLUSION

Based on the foregoing reasons, we urge the Court to grant Plaintiff's Motion for a Preliminary Injunction and restore the President's House site to its status as of January 21, 2026.

Respectfully submitted,

/s/  *Shannon A. Sollenberger*
Shannon A. Sollenberger
PA ID # 308878
Clarissa LeeAnne Freeman
PA ID # 209716
Jesse Tomkiewicz
PA ID # 334536
Senate Democratic Caucus
Senate of Pennsylvania
Room 535 Main Capitol Building
Harrisburg, PA 17120
(717) 787-7683
shannon.sollenberger@pasenate.com
clarissa.freeman@pasenate.com
jesse.tomkiewicz@pasenate.com

Dated: January 29, 2026

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 29, 2026, a copy of the forgoing *Amicus Curiae* Brief of Members

of the Democratic Caucus of the Senate of Pennsylvania was served on all counsel of record.

/s/ *Shannon A. Sollenberger*
Shannon A. Sollenberger, Esq.
PA ID # 308878
Chief Counsel
Senate Democratic Caucus Members
Senate of Pennsylvania
Room 535 Main Capitol Building
Harrisburg, PA 17120
(717) 787-7683
shannon.sollenberger@pasenate.com

*Attorney for Amici Curiae*

Dated: January 29, 2026

**Attachment A**

**Additional Amici Curiae**

Senator Jay Costa
Senator Maria Collett
Senator Steven J. Santarsiero
Senator Judy Schwank
Senator Nick Miller
Senator Lisa Boscola
Senator Amanda Cappelletti
Senator Carolyn Comitta
Senator Marty Flynn
Senator Wayne Fontana
Senator John Kane
Senator Timothy P. Kearney
Senator Patty Kim
Senator Andrew Malone
Senator Katie Muth
Senator Nick Pisciottano
Senator Lindsay M. Williams

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CITY OF PHILADELPHIA,      :
                            :
          *Plaintiff*,      :
                            :
         v.            :     Civil Action No. 2:26-cv-434
                            :
SECRETARY DOUG BURGUM, *et al.*,  :
                            :
         *Defendants.*    :

**[PROPOSED] <u>ORDER</u>**

      AND NOW, this _____ day of _____, 2026, upon consideration of the

Unopposed Motion for Leave to File Amicus Curiae Brief of Members of the Democratic

Caucus of the Senate of Pennsylvania, it is hereby ORDERED that the Motion is GRANTED.

      The brief attached to the motion shall be docketed.

BY THE COURT:

_____

Honorable Cynthia M. Rufe
United States District Court Judge

# EXHIBIT 1

**GRANT AGREEMENT BY AND BETWEEN
THE DELAWARE RIVER PORT AUTHORITY
AND THE CITY OF PHILADELPHIA through its DEPARTMENT OF PUBLIC
PROPERTY**

This AGREEMENT made effective this 25th day of _June_, 2010 by and between the DELAWARE RIVER PORT AUTHORITY (hereinafter referred to as the "DRPA"), a bi-state, public corporate instrumentality of the Commonwealth of Pennsylvania and the State of New Jersey, having its principal office at One Port Center, 2 Riverside Drive, Camden, New Jersey, 08101-1949 and the CITY OF PHILADELPHIA through its DEPARTMENT OF PUBLIC PROPERTY, having its principal place of business at Room 790 City Hall, Philadelphia, Pennsylvania 19107 (hereinafter referred to as the "Department").

**WITNESSETH**

WHEREAS, the DRPA is authorized by its Compact to promote the economic development of the Port Region; and

WHEREAS, the Department has requested funding in support of the President's House Project, a partnership between the City of Philadelphia, the National Park Service and the Independence National Historic Park; and

WHEREAS, the President's House, an approximately 12,000 square foot permanent, outdoor commemorative installation to be placed at the footprint of the President's House, which is immediately adjacent to the Liberty Bell Center, will integrate major elements of Independence National Historical Park by commemorating the site of the executive mansion where Presidents George Washington and John Adams lived; and

WHEREAS, pursuant to a Request for Qualifications issued September 29, 2005 and a Request for Proposal, June 15, 2006, the City and National Park Service selected the project team managed by Kelly/Maiello, LLC to design, fabricate and install the President's House Project at Independence National Historical Park; and

WHEREAS, by Resolution DRPA-09-015, dated February 18, 2009 (attached hereto as Exhibit A), the DRPA agrees to provide funding to the Department in an amount not to exceed Three Million Five Hundred Thousand Dollars ($3,500,000) to assist in its efforts to design and build the President's House;

NOW THEREFORE, in consideration of the mutual exchange of promises and covenants herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    **Obligation of the DRPA.**  The DRPA will provide to the Department an amount not to exceed Three Million Five Hundred Thousand Dollars ($3,500,000) in the

form of a grant to be used for the design and construction of an approximately 12,000 square foot permanent, outdoor commemorative installation to be placed at the footprint of the President's House, which is immediately adjacent to the Liberty Bell Center (hereinafter the "Project") as more specifically described in the Department's Briefing Document for the Office of the Mayor, City of Philadelphia, revised, January 4, 2010, attached hereto as Exhibit B along with a maintenance endowment for the Project. The grant funding described in this Section 1 shall be referred to herein as the "Project Funding".

2.      **Manner of Payment.**  Upon submission by the Department of funding requests, the DRPA will release monies in the amount requested, up to the total grant amount of $3,500,000.  Such requests for funding must be accompanied by supporting documentation, including but not limited to invoices and receipts which detail the manner in which grant funds have been used.  DRPA reserves the right to request additional supporting documentation for any expense.  No monies will be released by the DRPA until the Department submits to the DRPA proof of binding commitments for one hundred percent (100%) of the Project funding.  The Department shall exhaust other sources of funding before it requests payment from the DRPA for any Project costs, including the Project endowment.

3.      **Preconditions to Funding.**  Before any monies are released by the DRPA, the Department shall submit to the DRPA a detailed Project budget, along with detailed Project work and cash flow schedules and a firm and final estimated Project cost. The Department also shall submit a detailed report as to how the DRPA grant monies will be applied to Project costs and to the Project endowment prior to any monies being released by the DRPA.  No monies will be released by the DRPA until the Department submits to the DRPA proof of binding commitments for one hundred percent (100%) of the Project Funding.  The DRPA retains the right to request additional information if the submissions of the Department are deemed inadequate in the sole discretion of the DRPA.

4.      **Submission of Progress Reports.**  The Department shall submit to the DRPA on a quarterly basis a Progress Report detailing the status of the Project.  The Department also shall cause to be delivered to the DRPA other such information related to the Project as the DRPA may reasonably require from time to time, in form and substance reasonably satisfactory to the DRPA, as necessary to insure compliance by the Department with this Agreement.  All information sent to the DRPA shall be sent to:

> Christina Maroney
> Manager, Special Projects
> Delaware River Port Authority
> One Port Center
> 2 Riverside Drive
> Camden, NJ 08101

5.    **Term.** This Agreement shall be effective as of its execution date and shall continue in force until December 31, 2011, unless otherwise terminated in accordance with Paragraph 11 of this Agreement. If any portion of the DRPA grant provided pursuant to this Agreement is not used by the Department before December 31, 2011, the parties shall meet to discuss the status of the Project and the DRPA's funding of the same. Notwithstanding the foregoing statement, the DRPA shall have the right, in its sole discretion, to require the return of any funds remaining unexpended at the end of the term of this Agreement.

6.    **Audit and Inspection.** The DRPA may, in its discretion, examine and inspect the Project and examine and audit the Department's records, correspondence and documentation with respect to the expenditure of the funds paid by the DRPA to the Department at any time upon reasonable notice to the Department. Should an audit identify any expenditures which do not comply with the conditions of this grant, the parties shall meet to discuss re-allocation of those funds to eligible expenses. In the event that funds provided to the Department are utilized for criminal, fraudulent, or other purposes not associated with the Project, those funds shall be refunded to the DRPA by the Department.

7.    **Insurance.** The City of Philadelphia is self insured against claims to persons or property under this Agreement and will provide DRPA appropriate proofs of it self insured status

8.    **Selection of Contractors.** The DRPA represents that it shall have no role in the selection of any organization, individual or entity that may be called upon to work on the Project, nor will the DRPA have any input into or control over the manner in which such work is performed.

9.    **Nondiscrimination.** The Department warrants and represents that in carrying out its obligations under this Agreement, it will comply with all applicable anti-discrimination laws.

10.    **Indemnification.** The Department agrees to defend, indemnify and protect and hold harmless the DRPA, its officers, commissioners, directors, members, agents, servants and employees (collectively referred to in this paragraph as the "DRPA") from and against any and all suits, claims, liabilities, losses, judgments, demands and damages, of whatsoever kind or nature, including, but not limited to, expenditures for and costs of investigations, hiring of expert witnesses, court costs, counsel fees, settlements, judgments or otherwise, which may be suffered by or accrue against, be charged to or recoverable from the DRPA, regardless of whether a suit has been filed or initiated (collectively "Claims") that arise from, arise out of, are connected with, or relate in any way to the performance of this Agreement. This includes but is not limited to Claims (1) caused in part or in whole by the DRPA, (2) which result from the negligence of the DRPA, and/or (3) which are based on strict liability. This further includes but is not limited to Claims that are solely brought against the DRPA, or that allege the DRPA is solely negligent and/or solely liable and that are related to this Agreement.

3

Notwithstanding the foregoing, Department shall not indemnify, defend and hold harmless DRPA to the extent that a Claim is attributable to the willful misconduct or gross negligence of DRPA.

The defense and indemnification obligations shall arise the moment a Claim is brought against the DRPA or the moment the DRPA receives notice of a Claim. The obligations of the Department shall survive the termination of this Agreement or the completion by the Department of its other obligations under this Agreement.

In any and all Claims against the DRPA by any employees of the Department, anyone directly or indirectly employed by the Department or anyone for whose acts the Department may be liable, the indemnification obligation under this Agreement shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for the Department under workers' compensation acts, disability benefit acts, or other employee benefits acts or any other legal or contractual provisions.

The indemnification rights provided to the DRPA in this provision shall be a supplement to, and not in lieu of, any indemnification rights that the DRPA possess under the common law.

The parties intend and agree that this provision shall be enforceable to the full extent permitted by law. To the extent any portion of this provision is found to be unenforceable for any reason, the parties intend and agree that the remainder of this provision shall be enforceable.

Nothing herein shall waive or amend any defense or immunity that the City, the DRPA, and their respective officers, agents or employees, may have under the Pa Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541 et. seq.

11. **Termination.**

a. **Termination by the DRPA.** If the DRPA, in its sole discretion, reasonably determines that the Department has not met its obligations hereunder, the DRPA reserves the right to terminate this Agreement upon giving not less than ten (10) days notice to the Department if such obligation has not been satisfied or cured by the Department within the ten (10) day period, or within such other period of time agreed to by the DRPA and the Department. In the event the DRPA exercises such right of termination, the DRPA shall be without further liability whatsoever to the Department under this Agreement. The Department agrees that it shall not be entitled to any damages whatsoever in the event of such termination.

b. **Termination by the DRPA and/or the Department.** Notwithstanding the provisions of Paragraph 11(a), it is understood and agreed that the DRPA and the Department hereby reserve unto themselves the right to terminate this Agreement at any time, for any reason whatsoever, upon giving not less than thirty (30) days notice to the other. In the event of the DRPA's exercising such right of termination, the Department shall be entitled to retain all funds expended or contractually committed

4

on the Project up to the date of the termination. All other funds shall be returned to the DRPA within thirty (30) days of the date of termination. The DRPA shall be without further liability whatsoever to the Department under this Agreement. Neither party will be entitled to any damages whatsoever in the event of such termination, other than those set forth in this paragraph.

    12.    **Notice.** All notices required or permitted to be given hereunder shall be in writing and shall be deemed to have been given when mailed by certified mail, return receipt requested, addressed to the other party as follows:

                        If to the Department:

                        Joan Schlotterbeck, Commissioner
                        Philadelphia Department of Public Property
                        Room 790 City Hall
                        Philadelphia, PA 19107

                        With a copy to:

                        Divisional Deputy City Solicitor, Real Estate and Economic Development
                        City of Philadelphia Law Department
                        1515 Arch Street, 17th Floor
                        Philadelphia, PA 19102

                        If to the DRPA:

                        Christina Maroney
                        Manager, Special Projects
                        Delaware River Port Authority
                        One Port Center
                        2 Riverside Drive
                        Camden, NJ 08101

                        With a copy to:

                        Richard L. Brown, Esquire
                        General Counsel
                        Delaware River Port Authority
                        One Port Center
                        2 Riverside Drive
                        Camden, NJ 08101

Any party may from time to time change its address for the purposes of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

13.    **Political Contributions.**  The Department warrants to the DRPA that neither the Department nor anyone authorized to act on the Department's behalf has made any payment or contribution to any political candidate, political committee, public official or any other person or entity for the purpose of influencing the award of this Agreement.  The Department agrees that if the Executive Committee of the DRPA decides, after such hearing as it deems necessary, that this warranty has been breached, the Department shall, within thirty (30) days of this decision, pay to the DRPA liquidated damages equal to twenty-five percent (25%) of the total amount of this Agreement, provided the Executive Committee's decision shall be final, unless the Department seeks a review thereof in a commercial arbitration proceeding conducted by the American Arbitration Association, instituted by the Department within fifteen (15) days of receipt of the Executive Committee's decision; and the Department further agrees that it shall be ineligible to receive any award of any contract or grant from the DRPA for a period of one (1) year from the date of any final decision unfavorable to it.

14.    **Jurisdiction.**  The laws of the Commonwealth of Pennsylvania shall govern the validity, interpretation, construction and performance of the terms and conditions of this Agreement.  Venue for any disputes arising under this Agreement shall be proper in the state or federal courts of the Commonwealth of Pennsylvania.

15.    **Applicable Law.**  By entering into this Agreement, the DRPA does not consent, either expressly or impliedly, to the jurisdiction or application of any laws, regulations, procedures or requirements of any governmental, quasi-governmental or other political entity which would otherwise not be applicable to the DRPA.

16.    **Entire Agreement.**  This Agreement contains the entire agreement of the parties and shall be binding on their respective executors, administrators, legal representatives, successors and assigns.  This Agreement may not be amended or altered without the written consent of both parties hereto.

17.    **Waiver.**  A waiver by any party of a breach or default by the other party of any provision of this Agreement shall not be deemed a waiver of future compliance therewith, and such provisions shall remain in full force and effect.

18.    **Headings.**  All heading preceding the text of the several sections and paragraphs of this Agreement are inserted solely for the convenience and reference of the parties and shall not constitute a part of this Agreement, nor shall they affect the meaning or interpretation thereof.

19.    **Assignment.**  This Agreement may not be assigned without the prior written consent of the other party.

20.    **Severability.**  If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, such provision and this Agreement shall be deemed and construed to be modified or restricted to the extent that and in the manner necessary

to render the same valid and enforceable, or shall be deemed excised from this Agreement as the case may require.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Agreement to be duly executed as of the date and year first above written.

ATTEST:

_____
Secretary

DELAWARE RIVER PORT AUTHORITY

_____
John J. Matheussen
Chief Executive Officer

ATTEST:

_____
Secretary

PHILADELPHIA DEPARTMENT OF
PUBLIC PROPERTY

_____  6/8/10
Joan Schlotterbeck
Commissioner

Reviewed by the Office of
General Counsel and
Approved as to Legal
Form.

APPROVED AS TO FORM
SHELLEY R. SMITH, CITY SOLICITOR

Per _____
Deputy City Solicitor

7

SUMMARY STATEMENT

| | |
|---|---|
| ITEM NO. | **SUBJECT:** Infrastructure and Educational Projects in Support of Transit Oriented Development City of Camden – Downtown; City of Philadelphia Historic District |
| COMMITTEE: | Finance |
| COMMITTEE MEETING DATE: | January 22, 2009 |
| BOARD ACTION DATE: | February 18, 2009 |

**PROPOSAL:** (1) That the Board authorizes DRPA to provide funding in a total amount not to exceed $3.5 million for educational and infrastructure improvements to support transit oriented development projects in downtown Camden, New Jersey in and around PATCO's City Hall and Broadway Stations and authorizes staff to enter into agreements with the City of Camden Redevelopment Agency ("CCRA"), and other appropriate entities to carry out the program. (2) the Board authorizes DRPA to provide funding in a total amount not to exceed two million five hundred thousand dollars ($2.5 million) for improvements in the Philadelphia Historic District adjacent to the PATCO Franklin Square Station and for support to the educational work provided by the Lights of Liberty program. (3) The Board authorizes staff to negotiate agreements for funding not to exceed $3.5 million with the City of Philadelphia, Philadelphia Industrial Development Corporation (PIDC) or other appropriate public entities in support of The President's House project described herein.

**PURPOSE:** To provide support for a series of infrastructure and transit oriented projects including the demolition of the decaying Parkade Building adjacent to City Hall Station and related infrastructure improvements to the area relating to recreation and improvement of Roosevelt Park, and site acquisition, demolition, relocation and other costs in connection with UMDNJ's development of an Academic Research Facility to be located in the vicinity of Broadway and City Hall Stations. To provide funding for improvements at Franklin Square adjacent to the PATCO Franklin Square Station in Philadelphia and to provide funds in support of the educational mission of the Lights of Liberty program. To provide funding necessary to bring The President's House project to fruition.

**BACKGROUND:** The PATCO Hi - Speedline began operation on February 15, 1969, and presently averages more than 35,000 passenger trips on a daily basis, carrying its customers to work, school, sporting events, entertainment venues and shopping. Homes, apartment buildings, cultural venues, entertainment destinations, businesses and other points of interest have all developed along the PATCO Speedline, creating tremendous economic and population growth.

In 2005, PATCO initiated an effort to evaluate transit oriented development opportunities in the communities it serves. Transit-oriented development

SUMMARY STATEMENT
Finance Committee 2/18/09

Infrastructure and Educational Projects in Support
of Transit Oriented Development City of Camden –
Downtown; City of Philadelphia Historic District

(TOD) is considered to be development that is physically near transit facilities and capitalizes on this proximity, both in promoting transit ridership and as

an economic and community development tool. The areas adjacent to the PATCO stations in New Jersey are valuable real estate that has potential mixed-use development opportunities that are transit-oriented and in conformance with smartgrowth principles promoted by the State of New Jersey. DRPA engaged a consultant to evaluate PATCO's transit facilities and prepare a transit oriented development plan. PATCO's transit oriented development initiative is on-going. The transit oriented development program at Collingswood is in a fairly advanced stage and is an encouraging example of what can be done in this area.

PATCO operates three stations in the City of Camden; at the Walter Rand Transportation Center, near Cooper Hospital (Broadway Station), and the City Hall Station, near Rutgers University, Camden City Hall, and the Camden County Hall of Justice. The City of Camden and the CCRA are presently undertaking a project to reconstruct Roosevelt Plaza in the area between Camden City Hall and PATCO's City Hall Station. Concurrently, UMDNJ is presently undertaking a project to construct an Academic Research Facility as part of the Cooper Hospital/Robert Wood Johnson Medical School expansion taking place in the vicinity of Broadway Station.

The Roosevelt Plaza ("Plaza") project is the recreation of a downtown civic center through the development of a park in front of City Hall. This civic space will be created at the current site of the Parkade Building, a marginal and neglected office building and parking garage built in the mid 1950's.

The intent of the project will be for the City of Camden and CCRA to create a strikingly beautiful civic space as a forecourt to City Hall and the dramatic City Hall tower – a people place where workers, visitors, students and citizens of the region can gather for celebrations, festivals and civic events. Portions of the perimeter blocks facing the Plaza should be made available for the construction of new office or apartment buildings, designed to accentuate the dignity of the City Hall's presence and create a critical mass of revitalization able to extend out along Market and Federal Streets. This space will also benefit from the adjacent PATCO train stop on its northwest corner, which is utilized by many city and county employees and the students attending the downtown campuses of Rutgers, Rowan, and Camden County College. The project will include provisions insuring that the PATCO stop will be protected and that all construction will insure the safety of the PATCO line and its passengers.

In addition, adjacent to the southeast of the project site is the Walter Rand multi-modal transit complex where bus, light rail and PATCO speed line services all converge. These multi-modal transit systems facilitate the movement of thousands of commuters through the downtown on a daily basis.

SUMMARY STATEMENT
Finance Committee 2/18/09

Infrastructure and Educational Projects in Support
of Transit Oriented Development City of Camden –
Downtown; City of Philadelphia Historic District

Ground level shops and restaurants set around the new Roosevelt Plaza, within a block's walking distance to the transit center, will serve the consumer demands of these commuters, in addition to the local office workers, residents and visitors to Camden's central business district (CBD).

The creation of Roosevelt Plaza also creates, prospectively, greater land value surrounding the park, much the same way that green spaces in New York, Philadelphia and Chicago have increased surrounding land values. It is these

increased values, both financial and aesthetic, that will stimulate the office, retail and residential development so desired in the CBD. The City of Camden and CCRA have requested financial assistance to be used for the demolition of the Parkade Building and other infrastructure improvements.

UMDNJ is currently pursuing the development of a 160,000 square foot Academic Research Facility on Broadway in the Cooper-Lanning neighborhood of Camden. This estimated $136 million project is being funded by a combination of UMDNJ and Camden Economic Recovery Board funds. This location is one block away from Cooper Hospital's newly expanded patient care pavilion and two blocks from the Walter Rand multi-modal transit complex. The Cooper-Lanning neighborhood anticipates the construction and rehabilitation of over 700 units of housing in the next 5-10 years. The development of the Academic Research Facility in Camden will benefit individuals and families throughout the city and the region through dedicated research, medical education and clinical care. The development of the Academic Research Facility is governed by a Tri-Party Agreement between the City of Camden, the University of Medicine and Dentistry of New Jersey, and Cooper Health System. CCRA is acting as the City's agent in the acquisition and relocation necessary to assemble the site of the Academic Research Facility for UMDNJ. The designated site for the Academic Research Facility requires the acquisition of 23 parcels from 12 owners, with 8 owners requiring relocation assistance. Currently, 6 of the 8 owners/properties requiring relocation have either been fully relocated or are on a path to full relocation. One of the 2 remaining property owners requiring relocation from the site is Puerto Rican Unity for Progress (PRUP), a 30 year old non profit organization that provides education, training, and after school services to the community. As a relocation solution, PRUP has chosen to design and construct a new facility 6 blocks south of their current location on Broadway. CCRA has requested financial assistance to be used for site acquisition, demolition and relocation costs and expenses in connection with its development of the Academic Research Facility.

DRPA and PATCO staff believe these projects are consistent with PATCO's transit oriented development initiative in the City of Camden, New Jersey.

DRPA also proposes to use up to $2.5 million in support of two projects within the Historic District in Philadelphia. Both projects are near the existing

SUMMARY STATEMENT
Finance Committee 2/18/09

Infrastructure and Educational Projects in Support
of Transit Oriented Development City of Camden –
Downtown; City of Philadelphia Historic District

PATCO Hi Speed Line station at 8th and Market Streets, and one of the projects will be located at Franklin Square atop the currently inactive PATCO Franklin Square station.

The first of these capital projects is a permanent food structure in Franklin Square. In 2006 Historic Philadelphia Inc. (HPI) redeveloped Franklin Square, at the foot of the Ben Franklin Bridge, as a major destination site for visitors and neighborhood residents. Measuring close to eight acres, Franklin Square is one of William Penn's five original squares in the design of the city, dating back to 1682. The Fairmount Park Commission granted HPI the rights to renovate and manage Franklin Square as an outdoor recreational, amusement and heritage site. Raising $6.5 million, HPI brought needed renovations to the square, retained the park's primary character and added

attractions which draw regional residents, employees of neighborhood businesses, and visitors. HPI has received numerous awards for the renovation including being named Philadelphia Magazine's Best of Philly, "Best Play Space for Kids" in 2007. To build on Franklin Square's success, HPI would like to add a permanent structure in the Square to enhance family experiences and increase the use of the Square. The Delaware River Port Authorities grant to HPI would help pay for the capital improvements required to build the permanent structure.

The second capital project that HPI will undertake is to update the technology of the Lights of Liberty show. Lights of Liberty (LOL) began under the auspices of HPI in partnership with the National Park Service (NPS). The nighttime sound and light show was born of a desire by Governor Edward G. Rendell, then Philadelphia's Mayor, and Philadelphia's tourism community to add an evening attraction to the historic district's landscape with the ultimate goal of generating overnight-stays by tourists. The show debuted in 1999. Shortly after its debut, it split from HPI and became its own 501(c)(3) headed by a President & CEO and governed by a separate Board of Directors. The former President & CEO stepped down in early 2007 and, in keeping with Governor Rendell's original vision for programming in Philadelphia's historic district, LOL is now under the umbrella of HPI. While the show was considered unique and the first ambulatory sound and light show of it's kind in the world at its inception, technology has changed drastically in the past 10 years. HPI has enlisted the services of award winning exhibit designer Ralph Appelbaum. Mr. Applebaum is responsible for the concepts behind exhibits in Philadelphia's National Constitution Center and HPI's newest initiatives, Once Upon A Nation & Franklin Square. Mr. Appelbaum is intimately familiar with the Philadelphia landscape and will help to recreate a magical yet authentic night time experience that capitalizes on Philadelphia's history and treasures in the historic district.

During the period 1790 – 1800 both President George Washington and President John Adams occupied a mansion located one block north of

SUMMARY STATEMENT
Finance Committee 2/18/09

Infrastructure and Educational Projects in Support
of Transit Oriented Development City of Camden –
Downtown; City of Philadelphia Historic District

Independence Hall.  In a very real sense that mansion was the original home of United States Presidents.  Research has documented that during President Washington's residence in the President's House, nine enslaved Africans lived and worked there also.  The actual building that housed these two Presidents, their employees, family members and these nine enslaved Africans no longer exists.  In order to commemorate this essential piece of American history the concerned organizations intend to create a permanent outdoor commemorative installation at the site of the original President's House adjacent to the Liberty Bell Center.

Over two million visitors come to the Liberty Bell Center each year, and it is remarkable that during the excavation of the President's House site over three hundred thousand visitors watched as the archeological teams worked.

The design criteria for the President's House site emphasize five cultural values:  Identity, this exhibit will enable us to provide the names and personal information about the free and enslaved Africans who lived and worked at this site; Memory, this exhibit will help link the present to the past and will bring

the past history of those whose story has not been told to life for those who visit; Agency, the exhibit will show that both free and enslaved Africans were full participants in the cultural, economic and social life of the times and this will show what their roles were; Dignity, the exhibit will demonstrate that the enslaved peoples maintained a strong sense of dignity and a disciplined code of conduct under trying conditions; Truth, the exhibit will document the ways in which legal codes permitted the continuance of slavery and will also show the actual conditions of those who lived in slavery.

The design will also include the following criteria:  the house and the people who lived there; the Executive Branch; the slavery system; African American Philadelphia with an emphasis on the free African Americans in the City; the movement for freedom; how this history was recovered and why it is critical that we remember.

The funding for The President's House will come from reallocation of funds previously appropriated under DRPA 99-046 (Intermodal Facility at Philadelphia Naval Business Center using proceeds from the 1999 Port District Project Bonds, Series A) under which the DRPA authorized $16.0 million of which approximately $5.46 million remains unexpended and will be reallocated under this resolution.  The funding for all of the other initiatives will come from the proceeds of the 1999 DRPA Port District Project Bonds, Series B or other sources as approved by DRPA Bond Counsel.

SUMMARY STATEMENT
Finance Committee 2/18/09

Infrastructure and Educational Projects in Support
of Transit Oriented Development City of Camden –
Downtown; City of Philadelphia Historic District

| | | |
|---|---|---|
| SUMMARY: | Amount: | $ 9.5 million ($3.5 million for New Jersey Transit Oriented Development, Educational and Improvement projects; $2.5 million for Pennsylvania Transit Oriented Development, Educational and Improvement Projects; $3.5 million for The President's House) |
| | Source of Funds: | 1999 PDP Series A Bond proceeds (as to The President's House) ; 1999 PDP Series B Bond Proceeds or other sources as approved by DRPA Bond Counsel (as to Franklin Square and Lights of Liberty); 2001 Series A Bond Proceeds or other sources as approved by DRPA Bond Counsel (as to Parkade Building and Cooper Hospital). |
| | Operating Budget: | N/A |
| | Master Plan Status: | N/A |
| | Other Fund Sources: | Economic Recovery Board, New Jersey Department of Environmental Protection, State of New Jersey, Urban Enterprise Zone, William Penn Foundation, Community Development Block Grant; Historic Philadelphia, Inc.; Pennsylvania Heritage Society; City of Philadelphia, United States Department of Transportation |
| | Duration of Contract; | Varies |
| | Other Parties Involved: | City of Camden, City of Camden Redevelopment Agency, Economic Recovery Board, New Jersey Economic Development Authority, New Jersey Department of Environmental Protection, State of New Jersey, Urban Enterprise Zone, William Penn Foundation, PRUP, University of Medicine & Dentistry of New Jersey; Historic Philadelphia, Inc.; Pennsylvania Heritage Society; City of Philadelphia, PIDC, United States Department of Transportation; African American Museum in Philadelphia, Avenging the Ancestors Coalition, Philadelphia Multicultural Affairs Congress – a division of the Philadelphia Convention and Visitors Bureau, Independence Hall Association, Independence National Historical Park, Hon. Robert A. Brady. |

DRPA-09-015
Finance Committee: January 22, 2009
Board Date:  February 18, 2009
Infrastructure and Educational Projects in Support Oriented Development
City of Camden – Downtown; City of
Philadelphia Historic District

## RESOLUTION

**RESOLVED:** That the Board supports transit oriented development projects in the City of Camden and within the City of Philadelphia which help to enhance the use of the PATCO high speed transit system; and be it further

**RESOLVED:** That the Board supports capital improvement and educational programs related to transit oriented development projects; and be it further

**RESOLVED:** That the Board hereby authorizes funding to the City of Camden Redevelopment Agency, or other local governmental authority or Agency, in an amount not to exceed two million dollars ($2,000,000) to be used for costs associated with the demolition of the Parkade Building and perform other infrastructure and capital improvements in the vicinity of PATCO's City Hall Station following demolition; and be it further

**RESOLVED:** That the funding to the City of Camden Redevelopment Agency or other local agency be expressly conditioned upon the demolition and other contracts associated with the project including provisions acceptable to DRPA Engineering and PATCO which protect the PATCO right of way and tunnel and grant DRPA/PATCO the necessary property interests for the existing PATCO improvements on the Parkade Building Property; and be it further

**RESOLVED:** That the Board hereby authorizes funding to the City of Camden Redevelopment Agency in an amount not to exceed one million, five hundred thousand dollars ($1,500,000) to be used for site acquisition, demolition, relocation, and other ancillary capital costs associated with the development of a Academic Research Facility in the vicinity of City Hall Station and Broadway Station; and be it further

**RESOLVED:** That the DRPA's participation in these projects is conditioned upon the relevant parties agreeing to permit the DRPA and PATCO to have an active participating role in the planning and development of the projects in downtown Camden that are being funded by this Resolution; and be it further

**RESOLVED:** That the Board hereby authorizes funding to Historic Philadelphia, Inc. in an amount not to exceed $2.5 million for the two capital projects described in the attached Summary Statement; and be it further

**RESOLVED:** That the commitment of all funds remaining unexpended under DRPA Resolution 99-046 be and hereby is terminated and the said funds are made available to be reallocated; and be it further

RESOLVED:     That the Board hereby authorizes funding to the City of Philadelphia, Philadelphia Industrial Development Corporation or another appropriate public entity in an amount not to exceed $ 3.5 million in support of The President's House from funds previously allocated under DRPA 99-046 and reallocated pursuant to this Resolution; and be it further

RESOLVED:     That staff be and hereby is authorized to negotiate agreements with appropriate parties for the purposes described in this Resolution and the attached Summary Statement; and be it further

RESOLVED:     That prior to any funding being advanced by DRPA under the terms of this Resolution, DRPA must obtain an opinion from its Bond Counsel stating that the purpose for which the funding will be used will not affect the non taxable status of the bond issue; and be it further

RESOLVED:     The Vice Chairman and the Chief Executive Officer must approve all necessary agreements, contracts, or other documents relative to this Resolution as to New Jersey based projects on  behalf of the DRPA prior to execution. If such agreements, contracts,
or other documents have been approved by the Vice Chairman and if thereafter the Vice Chairman is absent or unavailable, the Chief Executive Officer may execute the said document(s) on behalf of DRPA; and be it further

RESOLVED:     The Chairman and the Chief Executive Officer must approve all necessary agreements, contracts, or other documents relative to this Resolution as to Pennsylvania based projects on behalf of the DRPA prior to execution. If such agreements, contracts, or other documents have been approved by the Chairman and if thereafter the Chairman is absent or unavailable, the Chief Executive Officer may execute the said document(s) on behalf of DRPA.

SUMMARY:  Amount:            $9.5 million total ($3.5 million for New Jersey Transit Oriented Development, Educational and Improvement projects; $2.5 million for Pennsylvania Transit Oriented Development, Educational and Improvement Projects; $3.5 million for The President's House)

Source of Funds:  1999 PDP Series A Bond Proceeds (as to The President's House); 1999 PDP Series B Bond Proceeds or other appropriate source of funds approved by Bond Counsel  (as to Franklin Square and Lights of Liberty); 2001 Series A Bond Proceeds or other appropriate source of funds approved by DRPA Bond Counsel (as to Parkade Building and Cooper Hospital).

Capital Project #:      N/A
Operating Budget:      N/A
Master Plan Status:    N/A
Other Fund Sources:   Economic Recovery Board, New Jersey Department of Environmental Protection, State of New Jersey, Urban Enterprise Zone, William Penn Foundation, Community Development Block Grant; City of Philadelphia, United States Department of Transportation

Duration of Contract:  12 Months
Other Parties Involved: City of Camden, City of Camden Redevelopment
Authority, Economic Recovery Board, New
Jersey Economic Development Authority, New Jersey
Department of Environmental Protection,  State of
New Jersey, Urban Enterprise Zone, William Penn
Foundation, University of Medicine and Dentistry of
New Jersey; PRUP; Historic Philadelphia, Inc.;
Pennsylvania Heritage Society; City of Philadelphia,
Philadelphia Industrial Development Corporation,
United States Department of Transportation; African
American Museum in Philadelphia, Avenging the
Ancestors Coalition, Philadelphia Multicultural Affairs
Congress – a division of the Philadelphia Convention
and Visitors Bureau, Independence Hall Association,
Independence National Historical Park, Hon. Robert A.
Brady.

# EXHIBIT 2

PRINTER'S NO. 3509

THE GENERAL ASSEMBLY OF PENNSYLVANIA

# HOUSE RESOLUTION

## No. 490 Session of 2002

INTRODUCED BY HORSEY, YOUNGBLOOD, WASHINGTON, CRUZ, JAMES,
BISHOP, D. EVANS, MYERS, KIRKLAND, ROEBUCK, OLIVER, PRESTON,
ROBINSON, THOMAS, WATERS AND J. WILLIAMS, MARCH 26, 2002

INTRODUCED AS NONCONTROVERSIAL RESOLUTION UNDER RULE 35,
MARCH 26, 2002

A RESOLUTION

1  Urging the National Park Service to erect a commemorative plaque
2      in recognition of the history of the slave quarters located
3      on the site of the planned Liberty Bell Pavilion.

4      WHEREAS, A portion of the proposed location of the planned

5  Liberty Bell Pavilion in Philadelphia is located on the historic

6  site of the residence of United States Presidents George

7  Washington and John Adams prior to the construction of the White

8  House in Washington, D.C.; and

9      WHEREAS, This property, referred to as the President's House,

10  included other complexes such as slave quarters and icehouses;

11  and

12      WHEREAS, The land previously occupied by the slave quarters

13  will be partially covered by the newly built facility; and

14      WHEREAS, The Liberty Bell is recognized as a symbol of the

15  American Revolution; and

16      WHEREAS, The Liberty Bell became famous when abolitionists

17  fighting to rid the nation of slavery adopted it as their

1   symbol; and

2     WHEREAS, The inscription on the Liberty Bell became the rally

3   cry for opponents of slavery; and

4     WHEREAS, It is important to maintain a permanent

5   acknowledgment of the rich history of the affected area,

6   especially the history associated with the slave quarters;

7   therefore be it

8     RESOLVED, That the House of Representatives of the

9   Commonwealth of Pennsylvania urge the National Park Service to

10  facilitate the placement of a permanent commemorative plaque

11  recognizing the site of the slave quarters and to work for

12  continuing recognition of this historic site; and be it further

13    RESOLVED, That copies of this resolution be transmitted to

14  the President of the United States, the National Park Service,

15  the United States Senate, the presiding officers of each house

16  of Congress, each member of Congress from Pennsylvania and the

17  Mayor of the City of Philadelphia.