Number _____

# THIRD AMENDMENT TO THE COOPERATIVE AGREEMENT

## BETWEEN

## NATIONAL PARK SERVICE
## UNITED STATES DEPARTMENT OF THE INTERIOR

## AND

## THE CITY OF PHILADELPHIA

## FOR

## PRESIDENT'S HOUSE PROJECT

This Third Amendment to the Cooperative Agreement ("**Third Amendment**") is made this _12_ day of May 2009, between the City of Philadelphia ("**City**") and the National Park Service ("**NPS**").

**ARTICLE I.**         **BACKGROUND**

A. A detailed summary of the Project is attached to this Third Amendment as **Attachment "A"** ("**Summary Sheet**").

B. In furtherance of the July 14, 1950 Agreement between the United States of America and the City to cooperate in the preservation of Independence National Historical Park, and the Cooperative Agreement between the City and NPS as such Cooperative Agreement has been amended, the NPS and City now desire to further extend the Term of the Cooperative Agreement and to establish the obligations and understandings of the City and the NPS from the Commencement Date forward regarding the design, fabrication and installation of the Project, such that the City may accomplish its goal of donating the completed Project to NPS in accordance with Section 2 of the Cooperative Agreement, within parameters acceptable to the NPS, and in compliance with applicable laws, regulations, government policies and Park management plans.

C. The Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS.

**ARTICLE II.**         **DEFINITIONS; ATTACHMENTS**

A. Capitalized terms not otherwise defined in this Third Amendment, including the definitions set forth in the Summary Sheet, shall have the meanings set forth in the Cooperative Agreement as amended.

B.  The following are Attachments to this Third Amendment and incorporated herein by reference:

> **Attachment A:**  Project Summary Sheet
> **Attachment B:**  Funding Obligations
> **Attachment C:**  Project Development Plan
> **Attachment D:**  Exhibit Team Insurance Requirements

## ARTICLE III.    COOPERATION OF THE PARTIES

Beginning on the Commencement Date, City and NPS agree to cooperate in the following manner so that the City may cause the design, fabrication, installation and completion of the Project in a manner suitable for acceptance of the Project by the NPS:

A.  The NPS agrees to--

1.  Provide timely review, comment and input in accordance with the Project Development Plan attached to this Third Amendment as **Attachment "C" ("Project Development Plan")** and the Project schedule as it may be amended, and in writing, approve or deny:

   a.  Any contract between the City and any contractor, vendor, supplier, or professional services firm furnishing supplies or services to determine whether the contract is appropriate and consistent with the Cooperative Agreement as amended.

   b.  All design plans, interpretive works, construction drawings, samples, specifications, mockets, engineering documents, environmental compliance documents, change orders, and cost estimates generated by the City or the City's contractors.

2.  Monitor the general implementation of the Project, to include periodic inspection and tests for compliance with the requirements of the Cooperative Agreement as amended and the Commission Agreement as amended, any Project Design, Fabrication and Installation  phases, project implementation plan or applicable special use permit, and relevant laws, regulations, and policies.

3.  Provide Final Inspection in accordance with the Cooperative Agreement as amended and the Project Development Plan.

4.  Notify the Partner of any change in NPS policy that may affect implementation of this Commission Agreement as amended.

5.   Subject to the availability of appropriations, undertake NPS activities identified in the Cooperative Agreement as amended and the Project Development Plan.

6.   Provide access to the Park in accordance with the Cooperative Agreement as amended and the Project Development Plan.

B.   The City agrees to--

1.   In reliance on review, comment and input required to be provided by NPS above, ensure that the Exhibit Team adheres to the Cooperative Agreement as amended including the Project Design Plan, the Programmatic Agreement between the NPS, City and others, dated March 15, 2006, and to donate to NPS the Project identified in the Cooperative Agreement as amended. This donation is made by the City on its own volition and without compensation.

2.   Contact, or cause the Exhibit Team to contact NPS in a timely manner with requests for access to the Park to accomplish the Project in accordance with law, the Cooperative Agreement as amended and the Project Design Plan.

3.   Undertake and complete in a timely manner, at its sole cost and expense, the Project identified in this Cooperative Agreement as amended.

4.   Submit copies of all plans, designs, and specifications and Project related materials to NPS for review, comment and approval or denial, in accordance with the Cooperative Agreement as amended and the Project Design Plan.

5.   Execute any Third-Party Contract only after receiving written NPS approval. "Third-Party Contract" shall mean any and all contracts between the City and a third-party executed after the Commencement Date, for work on the Project, including but not limited to design, engineering or interpretive services, and construction. Third-Party Contracts shall not include amendments to the Commission Agreement as amended.

6.   Provide, in advance of entering into any Third-Party Contract, written certification that--

a.   The third-party:

i.   Has all required licenses to do the work contemplated by the agreement as required by applicable law;

      ii.      Is not suspended or debarred from federal contracting; and

      iii.      Demonstrates relevant experience and competence to perform the work contemplated by in the Third-Party Contract.

  b.    The City:

      i.      Used competition in selecting the third-party to perform the work;

      ii.      Has taken measures to avoid or mitigate conflicts of interest; and

      iii.      Has incorporated provisions reflecting best practices in contract management and project administration into the Third-Party Contract.

7.    Make the NPS an express third-party beneficiary of all Third-Party Contracts, and require that all Third-Party Contracts contain the following clause:

"The National Park Service is a third-party beneficiary of this contract, with all legal rights associated with that status, including the right to enforce the contract."

8.    Following the Commencement Date, include the following requirements in any Third-Party Contract for the performance of any work or for fulfilling any obligation related to the Project:

"The Contractor agrees to—

a.    Comply with all applicable laws, regulations, rules, orders, other legal requirements, and NPS policies;

b.    Comply with the terms and conditions of any Project Development Plan, project implementation plan or special use permits relating to the Project;

c.    Follow any NPS order to suspend work;

d.    Obtain and provide all warranties that would be given in normal commercial practice from subcontractors, manufacturers or suppliers for work performed and materials furnished:

      i.      For a period of not less than one year; and

ii.   Executed, in writing, for the benefit of the City and the United States;

e.   Be responsible for all damages to persons or property that occur as a result of the contractor's fault or negligence because of, or in any way growing out of or connected to the Project;

f.   Waive any defense to any claim of breach or negligence based on the contractor's alleged reliance on the Partner's or NPS' Project monitoring, inspections or tests. All monitoring, inspections or tests are for the sole benefit of the Partner and / or NPS and do not relieve the Contractor of responsibility for (i) providing adequate quality control measures, or (ii) ensuring against damage or loss prior to Project acceptance. In addition, such monitoring, inspections or test do not imply Project acceptance by either the Partner or NPS, nor does it affect the continuing rights of the Partner or NPS after Project acceptance.

g.   Neither the City's nor NPS' review, approval or acceptance of, nor City payment for, contractor services shall be construed to operate as a waiver of any rights of the City or NPS, nor of any cause of action that the City or NPS may have, and the Contractor shall be and remain liable to the City and the NPS in accordance with the terms of this contract and applicable law for all damages for which the Contractor is legally responsible.

h.   Have no recourse against the United States with respect to any aspect of construction activities and shall not lien any land, structures, fixtures, or improvements associated with this contract; and

i.   Be jointly and severally liable under this contract if the Contractor is comprised of more than one legal entity."

9.   Following the Commencement Date, in addition to the provisions of Section 8 (above), any Third-Party Contract for the provision of design or engineering services must contain the following provisions:

"The Contractor agrees--

a.   That it is solely responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the Contractor; and

       b.     To correct or revise any errors or deficiencies in its designs, drawings, specifications, and other services without any additional compensation.

       c.     That the final signed and sealed Final Construction Documents provided by the Contractor are the only true contract documents of record for this Project. By submission of the Final Construction Documents to the City, the Contractor warrants that all review comments have been resolved to the satisfaction of the Partner and incorporated into the Final Construction Documents."

10. Cause the Exhibit Team to ensure that the Project's Final Design complies with:

       a.     All applicable laws, regulations, rules, orders, or other legal requirements;

       b.     All applicable building codes and environmental, cultural, safety, accessibility, and sustainable design requirements.

11. Prior to initiating installation of the Project, demonstrate to NPS's reasonable satisfaction that all funds necessary to pay for the Project have been secured, and will remain available to pay City's expenses associated with the Project except that NPS acknowledges that, in accordance with Section III(A)(1) of the Project Summary Sheet attached as Attachment "A" hereto, funding for the Project, as designed as of the Commencement Date, has been fully secured.

12. Undertake installation of the Project only when all necessary written NPS approvals required in the Cooperative Agreement as amended and the Project Design Plan have been obtained.

13. Cause the Exhibit Team and as applicable, any entity or person entering into a Third-Party Contract, to maintain throughout the course of the Project the Performance and Payment Bonds requirements set forth in Attachment "D" of this Third Amendment, and immediately notify NPS in writing should any bond issued be canceled or withdrawn.

14. Permit the NPS to monitor, inspect, and to at all times have access to the construction site and construction-related materials and documents.

15. Promptly take reasonable steps at no cost to NPS, to address any concerns raised by NPS.  If reasonably requested by NPS, such reasonable steps may include suspension of the work on the Project.

16.  Certify in writing that upon NPS' acceptance of the Project as complete, all right, title, and interest to any completed construction, improvements, installations, fixtures, or associated donations, are free and clear of all debts, liabilities, or obligations.

17.  Consistent with the Partner's intent to donate the Project to the NPS as stated herein, waive any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS by or on behalf of the Partner.

18.  Comply with, and cause its contractors to comply with, the wage requirements of the Davis Bacon Act, 40 U.S.C. § 276(a) *et seq.*, and the relevant Department of Labor regulations, 29 C.F.R. Part 5.

19.  Act in accordance with any Project Development Plan that attached to this Third Amendment.

C.  The City and NPS jointly agree that--

1.  The Project's overall cost is estimated to be approximately $8.5 million. The City's financial obligations are detailed in **Attachment "B" ("Financial Obligations")**.

2.  In making certain programmatic and resource-related decisions, NPS is relying upon the City's promise to undertake and diligently pursue the Project in accordance with the Cooperative Agreement as amended.

3.  Project land and facilities shall not be subject to liens by the City or any third-parties.

4.  The attached Project Development Plan (Attachment C), as may be amended or supplemented by written agreement of the parties, addresses without limitation, deliverables, design elements, construction standards, mitigation measures, safety precautions, site access, construction monitoring, coordination between the parties, contractor requirements, and design modifications.

5.  The City and NPS are not establishing a joint venture, a joint enterprise or other entity by entering into this Cooperative Agreement as amended, and neither is liable for the contracts or actions of the other party relating to this Cooperative Agreement as amended or otherwise.

6.  NPS review and approval of documents pursuant to [Article III.A.1] of this Third Amendment shall not be construed to operate as a waiver of any rights of the NPS, nor a waiver of any cause of action that NPS may have arising under this Third Amendment or any Third-Party Contract.

7.      In consideration of the City's offer to complete and donate the Project described herein to the NPS, the NPS agrees to allow the City access to NPS property at the times and for purposes identified herein.  In reliance on this Third Amendment the NPS will not seek Federal appropriations for the Project to be constructed by the City. Further, NPS is using appropriated funds to work with the City and to implement the Project. It is the intent of both parties to be legally bound by this Cooperative Agreement as amended and both expressly waive the defense of lack of consideration. The waiver of the defense of lack or failure of consideration shall inure to any assign, surety or insurer of the parties hereto.

## ARTICLE IV.        AUTHORITY

NPS enters into this Third Amendment pursuant to (a) 16 U.S.C. § 6, which authorize NPS to accept donations for purposes of the National Park System; (b) 43 U.S.C. § 1473a, which gives the Secretary authority to accept and use contributions for cooperative projects with other Federal, State, or private agencies; (c)16 U.S.C. § 1f, which authorizes the Secretary to enter into agreements with individuals and entities to share costs and services in support of NPS projects; and (d) 16 U.S.C. §§ 1-4 (the NPS Organic Act), which authorizes NPS to take actions that in furtherance of the mission of the National Park Service.

## ARTICLE V.        KEY OFFICIALS

A. Key Officials:  The personnel specified below are considered essential to successful coordination and communication between the City and NPS for the work to be performed under this Third Amendment. Upon written notice to the other party, either party may designate an alternate to act in the place of the designated Key Official, or designate a new Key Official.

**City**
Joan Schlotterbeck
Commissioner of Department of Public Property
City of Philadelphia
City Hall, Room 790
Philadelphia, PA 19107
Ph: 215-686-4430
Fx: 215-686-4498
joan.schlotterbeck@phila.gov

**NPS**
Cynthia MacLeod
Superintendent
Independence National Historical Park
143 S 3rd Street, Philadelphia, PA 19106

Ph: 215-597-7120
Fx: 215-597-0042
Cynthia_MacLeod@nps.gov

B.  Notices: Any notice from one party to the other party required or provided in association with this Third Amendment shall be delivered in writing, by mail, personal delivery, electronic delivery or other appropriate means, to the first listed Key Official of the other party, at the address or contact number indicated in this Article, or at such other address or contact number for such Key Official as may be provided from time to time, and shall be considered delivered upon receipt at the office of such Key Official.

## ARTICLE VI.        TERM OF THIRD AMENDMENT

Unless modified by the parties in writing, or unless terminated by operation of the terms of this Cooperative Agreement as amended, this Cooperative Agreement as amended shall be in effect for a period of one (1) year beginning May 1, 2009 ("**Commencement Date**").   Nothing in this Article shall alter or affect the term of any bond or insurance coverage obtained in furtherance of the Project.

## ARTICLE VII.        INSURANCE AND LIABILITY

Prior to beginning the work authorized herein, the City shall provide the NPS with copies of Certificates of Insurance demonstrating that the Exhibit Team has acquired all insurance required in Attachment "D" of this Third Amendment, and City shall cause Exhibit Team members to immediately notify NPS if an insurance policy is canceled or terminates for any reason.

## ARTICLE VIII.        INTELLECTUAL PROPERTY

A.  Subject to applicable law, NPS shall be assigned any and all rights, titles, and interests, in any and all copyrights and trademarks created as a result of, arising from, or relating to the Project, including any copyrightable design elements utilized in the Exhibit Team's bid proposals and any pre-existing copyrightable design elements belonging to the City or the Exhibit Team that are included in the final Project design.  The preceding notwithstanding, the City is hereby given a non-exclusive, limited license to use such intellectual property for purposes related to the City's educational mission and to identify the Project in the City's marketing, advertisements and publicity about the City, the Project and the completed exhibit.  This provision shall survive expiration or termination of this Cooperative Agreement as amended.

B.  The City shall fully cooperate with the NPS in the protection and enforcement of any copyright and trademark rights resulting from activities and services performed in connection with the Project. This obligation includes timely execution, acknowledgment, and delivery to the NPS of all documents and papers that may be necessary to enable the NPS to utilize in any manner such copyright and  trademark rights.

**ARTICLE IX.**        **DISPUTES; NONCOMPLIANCE; VENUE**

A.  The parties agree that in the event of a dispute between them, NPS and the City shall promptly use their best efforts to resolve the dispute in an informal fashion through communication and consultation, or other forms of non-binding alternative dispute resolution that are mutually acceptable to the parties.

B.  In the event that one party reasonably believes that the other party is not complying with the Cooperative Agreement as amended, notice of such alleged noncompliance must be provided to the allegedly noncompliant party.  Such party shall have thirty (30) days (cure period) after receipt of the notice to cure such alleged noncompliance, or if the alleged noncompliance cannot be cured within the cure period, the alleged noncompliant party shall obtain approval of a written remedial plan specifying the intent to cure the alleged noncompliance as promptly as is reasonably practical and within a deadline determined by mutual agreement.

C.  In the event that the alleged noncompliant party fails to cure the alleged noncompliance within the cure period or to diligently pursue the action detailed in the remedial plan, the NPS may, without first obtaining a judgment or declaration of breach by any court, board, arbitrator or any other adjudicator, exercise its rights available under law or seek any alternative or additional remedies available to it including termination of this Third Amendment.

D.  The parties agree that the venue to commence litigation of any disputes stemming from this Third Amendment as amended shall be a Federal court located in the Eastern District of Pennsylvania.

**ARTICLE  X.**        **ACCOUNTING AND REPORTS**

The City and its contractors and subcontractors shall maintain accounting books and records under a system of accounts and financial controls meeting Generally Accepted Accounting Principles, and must permit the Department of the Interior or its designee, including the Comptroller General and Office of the Inspector General, to verify and audit the financial report from the books, correspondence, memoranda and other records of the City relating to this Third Amendment, during the period of this Third Amendment, and for such time thereafter as may be necessary to accomplish such verification. Such period shall be a minimum of three years after the Project is completed.

**ARTICLE XI.**        **COMPLIANCE WITH APPLICABLE LAW**

A.  This Third Amendment and performance hereunder is subject to all applicable laws and regulations whether now in force or hereafter enacted or promulgated.  This Third Amendment and performance hereunder is also subject to applicable government policies.  Nothing in this Third Amendment shall be construed as in any way limiting the general powers of the NPS for supervision, regulation, and control of its property under such applicable laws, regulations, and management policies. Nothing in this Third

Amendment shall be deemed inconsistent with or contrary to the purpose of or intent of any Act of Congress.

B.  In addition to other laws, regulations, and policies referenced in this Third Amendment, the City is on notice that, where applicable, it must comply with, and  assist NPS in complying with additional laws, regulations, Executive Orders and policies including, but not limited to  the Americans with Disabilities Act (42 U.S.C. § 12101), Architectural Barriers Act (42 U.S.C. § 4151 *et seq.*), the Rehabilitation Act (29 U.S.C. § 701 *et seq.*, as amended), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, *et seq.*), the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. § 4801, *et seq.*), the National Environmental Policy Act (42 U.S.C. § 4321, *et seq.*), the Coastal Zone Management Act (16 U.S.C. § 1451 *et seq.),* Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Safe Drinking Water Act (42 U.S.C. § 300, *et seq.),* the Endangered Species Act (16 U.S.C. § 1531 *et seq.*), the Wild and Scenic Rivers Act (16 U.S.C. § 1271, *et seq.*), the National Historic Preservation Act (16 U.S.C. § 470), the Archaeological and Historic Preservation Act (16 U.S.C. § 469), Strengthening Federal Environmental, Energy and Transportation Management (Exec. Order No. 13423), Notification of Violating Facilities (Exec. Order No.11738), Wetlands Protection (Exec. Order No. 11990), and Flood Hazards in Floodplains (Exec. Order No. 11988).

## ARTICLE  XII.      <u>REQUIRED AND MISCELLANEOUS CLAUSES</u>

A.  Non-Discrimination:  All activities pursuant to or in association with this Third Amendment shall be conducted without discrimination on grounds of race, color, sexual orientation, national origin, disabilities, religion, age, or sex, as well as in compliance with the requirements of any applicable federal laws, regulations, or policies prohibiting such discrimination.

B.  NPS Appropriations:  Pursuant to 31 U.S.C. § 1341, nothing contained in this Third Amendment shall be construed to obligate the government to any current or future expenditure of funds in excess or advance of the availability of appropriations from Congress.  Nor does this Third Amendment obligate the government to spend funds on any particular project or purpose, even if funds are available.

C.  Lobbying with Appropriated Moneys (18 U.S.C. § 1913): No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy, or appropriation, whether before or after the introduction of any bill, measure, or resolution proposing such legislation, law, ratification, policy, or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to any such Member or official, at his request, or to Congress or such official, through the proper official channels, requests for any legislation, law, ratification, policy, or appropriations which they deem necessary for

the efficient conduct of the public business, or from making any communication whose prohibition by this section might, in the opinion of the Attorney General, violate the Constitution or interfere with the conduct of foreign policy, counter-intelligence, intelligence, or national security activities. Violations of this section shall constitute violations of section 1352(a) of title 31. In addition, the related restrictions on the use of appropriated funds found in applicable law also apply. In addition, related restrictions on the use of appropriated funds and related legislation also apply.

D.  Release of Information:  The City must obtain prior government approval through the NPS Key Official for any public information releases which refer to the Department of the Interior, any bureau, a park or park unit, a government employee (by name or title), or this Third Amendment.  The specific text, layout, photographs, etc., of the proposed release must be submitted with the request for approval.

E.  Merger: This Third Amendment, including any attachments hereto and documents incorporated by reference herein, contains the sole and entire agreement of the parties with respect to the subject matter of this Third Amendment.

F.  Modifications:  This Third Amendment may be extended, renewed or amended only when agreed to in writing by the NPS and the City.

G.  Waiver: If a party fails to exercise any right or to insist that the other party comply with any obligation, no such failure or insistence shall be a waiver of a right of a party to demand strict compliance with each duty or obligation.  No custom or practice of the parties which varies from this Third Amendment shall constitute a waiver of the right of a party to demand exact compliance.  Waiver by one party of any particular default by the other party shall not affect or impair a party's rights in connection with any subsequent default of the same or of a different nature, nor shall any delay or omission of a party to exercise any rights arising from such default affect or impair the rights of that party as to such default or any subsequent default.  All waivers of any duty or obligation by a party must be express and evidenced in writing.

H.  Effect of Approval:  Any approval or consent given by the NPS regarding any contract or contractor, or by operation of inspection, or any other consent or approval given by the NPS under this Third Amendment, does not relieve the City or the City's contractors of responsibility for any errors or omissions, or from the responsibility to comply with the requirements of this Third Amendment.

I.  Effect of Acceptance:  Any acceptance by the NPS of the Project or any component thereof does not relieve the City or the City's contractors from liability for any known defect, or any latent defect, fraud, or gross mistake or negligence.

J.  Assignment: No part of this Third Amendment shall be assigned to any other party without prior written approval of the NPS and the Assignee.

---

K.   Counterparts.  This Third Amendment may be executed in counterparts, each of which shall be deemed an original (including copies sent to a party by facsimile transmission) as against the party signing such counterpart, but which together shall constitute one and the same instrument.

L.   No Lobbying for Federal Funds: The City must not seek appropriations from Congress to support any ongoing or proposed City activity or project relating to the subject matter of this Third Amendment or any amendments or sub-agreements hereto, including without limitation federal appropriations for construction, renovation, property acquisition, leasing, administration or operations.  Nothing in this paragraph is intended to preclude the City from applying for and obtaining a competitive or non-competitive grant of federal financial assistance from a federal agency or from undertaking otherwise lawful activities with respect to any project or proposal included in the President's budget request to Congress; nor should this paragraph be construed as requesting, authorizing or supporting advocacy by nonfederal entities before Congress.

M. Member of Congress: Pursuant to 41 U.S.C. § 22, no Member of Congress shall be admitted to any share or part of any contract or agreement made, entered into, or adopted by or on behalf of the United States, or to any benefit to arise thereupon.

N.   Agency:  The City is not an agent or representative of the United States, the Department of the Interior, or NPS, or the Park, nor will the City represent its self as such to third parties.  NPS employees are not agents of the City and will not act on behalf of the City.

O.   Non-Exclusive Agreement: This Third Amendment in no way restricts the City or NPS from entering into similar agreements, or participating in similar activities or arrangements, with other public or private agencies, organizations, or individuals.

P.   No Third-Party Beneficiaries: Unless expressly stated herein, nothing in this Third Amendment is intended to grant any rights or to provide any benefits to any third-party.

Q.   Survival:  Any and all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment.  Any and all liabilities, actual or contingent, which have arisen during the term of and in connection with this Third Amendment shall survive expiration or termination of this Third Amendment.

R.   Partial Invalidity:  If any provision of this Third Amendment or the application thereof to any party or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Third Amendment or the application of such provision to the parties or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby and each provision of this Third Amendment shall be valid and be enforced to the fullest extent permitted by law.

S.   Captions and Headings:  The captions, headings, article numbers and paragraph numbers appearing in this Third Amendment are inserted only as a matter of convenience and in no way shall be construed as defining or limiting the scope or intent of the provision of this Third Amendment, nor in any way affecting this Third Amendment.

T.  Drug Free Workplace Act: The City shall cause Third Party's to take comprehensive action to ensure the workplace is drug-free.

U.  Jointly Drafted:  This Third Amendment shall be deemed to have been jointly drafted by both parties and, in the event of a dispute, shall not be construed against either party.

V.  Further Assurances:  If requested by one party, the other party shall execute and deliver such other documents and take such other action as may be necessary to effect the terms of this Third Amendment.

*{The remainder of this page left blank intentionally; signature page attached.}*

## ARTICLE XIII.    <u>AUTHORIZING SIGNATURES</u>

**IN WITNESS WHEREOF,** the parties hereto have caused this Contract to be executed by their duly authorized representatives as of the respective dates indicated:

APPROVED AS TO FORM                    **THE CITY OF PHILADELPHIA:**
Shelly R. Smith, City Solicitor              **THE OFFICE OF THE MAYOR**

Per: _____          By: _____
        Deputy City Solicitor                          Clarence D. Armbrister
                                                        Chief of Staff


                                         **DEPARTMENT OF PUBLIC**
                                         **PROPERTY**

                                         By: _____
                                                 Joan Schlotterbeck
                                                 Commissioner


                                         **NATIONAL PARK SERVICE:**

                                         By: _____
                                                 Cynthia MacLeod
                                                 Superintendent
                                                 Independence National Historical
                                                 Park

**Attachment A – Project Summary Sheet**

## PROJECT SUMMARY SHEET
### April 16, 2009

I.  **PARK NAME/PROJECT NAME:** Independence National Historical Park, exhibit called "Freedom and Slavery in Making a New Nation" on the President's House Site in Philadelphia

II. **PROJECT DESCRIPTION:** The project consists of planning, design, and construction of an outdoor exhibit on the site of the 1790-1800 President's House (Robert Morris Mansion) in Philadelphia. The exhibit will commemorate all those who lived in the house while it was used as the executive mansion, including the nine enslaved Africans brought by George Washington from Mt. Vernon. Washington lived here while serving as our First President. Our Second President, John Adams and his wife Abigail, also lived at this site prior to the capital moving to Washington, D.C. Unlike Washington, Adams never owned any slaves. The mansion was adjacent to what is now the new Liberty Bell Center in Block One of the Independence Mall. The project cost is estimated at $8.5 million, which is a design-build project that will incorporate archeological remains of the mansion into the exhibit; an additional $2 million endowment is planned and will be held by the Friends of Independence, our non-profit partner, for long-term maintenance.

III. **STAFF ASSESSMENT:**
    **A.  Summary of DO #21:**

In December 2004, the City of Philadelphia confirmed its October 2003 offer of a $1.5 million donation for the President's House Site to cover the costs related to completing the project. The donation was vetted and approved by the Washington Partnership Office in May 2005. Subsequently, as part of the SAFETY-LU Transportation Bill, the project received a $3.6 million earmark primarily through the efforts of Congressman Chaka Fattah. The City has committed an additional $2 million from its Capital Funds for the project. On February 18, 2009, the Delaware River Port Authority, under the direction of Pennsylvania Governor Ed Rendell, approved a grant of $3.5 million. This grant will go toward the additional costs for incorporating archeological remnants found during a public investigation conducted March-July, 2007, which are $1.4 million. The city held a design competition and the winning design includes an extensive dependence upon electronic technology, for which the park has required a $2 million endowment, which will also be funded out of the DRPA grant. The Design Development Phase of the Partnership Construction Process is nearly completed.

1. General Agreement/Fundraising Agreement: The project is currently fully funded. The City of Philadelphia has taken the lead in an ongoing fundraising effort seeking public and private funds in a grassroots effort designed to raise awareness of the project as well as additional funds for the endowment. The City of Philadelphia will "float" the base cost of the project with reimbursement coming from DOT/ Penn DOT as the transportation funding may be spread out over 4 years.

2. Feasibility Study: Independence National Historical Park has submitted a feasibility study waiver request for the fundraising campaign.

3. Fundraising Plan: The Fundraising Plan is attached to the March, 2009, Fundraising Agreement. Funds raised will go toward the

endowment for maintenance of the site. The Agreement is for one year, renewable each year.

4. Donor Recognition Plan: The Independence National Historical Park Donor Recognition Plan is attached to the Fundraising Agreement.

B. **Legal & Ethics Review:** The non-federal donors, the City of Philadelphia and the Delaware River Port Authority, have been fully vetted.

C. **Planning & Compliance:** Phase I, II and III archeological excavations are complete. All Section 106 compliance and NEPA are complete. The City funded the archeological research dig, which occurred from March through July, 2007.

D. **Status in PMIS and Level of Review:** PMIS # 95291, region reviewed, previous update 2-25-05; current update in progress to reflect the $8.5 million scope, not including the endowment. (It is noted that the PMIS project was originally detailed as a $4.5 million project.

E. **Summary of Approved Budget Program:** As noted under III A. above, all funding needed for the project is now either in hand or committed. On August 1, 2008, the City issued a notice to proceed to the architect for the additional design work.

F. **Staffing and Operations Impact Analysis:** The exhibit will be a site fixture and will be a self guided experience. The park may occasionally create special programs, but there will be no requests for additional staff. There will be additional utility and maintenance costs, including maintaining the proper environment for the archeological remains.

G. **Summary of Development Advisory Board:** The project has been approved in concept by the Development Advisory Board in November 2005, which stated there was no requirement to return to the DAB.

H. **Congressional Review/Approval Process:** The project was encouraged by Congressional Staff comments in 2003.

IV. **OTHER INFORMATION:**

1. **History of the project:** In April 2003, the park submitted a report to the Interior Appropriations Committee per a request in House Report 107-564: "Therefore, given the historical significance of this issue, the Committee urges the NPS to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy." The report contained a conceptual design, interpretive themes and overview of planning and design process. In October, 2005, the City issued a Request for Qualifications that brought applications from 21teams. Each team included a designer/architect, general contractor, and interpretive specialists. A Selection Committee made up of City and NPS personnel including the Superintendent of Independence National Historical Park, the Division Chief of Cultural Resources Management of Independence National Historical Park, the Mayor of the City of Philadelphia and the Director of the City of Philadelphia Capital Program Office, with the counsel of a 10 person Oversight Committee representing community groups selected 6 teams to which a Request for Proposals ("**RFP**") was issued on June 15, 2006.

2. These teams prepared models and presentation boards of their designs. The models were displayed for public comment. The City and NPS took comments of the public and the Oversight Committee into consideration when selecting the finalist. The Selection Committee selected the a team headed by Kelly/Maiello, Inc. Architects and Planners.

Based on selection of the Exhibit Team by the Selection Committee, the City entered into a Commission Agreement for Design, Fabrication and Installation of a Public Exhibit ("**Commission Agreement**") with Kelly/Maiello Management, LLC on October 5, 2007. The Commission Agreement included the insurance provisions attached to the Third Amendment as **Attachment "D"**. Following execution of the Commission Agreement, Kelly / Maiello, LLC subcontracted with entities and individuals on the Exhibit Team for design, fabrication and installation of the Project.

3. **Public Awareness Process:** This project has significant visibility in the public, particularly in the African American community interested in expanding interpretation of slavery and memorialization of Washington's slaves. There was a rally in 2002 of about 500 people sponsored by the Avenging the Ancestors Coalition; in early 2003, about 300 people attended a public meeting to review the concept plan. According to the park briefing paper, "a substantial distrust of the NPS was exhibited." The park staff believes that this project will continue to require "significant input from both the general public and ...this country's leading historians as it moves forward." NPS held a civic engagement forum in 2004 with about 300 in attendance. Public comment confirmed the validity of the 5 identified themes for the commemoration as well as the public's support for beginning the project. With the City, NPS held a forum in November 2005 to provide an update on the planning process. About 200 attended and again voiced support for moving the process forward. On June 5, 2006, NPS and the City held another public forum with noted African American historians to discuss the qualities of good interpretive sites and to introduce the 6 semi-finalist teams to the public. About 300 people attended and expressed concern for diversity in the design teams and for generating local jobs. In March, 2007 the public attended the opening ceremony for the archeological research dig. Mayor Street participated. There was a public component of the dig that included a viewing platform and a webcam. The platform was staffed by volunteers and NPS interpreters. The site had over 300,000 visitors to the platform during the dig. Archeologists found foundation remnants of the bow window of the main house, the kitchen dependency and a connecting service passage. The project concluded with another ceremony on July 31, 2007. Heeding public sentiments, the City and NPS had Kelly Maiello amend their design to incorporate the newly-discovered features. In December, 2007, NPS and the City held a public meeting to introduce the amended design. About 150 attended and approved the new design. July 3, 2008, the Park Superintendent participated with ATAC in a public commemorative ceremony on the site. NPS and the City have been issuing press releases to keep the public informed about the process. In August 2008, we announced that Kelly Maiello will perform test borings on the site.

4.    **City/NPS Cooperation:** On or about September 1, 2006, The City and NPS entered into a Cooperative Agreement ("**Cooperative Agreement**") to address the responsibilities of the parties for the Project. The City and NPS entered into a First Amendment to the Cooperative Agreement, dated July 19, 2007 transferring additional funding to NPS for the Research Dig and to extend the term of the Cooperative Agreement for an additional year. The City and NPS entered into a Second Amendment to the Cooperative Agreement, dated August 15, 2008 to extend the term of the Cooperative Agreement by an additional year.

This project will be managed through a unique partnership with the City of Philadelphia. It has jointly been determined that the City holds a contract with Kelly/Maiello Management, LLC for the work using a Design/Build approach. In accordance with the Cooperative Agreement as amended, NPS will receive copies of all designs and for the work product prior to final acceptance and will participate in the final review and approval of the Project. NPS will own and manage the commemorative work at the conclusion of the process. This approach is particularly beneficial as the City has the ability to advance the SAFETY-LU funds and then seek reimbursement from DOT/Penn DOT.

5.    **Opening Date:** The City of Philadelphia and NPS have agreed to dedication ceremony before the end of 2010.

**Attachment B – Financial Obligations**

**Attachment B: Financial Obligations**

**Sources**

City of Philadelphia                                                    $3.5 million
- Initial funding for the project was jump-started by former Mayor John F. Street with a 2003 pledge of $2 million from Capital Funds
- The City of Philadelphia, under Mayor Michael Nutter, later committed an additional $1.5 million in Cultural Corridors Bonds.

Department of Transportation                                            $3.6 million
- In 2004, U. S. Congressmen Chaka Fattah and Robert A. Brady secured a multi-year federal grant of $3.6 million, intended to complete the funding for the project.

Delaware River Port Authority                                          $3.5 million
- $1.5 million will complete funds for design and construction work
- $2 million will be used to create a Project Maintenance Endowment (detailed in an agreement between the National Park Service and the Friends of Independence).

Total                                                                  $10.6 million

**Uses**

Design and Construction
| | |
|---|---|
| RFP Services | $    10,000 |
| Owner's Representative | 547,500 |
| Design Competition | 74,000 |
| Feasibility Study on Arch. Dig | 25,000 |
| Archeological Excavation | 768,441 |
| Independence Park Sitework | 143,320 |
| Primary Design/Build Cost | 4,500,000 |
| Additional Design/Build Cost with Archeological Component | 2,468,000 |
| | $8,536,261 |

Endowment                                                              $2,063,739

Total                                                                  $10,600,000

**Attachment C – Project Development Plan**

Attachment C to the Third Amendment to the Cooperative Agreement
Between
The City of Philadelphia and
National Park Service
for the
The President's House:   Freedom and Slavery in Making a New Nation Project

PROJECT DEVELOPMENT PLAN

A.    Purpose

The purpose of the Project Development Plan is to describe the process for the planning, design, development and construction of the Project beginning on the Commencement Date of the Third Amendment to the Cooperative Agreement.  The Plan sets forth standards for each stage of the Project and the roles and responsibilities of the National Park Service (NPS) and the City of Philadelphia (City) in this process.

B.    Project Description

The Project consists of design, fabrication and installation of the Exhibit an outdoor exhibit on the site of the 1790-1800 President's house (Robert Morris Mansion) in Philadelphia.  The exhibit will commemorate the home of George Washington and John Adams during the first ten years of the federal government, as well as commemorate the enslaved Africans who resided in the Washington household.  Site interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved. The Project will be owned, maintained, managed, and interpreted by the NPS. Collectively, the work, which is generally described below, will be known as the "Project."

1.  While the project does not seek to recreate the original President's House that once stood at this site, the design establishes the physical boundaries of the original house using architectural fragments such as masonry exterior and interior, ground-level walls and fireplaces, metal framed front door and windows, and bluestone and marble pavers.

2.  Also included, if a practical design can be achieved with no adverse impact on historic resources, is a 20' x 20' conditioned glass enclosure, framed around a submerged archeological excavation site approximately twelve feet below grade level, and a 10' x 15' metal and glass framed enclosure marking the site of the former "slaves' quarters."  LED screens, speakers and graphic panels are incorporated into the fragments to provide an interpretive experience for visitors.

3.  A small landscaped area occupies a portion of the site and in-ground, recessed and surface mounted light fixtures provide general and accent lighting for the entire site.

**C.    Selection of Professional Consultants**

1. The City has engaged an interdisciplinary Design Team for the project. The team is headed by an architecture firm, Kelly/Maiello, with subcontractors including but not limited to a Mechanical, Electrical and Plumbing (MEP) engineer. The MEP engineer has experience in designing and testing: HVAC, lighting, plumbing, and other systems to maximize energy performance, and has a working knowledge of American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) codes.

2. The selection of the architect, Kelly/Maiello, was through a competitive process of evaluation of responses to a Request For Proposal [RFP] which stipulated the terms of the project and the forms of the submissions.

3. The City and NPS also selected a team of community leaders (the Oversight Committee) who have participated in the selection and review process throughout the course of this project.

4. The NPS has reviewed and approved, and will retain the right to review and approve, the individual consultant firms and individuals included within the Design Team. The City and the NPS have collaborated throughout the design process to develop the Project. This collaboration is memorialized in a Cooperative Agreement executed on August 25, 2006 and amended July 19, 2007 and August 15, 2008, and is pending execution of the Third Amendment, which incorporates this Project Development Plan as Exhibit "C".

**D.    Programming and Design of the Project**

1. During NPS's commitment to provide review, comment and approvals in accordance with the Cooperative Agreement as amended, NPS will provide input and guidance to the City on information relevant to completing the Project, including applicable federal, state and local regulations, NPS Management Policies 2006 9.1 - 9.4, published NPS standards generally applicable to similar facilities, all relevant documents, including plans, planning studies and planning documents, historical studies and park-specific documentation and other mutually agreed criteria. Applicable published NPS standards include NPS-6, Interpretation and Visitor Services; the NPS-28, Cultural Resource Management; DO-42, Accessibility for Visitors with Disabilities in the NPS Programs, Facilities and Services; DO 50-B, Occupational Safety and Health; and, DO 52-A Communicating the National Park Service Mission.

2. The NPS will review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended. All review by the NPS will be reasonable and timely.

3.  In addition to documents previously provided, the City will cause the Exhibit Team to prepare schematic design documents, including value analysis for the Project, in accordance with the approved program.  The NPS will review all previously submitted and future schematic design documents, design development documents, and construction documents.

**E.  Data and Materials to Be Provided By NPS**

1.  The NPS will be responsible for all compliance as required by the National Environmental Policy Act (NEPA) and the National Historic Preservation Act.

2.  The NPS will provide all relevant studies including but not limited to Surveys, Archeology Reports, NPS exhibit and interpretive criteria.

3.  The NPS will provide professional expertise for review, information, assistance and facilitation of the project.

**F.  Core Design Requirements**

1.  The design will conform to the Independence Mall Design Guidelines as appended to the RFP.

2.  The following Core Design Requirements will be used throughout all stages of the design process:

    a.  The outer boundaries or footprint of the President's House must be clearly demarcated.

    b.  The footprint of the Slave Quarters must be conspicuously highlighted and a solemn "sense of place" clearly established.

    c.  Documented interior rooms or spaces may be included in the design's ground plan to a level of detail that the designer determines will be understood by the public.  Additional interpretive elements may provide expanded explanation of historical use of the property.

    d.  Six substantive themes must be reflected in the final design.  The first five listed below emerged from the preliminary Conceptual Design, and the sixth became clear in a Public Forum held in October 30, 2004:

        i.  The house and the people who lived and worked there

        ii.  The Executive Branch of the U.S. Government

        iii.  The system and methods of slavery

        iv.  African-American Philadelphia (including an emphasis on free African-Americans)

        v.  The move to freedom

      vi.  History lost and found (how knowledge of the President's House and the presence of slavery was forgotten and recovered; why we must remember"

  e.  Five cultural values also emerged from the October 30, 2004 Public Forum:

      i.  Identity – Interpretation at this site offers an opportunity to put names and faces on a small fraction of the enslaved and free people of African descent who were part of the fabric of the life in the President's House. These enslaved individuals thus are symbols of the millions of people who were held in bondage during the 16th, 17th, 18th, and 19th centuries. What is known of the lives of those who were enslaved and worked in the President's House will be a backdrop of the story.

      ii.  Memory (a sense of influence of the past on the present) – The nation's first Executive Branch conducts the affairs of the government in the rooms of the house. At the same moment in the 18th century, the economic labor system that made it legal to enslave human beings was actively practiced in the house. By describing and honoring the enslaved people who lived at the site, we are commemorating and honoring the many enslaved people whose stories will never be known and told.

      iii.  Agency – The 18th century system of slavery was a complete economic, cultural and social world with people of African descent as full participants in the affairs of the time.

      iv.  Dignity – The enslaved population retained their dignity. George Washington's slaves adhered to an unwritten code of conduct that was as nuanced and demanding as the first president's well-known code of civility.

      v.  Truth – A factual account of how Washington's household used nuances of the Pennsylvania Gradual Abolition Act of 1780 to keep individuals in slavery while they were in Philadelphia rather than at the estate in Mt. Vernon, Virginia. The condition of those in bondage was maintained in order to sustain the political and social strata of society during the post-revolutionary era.

  f.  As part of the landscaping of the first block of Independence Mall, an east-west walkway will be constructed that will connect the subway entrance on the southwest corner of Fifth and Market Streets to the President's House Site. Although the Design Team will not be responsible for the actual construction of the walkway, the walkway must be incorporated into the design of the President's House Exhibit so that the Exhibit receives the western end of this walkway.

**G. Professional Standards Requirements.**

1. General

   a. This work shall consist of the preparation of Schematic Design, Design Development, and Construction Documents. All documents shall be prepared using the English System of Weights and Measurements, and requirements included in the RFP.

   b. All work performed shall comply with applicable laws, regulations and the NPS policies and guidelines.

   c. Design Team shall:

      (i) Prepare drawings for Design submissions using Auto-Cadd Systems, latest edition, and in accordance with the American Institute of Architects ("AIA") "CAD Layer Guidelines" or such other guidelines as reasonable determined by the City. Final drawings shall be provided on mylar as well as in electronic format. In addition to providing submissions in accordance with the Project Schedule, Design Team shall furnish four (4) sets of sealed plans for permitting purposes and permit applications, each with required supporting documentation.

      (ii) Incorporate appropriate energy conservation measures into its Design where applicable as reasonably determined by the City and consistent with the Final Design and Cost Proposal, and any agreed amendments thereto;

      (iii) Comply, to the extent applicable; with the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101-12213 and all applicable regulations promulgated thereunder;

      (iv) With the assistance of the City as necessary, obtain sign-off of all utility service providers and the National Park Service;

      (v) Furnish cost estimates with the Design submission for each phase, which shall be organized in accordance with CSI format and incorporate contingencies and escalations appropriate to the Design development and Project Schedule;

      (vi) When required by law, have the Design services provided hereunder performed or reviewed, approved and sealed by architects or engineers duly licensed to practice in the Commonwealth of Pennsylvania.

   d. The City will submit all hard and electronic deliverables to: Doris Fanelli, Chief, Division of Cultural Resources Management, Independence National Historical Park, 143 South Third Street, Philadelphia, PA 19106 for review distribution or for deposit in the park's archives.

   e. The City is to perform oversight of design, fabrication and installation of the Project. This includes but is not limited to the following:

i.   Attendance at weekly construction meetings;
ii.  Photo documenting work;
iii. Reviewing shop drawings;
iv.  Reviewing test submittals;
v.   Approving requests for payment;
vi.  Insuring that the property party responds to requests for information;
vii. Causing Exhibit Team designers to issue addenda,
viii Reviewing change orders; and
ix.  Overseeing mechanical system testing.

2. Quality Control

The City shall accomplish a Quality Control Review and shall cause Exhibit Team designers to make corrections prior to each submittal to the NPS. The NPS will review the drawing and specifications in a timely manner in accordance with the Cooperative Agreement as amended.

**H. Schematic Design Phase:  The Schematic Design phase of the Project is completed.**

The City and NPS will confer on their review of Schematic Designs and convey said comments to Kelly/Maiello and incorporate resolutions into the Design Development phase of the project.

**I. Design Development Phase:  The Design Development Phase of the Project is completed pending NPS concurrence.**

1. The Exhibit Team designers have developed Design Development Documents based on the Schematic Design.

4. The Exhibit Team designers will submit written responses to review commentswithin 15 calendar days of receipt of comments.

**J. Construction Document Phase**

1. Construction Documents will be reviewed at 90% and 100% completion. At a minimum, construction documents shall include:

a.    Project Overview Site Plan
b.    Abbreviation Sheet/Symbol Sheet
c.    Demolition Plan (Removal of trees, walks, building, pipes);
d.    Layout and Grading Plan
e.    Erosion Control Plans
f.    Pedestrian Control Plans
g.    Overall Floor Plan
h.    Overall Roof Plan
i.    Exterior Elevations

j.      Site/Building Sections
k.      Site/Building Details
l.      Typical Details and Schedules
m.      Plumbing Plans
n.      Electrical Plans
o.      HVAC Plans
p.      Landscape Plan and Details
q.      Division 1 Construction Specifications
r.      Divisions 2 through 16 Construction Specifications. (The A-E shall utilize and modify their own Divisions 2 through 16 Construction Specifications templates. Divisions 2 through 16 Construction Specifications format shall match the NPS Division I Construction Specifications format.)
s.      Contract Price Schedule or Construction Bid Schedule
t.      Final Product File

2.  Design Team will prepare Class A Construction Cost Estimate based on the completed 100% Draft Construction Documents. Confirm that the project cost is within available funds.

3.  Design Team will prepare List of Required Submittals.

4.  Design Team will prepare Summary List of Operation and Maintenance Requirements as identified in individual construction specification sections.

5.  Design Team will finalize Constructability Analysis

6.  Deliverables - 100% Draft Construction Documents
    Design Team will submit 5 paper copies of the following documents for review:

    a.      Construction Drawings
    b.      Construction Specifications
    c.      Contract Price Schedule or Construction Bid Schedule
    d.      Product File
    e.      Class A Construction Cost Estimate
    f.      List of Submittals
    g.      List of Operation and Maintenance (O&M) Requirements
    h.      Constructability Checklist
    i.      Design Calculations

NPS will submit copyist review of the 100% Draft Construction Documents to the City.

7.  The City will submit 100% Complete Construction Documents for review, comment and final approval by the NPS in accordance with the Commission Agreement as amended.

**Attachment D – Exhibit Team Insurance Requirements**

## Exhibit Team Insurance Requirements

a.      Provider shall maintain such insurance as is specified in this Article X.  That insurance shall be maintained by the Exhibit Team member designated at its sole expense.  All insurance shall be subject to the reasonable approval of the City as to coverages, terms and insurance carriers.  All required coverages must be with companies with a Best's rating of A VIII or better.  No "cut-through" endorsements will be permitted.  The following are minimum coverage limits for insurance required to be maintained under this Agreement and the designation alongside each coverage indicates who shall secure and maintain that insurance:

    1.      Commercial General Liability on an occurrence form with the following limits:

        (a)      General Aggregate - $2,000,000
        (b)      Products/Completed Operations - $1,000,000
        (c)      Each Occurrence - $1,000,000
        (d)      Personal and advertising injury - $1,000,000
        (e)      Fire damage (any one fire) - $50,000
        (f)      Medical Expense (any one person) - $5,000

The general aggregate must apply on a per location basis.  Such coverage shall include the following provisions:

    i.      coverage for operations and products/completed operations;
    ii.      coverage for liability arising from the acts of independent contractors;
    iii.      personal injury liability;
    iv.      coverage for property damage due to explosion, collapse or underground hazards(Excluded for KMI only);
    v.      broad form property damage coverage, including completed operations; and

    2.      Commercial Automobile Liability covering all owned, hired and non-owned vehicles with limits of $1,000,000 combined single limit each occurrence.  The Provider does not own any vehicles.

    3.      Commercial umbrella coverage of $5,000,000 which shall apply to the excess of Commercial General Liability (following form per project limit), commercial automobile liability and employer's liability coverages.

3. <u>Professional Errors and Omissions Liability</u> with a $1,000,000 annual aggregate limit and a $50,000 annual aggregate deductible, covering claims arising from of professional services in connection with the management of the Project.

5. <u>Employers' liability insurance</u> with limits of not less than:

$500,000 Each Accident - Bodily Injury by Accident
$500,000 Each Employee - Bodily Injury by Disease
$500,000 Policy Limit - Bodily Injury by Disease

6. <u>Builder's Risk/Installation Floater Insurance</u>

(a) <u>Coverage</u>: "All risks" in an amount equal to not less than the full replacement cost of the work under the Agreement (meaning work in replacement which is of like kind and quality).

(b) <u>Period of Coverage</u>: Anything herein to the contrary notwithstanding, the Builder's Risk Insurance shall be procured and maintained during the entire period of performance of the Agreement until final acceptance of the Project by the City.

7. <u>Performance/Payment Bonds</u>

As provided by the Act of 1967, December 20, P.L. 869 (8 P.S. § 193, et seq., as amended), the Provider shall cause DJK (Keating) to provide, at the time of execution of the Agreement, security for the faithful performance of the work and for compliance with the Agreement in the form of a performance bond, with a surety company approved by the City, in a sum equal to 100% of the amount of the construction portion of fabrication and installation including any contingency amount. In addition, as provided by the Act of 1967, December 20, P.L. 869 (8 P.S. § 193, as amended), the Provider shall cause DJK to provide, at the time of execution of the Agreement, a payment bond, with a surety company approved by the City, in a sum one hundred percent (100%) of the amount of the fabrication, installation and/or construction portion of the fabrication and installation cost including any contingency amount, conditioned for the full payment of its Subcontractors furnishing labor and materials in the performance of the Agreement.

b. The insurance described in 1, 2 and 3 above shall include the endorsement as additional insureds, without liability by such additional insureds for

payment of the premiums thereof, and the following parties and each of their officers, directors, employees, agents and representatives:

> City of Philadelphia
> 1515 Arch Street, 14th Floor
> Philadelphia PA  19102
> Attention:  Risk Manager
>
> Department of the Interior
> National Park Service
> c/o Dennis Reidenbach, Superintendent
> Independence National Historic Park
> 313 Walnut Street
> Philadelphia, PA 19106

      c.      The Provider shall not cancel or permit to be canceled any of the insurance policies required without the prior written consent of City and the National Park Service (NPS).  The City, the NPS, and the other stakeholders identified by the City shall receive thirty (30) days prior written notice of cancellation, non-renewal or material reduction in coverage to any of the insurance policies required pursuant to this Agreement and each insurance policy and certificate thereof shall contain a valid provision or endorsement to that effect.  Not less than forty-five (45) days prior to the expiration of such policies, the Provider shall deliver to the City and NPS evidence that the relevant Exhibit Team member is seeking to have such policy/policies renewed or replaced in accordance with all of the provisions of this Agreement.

      d.      Original certificates of insurance must be submitted to the City's Risk Manager at the following address:

> City of Philadelphia
> Finance Department
> Division of Risk Management
> 1515 Arch Street, 14th Floor
> Philadelphia, PA 19102-1579
> (Fax No.: 215-686-1708).

A copy of the certificate of insurance shall be submitted to the Responsible Official. Both submissions must be made at least ten (10) days before work is begun.  The ten (10) day requirement for advance documentation of coverage may be waived in such situations where such waiver will benefit the City, but under no circumstances shall Provider actually begin work without providing the required evidence of insurance.

10. The NPS has the right to approve all design and construction work for the entire project in accordance with the Cooperative Agreement as amended.

## N. Amendments to the Development Plan

The NPS and the City mutually understand and acknowledge that preparation of the comprehensive design for the project may cause either or both parties to recommend changes to this Development Plan. Such revisions may be recommended by either party. Modifications, revisions, or additions to this Plan shall be made in writing and will become effective only upon the written approval of both parties. Amendments must be dated and signed by the Key Official or other authorized representative to this Cooperative Agreement as amended.