**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITY OF PHILADELPHIA, | |
| Plaintiff, | |
| v. | |
| DOUG BURGUM, SECRETARY OF THE INTERIOR, | Civil Action No. 2:26-cv-434 CMR |
| UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| JESSICA BOWRON, ACTING DIRECTOR OF THE NATIONAL PARK SERVICE, | |
| and | |
| NATIONAL PARK SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTION RELIEF**

**I.    INTRODUCTION**

1.    The President's House is one of the many buildings that comprise the Independence National Historical Park, the creation of which was directed by Congress in 1948. Congress specifically instructed that nothing would change on the buildings and grounds of National Independence Historical Park except by mutual agreement with the City of Philadelphia.

2.    Consistent with the statutory overlay on the Park, development of the President's House was the product of over a decade of close collaboration between the City and the United States, which entities worked together with the community to build a monument recognizing the

complexity inherent in the fact that some of the individuals instrumental to the founding of our country and its commitment to freedom themselves enslaved other human beings at the same time.

3.      The recognition of this complexity, and the work to develop the President's House, spanned several federal administrations culminating in a Cooperative Agreement in 2006 between the City of Philadelphia and the federal government that, through a series of amendments, detailed the design of the President's House Project as well as the rights and responsibilities of the parties.

4.      In March 2025, Executive Order No. 14253 called for, among other things, the Interior Department to "ensure that [materials under the jurisdiction of the department] do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times)."

5.      Without notice to the City of Philadelphia, the National Park Service has removed artwork and informational displays at the President's House site referencing slavery, pursuant to the mandate in the Executive Order.

## II.     JURISDICTION AND VENUE

6.      The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

7.      Venue properly lies within the Eastern District of Pennsylvania because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiff City of Philadelphia resides in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e).

## III.    PARTIES

8.      Plaintiff City of Philadelphia (the "City") is a municipal corporation and charter city organized and existing under the laws of the Commonwealth of Pennsylvania. The City is the birthplace of our Nation, home to Independence Hall, and served as the Nation's first capital.

9.      Defendant Doug Burgum is the Secretary of the Interior, a cabinet level position.

10.     Defendant United States Department of the Interior is a cabinet level agency of the United States.

11.     Defendant Jessica Bowron is the acting Director of the National Park Service, an agency of the Department of the Interior.

12.     Defendant National Park Service is an agency of the Department of the Interior and manages the property at Independence National Historical Park, where the President's House is located.

## IV.    FACTUAL ALLEGATIONS

Congress Establishes Independence National Historical Park

13.     In 1948, Congress enacted Public Law 80-795, now codified at 16 U.S.C. §§ 407m-407s, to provide for the establishment of Independence National Historical Park ("Independence Park") in Philadelphia.

14.     Among other provisions, the law authorized the Secretary of the Interior to enter into "cooperative agreements" with the City of Philadelphia "to assist in the preservation and interpretation of the property." 16 U.S.C. § 407n. The law further provided that such agreements must include a term "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds . . . except by

mutual agreement between the Secretary of the Interior and the other parties to the contracts," namely, the City. 16 U.S.C. § 407n.

15.     Pursuant to the authorizing legislation, the City and the United States, through the Secretary of the Interior, entered into a cooperative agreement for Independence Park in 1950 ("1950 Agreement"). (Doc. No. 36-1.)

16.     The 1950 Agreement provides the framework for cooperation between the City and the United States in the administration, maintenance, and exhibition of the Park to the public, including the term that "Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon." (Doc. No. 36-1 at art. III(c).)

17.     The 1950 Agreement also provides that "neither of the parties to this agreement will erect or place, or permit the erection or replacement of any monument, marker, tablet or other memorial, in or upon the buildings or grounds without the written consent of the other." (Doc. No. 36-1 at art. III(d).) Even the "design and location of any signs upon the exterior of the buildings . . . shall be subject to the approval of the City." (*Id.*)

18.     The 1950 Agreement further provides that "it is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole [Park] for the inspiration and benefit of the people of the United States, and to assure this result a high degree of cooperation is necessary with each other and with other bodies participating in the project . . . and the parties hereto pledge themselves to consult on all matter of importance to the program." (Doc. No. 36-1 at art. III(e).)

19.     Finally, the 1950 Agreement "shall continue in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination."

Doc. No. 36-1 at art. III(j).  Congress has not terminated the 1950 Agreement, either expressly or implicitly, and it is undisputed that the 1950 Agreement remains in effect.

<u>Around the Turn of the Century, Congress Enacted the Underground Railroad Act and the History of President's House and its Connection to the Underground Railroad was Rediscovered.</u>

20.     In 1998, Congress enacted the National Underground Railroad Network to Freedom Act, Pub. L. 105–203, July 21, 1998, 112 Stat. 678, codified at 54 U.S.C. §§ 308301-308304.

21.     The purposes of the Act, as recognized by Congress, are:

(1) To recognize the importance of the Underground Railroad, the sacrifices made by those who used the Underground Railroad in search of freedom from tyranny and oppression, and the sacrifices made by the people who helped them.

(2) To authorize the National Park Service to coordinate and facilitate Federal and non-Federal activities to commemorate, honor, and interpret the history of the Underground Railroad, its significance as a crucial element in the evolution of the national civil rights movement, and its relevance in fostering the spirit of racial harmony and national reconciliation.

Pub. L. 105–203, July 21, 1998, 112 Stat 678.

22.     The Act directed the Secretary of the National Park Service to establish a "National Underground Railroad Network to Freedom" consisting of sites throughout the country that have a connection to the Underground Railroad. 54 U.S.C. § 308302.

23.     In the early 2000s, the National Park Service ("NPS") and the City collaborated on a project to create a new Liberty Bell Center to maintain and exhibit the Liberty Bell.

24.     Around the same time, independent historians and community members began raising awareness regarding the site of the former "President's House" in Independence National Historical Park.

25.     The President's House served as George Washington's home and workplace while he was the first president of the United States.  John Adams and his family also lived there before the nation's capital was moved and a new executive residence established.

26.     In 2001, Edward Lawler, Jr., independent historian, published an article on the history of the home, whose exact location near Independence Hall had been subject to speculation after its demolition in the 1800s.

27.     Lawler wrote of the history of the home and the surrounding block, as well as the fact that George Washington and his family kept at least nine enslaved people on the property in free Pennsylvania, bringing the fact to prominence after it had been forgotten.

28.     Notably, President Washington kept enslaved individuals on the property as maids, cooks, stable hands, carriage drivers, and other roles critical to the functioning of the executive mansion, despite the fact that Pennsylvania was a free state.

29.     While Washington resided at President's House, Pennsylvania permitted owners of enslaved people to keep them in the state for up to six months, after which the enslaved person would be free under Pennsylvania law.  Later, Pennsylvania removed this six-month buffer period.

30.     Letters from Washington to his secretary reveal that our first president intentionally brought enslaved individuals out of the state before the six-month period had run, cycling them between his home at Mount Vernon or even sending them, in at least one instance, across the river to New Jersey for one day to skirt the purpose of the Pennsylvania manumission law.  Washington even advised that the enslaved people should not be informed of the true

purpose of their travels outside of Pennsylvania and that they should be transported under pretext to deceive the enslaved and the public.[1]

31.    One enslaved individual, Ona Judge, was Martha Washington's maid, inherited from her first husband after his death and known as "dower slave," brought into the Washington family through Martha's ownership.  Judge served Martha Washington at President's House, tending to her needs daily and interacting with free Black individuals in Philadelphia when sent out of the home for errands, typically accompanied by male enslaved individuals.  In 1796, Judge overheard Martha Washington say that Judge would be given as a gift to Martha's eldest granddaughter, Eliza Parke Custis Law, whom Judge and many others knew to have a fierce temper.  As the Washingtons prepared to go back to Virginia for the summer, Judge escaped when the family sat down for a meal – the brief time when her presence would not be missed. She was twenty-two years old.

32.    The Washingtons offered a $10 reward (roughly $250 today) for Judge's return and searched for her for years.  Even though she reached the free state of New Hampshire, Judge was a fugitive under the Fugitive Slave Act.  While Martha Washington was hurt by Judge's escape, George was incensed.  He would have to pay back the Custis estate for the loss of property if he were unable to return Judge to bondage.  At one point, one of Washington's agents found Judge in New Hampshire.  Washington instructed that Judge should not be taken by force at the time to avoid a potentially violent incident in abolitionist New Hampshire and the political blowback that would result.  Judge said she would be willing to return to slavery with the Washingtons if they would promise to free her upon their deaths.  George Washington wrote that

---

[1] *See* Edward Lawler, Jr., Washington, the Enslaved, and the 1780 Law, https://www.ushistory.org/presidentshouse/slaves/washingtonand8.php; *see also* Ona Judge, https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/ona-judge.

while he supported gradual abolition, if politically feasible, he could not reward such an escape

with freedom while other enslaved individuals were more loyal. Years later, Washington again

asked an associate to try to retrieve Judge but he, too, returned empty-handed, as a United States

Senator from New Hampshire and a free Black friend helped keep Judge safe.

33.    Judge lived until 1848, marrying and having children as a free individual, and

telling her story through interviews in the 1840s. While Judge lived in poverty at the end of her

life, she never regretted escaping to freedom, where she had her own family and learned to read.

34.    As a result of this rediscovered history, activists Avenging the Ancestors

Coalition and others campaigned for a memorial to the enslaved individuals and an exhibition

that told the long-buried true story of the inhabitants of the President's House in Philadelphia.

35.    The movement to recognize "The House and the People Who Worked and Lived

In It" gained traction. In a 2003 Appropriations report, the United States House of

Representatives stated that "given the historical significance of this issue," it "urge[d] the NPS to

appropriately commemorate the concerns raised regarding the recognition of the existence of the

Mansion and the slaves who worked in it during the first years of our democracy."

36.    Joining the community and activist voices, NPS Chief Historian Dwight

Pitcaithley also wrote to Independence Park's superintendent to urge her to consider a different

perspective:

> The contradiction in the founding of the country between freedom and slavery
> becomes palpable when one actually crosses through a slave quarters site when
> entering a shrine to a major symbol of the abolition movement . . . . How better to
> establish the proper historical context for understanding the Liberty Bell than by
> talking about the institution of slavery? And not the institution as generalized
> phenomenon, but as lived by George Washington's own slaves. The fact that
> Washington's slaves Hercules and Oney Judge sought and gained freedom from
> this very spot gives us interpretive opportunities other historic sites can only long
> for. This juxtaposition is an interpretive gift that can make the Liberty Bell

"experience" much more meaningful to the visiting public. We will have missed a real educational opportunity if we do not act on this possibility.

(*See* Gary Nash, *For Whom Will the Liberty Bell Toll? From Controversy to Collaboration*, The George Wright Forum, Vol. 21, No. 1 (Mar. 2004) at 46-47, *available at* https://www.jstor.org/stable/43597891?seq=9.)[2]

37.    Elected representatives on the federal, state, local level would soon add to the chorus of pleas. The U.S. House of Representatives Committee on Appropriations, in a July 2022 report on the Department of Interior and Related Agencies appropriations bill, stated that:

> The Committee is aware of recent developments relating to the identification of the site of the first official residence of the President of the United States at the current location of Independence National Historical Park in Philadelphia, Pennsylvania.  It has been discovered that George Washington and his household, including eight [sic] African American slaves, were quartered at the first Executive Mansion for six and one half years.  **Therefore, given the historical significance of this issue, the Committee urges the National Park Service to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy.**  Furthermore the Committee directs the Director of the National Park Service to submit a report to the Committee no later than March 31, 2003, detailing the actions taken at Independence National Historical Park to property address and resolve this issue.

(*See* 2003 U.S. House of Representatives Report 107-564, Prelim. Inj. Hr'g Ex. 2 (Doc. No. 36-2) at 47) (emphasis added.)

38.    That same year, the Pennsylvania House of Representatives passed House Resolution 490, which "[u]rg[ed] the National Park Service to erect a commemorative plaque in recognition of the slave quarters located on the site of the planned Liberty Bell Pavilion." (*See*

---

[2] While the Washingtons' cook at President's House, Hercules Posey, did escape from bondage, he did so from the Washingtons' Virginia home of Mount Vernon, not from the President's House site. Hercules left on George Washington's birthday, February 22, 1797, while the President held a ball in Philadelphia. Hercules Posey, https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/hercules.

H.R. 490, 2001-2002 Gen. Assemb., Reg. Sess. (Pa. 2002),

https://www.palegis.us/legislation/bills/text/PDF/2001/0/HR0490/PN3509.)

39.    Shortly thereafter, Philadelphia City Council passed its own resolution advocating

for NPS to "appropriate[ely] memorializ[e]" "the human beings of African descent held in

bondage at the President's House."  (*See* Phila. Council Resolution No. 020521 (Sept. 12, 2002),

available at https://phila.legistar.com/legislation.aspx.)

40.    In October 2003, the City, under the leadership of then-Mayor John Street,

committed $1.5 million of City funds toward commemoration efforts for the President's House.

41.    Two years later, driven by advocacy from the local delegation, Congress

appropriated $3.6 million for "Independence National Historic [sic] Park scenic enhancement

and pedestrian walkways improvement project in conjunction with the Park's Executive Mansion

Exhibit."  (*See* 119 Stat. 1308, Public Law 109-59 (Aug. 10, 2005).

42.    By 2005, despite its earlier resistance, NPS and Independence Park would become

"a full and enthusiastic partner" with the City.

43.    Indeed, in a briefing statement regarding work at the grounds, NPS wrote that:

NPS fully recognizes that the President's House site is one of very great historical
significance and that it carries tremendous cultural and emotional significance for
community groups. The site has much to teach us about the birth of our nation and
the intertwined themes of slavery and freedom.

(*See* URS Corp., NPS, and Independence Park, *The Archeology of Freedom and Slavery*

*Excavations at the President's House Site in Philadelphia* (Nov. 2009, Revised Sept. 2023) at

Appendix A at 13, *available at* https://npshistory.com/publications/inde/pres-house-

excavations.pdf.)

44.    In October 2005, the City and NPS issued a nationally distributed Request for Qualifications to implement the vision of President's House advanced through advocacy efforts and public engagement.

45.    The City and NPS also convened a formal Oversight Committee to help guide development to represent the public interest in the selection process.

46.    After selecting finalists for the design and construction of the project, the City provided funding for the bidders to create three-dimensional models of their proposals, which were placed on public display at the National Constitution Center and African American Museum in Philadelphia.  Nearly 1,000 visitors completed evaluation cards.  These evaluations were reviewed by the Oversight Committee and posted on the City's website. This process reflected the understanding that public input was essential to the development and vision of President's House.

47.    In February 2007, the City and Independence Park jointly announced the selection of project designers.  Mayor Street stated that:

> This is a great day for Philadelphia and our nation.  We are one huge step closer to fulfilling an obligation to tell the truth – the whole, complicated truth – about this small parcel of land on the doorstep of the Liberty Bell Center . . . I got personally involved in this project because enslaved Africans lived in our first President's household right here in Philadelphia – and most visitors to these symbols of liberty and justice, even now, are completely unaware of this terrible truth. That is about to change.

(Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 3.)

48. Independence Park Superintendent Dennis Reidenbach also added that:

> This project is a collaboration among the City of Philadelphia, the National Park Service, and so many others. With this commemoration, Independence National Historical Park will be at the forefront of national parks that address the issues of freedom and slavery. I could not be more pleased with the opportunity this project offers to teach and remember.

(*Id.*)

From 2006 to 2010, the City and Defendants Planned, Designed and Constructed the President's House Pursuant to Cooperative Agreements

49.     In 2006, the City and NPS entered into an agreement to establish an exhibit at the site of the former President's House (the "2006 Cooperative Agreement"), located on Independence Mall next to the Liberty Bell Center. (Doc. No. 36-3.) The 2006 Cooperative Agreement provided that the parties "desire to establish an exhibit at the Park that "illuminates the history of the site of the former President's House . . . (where Presidents George Washington and John Adams lived and where at least nine enslaved Africans - kept by George Washington- also lived) and its symbolic importance to the founding of the United States. (*Id.* at ¶ E.)

50.     The 2006 Cooperative Agreement was amended in 2007, 2008, and 2009. (*See* Doc. Nos. 36-4, 36-5, 36-6.)

51.     Under the 2009 Third Amendment, the City was responsible for the "design, fabrication, installation, and completion" of the President's House Project, titled "Freedom and Slavery in Making a New Nation," and upon its completion the exhibit was to be "owned, maintained, managed, and interpreted" by the NPS. (Doc. No. 36-6 at art. I, Sections B and C; Attach. A, Section IV, Paragraph 4.)

52.     The 2006 Cooperative Agreement and its subsequent amendments provide that the President's House together with the interpretative displays in it are all part of a single exhibit. (Doc. No. 36-3 at Background Paragraphs E and F; also, Doc. No. 36-6 at Attachment C, Section B.).

53.     The 2006 Cooperative Agreement and its Third Amendment also expressly call for explaining the lives of enslaved people living at the President's House.  (*See*, *e.g.*, Doc. No. 36-3 at Background Paragraph E; Doc. No. 36-6 at Attachment A, Sections I—II.)  The

agreements acknowledged that the exhibits not only "will commemorate the home of George Washington and John Adams during the first ten years of the federal government," but that equally important was the intention to "commemorate the enslaved Africans who resided in the Washington household." (Doc. No. 36-6 Attachment C, Section B.) Further, the Project Summary Sheet describes the project as an exhibit that will "commemorate all those who lived in the house while it was used as the executive mansion, including the nine enslaved Africans brought by George Washington from Mt. Vernon." (*Id.* at Attachment A, Section II.)

54.    The Agreement contained a Project Development Plan, which provided that "[s]ite interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved." (Doc. No. 36-6 at Attachment C, Section B.)

55.    Additionally, the City has an equal right with the NPS under these agreements to approve the final design of the President's House Project. (Doc. No. 36-6 at Attach. A, Section IV(4) (stating that NPS "will participate in the final review and approval of the Project").) A "core design requirement" mandated that "the footprint of the Slave Quarters must be conspicuously highlighted and a solemn 'sense of place' clearly established." In addition, five of the six jointly agreed upon themes "that must be reflected in the final design" all centered on enslaved persons to highlight "how knowledge of the President's House and the presence of slavery was forgotten and recovered; why we must remember." (*Id.* at Attach. C, Section F, subsection D).

56.    In addition to shared design vision, the City made significant financial contributions to the President's House, due to the large national and local public interest in this

exhibit. The City paid $3.5 million toward the overall project in addition to securing grant funding from the Delaware River Port Authority and federal congressional appropriation in the SAFETY-LU Transportation Bill. Further, the rationale behind the City's contribution is spelled out in the agreement: "Providing funds for the Project and Research Dig fulfills the public purpose requirement because it enables the City to commemorate the symbolic and historical importance of the President[']s House for the City of Philadelphia, its citizens and all Americans nationwide, and by doing so, there is a public benefit inuring to the City." (Doc. No. 36-3 at Background Paragraph K.)

57.    The 2009 Agreement includes a provision requiring the NPS and City to "promptly use their best efforts to resolve the dispute in an informal fashion through communication and consultation, or other forms on non-binding alternative despite resolution that are mutually acceptable to the parties." (Doc. No. 36-6 at art. IX, Section A).

58.    While the term of the 2006 Agreement and subsequent amendments has expired, the Agreements contain survival clauses that extend the life of certain provisions.

59.    The 2009 Amendment includes Paragraph XII(Q), which provides that "[a]ny and all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment." (Doc. No. 36-6 at ¶ XII(Q).) Paragraph C(7) provides that "It is the intent of both parties to be legally bound by this Cooperative Agreement as amended and both expressly waive the defense of lack of consideration." *Id.* at ¶ C(7).

From 2010 to 2026, the President's House Exhibit is Open to the Public and the City and
Defendants Continue to Collaborate Pursuant to the Cooperative Agreements

60.    After design and construction, the President's House exhibit opened in 2010,

featuring a number of display panels depicting slavery and enslaved people, including Ona

Judge. (*See* Doc. No. 36-11 (photos of President's House before January 22, 2026).)

Construction continued on the site until 2015, as NPS and the City worked to finalize all

outstanding issues with the project.

61.    Additionally, in July and December 2015, the City entered into agreements

assigning the intellectual property rights of the President's House Project to the NPS (the "2015

IP Assignment Agreements"). (Doc. No. 36-7.)

62.    Specifically, the 2015 IP Assignment Agreements include an assignment for the

"Interpretative Works" of the President's House Project. (Doc. No. 36-7 at Recital (B).)

63.    The Schedule of Interpretative Works, attached as Exhibit A to the July 2015 IP

Assignment Agreement, reflects that many of the works expressly address slavery. (Doc. No. 36-

7 at Ex. A.)

64.    Under the 2015 IP Assignment Agreements, the City retained a license to use the

intellectual property and accepted an obligation to assist NPS in protecting the property rights.

These rights and obligations specifically survived the expiration of the Agreements.

65.    The transfer of the copyrights under the 2015 IP Assignment Agreements did not

include the authority to materially alter or destroy altogether the exhibit underlying the

copyright.

66.    In 2017, NPS issued the Foundation Document for Independence Park, a public

document that governs goals and themes of the Park.  (Doc. No. 36-8.)  President's House is a

"core component" of the Park, according to the NPS document, and the "Paradox of Freedom

and Slavery" is a "statement" on the "significance" of the Park.  An interpretive theme for the Park is "Liberty: The Promises and the Paradoxes."  (*Id.*)

67.    In 2022, President's House was formally designated as a National Underground Railroad Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act, Pub. L. 105–203, July 21, 1998, 112 Stat. 678, codified at 54 U.S.C. §§ 308301-308304; *see also* https://www.nps.gov/subjects/undergroundrailroad/ntf-listings.htm (listing all Network sites, including President's House) (last accessed Feb. 6, 2026).

68.    The application for President's House to become a Network site describes in detail the story of Ona Judge's enslavement in the President's House in Philadelphia and her daring and successful escape to freedom. *See* Doc. No. 36-10 at 8.

69.    NPS granted the application and designated President's House a Network site in 2022.  *See id.*  President's House is still listed as a Network site on the National Park Service website as of February 6, 2026.

On January 22, 2026, NPS Removes All President's House Panels That Reference Slavery.

70.    On January 22, 2026, the City learned that Defendants, through the National Park Service, had removed all educational panels at the President's House site that reference slavery.

71.    On the same day, the City filed the Original Complaint and Motion for Preliminary Injunction in this case.

72.    On January 28, 2026, Defendants filed on the docket in this case an Affidavit from the Superintendent of Independence Park. The Affidavit states that the acting Director of NPS directed the Superintendent "to remove the video and exhibits on the interior and exterior of the walls of the President's House. However, the footprints in the concrete and the names on the Memorial Wall were to remain as-is." (Doc. No. 27-1 ¶ 4.)

16

73.     The Superintendent was directed to remove the video and exhibits on January 22, 2026.  He therefore directed NPS staff to conduct the removal and "at or around 3:00 p.m., NPS employees removed all but one of the exhibits on the interior and exterior of the President's House walls using hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls."  (Doc. No. 27-1 ¶ 6.)

74.     The one panel that was not removed on January 22 "is made of wood and located at the southern end of the site in a stand alone structure made of metal. NPS did not remove it on January 22, 2026 because additional tools were needed to do so." (Doc. No. 27-1 ¶ 7.)

75.     All of the panels and materials that were removed on January 22, 2026 are in storage in NPS custody at the National Constitution Center in Philadelphia. (Doc. No. 27-1 ¶ 8.)

76.     On information and belief, the removal was part of a larger effort by this administration, the Department of the Interior, and the National Park Service to erase all references to slavery and the civil rights movement throughout National Independence Historical Park as well as other sites nationwide. The City reasonably believes that NPS intends to remove additional materials both at President's House and in Independence Park and to replace the materials removed with "alternative" materials that will not be historically accurate and will attempt to bury the history of slavery, the connection to the Underground Railroad, and the civil rights movement at the site to comport with this administration's political narrative rather than objectively true history as understood by historians and archeologists, including NPS's own experts.

## V.    CAUSES OF ACTION

### Count I – 5 U.S.C. § 702 – Unlawful Agency Action
### *(All Defendants)*

77.     The preceding paragraphs are incorporated and realleged here.

78.     Section 702 of the Administrative Procedure Act permits challenge of agency action where a plaintiff is not seeking money damages.  5 U.S.C. § 702.  As explained by the Third Circuit Court of Appeals in *Treasurer of New Jersey v. U.S. Dept. of Treasury*, 684 F.3d 382 (3d Cir. 2012), Section 702 provides a general waiver of sovereign immunity for legal wrong, not limited to final agency action, where the sought relief is not money damages.  *See also, e.g., Air Marshal Assn. v. Sec'y of Dept. of Homeland Sec.*, No. 22-2254, 2025 SL 388814, at \*4-5 (E.D. Pa. Feb. 4, 2025).

79.     Defendants Department of the Interior and National Park Service are "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1).

80.     Defendants' actions on January 22, 2026 breached the 1950 Cooperative Agreement and surviving and enforceable terms of the 2006 Cooperative Agreement and its Amendments.

81.     Defendants breached the Agreements by failing to obtain mutual consent and failing to consult with the City prior to its removal of all interpretative panels and ceasing of videos at President's House.

82.     Defendants breached the Agreements by removing virtually all references to slavery and enslaved persons, significantly altering the exhibit and its interpretive focus.

83.     Defendants' failure to conform to the terms of its agreement does not cause specific monetary damage to the City.  The only remedy to which the City is entitled is equitable,

that the United States be enjoined to undo the harm it caused and comply with its contractual obligation to make changes to the buildings and grounds only by mutual agreement.

84.    Plaintiff therefore asks the Court to declare under 5 U.S.C. § 702 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House is unlawful agency action; provide preliminary relief under 5 U.S.C. § 705; preliminarily mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law, including the parties' contractual obligation that changes be made only by mutual agreement.

**Count II – APA 5 U.S.C. § 704, 706(2)**
**Arbitrary and Capricious Agency Action in Violation of the National Underground**
**Network to Freedom Act of 1998**
*(All Defendants)*

85.    The preceding paragraphs are incorporated and realleged here.

86.    Defendants' actions to remove the panels referencing slavery are arbitrary and capricious because the removal directly contradicts Congress's express purpose to preserve and recognize important historical sites of the Underground Railroad.

87.    Defendants Department of the Interior and National Park Service are "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). The removal of artwork and informational displays at the President's House site referencing slavery constitutes final agency action subject to review by this Court.

88.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

89.     "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

90.     "An agency acts arbitrarily and capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (*quoting State Farm*, 463 U.S. at 43).

91.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

92.     The National Underground Railroad Network to Freedom Act was passed in 1998.

93.     Congress enacted the National Underground Railroad Network to Freedom Act with the express purpose to "recognize the importance of the Underground Railroad, the sacrifices made by those who used the Underground Railroad in search of freedom from tyranny

and oppression, and the sacrifices made by the people who helped them." PL 105–203, July 21, 1998, 112 Stat 678 at Section 2(b)(1).

94.    In its adoption, Congress found "the Underground Railroad bridged the divides of race, religion, sectional differences, and nationality; spanned State lines and international borders; and joined the American ideals of liberty and freedom expressed in the Declaration of Independence and the Constitution to the extraordinary actions of ordinary men and women working in common purpose to free a people."  P.L. 105-203, Section 2(a)(2).

95.    Congress also found that "the National Park Service can play a vital role in facilitating the national commemoration of the Underground Railroad."  *Id.* at 2(a)(5).

96.    Congress mandated that the "Secretary [of the Interior] shall establish in the Service the National Underground Network to Freedom.  Under the national network, the Service shall – produce and disseminate appropriate educational materials, such as handbooks, maps, interpretive guides, or electronic information[.]"  54 U.S.C. § 308302.

97.    There is no statutory or other authority for the Secretary to remove and destroy Network sites after designation, and doing so runs counter to the express purpose of the Act.

98.    In 2022, NPS supported the application to designate the President's House as a Network to Freedom site.  Core to this submission is the fact that Ona Judge, one of the women held in slavery by the Washington family, escaped from them through the Underground Railroad.  Her story and that of the other individuals held in slavery by the Washingtons were central to the narrative and site interpretation at President's House, consistent with the early project development plan.  (2009 Am. to Coop. Agreement, Attachment C, Project Development Plan, Prelim. Inj. Hr'g Ex. 6 (Doc. No. 36-6 at 24-30).)

99.     The project development plan explains that "site interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."

100.    The biographical information and explanation about slavery are what NPS removed when it stripped the panels from the site.  The erasure of Ona Judge's story, the very information that specifically qualified the President's House as a Network to Freedom site, unequivocally contradicts the express direction of Congress to *create*, not *destroy*, sites that educate the public about the Underground Railroad.

101.    Plaintiff therefore asks the Court to declare under 5 U.S.C. § 704 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House is arbitrary and capricious final agency action in violation of the National Underground Railroad Network to Freedom Act of 1998; provide preliminary relief under 5 U.S.C. § 705; preliminarily mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law.

### Count III – APA 5 U.S.C. § 704, 706(2)
### Arbitrary and Capricious Final Agency Action in Violation of Title 16 Sections 407m, 407n
#### *(All Defendants)*

102.    The preceding paragraphs are incorporated and realleged here.

103.    Defendants' actions to remove the panels referencing slavery without any consultation with or agreement by the City of Philadelphia are arbitrary and capricious final agency action because they expressly violate the statutory mandate in Title 16 Sections 407m

and 407n that changes on the buildings and grounds of Independence National Historical Park only be made with mutual agreement.

104.    Defendants Department of the Interior and National Park Service are "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). The removal of artwork and informational displays at the President's House site referencing slavery constitutes final agency action subject to review by this Court.

105.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

106.    The removal of educational panels referencing slavery is final agency action because it reflects final decisions—in accord with presidential directives—to unilaterally rewrite history to suit the current Administration's preferred narrative.

107.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

108.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

109.    "An agency acts arbitrarily and capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (*quoting State Farm*, 463 U.S. at 43).

110.    Title 16, Section 407n directs that "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts."

111.    President's House is part of the buildings and grounds that comprise Independence National Historical Site.

112.    The panels and displays that were removed are an integral part of the President's House, as illustrated by the care and work that went into the collaborative design and development of those materials.

113.    Defendants did not engage with any persons from the City of Philadelphia before unilaterally changing core components of the President's House.

114.    The City of Philadelphia does not agree with the National Park Service's unilateral removal of historical materials that are necessary context for the President's House.

115.    Plaintiff therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House without the mutual agreement violates the APA because it is final agency action that violates a statutory mandate; provide preliminary relief under 5 U.S.C. § 705; preliminarily

mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law.

**Count IV – APA 5 U.S.C. §§ 704, 706(2)**
**Arbitrary and Capricious Final Agency Action in Violation of Agency Policy Documents**
*(All Defendants)*

116.    The preceding paragraphs are incorporated and realleged here.

117.    Defendants' actions are contrary to their own "Foundation Document," which describes the plan to manage and preserve the Independence National Historical Park.

118.    Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

119.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

120.    "An agency acts arbitrarily and capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.'" *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (*quoting State Farm*, 463 U.S. at 43).

121.    Congress mandates that NPS prepare "general management plans" for each "unit," or park in the NPS System. 54 U.S.C. § 100502.

122.    To comply with this mandate, NPS issued a document called "Management Policies" and Director's Order No. 2 to guide its planning for each park.[3]

123.    The governing planning document for Independence Park is its Foundation Document, last amended in 2016.

124.    President's House is a "core component" of Independence Park, "especially in the paradox of the Washingtons bringing their enslaved people to work and live there." (*See* Independence National Historical Park Foundation Document (2017), Prelim. Inj. Hr'g Ex. 8 (Doc. No. 36-8)) at 11.)

125.    The "paradox of freedom and slavery" is a significance statement for the Park. (*Id.* at 15.)

126.    NPS considers (or considered until very recently) the "interpret[ation] of race and slavery in its historic context" at the President's House archeological site to be a "fundamental resource[] and value[]" of the Park. (*Id.* at 17.)

127.    The "fundamental value" of "partnerships and collaboration" is "best illustrated by Independence National Historical Park's close working relationship with the City of Philadelphia, which still owns the most iconic building Independence Hall and resources such as the Liberty Bell." (*Id.* at 18.)

---

[3] Management Policies, https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf (last viewed Feb. 5, 2026); Director's Order No. 2, https://www.nps.gov/subjects/policy/upload/DO_2_1-11-2021.pdf (last viewed Feb. 5, 2026).

128.    The "promises and the paradoxes" of liberty is one of only four interpretive themes of the Park.  (*Id.* at 19.)

129.    NPS also instructs that "[u]nderstanding and considering the public's interest will inform and strengthen the entire planning portfolio," including by complying with various Management Policies and Director's Orders.  (*See* Director's Order No. 2, *supra*, n.2, ¶ 3.6.)

130.    NPS Management Policies 2.1.3 and 2.3.1.5 expressly provide for public involvement for planning purposes, such as developing or changing the Foundation Document. (*See* Management Policies, *supra*, n.2.)

131.    The removal of the interpretive panels and signs at President's House expressly contravened these policies or directives.

132.    All interested parties are left completely in the dark as to why this decision was made, who made the decision, how this meticulously-researched exhibit fits within the parameters outlined in Executive Order 14253, and what the NPS has planned for the site.

133.    Plaintiff therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House without the mutual agreement violates the APA because it is final agency action that violates a statutory mandate; provide preliminary relief under 5 U.S.C. § 705; preliminarily mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law.

**Count V – Ultra Vires**
**Agency Action in Violation of Law**
*(All Defendants)*

134.    The preceding paragraphs are incorporated and realleged here.

135.    Under this Court's traditional equitable jurisdiction, Plaintiff is entitled to equitable relief to prevent and restrain ongoing violations of statutory law by Defendants.

136.    Because such actions seek simply to halt or prevent a violation of federal law rather than the award of money damages, they do not ask the Court to imply a new cause of action. To the contrary, the ability to sue to enjoin unlawful actions by non-presidential federal actors is the creation of courts of equity and reflects a long history of judicial review of illegal executive action, tracing back to England.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

137.    Defendants took unilateral action that significantly affected the buildings and grounds of Independence National Historical Park.  This unilateral action violated the statutory mandate to only make such changes by mutual agreement.  Plaintiff does not agree with Defendants' actions.

138.    Plaintiff therefore asks the Court to declare that Defendants' removal of the artwork and informational displays referencing slavery at the President's House without the mutual agreement violates the express statutory direction to only make changes on the buildings and grounds of Independence National Historical Park only by mutual agreement; preliminarily mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with applicable law.

## VI.    RELIEF SOUGHT

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and grant the following relief:

A.    A declaratory judgment declaring that Defendants' removal of the interpretative panels referencing slavery is unlawful;

B.    A temporary restraining order that enjoins Defendants from replacing the removed materials without mutual agreement;

C.    A preliminary injunction enjoining Defendants from taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site and requiring Defendants to take all necessary steps to ensure the safety, security, and preservation of any such items removed from the President's House Site on January 22, 2026.

D.    An order restoring the President's House Site to its status as of January 21, 2026.

E.    A permanent injunction prohibiting Defendants from removing the interpretative panels referencing slavery without complying with the APA and all applicable law; and

F.    Any other relief the Court deems just and proper.

Respectfully submitted,

Date:  <u>February 6, 2026</u>

Renee Garcia, City Solicitor
Anne Taylor, Chair | Litigation
Lydia Furst, Chief Deputy City Solicitor

*/s/ Ryan B. Smith*
Ryan B. Smith, Divisional Deputy City Solicitor
Bailey Axe, Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
(215) 410-8264
Ryan.Smith@phila.gov

*Attorneys for Plaintiff City of Philadelphia*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CITY OF PHILADELPHIA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 2:26-cv-434** |
| **DOUG BURGUM, SECRETARY OF THE INTERIOR, et al.,** | |
| **Defendants.** | |

## <u>CERTIFICATE OF SERVICE</u>

      I, Ryan B Smith, do hereby certify that a true and correct copy of the foregoing Amended

Complaint was filed via the Court's electronic filing system and is available for downloading.


Date: February 6, 2026      BY:   */s/ Ryan B. Smith*
                                 Ryan B. Smith, Divisional Deputy City Solicitor
                                 City of Philadelphia Law Department
                                 1515 Arch Street, 15th Floor
                                 Philadelphia, PA 19102
                                 (215) 410-8264
                                 Ryan.Smith@phila.gov

                                 *Attorney for Plaintiff City of Philadelphia*