**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CITY OF PHILADELPHIA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 2:26-cv-434** |
| **DOUG BURGUM, SECRETARY OF THE INTERIOR, et al.,** | |
| **Defendants.** | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2026, upon consideration of Plaintiff the City of Philadelphia's Motion for Temporary Restraining Order (Doc. No. __), and any response thereto, it is **HEREBY ORDERED** that the Motion is **GRANTED**. Defendants are hereby ordered to:

1. Refrain from taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site;

2. Take all necessary steps to ensure the safety, security, and preservation of any such items removed from the President's House Site on January 22, 2026;

3. Refrain from making any and all further changes to President's House, including the removal or destruction of any portion of the exhibit that remains in place after January 22, 2026, and the installation of replacement materials, without the mutual agreement of the City of Philadelphia.

BY THE COURT:

_____

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CITY OF PHILADELPHIA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 2:26-cv-434** |
| **DOUG BURGUM, SECRETARY OF THE INTERIOR, et al.,** | |
| **Defendants.** | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2026, upon consideration of

Plaintiff the City of Philadelphia's Amended Motion for Preliminary Injunction (Doc. No. ___),

and any response thereto, it is **HEREBY ORDERED** that the Motion is **GRANTED**.

Defendants are hereby ordered to restore the President's House Site to its status as of January 21,

2026.

Defendants are further enjoined from taking any action to damage any exhibits, panels,

artwork, or other items from the President's House Site, are ordered to take all necessary steps to

ensure the safety, security, and preservation of any such items removed from the President's

House Site on January 22, 2026, and are enjoined from making any and all further changes to

President's House, including the installation of replacement materials, without the mutual

agreement of the City of Philadelphia during the pendency of this litigation or until further order

of this Court.

BY THE COURT:

_____

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CITY OF PHILADELPHIA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 2:26-cv-434** |
| **DOUG BURGUM, SECRETARY OF THE INTERIOR, et al.,** | |
| **Defendants.** | |

## PLAINTIFF THE CITY OF PHILADELPHIA'S AMENDED MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

On January 22, 2026, Defendants removed display panels depicting slavery and enslaved persons from the President's House Site in the Independence National Historical Park ("Independence Park") in Philadelphia. Plaintiff the City of Philadelphia (the "City") hereby moves, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction to restore the President's House Site to its status as of January 21, 2026. The City also moves for an immediate temporary restraining order pending consideration of the City's request for a preliminary injunction to enjoin Defendants from: (1) taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site; and (2) making any and all further changes to President's House, including the installation of replacement materials, except by mutual agreement between the United States and the City of Philadelphia.

Defendants' removal of the display panels is contrary to law and the longstanding contractual relationship between the parties, and has caused immediate, irreparable, and ongoing harm to the City. The balance of equities and public interest strongly favor both entry of a preliminary injunction restoring the President's House to its status as of January 21, 2026, and

the entry of a temporary restraining order enjoining further removals and changes pending

consideration of the City's motion. In support of this Motion, the City refers to and incorporates

the attached Memorandum of Law, Plaintiff's Amended Complaint and attached exhibits, as well

as the evidence and oral argument presented at the hearing held by this Court on January 30,

2026.

|                         | Respectfully submitted,                           |
|-------------------------|---------------------------------------------------|
|                         | CITY OF PHILADELPHIA<br>LAW DEPARTMENT            |
| Date: February 6, 2026  | */s/ Ryan B. Smith*                               |
|                         | Renee Garcia, City Solicitor                      |
|                         | Anne Taylor, Chair \| Litigation                  |
|                         | Lydia Furst, Chief Deputy City Solicitor          |
|                         | Ryan B. Smith, Divisional Deputy City Solicitor   |
|                         | Bailey Axe, Deputy City Solicitor                 |
|                         | City of Philadelphia Law Department               |
|                         | 1515 Arch Street, 15th Floor                      |
|                         | Philadelphia, PA 19102                            |
|                         | (215) 410-8264                                    |
|                         | Ryan.Smith@phila.gov                              |
|                         |                                                   |
|                         | *Attorneys for Plaintiff City of Philadelphia*    |

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CITY OF PHILADELPHIA,**<br><br>                    **Plaintiff,**<br><br>          **v.**<br><br>**DOUG BURGUM, SECRETARY OF THE INTERIOR, et al.,**<br><br>                    **Defendants.** | **Civil Action No. 2:26-cv-434** |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF THE CITY OF PHILADELPHIA'S AMENDED MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**</u>

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

II.  BACKGROUND ........................................................................................................... 2

   A.   The Establishment of Independence National Historical Park and the Beginning of the Collaborative History Between the City and the Federal Government at and Around Independence Mall ....................................................................................................... 2

   B.   The Demand for and Development of Commemoration and Interpretation at the President's House ............................................................................................................ 4

   C.   The City and the United States Enter Into Cooperative Agreements for President's House 10

   D.   The Completion of the President's House, the First Federal Property to Feature a Slave Memorial .......................................................................................................................11

   E.   Congress Seeks to Preserve and Honor Locations Associated with the Underground Railroad ........................................................................................................................ 14

   F.   NPS Issues the Current "Foundation Document" for Independence National Historical Park 15

   G.   The President's House Property is Abruptly Altered by the Removal of the Exhibit ....... 18

   H.   Procedural History ........................................................................................................ 19

III. LEGAL STANDARD ................................................................................................... 19

IV.    ARGUMENT .................................................................................................... 21

  A.    The City is Likely to Succeed on the Merits of its Claims ................................ 22

    1.    The City Has Established a Likelihood of Success on the Merits of its Breach of
Contract Claim, brought pursuant to 5 U.S.C § 702 ............................................. 23

      a.    The NPS Removal is Final Agency Action ..................................................... 29

      b.    The NPS Removal is Arbitrary and Capricious ............................................ 30

    3.    The City Has Established a Likelihood of Success on the Merits of Its APA Claim
Alleging Arbitrary and Capricious Final Agency Action in Violation of Title 16, Sections
407m, 407n ............................................................................................................. 33

    4.    The City Has Established a Likelihood of Success on the Merits of Its APA Claim
Alleging Arbitrary and Capricious Final Agency Action in Violation of NPS Policy
Applicable to President's House ............................................................................... 34

    5.    The Discretionary Exception to the APA Waiver of Sovereign Immunity Does Not
Apply to the NPS's Removal of Critical Material from the President's House ................. 36

  B.    Irreparable Injury Will Result Absent Preliminary Relief ............................................ 39

  C.    The Balance of Equities and the Public Interest Favor Granting Relief...................... 43

  D.    As Relief, the Court Should Order the Restoration of the Removed Materials as
Preservation of the Status Quo Requires Returning the President's House to Its Status as of
January 21, 2026 ................................................................................................... 46

TABLE OF AUTHORITIES

Page(s)

Cases

138 F.4th 1189 (9th Cir. 2025) ................................................................. 32
*Acierno v. New Castle Cnty.*,
   40 F.3d 645 (3d Cir. 1994) ................................................................. 39
APA,",
   672 F.2d 959 (D.C. Cir. 1982) ........................................................... 25
*Bennett v. Spear*,
   520 U.S. 154 (1997) ......................................................................... 23
*Bieros v. Nicola*,
   857 F. Supp. 445 (E.D. Pa. 1994) ..................................................... 20
*Bowen v. Mass.*,
   487 U.S. 879 (1988) ......................................................................... 24
*C.G. v. Saucon Valley Sch. Dist.*,
   571 F. Supp. 3d 430 (E.D. Pa. 2021) ........................................... 20, 46
*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024) ......................................................................... 22
*Dep't of Health and Social Servs. v. United States Dep't of Health & Hum. Servs.*,
   272 F. Supp. 3d 103 (D.D.C. 2017) ................................................... 30
*Dir., Off. of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*,
   514 U.S. 122 (1995) ......................................................................... 22
*Dunmore Sch. Dist. v. Pa. Interscholastic Athletic Ass'n*,
   505 F. Supp. 3d 447 (M.D. Pa. 2020) ............................................... 46
*F.C.C. v. Fox Tele. Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................................... 35
*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
   537 U.S. 293 (2003) ......................................................................... 22
*Franklin v. Mass.*,
   505 U.S. 788 (1992) ..................................................................... 22, 29
*Gentile v. Secs. & Exch. Comm'n*,
   974 F.3d 311 (3d Cir. 2020) ............................................................. 37
*Holiday Inns of Am., Inc. v. B & B Corp.*,
   409 F.2d 614 (3d Cir. 1969) ............................................................. 39
*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*,
   582 F.3d 721 (7th Cir. 2009) ............................................................. 20
*Kos Pharma., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004) ........................................................ 20, 46
*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................. 44
*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ......................................................................... 29

*Mylan, Inc. v. Kirkland & Ellis LLP*,
 No. 15-181, 2015 WL 12733414 (W.D. Pa. June 9, 2015) ................................... 46

*New York v. Kennedy*,
 155 F.4th 67 (1st Cir. 2025) ..................................................................................... 44

*Nken v. Holder*,
 556 U.S. 418 (2009) .................................................................................................. 44

*Nuclear Regul. Comm'n v. Tex.*,
 605 U.S. 665 (2025) .................................................................................................. 38

*NVE, Inc. v. Dept. of Health and Hum. Servs.*,
 436 F.3d 182 (3d Cir. 2006) ...................................................................................... 22

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
 920 F.2d 187 (3d Cir. 1990) ................................................................................. 20, 46

*Pleasant Grove City, Utah v. Summum*,
 555 U.S. 460 (2009) .................................................................................................. 45

*Reilly v. City of Harrisburg*,
 858 F.3d 173 (3d Cir. 2017) ........................................................................ 19, 20, 39, 46

*Robbins v. U.S. Bureau of Land Mgmt.*,
 438 F.3d 1074 (10th Cir. 2006) ............................................................................. 23, 25

*Satanic Temple, Inc. v. Saucon Valley Sch. Dist.*,
 671 F. Supp. 3d 555 (E.D. Pa. 2023) ..................................................................... 20, 46

*Smiley v. Citibank (S. Dakota), N.A.*,
 517 U.S. 735 (1996) .................................................................................................. 35

*Somerville Pub. Schs. v. McMahon*,
 139 F.4th 63 (1st Cir. 2025) ...................................................................................... 44

*State Sportsmen's Ass'n, v. Del. Dep't of Safety & Homeland Sec.*,
 108 F.4th 194 (3d Cir. 2024) ................................................................................. 19, 23

*Treasurer of N.J. v. U.S. Dept. of Treasury*,
 684 F.3d 382 (3d Cir. 2012) ................................................................................. 22, 23

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
 578 U.S. 590 (2016) ............................................................................................. 23, 29

*United States v. Nixon*,
 418 U.S. 683 (1974) .................................................................................................. 35

*Veterans Guardian VA Claim Consulting LLC*,
 133 F.4th ................................................................................................................... 39

*Washington v. Reno*,
 35 F.3d 1093 (6th Cir. 1994) ..................................................................................... 44

*Winter v. Nat'l Res. Def. Couns., Inc.*,
 555 U.S. 7 (2008) ................................................................................................. 19, 44

## Statutes

5 U.S.C. § 701(a)(2) ...................................................................................................... 36, 37
5 U.S.C. § 702 ........................................................................................................... 22, 23, 26
16 U.S.C. § 407m ............................................................................................................ 2, 37
16 U.S.C. § 407n ............................................................................................... 2, 26, 38, 39
28 U.S.C. § 1346(a)(2) ......................................................................................................... 23

28 U.S.C. § 1491(a)(1) ................................................................................................. 25
28 U.S.C. § 1491(a)(2) ................................................................................................. 25
31 U.S.C. §§ 6501-6508 ............................................................................................... 10
54 U.S.C. § 100502 ...................................................................................................... 34
54 U.S.C. § 306108 ...................................................................................................... 32
54 U.S.C. § 308302 ................................................................................................ 15, 31
P.L. 105-203, Section 2(a)(2) ...................................................................................... 31
Public Law 105-203 ..................................................................................................... 14
Public Law 109-59 ......................................................................................................... 7

## Rules

Federal Rule of Civil Procedure 65 ............................................................................... 1

## Other Authorities

11A Fed. Prac. & Proc. Civ. § 2951 (3d ed.) ............................................................... 20
Executive Order 14253 ................................................................................................ 36
H.R. 490 ......................................................................................................................... 6

Plaintiff the City of Philadelphia (the "City" or "Philadelphia"), by and through its undersigned counsel, hereby files this Memorandum of Law in Support of its Amended Motion for Preliminary Injunction and Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65.

## I.    <u>INTRODUCTION</u>

On January 22, 2026, Defendants abruptly removed display panels from and ceased videos playing at the President's House, a building and exhibit on the grounds of Independence National Historical Park in Philadelphia. The removed materials collectively educated the public about the history of the nine persons enslaved by the Washington family at that site. The removed materials also educated the public about the dynamic history of the free Black population in Philadelphia at and around that same time, about the Commonwealth of Pennsylvania's manumission law, the Washingtons' concerted efforts to avoid application of the Commonwealth manumission law to those persons they held in slavery, and the journey to freedom of one woman held in slavery specifically by Martha Washington.

The City has filed suit, contending that in erasing this history from the President's House, the United States has acted unlawfully. And by this motion, the City seeks an Order directing that the Secretary of the Interior and the National Park Service restore the panels and the videos to the President's House, because any such changes to the buildings and grounds in Independence National Historical Park cannot be made except by mutual agreement. That Interior and the National Park Service removed these materials without abiding by the statutory mandate is an arbitrary and capricious, ultra vires agency action that can and should be reversed by this Court.

Entry of an injunction is further warranted by the clear evidence that the removal of the educational materials causes continuing and irreparable harm, that the public interest favors

- 1 -

reversal of this action, and that the balancing of the harms weighs clearly in favor of the City. Both the law and the evidence support entry of an injunction, for the reasons that follow.

II.    **BACKGROUND**

### A. The Establishment of Independence National Historical Park and the Beginning of the Collaborative History Between the City and the Federal Government at and Around Independence Mall

Congress established Independence National Historical Park in 1948, "[f]or the purpose of preserving for the benefit of the American people as a national historical park certain historical structures and properties of outstanding national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States[.]"  16 U.S.C. § 407m.  In detailing how the creation of the park would be accomplished, Congress also instructed that the Secretary of the Interior was authorized to enter into agreements with the City of Philadelphia to "assist in preservation and interpretation of the property," and "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts."  16 U.S.C. § 407n.

Within two years of this statutory instruction, the Secretary of the Interior and the City of Philadelphia entered into a Cooperative Agreement (the "1950 Cooperative Agreement").  Article I(a) of that agreement permitted the Secretary to occupy the grounds "for the purposes of preserving, exhibiting, and interpreting them to the American people."  (*See* 1950 Cooperative Agreement, Prelim. Inj. Hr'g Ex. 1 (Doc. No. 36-1).)  The curatorial responsibility reserved to the Secretary included the "care and display of museum objects, furnishings, or exhibits of historic interest as may be available in the Independence Hall group of buildings for exhibit and

interpretive purposes, including the right to rearrange furniture and exhibits and to determine accession policy for items to be utilized in the museum or interpretive program." (*Id.* at I(b).)

The Secretary agreed to "exercise reasonable care to prevent damage to, or destruction of, any part of the grounds and buildings or their appurtenances." (*Id.* at Art. II(b).) Consistent with the statutory mandate in the 1948 act that created Independence Park, the parties specifically covenanted that "any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon." (*Id.* at Art. III(c).) They agreed that "neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet, or other memorial, in or upon the buildings or grounds without the written consent of the other." (*Id.* at Art. III(d).) The parties also committed that "it is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States, and to secure this result a high degree of cooperation is necessary with each other and with other bodies participating in the project, to wit, the Commonwealth of Pennsylvania, Christ Church, Carpenters' Company of Philadelphia, and Independence Hall Association, and the parties hereto pledge themselves to consult on all matters of importance to the program." (*Id.* at Art. III(e).) The 1950 Agreement "continue[s] in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination." (*Id.* at Art. III(j).) The Agreement does not involve any exchange of goods or services and has no monetary value. (*See generally id.*) Instead, it lays out the parameters by which two governments must collaborate to create a site that benefits the public.

**B.  The Demand for and Development of Commemoration and Interpretation at the President's House**

In 1997, the National Park Service (the "NPS") and the Philadelphia community developed a Master Plan for the redesign of the three blocks of Independence Park incorporating several new buildings: the Liberty Bell Center, the Independence Visitor Center, the Independence Park Institute, and the National Constitution Center.  (*See* Request for Qualifications ("RFQ"), Prelim. Inj. Hr'g Ex. 14 (Doc. No. 36-15) at 3.)

As the new buildings and landscape were being designed and constructed, however, new and important information came to light regarding a long-forgotten component of Independence Park: the location of the executive mansion occupied between 1790 to 1800, first by President Washington and then by President Adams (the "President's House").  (*Id.*)  This uncovered history—brought to the public's attention initially by Edward Lawler, Jr., an independent scholar, in January 2002—highlighted the fact that, during the initial years of our country, itself founded upon core values of liberty, enslaved persons lived in the President's House and were held in bondage by George and Martha Washingon.  (*See* Edward Lawler, *The President's House in Philadelphia: The Rediscovery of a Lost Landmark*, Pa. Magazine of History and Biography (Jan. 2002), *available at* https://www.ushistory.org/presidentshouse/history/pmhb/index.php.)  In his seminal piece of scholarship regarding this neglected part of our history, Lawler also recounted why it had become so important on an emotional level that the full story of the President's House be told:

> An extraordinary juxtaposition will be in place when the LBC [Liberty Bell Center] is completed, one which seems to have occurred by accident . . . . The last thing that a visitor will walk across or pass before entering the Liberty Bell Center will be the slave quarters that George Washington added to the President's House.

(*Id.*)  Following the publication of this research, Independence Park initially announced it had no immediate plans for archeological exploration and "that it would not change its interpretive plans

for the site." (*See* URS Corp., NPS, and Independence Park, *The Archeology of Freedom and Slavery Excavations at the President's House Site in Philadelphia* (Nov. 2009, Revised Sept. 2023), *available at* https://npshistory.com/publications/inde/pres-house-excavations.pdf.)

Public outcry ensued. (Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 2.) Self-appointed oversight, advocacy, and activist support groups formed, such as Avenging the Ancestors Coalition ("ATAC"), Generations Unlimited, and the Ad Hoc Historians, a coalition of area historians, among others. (*See* RFQ, Prelim. Inj. Hr'g Ex. 14 (Doc. No. 36-15) at 4.) Together, the coalitions began pressing NPS to commemorate not only the President's House, but also the long-obscured story of slavery within it. (*See* Ex. A, Prelim. Inj. Hr'g Tr. at 40:19 — 41:21.) Their principal unifying theme stressed that "the experience of the Liberty Bell could not be complete without a full portrayal of the economic role enslaved and free Africans played in this country's formation." (*See* RFQ, Prelim. Inj. Hr'g Ex. 14 (Doc. No. 36-15) at 4.) Joining the community and activist voices, NPS Chief Historian Dwight Pitcaithley also wrote to Independence Park's superintendent to urge her to consider a different perspective:

> The contradiction in the founding of the country between freedom and slavery becomes palpable when one actually crosses through a slave quarters site when entering a shrine to a major symbol of the abolition movement . . . . How better to establish the proper historical context for understanding the Liberty Bell than by talking about the institution of slavery? And not the institution as generalized phenomenon, but as lived by George Washington's own slaves. The fact that Washington's slaves Hercules and Oney Judge sought and gained freedom from this very spot gives us interpretive opportunities other historic sites can only long for. This juxtaposition is an interpretive gift that can make the Liberty Bell "experience" much more meaningful to the visiting public. We will have missed a real educational opportunity if we do not act on this possibility.

(*See* Gary Nash, *For Whom Will the Liberty Bell Toll? From Controversy to Collaboration*, The George Wright Forum, Vol. 21, No. 1 (Mar. 2004) at 46-47, *available at*

https://www.jstor.org/stable/43597891?seq=9.)[1]  Elected representatives on the federal, state,

local level would soon add to the chorus of pleas. The U.S. House of Representatives Committee

on Appropriations, in a July 2022 report on the Department of Interior and Related Agencies

appropriations bill, stated that:

> The Committee is aware of recent developments relating to the identification of the
> site of the first official residence of the President of the United States at the current
> location of Independence National Historical Park in Philadelphia, Pennsylvania.
> It has been discovered that George Washington and his household, including eight
> [sic] African American slaves, were quartered at the first Executive Mansion for six
> and one half years.  **Therefore, given the historical significance of this issue, the**
> **Committee urges the National Park Service to appropriately commemorate**
> **the concerns raised regarding the recognition of the existence of the Mansion**
> **and the slaves who worked in it during the first years of our democracy.**
> Furthermore the Committee directs the Director of the National Park Service to
> submit a report to the Committee no later than March 31, 2003, detailing the actions
> taken at Independence National Historical Park to property address and resolve this
> issue.

(*See* 2003 U.S. House of Representatives Report 107-564, Prelim. Inj. Hr'g Ex. 2 (Doc. No. 36-

2) at 47) (emphasis added.) That same year, the Pennsylvania House of Representatives passed

House Resolution 490, which "[u]rg[ed] the National Park Service to erect a commemorative

plaque in recognition of the slave quarters located on the site of the planned Liberty Bell

Pavilion." (*See* H.R. 490, 2001-2002 Gen. Assemb., Reg. Sess. (Pa. 2002),

https://www.palegis.us/legislation/bills/text/PDF/2001/0/HR0490/PN3509.) Shortly thereafter,

Philadelphia City Council passed its own resolution advocating for NPS to "appropriate[ely]

memorializ[e]" "the human beings of African descent held in bondage at the President's House."

---

[1] While the Washingtons' cook at President's House, Hercules Posey, did escape from bondage,
he did so from the Washingtons' Virginia home of Mount Vernon, not from the President's House
site. Hercules left on George Washington's birthday, February 22, 1797, while the President held
a ball in Philadelphia. Hercules Posey,
https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/hercules.

(*See* Phila. Council Resolution No. 020521 (Sept. 12, 2002), available at

https://phila.legistar.com/legislation.aspx.)

In October 2003, the City, under the leadership of then-Mayor John Street, committed

$1.5 million of City funds toward commemoration efforts for the President's House.  (Press

Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 2.; Ex. A, Prelim. Inj. Hr'g

Tr. (Jan. 30, 2026) at 39:4-40:8.)  Publicly announced at the opening of the new Liberty Bell

Center, this funding commitment marked the beginning of the formal development of the

President's House. (*Id*.)   Two years later, driven by advocacy from the local delegation,

Congress appropriated $3.6 million for "Independence National Historic [sic] Park scenic

enhancement and pedestrian walkways improvement project in conjunction with the Park's

Executive Mansion Exhibit."  (*See* 119 Stat. 1308, Public Law 109-59 (Aug. 10, 2005); Press

Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 2.)

By 2005, despite its earlier resistance, NPS and Independence Park would become "a full

and enthusiastic partner" with the City.  (*See* RFQ, Prelim. Injun. Hr'g Ex. 14 (Doc. No. 36-15)

at 4.)  Indeed, in a briefing statement regarding work at the grounds, NPS wrote that:

> NPS fully recognizes that the President's House site is one of very great historical
> significance and that it carries tremendous cultural and emotional significance for
> community groups. The site has much to teach us about the birth of our nation and
> the intertwined themes of slavery and freedom.

(*See* URS Corp., NPS, and Independence Park, *The Archeology of Freedom and Slavery*

*Excavations at the President's House Site in Philadelphia* (Nov. 2009, Revised Sept. 2023) at

Appendix A at 13, *available at* https://npshistory.com/publications/inde/pres-house-

excavations.pdf.)  In October 2005, the City and NPS issued a nationally distributed Request for

Qualifications to implement the vision of President's House advanced through advocacy efforts

and public engagement. The RFQ contemplated "the design of a permanent, outdoor

commemorative installation to be placed on the footprint of the President's House," setting forth core design requirements reflecting substantive themes and cultural values that emerged from an earlier public forum.  (RFQ, Doc. No. 36-15 at 9-10.)  It further explained that the President's House "offers an opportunity to tell a story of national importance in an honest, inspiring, and informative way" and that "Independence Park considers this project to be one of the top interpretive opportunities that the National Park Service has to offer."  (*Id.* at 2.)

The City and NPS also convened a formal Oversight Committee to help guide development to represent the public interest in the selection process.  (*See* Doc. No. 36-15 at 4.)  Compromised of key stakeholders, the City and Independence Park described this committee in subsequent joint press releases as "made up of representatives of the advocacy groups who fought hardest for this commemoration – historians, community activists, and others who understand the national significance of this undertaking."  (Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 2.)  Included were ATAC, Generations Unlimited, Philadelphia's African American Museum, the Convention and Tourism Bureau, Independence Hall Association, the Ad Hoc Historians, the Superintendent of Independence Park, the Mayor's Chief of Staff for the City, and designees from Congressman Brady and Fattah.  (*Id.*)

Following the issuance of the RFQ, five semi-finalists were identified.  (Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 2.)  The City and NPS thereafter issued a Request for Proposal (the "RFP") for final selection.  (*See* RFP, Prelim. Inj. Hr'g Ex. 15 (Doc. No. 36-16).)  The City provided funding for the bidders to create three-dimensional models of their proposals, which were placed on public display at the National Constitution Center and African American Museum in Philadelphia.  (Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 3; Ex. A, Prelim. Inj. Hr'g Tr. (Jan. 30, 2026) at 47:20-48:11.)  Nearly

1,000 visitors completed evaluation cards.  (Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex.

17 (Doc. No. 36-18) at 3.)  These evaluations were reviewed by the Oversight Committee and

posted on the City's website. (*Id.*) This process reflected the understanding that public input was

essential to the development and vision of President's House.  (Ex. A, Prelim. Inj. Hr'g Tr. (Jan.

30, 2026) at 48:4-22.)

In February 2007, the City and Independence Park jointly announced the selection of

Kelly/Maiello Architects and Planners.  (Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17

(Doc. No. 36-18) at 3; Additional Information Proposal for Design, Fabrication, and Installation

for THE PRESIDENT'S HOUSE: Freedom and Slavery in Making a New Nation (Aug. 21,

2006), Prelim. Inj. Hr'g Ex. 16 (Doc. No. 36-17).)  In connection with this announcement, both

the government partners stressed the significance of this endeavor.  Mayor Street stated that:

> This is a great day for Philadelphia and our nation.  We are one huge step closer to
> fulfilling an obligation to tell the truth – the whole, complicated truth – about this
> small parcel of land on the doorstep of the Liberty Bell Center . . . I got personally
> involved in this project because enslaved Africans lived in our first President's
> household right here in Philadelphia – and most visitors to these symbols of
> liberty and justice, even now, are completely unaware of this terrible truth. That is
> about to change."

(Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 3.)

Independence Park Superintendent Dennis Reidenbach also added that:

> This project is a collaboration among the City of Philadelphia, the National Park
> Service, and so many others. With this commemoration, Independence National
> Historical Park will be at the forefront of national parks that address the issues of
> freedom and slavery. I could not be more pleased with the opportunity this project
> offers to teach and remember.

(*Id.*)

### C.  The City and the United States Enter Into Cooperative Agreements for President's House

The path from the commitment of funding to the actual creation of the President's House, "the first federal property to feature a slave memorial," demonstrates the mutual agreement and partnership that Congress mandated for changes to the buildings and grounds of Independence Park.  In 2006, the City and the United States – acting through the NPS – entered into a Cooperative Agreement "for the President's House Project and Archeological Research Dig" (the "2006 Cooperative Agreement).  (*See generally* 2006 Cooperative Agreement, Prelim. Inj. Hr'g Ex. 1 (Doc. No. 36-3).)  The parties acted "in accordance with the Intergovernmental Cooperation Act, 31 U.S.C. §§ 6501-6508," and desired "to establish an exhibit at the Park that illuminates the history of the site of the former President's House, located directly north of the Liberty Bell Center, (where Presidents George Washington and John Adams lived and where at least nine enslaved Africans – kept by George Washington – also lived) and its symbolic importance to the founding of the United States[.]"  (*Id.* at E.)  In entering this agreement, the parties acknowledged "that final Project designs [were] subject to the approval of the Superintendent of the Park and the Mayor of the City of Philadelphia, or their designees."  (*Id.* at F.)  The United States acknowledged that "providing funds for the Project and Research dig fulfills **the public purpose requirement** because it enables the City to commemorate the symbolic and historical importance of the Presidents' House for the City of Philadelphia, its citizens, and all Americans nationwide, and by doing so, **there is a public benefit inuring to the City**."  (*Id.* at K (emphasis added).)  These background terms were expressly incorporated into the 2006 Cooperative Agreement, *id.* at ¶ 1, which also provides that "the terms, covenants and conditions contained in this Agreement shall extend to and be binding upon the parties hereto and their respective successors and assigns."  (*Id.* at ¶ 15.)

The United States and the City entered into amendments to this Cooperative Agreement as needed, to address issues that arose during the design, archeological dig, and construction of the President's House.  (*See* First Amendment to Cooperative Agreement (2007), Second Amendment to Cooperative Agreement (2008), Third Amendment to Cooperative Agreement (2009), Prelim. Inj. Hr'g Exs. 4-6 (Doc. Nos. 366).)  One such amendment, executed in 2009, included as an exhibit the Project Development Plan, which stated that "site interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."  (Third Amendment to Cooperative Agreement (2009), Prelim. Inj. Hr'g Exs. 6 (36:6) at Ex. C, Project Development Plan, at B.)  NPS committed to "review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended.  All review by the NPS will be reasonable and timely."  (*Id.* at D.2.)

### D.  The Completion of the President's House, the First Federal Property to Feature a Slave Memorial

In December 2010, the President's House opened to the public.  (Press Release (Dec. 15, 2010), Prelim. Inj. Hr'g Ex. 23 (Doc. No. 36-24).)  Formally titled "President's House: Freedom and Slavery in the Making of a New Nation," officials characterized it as one of "major international importance because it recognizes the broader picture of the people who participated in this nation's early history, including enslaved and free people of African descent."  (*Id.* at 1.)  Cynthia MacLeod, Superintendent of Independence Park, stated upon its opening that:

> From its inception, this project has generated conversation and discovery, and we hope it will continue to do so. Benefitting from the voices of citizens and guiding legislation from the U.S. Congress and the collaboration between the City of Philadelphia and the National Park Service, the project is a welcome addition to Independence National Historical Park.

(*Id*. at 3.)  Notably, when the President's House opened in 2010, it became the first federal property to feature a slave memorial.  (*See* Roger C. Aden, Upon The Ruins Of Liberty: Slavery, The President's House At Independence National Historical Park, And Public Memory, Smithsonian Libraries and Archives, available at https://www.si.edu/object/upon-ruins-liberty-slavery-presidents-house-independence-national-historical-park-and-public-memory%3Asiris_sil_1090980.)

However, despite the ceremonial introduction, the President's House was not yet finished. The City would work and provide additional funding for another five years – even when it was itself facing dire financial straits – to ensure to ensure completion in accordance with the expectations and demands of the public.  (Ex. A, Prelim. Inj. Hr'g Tr. (Jan. 30, 2026) 70:4-17, 73:9-82:8.)

The President's House reached formal completion by the end of 2015. The final project reflected over a decade of public collaboration and executed the original vision: to "commemorate all those who lived in the house while it was used as the executive mansion, including the nine enslaved Africans brought by George Washington from Mt. Vernon." (*See* Third Amendment to Cooperative Agreement (2009), Prelim. Inj. Hr'g Ex. 6 (Doc. No. 36-6) at Attachment A at 1; Photographs (Apr. 2015), Prelim. Inj. Hr'g Ex. 14 (Doc. Nos. 36:11-12).)



(*See* Independence Park, Visiting the President's House Site Website (Jan. 22, 2026), Prelim. Inj. Hr'g Ex. 9 (Doc. No. 36-9).)  Key to the site design is the basic footprint of the house that allows visitors to walk through the first floor as it was laid out in the late 18th century.  (Press Release (Dec. 15, 2010), Prelim. Inj. Hr'g Ex. 23 (Doc. No. 36-24).)  The bowed window, state dining room, and kitchen complete with hearth are among the elements in the recreated layout.  (*Id.*) Narrative Porcelite exhibit panels and glass illustrations using an "if these walls could talk approach" provide visitors with a sense of events that occurred during Philadelphia's early history. (*Id.*) Five video re-enactments depict what life was like for the enslaved persons living in the Washington household. (*Id.;* Script for Video Media (2010), Prelim. Inj. Hr'g Ex. 12 (Doc. No. 36-13).)  This media reflected Oversight Committee's determination that it should "tell the stories that are not often told and share the perspectives of the people who up to now have been nameless and voiceless."  (Press Release (Dec. 15, 2010), Prelim. Inj. Hr'g Ex. 23 (Doc. No. 36-24).)   A glass vitrine structure is the centerpiece of the interpretive design and houses elements of the 18th century structure that were unexpectedly uncovered during a 2007 archeological dig. (*Id.*)   A few feet from the entrance to the Liberty Bell Center sits a small glass structure that

serves as a memorial to the enslaved Africans. (*Id.*)  Listing the names of the African tribes of origin for many enslaved, the space is intended as a place of solemn reflection. (*Id.*)

As of January 21, 2026, NPS and Independence Park continued to inform visitors of the full history of the President's House per their nearly two-decade long commitment**:**

> In the 1790s, at the President's House location at Sixth and Market Streets, Presidents George Washington and John Adams lived and conducted their executive branch business.  Washington brought some of his enslaved Africans to this site and they lived and toiled with other members of his household during the years that our first president was guiding the experimental development of the young nation toward modern, republican government.  Washington's large household, including enslaved African descendants, contrasted with Adams' small household.  Adams never owned slaves.

> The President's House in the 1790s was a mirror of the young republic, reflecting both the ideals and contradictions of the new nation.  The house stood in the shadow of Independence Hall, where the words "All men are created equal" and "We the People" were adopted, but they did not apply to all who lived in the new United States of America.

(*See* Independence Park, Visiting the President's House Site, https://www.nps.gov/inde/learn/historyculture/ places-presidentshousesite.htm (last accessed Feb. 6, 2026).)

### E.  Congress Seeks to Preserve and Honor Locations Associated with the Underground Railroad

Perhaps anticipating the issues that would arise a few years later in Philadelphia, notably the discovery of what had been lost history, Congress passed the National Underground Railroad Network to Freedom Act in 1998, Public Law 105-203.  In that Act, Congress found that the "Underground Railroad bridged the divides of race, religion, sectional differences, and nationality; spanned State lines and international borders; and joined the American ideals of liberty and freedom expressed in the Declaration of Independence and the Constitution to the extraordinary actions of ordinary men and women working in common purpose to free a people."

*Id.* That Congress also found that the "National Park Service can play a vital role in facilitating the national commemoration of the Underground Railroad." *Id.* To that end, the NPS was directed to establish a "National Underground Network to Freedom" program, and to "produce and disseminate appropriate educational materials[.]" *Id.*; *see also* 54 U.S.C. § 308302 (the 2014 codification of this program under Title 54, from its prior location under Title 16). In Section 308303 of that Title, Congress permits the Secretary to make grants in furtherance of the goals of preservation and restoration of historic buildings associated with the Underground Railroad, subject to the condition that "(1) no change or alteration may be made in property for which the grant is used except with the agreement of the property owner and the Secretary[.]"

In 2022, an application was submitted for designation of the President's House as a Network to Freedom Site. (*See Application and Approval for Presidents House in Underground Railroad Network*, Prelim. Inj. Hr'g Ex. 10 (Doc. No. 36-10).) That application contains a fulsome description of the history of the site, the specific history of Ona Judge's escape from enslavement via the Underground Railroad, and the history of the site's development. (*Id.* at 8.) The then-superintendent of Independence Park, Cynthia MacLeod, submitted her consent in her official capacity "to the inclusion of the President's House Site in the National Park Service National Underground Railroad Network to Freedom." (*Id.* at 28.) The application was granted, and the President's House is now a Network to Freedom site. (*See* NPS, Underground Railroad: Explore Network to Freedom Listings, https://www.nps.gov/subjects/undergroundrailroad/ntf-listings.htm.)

### F. NPS Issues the Current "Foundation Document" for Independence National Historical Park

In September 2017, NPS issued the current Foundation Document for Independence Park. (*See* Independence National Historical Park Foundation Document (2017), Prelim. Inj.

Hr'g Ex. 8 (Doc. No. 36-8).)  Every "unit" (or park) of the National Park System has a

"foundational document to provide basic guidance for planning and management decisions."

(*See* NPS, Foundation Documents, https://www.nps.gov/subjects/parkplanning/foundation-

documents.htm (last viewed Feb. 5, 2026).)  The documents "aim to answer several key

questions, including":

- What is the purpose of this park?
- Why was it included in the national park system?
- What makes it significant?
- What are its fundamental resources and values?
- What legal and policy requirements, special mandates, and administrative commitments apply to this park?

*Id.*

President's House is listed as a "Core Component" of Independence Park.  (*See id*. at 11.)

"The site of the President's House, where George Washington and John Adams and their

households lived and worked during their terms as the first and second presidents of the United

States, prior to Adams' move to the White House in 1800, is interpreted by the park, especially in

the paradox of the Washingtons bringing their enslaved people to work and live there."  (*Id.*)

The Foundation Document also explains:

> [w]ith so many important places under its care, Independence National Historical Park works collaboratively with many partners and stakeholders in the stewardship of our national heritage. The park works closely with the city of Philadelphia and the state of Pennsylvania, and with the Independence Visitor Center Corporation jointly managing the Independence Visitor Center located on 6th and Market Streets.
>
> . . .
>
> There are numerous civic organizations, nonprofit groups, corporations, and countless stakeholders locally, nationally, and internationally that the park engages with on a regular basis. The diverse interests and passion of the park's many partners and stakeholders reflect the importance of buildings and resources protected by Independence National Historical Park.

(*Id.* at 12.)

The Foundation Document describes the significance of Independence Park through "significance statements," including the "Paradox of Freedom and Slavery." (*Id.* at 15.) Describing the efforts to agree on the Constitution that replaced the Articles of Confederation, NPS highlights the resulting document that "did not address the issues of slave ownership or the emancipation of individuals held in bondage," and thus created "the paradox of a nation conceived in liberty but once bound by legalized slavery can be explored at Independence National Historical Park." (*Id.* at 15.) Discussing the Park's "Fundamental Resources and Values," the Foundation Document notes:

> Archeological investigations at the President's House Site revealed physical connections to the enslaved in President George Washington's household. This information was used to guide future development at the site. Based on these discoveries, the park designed its first community-based exhibition at the President's House archeological site that interprets race and slavery in its historic context.

(*Id.* at 17.) NPS even touts its "Pioneering Partnerships and Collaboration" as a "fundamental value":

> As a fundamental value, partnerships and working collaboratively with numerous state, local, and nonprofit organizations is essential to the success of the park. The dynamic role of partnerships at the park is best illustrated by Independence National Historical Park's close working relationship with the City of Philadelphia, which still owns the most iconic building Independence Hall and resources such as the Liberty Bell.

(*Id.* at 18) Finally, the Foundation Document identifies "Interpretive Themes" for Independence Park, including "Liberty: The Promises and the Paradoxes." The Foundation Document explains that "[t]he promises of liberty and equality granted in the founding documents present a paradox: not only are they ideals to strive for but they are unfulfilled promises for people who struggle to be fully included as citizens of our nation." (*Id.* at 19.)

### G. The President's House Property is Abruptly Altered by the Removal of the Exhibit

On January 22, 2026, employees of NPS removed nearly all of the panels and videos that

explained "the house and the people who lived and worked there, the Executive Branch of the

U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the

move to freedom for the enslaved." (2009 Am. to Coop. Agreement, Attachment C, Project

Development Plan, Prelim. Inj. Hr'g Ex. 6 (Doc. No. 36-6 at 24).)



(*See* Photographs (Jan. 28, 2026), Prelim. Inj. Hr'g Ex. 24 (Doc. Nos. 36-25 to 36-28).)  Within

hours, the entire context, essential to the grounds of the President's House, was gone, stored in a

warehouse space below the National Constitution Center.  (*See* Declaration of Steven Sims (Jan.

27, 2026) (Doc. No. 27-1) at ¶ 8.)  NPS did this without having made any outreach to the City of

Philadelphia, without having performed any consultation, and certainly without mutual agreement.  (Ex. A, Prelim. Inj. Hr'g Tr. (Jan. 30, 2026) at 103:25-104:7.)

### H.  Procedural History

On January 22, 2026, the City filed the first Complaint and initial Motion for Preliminary Injunction in this case. (Doc. Nos. 1 & 2.) On January 28, 2026, Defendants filed their Memorandum of Law in Opposition to the City's Motion along with an Affidavit signed by the Superintendent of Independence Park. (Doc. Nos. 27 & 27-1.) The Affidavit indicated that one remaining sign at President's House, "made of wood and located at the southern end of the site in a stand alone structure made of metal," was not removed on January 22 "because additional tools were needed to do so." (Doc. No. 27-1 ¶ 7.)  An evidentiary hearing was held on January 30, 2026, on the City's initial request for preliminary injunction.

## III.    <u>LEGAL STANDARD</u>

To obtain a preliminary injunction, a plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities, considering the harm to be suffered by the other party if relief is granted, tips in its favor; and (4) preliminary relief is in the public interest. *Winter v. Nat'l Res. Def. Couns., Inc.*, 555 U.S. 7, 20 (2008); *Del. State Sportsmen's Ass'n, v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 201–02 (3d Cir. 2024).  In the Third Circuit, "[a] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors" - that is, "it must demonstrate that it can win on the merits" and "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief" - before the court moves on to the final two factors. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If both of "these gateway factors are met," the court will "consider the remaining two . . . and determin[e] in its sound

discretion if all four factors, taken together, balance in favor of granting the requested

preliminary relief." *Id*.  In exercising its sound discretion while balancing the four factors, the

court can be guided by the principle that "'How strong a claim on the merits is enough depends

on the balance of the harms: the more net harm an injunction can prevent, the weaker the

plaintiff's claim on the merits can be while still supporting some preliminary relief.'" *Id.*

(quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721,

725 (7th Cir. 2009)).  This balance weighs in favor of granting relief here.

A preliminary injunction serves to maintain the status quo pending the resolution of the

litigation.  *Kos Pharma., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The "status quo"

is "defined as the last, peaceable, noncontested status of the parties." *Id.* (quoting *Opticians*

*Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)).  Courts may issue

prohibitory or mandatory injunctions; a prohibitory injunction "maintains that status quo until a

decision on the merits of a case is rendered," *Satanic Temple, Inc. v. Saucon Valley Sch. Dist.*,

671 F. Supp. 3d 555, 566 (E.D. Pa. 2023) (quoting *C.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp.

3d 430, 438 (E.D. Pa. 2021)), while a mandatory injunction "alters the status quo" and

"provid[es] the moving party with substantially all the relief sought and that relief cannot be

undone even if the defendant prevails at a trial on the merits." *Id.* (quoting *C.G.*, 571 F. Supp. 3d

at 438).

"The standards for a temporary restraining order are the same as those for a preliminary

injunction." *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994). The purpose of a temporary

restraining order is to maintain the current status while a motion for preliminary injunction is

under consideration by the court. *See* § 2951 Temporary Restraining Orders—In General, 11A

Fed. Prac. & Proc. Civ. § 2951 (3d ed.)

IV.    **ARGUMENT**

Based upon the record presently before the Court, the City is entitled to entry of an injunction that restores the President's House to its condition before NPS unlawfully removed the panels and videos.  The City has a recognized property right in the public benefit that inured to the City – as expressly recognized by the United States – in the construction and contents of the President's House as it was fulsomely described in the contracting documents.  The City has an implicit statutory right to consultation about changes to Independence Park, and an explicit statutory prohibition on changes to buildings and grounds, without mutual agreement.

The unilateral actions of NPS breached the agreements between the United States and the City.  NPSs actions in violation of Title 16, Section 407n, in violation of the National Underground Railroad Network to Freedom Act, and in violation of the site-specific guidance documents were arbitrary and capricious.  In the alternative, NPS acted outside its statutory authority when it took unilateral action affecting the grounds of Independence Park, such that the action is *ultra vires*.

As explicated further below, the City has a likelihood of success on the merits of its claims.  The City is irreparably harmed by the destruction of the President's House.  And the public harm, and weighing of equities, overwhelmingly favors entry of an Order restoring the President's House to its condition as of January 21, 2026.  The City addresses these issues *seriatim*.

**A.  The City is Likely to Succeed on the Merits of its Claims**

"The Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(a)(2) – which means, of course, any law, and not merely those laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).  "The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Treasurer of N.J. v. U.S. Dept. of Treasury*, 684 F.3d 382, 396 (3d Cir. 2012) (quoting *Franklin v. Mass.*, 505 U.S. 788, 796 (1992)).

"Section 702 authorizes persons injured by agency action to obtain judicial review by suing the United States or one of its agencies, officers, or employees." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 807 (2024).  It "provides both a waiver of sovereign immunity and a right of judicial review." *NVE, Inc. v. Dept. of Health and Hum. Servs.*, 436 F.3d 182, 189 (3d Cir. 2006).  Pursuant to that statute, a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Here, this requires the City "to show, at the outset of the case, that [it] is injured in fact by agency action[,]" and to identify the alleged injury is cognizable under law.  *Dir., Off. of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 127 (1995).

Turning to Sections 704 and 706 of the Administrative Procedure Act, "[u]nless another statute makes the agency's action reviewable, judicial review is available only for final agency action."  *Corner Post*, 603 U.S. at 808.  "In most cases, then, a plaintiff can only challenge an action that marks the consummation of the agency's decisionmaking process and is one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.*

- 22 -

(quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  The court takes a pragmatic approach to determining finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

The City challenges NPS's removal of panels that comprise an essential part of the President's House, which removal was done in contravention of the NPS's obligations under long-standing collaboration agreements, its designation as a Network to Freedom site, its Foundation Document, and the prohibition in Title 16 of the U.S. Code against making changes or alterations to the property except by mutual agreement.  As a result of those violations, the actions of the NPS are *ultra vires*.

          1.   The City Has Established a Likelihood of Success on the Merits of its Breach of Contract Claim, brought pursuant to 5 U.S.C § 702.

Section 702 of the Administrative Procedure Act permits challenge of agency action where a plaintiff is not seeking money damages.  5 U.S.C. § 702.  As explained by the Third Circuit Court of Appeals in *Treasurer of New Jersey v. U.S. Dept. of Treasury*, 684 F.3d 382 (3d Cir. 2012), Section 702 provides a general waiver of sovereign immunity for legal wrong, not limited to final agency action, where the sought relief is not money damages.  *See also, e.g.*, *Air Marshal Assn. v. Sec'y of Dept. of Homeland Sec.*, No. 22-2254, 2025 SL 388814, at *4-5 (E.D. Pa. Feb. 4, 2025).  The City makes such a claim here.[2]

As thoroughly reviewed above, the history of the development of Independence Park, and specifically the President's House, is replete with instances and examples of the United States and the City entering into collaboration agreements that outline the duties and responsibilities of

---

[2] The City notes that in its oral argument to the Court on Friday, January 30, counsel stated that this Court had subject matter jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), because the value of the contracts at issue are under $10,000.  Upon further review, and consistent with counsel's obligations as a member of the bar, the City withdraws this contention because the Little Tucker Act impliedly forbids federal courts from ordering specific performance, the remedy sought here.  *See, e.g.*, *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006).

each government regarding development and stewardship of these nationally important assets. None of the agreements included payments by the United States to the City.  Particularly for the development of the President's House, the cooperation agreements largely describe the work that the City would undertake to develop and construct the building before donating it to Independence Park as an addition to the buildings and grounds that comprise that Park.  The United States' failure to conform to the terms of its agreement does not cause specific monetary damage – and does not result in a failure to pay promised funds – to the City.  The only remedy to which the City is entitled are equitable, that the United States be enjoined to undo the harm it caused and comply with its contractual obligation to make changes to the buildings and grounds only by mutual agreement.

The United States' failure to meet its obligations surely is a legal wrong.  The issue is whether it is a legal wrong over which this Court has subject matter jurisdiction, a question governed by the terms of and tension between the Tucker Act and the Administrative Procedure Act.  In analyzing the jurisdictional waivers – and thereby the claims cognizable in the Court of Federal Claims and the Federal District Courts – of the Tucker Act and that of the Administrative Procedure Act, the Supreme Court quoted with approval the 1970 testimony of Dean Cramton before Congress, notably that "today the doctrine of sovereign immunity may be satisfactory to technicians but not at all to persons whose main concern is with justice . . . .  The trouble with the sovereign immunity doctrine is that it interferes with consideration of practical matters, and transforms everything into a play on words."  *Bowen v. Mass.*, 487 U.S. 879, 912 (1988).  And the *Bowen* court further observed, "the Claims Court does not have the general equitable powers of a district court to grant prospective relief.  Indeed, we have stated categorically that the Court of Claims has no power to grant equitable relief."  *Id.* at 905.

By its plain terms, the Tucker Act provides a waiver of sovereign immunity and vests jurisdiction in the Court of Federal Claims for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). The Court of Federal Claims may, incident or collateral to a judgment for money damages, "issue orders directing restoration to an office or position, placement in an appropriate duty or retirement status, and correction of applicable records[.]" *Id.* at 1491(a)(2). Though mindful of the admonition of the Circuit Court of Appeals for the District of Columbia in *Megapulse Inc. v. Lewis*, that "a plaintiff whose claims against the United States are essentially contractual [is] not . . . allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA," 672 F.2d 959, 967 (D.C. Cir. 1982), the City nevertheless suggests that the Supreme Court instruction in *Bowen* to consider practical matters counsels a conclusion that this Court has jurisdiction to entertain the City's challenge, seeking purely equitable relief, to the NPS's violations of its obligations to proceed only by mutual agreement.

While the City has contractual claims against the United States, these claims do not implicate any monetary damages or recompense for the harm – the City's claims based upon the several agreements between the City and the United States are solely limited to non-monetary specific performance. Indeed, there is no way to numerically represent the harm that has come to the City and the public as a result of the NPS's erasure of history. And while specific performance is a contract remedy, it is not one that the Court of Federal Claims can provide. *See* 28 U.S.C. § 1491(a)(2). The City respectfully submits that jurisdiction is appropriate under

Section 702, because absent such review of this equitable claim there is no other avenue for relief from the United States' breach of its clear obligations under this statutorily-mandated cooperation agreement.  *See* 16 U.S.C. § 407n.

Should this Court determine that it has jurisdiction under Section 702 of the APA to consider the City's claim grounded in the cooperative agreements between the United States and the City of Philadelphia, the City has a likelihood of success on the merits of this claim.  NPS's abrupt removal of the President's House panels expressly violates the 1950 Agreement between the United States, through the Secretary of the Interior and the City.  Article III, Section C of that agreement requires that "any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work have been mutually agreed upon." (*See* 1950 Cooperative Agreement, Prelim. Inj. Hr'g Ex. 1 (Doc. No. 36-1).) Section D of Article III further provides "that neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet, or other memorial in or upon the buildings or grounds without the written consent of the other." (*Id.*)  Finally, the parties pledged "themselves to consult on all matters of importance to the program." (*Id.* III(e).)

The detailed factual record of the collaboration, consultation, and community stakeholder engagement giving rise to the construction of the President's House clearly demonstrates the extent to which the panels and educational videos constitute a matter of importance to the program.  They also establish the extent to which those materials are critical infrastructure of the buildings and grounds of Independence Park. By contrast, there is no evidence that NPS made any contact with the City before changing the President's House building and memorial at the Independence Park.  The affidavit submitted by Acting Regional Director Steven Sims suggests that no such contact was even attempted – as narrated by Director Sims, he received direction on

January 22, 2026 to remove the video and exhibits on the interior and exterior of the President's House, and that this removal began and was completed later that day.  (*See* Declaration of Steven Sims (Jan. 27, 2026) (Doc. No. 27-1) at ¶¶ 4-6.)  Director Sims previews that further removal is planned, with no suggestion of seeking the required approval by the City.  (*See id.* ¶ 7.)

Beyond the 1950 Agreement, the 2006 Cooperation Agreement has an express provision, number 15, that "the terms, covenants and conditions contained in this Agreement shall extend to and be binding upon the parties hereto and their respective successors and assigns."  Among the conditions expressly incorporated into the 2006 Agreement, via the 2009 Amendment, is that interpretation at the site focus on the people who lived and worked at President's House, and the move to freedom for the enslaved.  While the construction of the project may have completed, the conditions to which that construction is subject survive and bind the successors.

The United States, through the Secretary of the Interior, and the City of Philadelphia have a contract that requires City agreement to changes to buildings and requires City agreement to the content of memorials.  The parties also have a contract that specifically directs what must be the focus of interpretation at the site.  Neither the 1950 Agreement nor the 2006 Cooperation Agreement and amendments thereto direct the flow of any funds from one governmental entity to the other – all of them memorialize the commitments to collaboration, coordination, and support for the Independence Park site and all its buildings and grounds, inclusive of the President's House.  NPS plainly violated the terms of those agreements when it summarily removed the President's House panels and videos.  The City has thus established that there were valid agreements, NPS clearly breached those agreements, and the City has a likelihood of success on the merits of this claim seeking specific performance – the recission of the activity that breached

the agreement and the congressional mandate to abide by the mutual agreement requirements in the controlling cooperation agreement.

      2.    <u>The City Has Established a Likelihood of Success on the Merits of its APA Claim Alleging Arbitrary and Capricious Final Agency Action in Violation of the National Underground Railroad Network to Freedom Act of 1998</u>

NPS has already acknowledged that the President's House exhibit "enables the City to commemorate the symbolic and historical importance of the President's House for the City of Philadelphia, its citizens, and all Americans nationwide, and by doing so, there is a public benefit inuring to the City." (*See* 2006 Cooperative Agreement, Prelim. Inj. Hr'g Ex. 3 (Doc. No. 36-3) at 5.) The City, at the preliminary injunction hearing, presented substantial evidence showing the investment of the City in the creation of the President's House – and specifically the significant value the City placed on partnering to develop the first federal memorial educating the public about the persons enslaved by the Washington family while the country was being built. The United States acknowledged the public benefit inuring to the City from the establishment of this first federal slave memorial. The City also presented substantial evidence establishing the extent to which the City expected to platform the President's House during the semiquincentennial, and the significant value the President's House has to the City, specifically as a Network to Freedom site and as a place that honors and sheds light on the history of the persons who were enslaved by George Washington, and the complexity of the early history of our country.

In summarily removing the panels and videos from the President's House, NPS has infringed upon the public benefit that inured to the City from the site, integral to which was the education of the public about the tension inherent in the first President of the United States enslaving people, and the journey of some of those enslaved persons to freedom via the Underground Railroad. This infringement on its intangible property right establishes the City's standing to bring an APA claim challenging the exhibit's removal as arbitrary and capricious in

violation of the express instructions by Congress in the National Underground Railroad Network to Freedom Act of 1998.  Unlike the petitioners in *Lujan v. National Wildlife Federation*, who only vaguely articulated potential future harm to some portion of several thousand acres of national land that they contended was improperly managed by the Bureau of Land Management, the City has a specific benefit attributable to the construction of the President's House as a memorial specifically addressing the existence and lived experiences of the people enslaved by the first president of our country.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).  That benefit has been destroyed by the removal of the information that qualified the President's House as a Network to Freedom site.  And the City has further established the specific harms it has and will experience from the destruction of this site.  Having thus established its standing to bring an APA claim, the City now turns to the substance of its claim under the National Underground Railroad Network to Freedom Act of 1998.

> a.    *The NPS Removal is Final Agency Action*

Establishing final agency action requires showing that the challenged action marks the culmination of the agency's decision-making process, and that it must be an action from which legal consequences will flow.  *Hawkes Co*, 578 U.S. at 597.  "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."  *Franklin*, 505 U.S. at 797.

Addressing the first prong of final agency action, the declaration of the Acting Regional Director of Independence Park demonstrates the finality of NPS's removal of these essential portions of the site.  Notably, he asserts that he was instructed to remove them in the morning, he did so in the afternoon, and he anticipates removing the remaining materials when the weather breaks and he gets the appropriate tools.  (*See* Declaration of Steven Sims (Jan. 27, 2026) (Doc.

No. 27-1) at ¶ 7.)  Nothing in the evidence before the Court suggests this was a tentative or interlocutory act – it instead demonstrates the conclusion that this material is removed.  Indeed, it "is not pending, interlocutory, tentative, conditional, doubtful, unsettled or otherwise indeterminate.  It is done."  *Del. Dep't of Health and Social Servs. v. United States Dep't of Health & Hum. Servs..*, 272 F. Supp. 3d 103, 111 (D.D.C. 2017).

Turning to the legal consequences that flow from this decision, NPS almost completely removed the jointly-developed interpretive work from the President's House, the focus of which was, as informed by community meetings and input, the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved.  (2009 Am. to Coop. Agreement, Attachment C, Project Development Plan, Prelim. Inj. Hr'g Ex. 6 (Doc. No. 36-6 at 24)).  These interpretive materials were integral to the site and to the public benefit that inured to the City from its creation.  Removal of those materials, then, infringes upon or eviscerates the public benefit – the intangible property – of the City.  This infringement or evisceration of an intangible property constitutes a legal consequence that flows from the NPS's action.

### b.    The NPS Removal is Arbitrary and Capricious

The National Underground Railroad Network to Freedom Act was passed in 1998.  In its adoption, Congress found "the Underground Railroad bridged the divides of race, religion, sectional differences, and nationality; spanned State lines and international borders; and joined the American ideals of liberty and freedom expressed in the Declaration of Independence and the Constitution to the extraordinary actions of ordinary men and women working in common purpose to free a people."  P.L. 105-203, Section 2(a)(2).  Congress also found that "the National

Park Service can play a vital role in facilitating the national commemoration of the Underground Railroad." *Id.* at 2(a)(5). Congress mandated that the "Secretary [of the Interior] shall establish in the Service the National Underground Network to Freedom. Under the national network, the Service shall – produce and disseminate appropriate educational materials, such as handbooks, maps, interpretive guides, or electronic information[.]" 54 U.S.C. § 308302.

And in 2022, NPS did just that. NPS supported the application to designate the President's House as a Network to Freedom site. Core to this submission is the fact that Ona Judge, one of the women held in slavery by the Washington family, escaped from them through the Underground Railroad. Her story and that of the other individuals held in slavery by the Washingtons were central to the narrative and site interpretation at President's House, consistent with the early project development plan. (2009 Am. to Coop. Agreement, Attachment C, Project Development Plan, Prelim. Inj. Hr'g Ex. 6 (Doc. No. 36-6 at 24-30).) The project development plan explains that "site interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved." (*Id.*) Which is what the City and NPS did, until January 22, 2026.

The biographical information and explanation about slavery are what NPS removed when it stripped the panels from the site. The erasure of Ona Judge's story, the very information that specifically qualified the President's House as a Network to Freedom site, unequivocally contradicts the express direction of Congress to *create*, not *destroy*, sites that educate the public about the Underground Railroad. That the instruction to desecrate the site was given in the morning and executed just a few hours later – clearly without thought or deliberation – adds to the weight of evidence demonstrating this action was arbitrary and capricious.

The City submits that the Ninth Circuit Court of Appeals' recent decision in the *Tohono O'odham Nation v. United States Dep't of the Interior* case is instructive, and counsels finding that the City has established a likelihood of success on its claim. 138 F.4th 1189 (9th Cir. 2025). In that case, the appellate court found that the plaintiffs had plausibly stated a claim that the Department of the Interior had engaged in arbitrary and capricious final agency action when the Bureau of Land Management failed to meet its obligations under the National Historic Preservation Act, 54 U.S.C. § 306108. "The NHPA is chiefly procedural in nature, requiring agencies to generate information about the impact of federal actions on historic properties and to carefully consider the information produced." *Tohono O'odham Nation*, 138 F.4th at 1193. The federal government's obligations under the NHPA were detailed in a statutorily-authorized Programmatic Agreement, and the plaintiffs contended that the federal government failed to conform to the requirements of NHPA such that the plaintiffs – who were not parties to that agreement but whose harm flowed from the construction of a transmission line over property they contended was protected as a historic property – stated a claim under the APA.

Similar to the *Tohono O'odham Nation* plaintiffs, the City here has identified an express statutory instruction that was not followed by the federal government, which failure adversely affects the City's public benefit from the President's House. And unlike the plaintiffs in that case, the City has established that the federal government's action in eviscerating the President's House expressly violated its statutory directive, thereby demonstrating that the City has a likelihood of success on the merits of this claim.

The City has a substantial likelihood of success on its APA claim that NPS acted arbitrarily and capriciously in violation of the Congressional instruction in the National

Underground Railroad Network to Freedom Act of 1998 to create, and not destroy, Network to Freedom sites.

      3.   <u>The City Has Established a Likelihood of Success on the Merits of Its APA Claim Alleging Arbitrary and Capricious Final Agency Action in Violation of Title 16, Sections 407m, 407n</u>

As detailed above, the abrupt removal of nearly all the interpretive components of the President's House constitutes final agency action.  And this final agency action, which violated the express directives regarding Independence Park in Title 16 of the United States Code, was arbitrary and capricious.

In Title 16, Section 407n, Congress specifically directed that "<u>no changes or alterations shall be made</u> in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts." (emphasis added).  The history and course of dealing between the United States and the City is illustrative of what Congress directed by way of this language.

In order to make the significant change or alteration to the buildings and grounds of Independence Park represented by the creation of the President's House exhibit to the Park, the parties engaged in years of collaborative work with each other and external stakeholders, drafting agreements that memorialized the commitment of each sovereign to specific courses of action, hosting community meetings to garner input on these important issues, and remaining in constant dialogue over the course of at least a decade to bring the project to completion.  The import of these alterations to the buildings and grounds was reflected in the attachments to the various contract documents, and to the recognition of the particular and specific value that being a site to address slavery and the pathways to freedom brought to all of the parties.

Having failed to engage in any dialogue or discussion before undertaking a significant alteration or change to the property, buildings, and grounds of Independence Park, NPS expressly violated the terms of the congressional directive controlling the operation of this space.  By unilaterally removing core exhibit features from the property, NPS violated this congressional mandate to make changes or alterations only by mutual agreement.  As with the NPS's violation of the mandates in the National Underground Railroad Network to Freedom Act, the manner by which the NPS took action was arbitrary and capricious, and the City's public benefit in the exhibit was compromised.

4.  <u>The City Has Established a Likelihood of Success on the Merits of Its APA Claim Alleging Arbitrary and Capricious Final Agency Action in Violation of NPS Policy Applicable to President's House</u>

The City is likely to succeed on the merits of its claim that NPS's action to remove the educational panels at President's House is arbitrary and capricious and contrary to NPS's long-established policies.  Congress mandates that NPS prepare "general management plans" for each "unit," or park in the NPS System. 54 U.S.C. § 100502.  To comply with this mandate, NPS issued a document called "Management Policies" and Director's Order No. 2 to guide its planning for each park.[3]  The governing planning document for Independence Park is its Foundation Document, last amended in 2016. Because NPS's action to remove the educational panels at President's House is a total abandonment of NPS's previous position on the core components, park significance, fundamental resources and values, and interpretive themes of Independence Park, the action is in violation of the law.

---

[3] Management Policies, https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf (last viewed Feb. 5, 2026); Director's Order No. 2, https://www.nps.gov/subjects/policy/upload/DO_2_1-11-2021.pdf (last viewed Feb. 5, 2026).

An agency such as NPS must "provide reasoned explanation for its action," when changing course, including "display[ing] awareness that it *is* changing position." *F.C.C. v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009). The new policy must be "permissible under the statute" and have "good reasons for it." *Id.* It may not "depart from a prior policy *sub silentio* or simply disregard rules that still on the books." *Id.* (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)). And "of course the agency must show that there are good reasons for the new policy." *Id.* When the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account," the agency must provide a "more detailed explanation than what would suffice for a new policy created on a blank slate." *Id.* (citing *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996)). It is "arbitrary and capricious to ignore such matters." *Id.*

Here, NPS's previous position is well documented by its course of conduct in creating President's House, as the Court heard at the hearing on January 30, 2026, as well as its own Foundation Document and official policies. President's House is a "core component" of Independence Park, "especially in the paradox of the Washingtons bringing their enslaved people to work and live there." (*See* Independence National Historical Park Foundation Document (2017), Prelim. Inj. Hr'g Ex. 8 (Doc. No. 36-8)) at 11.) The "paradox of freedom and slavery" is a significance statement for the Park. (*Id.* at 15.) NPS considers (or considered until very recently) the "interpret[ation] of race and slavery in its historic context" at the President's House archeological site to be a "fundamental resource[] and value[]" of the Park. (*Id.* at 17.) The "fundamental value" of "partnerships and collaboration" is "best illustrated by Independence National Historical Park's close working relationship with the City of Philadelphia, which still

owns the most iconic building Independence Hall and resources such as the Liberty Bell." (*Id.* at 18.)  The "promises and the paradoxes" of liberty is one of only four interpretive themes of the Park. (*Id.* at 19.)  NPS also instructs that "[u]nderstanding and considering the public's interest will inform and strengthen the entire planning portfolio," including by complying with various Management Policies and Director's Orders. (*See* Director's Order No. 2, *supra*, n.2, ¶ 3.6.)  NPS Management Policies 2.1.3 and 2.3.1.5 expressly provide for public involvement for planning purposes, such as developing or changing the Foundation Document. (*See* Management Policies, *supra*, n.2.)

Now, NPS turns its back on these longstanding policies with no explanation at all.  All interested parties are left completely in the dark as to why this decision was made, who made the decision, how this meticulously-researched exhibit fits within the parameters outlined in Executive Order 14253, and what the NPS has planned for the site.  This quintessentially arbitrary and capricious decision was made without engagement with the City or the public, without acknowledgement of the change in policy, without new factual findings, without consideration of the serious reliance interests on the old policy, and without reason.

5.  <u>The Discretionary Exception to the APA Waiver of Sovereign Immunity Does Not Apply to the NPS's Removal of Critical Material from the President's House</u>

The United States has suggested that the NPS's removal of critical elements of President's House constitutes "agency action committed to agency discretion by law," 5 U.S.C. § 701(a)(2).  Defs.' Resp. in Opp., Doc. No. 27, at 15.  Anticipating this will be raised again in opposition to this renewed motion for injunctive relief, the City addresses this contention herein.  In short, the United States is incorrect.

Removal of the core information essential to the existence and mission of an exhibit that is both a building and the grounds of Independence Park is not a mere curatorial decision that

falls within the day-to-day management of parks sites.  The distinction applicable to this site is apparent from the 1950 Agreement, which expressly provides that monuments or memorials will not be placed without the written consent of the other party as mandated by the statute creating the Park, 16 U.S.C. §§ 407m & 407n.  1950 Agreement, Section III(d).  Even if the agreement language did not provide clear parameters around what activity NPS can engage in without consent, the discretionary exception in Section 701(a)(2) is construed narrowly, and includes actions such as "decisions to refrain from enforcement or investigative activity, decisions implicating intelligence and national security concerns, and the spending of lump-sum appropriations."  *Gentile v. Secs. & Exch. Comm'n*, 974 F.3d 311, 319 (3d Cir. 2020).

Violating a statutory mandate that changes be made by mutual agreement and violating the congressional direction that NPS support (not destroy) Network to Freedom sites – are not the type of agency action contemplated by the discretionary exception to the Administrative Procedure Act.  Such action has nothing to do with national security concerns, enforcement activity, or spending of appropriations.  Instead, this abrupt change is an arbitrary and capricious final action that violates the implementing legislation for this Park, that undermines the stature of the President's House as an Underground Railroad Network to Freedom site, and that violates NPS's planning documents and guidance documents.

6.  <u>In the Alternative, the City Has Established a Likelihood of Success on the Merits of Its Claim That NPS Engaged in *Ultra Vires* Action, Warranting Relief</u>

Courts, prior to the enactment of the APA, "recognized a right to equitable relief where an agency's action was *ultra vires* – that is, unauthorized by any law and . . . in violation of the rights of the individual."  *Nuclear Regul. Comm'n v. Tex.*, 605 U.S. 665, 680 (2025).  This exception to the constraints of APA review is a narrow one, and "applies only when an agency

has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Id.* at 681. This review is unavailable if aggrieved persons have a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review. *Id.* The Supreme Court endorsed the categorization of this review as a Hail Mary pass – one that is in court, as on the football field, rarely successful. *Id.*

If the Court otherwise disagrees with our position, the City respectfully suggests that, in the specific and unique circumstances of this case, it has executed the play. In *Nuclear Regulatory Commission*, the Supreme Court found that the parties – Texas and a private entity – were attempting to "dress up a typical statutory-authority argument as an ultra vires claim." 605 U.S. at 682. But in that case, the opportunity to make such an argument was provided during a contested licensure proceeding before a commission, in which proceeding the parties had been denied status as intervenors, and further opportunity was provided to object to the project during a notice and comment period. *See id.* at 673-74. No such opportunities to otherwise challenge the scope of NPS's authority exist here. Title 16, Section 407n contains an implicit prohibition on unilateral changes to the buildings and grounds of Independence Park. NPS's action has infringed or eviscerated an intangible property right of the City. Should the Court determine that the City has not otherwise made out its claims, the City lacks any other remedial measure to vindicate the procedural and collaborative obligations imposed by the statute. The City thus satisfies the narrow *Kyne* exception, and this Court should find that the NPS's abrupt removal of the interpretive panels constituted an unlawful, ultra vires action, warranting the relief of restoration and a process by which the parties meet, confer, and make changes only by mutual agreement, as instructed by Congress in Title 16, Section 407n.

### B. Irreparable Injury Will Result Absent Preliminary Relief

In this judicial circuit, irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994). Moreover, injunctive relief is limited to circumstances in which the injury alleged is not only irreparable, but actual and imminent. *Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969) (noting that injunctive relief may not be used to simply "eliminate a possibility of remote future injury, or a future invasion of right . . ."). The standard for irreparable harm requires a showing of more likely than not. *Veterans Guardian VA Claim Consulting LLC*, 133 F.4th at 218 (citing *Reilly*, 858 F.3d at 179). The City has overwhelmingly demonstrated the irreparable and ongoing harm that has resulted from the removal of the panels and video contextualizing the President's House and providing insight into and education about the experience of the persons living in slavery under the Washingtons.

There can be no debate – indeed, it was conceded by counsel for Defendants at the January 30 Hearing – that the President's House is one of very great historical significance and carries tremendous cultural and emotional significance for the community. (*See* Ex. A, Prelim. Inj. Hr'g Tr. (Jan. 30, 2026) at 121:12-16.) It represents years of scholarship, civic engagement, and advocacy, which sought to correct the considerable injustice of a trampled history of slavery, buried and forgotten beneath the entrance to the nation's most recognized icon of liberty. Both citizens and public officials called for memorialization and explanation of this extraordinary juxtaposition, including the demand of the United States Congress "to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy." (*See* 2003 U.S. House of Representatives Report 107-564, Prelim. Inj. Hr'g Ex. 2 (Doc. No. 36-2) at 47.)

As was recognized in the RFQ issued in 2005, "[t]he story of the President's House is []
one of achievement and infamy — of the birth of a free nation and indefensible slavery existing
side-by-side." (*See* RFQ, Prelim. Inj. Hr'g Ex. 14 (Doc. No. 36-15) at 2.)  The RFQ, issued by
the City in partnership with NPS and Independence Park, further stated that "[a]s a nation, we
have a compelling obligation to illuminate the history of this house and its inhabitants in all its
fullness" and thus asked "[w]hat better place to do this than on the threshold of the Liberty
Bell?" (*Id.*)  As reflected in the RFQ, these government partners mutually embraced and
advanced what had become the unifying theme of previous community advocacy: that the
experience of the Liberty Bell could not be complete without a full portrayal of the economic
role enslaved and free Africans played in this country's formation. (*Id.* at 4.)  As a result,
President's House was conceived as an "opportunity to tell a story of national importance in an
honest, inspiring, and informative way – through architecture, landscaping, imagery, and
interpretive text placed on the threshold of the Liberty Bell Center, home to the symbol of
freedom in this country." (*Id.* at 2.)  The result was a "permanent, outdoor commemorative
installation," fully accessible 24 hours a day, which incorporated substantive themes and cultural
values that emerged from the considerable public engagement. (*Id*. at 9-10.)

The irreparable harm wrought by the dismantling of the President's House is well
illustrated by these foundational statements.  The substantive materials were not merely
decorative; rather, they were integral components.  Thus, the removal of the interpretive panels,
exhibits, and signage at the President's House – everything explaining the historical context of
the grounds at this specific site – was not just an aesthetic change.  It was wholescale gutting and
desecration.  Their excising constitutes erasure, undermines public trust, and compromises the

integrity of public memory.  Moreover, the injustice righted by providing context and commemoration at the cradle of democracy has once again been inflicted.

The President's House was always to be more than a mere footprint of the former executive mansion; rather, it was to be a clearly defined physical place where people can stand and connect viscerally to the past.  (*Id.* at 4.)  Such an experience and opportunity cannot be replicated anywhere else.  (*See, e.g.,* Press Release (Dec. 15, 2010), Prelim. Inj. Hr'g Ex. 23 (Doc. No. 36-24); (Ex. A, Prelim. Inj. Hr'g Tr. (Jan. 30, 2026) 78:17-79:3.))  To borrow from recent communications to the Department of the Interior, "[w]hen researched and analyzed with depth and scholarship, history captures the complete record of idealism and injustice, progress and regression in our shared journey toward a more perfect union."  (*See* Ltr. to Doug Burgum, Secretary, Department of the Interior (Sept. 8, 2025), *available at* https://preservationalliance.com/wp-content/uploads/2025/09/NPS-Signage-Letter-9-9-25.pdf.) However, "[t]o eliminate or revise "these truths", glorious or not, is to deny the lived experiences of millions of Americans and perpetuate the harms of ignorance." (*Id.*)  "Hard truths are nonetheless true and lead to a well-informed and better citizenship."  (*Id.*)

While the injury inflicted by the desecration and destruction of President's House affects those beyond the geographical boundaries in which this judicial district sits, it is born most acutely by the City.  Philadelphia has approximately 1.6 million residents.  (*See* U.S. Census Bureau, 2020 Data for Philadelphia, PA, available at https://data.census.gov/profile/ Philadelphia_city,_ Pennsylvania?g=160XX00US4260000.)  Its citizenry includes a diverse tapestry of racial, ethnic, and cultural backgrounds, with the largest demographic being Black or African American.  (*Id.*)  It also welcomes millions of visitors annually from around the world, a significant portion of whom come to the literal birthplace of America democracy to see historic

sites and stay only for a day.  (*See* Independence Visitor Center Corporation Annual Report (2018) at 2, 12, *available at* https://www.phlvisitorcenter.com/AboutUs.)  Chief among them is America's "Most Historic Square Mile," with Independence Park receiving an estimated three to five million people annually.  (*See* Park Statistics, Independence National Historical Park, *available at* https://www.nps.gov/inde/learn/management/statistics.htm; Peter Crimmins, Philadelphia's Independence Hall Reopens After Being Closed For 4 Months, WHYY, Jan. 29, 2026, *available at* https://whyy.org/articles/independence-hall-reopens-philadelphia.)  An additional 1.5 million more are expected this year during the celebration of America's 250th anniversary.  (*See* Ex. A, Prelim. Inj. Hr'g Tr. (Jan. 30, 2026) at 104:20-23.)

The President's House, in the words of Philadelphia Mayor John Street, represented the City "fulfilling an obligation to tell the truth – the whole, complicated truth."  (*See* Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at p. 2.)  However, following Defendants' actions on January 22, 2026, and in contravention of congressional mandate, there is currently no truth told on its grounds.  The President's House lays mostly bare, its walls empty save for remnants of the adhesive that had been broken by Defendants' crowbars.  (*See* Photographs (Jan. 28, 2026) Prelim. Inj. Hr'g Ex. 24 (Doc. No. 36-25 to 28); Declaration of Steven Sims (Jan. 27, 2026) (Doc. No. 27-1).)  The names of the nine enslaved Africans carved into the stone are untethered to any context, their stories and narratives locked in an underground storage facility inaccessible from public view.  (Inspection Report of the Court (Feb. 2, 2026) (Doc. No. 39).)  Every moment that the President's House remains in its current state, the City's citizenry – the history of many of whom is inextricably linked to the history of slavery (Ex. A, Prelim. Inj. Hr'g Tr. (Jan. 30, 2026) 37:11-13) – is denied access to the honest and accurate commemoration and representation that advocates fought long to recognize.  Moreover,

Philadelphia is deprived of the opportunity to honestly and accurately tell its story during the unique opportunity afforded by the semiquincentennial, in which the City will play a pivotal role. (Ex. A, Prelim. Inj. Hr'g Tr. 104:16 — 108:25 (testimony of Philadelphia Chief Cultural Officer Val Gay).) This harm is irreparable harm.  It cannot be redressed by a legal or an equitable remedy following a trial.

It is anticipated that Defendants will argue again – as they did in their initial opposition and at the January 30 Hearing – that there can be no irreparable harm given that the President's House can be restored to its original state at the conclusion of litigation.  However, such a contention is undermined both by the reality of current state of the President's House and the nature of the City's injury.  In the words of NPS' own historian, if the panels are not displayed, "we will have missed a real educational opportunity[.]"   (*See* Gary Nash, *For Whom Will the Liberty Bell Toll? From Controversy to Collaboration*, The George Wright Forum, Vol. 21, No. 1 (Mar. 2004) at 46-47, *available at* https://www.jstor.org/stable/43597891?seq=9.)  While President's House is barren, no Philadelphia resident or visitor who visits the site seeking to learn about its history, or to visit Underground Railroad Network sites specifically, will have the public benefit intended, nor can they go back in time for another opportunity if the exhibits are restored later.

Accordingly, the City has demonstrated that its harm is irreparable and preliminary relief is warranted.

### C.  The Balance of Equities and the Public Interest Favor Granting Relief

"In each case, courts must balance the competing claims of injury and must consider the effect on each part of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555

U.S. 7, 24 (2008).  "[T]he traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest.  These factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

When the government has violated its obligations, no public interest exists.  *New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025).  In *Kennedy,* the First Circuit denied the defendant federal government's stay request from a preliminary injunction ruling in favor of state plaintiffs in an APA arbitrary and capricious challenge.  *Id.* at 70-71.  Because the district court had found the plaintiff states had a likelihood of success on the merits the court was "especially mindful that 'there is generally no public interest in the perpetuation of unlawful agency action.'"  *Id.* at 77 (quoting *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 79 (1st Cir. 2025)); *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  Indeed, courts have consistently found that "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

The United States cannot plausibly argue that would be harmed by restoration of an exhibit in the development of which the sovereign actively participated.  And the United States cannot plausibly argue that the public interest favors the removal of this collaboratively-developed exhibit, in contravention of its designation as an Underground Railroad Network to Freedom site.

Defendants have argued that the weighing of equities favors the federal sovereign because the City's application to restore the panels is akin to an application to mandate government speech.  (Defs.' Resp. in Opp., (Doc. No. 27 at 23-24).)  In so arguing, the United States relies on caselaw inapplicable to the situation before this court.  The United States

suggests that *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) instructs that the federal government cannot be mandated to participate in speech to which it objects.  While that proposition may hold, it does not apply to the facts of this case.

In *Pleasant Grove City*, the local government rejected an application by a religious group to install a monument professing the religious precepts of that group in a public park.  That park already contained a variety of other statues, including one of the Ten Commandments that had been installed decades prior by another group.  The religious group challenged the local government's rejection on free speech grounds, claiming it was denied access to a public forum. The Supreme Court determined that permanent installation of a monument with a message was more akin to compelled government speech, given the imprimatur of adoption by virtue of permanent placement.  Such concerns did not exist where, as in a public forum, speech is often of shorter duration.  In the void, the United States' argument about the restoration of the panels might pass muster, but the Independence National Historical Park is not a space like a municipally-owned park – it is instead a creature of statute and agreement that requires change only be implemented when mutually agreed upon.  It also bears noting that the speech the federal government now complains of is exactly that which Congress *specifically directed* be spoken.  It also bears noting that, to the extent the federal government changes the speech in this collaboratively-developed structure without the requisite mutual agreement, it is functionally forcing the City to endorse speech with which it does not agree.

The United States' attempted reliance on a public interest of federal government speech is inapposite to the issues before the Court.  Instead, as the City has demonstrated through testimony, evidence, and the submissions of amici, the public interest overwhelmingly favors restoration of the site.

### D. As Relief, the Court Should Order the Restoration of the Removed Materials as Preservation of the Status Quo Requires Returning the President's House to Its Status as of January 21, 2026

The Court should return the parties to the status quo, i.e., President's House as it was designed, constructed, and maintained jointly until Defendants' unilateral actions on January 22, 2026. That was the "last, peaceable, noncontested status of the parties." *Kos Pharm., Inc.*, 369 F.3d at 708 (quoting *Opticians Ass'n of Am.*, 920 F.2d at 197). Here, the City seeks a prohibitory injunction to maintain the status quo during the pendency of the litigation. Even when the court must order some affirmative act to restore the "relationship that existed between the parties before the wrongdoing complained of," the injunction is still prohibitory in nature. *See Satanic Temple, Inc.*, 671 F. Supp. 3d at 566 (quoting *Mylan, Inc. v. Kirkland & Ellis LLP*, No. 15-181, 2015 WL 12733414 at *8 (W.D. Pa. June 9, 2015) (issuing a prohibitory injunction that the defendant school district must restore the plaintiff's status as an approved user of school facilities even though school had already revoked plaintiff's approval before the start of the litigation)). To obtain a mandatory injunction, a movant must demonstrate "a substantial likelihood of success on the merits and that their right to relief is indisputably clear." *C.G.*, 571 F. Supp. 3d at 439 (quoting *Dunmore Sch. Dist. v. Pa. Interscholastic Athletic Ass'n*, 505 F. Supp. 3d 447, 457 (M.D. Pa. 2020)). Whether prohibitory or mandatory, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while supporting some preliminary relief." *Id.* (quoting *Reilly*, 858 F.3d at 179).

The City has demonstrated all four elements necessary to obtain a preliminary injunction whether the Court determines that the relief sought is prohibitory or mandatory, given the extensive "net harm" prevented by the issuance of an injunction.

V.     **CONCLUSION**

For all of the reasons set forth herein, the City requests that the Court grant preliminary

injunction to preserve the status quo with respect to the President's House.

Respectfully submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Date: February 6, 2026               */s/ Ryan B. Smith*
Renee Garcia, City Solicitor
Anne Taylor, Chair | Litigation
Lydia Furst, Chief Deputy City Solicitor
Ryan B. Smith, Divisional Deputy City Solicitor
Bailey Axe, Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
(215) 410-8264
Ryan.Smith@phila.gov

*Attorneys for Plaintiff City of Philadelphia*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CITY OF PHILADELPHIA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 2:26-cv-434** |
| **DOUG BURGUM, SECRETARY OF THE INTERIOR, et al.,** | |
| **Defendants.** | |

## <u>CERTIFICATE OF SERVICE</u>

I, Ryan B Smith, do hereby certify that a true and correct copy of the foregoing Amended

Motion for Preliminary Injunction, and supporting documentation, was filed via the Court's

electronic filing system and is available for downloading.

Date: February 6, 2026          BY:     */s/ Ryan B. Smith*
                                        Ryan B. Smith, Divisional Deputy City Solicitor
                                        City of Philadelphia Law Department
                                        1515 Arch Street, 15th Floor
                                        Philadelphia, PA 19102
                                        (215) 410-8264
                                        Ryan.Smith@phila.gov

                                        *Attorney for Plaintiff City of Philadelphia*