1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF PENNSYLVANIA

3    CITY OF PHILADELPHIA,
                                    Case No. 2:26-CV-00434-CMR
4                  Plaintiff,

5    v.                             Philadelphia, Pennsylvania
                                    January 30, 2026
6    DOUG BURGUM, Secretary Of The  10:38 a.m.
     Interior, et al,

7
                   Defendants.
8

9        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
           BEFORE THE HONORABLE CYNTHIA M. RUFE
10            UNITED STATES DISTRICT COURT JUDGE

11
     APPEARANCES:
12   For the Plaintiff:            Bailey Axe, Esq.
                                   Renee Garcia, Esq.
13                                 Lydia M. Furst, Esq.
                                   Anne B. Taylor, Esq.
14                                 City of Philadelphia Law
                                   Department
15                                 1515 Arch Street, 15th Floor
                                   Philadelphia, PA 19102
16
     For the Defendant:            Gregory B. In Den Berken, Esq.
17                                 Mark J. Sherer, Esq.
                                   U.S. Attorney's Office for the
18                                 Eastern District of Pennsylvania
                                   615 Chestnut Street
19                                 Suite 1250
                                   Philadelphia, PA 19106
20
     Court Recorder:               Unknown
21
     Transcription Service:        Chris Hwang
22                                 Abba Reporting
                                   PO Box 223282
23                                 Chantilly, Virginia  20153

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

1                                    **INDEX**

2

3   <u>WITNESSES FOR PLAINTIFF</u>   <u>Direct</u>   <u>Cross</u>     <u>Redirect</u>   <u>Recross</u>

    Joyce Wilkerson              33        60

4   Edward Gillison             66

5   Valerie Gay                 96

6

7   <u>WITNESSES FOR DEFENDANT</u>

8   n/a

9

10  <u>EXHIBITS</u>                            <u>OFFERED</u>   <u>RECD</u>

11      Defendant's 27-1                     111       111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order at 10:38 a.m.)

2               THE CLERK:  All rise.  Court is now in session for

3     the United States District Court of the Eastern District of

4     Pennsylvania.  The Honorable Judge Cynthia Rufe now presiding.

5               THE COURT:  Good morning, everyone.  Please be

6     seated.

7               ATTORNEYS (IN UNISON):  Good morning, Your Honor.

8               THE COURT:  As you well know, I am Judge Cynthia Rufe

9     and I have been assigned this case, which for the record we

10    will review the parties and counsel who are present.

11              And we will start with the City of Philadelphia.  And

12    as the Plaintiff represented by Renee Garcia, Chief Solicitor

13    of the Philadelphia Law Department.  And would you please

14    introduce your team of lawyers?

15              MS. GARCIA:  Thank you, Your Honor.  And good

16    morning.  I am Renee Garcia, the City solicitor representing

17    the City of Philadelphia.  I have next to me Bailey Axe, Lydia

18    First, and Anne Taylor.  All three are in the City Solicitor's

19    Office.  Thank you.

20              THE COURT:  Thank you.  The City has sued in civil

21    action 424 of 2026, a number of Defendants from the United

22    States Government.  Doug Burgum, Secretary of the Interior,

23    United States Department of the Interior, Jessica Bauer, an

24    acting director of the National Park Service and National Park

25    Service, United States Department of the Interior.

1          Each of these Defendants are represented by the same

2     lawyers.  Mr. In Den Berken?

3          MR. IN DEN BERKEN:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. IN DEN BERKEN:  Greg In Den Berken for the

6     federal Defendants.

7          MR. SHERER:  Good morning, Your Honor, Mark Sherer

8     also for the Defendants.

9          THE COURT:  Thank you.  Do you have any other

10    attorneys here that will be addressing the Court today?

11         MR. IN DEN BERKEN:  No, Your Honor.

12         THE COURT:  I know you have other assistants and the

13    like behind you.

14         MR. IN DEN BERKEN:  Correct, but no one here.

15         THE COURT:  Thank you.

16         Because we have been requested to and granted a

17    number of amici briefs, and I have limited it to briefs, it's

18    not been extended to giving testimony.  I don't feel the

19    appropriateness of that when we have able counsel to present

20    this case.

21         However, that may change in the future, but my

22    decision here is made without prejudice, but I'm very

23    interested, having reviewed each of the briefs that were

24    submitted and having that made part of the record, which it is

25    as a brief.

1          And argument will be permitted.  Where in the

2     proceedings, the argument flows will be determined as we see

3     how much evidence we can get through here because today is

4     about evidence.

5          This is a hearing.  Yes, there will be various bouts

6     of oral argument on legal issues, which abound in this

7     particular clash of titans.

8          However, we are going to get through any and all

9     evidence before we get to argument.  Now on behalf of I have

10    four amici, I'd like you to stand and tell me who you are

11    representing?

12         MS. MCCLELLAN:  Good morning, Your Honor, Kara

13    McClellan (phonetic) on behalf of amici Avenging the Ancestors

14    Coalition and Black Journey.

15         With me is Mary Katherine Roper (phonetic), Natalie

16    Ricon (phonetic), and Kate MacNamara Marsland.  And then also

17    present in the courtroom are members of Avenging the Ancestors

18    Coalition, including Mr. Michael Coard, the founder.

19         THE COURT:  Very good.  Thank you.

20         MS. MCCLELLAN:  Thank you.

21         THE COURT:  I have other amici.  I say amici, you say

22    amici, and there's several other ways to say it, too, but I

23    think I don't want to change my course at the moment.

24         So is there anyone else here representing any of the

25    other three amici, one of whom is the governor of Pennsylvania.

1    The most recent request that I approved came this morning or

2    yesterday and I am certain that I have -- I don't think I have

3    their motion printed out.  I can't find it.  This one?  Oh, all

4    the way over there, okay.  And that's the Democratic Caucus of

5    the Senate of Pennsylvania in support of the Plaintiff's motion

6    for preliminary injunction.

7          So that takes care of the amici.  Thank you for your

8    interest.

9          So let's see where we are.  We know that you are all

10   aware and those on the telephone phone in line must have been

11   made aware that there was a call in, audio only.  No videos are

12   presented from the Court.  Court is not approved for streaming

13   services either.

14         And of course, no recordings can take place.  And

15   I -- if you are in this courtroom or the additional adjunct

16   courtroom at 12B, all of you must follow those rules.

17         And the only laptops that were permitted were those

18   of the press, which I have asked to be seated closer to

19   witnesses here in the jury box.  And I hope that's

20   accommodating all of your requests.

21         We also have some more press that have called in.

22   And that is fine because this is an open courtroom.  It is a

23   public courtroom.  And if ever there was a public issue or 3 or

24   10 or more, it's this case.

25         And all of our proceedings are open.  We make our

1    decisions in the open.  Unless we have to write them down and

2    we'll make them in Court, and then, commit them to writing.

3         This is important that everyone hear the same

4    evidence the Court is, report it carefully, listen to it with

5    interest and please no responses, all right?  It's not a

6    townhall meeting.  And it's not a social gathering.  And I

7    thank you all for being as serious about this as I know we and

8    the parties are and their attorneys.

9         The additional matters that I want to address I will

10   do so as we move along.  I do know that this morning, I was

11   given a stipulation between the parties.

12        And that concerns the admission of certain documents

13   and other pieces of evidence that the parties agree to have

14   submitted to the Court.

15        Counsel, would you address these -- this stipulation,

16   please?  Ms. Garcia?

17        MS. GARCIA:  Sure, thank you, Your Honor.  We have 24

18   documents that we may not use all of them, but could be used

19   today.  We have three witnesses.

20        And yes, we have entered into a stipulation with the

21   United States that these documents be submitted for

22   authenticity, admissibility for the purposes of the preliminary

23   injunction only.  That's at the bottom of page 1.

24        And you do have up there, Your Honor, a binder with

25   the 24 documents in it.  And I believe your clerk has a binder

1    as well.  And we have a copy for the witness and of course the

2    Defendants have a copy of all the documents.

3         THE COURT:  Are these related to authenticity, but

4    also admissibility?

5         MS. GARCIA:  Yes, yes, Your Honor.

6         THE COURT:  So I don't expect any objections when any

7    of these documents are available?

8         MR. IN DEN BERKEN:  I think foundation will need be

9    to be established for each witness, Your Honor, but other than

10   that, the admissibility and authenticity are no issue.

11        THE COURT:  All right, I think that's an appropriate

12   way to proceed.

13        MS. GARCIA:  Thank you, Your Honor.

14        THE COURT:  And are you ready to proceed, Ms. Garcia?

15        MS. GARCIA:  Yes, Your Honor.

16        THE COURT:  You do have witnesses to present.  That's

17   why we re-scheduled this hearing from Wednesday.  And the

18   Government did have an additional day to respond to the

19   preliminary injunction complaint and we have reviewed all the

20   pleadings including the complaint.

21        The Government's response on the complaint will be

22   determined by my next order, because I don't think I'm going to

23   want to wait 60 days.  And we'll talk about that because this

24   is too pressing an issue.  This is the quincentennial

25   celebration being planned as we speak for the very site

1    inclusive of the very site that this case involves.

2            And this will not drag into the summer.  It will not

3    drag into the spring.  We will decide this promptly so that

4    everyone knows where they are and what they can do.  Please

5    proceed.

6            MS. GARCIA:  Your Honor, am I permitted to make an

7    opening statement to advise the Court what --

8            THE COURT:  You are.

9            MS. GARCIA:  -- we are going to proceed today?  Thank

10   you so much.  And thank you Your Honor for the short

11   adjournment.  Our witness was able to get in from California

12   yesterday at 1:00 a.m.  So she's here today.  Thank you.

13           Good morning, Your Honor.  I'm Renee Garcia.  I'm the

14   City Solicitor here on behalf of the City of Philadelphia.  The

15   City is here on its motion for preliminary injunction seeking

16   the restoration of the President's House in the Independence

17   National Historical Park.

18           As you will hear today, the City is irreparably

19   harmed by the destruction of the commemorative exhibit the

20   first federal property to feature a slave memorial.  And by the

21   Park Services own account, they have more damage to do at the

22   site.

23           The City has already submitted in support of its

24   complaint various of the contracting documents that illustrate

25   the extensive history between the City and the Park Service

1    associated with this site.

2              Indeed, the foundation of this collaboration between

3    the parties states back to an act of Congress from 1948.  For

4    the record, that's Title 16, Section 407, subsections (m) and

5    (n) establishing the Independence National Historical Park.

6              That act specifically authorizes the Secretary of the

7    Interior to enter into cooperative agreements with the City of

8    Philadelphia to preserve the park for the benefit of the

9    American people.

10             Pursuant to the act, the National Park Service and

11   the City of Philadelphia entered into a cooperative agreement

12   dated 1950.  And I quote from that agreement.

13             Quote, it is the purpose of both parties to this

14   agreement to develop a unified long range program of

15   preservation, development, protection, and interpretation for

16   the whole of Independence National Historical Park for the

17   inspiration and benefit of the people of the United States.

18             And to secure this result, a high degree of

19   cooperation is necessary with each other.  And the parties

20   hereto pledge themselves to consult on all matters of

21   importance to the program.  That's Article 3, Subsection (e) of

22   the 1950 agreement.

23             I submit to you this morning that the removal of the

24   exhibit at the President's House is of grave importance to the

25   program.

1          These pledges that the parties made in 1950 to the

2    public and to each other at the direction of Congress form the

3    bedrock of the relationship that made the restoration of the

4    President's House possible.

5          At each stage, the City, the Park Service, and the

6    community worked together to create a shared vision, a shared

7    message, a message that reflects the years of discovery,

8    research, soul searching, and reconciliation with a history

9    that is not as clean as we learned in grade school, a history

10   that is imperfect, a history that is flawed.

11         The central theme of the project commemoration of the

12   enslaved persons who lived in the Washington household was laid

13   out specifically in the 2006 cooperation agreement between the

14   parties amended three times and reinforced by the federal

15   government over and over, culminating in the President's House

16   designation as an underground railroad network site.

17         The Park Service has an ongoing obligation to

18   maintain and manage the site, and yes, interpret the site as

19   well, but the contract specifically proscribes that the site

20   interpretation will focus on the house and the people who lived

21   and worked there.

22         The executive branch of the United States government,

23   the systems and methods of slavery, African American

24   Philadelphia, and the move to freedom for the enslaved.  That's

25   the 2009 amendment, attachment C, the project development site,

1    Section B.

2            The Park Service does not have cart blanche to

3    interpret as they like.  They have no discretion.

4            To summarize the history, the President's House

5    project has been book ended by acts of Congress.  First, a

6    directive to the Interior and the City to collaborate on

7    preservation of the park, all the way through the 2022

8    designation of the site under the National Underground Railroad

9    Network to Freedom Act of 1998.  Those acts of Congress remain

10   effective as does the 1950 cooperation agreement.

11           It is clear that neither party has the ability to

12   unilaterally erect an exhibit or take down an exhibit,

13   particularly an exhibit of this significance.

14           For the Park Service to now destroy a commemorative

15   site that took 10 years, millions of dollars, and substantial

16   collaboration without so much as a conversation is the very

17   definition of an arbitrary and capricious action.

18           Your Honor, today, the City will present testimony

19   and documents that will illustrate the integral role that the

20   City played in supporting the design and development of the

21   President's House and will further illuminate the core

22   principal of this commemorative site that it exists to educate

23   the public about the inherent tension and the fact that the

24   first leader of our new country built upon core principles of

25   liberty had slaves.

1           You will hear from Joyce Wilkerson, former Chief of

2   Staff for Mayor John Street, a member of the oversight

3   committee from the project's inception.

4           Ms. Wilkerson will provide testimony detailing the

5   origins of the project dating back to the early 2000s,

6   beginning with community activism, encouraging the

7   interpretation and commemorization of the site to honor

8   enslaved persons who resided in President Washington's home.

9           She will explain that beginning in 2003, the City

10  took a leadership position in collaboration with the Park

11  Service to develop the contact -- content and raise funds for

12  the project.

13          The process included input from public advocates,

14  historians, academics, educational institutions, archeologists,

15  and federal and local elected officials amongst others.

16          The purpose was to uncover both literally and

17  figuratively the real truth about the persons who lived in the

18  first White House.

19          You will hear from Edward Gilleson, the Chief of

20  Staff for Mayor Michael Nutter, who carried this project

21  through a slog of four years of construction and technology

22  issues to its final close out in 2015.

23          He will explain that despite the issues, the parties

24  remain committed to finishing this project, the one they had

25  been tasked to complete for the people of the City and the

14

1    people of this country.

2         Both Ms. Wilson and Mr. Gilleson will testify that

3    they never thought this could happen, that the Park Service

4    after all the parties had worked towards would tear out the

5    very heart of the president's home.

6         Finally, you will hear from Val Gay, the chief

7    cultural officer for the City of Philadelphia.  Ms. Gay will

8    testify regarding the importance of the President's House and

9    the landscape of Philadelphia today as both an exhibit in its

10   own right and a National Underground Railroad Network site and

11   the impact the removal is having and will have on the City.

12        Ms. Gay will explain how this impact is especially

13   pronounced in the year that Philadelphia and these sites in

14   particular will host significant increased number of visitors

15   seeking to celebrate the semi quincentennial anniversary of the

16   founding of the United States of America.

17        You will see the shared press releases about the

18   project.  You will see the design documents.  You will see

19   requests for query documents showing the intention of the site.

20   You will see photos of the site before and after destruction.

21   All of this evidence will demonstrate that the City, which

22   invested and helped develop this important site and which has

23   statutory and contractual rights to consultation input and

24   approval before the changes are made is specifically harmed by

25   the United States' abrupt decision to remove essential

1   information from the President's House, thereby undermining the

2   very reason for this commemorative site.

3       Your Honor, after the City presents its evidence, we

4   will be prepared to argue on the legal merits in response to

5   Defendant's brief.

6       But just briefly, we submit that the City has

7   standing to pursue its claims grounded in the act of Congress

8   1948 and the cooperative agreement in 1950, the terms of which

9   can only be overwritten by Congress, the 2006 cooperative

10  agreement as amended requires the Park Service to maintain,

11  manage, and interpret the site, but not interpret as they want.

12      Interpret as required by the agreement.  The

13  obligations of which survive the expiration of the contract.

14      75 years of collaboration went out the window last

15  Thursday with no warning, no notice, and a clear violation of

16  these governing agreements.

17      Additionally, the Court has jurisdiction to hear

18  these claims.  28 USC §1348 instructs that district courts have

19  original jurisdiction over contract claims where the amount at

20  issue is under 10,000.

21      This is not a grant termination case seeking specific

22  performance that requires the federal government to spend

23  millions of dollars.  This is a case about a failure to

24  confirm -- conform to required collaboration.

25      The City will establish a substantial likelihood of

1    success on the contract claim brought under the Administrative

2    Procedures Act, Section 702, the City will plainly show the

3    Park Service breached the 1950 agreement.

4         On the other APA claims, the City will establish that

5    the Park Services action is a final agency action.  The

6    memorial is damaged and harmed to the City's legal rights to

7    the space flow from that action.

8         The evidence will demonstrate that the Park Service's

9    action is arbitrary and capricious, the National Underground

10   Network of Freedom Act specifically acknowledges that, and I

11   quote, underground railroad bridged the divides of race,

12   religion, sectional differences, and nationality, spanned state

13   lines and international borders, and joined American ideals of

14   liberty and freedom expressed in the Declaration of

15   Independence and the Constitution, both of which were signed

16   within striking distance of the House to the extraordinary

17   actions of men and women working in common purpose to free up

18   people.

19        It specifically directs the Secretary of the Interior

20   to develop a program highlighting and supporting sites involved

21   in the Underground Railroad.

22        President's House is one of these network to freedom

23   sites and the Park Service has now removed the essential

24   information and contravention of the direction of Congress and

25   with seemingly no consideration at all.

1          That the Park Service did this without contacting the

2    City let alone seeking agreement is also arbitrary and

3    capricious in violation of Title 16, Section 407N, which is

4    that 1948 Act.

5          The City will establish irreparable harm.  The

6    contents of the removed panels are critical context to share

7    the story of the individuals enslaved at the President's home

8    and their fight for freedom.

9          The evidence will show that the balance of harms and

10   public interest favor immediate restoration of the President's

11   House.

12         At the close of evidence, the City will ask for entry

13   of injunction directing that the United States restore the

14   President's House because all four factors weigh in favor of

15   granting this relief.

16         And time is of the essence.  As you said, Your Honor,

17   as we near the festivities of the semi quincentennial.  Our 250

18   year old legacy holds the stories of all people of the United

19   States, living and gone.  And it belongs to Ona Judge just as

20   must as you and me.  Thank you.

21         THE COURT:  Thank you, Ms. Garcia.

22         Counsel, on behalf of the Defendants, would you like

23   to address the Court in argument now?

24         MR. IN DEN BERKEN:  Briefly, Your Honor.

25         THE COURT:  Please do.

1          MR. IN DEN BERKEN:  May it please the Court.

2          THE COURT:  Okay, I think there's a sign up there.

3     It works a little bit better when it's closer to your chin.

4          MR. IN DEN BERKEN:  There we go.  This better, Your

5     Honor?

6          THE COURT:  Very good.

7          MR. IN DEN BERKEN:  Under federal law, the National

8     Park Service is the shepherd of our nation's history and

9     property as far as federal parks are concerned.

10         They shepherd it, they safeguard its resources, and

11    properties for the safekeeping and interpretation of the

12    American people.  That includes our history.

13         Ultimately, the National Park Service is a decision

14    maker when it comes to what it displays and places on its

15    property.

16         Reasonable minds might obviously disagree what the

17    appropriate use of that finite space is, what topics, issues,

18    and questions of history need to be discussed, exhibited,

19    explained, and shown, but ultimately, the authority to make

20    that call is from the National Park Service.

21         Now I think it's hard to disagree after hearing my

22    friend's opening statement that what they've actually brought

23    today is fundamentally a contract claim.  Their claims are

24    rooted fundamentally in the 2006 cooperative agreement and

25    before that in 1950 original establishing cooperative

1    agreement.

2              What you haven't heard them say and what we also did

3    not see in any of the briefing or the complaint is the mention

4    that the 2006 cooperative agreement expired in 2010.  It has

5    been ineffective and completed for 16 years.

6              THE COURT:  Although you did hear the same argument I

7    did.  And there's such a thing as a survival clause --

8              MR. IN DEN BERKEN:  Absolutely.

9              THE COURT:  -- to these cooperation agreements.

10             MR. IN DEN BERKEN:  Absolutely, Your Honor.

11             THE COURT:  Plus the original intent of the

12   government, that is Congress not the executive branch, the

13   legislative branch.

14             MR. IN DEN BERKEN:  Absolutely, Your Honor.  And in

15   the 1950 agreement, the term and there's no dispute that the

16   1950 agreement is still in effect.  The 1950 agreement provides

17   that the Secretary has exclusive curatorial responsibility over

18   the display and the selection of the display of exhibits in the

19   national park.

20             There is no requirement on that exclusive

21   responsibility to confer or to get City or anyone else to sign

22   off.

23             The National Park Service routinely changes its

24   displays, revises them, takes them down, updates them, modifies

25   them.  Those are all exercises of their inherent statutory

1    authority and discretion to maintain and ensure the safekeeping

2    and presentation of federal resources.

3          In this case, the 2006 cooperative agreement has

4    expired, although Your Honor's absolutely correct that there

5    are survivability clauses in there and then, there are terms

6    they do survive the expiration of that contract.

7          It is unambiguous in that it provides that ownership

8    and responsibility, including all rights over the exhibit after

9    the completion lie within National Park Service.

10          Now I've heard a lot in this case about a requirement

11    to get signoff, to obtain input.  They are absolutely correct

12    that the 2006 February provides for those requirements, but

13    that was for the creation of the project.

14          It makes clear that at the completion of the project,

15    ownership of the exhibit, including all rights, titles, all

16    intellectual property rights would be transferred entirely to

17    the National Park Service.

18          Now the same inherent authority and discretion that

19    the Park Service exercised 20 years ago to enter into the 2006

20    cooperative agreement and embark on this project that establish

21    his exhibit and the President's House site is the exact same

22    authority and discretion that the National Park Service used

23    last week and decided to take it down.

24          THE COURT:  No, it's not.  It was unilateral.  No

25    notice.  No cooperation.  No intent to involve the City.  As

1    the other decisions had been made.  So don't stay it's the

2    same.

3            MR. IN DEN BERKEN:  But there's no requirement to do

4    that under the original agreement.

5            THE COURT:  You may ultimately prove that there's no

6    requirement, but don't try to argue to me that they did the

7    same thing because there was an awful lot of people's interest,

8    time, and money coming from the City, other organizations,

9    fundraising taxpayers that went into all of this creation of

10   part of the exhibit of the President's House.

11           And this is an act that was not in conformity with

12   what they had agreed to before.  So I expect to hear from the

13   Government as to why they changed their mind.

14           MR. IN DEN BERKEN:  I in no way mean to denigrate the

15   investment effort.  So I want to be original effort.  Both by

16   the City and the National Park Service.

17           THE COURT:  Well, it does sound cavalier, counsel.

18   They can do whatever they want.  Well, what is the premise of

19   changing what they want?  You can present evidence on that.

20   I'm expecting to hear some.

21           MR. IN DEN BERKEN:  I think my point is, Your Honor,

22   that inherently, they have to authority to make that decision.

23   And they get to do so on behalf of the public.  That is the

24   authority they exercised originally, it's the authority

25   exercised last week.

1          Now the fact that we are having an argument or a

2    debate about the meaning of the contractual term, the 1950

3    agreement, the 2006 cooperative agreement, re-enforces the

4    Government's exact point that this is a contract claim.

5          THE COURT:  Okay, so do you agree that there is a

6    current contract at least one clause that survives that the

7    City can sue on here?

8          MR. IN DEN BERKEN:  There are various contractual

9    provisions that have survived the expiration and termination of

10   2006 cooperative agreement.  And there is at least one contract

11   in 1950 establishing foundational agreement that remains in

12   effect, but the fact that we're having dispute over which term

13   applies, what it requires, does it require consultation, was it

14   in conformity therewith establishes that these are

15   fundamentally contract claims.

16          And under the Tucker Act, because what they are

17   seeking is specific performance, not monetary relief, specific

18   performance.  They want the government to comply with what they

19   assert are effective contractual provisions.  That means the

20   Tucker Act strips Your Honor of jurisdiction.  And this case

21   belong to the Court of federal claims.  Now that's a merits

22   argument, but --

23          THE COURT:  No, it's a -- it's a jurisdictional

24   argument, not a merits argument --

25          MR. IN DEN BERKEN:  Point taken.

1          THE COURT:  -- obviously, that we need to decide.

2          MR. IN DEN BERKEN:  But before we even get there,

3     there are standing issues.  There -- although they're not

4     jurisdiction issues as to the contractual nature of their claim

5     and specific performance requests, they lack standing.

6          Now in our brief, we cite the various and quote the

7     various specific contractual provisions that establish that

8     complete ownership of the exhibit, all rights, ultimately

9     transferred to the National Park Service.

10          Certainly, Your Honor.  Court's indulgence.

11          THE COURT:  No problem.

12          MR. IN DEN BERKEN:  On top of that, the City fails to

13     state actual claims under the APA.  What they've identified

14     here are not actual agency actions.  These steps were taken

15     pursuant to the day-to-day operations of the National Park

16     Service.  Changing exhibits, revising them, updating them, or

17     placing interpretive exhibits is ordinary course activity for

18     the National Park Service.

19          THE COURT:  It's frightening to think that that could

20     happen to Independence Hall tomorrow.  It's frightening to

21     think that the citizenry would not be involved in such an

22     important change, contract or not.

23          MR. IN DEN BERKEN:  I think fundamentally, changes to

24     the exhibit are one thing.  Changes to structures, properties,

25     or permanent placements are a separate matter.  Taking down

1    Independence Hall I don't think is equivalent to exhibit.

2              THE COURT:  I didn't say taken down.  The changing

3    the script of the tour guides would be a change, wouldn't it?

4    Because something's going on here, counsel.

5              MR. IN DEN BERKEN:  But Your Honor, I think --

6              THE COURT:  The script is changing, but not according

7    to historical fact.

8              MR. IN DEN BERKEN:  But I think, Your Honor, the

9    changes to scripts happen routinely.  And those aren't agency

10   actions that every member of the public can sue upon.

11             Taking -- changing the tour, choosing to emphasize

12   this part of Independence Hall versus that part, those are

13   interpretive decisions that the agency makes every day.

14   They're not subject to APA claims.

15             In addition, the City hasn't established that they

16   are final agency actions.  For that to occur as our brief lays

17   out, discreet actual legal consequences have to follow.

18             THE COURT:  You argued that in your brief.  I read

19   that with interest because you said there was no injury,

20   particular injury to the City of Philadelphia who is the

21   Plaintiff here.

22             MR. IN DEN BERKEN:  To have an injury, they have to

23   have a right.  They have signed over all ownership and title to

24   the exhibit to the National Park Service.

25             As a result, revisions, which were contemplated by

1   the contract, aren't an injury.  They have no standing and

2   there are no legal consequences that stem from taking down the

3   exhibit.

4        In addition, what they've challenged here is

5   inherently agency discretion.  Although we've heard about the

6   National Underground Railroad statute, they've cited no

7   provision of law, no regulation, no binding policy that they

8   assert the NPS here violated.

9        There are no -- there are no -- there's no framework

10  to check the agency's action here because there is no check in

11  this regard on the agency's action.

12       THE COURT:  So the executive branch has absolute

13  power?

14       MR. IN DEN BERKEN:  In the context of interpreting

15  and running the National Park Services property when it comes

16  to historical exhibits, curating them, deciding what to

17  display, that's a National Park Service discretionary ability.

18       THE COURT:  Then why now?  Why now exercise this

19  stark difference?

20       MR. IN DEN BERKEN:  Because this administration --

21       THE COURT:  The culture has changed?

22       MR. IN DEN BERKEN:  -- this administration decided to

23  issue the Executive Order that resulted in this action.

24       THE COURT:  Yes, the Executive Order, we'll get to

25  that.

1          MR. IN DEN BERKEN:  And fundamentally, the next

2    administration gets to revise that interpretation.  Ultimately,

3    the authority lies with the people.

4          THE COURT:  Oh, so it bounces back every four years,

5    is that what you're trying to tell me back and forth?

6          MR. IN DEN BERKEN:  What I'm saying, Your Honor, is

7    that the same authority that an administration exercised 20

8    years ago to enter into the agreement to embark on this choice.

9          THE COURT:  That was an act of Congress, not the act

10   of an executive.  The legislature.  So you have three branches

11   of government at work here working together.

12         MR. IN DEN BERKEN:  Your Honor, the National Park

13   Service was the one who entered into the 2006 cooperative

14   agreement.  There was no statute that required him to do that.

15         THE COURT:  It emanated from 1948 Congress.  And you

16   heard Ms. Garcia cite that.  You don't deal with that very well

17   in your brief because you're avoiding it.

18         MR. IN DEN BERKEN:  Your Honor, I --

19         THE COURT:  You're going to have to deal with it with

20   me.

21         MR. IN DEN BERKEN:  I'm happy to address the 1950

22   agreement.  In fact, I think it makes sense to do so right now.

23         If we turn to I think this is part of Exhibit 1 in

24   your binder, I would bring Your Honor's attention to clause

25   Article 1(a).

1          And I'm quoting here, the City will retain ownership

2     of the Independence Hall group structures and on the land

3     around the area erected and the park area adjacent thereto

4     known as Independence Hall Square, but hereby agrees, (a), to

5     permit the Secretary to occupy them exclusively except as

6     otherwise provided herein.

7          During the term of this agreement for the purposes of

8     preserving, exhibiting, and interpreting them to the American

9     people.  And otherwise utilizing them in their adjacent grounds

10    for national historical park purposes.

11          (b), to permit the Secretary to have curatorial

12    responsibility for the care and display of such museum objects,

13    furnishings, or exhibits of historic interest as may be

14    available in the Independence Hall group of buildings for

15    exhibit and interpretive purposes, including the right to

16    re-arrange furniture and exhibits to determine such a policy

17    for items to be utilized in the museum or an interpretive

18    program.

19          That 1950 agreement likewise places responsibility

20    for the exhibits, choosing which ones to display, how to

21    display them, updating them, changing them, removing them in

22    the hands of the National Park Service.

23          So even if we go under the terms of the 1950

24    agreement, which I submit reinforces our argument that these

25    are contract claims, there is still no actual violation here.

1   And therefore, no cognizable injury to the City.

2          THE COURT:  I understand that's your position.  And I

3   have a copy of that statute in addition to the one you just

4   provided.

5          And we will hear evidence as to how it relates to the

6   working contingent of local, state, and federal authorities for

7   so many years since 1950 on this exhibit especially up and

8   including 2015.

9          So I am imagine that the behavior of the parties in

10  conformance with what they all understood to be their

11  obligations and authority and responsibilities will come into

12  play here, especially if it's a contract term.

13         MR. IN DEN BERKEN:  If I may, Your Honor, I think

14  that's one of the problems that we're facing here.  Under

15  ordinary contractual principles of interpretation,

16  interpretation of contractual terms is limited to the four

17  corners of the contract.

18         You don't look to course of conduct or the meaning

19  that parties ascribe to it unless you have a contractual

20  ambiguity.  In this case --

21         THE COURT:  Well, don't forget, the pleading here on

22  several of the claims is arbitrary and capricious conduct on

23  behalf of your client.  And that has to be considered as well.

24         So you may say I don't have jurisdiction, they don't

25  have standing, nobody has any authority here except the park

1    commission, and then, why is the big question because why leads

2    to other bad inquiry, which I expect to get to in this

3    testimony.  That inquiry needs to be addressed or it will

4    happen again and again and again.

5         And I don't think that's how these statutes are

6    supposed to be operate.  With my cursory view of them and a

7    little bit of historical knowledge, that we can learn if we

8    don't already know it.

9         So we don't live in a vacuum, counsel.  And there is

10   no clear line of authority from an Executive Order to

11   destroying an exhibit.

12         MR. IN DEN BERKEN:  I think that raises to the next

13   point, Your Honor.  The exhibit is not destroyed.

14         THE COURT:  Well, you say so, but I haven't inspected

15   it yet.

16         MR. IN DEN BERKEN:  The fact --

17         THE COURT:  You hid it away in the national

18   Constitutional center where you say it's safe.  And I believe

19   it's safe there, but I have not inspected it yet.  That will

20   happen.

21         MR. IN DEN BERKEN:  I think the fact that Your Honor

22   is capable of ordering their restoration, their replacement,

23   their reinstallation and the fact that they are kept as we

24   established with sworn declaration of the superintendent of

25   Independence National Historical Park secure in the custody of

1    NPS, the fact that that harm that is asserted is redressable at

2    the conclusion of this case, Your Honor can work award relief.

3    There's is no -- that means by definition there is no

4    irreparable harm.  Your Honor's capable at the conclusion of

5    this case of --

6        THE COURT:  Counsel, if you are correct that there's

7    no standing for the City to bring this, and the Court has no

8    jurisdiction to decide this, then how can I correct any harm at

9    all?  So I can always do that then.  I don't understand your

10   argument.

11       MR. IN DEN BERKEN:  I think these are independent

12   elements, Your Honor.  If Your Honor disagrees about

13   jurisdiction, about standing, and that these claims are not

14   properly cognizable, that means you can proceed from likelihood

15   of success on the merits to the second element of the P.I.,

16   which is irreparable harm.

17       In this case, the fact that Your Honor can award

18   relief that would require the reinstallation of the plaques

19   means there is by definition no irreparable harm.

20       At the conclusion of this case, if Your Honor

21   proceeds and finds that this is a case for which there is so

22   now jurisdiction, it is cognizable and there is a later way to

23   proceed, relief at the conclusion is possible.  And as a

24   result, the drastic remedy of emergency injunctive relief at

25   this preliminary stage is not warranted.

1          Now the final elements of an injunction, especially

2    in the context of a federal government injunction, are the

3    balance of harm -- balance of equities and the public interest.

4          In this case, although as I said earlier, these are

5    issues that are important to many people.  And reasonable minds

6    can differ as to what needs to be displayed, what needs to be

7    shown, how it needs to be shown.

8          Ultimately, it is the National Park Service and

9    federal government's choice what to do there.  That choice is

10   obviously bounded and controlled by Congress and ultimately

11   accountable to the will of the people.

12         But on a day-to-day basis, it is the federal

13   government's choice of how to exercise that authority and

14   discretion.

15         And I think in the context of this case, and what

16   they're asking for is essentially an order requiring a co-equal

17   branch of government to speak in their preferred manner in a

18   way that he has chosen no longer to speak, counsel's

19   particularly in this context against issuing an injunction.  It

20   would compel the Government to speak in a way that it has

21   chosen not to.

22         Here, I think all these issues, all these points

23   counsel strongly against awarding an injunction.  I think as I

24   said before, this case can't proceed here.  They lack standing.

25   They haven't brought cognizable APA claims.

1          But even if Your Honor disagrees with all of that,

2     they still haven't shown irreparable harm or that the drastic

3     remedy of compelling a co-equal branch of government to speak

4     in a way that's chosen not to any more is appropriate.  For all

5     those reasons, Your Honor should deny Plaintiff's motion for

6     preliminary injunction.

7          THE COURT:  Very interesting.

8          MR. IN DEN BERKEN:  Thank you, Your Honor.

9          THE COURT:  I am holding argument from the amici

10    separately.  After the conclusion of at least the Plaintiff's

11    evidence and possibly both the Defense evidence if they should

12    choose to produce any.

13         So I would ask you to proceed, Ms. Garcia, with your

14    first witness?

15         MS. GARCIA:  Thank you, Your Honor.

16         UNIDENTIFIED SPEAKER:  Good morning, Your Honor, the

17    City of Philadelphia would like to call Joyce Wilkerson as our

18    first witness.

19         Your Honor, while this witness gets settled, may I

20    provide your civil deputy with a copy of the exhibits for the

21    witness stand?

22         THE COURT:  Good morning.  You may.

23         THE CLERK:  Please raise your right hand.

24                    JOYCE WILKERSON

25    called as a witness for the Plaintiff, having been duly sworn

1                              testified as follows:

2                  THE CLERK:  Please state your name and spell your

3     last name for the record.

4                  THE WITNESS:  Joyce Wilkerson, W-I-L-K-E-R-S-O-N.

5                  THE COURT:  Please be seated.  Good morning.

6                  THE WITNESS:  Good morning.

7             MS. AXE:   May I, Your Honor?

8                  THE COURT:  You may.

9             MS. AXE:  Thank you.

10                          **DIRECT EXAMINATION**

11    BY MS. AXE:

12        Q    Could you please introduce yourself to the Court?

13        A    My name is Joyce Wilkerson.

14        Q    Good morning, Ms. Wilkerson.  Before we get to the

15    subject that brings us here today, I'd like to just briefly

16    cover your background.  Could you give the Court an

17    introduction to your educational background?

18        A    I was educated first at Mount Holyoake College,

19    dropped out, and ended up getting my degree from University of

20    Pennsylvania, and then a law degree from Bolt Hall School of

21    Law at Berkeley.

22        Q    Thank you.  And I want to talk briefly then about

23    your professional background.  Could you start -- could you

24    describe the beginning of your career?

25        A    I started out as a legal service lawyer in

1    Philadelphia.  I served representing public housing tenants as

2    a part of community legal services.

3        I then went to the Redevelopment Authority, where I

4    focused on the development of affordable housing.  And finally,

5    ended up in Records as Chief of Staff to John Street, who was

6    then counsel president in Philadelphia.  And when he became

7    Mayor, I become his Chief of Staff.

8        Q    And when did you become Chief of Staff when Mayor

9    Street became mayor?

10       A    I think it was in August of 2000.

11       Q    Okay, August of 2000.  Could you just provide the

12   Court with a brief snapshot of your roles and responsibilities

13   as Chief of Staff for Mayor Street?

14       A    I was responsible for coordinating the work in

15   government, working through the cabinet officers.  I chaired

16   the weekly cabinet meetings.  I spoke on behalf of the mayor in

17   public forums.  I communicated closely with the communication

18   director.  I worked with the finance director and budget

19   director.

20       I also had to direct responsibility for oversight of the

21   gas company that would at that point was in a point of crisis,

22   the Housing Authority, and a number of other city departments.

23       Q    Okay, I think you said one of your roles was

24   coordinating and being the voice of the mayor.  Do I have that

25   right?

1          A    That's correct.

2          Q    Okay.  Now I want to cut to the subject at the

3     hearing today.  Are you familiar with the President's House

4     site at the corner of 6th and Market?

5          A    Yes, I am.

6          Q    Okay.  And how do you first learn about the

7     historical significance at that site with respect to the

8     President's House?

9          A    I think I first learned through public communication

10    through press communication.  At that time, the City had worked

11    with the Park Service to move the Liberty Bell site from around

12    5th and Market Street up to 6th and Market Street.  And so,

13    there was a lot of focus on that.

14         At the same time, there was an amateur historian Ed

15    Lawler, who had written an article about that site, about the

16    President's House.

17         There had been a lot of confusion about the President's

18    House over time, where it was located, what parts of it.  And

19    Ed Lawler had written a definitive article that received a lot

20    of national attention in particular by historians.

21         There was -- a part of Ed's research highlighted the fact

22    that President Washington had kept Africans enslaved there.

23    And it is meticulous work.  He had actually identified where on

24    the site that was.

25         It was some of Ed's work that precipitated advocacy in the

1    community, Avenging the Ancestors Coalition that was led by

2    Michael Coard was, you know, was one of the voices and the

3    issue got increased public awareness.

4        And I was part of the public that learned more and more

5    about what had happened at the President's House site.  I had

6    not realized that Washington kept Africans enslaved there.  I

7    didn't understand the whole history and the Liberty Bell and

8    the juxtaposition to the Independence Hall, the Declaration,

9    the Constitution.  So it was as a result of the advocacy and

10   all the press about it that I became really aware of what was

11   happening and the significance of it.

12       Q    I want to just ground us in some dates here.  Do you

13   remember approximately what year that was when you first became

14   aware of it?

15       A    I think it was in 2002, 2003.  For me, it was the

16   Liberty Bell Pavilion opening, because the mayor was due to

17   speak at that opening.  And I think that's when I began

18   focusing more directly on it.

19       Q    Okay, and you're aware of this general community

20   interest, but during this time, were you aware of any specific

21   interest in developing and interpreting this site given this

22   history?

23       A    Yeah, so as the history became more and more clear,

24   there was concern that the Liberty Bell Pavilion interpretation

25   was not accurate and, you know, my understanding is that it was

1    an issue both within the Park Service as well as, you know, an

2    issue for the general public.

3        Also, that the Liberty Bell Pavilion site was adjacent to

4    a parcel that we now know as a result of Mr. Lawler's research

5    had been the site of the President's House and in fact the

6    location where enslaved Africans were kept.  All of that began

7    to crystallize during that period.

8        Q    Okay, I want to talk you're the Mayor's Chief of

9    Staff at this time, but you're also a Philadelphian.  Did you

10    have a personal interest in developing the site?

11        A    I'm a black person.  I'm a black woman.  You know, so

12    my history is the history -- is also the history of slavery in

13    the United States.  And so, I think that that made it

14    personally important.

15        And so, when Mayor Street was supposed to be going to

16    testify or present at the Liberty Bell Pavilion, I remember

17    going to him and saying, we can make this happen.

18        And for me, this was we can tell a fuller story, and then,

19    on a story about what happened in this country at the founding

20    of the country.

21        And I was also aware of the fact that the City had worked

22    collaboratively with the Park Service over time.  Just because

23    I was Chief of Staff, you know, I wasn't directly involved in

24    every little decision, but I knew that there were projects.

25    Where the City and the Park Service had worked collaboratively

1    the City actually owned -- may still own Independence Hall.

2    You know, we own the Liberty Bell.  And so you know, for those

3    reasons, you know, there was this really close relationship or

4    collaborative relationship.

5        And so, when I went to him and I said we can make this

6    happen, I knew that there was precedent for that.  And I also

7    knew that it was important.

8        It was important that we come to terms and that the Park

9    Service, the advocates, the historians had all agreed that, you

10   know, it was finally time to tell an honest story about

11   American history and the founding of this country and the role

12   that slavery and enslaved Africans had in the -- as well as the

13   free Philadelphians in Philadelphia.

14       Q    And I just want to talk about this collaboration

15   piece.  When you're talking about a precedent for

16   collaboration, do you mean between the City and the National

17   Park Service?

18       A    Specifically, there were agreements, there were

19   documents in part because of the ownership overlap.  You know,

20   so Chestnut Street is a public street that runs through

21   Independence Park.  You know, the City has -- had ownership of

22   Independence Hall.  The Liberty Bell was our Liberty Bell.

23       You know, so that recognizing that there historically had

24   been a really close relationship agreements going back half a

25   century or more that reflected that relationship, the agreement

1    to collaborate on projects, you know, sign off, approvals.

2    That was very much the history of City and Park Service

3    operation over the decades.

4        Q    So let's talk about, you know, these concrete actions

5    that then happen.  You talked about this public interest.  So

6    what happened?  What is -- what actions are taken based by the

7    City based on the interest in developing this historical site?

8        A    I remember that it was the day close to the day when

9    the mayor was due to speak at this -- the opening of the

10   Liberty Bell Pavilion.  I remember going to him and saying we

11   can make this happen.

12       And he said write me a letter.  And so, it's like I wrote

13   a letter.  As I recall, it was addressed to Michael Coard.  And

14   it was committing a million and a half dollars.

15       It was our understanding that that was the gap in the

16   funding that was needed at the time, but it was committing the

17   money in order to make this happen.

18       And the this was -- that this was a fuller story,

19   recognizing the existence of nine enslaved African Americans,

20   recognizing the footprint of the President's House, recognizing

21   that slavery was critical and a crucial part of what was going

22   on in the development of this country economically, socially.

23       So that this was really important.  And it was because of

24   that that we committed the funds and made this -- made the City

25   elevated probably or made the City willing to really take an

1  aggressive role in moving this project forward.

2      Q    And you said that Mayor Street committed 1.5 million.

3  Were there at that point -- and what year are we talking about?

4  2000, 2003?  Do you --

5      A    I think it was 2003.

6      Q    Okay.  And this was I'm sorry just to go back, this

7  is when the Liberty Bell Pavilion Center's opening, correct?

8      A    Right.

9      Q    Okay.  Were there at that point additional sources of

10  funding that had already been secured for the interpretation of

11  that site?

12      A    Yes, it's my understanding that there were.  And the

13  reason that we came up with a million and a half is because we

14  were funding a gap.

15      We were aware that the federal -- that in particular,

16  Congressman Brady, Congressman Fattah were committing 3 and a

17  half million dollars.  And so, for us, we were trying to fill

18  the gap in order to assure that the project moved forward.

19      Q    And you know, so I want to talk about this intention

20  to move forward.  You talked a little bit about what the

21  general intention was.  Was the funding that was committed by

22  Mayor Street, was that tied to a specific vision of the site

23  development?

24      A    Yeah, it was -- for us, it was important that the

25  full story be told.  And we were very aware of the advocacy led

1    by Avenging the Ancestors led by Ed Lawler, an amateur

2    historian in Philadelphia.  There were any number of

3    organizations.

4        There was also the Park Service.  You know, so the Park

5    Service had made -- had come to terms with the fact that this

6    is a story that needed to be told on this site.  You know, when

7    it became clear that Washington held Africans enslaved, you

8    know, there was some interest in, you know, or willingness to

9    tell the story, but tell it elsewhere.

10        But my understanding is that the Park historians were part

11   of the team that said, no, this is a story that has to be told

12   here, that this -- there is no other site where that

13   story -- where this story can be told, the story of

14   enslavement, the role that slavery played in the economic and

15   social life in this country, the fact that it was happening at

16   the same time that the Declaration of Independence, the

17   Constitution were all being debated and decided, the fact that

18   George Washington who was a mover and shaker, held enslaved

19   Africans on that site, that that was a story that had to be

20   told there and it had to be told in a robust way and in an

21   honest way.

22        Q    Now you've described a number of different types of

23   stakeholders that were crucial to the interest and development

24   of the initial stages of this project.

25        Were there differences of opinion generally about the

1    development, the design, the construction?  Could you speak a

2    little bit to that and the involvement of the public?

3        A    The -- by the time we became involved and by we, I

4    mean, the City, that the issue of where the story be told was

5    resolved.  And so, there was agreement that this site, the

6    President's House site, was the appropriate place.

7        The second part of your question was?

8        A    Was there involvement from the public?

9        Q    Yeah, the -- from the beginning, there was

10   involvement by the public.  The -- there were the amateur

11   historians, Ed Lawler, Avenging the Ancestors.

12       There was a focus by Blockson, Charles -- I think Charles

13   Blockson, who was a black historian.  He has a whole museum.

14   He had collected history over time of the free African American

15   community in Philadelphia as well as the story of enslavement

16   in Philadelphia.

17       You know, there were -- there was widespread interest.  It

18   even got to the point that I think the food critic for "The

19   Inquirer" was writing about, you know, the story.

20       Because one of the enslaved Africans, Hercules, was the

21   chef for George Washington.  So there's just broad, you know,

22   broad based understanding that this was important and more and

23   more people gravitated to the issue and were invested in the

24   issue.

25       And I think that carried throughout the project.  So we

1    had -- we established an oversight committee.  When we

2    developed the project, we paid, you know, we solicited

3    invitations for developers from around the country when we

4    narrowed down the list.  You know, we had exhibits created and

5    had those exhibited at the Constitution Center and allowed the

6    public to, you know, to actually weigh in?

7        Q    Yeah, so I want to walk back for just a second some

8    of those actions because you just previewed those for the

9    Court.

10       So one of the things that you talked about in getting this

11   off the ground, you have a -- you had a public interest.  You

12   have the public commitment.

13       Let's talk about how we get it built.  So the first thing

14   you mentioned was the formation of an oversight committee.

15   Could you explain more about that?

16       A    Well, let me back up.  So part of what I did was I

17   went to the Park Service and said that the City was willing to

18   take the lead on this, working collaboratively, because I

19   understood that, you know, this -- there was precedent for

20   this.  It was the way we had -- we the City had developed

21   projects before.

22       Part of the commitment was to have everybody at the table.

23   And so, there was an oversight committee that included the Park

24   Service, that included the City, that included Michael Coard

25   specifically.

1          It included historians.  It included representatives of

2    Congressman Brady's office, Congressman Fattah's office.  It

3    included minority cultural organizations.

4          So it was -- it was a group of -- we tried to identify all

5    the stakeholders who were interested in and vested in having

6    this project move forward.

7          Q    You talked a little bit about the relationships of

8    the public officials.  And I think you said that that included

9    both City and federal representatives.  Why was that important?

10         A    It was important because they were all players,

11   right?  And the funding was being involved, you know, funding

12   was involved.

13         So there was about $3.5 million that the federal

14   government, you know, through Congressional appropriations was

15   committing.  You know, the Park Service was an integral partner

16   in it.

17         The City because, you know, a lot of these assets were

18   actually owned by the City.  And it was in our town.  So there

19   were a lot of official representatives involved.

20         Q    And let's talk a little bit about, you know, you

21   mentioned that you had approached the Park Service.  You had

22   offered that the City is going to take lead in the development

23   here.  Let's talk about how you staffed the project from the

24   City's end.

25         A    Well, I -- so I was Chief of Staff.  So I was

1    involved in a lot of stuff, but I had somebody in my office,

2    Hal Fitchhandler (phonetic), whose primary job was shepherding

3    the President's House project.

4        So we had Hal involved.  Our law department was involved.

5    We hired a consultant, Eraz McPherson (phonetic) to help us

6    move the project forward.  It was supported by the City.  It

7    was moved along by the City.

8        Q    Okay, and at some point as this project is

9    progressing, is there request for qualifications issued?

10       A    Yeah.  That's how you move these kinds of development

11   projects.  We issued -- we meaning the City and the Park

12   Service issued a request for qualifications.

13       It is an invitation for parties to come forward.  We

14   defined in the RFQ what the project was.  And it's an

15   invitation for interested parties to respond by stating their

16   vision of the project and also their qualifications to

17   implement the project.

18       Q    I'd like you to turn to Exhibit Tab 14 in the binder.

19   Ms. Wilkerson, we just discussed the RFQ that was issued.  Is

20   this document a copy of that RFQ that you just testified to?

21       A    No, this is the document.

22       Q    Okay.  And is the intention of the RFQ to define the

23   scope of the project?

24       A    Yes, it identifies what the project is, so that

25   parties know what it is that they're being asked to create.

1      Q     Okay, and what was the -- I'll have you set that

2    aside for a moment.  What was the selection process for

3    responsive submissions to the RFQ?

4      A     Everything that came in, we vetted it with the

5    oversight committee.  Also, with the Park Service, and it, you

6    know, we had people inside the City who were our law

7    department, our public property department were all involved.

8      But the public was, you know, was integrally involved in

9    part through the oversight committee.

10     Q     Okay, and you received responsive proposals to the

11   RFQ, correct?

12     A     Yes.

13     Q     Okay, and then, what happened?  How do you narrow

14   those proposals down?

15     A     So part of the review process is deciding

16   which -- you know, which responses best capture the sense of

17   what it is we're looking for and which teams that were advanced

18   had the qualifications in order to move the project forward.

19     As a result of that process, it was narrowed down from

20   perhaps 20 some odd initial responses to maybe I can't remember

21   exactly, probably 5, something like that.  5 responses that we

22   were interested in exploring further.

23     Q     And when in connection with exploring those further,

24   was there a request for proposal issued?

25     A     Yeah, that's normally the next step.  And so, with a

1   request for proposal, RFP, what you're looking for is a more

2   developed plan.  You know, exactly what are we talking about?

3   How do you envision addressing the issues?

4        And so, what we were looking for was, you know, one of the

5   commitments, one of the make it happen part of it was

6   identifying the footprint of the President's House.

7        Part of it was creating a memorial for the nine enslaved

8   Africans for Ona Judge, for Hercules, for Richmond, for Paris,

9   for the nine Africans who were enslaved there.

10        It was also important that the parties tell an accurate

11   and robust story about slavery and the interface between the

12   enslaved Africans and the role of free Africans in

13   Philadelphia.

14        And so, they were these various elements that had to be

15   addressed.  And so, that was what we were looking for in the

16   RFP.

17        Q    I want to have you turn to Exhibit Tab 15 please.  Is

18   this a copy of the RFP that you just discussed?

19        A    Yes, uh-huh.

20        Q    Okay.  Thank you.  I'm going to have you set that

21   document aside.  So you have the RFP issued.  You have the

22   semifinalist.  What was the selection process then for how to

23   determine how to move forward?

24        A    One of the things we did that was perhaps

25   unprecedented is the City actually put money on the table in

1    order to have the proposers create models of what they

2    envisioned.  And we had those models exhibited at the

3    Constitution Center.

4        Part of what we wanted, we wanted to have the public able

5    to see what it is, you know, to follow the project.  The public

6    had been so involved in creating the project.  We wanted to

7    make sure that the public had an opportunity to evaluate and

8    comment on what was envisioned for the President's House site.

9        And so, in addition to just having them see it, they were

10   invited to submit comments about the various proposals that

11   were submitted.

12       Q    And that, from the beginning stages, the involvement

13   and opportunity of the public was -- it was important for you

14   as the representative of the City?

15       A    It was credible.  I mean, it had been part -- it was

16   the public engagement that resulted in the moving forward with

17   the project to tell a complete story about the President's

18   House site and all that was involved there.

19       And so, throughout the project, in creating the oversight

20   committee in making the decision to, you know, exhibit the

21   various proposals and have public comment.  I mean, it was

22   just -- it was integral to every aspect of this project.

23       Q    So, eventually, after this public display and comment

24   period, is there a winning proposal selected?

25       A    There was.  The decision was made to move forward

1    with the Kelly Myale (phonetic) proposal for the President's

2    House.

3        Q    Okay.  And in connection with their response to the

4    RFP, had they put together a proposal for how they would

5    develop and interpret the site?

6        A    Yes.  They came up with a proposal that was actually

7    implemented that respected the request to have the building

8    footprint identified on the site.  There was a specific

9    memorial created.  It was important to everyone that the nine

10   enslaved Africans be memorialized on the site.

11       It was important that the story of enslavement be told and

12   the role of slavery and the creation of this nation, all of

13   those stories needed to be told on that site.  And it was

14   important that it be there because it -- there's no place else

15   where you can tell the story.  And the Kelly Myale project did

16   all of that.

17       Q    And I want to have you turn to Exhibit Tab 16,

18   please.  Is this a copy of the proposal that you just discussed

19   from the winning bid?

20       A    Yeah, I believe it is.

21       Q    Okay, I'm going to have you set that aside.  Winning

22   bid is selected.  Do you know if the mayor, Mayor Street and

23   the superintendent or some representative of NPS jointly

24   announced the winner?

25       A    Yes.  They announced that there was a -- there were

1    press releases.  Both the City and the Park Service were

2    working collaboratively.  And so, with the issuance of the RFQ,

3    the RFP, press releases, we were all doing it -- working

4    jointly in tandem.  And so, there were press releases about the

5    selection of the developer.

6         Q    I want to have you turn to Exhibit 17, please.  Do

7    you recognize this as the press release that you just testified

8    to announcing the winner?

9         A    Yes.

10        Q    And is that one that's jointly issued by the City and

11   by NPS?

12        A    Yes.

13        Q    Okay, thank you.  I'm going to have you set that

14   document aside.

15        Now during the selection process and through this

16   development, were you aware of any formal agreements entered

17   between the City and the federal government to ensure clarity

18   of roles relating to the project?

19        A    Yeah, there was a cooperative agreement that was

20   entered into -- I think I might have signed it.  Actually, it

21   was important that, you know, and it carried forward what had

22   been the practice.

23        And so, every decision that was made was made jointly.

24   And the agreement, you know, said there aren't any you know

25   that both the design and the solicitation --

1          MR. IN DEN BERKEN:  Objection Your Honor.

2          THE WITNESS:  Every --

3          MR. IN DEN BERKEN:  I think the agreement speaks for

4    itself.  I think unless she has a documents in front of her,

5    unless she can speak to them somehow, I don't think her

6    interpretation of the contract is admissible.

7          THE COURT:  If she was a party to these negotiations

8    and contracts, I will let her testify as to unanimity and who

9    was involved.  I think that's acceptable, so you may.

10          MR. IN DEN BERKEN:  Thank you, Your Honor.

11          THE WITNESS:  So the City was involved, the federal

12    Park Service.  And it carried forward what had been the

13    practice since, you know, the original cooperation agreement.

14    BY MS. AXE:

15     Q    So I'll have you turn to Exhibit Tab Number 3.  Is

16    this a copy of the 2006 agreement that you were just

17    referencing?

18     A    Yes, uh-huh.

19     Q    And I want you -- I'm not going to spend too much

20    time on this document, but I want you just to flip to the

21    signature block.  It's page 14 of 14 and on the bottom left?

22     A    I'm there.

23     Q    And is that your signature on behalf of the City of

24    Philadelphia?

25     A    Yes, it is.

1    Q    Okay, and if you look to the next page, there is an

2    exhibit, correct?

3    A    Correct.

4    Q    And is that a copy of the 1950 agreement that you

5    were just referencing?

6    A    Yes, it is.

7    Q    Okay, I'm going to have you set that aside.  Now

8    during your tenure as Chief of Staff, did you enter into an

9    amendment to the 2006 cooperative agreement?

10    A    Yes.

11    Q    Okay, and I'm going to have you turn to Exhibit Tab 4

12    please.  Okay, this agreement is dated from 2007.  Is this the

13    agreement that you remember entering into?

14    A    Yes, it is.

15    Q    Okay.  And I'm going to have you flip.  I don't have

16    a page number.  My apologies, but just if you can find the

17    signature page there.

18    A    I've got that.

19    Q    Okay.  And that's your signature there Ms. Wilkerson?

20    A    Yes, it is.

21    Q    On behalf of the City of Philadelphia?

22    A    Yes.

23    Q    Okay, what was the intention behind this amendment?

24    A    One of the things that -- during the course of the

25    project, I remember how Fitchhandler, my deputy, coming to me

1    saying that we got to make a decision about an excavation, an

2    archeological dig on the site.

3        And I remember asking him how much is it going to cost.

4    And he said between 6- and $700,000.  I read the -- I read the

5    analysis that had been done at the site.  And the archeologist

6    had said it was not likely that we would find anything.  The

7    site had been used for various other uses.  The site at one

8    point was public restrooms over where I think as a result of

9    the Lawler work, we understood that enslaved Africans had

10    lived.

11        I committed on behalf of the City to fund the

12    archeological dig.  It was important that we unearth the truth.

13    That was the whole purpose of this project was to tell the

14    truth.

15        And so, the City committed over $600,000.  And that was

16    reflected in some of the agreements and the amendment to

17    increase that amount as the actual costs became more clear.

18        Q    So you've talked about a number of components to what

19    this project, I'll use that in quotes specifically.  You

20    testified to a footprint of the executive mansion, a memorial,

21    an exhibit.  And now you have this architectural dig component,

22    too.  Do I have that correct?

23        A    Yes.

24        Q    Okay, so when generally if you recall did ground

25    break on the project?

1        A    I think ground was broken in 2007 as I recall.

2        Q    Okay, and I just want to talk little bit about the

3    archeological date.  Did that also commence in 2007?

4        A    Yes.

5        Q    Could you talk little bit more about the component of

6    the dig?  Were you there when that was getting started?

7        A    Yeah, I was there.  It was, you know, it was done by

8    contractors, by archeologists.  I think they were under

9    contract to the Park Service as I recall.

10        And there was a dig because of the interest, there was a

11    platform overlooking the dig that was created.  And during the

12    course of the dig that extended several months and it was

13    actually the time was extended even further because of the

14    public interest.

15        More than 300,000 people stood on the platform and looked

16    at the dig and interacted with the archeologists that were

17    talking about what it was that was found and the significance

18    of the site and the full story of what happened there.

19        Q    And throughout the process, this dig, how long did it

20    take do you know?

21        A    As I recall, it started in the early spring.  It was

22    extended into the summer because in part because of the

23    interest.  There were a number of things found that nobody had

24    anticipated.  Like I said, you know, it had been a public

25    toilet.  You know, nobody thought much of the site.  But you

1   know, as it turned out, there were considerable findings there.

2       Q    And you testified to this earlier, the interest in

3   keeping the public apprised of what was going on.  Do you

4   recall a series of or have you been aware of a series of press

5   releases issued in 2007?

6       A    Yeah, there were any number of press releases.  Like

7   I said, nobody had anticipated what it turned out was unearthed

8   at the site.

9       And so, at one point, the dig revealed that there was a

10  foundation to the kitchen where Hercules, the enslaved African,

11  had cooked.  There was the foundation that led from the kitchen

12  underground into the President's House.

13      What they found was part of the foundation for the bow

14  window that was added at Washington's direction to the house.

15  Nobody anticipated finding that.

16      And those things were important.  The bow became the

17  precursor for round rooms in the current White House.  I think

18  it is in part why we have an Oval Office now.  So the dig and

19  what was unearthed in the dig was important.  And as these

20  things were uncovered, there were press releases issued jointly

21  by the Park Service and the City.

22      Q    So I would like to -- I don't need to go over these

23  press releases, but I would like just very quickly to have you

24  look at Tabs 18, 19, 20, and 21 if you don't mind.  I can take

25  those in order, Your Honor, just for judicial efficiency.

1              THE COURT:  Please do.

2              MS. AXE:  Just Tab -- okay, thank you.

3    BY MS. AXE:

4         Q    All right, could I have you turn to Tab 18, please?

5         A    Okay.

6         Q    Is this a press release from March 21st of 2007?

7         A    Yes.

8         Q    Okay, and was this one of the press releases that you

9    were just testifying to?

10        A    This is one.

11        Q    Okay, and is the title of this the kickoff for the

12   President's House archeological dig?

13        A    Yes, it is.

14        Q    Okay.  And this was issued jointly by the City and

15   Independence National Historic Park?

16        A    Correct.

17        Q    Okay.  I'm going to have you turn to Tab 19.  Similar

18   question.  Is this a press release -- this is another one of

19   the press releases that you were generally testifying to?

20        A    Yes.

21        Q    This is from May 2nd, 2007, correct?

22        A    Correct.

23        Q    Issued jointly between the City and National Historic

24   Park?

25        A    Yes.

1    Q    Okay.  And is this about the archeological dig?

2    A    Yes, it is.

3    Q    Okay.  And I'm going to have you turn if you don't

4  mind to Exhibit 20.

5    A    Yes.

6    Q    Okay.  Is this a press release from May 10th, 2007?

7    A    Yes, it is.

8    Q    Okay.  This is also issued jointly between the City

9  and the federal government about the archeological dig?

10   A    Yes.

11   Q    And my apologies to the Court.  I know I'm moving

12 quickly, but I'm going to have you turn to Exhibit Tab 21,

13 please.

14   A    I'm there.

15   Q    Okay, and this is a press release from June 19th,

16 2007, correct?

17   A    Yes.

18   Q    Okay, also jointly issued?

19   A    Yes, it is.

20   Q    And this is to apprise the public of the next steps

21 for the President's House, correct?

22   A    Correct.

23   Q    Okay.  I'm going to have you set those documents

24 aside, please.  Now you end your time at least this tenure as

25 Chief of Staff, I know you have a subsequent professional

1    history, but you end that period of your professional history

2    in the end of 2007, correct?

3        A    Correct.

4        Q    Okay, what did you do after you left?  Just for the

5    couple years after, what did you do after you left City

6    government?

7        A    I traveled, and then, I became the executive director

8    of the Redevelopment Authority in New Orleans --

9        Q    Okay.

10       A    -- in some of the post Katrina years.

11       Q    So you understood that the project wasn't finished

12   when you left City government, correct?

13       A    Correct.

14       Q    Okay.  Was it your understanding that the project

15   from the City's perspective would be continued to be run out of

16   the mayor's office?

17       A    Yes.

18       Q    Okay, and did you attend the opening or at least the

19   soft opening of the exhibit back in December of 2010?

20       A    Yeah, I came back from New Orleans in order to

21   attend, yeah.

22       Q    Okay, and that was at that point the culmination of

23   what you had initially started, correct?

24       A    Correct.

25       Q    Okay.  Last set of questions here, Ms. Wilkerson.  As

1    you were entering into the agreements as you're developing this

2    property, you're going to these public forums.

3        Did you ever contemplate the possibility that the federal

4    government would tear down all that was designed, built, and

5    installed over the course of almost a decade worth of

6    partnership in just a single afternoon?

7        A    It never occurred me.  I thought that we had -- that

8    it was progress that we had made and a commitment to telling

9    the truth.

10        And that the whole project reflected close collaboration

11   between the advocates representing the community, the

12   historians investigating the facts, the federal government,

13   local government, you know, the City and its residents.  It

14   never occurred to me that all the work, the financial

15   commitment, the investments we had all made would ever be

16   destroyed.

17        That we would reach the point that we weren't telling the

18   story, telling the truth about what happened on that site and

19   the development of this country.  It never -- I don't think it

20   ever occurred to any of us that we would turn our backs on that

21   or that part, you know, the federal government would turn its

22   back on the commitments that were made to tell the truth.

23        Q    And the truth, again, just to put the point there is

24   that you were commemorating and recognizing the lives of nine

25   enslaved Africans, correct?

1    A    We were commemorating it, but we were also telling

2    the story of slavery and the role that slavery had in the

3    development of this country, and the fact that they both

4    happened and carried on, went on at the same time.  And that

5    was the story that I think everybody had agreed needed to be

6    told and were willing to tell the truth.

7    Q    Do you know, and maybe this beyond your knowledge,

8    but as the Chief of Staff from Mayor Street for seven years,

9    eight years, would the City have invested all of this, its

10   time, its commitment, its money into this project if that was

11   ever a possibly?

12   A    No, I mean, the money is important, but it wasn't as

13   important as the time and that the City put into it and the

14   commitments that it made.

15   Q    Thank you, Ms. Wilkerson.  I don't have any

16   questions, any additional questions right now.  The Defendants

17   might, but I thank you for your time.

18   A    Thank you.

19         THE COURT:  Thank you, Ms. Axe.

20         Do you have questions, counsel?

21         MR. IN DEN BERKEN:  Brief questions, Your Honor.

22         THE COURT:  Brief, then let's go ahead and we'll take

23   a brief recess after that.

24                    **CROSS-EXAMINATION**

25   BY MR. IN DEN BERKEN:

1    Q    Good afternoon, Ms. Wilkerson.

2    A    Hi.

3    Q    I understand you're joining us from California; is

4    that right?

5    A    I was stranded out in California.

6    Q    Well, hope you made it in all right.  And I imagine

7    that a little snow there currently than we do, but thank you

8    for joining us today.  You were Mayor Street's Chief of Staff

9    for seven years, is that what I heard?

10    A    I began in summer of 2000 and ended when his term

11    in -- of office ended at the end of the 2007, yeah.  2000 to

12    2007.

13    Q    And I heard you testify that you were or you played a

14    large role in the execution and formation of the original 2006

15    property agreement; is that right?

16    A    Yes.

17    Q    And you're familiar with that document?

18    A    Yes.

19    Q    If I could have you flip to Exhibit Tab 3, which is

20    the cooperative agreement.  I think we talked a little bit

21    earlier or you talked a little bit earlier about the

22    cooperative agreement and what went into it.  Do you know who

23    drafted this?

24    A    No.

25    Q    But you agree with me if you flip to page 14, is it

1    your signature on behalf of the City of Philadelphia, correct?

2        A    Yes.

3        Q    And I don't know what standard practice was, but

4    would you read every legal document you signed as Chief of

5    Staff --

6        A    No.

7        Q    -- Mayor Street?  Do you remember if you read this

8    one?

9        A    I don't remember.  I remember that it was the

10    agreement to work collaboratively with the federal Park Service

11    and that we would agree to jointly review and develop the

12    project.

13        Q    But you don't remember reading this before you signed

14    it?

15        A    I don't recall.  I don't remember.

16        Q    Could I have you flip to page 3 of the agreement?

17    And I think approximately at the middle part of that page, once

18    you get there, there's a Section 2 that says ownership of

19    exhibit.  You see that?

20        A    Yes, uh-huh.

21        Q    I'm going to read that.  If you could read along

22    silently while I read aloud.  I appreciate it.  Upon completion

23    of the exhibit, in accordance with this agreement, ownership of

24    the exhibit shall transfer to the NPS.  NPS ownership of the

25    exhibit shall survive any termination of this agreement,

1   ownership of the sidewalk and surrounding areas of the exhibit

2   shall remain with the current property holder.  Did I read that

3   correctly?

4       A    Yes.

5       Q    And if you flip to the next page, which is page 4,

6   there's a top section captioned management and maintenance of

7   the President House exhibit.  Do you see that?

8       A    Yes.

9       Q    I'm going to read again Subsection (a).  NPS agrees

10  that it shall undertake all responsibility to manage, occupy,

11  utilize, operate, repair maintain interpret, and administer the

12  exhibit, which shall become property of the NPS in accordance

13  with this agreement and part of the Liberty Bell Center in

14  accord with current NPS policies and guidelines.  Did I read

15  that correctly?

16      A    Yes.

17      Q    Turning away from this property agreement, during

18  your tenure as Chief of Staff, do you remember any other

19  collaborative endeavors that you undertook with the National

20  Park Service?

21      A    I don't remember any others.

22      Q    Do you remember the National Park Service ever

23  contacting you or the mayor to discuss or coordinate on

24  interpretive steps that they were taking?

25      A    I don't remember anything specifically.  There was

1   ongoing coordination, for example, with the dig.  You know, so

2   it was a close working relationship.  I don't remember anything

3   specifically.  We went through -- I don't remember anything

4   specifically.  I'd have to --

5       Q    What about unrelated to this project in general?  Do

6   you remember any approach or collaboration with the National

7   Park Service on Independence Mall, on the Liberty Bell Center,

8   Constitution area in general?

9       A    Yeah, I mean, there was always close collaboration.

10  I remember on the heels of 9/11 for example.  You know, there

11  was concern about what the security was going to be at the Park

12  Service.  Chestnut Street runs through the middle of the Park

13  Service.  You know, it's such a close relationship, there was

14  constant communication at various levels of government I'm

15  sure.

16      Q    Do you recall any communication about their

17  interpretive contact?  Like tours or displays, anything of that

18  sort?

19      A    Every -- I don't have any specific recollection of

20  that.

21      Q    Okay.

22      A    You know, beyond the whole development process,

23  right.  So we all agreed on what the project was going to be.

24  We were all involved in selecting what the project was going to

25  be.  We were all committed to having it be an interpretation of

1    the role of slavery in developing the country.  I mean, all of

2    those were constant themes and came up in various ways.

3        Q    Thank you for your time.  I have nothing further.

4            THE COURT:  Thank you.

5            Any redirect?

6            MS. AXE:  No, Your Honor.  Thank you very much.

7            THE COURT:  Thank you.  You may step down, Ms.

8    Wilkerson.

9            THE WITNESS:  Okay, thank you.

10        (Witness is dismissed)

11           THE COURT:  We are going to take a 10 minute recess

12   and then come back and hear your next witness.

13           MS. AXE:  Thank you.

14        (Recess taken at 12:06 p.m., recommencing at 12:27 p.m.)

15           THE CLERK:  All rise.  Court is now in session.  The

16   Honorable Judge Cynthia Rufe now presiding.

17           THE COURT:  Please be seated, everyone.  Good

18   afternoon.

19           MS. AXE:  Good afternoon.

20           MR. IN DEN BERKEN:  Good afternoon, Your Honor.

21           THE COURT:  The City of Philadelphia may call its

22   next witness.

23           MS. AXE:  Thank you, Your Honor.  We would like to

24   call Edward Gillison to the stand.

25           THE CLERK:  Please raise your right hand.

1          EDWARD GILLISON

2     called as a witness for the Plaintiff, having been duly sworn

3                    testified as follows:

4          THE CLERK:  Please state your full name and spell

5     your last name for the record?

6          THE WITNESS:  Edward Gillison, G-I-L-L-I-S-O-N.

7          THE COURT:  Please be seated.

8                    **DIRECT EXAMINATION**

9     BY MS. AXE:

10     Q    Good afternoon.  Could you please introduce yourself

11     to the Court?

12     A    Yes, good afternoon, Your Honor.  Edward Gillison,

13     former a lot of different things I'm sure you'll hear about.

14     Q    What is your current title, Mr. Gillison?

15     A    I currently work with the Defender's Association of

16     Philadelphia.  I am the director of employee and labor

17     relations now.

18     Q    Okay.  I want to take a step backwards.  Could you

19     just briefly summarize your educational background?

20     A    Sure.  I'm native Philadelphian.  You can't start

21     with Philadelphia without saying where you went to high school.

22     I went to University City High, West Philadelphia born and

23     raised.  I won't do the rest.  We also -- I went to the

24     University of Pennsylvania as an undergraduate.  I -- once I

25     graduated, I went to Syracuse University for law school.

1      In between, I was a case worker.  I started out in social

2   work.  And once I went to law school, came back, I came back to

3   the Defender's Office where I worked for the next 20 years

4   doing mostly capital cases and special defense cases.

5      Q    And at some point, did you join City government?

6      A    Yes, Michael Nutter, a friend of mine, decided to run

7   and win for the City of -- the mayor for the City of

8   Philadelphia and asked me to join him.  So I was with him from

9   day 1, which was 2008.

10      Q    What was your first role with Mayor Nutter in 2008?

11      A    I was the deputy mayor for public safety.  In that

12   role, the where -- the way that the Nutter administration was

13   comprised, he had four or he started with four then went to

14   five managing directors for a particular area.

15      I ended up being the deputy mayor and managing director

16   for public safety.  That meant that police, fire, prisons,

17   office of emergency management, the courts at the time because

18   we ended up reviewing their budget.  So I was the person that

19   was -- that they would present the budget to and go through at

20   the District Attorney's Office and my former office, the

21   Defenders would all come through me in order to make sure we

22   would get and go through and get the approvals going forward.

23      Q    And after you were deputy mayor, did you hold another

24   role within the Nutter administration?

25      A    Yes, because no good deed goes unpunished.  Busy

1    people get to do busy things.  The first Chief of Staff was

2    Clay Armbrister, another friend that I grew up.  We went to

3    Penn together along with Michael.  He was the first Chief of

4    Staff.  When Clay decided to leave, he left in 2010, Michael

5    had an interim while he tried to figure out who he wanted to be

6    Chief of Staff and came to me and said he wanted me to take the

7    Chief of Staff role, while not giving up my deputy mayor role

8    for public safety.

9         And so, I was Chief of Staff/deputy mayor for public

10   safety at the same time.  So I was first among equals.

11              THE COURT:  I guess that's a double thank you for

12   your service.

13              THE WITNESS:  Yes, absolutely.  And my wife still to

14   this day says there's got to be a way that you are underpaid

15   because you work two jobs or three jobs and you only got one

16   salary.

17   BY MS. AXE:

18        Q    Well, I want to talk just about one of those jobs,

19   which was your time as Chief of Staff for then Mayor Nutter.

20   So you became Chief of Staff you said in 2010.  We heard

21   earlier a little bit about Ms. Wilkerson's duties and

22   responsibilities during her time as Chief of Staff, but

23   different administration.  Could you describe your roles and

24   responsibilities as Mayor Nutter's Chief of Staff?

25        A    Yes.  Again, we had an inner team of five deputy

1    mayors.  We also had five persons that were also integral so

2    there was 10 of us that ended up being the inner team.

3        And I as Chief of Staff, you were the person that was the

4    cabinet.  But we had an inner cabinet and an outer cabinet.  So

5    the executive team was managed by the Chief of Staff, as well

6    as making sure that everybody played well together going

7    forward.

8        So, yes, the Chief of Staff's role is to keep all the

9    other deputy mayors both on point with the mayor's vision.  And

10   also, I would actually speak for the mayor if there was a

11   something that was going on that needed attention.  The last

12   person in the room with the mayor at any particular time would

13   be the Chief of Staff.

14       Q    Okay, now I want to take you to the subject of

15   today's proceeding, which relates to the President's House

16   project.  When do you first learn about the President's House

17   site if you recall?

18       A    Clay said to me you thought you had a lot of things

19   to do when you were just doing deputy mayor stuff.  So I'm

20   leaving you a couple of things that need your attention.  And

21   one of them is going to be the President's House.

22       And so, I was aware of the President's House obviously.

23   It was something that we had invested a lot of time energy in,

24   but I was not as aware, but he said there's a file that you'll

25   get.

1        And I got my briefing.  Kathy Loney (phonetic) was Clay's

2   executive assistant and she sat me down and kind of poured over

3   a lot of the open projects that were going on.

4        We were still reeling from the Great Recession at the

5   time.  So we were -- people don't remember it too much today,

6   but it was something that had a major effect on the Nutter

7   administration.

8        When we came in, we for six months we -- everybody loved

9   us.  And then, the bottom fell out in July to August of 2008.

10  Lehman Brothers went under.  And at that point, the entire

11  economy went down.  The City of Philadelphia was about to go

12  bankrupt.  And yet, we couldn't act like it because we didn't

13  want to cause concern.

14       So we're still coming out of that particular time.  And

15  Clay is telling me, yeah, there's a lot of things that we're

16  still investing in.  And President's House became one of the

17  things that I had to keep on my radar.

18       Q    Okay, so President's House becomes part of your

19  portfolio of work.  Although you had been generally familiar

20  with the project in Philadelphia, correct?

21       A    Correct.

22       Q    Okay.  And did you know -- let's -- before your role

23  specifically, what was just sort of the general information

24  that you knew about the project?

25       A    I think that I became the way or the same way that

1    Joyce became aware of it.  When the Independence -- when the

2    Liberty Bell was going to get moved, there was a big hoopla in

3    Philadelphia all about that.  And there was a lot of things

4    that were being discovered.

5         Philadelphia is a place, I love it to my core, but we

6    always have a lot of things that are amazing that are in plain

7    sight that we don't have an appreciation for.

8         This was something that we discovered as a City during

9    that move.  And the entire Independence Mall, I always used to

10   chide with people and would say do you remember what

11   Independence Mall looked like prior to the '30s and '40s and

12   '50s.  There are pictures.

13        And they said, yeah, it was just a whole bunch of houses

14   and everything.  Yeah, it did -- wasn't a mall.  It wasn't

15   until afterwards that people started -- the City and the

16   federal government decided to make it into a mall that it

17   really began its current look where the City owned it all and

18   now they became a cooperation between the federal government

19   and the City to make it what it is today.  And it's one of the

20   most beautiful places I think in the country.

21        Q    Uh-huh.  So let's take you to that mall.  You're

22   Chief of Staff in 2010.  You heard some testimony from Ms.

23   Wilkerson earlier about the exhibit opening in December of

24   2010.  Is that your memory?

25        A    I believe so.  I was not able to go, but Clay

1    actually came back and Clay was there along with the mayor.  I

2    remember them going down.  I was unable to go because there was

3    another fire for me to put out.  So that's what I remember

4    about that day.  I was not there.

5         Q    Was it your -- you talked about sort of the -- your

6    portfolio of general responsibilities.  You're aware that the

7    City, while you were Chief of Staff, is it still putting out

8    press releases about various things of public interest?

9         A    Absolutely.

10        Q    Okay.  So I'm going to represent to you.  I have a

11   set of exhibits in a binder.  Counsel and I have already

12   stipulated to their authenticity.  I just want to have you turn

13   to Exhibit 23.  Oh, I'm sorry.  Yes, Exhibit 23.  And this is a

14   press release from December of 2010.  Do I have that right?

15   Are your looking at that document?

16        A    I am.

17        Q    Okay, and this is about the President's House site

18   opening in Philadelphia; is that correct?

19        A    Yes.

20        Q    Okay.  And this is jointly issued by the City and

21   NPS, correctly?

22        A    That's correct.

23        Q    Okay.  And this would have been issued while you were

24   Chief of Staff, correct?

25        A    That's correct.

1    Q    Okay.  So the exhibit opens.  There's a press

2  release.  It's announced to the public.  December 15th, 2010.

3  It's opening.  Is that the end of the project --

4    A    Oh, God.

5    Q    -- from the state's perspective?

6    A    I wish it were.

7    Q    Okay.  So --

8    A    The answer was no.

9    Q    Okay.  So, 2010, it opens to the public, but no,

10  that's not the end of the project.  And I want to talk a bit

11  more about that.  So there is work left to be done at the site.

12  Could you talk a little bit more about that, please?

13    A    Yes.  One of the things that was going on is that

14  there was constant issues.  We wanted to make sure that we were

15  transmitting to the Park Service, our partners, we were

16  transmitting what we said we were going to do in the agreement.

17    And that was to have a first class understanding and

18  recitation of what happened at that site.  So there was a whole

19  lot of different things.  And there was a punch list that was

20  given to me to -- for me to in essence follow along.

21    And I began a series of communications with Cynthia.  She

22  was the head of the Park Service at the time, where there would

23  be issues that were brought up that we thought were actually

24  closed out and they would say, look, hold on, that's really not

25  correct.  This is not closed out.  We need somebody to have

1    some attention to it.  They would bring it to my attention.

2         I would then sit down with the team, the team in the City

3    had law department, had the CPO James Lowe (phonetic), capital

4    projects I'm sorry Your Honor.  Capital projects office.

5         There was a number of different people.  I even had people

6    in the government that I had gotten to know and trust on

7    different buildings that I was -- we were doing in our

8    administration, Gary Knapp (phonetic) from public property as

9    well.  They would all have different ways of informing what was

10   going on and how.

11        I wanted to be able to really give the mayor's view.  And

12   it was always, Edward, get it done and get it done right.  And

13   so, that was my marching orders.

14        And I worked with my partners to make sure that that's

15   what's going to -- that was going to happen.  It didn't happen

16   overnight.

17        As a matter of fact, it didn't happen for me until I was

18   literally walking out the building.  We transmitted I think my

19   last letter is somewhere around 2015.

20        Q    Okay.

21        A    So I had five years of working with --

22        Q    Yeah, let's back up.

23        A    -- this project.

24        Q    Yeah, so we have 2010, project opened.  You're

25   walking out the door, project can completion.  That's -- so you

1    were working on this for five years.

2        A    Correct.

3        Q    Between 2010 and 2015.

4        A    That is correct.

5        Q    Okay.  So I want to talk a bit about what happens

6    during that five year period, but first, you mentioned a name

7    here.  You said Cynthia.  Is that Cynthia I'm going to

8    mispronounce her last name, so I apologize, McLeod (phonetic)?

9        A    Yes, I think that's the way it is.  I would just say

10   Cynthia at the point.  We ended up having such an --

11       Q    McLeod.

12       A    -- McLeod, yeah.  We ended up having a lot of

13   relationship with one another because one thing that most

14   people don't recall, even though it was another thing that was

15   part of my life, was the Pope was coming.  And the Pope took

16   place and part of that was this site.

17       And it was important especially to the mayor, especially

18   to the citizens of Philadelphia that we were going to work with

19   the Secret Service and the federal government to be able to put

20   that on.

21       And that was another part of the collaboration, Your

22   Honor, that we had with them.  And if you think that the

23   President's House, we had meetings and whatever, that was

24   something that I got to know them and they got to know me

25   because whenever there was a problem, my phone rang.

1          My phone started with being a Blackberry.  When I started

2     the office, I think we ended with somewhere would Samsung.  So

3     I'm not sure.

4          But literally, that's what my job was as Chief of Staff

5     was to really try to use the punchlist, go through it, and if

6     Cynthia had a problem, she would call me.  If I had a problem

7     or if I needed something, I would call her.

8          We ended up having a very good relation to the point that

9     in some of the letters, I know that she would jab me if she

10    didn't think she was getting the response that she wanted and I

11    would jab back because I would say, well, we need this and we

12    need that.  It was collaboration the entire time.

13         Q     So you're on a first name basis with Cynthia?

14         A     Yes.

15         Q     And she's just, to get her title, she was the

16    superintendent of the Independence National Historic Park, do I

17    have that right?

18         A     I believe so, yes.

19         Q     Okay.  And you're taking friendly jabs at each other?

20         A     Yeah.

21         Q     Because you want to get this project done, correct?

22         A     Yes.

23         Q     And this is a -- you considered it a partnership,

24    correct?

25         A     Yes.

1          Q    Okay.  And finishing the project, doing it right,

2    that was important both to the Nutter administration as well as

3    the City, correct?

4          A    Absolutely.

5          Q    Okay.  You talked a little bit about some of the

6    other historical context here.  You had the Pope coming.  And

7    we'll talk about that in a second.  But the site itself had

8    significant value, correct?

9          A    Absolutely.  Learning that from the work that Joyce

10   had done with the Street administration.  I mean, no

11   administration stands alone.  It always is built on the

12   previous administration.

13        Joyce had done wonderful work, yeoman's work.  Any work

14   that I -- you know, you don't know until you actually sit down

15   and start seeing some of the evidence of what was going on.

16   And so, we were taking the promise that Mayor Street had made

17   and were trying to make sure that it became reality.

18        And they invested quite a lot of money.  And again, we

19   invested continually sums of money to make it right even during

20   the time when we were scraping like bottom to make sure it

21   could happen.  I mean, you have to think that I was going to

22   Rob Debeaux (phonetic) --

23             THE COURT:  Scraping bottom means money?

24             THE WITNESS:  Yeah, money.  Yeah, scraping the -- I

25   was asked -- I'm looking at the --

1          THE COURT:  You weren't still digging in other words?

2          THE WITNESS:  Yeah, that's true.  I'm sorry, but

3    yeah, I'm looking at the finance director saying, Rob, I just

4    need additional -- like this is going to be 5,000 here.  It's

5    going to -- we need more money.  We've got to get this done.

6          The things that were causing a lot of problems was,

7    you know, the monitors may or may not -- didn't -- I'm sorry.

8        Q    No, no, no.  I appreciate that, but I want

9    to -- let's talk about where that money's going.

10       A    Okay.

11       Q    And how you finish out this project.  So what work

12   still needs to be done.  Could you talk to that?  And again,

13   we're talking past 2010 here.

14       A    Yes.  Yeah, from 2010 all the way through 2015, there

15   was always something left.  The biggest thing that caused me

16   the most problems was the monitors.

17       The City and the Park Service had approved certain

18   monitors.  And the monitors were used for the interpretation.

19   The actors had been filmed.  And so, part of the site was to be

20   able to have people speaking to the people at the site in first

21   person, right?  First -- so if you -- and sometimes the vantage

22   point of the work would be from like within the kitchen.

23       So Hercules has a particular part of one of the monitors

24   where he's speaking from the kitchen and he's at the site.

25   That's why this is a unique site.  And that's why it was so

1    important to say these things were happening at this place.

2        So when he's speaking, he's like in the kitchen and you're

3    looking down.  And you're in the kitchen.  There's no other

4    thing that's like that to happen.  And yet, the monitors kept

5    failing.

6        There was one thing about the extreme temperatures, if you

7    can imagine that, extreme temperatures in Philadelphia were

8    causing the monitors to freeze up.

9        And so, they didn't work.  And the worst thing that we

10   were getting and of course we're -- I'm representing a

11   political institution, a human institution, we would get calls

12   from people, yes, Michael, I know.  I took calls from you that

13   would say this doesn't look right and I would say I'm sorry we

14   will get to do it and we will handle it.

15       So the public was always integral to what we were doing.

16   The Park Service was integral.  Yes, Congressman Brady would

17   even say we put money up.  Remember, we're -- you know, we have

18   say in this, too.

19       So I'm taking calls from everybody just to make sure.  And

20   we're trying to shepherd this to make sure that we're

21   reflecting the best that we can do as a City at this site.

22       Q    Okay, so you talked about the monitors.  Were there

23   other sort of I'd say more infrastructure issues?  What else

24   did the City, you know, do to get this ready?

25       A    Well, the -- you had heard from Joyce that there was

1    the observation that was looking down and the ruins underneath

2    were glass enclosed.

3        They had to be protected because they would completely

4    degrade -- the degradation would happen if they were not

5    temperature and humidity controlled.

6        I learned more about temperature and humidity control for

7    soil samples than I ever thought I would do in law school.  I

8    mean, I didn't really think that was part of the deal.

9        But the glass was breaking, which would then cause the

10   humidity to penetrate, which would then cause the ruins and the

11   foundations that had been preserved to actually degrade or

12   degrade, I'm sorry.

13       So, as a result, we had to do something.  So I'm on the

14   phone with Daniel Keating (phonetic).  And I'm on the phone

15   with Kelly.  And I'm on the phone saying what are we doing?

16   How are we doing it?

17       And Jim Lowe is always -- and he's my point person to say

18   let me know what's happening.  If you need my juice to get

19   things done or get people to pay attention, I'll get on the

20   phone.  I don't have a problem with that.  And that's how I was

21   kept abreast of what was going on and how.

22       So whenever something -- I mean, down to the point where I

23   got a call about from Cynthia that the pavers that were put in

24   had failed.  And so, we needed to get new pavers and they

25   wanted to know what I was going to do about it.

1    Q    So let's talk a little bit about this because these

2  aren't just aesthetic things, correct?  This is how the public

3  is going to engage with the exhibits.

4    A    Exactly right.

5    Q    Correct?  Okay, so you have television monitors to

6  tell the story, correct?

7    A    Correct.

8    Q    You have the glass so that you can look at the

9  architectural dig, correct?

10    A    Correct.

11    Q    You have pavers so that people can access the site,

12  correct?

13    A    Correct.

14    Q    And you're devoting City resources in order to put on

15  you heard some testimony I apologize this question just

16  meandered, but from Ms. Wilkerman at the beginning that the

17  intention behind the site back in 2007 was it was a memorial

18  and an exhibit.  Was that still your understanding in 2010?

19    A    Yes.

20    Q    Okay, and all these components have to get it right

21  for this memorial and exhibit and archeological site, correct?

22    A    That's correct.

23    Q    Okay.  So you're working through the City or through

24  these issues.  And I think you mentioned that it's City

25  resources that are going to fund it?

```
 1        A     Yes.

 2        Q     Okay.  And this is from let's say early 2011 on,

 3   would that be accurate?

 4        A     I would -- well, Clay was working with it prior so.

 5        Q     Okay.

 6        A     I mean, I'm just continuing what had been done just

 7   like Clay continued what Joyce had done.  I was continuing what

 8   Clay had done.  And you know, we just keep passing it on.

 9        Q     So --

10              THE COURT:  Excuse me, counsel, can you clarify is

11   Clay --

12              THE WITNESS:  Clay Armbirster was the --

13              THE COURT:  Armbirster.

14              THE WITNESS:  -- Chief of staff from 28 to 2010.

15              THE COURT:  So he's Clarence.

16              THE WITNESS:  Clarence, yes, Clarence Armbirster.

17              THE COURT:  Okay.

18              THE WITNESS:  I'm sorry.

19   BY MS. AXE:

20        Q     Now eventually, at some point, we're getting towards

21   the home stretch, correct?

22        A     Amen.

23        Q     Okay.  So I want to take you back to spring of 2015.

24   There is eventually going to be that the City is going to have,

25   you know, complete on the project, correct?
```

1    A    That was the hope, yes.

2    Q    Okay.

3    A    We were always trying to get to completion.

4    Q    Yeah.  And I want to take a step back, too.  When you

5    were working on these issues, do you ever go down to the site?

6    A    Oh, yes.

7    Q    Okay.  Why was that important?

8    A    I'm a person that believes that I have to be in an

9    environment to actually see for myself what's going on.  It's

10   an old trial lawyer habit.  I tried a lot of cases that I had

11   to be in the space where I was in order to make sure I

12   understood what was going on.  Context is everything.

13   Q    Okay, so you were familiar with the site?

14   A    Yes.

15   Q    As this project is being completed, you were familiar

16   with the way that it looked, correct?

17   A    Yes.

18   Q    You're familiar with the -- I'm going to call it hard

19   scape, the hard infrastructure there, correct?

20   A    Yes.

21   Q    You're familiar with the exhibit itself, correct?

22   A    Yes, I am.

23   Q    Okay.  You're familiar with the videos --

24   A    The videos.

25   Q    -- that we play on the monitors, correct?

1       A    Yes.

2       Q    You're familiar with the memorial that was etched

3   into the stone, correct?

4       A    That's right.

5       Q    Okay.  And you're familiar with the observation

6   points to look at the dig, correct?

7       A    That's correct.

8       Q    Okay, I want to show you if -- with the Court's

9   indulgence.  I just want to get this into the record, Your

10  Honor, for what the site looked like as it's nearing

11  completion.

12      So I'm going to have you turn to Exhibit Tab 11.

13  Defendants and the City have entered into a stipulation

14  regarding the authenticity of the documents in this binder.

15      I will represent to you that these photos were taken in

16  April of 2015.  What I'd like you to do is just spend a moment

17  looking through these pictures.  And I'm going to ask you a few

18  questions after you do so.

19      A    Okay.

20      Q    And as you look through, just let me know when you've

21  when you've reached the end of the photos?

22      A    Hercules and the names.  Absalom Jones.  Yes, I'm

23  done.

24      Q    Okay, now I'm going to ask you a few follow-up

25  questions about these photos.  Like I said, these were taken in

1    April of 2015 of the site.  Do these photos, do they look

2    accurate in your memory of walking through the site?

3         A    Yes.

4         Q    Okay.  And as you look through them, would it be fair

5    to say that so some of these photos display signs of the

6    exhibit?

7         A    That's correct.

8         Q    And some of these photos display placards with

9    different artists drawings on them, correct?

10        A    That's correct.

11        Q    Okay.  And I don't want to go through all of the

12   photos.  We'll have the Court look at those later, but these

13   photos, many of them talk about the history of the site,

14   correct?

15        A    That's right.

16        Q    And that a lot of these photos talk about the

17   enslaved individuals that are at that site, correct?

18        A    That is also correct.

19        Q    Okay.  And you noticed at one point -- and so, the

20   photos provide some information to the public, correct?

21        A    Uh-huh.

22        Q    About the history; is that correct?

23        A    That's correct.

24        Q    Okay.  And some of the photos exhibit just

25   information about the executive mansion, the building itself,

1    correct?

2        A    That's correct.

3        Q    Okay.  And we'll get an inventory in just a second,

4    but there's a photo for example of a wall with names etched on

5    to the side.  Do you know whose names those were?

6        A    Yes, those were the nine Africans that were had been

7    enslaved there.

8        Q    Okay.  Now I'm going to have you set that aside.  And

9    I'm going to go to Exhibit 12 in the binder.  I'm going to

10   represent to you that this was a script of the video media that

11   would have played on the television monitors.  Do you have any

12   reason to doubt that?

13       A    No, no.

14       Q    Okay.

15       A    I know the art -- the artist who wrote this.

16       Q    And who's the artist that wrote this?

17       A    Lorraine Kerry (phonetic).  She's a classmate of

18   mine.  Elementary school.

19       Q    And then, I'm also going to have you go to Exhibit 13

20   if you don't mind.

21       A    All right.

22       Q    Okay, so I'm going to represent to you -- I'm going

23   to ask you a couple of questions here.  I'm going to represent

24   to you that this -- at Exhibit 13, this was an inventory of

25   what was at the site and some of the design plans.  And this

1    inventory was put together by the City in advance of an

2    intellectual property agreement.

3        So the first thing I'm going to have you do is page

4    through Exhibit 13.  Take a moment and let me know when you're

5    finished.

6        A    I do recall these.  This probably would have been in

7    Jim Lowe's files.  Okay.

8        Q    Okay.  And just looking through these photos, do

9    these look the same as what you saw at Exhibit 11, what you

10   remember seeing at this site?

11       A    Yes.

12       Q    Okay.  And this is just an inventory --

13       A    That's -- yes..

14       Q    -- of what's there?

15       A    That's correct.

16       Q    Okay, thank you.  I'm going to have you set that

17   aside.  I want talk to you about and an I.P. agreement.  Back

18   in 2015, were you aware of an I.P. agreement that was entered

19   into between the City and the federal government?

20       A    Yes, one of the things that was left that came about,

21   which is why we ended up having to do the 2012 matter that you

22   had at Exhibit 13 was intellectual property rights was

23   important to the National Park Service as being part of this

24   because they wanted to be able to have an opportunity at some

25   point to monetize the things that were happening as a way to

1  support the site.

2      We were transferring additional monies to them through an

3  endowment that had been done to be able to help maintain the

4  site going forward, but there -- the I.P. rights were -- was

5  something that they needed in order to make sure that they

6  would be able to kind of, you know, take a picture and then,

7  sell it, and then, make money and to be able to do things.

8      That -- so that was a source of a couple of different

9  meetings that we had to make sure that we could do.  And I

10  remember there being a problem.  I didn't know the nature of

11  the problem until I got to a meeting and they said that one of

12  the artists could not be located.  So they could not get a

13  signature that said that we could use that.

14      But I said, well, I mean, we can't locate him.  What do we

15  need to do?  And I follow my instructions from my lawyers when

16  they said we have to represent that we used all best efforts in

17  order to make sure that we did what we could.

18      And that's what you'll be signing to.  And I says okay.

19  As long as you guys did that, I will follow your instructions.

20  So the City Solicitor gave me the advice.  I followed the

21  advice and that was part of the documentation that I

22  transmitted to the Park Service going forward.

23      Q    So that last piece, the I.P. agreement, so you fixed

24  the let's say some of the aesthetic issues, the infrastructure

25  issues.  You have the agreement in place.  It's a lot of work

1    and resources that went into that, correct?

2          A    Absolutely.

3          Q    Okay.  And I think you mentioned -- I just want to go

4    back to this briefly, you mentioned an endowment.  What was

5    that?

6          A    It was money that was -- that we had promised or

7    someone had promised.  I know that we, when I say we, I go back

8    to being that, you know, I speak for the City.

9          But we had promised that part of what we would transmit to

10   the Park Service would be money so that they'd be able to

11   maintain.

12         And I think it was about $1,000,000 plus maybe 1.5

13   million.  And so, part of the -- during the time that I was

14   Chief of Staff, there was an interesting getting the money to

15   the, you know, the Park Service wanted the money.  And we would

16   hold back.

17         And we would say, well, we're not at the point where

18   you're accepting what we're thinking is done.  So let's hold

19   back.

20         And I think even one time, we came up with an agreement

21   that we would transmit half of the money to them if they ended

22   up saying that we had done everything that we could do that we

23   made it right.

24         And so, I think there's a letter that I may have written

25   that was something to that, like I'll give you half right now,

1   and then, as soon as we get this other piece done, I'll get the

2   other half.  But it was -- it's part of a way of making sure

3   that we were honoring our commitments to one another.

4        Q    And that's the spirit, right?

5        A    Yeah, it's the spirit, yeah.

6        Q    You understood this collaboration?

7        A    Absolutely.

8        Q    Okay.  When you came on board, you said that you were

9   given a file relating to the President's House, correct?

10        A    Yeah, Kathy would have given me a lot of things to

11   look over to make sure that I was up to speed since I would now

12   be the person entering into and also executing on behalf of the

13   mayor and the City.

14        Q    So you understood at that point that and I know that

15   you -- this pre-dated your service as Chief of Staff, but you

16   may have been aware that there were a series of cooperative

17   agreements, correct, between the City and the federal

18   government --

19        A    Oh, yeah.

20        Q    -- for the development?  Okay.

21        A    Yes.

22        Q    I want to have --

23        A    For the development of Independence Hall.  I mean,

24   I'm a Philadelphian.  My wife worked for Park Service, so she

25   actually told me how -- what was going on down there when I was

1    dating her.

2         So, no, there's a lot of -- this is a small city.  It's a

3    big -- I would say Philadelphia's is a big town.  And you know,

4    there's always a way for someone to have some relationship to

5    what's going on, no matter what it is.

6         And so, yeah, so I was aware of the cooperative nature of

7    the City and the Park and the Independence Hall for many, many,

8    many years.

9         Q    So I want to take you to Exhibit 6.  This is the

10   Third Amendment to the cooperative agreement.  I'll represent

11   to you, again we stipped as to the authenticity.  I'll

12   represent to you that this was entered into in 2009.  Do you

13   have any memory of this document or this had been something

14   that would have likely made it into your files?

15        A    It would have been in the file because I see that on

16   page 15 of 15, it's Clay's signature.

17        Q    Okay, and Clay again was your predecessor as chief of

18   staff?

19        A    Yes, yes.  I'm sorry, Clarence Armbrister, yes.

20        Q    Okay.  And I want you to flip to page 9 of

21   the -- there's page numbers at the bottom.

22        A    Uh-huh.

23        Q    And specifically, I'm interested in Article 8.

24        A    Okay.

25        Q    And is this -- I want you to just -- I'm going to

1    read part of this paragraph if you don't mind.  And I want you

2    to follow along and make sure that I have read it accurately.

3        I'm going to start in the middle of the paragraph 1, 2, 3,

4    4, 5, 6 lines down.  And I'm going to start with the City is

5    hereby given a nonexclusive limited license to use such

6    intellectual property for purposes related to the City's

7    educational mission and to identify the project in the City's

8    marketing, advertisements, and publicity about the City, the

9    project, and the completed exhibit.

10        This provision shall survive expiration for termination of

11   this cooperative agreement as amended.  Did I have that right?

12       A    Yes.

13       Q    When you were working with NPS, again, to close out

14   the project, was that your understanding that the spirit of

15   this provision here?

16       A    Yes.

17       Q    Okay.  And I want to read just the next sentence that

18   is at paragraph B of Article 8.  The City shall fully cooperate

19   with the NPS in the protection and enforcement of any copyright

20   entry mark rights resulting from activities and services

21   performed in connection with the project.  Do I have that

22   correct?

23       A    Yes.

24       Q    Okay.  And that is -- does that accord with your

25   general understanding of the City is going to continue to work

1    with the Park Service?

2         A    Oh, absolutely.

3         Q    Okay, now just going back briefly to this endowment,

4    when does the endowment expire?

5         A    As far as I know, it doesn't.

6         Q    Just in perpetuity; is that correct?

7         A    I mean, I don't have any knowledge it does.  I say

8    here right now that it expires.

9         Q    Okay.

10        A    So I think the money was given to support the

11   project.

12        Q    Got it.  And just a final set of questions for you

13   here.  You did a lot of work in those five years; correct?  Did

14   you ever contemplate the possibility that the federal

15   government would tear down all that was designed built

16   installed, including under your tenure over at this point it's,

17   you know, over a decade in a single afternoon.

18        A    You know, that question respond -- gets an emotional

19   response from me.  And I don't want to curse in Court.  I am an

20   attorney still, so I want to make sure I keep that.  But this

21   really, the answer is, no, I would never have imagined

22   especially given the traditions that we have maintained with

23   the Park Service.

24        I don't think people really understand that as a City, we

25   really have partners that we work with.  When the Pope decided,

1    you know, we went to Italy to get the Pope to come.  One of the

2    places the Pope wanted to come to was Independence Hall.

3         We ended up, you know, we're -- Michael called Cynthia

4    saying he wants to -- if he comes, he's coming there.  And they

5    were like they all we'll make it happen.  Well, you know we

6    always have each other back.

7         And so, when the Pope came, we had a thing right out here

8    on the mall.  The integral part of when the Secret Service

9    wanted to divide the City because of security issues, which we

10   had to deal with, we put up gates.

11        The parts of the area that was enclosed to be part

12   of -- to make sure that the Pope was able to see a lot of the

13   City in a secure area, he was residence out at the seminary at

14   City Avenue and Lancaster.  Took helicopters to get to the

15   prison, helicopters to sometime come in town.

16        When he was in the area and got within the security

17   perimeter, he was here at Independence Hall.  He walked out and

18   he was able to see all the things that were part of the

19   Independence and the Liberty Bell.

20        Well, part of the places that I am -- I believe that he

21   walked through was this site because it's right there.  It's an

22   integral part of our story.

23        I could not imagine that anybody would decide after all

24   that it took together and that we always had each other's back,

25   that they would overnight tear it down.  I just -- it boggles

 1   my imagination.

 2       And that's a visceral issue for me.  There was just too

 3   much that went into from attack and Michael's work and Joyce's

 4   work, and the mayor's work, and the Congress people's work,

 5   Congressman Fattah, Congressman Brady.  There just a lot of

 6   people that put a lot of money, a lot of effort.

 7       And it was all done because we collaborated with one

 8   another.  That was the tradition.  That's the context of this

 9   particular site.

10       And I cannot imagine in answer directly to your question

11   that that would ever have been just tossed aside at a stroke of

12   anybody's pen.  And that's all I'll say about that.

13       Q    Thank you, Mr. Gillison.  I don't have any other

14   questions right now.  Defendants may have some, but I'll take

15   my seat.  Thank you.

16            THE COURT:  Thank you.

17            MR. IN DEN BERKEN:  I have no questions, Your Honor.

18            THE COURT:  Thank you.  You may step down.  Thank

19   you.

20            THE WITNESS:  Thank you.

21        (Witness is excused)

22            MS. GARCIA:  Your Honor, the City calls Valerie Gay.

23            THE COURT:  Very well.

24            THE CLERK:  Please raise your right hand.

25                              VALERIE GAY

1    called as a witness for the Plaintiff, having been duly sworn

2                              testified as follows:

3              THE CLERK:  Please state your full name and spell

4    your last name for the record?

5              THE WITNESS:  Sure.  Valerie Gay.  People call me Val

6    Gay, G-A-Y.

7              THE COURT:  Thank you.  Please be seated.

8              THE WITNESS:  Thank you.

9              THE COURT:  Counsel?

10                        **DIRECT EXAMINATION**

11    BY MS. GARCIA:

12        Q    And good afternoon, Ms. Gay.  Can you please briefly

13    introduce yourself to the Court?

14        A    Sure.  Good afternoon, my name is Valerie Gay or Val

15    Gay.

16        Q    And are you currently employed by the City of

17    Philadelphia?

18        A    I am.

19        Q    What's your title?

20        A    My title is chief cultural officer for the City of

21    Philadelphia and executive director of Creative Philadelphia,

22    which is the City's Office of Arts and Culture.

23        Q    Okay.  And what is the office that's called Creative

24    Philadelphia?

25        A    Sure.  So as the City's office of arts and culture,

1    we oversee just that, activities in the City, but also we

2    steward over a thousand pieces of public art, including

3    monuments, memorials, statues, murals, et cetera.  We're also

4    overseeing part of the mural arts.

5        Q    Okay, and in your role, are you also doing any work

6    with or collaboration with entities that are working on tourism

7    or visitors in the City of Philadelphia?

8        A    Sure, yes.  They are our partners if you will.  Many

9    of the activities that we do in the City, we do in

10   collaboration and partnership.

11       Q    When do you start as the chief cultural officer of

12   the City?

13       A    Sure, I was appointed in April 2024.

14       Q    Okay.  And how does your position fit within the

15   structure of City government?

16       A    Yes, I am a member of the mayor's cabinet.

17       Q    So you report directly to the mayor?

18       A    Yes, I do.

19       Q    Okay.  So Ms. Gay, can you just give us a brief

20   overview of your professional background let's say going from

21   like 2004 to 2024?

22       A    Sure.  So in 2004, the middle of 2004, I left my

23   career as a banker.  I was a wealth manager with PNC Advisors

24   and I went to Temple University, where I ultimately became the

25   Assistant Dean for institutionalize advancement for the college

1  of education.

2      In 2012, I left there and I succeeded Lorene Kerry

3  (phonetic) as the executive director of Art Sanctuary.

4      In 2019, I left there and became the chief experience

5  officer and deputy director of audience engagement at the

6  Barnes Foundation.  And then in 2024, was appointed by Mayor

7  Parker to my current position.

8      Q    Okay, and what is your educational background?

9      A    Sure.  I too am a native Philadelphian.  So I must

10  say I am a graduate of the Philadelphia High School for Girls,

11  class of uh-huh.

12      And then from there, I spent one-half of my undergrad time

13  at Johns Hopkins Peabody Conservatory, the other half at the

14  University of the Arts here.

15      My degrees are in music.  I then while at Temple, attained

16  a Masters degree in vocal performance and then a post grad

17  degree or certificate in vocal performance at Temple.

18      Q    So you mentioned that you are a native Philadelphian?

19      A    I am.

20      Q    Are you familiar with the President's House site in

21  Independence National Historical Park?

22      A    I am.

23      Q    When did you first become aware of the President's

24  House site?

25      A    I think it was around 2008, 2000 -- late maybe 2007,

1    2008, somewhere around that time period.

2        Q    Okay, and are you aware of the connection between the

3    site and this history of enslaved persons who lived there?

4        A    Yes.

5        Q    Okay.  And did you become aware of that around that

6    same time, 2007 or 2008?

7        A    Yes.

8        Q    Okay.  When was the last time you visited the

9    President's House site?

10        A    This morning.

11        Q    Okay.  So, Ms. Gay, I'm going to ask you to turn to

12    Exhibit 24.  That's the very last tab in the binder.  These are

13    a series of photos that were taken two days ago at President's

14    House.  And I will just take -- I'll ask you just take a moment

15    to look through those and just let me know when you're done.

16        A    Yes.

17        Q    Okay, do these photos accurately represent what

18    President's House looks like today?

19        A    Yes.

20        Q    Okay.  So prior to your visit this morning, do you

21    remember when was the last time before that, that you visited

22    President's House?

23        A    Yes.

24        Q    When was that?

25        A    July 4th, 2025.

1       Q    Okay, is it fair to say that you're pretty familiar

2    with President's House and what it looked like prior to the

3    removal versus after the removal?

4       A    Yes.

5       Q    Okay.  Ms. Gay, from your perspective as chief -- as

6    Philadelphia's Chief Cultural Officer, why does the President's

7    House site matter to Philadelphia today?

8       A    The site represents a fuller telling of our founding

9    of our history that allows the convergence of history and the

10   present day.  And so, it is important I think for us all to

11   know the truth and to be able to digest the truth, the

12   unburnished truth regardless of its perception of either

13   positive or a negative connotations.

14       But that is important for all of us, and particularly for

15   Philadelphia, which is the birth place of our country, to tell

16   the truth.

17       It is this -- it is a place where as we saw this morning,

18   folks from around the country can come and spend time with

19   grappling with our history, our imperfect history.

20       That then I think imbues to us as individuals our own

21   responsibilities, our own expectations of our own imperfections

22   and how those can become and help us become better.

23       Q    And as the chief cultural officer, do you think it's

24   important for the site to include artwork and words that tell

25   the specific stories of the enslaved people who live there?

1       A    Yes.

2       Q    Why?

3       A    I think it's important because we need to know who

4   was here.  So if it's not important for them to be known, it's

5   not important for us to know about any anything else in terms

6   of our founding.

7       They are as important as the founding fathers, who were

8   there.  They are as important as us understanding the humanity

9   that it took to create this nation, that the people who created

10  our -- the words that we live by were fallible human beings who

11  were not necessarily career politicians.  They were people who

12  became leaders in our country.

13      They were ordinary people like all of us.  And the people

14  who were enslaved there were also human beings, whose lives

15  were important.  And actually, one could argue helped to found

16  this county.

17      Q    Uh-huh, are you aware of any connection between

18  President's House and the Underground Railroad Network?

19      A    Yes.

20      Q    Okay.  How is President's House relevant to the

21  Underground Railroad?

22      A    Well, just knowing that the -- that the President's

23  House is a part of this entire network to tell the full story.

24  It is really important.  Philadelphia plays a really important

25  role in the Underground Network.  It was form for many

1    insulated Africans a beacon of freedom.

2        And for President's House to be so close, physically close

3    to the founding of this county, is it's I don't think that it's

4    importance could be overstated.

5        Q    Are you aware of whether any of the insulated

6    Africans who lived at the President's House escaped to freedom?

7        A    Yes.

8        Q    On that site?

9        A    Yes.

10       Q    Okay, and can you tell the Court about that, please?

11       A    Sure.  So two folks that we know of escaped to

12   freedom.  One was Hercules.  We've heard a lot about Hercules,

13   but he did not escape from Philadelphia as we understand.  We

14   understand that he escaped from Virginia.

15       But the other is Oney Judge or Ona Judge, who escaped and

16   if I am correct in 1796.  And she lived to 1848.  So about 52

17   years in freedom.

18       She was the maid of Martha Washington, and therefore, was

19   what we call a dowager slave, meaning that upon Mrs.

20   Washington's death, she would automatically become the property

21   of the estate and would be passed down to Mrs. Washington's

22   heirs.  And in this case, her granddaughter, Mrs. Washington's

23   granddaughter.

24       And so, Ona Judge prepared a meal and escaped and was able

25   to get to New Hampshire, and was able to really -- she married

1    a free black man there.  She had three children.  She was able

2    to live a life of freedom.

3        And how we know that a lot of this is because she actually

4    told people when she was 75 years old.  She talked about her

5    freedom.  She talked about even though President Washington

6    searched for her for many years, she was through the aid of

7    others, was able to escape.

8        Also, I should mention that because of the Fugitive Slave

9    Act, which I believe was enacted and signed by President

10   Washington in 1793, she was actively a fugitive even though she

11   was in a free state.

12       Q    Do visitors come to Philadelphia specifically to

13   visit Underground Railroad sites?

14       A    Yes, absolutely.

15       Q    Okay.  All right, so shifting a little bit to recent

16   events, when did you learn that panels referencing slavery and

17   enslaved persons were being removed from President's House?

18       A    I received a text message from someone that had an

19   Instagram post.  I believe it was from WHYY showing the removal

20   of the panels.

21       Q    Okay, so this would have been on?

22       A    Last Thursday.

23       Q    Thursday of last week?

24       A    Yes.

25       Q    Okay, did anyone from the National Park Service reach

1   out to discuss potential changes to the President's House

2   before the panels were removed?

3       A    No.

4       Q    Are you aware of any City personnel getting outreach

5   from NPS to discuss potential changes before the panels were

6   removed?

7       A    No.

8       Q    Okay.  When you learned that the panels were removed,

9   what were your first thoughts?

10      A    I actually thought I was having a concussive

11  nightmare because I was sick in bed actually.  And I remember

12  opening my phone.  It had just hit my head, opened my phone,

13  and I saw this.  And it just didn't make sense.  And then, I

14  felt sick to stomach and couldn't believe it was actually

15  happening.

16      Q    Are you involved in preparations for the semi

17  quincentennial celebration taking place in Philadelphia this

18  year?

19      A    Yes.

20      Q    Are you aware of how many visitors are expected in

21  2016?

22      A    A lot.  It depends on who you talk to.  It could be

23  as many as 1.5 million.

24      Q    Okay, and can you give a little overview of what kind

25  of events are planned for 2026 in Philadelphia?

1        A    Sure.  We will celebrate in many ways both here down

2    here in the historic district, as well as across the entire

3    City.  So there will be activities.  There will be lots of

4    block parties, really getting the residents involved, as well

5    as art activations happening all over the City.

6        Are -- there's amazing organization called Art Philly that

7    will have an arts festival or Wawa Welcome America.  We'll also

8    have I forget how many days of activities, as well as any

9    number of parades and again block parties.

10        There will be superblock parties that happen all over the

11    City.  And so, this is an opportunity for us to celebrate

12    Philadelphia.

13        Q    Okay.  Do the sites in and around Independence

14    National Historic Park have a role in the celebrations?

15        A    Yes, absolutely.

16        Q    And can you explain what that role is?

17        A    Sure.  In many respects, just being there as Mr.

18    Gillison just said, this is one of the most beautiful areas in

19    the country.

20        And as we think about civic engagement and civic actives,

21    every year around July 4th, this entire area becomes animated

22    and become a part of the celebrations.

23        And so, just even the mall itself, Independence Center,

24    the President's House, and then, across the street with

25    Philadelphia Independence Visitor Center, that whole area

1    becomes amplified.

2        Q    Are you aware of any plans specifically for

3    President's House in relation to semi quincentennial

4    celebrations?

5        A    No.

6        Q    Okay.  Does the removal of the panels that we

7    discussed have any impact on the planned events around 2026?

8        A    I'm not sure.  I think so in that were there any

9    sites specific activities planned for that?  I don't know.  But

10   having them be removed absolutely impacts all of our

11   activities.  Our parades go right by -- the President's House

12   on Market Street is generally where the parade is.

13        And so, literally, every street if you think about 5th

14   Street and 6th Street and Market Street, that kind of H if you

15   will, President's House sits right there.  Oftentimes that

16   site, that corner intersection is a spot where everything stops

17   and there is celebration right there.

18        So not having the panels as a part of it, it's -- we are

19   bereft.  The activity, the backdrop if you will is bereft.

20        Q    So, as a native Philadelphian, and now a City

21   official, can you speak to what the semi quincentennial means

22   as far as memorializing, celebrating, and also providing an

23   opportunity for education for the City of Philadelphia?

24        A    Sure.  I would say this is an amazing opportunity for

25   us to educate ourselves, our -- all of the visitors in the

1    especially the residents of Philadelphia.

2        50 years ago, when we celebrated our bicentennial is when

3    we took the opportunity, the amazing opportunity, to expand our

4    knowledge base about our country.

5        So, 50 years ago, the African American Museum at that

6    point was named something slightly different was established.

7    It was there that we got to learn more about free and enslaved

8    Philadelphians during that time period.

9        We got to learn about our collective history.  I remember

10   as a child going to the African American Museum and learning

11   all of these things and coming back home and telling my parents

12   what I learned.

13       And I remember my mother asking me questions.  Well, I

14   asked -- I just assumed she knew.  And she said that she

15   didn't.  And I was shocked because at that time, my mother was

16   the smartest person I knew.  And I couldn't understand how she

17   had never heard of this girl named Phyllis Wheatly (phonetic)

18   for example.

19       And I remember talking in my 10 year old mind like how

20   could she not know these things?  And finally, my mother as I

21   recall, I didn't know what that look was then, but I recognize

22   it now was almost shame.  And she said, sweetie, when I was in

23   school, they didn't teach us about this.  They told us that we

24   didn't have any history.

25       And I remember then that it was my job to go to school and

1    pay attention, so that I could come back home and teach my

2    parents about our history.

3        That's what the bicentennial did for not just me, but

4    millions I know of other folks who perhaps have like I do a

5    history whose ancestors were enslaved, but also who were not,

6    who people who come from around the world to learn about this

7    human institution that happened the founding again of this

8    country.

9        And that if we bring it forward 50 years, now this year to

10   the semi quincentennial, we have an opportunity to continue to

11   tell the truth and hold both things.

12       I would say the memorial that's out there, that's still

13   out there right now, there are two lines there that I think

14   embody all of this.

15       It says something like the devastating effect of slavery

16   affects race relations to this day.  Yet we must all strive to

17   embody the ideals held or to hold the -- strive for the ideals

18   embodied by the Declaration of Independence and the U.S.

19   Constitution.

20       Those two things are so important.  And this is a special

21   year that allows us to hold both and celebrate and be

22   reflective at the same time.

23       Q    Thank you, Ms. Gay.

24            MS. GARCIA:  Your Honor, this -- those -- that's all

25   the questions I have for this witness at this time.

1          THE COURT:  Thank you.  Will be there be any cross?

2          MR. IN DEN BERKEN:  No cross, Your Honor.

3          THE COURT:  Thank you.  You may step down.

4          THE WITNESS:  Thank you.

5       (Witness is excused)

6          MS. AXE:  Your Honor at this time, that concludes the

7    City's evidence.  Would Your Honor like us to move in to the

8    record our exhibits?

9          THE COURT:  Yes, I'd like to hear if there are any

10   objections to the authenticated exhibits authenticated by

11   stipulation?

12          MR. IN DEN BERKEN:  No, Your Honor.

13          THE COURT:  All of your exhibits are admitted then.

14          MS. AXE:  Thank you Your Honor.

15          THE COURT:  As the foundations have been laid in any

16   event by your witness' testimony.  And the Court has already

17   viewed these.  They will be filed in the docket.

18          MS. AXE:  Understood, Your Honor.  We will do so.

19   Thank you.

20          THE COURT:  Okay.  With that, you rest as to the

21   preliminary injunction?

22          MS. AXE:  We rest as to the evidence.  I understand

23   that you will hear argument, but our evidence is presented and

24   we rest on that respect.  Thank you, Your Honor.

25          THE COURT:  Very well, Ms. Axe.  Let's turn to the

1    Defense and ask what evidence you'd like to present.  I think

2    you said you weren't going to, but you still are able to.

3            MR. IN DEN BERKEN:  Your Honor, as we previewed on

4    Monday's conference call, the government is not presenting any

5    witnesses.  We'll be relying on the declaration of Mr. Simms,

6    which is ECF 27-1.  And that will be the only document or

7    materials we will offer.

8            THE COURT:  That is in this group, isn't it?

9            MR. IN DEN BERKEN:  It was filed on the docket.  I'm

10   not sure if it's in the -- it's on the exhibit binder that

11   counsel prepared for you.

12           THE COURT:  If it's not in the exhibit binder itself,

13   I'd like it to be filed.

14           MR. IN DEN BERKEN:  It's filed.  It's ECF 27-1.  It's

15   attached to our opposition brief.

16           THE COURT:  It's attached to your brief, but it's not

17   in the record here yet unless you ask me to -- for it to be.

18   So that's what I'm asking you.

19           MR. IN DEN BERKEN:  In that case, Your Honor, we

20   would move for the admission of ECF 27-1 into the record.

21           THE COURT:  And name it, please, because I have to

22   hear out your adversaries here on this.

23           MR. IN DEN BERKEN:  It is the Declaration of Steven

24   Simms ECF Number 27-1 executed on January 27, 2026.

25           MS. AXE:  We have no objection to that admission,

1    Your Honor.  Thank you.

2            THE COURT:  All right, the Stevens Simms declaration

3    attached to the responsive brief of the government to the

4    preliminary injunction, I have reviewed it.  And there is no

5    objection.  It will be admitted.

6        (Defendant's Exhibit 27-1 admitted into evidence)

7            MR. IN DEN BERKEN:  Thank you, Your Honor.

8            THE COURT:  All right.  Anything else from the

9    government --

10           MR. IN DEN BERKEN:  No.

11           THE COURT:  -- besides argument?

12           MR. IN DEN BERKEN:  Nothing further except argument.

13           THE COURT:  All right.  I am aware of the hour.  I

14   would love to just go through argument, but I have a very grave

15   interest in hearing the arguments if they are requested by each

16   of the amici.  And I'm not going to rush anybody through lunch,

17   yet the day is going to be long enough.

18           So that I will hear you out.  Which of the Amici

19   would like to present argument today and please tell me.  Would

20   that be you, Ms. McClellan?

21           MS. MCCLELLAN:  Yes that's correct, Your Honor.

22           THE COURT:  Is there anyone here yet from the

23   governor of Commonwealth of Pennsylvania's Office that wishes

24   to argue?  I see no one.

25           So I would accept your argument when we get back.

1    I'd like you to argue on behalf of your client.  Of course,

2    that's not factual.  That's an argument, but you can use your

3    own set of criteria to develop that argument.

4         Then, I would like to hear from the government, your

5    argument.  And then, the City of Philadelphia.  The record for

6    now will be closed except for certain things that could still

7    happen.  That is subsequential briefing based on the evidence

8    presented.

9         And also, my inspection, which I tried to give you a

10   heads up this morning.  I intend to inspect the original

11   exhibit pieces that were removed and the present site.  I have

12   not done so, because I thought it was more important that I

13   start with the briefing arguments and evidence.

14        So these things have to happen.  I'm hoping they'll

15   happen by Monday, but today, we will finish with the arguments.

16   All right?  And we'll get back to you.

17        I don't want this to be a long break, but there are

18   many people here.  Are you already to argue in 30 minutes?

19        MR. IN DEN BERKEN:  Yes, Your Honor.

20        MS. GARCIA:  Yes, Your Honor.

21        THE COURT:  Is that too brief a break for you?

22        MS. MCCLELLAN:  That's fine, Your Honor.

23        THE COURT:  Yeah, it's the way I roll.

24   Unfortunately, that's the lunch hour I get.  There's no lunch

25   involved in it either, but in 30 minutes, when we come back

 1   here and hear first you, Ms. McClellan, and you Mr. In Den

 2   Berken.  And then who's arguing?

 3              MS. TAYLOR:  Ms. Taylor.

 4              THE COURT:  Thank you, Ms. Taylor, okay.  We're in

 5   brief recess.

 6              MR. IN DEN BERKEN:  Thank you.

 7         (Recess taken at 1:38 p.m., recommencing at 2:20 p.m.)

 8              THE CLERK:  All rise.  Court is now in session, the

 9   Honorable Judge Cynthia Rufe now presiding.

10              THE COURT:  Good afternoon, everyone.  Please be

11   seated.

12              ATTORNEYS (IN UNISON):  Good afternoon, Your Honor.

13              THE COURT:  Thank you.  All right, we're ready to

14   hear argument on the testimony and evidence presented as well

15   as the briefing on the preliminary injunction motion filed by

16   the City against the Defendants.

17              And Ms. McClellan, on behalf of your client, would

18   you please and your client is Avenging the Ancestors Coalition.

19              MS. MCCLELLAN:  And the Black Journey.

20              THE COURT:  And the Black Journey, LLC.

21              MS. MCCLELLAN:  Thank you, Your Honor.  So we've

22   heard today about the establishment of the President's House

23   slavery memorial exhibit as a partnership between the City of

24   Philadelphia and the National Park Service.

25              And what amici had really introduced through our

1    brief is the reality as we heard as well that this was a three-

2    way partnership between the National Park Service, between the

3    City of the Philadelphia and the public.

4         There was a recognition of the public interest at

5    ensuring history is told.  Avenging the Ancestor's Coalition

6    was formed as a result of a historical discovery that there

7    were nine people held in slavery at the President's House site

8    by President George Washington.

9         And as the founder Michael Coard often says, ATAC of

10   Avenging the Ancestors Coalition was founded to ensure that we

11   heard the truth, the whole truth, and nothing but the truth.

12        As others have described today and we can stick with

13   the beam of hearing about different schools, he is a graduate

14   of Masterman and he became enraged when he learned about this

15   history because he had gone to one of the best schools in the

16   country and never learned this history.

17        And it upset him because it made clear that this

18   history had actually been suppressed.  Hundreds of others were

19   moved when they found out about this history.  And they worked

20   with the ATAC to make sure that this history would be told.

21        They wanted a recognition in the historical record of

22   the nine people who lived at the site and who were held as

23   slaves.

24        And 15,000 people signed a petition that was actually

25   delivered to Independence Park in 2002 asking for a recognition

1    of this history.  ATAC sent letters to the mayor of

2    Philadelphia and to Congress people representing Philadelphia

3    asking for a recognition of this history.

4         And it had an impact.  The mayor, Mayor John Street

5    at the time, actually responded saying I wasn't aware of this

6    history.

7         And in fact, I'm going to kick off an oversight

8    committee to look into this.  And I'm going to start the

9    process of raising the funding by committing the City to 1.5

10   million dollars.

11        And then we know Congressman Fattah and Congressman

12   Brady also committed 3.5 million dollars, all specifically

13   recognizing that the story of the nine people held in slavery

14   must be told at this site.

15        So this was a three-way partnership.  The purpose was

16   recognized repeatedly by public officials including City

17   counsel, who passed resolution saying that the story must be

18   told at this site and the Pennsylvania General Assembly.

19        Through the partnership, the City and National Park

20   Service established a steering committee.  And they also

21   through a cooperative agreement as we've heard about today

22   built in a process for the public to be heard.

23        They ensured that on the oversight committee, there

24   would be community members representing including ATAC and

25   Michael Coard, who were part of the oversight committee, but

1    also through a process that provided opportunity for public

2    input repeatedly.

3              In fact, in 2003, there was a public meeting in which

4    300 people attended to talk about the concept of the plan.  And

5    there was public comment.  And it was through this process that

6    the themes and the values of the exhibit were identified.

7              In 2004, there was another civic engagement form in

8    which 300 people attended.  In 2005, there was an update on the

9    planning.  200 people attended and they were all in support of

10   moving forward.

11             And then ultimately, in 2007, NPS and the City held a

12   public meeting to introduce the design.  And there were 150

13   people attending who approved the design moving forward.

14             This was the recognition of the public interest and

15   their being an exhibit at this site.  It was included

16   specifically in the cooperative agreement as you can see in

17   Exhibit 6 on page 18 and on page 25, which specify the

18   opportunities for community input.

19             And it was with the National Park Service at every

20   step of the way.  And in fact, it's worth quoting the letter

21   that after receiving ATAC's communication, the National Park

22   Service chief historian wrote to who was then superintendent of

23   Independence Park explaining why it was urgent to recognize

24   this history and if I could may quote just for a second from

25   that letter.

1          NPS' historian recognized, and I'll quote, "the

2     contradiction and the founding of the country between freedom

3     and slavery becomes palpable what one actually crosses through

4     a slave quarter site what entering a shrine to a major symbol

5     of the abolition movement".

6          How better to establish the proper historical context

7     for understanding that Liberty Bell that by talking about the

8     institution of slavery?  And not the institution as generalized

9     phenomenon, but as lived by George Washington's own slaves.

10         So 24 years later, after this deliberative process

11    that involved the public, the National Park Service, and the

12    City of Philadelphia working together without warning, there's

13    abrupt removal of this -- of the interpretive panels that make

14    up this exhibit with crowbars placing them into a pickup truck.

15    This is the opposite of the deliberative process that we saw

16    play out over eight years due to oversight committee and the

17    collaborative process.

18         And in fact, we know from the Defendant's declaration

19    that the only reason that the memorial was not removed was

20    because they did not have the appropriate tools at the time.

21         Under Executive Order 14253, staff at the National

22    Park Service were instructed to post QR codes asking for

23    comments.  And we know from reporting that as of July, there

24    were 13 comments received, only 13 comments.  And all were

25    positive.

1          ATAC wrote to National Park Service asking about were

2     there plans for removal, trying to understand what was coming.

3     They never received a response.

4          In fact, everyone was left in the dark even after the

5     September deadline when the removal was supposed to incur.

6     Suddenly, there was a change in plans on January 22nd in terms

7     of the removal, occurred much later than the earlier identified

8     date and without warning and without any opportunity for

9     comment and conversation with the City as we've heard, with

10    ATAC and with others who had reached out asking for an

11    explanation of what was coming.

12         To be clear, Defendant's removal of the interpreted

13    panels is clearly a final agency decision.  The interpretive

14    panels as their name so states are the way that you can

15    interpret the exhibit.  Without them, the substance of the

16    exhibit is removed.

17         And this removal has occurred through a process in

18    which there was no explanation, no reasoning given.  And it is

19    truly a legal and practical concrete harm whose consequences

20    are ongoing every day.

21         There is a harm when people visiting the site cannot

22    access this information.  There's a harm to all of us as

23    Americans when we cannot learn this history.

24         And as ATAC and Black Journey had described, there is

25    a particular harm to people of African descent to have the

1    history of their ancestors removed in this abrupt and cavalier

2    way.

3            The degradation of the substantive materials at a

4    nationally significant site is disrupting reliance interests of

5    hundreds of thousands of people who visit the site on the eve

6    of our country's 250th anniversary of the birth of this country

7    at the very site in the City that is the birth place of

8    American democracy.

9            To be clear, this is like pulling pages out of a

10   history book with a razor in terms of the erasure of history.

11   And history does not change based on who is put in political

12   office.

13           Still, there has not been no contemporaneous reason,

14   explanation for the removal 24 years after the exhibit was

15   first beginning to be designed and thought about.  And in

16   contrast with the 8 year process through which it was put

17   together.

18           The public interest is surely harmed by this erasure.

19   This again is the first monument to enslaved people on federal

20   law.

21           And its removal is a violation of the law, in

22   particular, the National Underground Railroad Network to

23   Freedom Act, which recognized that this was a site that needed

24   to be protected and preserved because of its history.

25           I want to make clear that, again, the removal of

1    discussions of slavery, the censoring of this core aspect of

2    our country's history, harms all Americans.

3            But the site also included stories of resistance of

4    the abolitionist movement.  It told the stories of Bishop

5    Richard Allen, of Reverend Absalom Jones.  These were all core

6    to the panels and they are a part of what has been removed.

7    These are stories that it harms the public interest when they

8    are not told.

9            So all of this begs the question, why can't we know

10   this history?  We still have not heard a reasoned explanation

11   of why the panels and the stories of the nine people have been

12   removed.

13           Repeatedly, it was recognized that the stories had to

14   be told at this specific site where the history occurred.  And

15   the refusal to provide reasons for why it cannot be told and

16   told here is in direct violation of the Administrative

17   Procedure Act, which requires reasoning and not such an abrupt

18   reversal, but a reasoned explanation accounting for, again, the

19   reliance interest and the statutory purpose.

20           So, in conclusion, the City has established

21   likelihood of success on the merits.  It's clear that the

22   balance of equities require an injunction and that the public

23   interest is harmed an irreparable harm.  Thank you, Your Honor.

24           THE COURT:  Thank you.  Anyone else from amici?  Then

25   we will turn to the Defense.

 1          MR. IN DEN BERKEN:  Your Honor, if I may, as this is

 2    the City's motion, I would appreciate an opportunity to at

 3    least respond to their arguments.  Now if you'd be okay with

 4    switching the arguments or provided brief rebuttal, either

 5    would be acceptable, but that's the request I would make.

 6          THE COURT:  I think I'll give you a brief rebuttal.

 7          MR. IN DEN BERKEN:  Thank you, Your Honor.

 8          THE COURT:  Is that your water?  Okay.

 9          MR. IN DEN BERKEN:  Actually, this is not my water.

10    May I proceed?

11          THE COURT:  Yes, you may.

12          MR. IN DEN BERKEN:  May it please the Court.  What we

13    heard today was the President's House and its history is

14    important and meaningful to many people for many reasons.

15          It evokes strong emotions, strong feelings, and tells

16    an important tail.  But fundamentally, none of the evidence

17    presented here today changes the law and ultimately only re-

18    enforces the Government's arguments.

19          At this point, it is undeniable that the City is

20    asserting contractual rights.  It is asserting claims that are

21    based on contractual provisions.

22          And what they are seeking here is specific

23    performance on the contractual rights they say they have.

24    Binding precedent says they cannot do that.

25          The City cannot assert such claims under the APA.

1    The Tucker Act precludes subject matter jurisdiction for such

2    claims no matter how they are labelled, no matter how they are

3    dressed up if the substance of the claim sounds in contract,

4    which these claims do, they must be brought in the Court of

5    federal claims.

6         In any event, even if that hurdle was overcome, the

7    contracts here, the substance of provisions that are invoked

8    have expired.  We heard testimony about the project closeout,

9    the handoff.

10        Now that term is important, the handoff, the close

11   out was because there was a termination of the actual substance

12   of provisions when the project was completed.  At that point,

13   the exhibit was transferred to the National Park Service.

14        And under the agreement, 2006 cooperative agreement,

15   which is contained binder of exhibits, the very first substance

16   of provision, Section 2, it specifies that complete and

17   unconditional ownership of the exhibit shall lie with the

18   National Park Service after project closeout.

19        Numerous additional provisions in the amendments as

20   well as the original agreement specify unambiguously that the

21   exhibit will become the property, the unconditional property of

22   the Park Service.

23        I'm quoting here from Article 1, Section C in the

24   Third Amendment to the (indiscernible) cooperative agreement.

25   Quote, the project will be owned, maintained, managed and

1    interpreted by the NPS following completion of a project and

2    acceptance by the City.

3            This is Article 3(b)(1).  Quote, City agrees, quote,

4    sorry, this is the quoted language, to donate to NPS the

5    project identified in the property agreement as amended.  This

6    donation is made by the City of its own volition without

7    compensation.

8            There are other provisions in which the City agrees

9    to certify in writing upon NPS' acceptance of the project as

10   complete that all right, title, and interest to any completed

11   construction, improvements, installations, fixtures or

12   associated donations are free and clear of all debts,

13   liabilities, or obligations.

14           They agree that, quote, NPS will own and manage the

15   commemorative work at the conclusion of the process.  I

16   understand as I said before that the President House is

17   important, tells an important story.

18           And the beauty of our country and the technology in

19   modern day is that this is not the only source of that history.

20   The history will endure.

21           I think what we heard here today confirms that there

22   are many people making sure that those stories will continue to

23   be told, but they have no right to compel the Government to

24   tell the story for them if the Government chooses not to.

25           At this point, the National Park Service has elected

1    to take the exhibit down.  That is a discretionary act that is

2    an interpretive step as part of their complete ownership of

3    this project.

4         There are no provisions that they have cited, no

5    specific contractual provisions that the removal of the exhibit

6    violates.  This is exactly what the contract said.  At the

7    conclusion of the project NPS will own the exhibit.

8         Now in addition to the Tucker Act hurdle, even if

9    these were cognizable APA claims, there is no agency action

10   here as defined under 5 USC 55-113.

11        This is the operation of a program.  On a regular

12   basis, the Park Service updates, maintains, changes, eliminates

13   and makes other edits to its interpretive exhibits, its tours,

14   its displays.  Every time they are changed, but they are not

15   subject to an APA claim.  They are not subject to notice and

16   comment rule making.

17        If the National Park Service decides that in light of

18   current developments, it makes more sense to do this versus

19   that, that is their prerogative.

20        THE COURT:  I'm sorry, in light of what current

21   developments?  I haven't heard any evidence on the change in

22   current developments.  What are you talking about?

23        MR. IN DEN BERKEN:  Like --

24        THE COURT:  Just clarify.

25        MR. IN DEN BERKEN:  -- like my point there, Your

1  Honor, is that if the Park Service makes a determination of

2  that kind.

3          THE COURT:  Yeah, but how do they make that?  And did

4  they make that here?

5          MR. IN DEN BERKEN:  I have --

6          THE COURT:  That determination?  Don't

7  they -- wouldn't they have had to make that determination or

8  were they told to make that determination?

9          MR. IN DEN BERKEN:  Other than public reports from

10  the Department of Interior public statements as to why this

11  action was taken, I believe the only reported explanation is

12  that it was pursuant to the Executive Order.  That was their

13  determination.  They were following the Executive Order.  And

14  they determined it was --

15         THE COURT:  Whose interpretation of the Executive

16  Order?  Was it the Park Service superintendent or was it higher

17  up in that?  You didn't cover any of that, counsel.  So I

18  imagine there's a reason.

19         MR. IN DEN BERKEN:  I think the reason is, Your

20  Honor, that we have no burden here today.  We are not the

21  movant.  We as 3rd Circuit and Supreme Court precedent

22  established have no burden of proof here.  The burden for the

23  extraordinary remedy of a preliminary injunction lies squarely

24  with the movant.  That is why we have not presented evidence

25  here.

1          Now if Your Honor disagrees and this case proceeds on

2     the normal regular pace, under APA review, there would come a

3     time when there needs to be provided an explanation.  We are

4     not there at this stage and it's our position based on all the

5     fatal infirmities that we've laid out in the claims that the

6     City asserts that we're not -- we should not get there, Your

7     Honor.

8          THE COURT:  But what you told me is the discretionary

9     functions of the National Park Service gives it an absolute

10    right to change its mind despite years of collaboration and

11    cooperation and communication with the City of Philadelphia and

12    various people of Philadelphia who got this exhibit together

13    and produced it and maintained it and promoted it and paid for

14    it.

15         You have said they have discretion so they can change

16    their mind.  How is that not reviewable for arbitrary and

17    capriciousness if you don't have any valid reason to do it?

18         MR. IN DEN BERKEN:  Because Your Honor, the

19    negotiations, the collaboration, that itself was an exercise in

20    discretion.  By itself, it was of the kind for many, many years

21    the Park Service exercised that discretion to have that

22    collaboration.

23         And now, they have elected in this particular

24    instance not to.  Both of those --

25         THE COURT:  Well, it's curious, isn't it, because you

1    have to look motivation and meaningful avoidance of harm.  And

2    you don't acknowledge any harm.  I get that from the blanket

3    position you're taking, but how do you discount the harm to the

4    truth?

5            MR. IN DEN BERKEN:  I think, ultimately, as we say in

6    our brief, that is an issue for the political process.

7    Ultimately, there's always accountability in our system to

8    democracy.  There's always --

9            THE COURT:  I'd like to believe that, but I have to

10   ask you another question because it has to do with your

11   accountability, your client's accountability.

12           And I'm going to quote here from President Trump's

13   Tweet in 2017.  When he was reacting to the removal of the

14   Robert E. Lee statute in Charlottesville, Virginia.

15           Quote, Sad to see the history and culture of our

16   great country being ripped apart with the removal of our

17   beautiful statues and monuments.  You can't change history, but

18   you can learn from it.  Robert E. Lee, Stonewall Jackson.

19   Who's next?  Washington, Jefferson?  So foolish.

20           Also the beauty that is being taken out of our

21   cities, towns, and parks will be greatly missed and never able

22   to be comparably replaced, exclamation point in bold.

23           Does this represent the Government's position on

24   irreparable harm?

25           MR. IN DEN BERKEN:  I think President Trump's private

1   tweets in 2014 are not indicative of --

2            THE COURT:  2017.

3            MR. IN DEN BERKEN:  2017, Your Honor, I'm not

4   familiar with the tweet.  Don't know the context.  I am not

5   here today to defend or speak about tweets.

6            THE COURT:  But you talked about the Executive Order

7   that he entered last year.

8            MR. IN DEN BERKEN:  Because that's the --

9            THE COURT:  And this emanates from that Executive

10  Order, does it not?

11           MR. IN DEN BERKEN:  As the Department of Interior as

12  stated in public statements, yes.

13       Q    But somehow, it's sensible now?  It wasn't

14  sensible then or maybe it was.  Whatever his reaction, he

15  created the Executive Order.  His administration backs it.  And

16  after a number of months without any notice, still continuing

17  to collaborate and cooperate and communicate with the City,

18  boom, it's gone.  It's gone overnight.

19           Well, in the morning of one day last Thursday.  So

20  how do you reconcile the point of the Executive Order with the

21  change in history that President Trump was complaining about in

22  his tweet in 2017?  That's not that long ago by the way.

23           MR. IN DEN BERKEN:  Your Honor, I neither drafted the

24  Tweet nor the E.O. I do not think they need to be reconciled.

25  I think ultimately for purposes of what we are here for today,

1    the answer remains the same.

2              THE COURT:  Well, if you read the Executive Order,

3    you can see how it's the same for him and the president is

4    doing and saying the same thing, counsel.  You are now in a

5    position of representing his administration.  That's the

6    question I'm posing to you.  Is that where this comes from?  Is

7    it a desire to change history?

8              MR. IN DEN BERKEN:  I have no insight into the

9    subjective motivations for the decision.  What I can tell Your

10   Honor is exactly what the Interior Department has said in

11   public statements.

12             Consistent with that Executive Order, they conducted

13   a review.  And pursuant to that review, a decision was made to

14   remove the tablets.

15             THE COURT:  For purpose to change history by

16   providing or by hiding any written word or spoken word or

17   physical facility to teach it?

18             MR. IN DEN BERKEN:  Your Honor --

19             THE COURT:  That had been in existence for some

20   years?

21             MR. IN DEN BERKEN:  Your Honor, under APA review,

22   even if these were cognizable claims, we don't probe into the

23   subjective motivations for certain actions.  We don't question

24   the subjective individual intentions of one particular decision

25   maker.  Review under the APA's on the record --

1    THE COURT:  Well, what's the review for then that you

2  suggest has to happen in the Court of claims?  What is that

3  review for?

4    MR. IN DEN BERKEN:  It's --

5    THE COURT:  If not to figure out is this correct?  Is

6  this legal?  Is this right?  Would they do anything differently

7  than I'm asking you now, counsel?

8    MR. IN DEN BERKEN:  I think, Your Honor, at that

9  point, we would have an administrative record on which we could

10  determine whether there was that reason decision making

11  process.

12    We are at such a preliminary stage of this case,

13  there is no administrative record.  We are at a --

14    THE COURT:  Okay, so what are they going to review?

15  How can you say it's an administrative process, we have to

16  review that in another court?  How can you say that when you

17  don't have any record?  You don't have a record.  You just have

18  the act.  Aren't you stuck with dealing with the act?

19    MR. IN DEN BERKEN:  Which act, Your Honor?

20    THE COURT:  The act of removing something that was

21  approved by the Park Service, the City of Philadelphia, its

22  taxpayers, and a number of organizations who funded it.

23    MR. IN DEN BERKEN:  Your Honor, ultimately, the

24  question of where this claim should go and should this claim

25  proceed has to be based on substantive federal law.

1        And our position is, as we explain in our brief, that

2   ultimately, the answer is their contractual claims cannot be

3   asserted here.  That doesn't mean there is no recourse.  It

4   means that, ultimately, that's the process they were -- they

5   need to follow.

6        Now I understand that we are at a very preliminary

7   stage and there are questions that Your Honor has, that the

8   City has, but they are answered for the most part by the same

9   contracts they invoke.

10        What they have asked for today and the only purpose

11   of the hearing today is to determine is the extraordinary

12   drastic remedy of the preliminary injunction appropriate?

13        It's not a trial on the merits.  It's not on the

14   record review under the APA.  It's a P.I. hearing.  The showing

15   we to make is like (indiscernible) on the merits, irreparable

16   harm, and the balance of the equities and public interest.

17        The fact that they there are fatal jurisdictional

18   hurdles that they cannot overcome, the fact that the contracts

19   are expired, they explicitly award ownership, title, and

20   interpretative rights to the National Park Service, the fact

21   that those claims belong in the court of federal claims, the

22   fact that there's no provision that they have cited that this

23   violates, the fact that this is not agency action and contrary

24   to amici's argument is also not final.  There are no specific

25   legal results that have stemmed from this action for purposes

1    of the City.

2            They have saved face the legal consequences.  They

3    face no liability.  There are no ramifications.  Not legal

4    ramifications for this removal.  Therefore, it's not final

5    agency action.

6            THE COURT:  So no one can be held accountable for

7    what happened?  No one?

8            MR. IN DEN BERKEN:  Not under the APA, Your Honor.

9    Ultimately, the voters and the electorate will be the decision

10   makers here.  And that is what the APA contemplates, the fact

11   that only discrete final agency action be subject to review.

12           THE COURT:  How is this not final, counsel?

13           MR. IN DEN BERKEN:  It's not final because under

14   Bennett v. Spear, as we laid out in our brief, there is a

15   specific definition of final.

16           And that definition provides, and I quote, first the

17   action was marked the consummation of the agency's decision

18   making process.  It must not be tentative or interlocutory.

19           And two, the action on must be one by which rights or

20   obligations have been determined or from which legal

21   consequences will flow.

22           Cases interpreting that second condition have

23   explained that the action has to impose obligations,

24   prohibitions, restrictions, or give rise to direct and

25   appreciable legal consequences.

1    The City waived all rights and title in the exhibit

2    when they transferred it.  Its removal imposes no prohibitions

3    on it.  No restrictions.  It imposes no obligations.  And it

4    gives them no direct and appreciable legal consequences.

5    They face no liability.  They are not detrimentally

6    affected in a way where they face liability for a claim.

7    Therefore, under the APA, there is no final agency action.

8    Now even if they could show a likelihood of success

9    on the merits, they have a chilling irreparable harm.  That

10   requires harm that cannot be remedied at the conclusion of this

11   case.  It requires something that is by its nature intangible

12   and cannot be rectified.

13   Here, the fact that Your Honor is -- would be able to

14   order the panels restored and installed shows that there is no

15   immediate urgency.  There is no irreparable harm.

16   That brings us to the balance of the equities in the

17   public interest.  And as I alluded in my opening statement,

18   here, what they are seeking is an order that would compel

19   co-equal branch of government to speak in a way that is elected

20   not to speak.

21   The Supreme Court has made clear time after time that

22   the federal government, quote, has the right to speak for

23   itself.  This is Pleasant Grove City v. Summum, 555 U.S. 460 at

24   467.  And this is also a quote, to select a view it wants to

25   express.

1          THE COURT:  Counsel, talk about, please, your

2     position for your client on the impact of a survival clause in

3     the cooperative agreement that is the Third Amendment on the

4     obligations and rights of the parties.  This is in reference to

5     claim 1.

6          MR. IN DEN BERKEN:  So the survivability clause

7     specified that rights of obligations that by their nature are

8     expected or anticipated to continue after the termination of

9     the contract will continue.

10          There are various terms in the contract that

11     explicitly address survivability.  They say this term will

12     survive.  And there are various that I think by implications

13     do.

14          The nice thing is we have an answer in this

15     particular case as to how it relates because if we go to the

16     2006 cooperative agreement, the original unamended version,

17     this is Section 2, ownership of the exhibit.  Upon completion

18     of the exhibit in accordance with this agreement, ownership of

19     the exhibit shall transfer to the NPS.  NPS ownership of the

20     exhibit shall survive any termination of this agreement.

21          THE COURT:  Is that the second or the third

22     amendment?

23          MR. IN DEN BERKEN:  That is the original 2006

24     agreement, not any of the amendments.

25          THE COURT:  Well, the later amendment has a survival

1    clause in it, too.  They all do.

2            MR. IN DEN BERKEN:  Yes, Your Honor, but that

3    ultimately doesn't change that explicit term.  I can see that

4    there are numerous provisions that by their nature would

5    survive termination of the contract.  The problem is they

6    haven't invoked it.

7            THE COURT:  Do you agree, counsel, that all of the

8    contract or most of the contract clauses in these cooperation

9    agreements, which existed alongside the collaboration that the

10   entities that we've been hearing evidence about today were

11   performing, all emanate from the 1948 Congressional Act to

12   provide for the establishment of the Independence National

13   Historical Park and for other purposes?

14           MR. IN DEN BERKEN:  Yes, Your Honor.

15           THE COURT:  Okay.  And isn't there a provision,

16   Section 2 of that act, which explicitly states that there will

17   be no changes except by mutual agreement between the Secretary

18   of the Interior and the other parties to contracts.

19           MR. IN DEN BERKEN:  Are you quoting the statute, Your

20   Honor, or the --

21           THE COURT:  I'm quoting the statute, the act.  I

22   could read the entire section for you to put it in context.

23   Section 2, in furtherance of the general purpose of this act as

24   prescribed in Section 1 hereof, the Secretary of the Interior

25   is authorized to enter into cooperative agreements with the

1    City of the Philadelphia to assist in the preservation and

2    interpretation of the property known as the Independence Hall

3    National historic site.  That's the entire property not just

4    the building.

5         And with the Carpenters Company of Philadelphia for

6    Carpenters Hall.  To assist in the preservation and

7    interpretation of those facilities in connection with the

8    Independence National Historical Park.

9         It goes on to say such agreement shall contain but

10   shall not be limited to provisions that the Secretary of the

11   Interior through the National Park Service shall have the right

12   of access at all reasonable times to all public portions of the

13   property now within Independence Hall national historic site

14   and to Carpenters Hall for the purpose of conducting visitors

15   through such buildings and grounds and interpreting them to the

16   public, that no changes are alterations shall be made in the

17   property within the Independence Hall national historic site

18   including its buildings and grounds or in Carpenters Hall

19   except by mutual agreement between the Secretary of the

20   interior and the other parties to the contracts, which of

21   course are the City of Philadelphia and others.

22        MR. IN DEN BERKEN:  And pursuant to that statute, two

23   years later, the City of Philadelphia and the National or the

24   Department of Interior entered into the 1950 cooperative

25   agreement that to this day endures.

1          That term that Your Honor quoted about no material

2    alterations appears in that contract.  And it indeed reads any

3    work or restoration or any major alterations or repairs to any

4    of the buildings shall not be under taken until the plan for

5    such work shall be mutually agreed upon.

6          Your Honor --

7          THE COURT:  That's accurate.

8          MR. IN DEN BERKEN:  -- consistent with the statute,

9    it's buildings.  This was not a building.  This is an outdoor

10   exhibit.  The project description specifically lays out --

11         THE COURT:  Oh, no.

12         MR. IN DEN BERKEN:  -- that it is not intended to be

13   --

14         THE COURT:  No, it's a structure.

15         MR. IN DEN BERKEN:  -- it --

16         THE COURT:  It's a structure.

17         MR. IN DEN BERKEN:  That is not the definition in the

18   project, Your Honor.

19         THE COURT:  I beg to differ, counsel.  Because you

20   can't treat it like changing the definition of what this bricks

21   and mortar are because you want to do something do with its

22   information.

23         You just can't go back and forth with the projects

24   like that.  Where does the Liberty Bell fit in?  Where does the

25   National Constitutional Center fit in?  Where is Carpenters

1    Hall today and the Independence Hall site?  Well, yes, they're

2    buildings, so nothing can happen to them.

3              MR. IN DEN BERKEN:  I think, Your Honor, in those

4    cases, that provision comes into operation.  At that point

5    reparations or alterations need mutual consent.  The fact that

6    an exhibit, which is how --

7              THE COURT:  You had that mutual assent and consent

8    term in each of the subsequent amendments and a survival clause

9    in each of those cooperative agreements as amended.

10             Nowhere did it say the President's House is not a

11   building and doesn't fall in this -- into this definition.  So

12   we're going to treat it differently because it wasn't treated

13   differently, counsel.

14             MR. IN DEN BERKEN:  Your Honor, I would refer you to

15   the 2006 cooperative agreement and how it approaches and

16   describes the project.

17             And there is a definition in the background section,

18   this is background section Subsection (f).  The City and NPS

19   intend to work together to complete the following.  Select a

20   team of designers, historians, and other professionals, the

21   exhibit team to design, fabricate, and install the President

22   House exhibit.

23             It then proceeds to explain what that consists of and

24   at no point does it contemplate that it will be a property or a

25   structure much like Independence Hall or Constitution Hall that

1    is a property for purposes of the 1950 agreement.

2            In addition, this is not the argument that the

3    Government has asserted.  Their rights they invoke or the City

4    has asserted, the rights they invoke are under a 2006

5    agreement.  I have not heard them invoke the 1950 agreement

6    substantively.

7            In addition, that provision about mutual assent, as I

8    said, it applies to property.  This -- these are exhibits.

9            THE COURT:  Why did you refer to 16 United States

10   code Section 407, please?

11           MR. IN DEN BERKEN:  I do not have Title 16 in front

12   of me, Your Honor.

13           THE COURT:  Well, let me quote it.

14           MR. IN DEN BERKEN:  Please.

15           THE COURT:  Including buildings and grounds and it's

16   not an exhaustive list.  It says so.

17           MR. IN DEN BERKEN:  I am not --

18           THE COURT:  Including buildings and grounds, counsel.

19           MR. IN DEN BERKEN:  I'm not familiar with what the

20   statute itself says.  You quoted --

21           THE COURT:  Well, how can you not --

22           MR. IN DEN BERKEN:  -- buildings and grounds.

23           THE COURT:  -- apply all the statutes that are at

24   issue here?  Picking and choosing what you want to interpret as

25   you think the Executive Order says you must does not lend

1    itself to rule of law interpretation, does not give consistency

2    to history.

3         And it can't be that you practice law like that.  It

4    can't be that you practice running the government like that

5    because everyone needs rule of law and consistency to believe

6    in it.  And what does the Park Service's behavior here leave us

7    to believe?

8         MR. IN DEN BERKEN:  I think different people can draw

9    different conclusions, but I think ultimately, what we are left

10   with is the law that we need to apply in this case.  They have

11   brought APA claims.  And binding precedent says you cannot

12   disguise contract claims as APA claims.

13        Ultimately, we end where I begin -- began, which is

14   all the evidence we heard today reinforces the importance of

15   the exhibits and many people.  But ultimately, it doesn't

16   change the conclusions of law in this case, which they have

17   brought contractual claims.  They cannot do some of the APA,

18   their claims are barred.

19        The provisions they invoke do not establish any

20   contractual liability.  They actually belie it.  They establish

21   that the exhibit belongs to the National Park Service.

22        Even if they could overcome that hurdle, there is no

23   irreparable harm here because Your Honor can order the

24   reinstallation of the exhibit.  It is not harm that requires

25   the extraordinary remedy of a preliminary injunction.

1    And that brings us to the final element, the balance

2    of the equities and the public interest.  Although many people

3    feel strongly about this one way, other people may disagree or

4    feel strongly another way.  Ultimately, it is in this context

5    that the Government gets to choose the message it wants to

6    convey.  Compelling them --

7    THE COURT:  That's the most dangerous statement you

8    are making.  That is horrifying to listen to.  It changes on

9    the whim of someone in charge?

10    MR.  IN DEN BERKEN:  Your Honor --

11    THE COURT:  I'm sorry, that's not what we elected

12    anybody for.

13    MR.  IN DEN BERKEN:  Your Honor, the message that the

14    Government chooses to convey is for the Government to choose.

15    I don't get to choose what that message is.  And it's our

16    position that the City doesn't either.

17    THE COURT:  It would seem to me there has to be some

18    acknowledgement and respect for history.  And as if we didn't

19    hear enough credible evidence this morning, of how that respect

20    has been earned and the acknowledgement has been deserved, I

21    can't help but think that the moving target of what's

22    acceptable and what is not is a bane on our country's

23    existence, counsel.  And no citizen should be subjected to that

24    kind of whim.

25    So we either go with what's true and proven to be

1    true, or we just abandon all truth and let anybody in charge

2    say what they want to say about everything.  First Amendment

3    right maybe, but not when it affects other's rights.

4            And I keep thinking about this kind of situation all

5    over the world.  This is not a new and unique thing except here

6    in the United States of America.  And I cited the back and

7    forth on the Confederate General Robert E. Lee.

8            And I think that it's telling because you can go to

9    almost any country and say, well, what if that happened there?

10   And there's deniers everywhere.

11           So just take this as an example.  So there's a

12   monument to the United States soldiers who liberated the

13   concentration camp of Dachau.  What if they just decided to

14   tear down that monument like it didn't happen and it wasn't a

15   site of the Holocaust terror?

16           What are we doing here?  I have to ask that question

17   in almost every case.  What are we doing here?  Are we seeking

18   truth and justice?  Are we playing with words and partitioning

19   sections of cooperation agreements and statutes to achieve and

20   end that is not desired by almost every American?

21           And it's not a question of what I want to believe or

22   what citizens want to believe.  It's a question of what's been

23   proven to be true?

24           And now we can't count on anything because everything

25   gets rewritten and revised.  You can't erase history once

1    you've learned it.  It doesn't work that way.

2         So magic interpretation that this belongs in the APA

3    and in another court, but I still have the authority to

4    resurrect the monuments and put them back.  You are talking

5    both sides of your mouth, counsel, because you don't want to

6    argue that.  You don't want to the district court or me as the

7    judge in the District Court.  I don't think it's personal.  You

8    don't want this review here.  It's too close to the people.

9         MR. IN DEN BERKEN:  Your Honor, if I may, these are

10   disjunctive arguments.  If you disagree with the likelihood of

11   success in the merits argument, and you hold that there is APA

12   jurisdiction, you must still find irreparable harm.  Those

13   arguments are in the alternative or cumulative because you

14   need -- they need all of them to prevail on their motion.

15        They're not inconsistent.  They are entirely

16   consistent because Your Honor would need to find both those

17   elements at the very least are met to issue them the relief

18   that they've requested.

19        So if Your Honor disagrees and finds that she can

20   proceed with the case, the Court can proceed, in that case, you

21   have the ability to redress the harm and still in this context

22   there be no irreparable harm.

23        THE COURT:  Just let me get this straight.  Is the

24   Government asserting the unqualified right to modify this

25   monument any way in it chooses?  Even today?

1          MR. IN DEN BERKEN:  I think there is no legal

2     statutory regulatory or binding policy guidance that the City

3     has cited that prevent that decision if it were made.

4          I'm sure there could be other impediments that have

5     not been briefed, that I am not privy to, but nothing that the

6     City has cited would be at bar at this stage.

7          THE COURT:  There's something else that was covered

8     basically in argument, but also in evidence to a certain degree

9     because I think it's a contingent problem.

10         What is the Government's position on the claims in

11    the Claims 2 and 3 concerning the National Underground Network

12    to Freedom Act and how that applies here or doesn't apply?

13    Does it interfere with your reasoning or the City's reasoning

14    because I didn't hear anything from you on that.

15         MR. IN DEN BERKEN:  They invoke the National

16    Underground RAILROAD FREEDOM ACT in a cursory fashion to say

17    that it has a statutory purpose about preservation and

18    education.

19         The Government has no quibble or disagreement with

20    that frame or that -- the description of the statute.  It

21    contains no substantive provisions however preventing changes

22    to sites so designated.  It describes a purpose.  It imposes no

23    binding restrictive obligations that are applicable here.

24         THE COURT:  I don't think you're adversaries agree

25    with you.  I know I will hear them out on that.  I think we're

1    pretty much done here.

2           MR. IN DEN BERKEN:  There's nothing further, Your

3    Honor.

4           THE COURT:  There is one part of that, though,

5    counsel.  You said there's no obligation to do anything?

6           MR. IN DEN BERKEN:  There is no substantive provision

7    that applies in this context to restrict any of the actions

8    that the City has complained about.  They invoke none either.

9           THE COURT:  What about the Secretary's obligation to

10   provide educational materials about it, the National

11   Underground Network to Freedom?

12          MR. IN DEN BERKEN:  Consistent with that general

13   statutory purpose is my understanding that that is ongoing.

14   This -- removing --

15          THE COURT:  But that's an obligation.

16          MR. IN DEN BERKEN:  Correct, but removing any

17   particular site or -- it doesn't even remove the site because

18   the site remains.

19          Removing any particular exhibit or interpretive

20   program, display, brochure does not in any way undercut that

21   statutory purpose.  And to hold differently, if every site

22   designated as a National Underground Railroad Network Freedom

23   site had to be --

24          THE COURT:  Yeah, I thought you were going to say

25   that they're not buildings, Your Honor.  They're just plaques.

1    So we can take them apart any time we want.  That's what I

2    thought you were going to say.  I'm glad you didn't.

3            MR. IN DEN BERKEN:  What I'm saying, Your Honor, is

4    that there are numerous sites designated and the law is not

5    that not that no site once designated shall become etched in

6    stone, cannot be altered forevermore.  That is not something

7    that appears in the statute.

8            And they cite no substantive provision that is

9    actually violated here.  They cite the general statutory

10   purpose.  That by itself cannot impose --

11           THE COURT:  That is an -- that was a question posed

12   as an analogy, counsel.  I heard your answer.  Thank you.

13           MR. IN DEN BERKEN:  For all those reasons, Your

14   Honor, it's the Government's position that the motion for

15   preliminary injunction should be denied.  Thank you.

16           THE COURT:  Thank you.

17           MS. TAYLOR:  Good afternoon, Your Honor.

18           THE COURT:  Ms. Taylor, good afternoon.

19           MS. TAYLOR:  So the City is here seeking an

20   injunction that directs the Park Service to restore the panels

21   and other that were removed from the President's House.

22           We understand that as a Plaintiff, we carry a high

23   burden when we are seeking affirmative action from the

24   Government rather than just a stasis.

25           And we respectfully ask that the Court after this

1    hearing entertain proposed findings of fact and conclusions of

2    law, so we can more clearly establish our right to that relief

3    based on the record.

4         Because of the urgency as Your Honor has already

5    previewed, we respect -- we respectfully request that these

6    submissions be on an expedited basis.

7         Today, however, as I stand here, we are asking that

8    the Court at least issue an order that directs the Park Service

9    not to take down anything further.

10         The affidavit submitted by the acting director of the

11   NATIONAL INDEPENDENCE HISTORICAL PARK suggests that but for the

12   weather and the tools, the National Park Service would remove

13   what limited substantive information remains in the President's

14   House.

15         And we ask that that be stopped from happening and

16   that, further, the Court specifically order that no harm come

17   to the panels.

18         As we understand it, they're not held at the

19   Constitution Center itself but at a storage facility adjacent

20   to the Constitution Center that is in the Park Service custody.

21   So that order would bind the Park Service to protect those

22   materials during the pendency of our larger ask for

23   reinstatement.

24         With that said, why are we entitled to this relief?

25   Obviously, and in first had -- I do want to address the

1    jurisdictional issues raised by counsel.

2             One of our three entitlements to relief is grounded

3    in contract.  And yes, the Tucker Act does apply to contracts

4    who have a value over $10,000.

5             The decisional law referenced in the United States

6    brief arises out of the last year of litigation primarily

7    around grant agreements and whether or not the, you know,

8    contentions that the Government has arbitrarily and

9    capriciously stopped the flow of money to programs that are

10   essential to the functions of many different things across our

11   country.

12            This is not that case.  The contracts at issue, and

13   I'll get into the weeds on those in a bit, but the contracts at

14   issue are not about values of money that the City says the Park

15   Service must take action to restore a flow of money to the

16   City.

17            We are saying under these contracts, this exhibit

18   should be maintained as it is, was, and built together to be.

19   That is a claim over which this Court has original jurisdiction

20   under 28 USC 1346(a)(2).

21            I believe that it colloquially called the little

22   Tucker Act, which basically reserves small claims, nonmonetary

23   large claims expressly to the jurisdiction of this Court.  I

24   think this Court may not concern itself with jurisdiction.

25            Under 5 USC 702, this Court can hear claims against

1    the United States where the release sought is injunctive.  We

2    are not seeking money.  We are seeking action.  This Court has

3    jurisdiction under that specific prong of the Administrative

4    Procedure Act.

5         So turning to the contracts, what contracts are we

6    talking about?  Many of these have already been previewed.  And

7    I apologize in advance, but I do want to read specific

8    provisions into the record because I believe they are important

9    for the Court's consideration.

10        I'll direct the Court's attention first to Article 3

11   of the 1950 agreement.  Article 3, Section C specifically says

12   any work of restoration or any major alterations or repairs to

13   any of the buildings shall not or shall not be undertaken until

14   the plans for such work shall have been mutually agreed upon.

15        Provision D continues.  That neither of the parties

16   to this agreement will erect or place or permit the erection or

17   placement of any monument, marker, tablet or other memorial in

18   or upon the buildings or grounds without the written consent of

19   the other.

20        And then, provision (e) in that same Article 3, that

21   it is the purpose of both parties to this agreement to develop

22   a unified long range program of preservation, development,

23   protection, and interpretation for the whole Independence

24   National Historical Park for the inspiration and benefit of the

25   people of the United States.

1          And to secure this result, a high degree of

2     cooperation is necessary with each other and with other bodies

3     participating in the project.  To wit, the Commonwealth of

4     Pennsylvania, Christ Church, Carpenters Company of

5     Philadelphia, and Independence Hall Association.  And the

6     parties hereto pledge themselves to consult on all matters of

7     importance to the program.

8          The United States has already conceded that the 1950

9     agreement has not been done away by an act of commerce, which

10    is the only way that this can be invalidated.

11         Those provisions standing alone direct mutual

12    agreement, direct mutual written assent to changes to the

13    Independence National Historical Park.

14         And the everything the Court heard today manifested

15    what that agreement looks like, what that mutual looks like

16    when it is done properly.

17         It might take a long time, but it is collaboration,

18    cooperation, stakeholder engagement, critical engagement by the

19    public, by all the government entities to come together to do

20    something.  That is the type of cooperative collaborative

21    behavior that is directed by the still controlling 1950

22    agreement.

23         And yes, I will -- the United States point is fairly

24    made.  We did not expressly say this in our papers.  Your

25    Honor, we had a few hours to file while this was happening.

1          So to the extent it is helpful to the Court, we can

2     certainly, you know, file an amended pleading that more clearly

3     conforms with the arguments I'm presenting to the Court, which

4     is also why I'm talking very slowly and making statutory pin

5     cites.

6          Next on the agreement front and in the City's claim

7     about the development of these agreements, I turn the Court's

8     attention you -- the Court has heard a lot of testimony about

9     the development of these agreements.  One provision in

10    particular I would submit is important for the Court's

11    consideration.

12         In the 2006 cooperation agreement, Provision 15 in

13    that agreement binding on successors.  The language of that

14    provision states the terms, covenants, and conditions contained

15    in this agreement shall extend and be binding upon the parties

16    hereto and their respective successors and assigns.

17         So what does -- what really are the terms, covenants,

18    and conditions?  And we would submit core to the terms,

19    covenants, and conditions of the development of this site, is

20    that it shared the truth.  It educate the truth of the facts

21    that the first president of our country intentionally housed

22    enslaved persons at his house in and in his household.

23         And not only that, the educational pieces and this

24    didn't come through the testimony, but it is in the submission

25    documents, particularly the National Park Service's submission

1   for recognition as a network to freedom site under the National

2   Underground Railroad Network to Freedom Act of 1998.

3          That submission details how not only did the first

4   president of the United States keep people in slavery in the

5   house, he and his household specifically moved people in and

6   out of the state of Pennsylvania so that the six month

7   provision by which under Pennsylvania law, individuals would be

8   freed if they stayed six continuous months in the state of

9   Pennsylvania.

10          Our first president moved members of his household,

11  enslaved persons of his household, out of state specifically so

12  that provisions would not then free the people who were held in

13  slavery in his household.

14          This is important history and this is part of the

15  history that was understood in 2006 when the terms, covenants,

16  and conditions contained in the agreement were agreed to be

17  binding upon successors and assigns.

18          What those conditions are is made -- among those

19  conditions are made even more clear in Exhibit 6 submitted to

20  the Court, the 2009 amendment.

21          I would direct the Court's attention to the project

22  development plan.  You heard testimony about that.  Its

23  Attachment C to the 2009 amendment.

24          The project description in that plan specifically

25  states site interpretation will focus on the house and the

1    people who lived and worked there, the executive branch of the

2    U.S. government, the systems and methods of slavery, African

3    American Philadelphia, and the move to freedom for the

4    enslaved.

5            That is what this house is about.  Those are the

6    agreements that bounded the purpose and contents and narrative

7    and what was everyone's goal to explain and to educate.

8            And you heard incredibly moving testimony about what

9    the power of that education can be when that history is

10   otherwise not taught.  And that this offers an offered and

11   continues to offer a unique place and way for people to learn

12   that history.

13           Within all that, we submit that as for Count 1, we

14   have the provisions in these contracting documents, the

15   guidance given under the 1950s agreement and all 1950 agreement

16   and all the work done since then, shows what had to have been

17   done to make a change of this magnitude on the grounds of the

18   Independence National Historical Park.

19           None of that was done.  You certainly heard Ms. Gay

20   as the chief cultural officer for the City of Philadelphia

21   never got a call about this.

22           And also, frankly, the affidavit submitted by

23   Regional Director Simms shows that.  He by his -- if I recall

24   his affidavit correctly, I believe he got a call the morning of

25   the 26th.  And by the or the 22nd, by the afternoon, the panels

1   were gone.

2         That does not show any sort of engagement in the very

3   least with the effort at mutual agreement that is meant to be

4   done in.  And it certainly violates all with the provisions

5   that carry forward about what this exhibit is meant to show.

6   That's just our first claim.

7         I would like to talk to the Court briefly through our

8   second claim, which is a more standard APA arbitrary and

9   capricious action.

10        So in terms of standing to make a claim, and this is

11  specifically under the National Underground Network to Freedom

12  Act of 1998.  The City in the first instance as does every

13  litigant has to establish that we have standing to make this

14  claim.

15        And aside from the contractual -- residual

16  contractual interest we have in the site being as it was

17  contemplated and that we still have an Independence National

18  Historical Park, I would also submit that the United States has

19  already expressly recognized that the City particularly has

20  public benefit that inures from the creation of the President's

21  House.

22        And for that, I would Court -- direct the Court's

23  attention back to Exhibit 1, which is the 2006 agreement and

24  provision K and the recitals there, the background recitals.

25        It's the -- you know, both parties signed this, but

1    that the President's House and participating in and funding the

2    President's House for the City enables the City to commemorate

3    the symbolic and historical importance of the President's House

4    for the City of Philadelphia, its citizens, and all Americans

5    nationwide.

6          And by doing so, there is a public benefit inuring to

7    the City.  The City has standing to contend that the National

8    Park Service engaged in arbitrary and capricious agency action

9    when it took steps that absolutely wiped the basis and reason

10   why the President's House became and interpreted how the

11   President's House has such a powerful space in the Underground

12   Railroad.

13         So I should also touch briefly on I would say in at

14   least in their briefing, the United States did not particularly

15   argue that this doesn't have the hallmarks of final agency

16   action.

17         I would submit that decisively taking down all of the

18   information explaining the space is the type of culmination of

19   an administrative decision making process that is the hallmarks

20   of finality for purposes of final agency action.

21         And then, touching on the other element, the City's

22   legal interests are adversely affected by this.  Grounded, A,

23   in the contract, and B, in the interruption in our public

24   benefit, which has been completely done away with by removal of

25   this information from the public sphere.

1              So in terms of final agency action, this is one that

2       we are certainly happy to build out more for the Court in

3       findings and conclusions, but those two pieces as we sit here

4       today that has the hallmarks of final agency action that the

5       City has been specifically harmed by.

6              In terms of the arbitrary and capricious nature of

7       it, I would like to bring the Court's attention to the National

8       Underground Railroad Network to Freedom Act that was passed by

9       Congress in 1998.  It is public law 105-203.  And I believe it

10      was enacted on July 21st, 1998.

11             In the findings and purposes, so Congress defining

12      this act, Congress states the Underground Railroad bridged the

13      divides of race, religion, sectional differences and

14      nationality spans state lines and international borders and

15      joins the American ideals of liberty and freedom expressed in

16      the Declaration of Independence in the Constitution to the

17      extra ordinary actions of ordinary men and women working in

18      common purpose to free up people.

19             Congress then further found the National Park Service

20      can play a vital role in facilitating the national

21      commemoration of the Underground Railroad.  That was in 1998.

22             In 2022, the Park Service submitted a very detailed

23      application to have the President's House specifically

24      recognized as a Network to Freedom site under this statute.

25             And the application by the Park Service is Exhibit

1    10.   That was submitted to the Court without objection.  And I

2    would particularly invite the Court, it's a long narrative

3    submission that really explains the historical import and

4    connection of the President's House with the Underground

5    Railroad.

6           But I would particularly direct the Court's attention

7    to the narratives starting at page 8, which is the story of Ona

8    Judge.

9           And as you heard Ms. McClellan explain, Ona Judge was

10   part of the dower (sic) estate for Martha Washington.  So

11   Martha Washington, and this is gross, inherited Ona Judge's

12   property upon the demise of her husband.  And then, Ona Judge

13   would pass as property to Mrs. Washington's children upon Mrs.

14   Washington's demise.  That is how Ona Judge got to

15   Philadelphia.

16          The narrative story of Ona Judge working in the

17   White -- in the President's House at the time that George

18   Washington was president and Martha Washington, his wife, had

19   Ona Judge go in and out of the state so she remained in bondage

20   in contravention of the laws or just complying with the laws of

21   Pennsylvania, so she would not be freed as Pennsylvania would

22   otherwise dictate for somebody who lived in the state.

23          That she then partnered with the free African

24   American community in Philadelphia to facilitate her escape

25   from slavery, all of that critical story telling about the

1    start of our country is in the application by the National Park

2    Service to get this designation for it to be a Network to

3    Freedom site.

4            All of that information is in the panels that are

5    part -- critical part of the exhibit.  And all of that Congress

6    directed that the National Park Service can play a vital role

7    in facilitating the national commemoration.

8            Congress directs the Park Service to create and not

9    destroy sites that educate the public about the Underground

10   Railroad.  The action that day was expressly in contravention

11   of the statutory instruction to create, not destroy, and

12   frankly, was arbitrary and capricious.  And we submit we have a

13   likelihood of success on the merits of that claim.

14           The other APA claim that we bring, which Your Honor

15   has previewed by quoting a language of Title 168 Section

16   407(m), again, this is a -- this was the statute by which or

17   the legislation by which the Independence National Historical

18   Park was founded.  That remains good law.

19           And that also instructs that, specifically, no

20   changes or alterations shall be made in the property within the

21   Independence Hall National Historical site including a

22   buildings and grounds or in Carpenter's Hall except by mutual

23   agreement between the Secretary of the Interior and the other

24   parties to the contracts.

25           As the Court has heard, none of that happened here.

1    And we submit that we will == we have a likelihood of success

2    in the merits of that claim.

3          I do want to touch on one point raised by the United

4    States in it briefing.  And that specifically is the contention

5    that the removal of all this information is simply a curatorial

6    decision that is entirely the purview of the United States.

7    It's a discretionary function that the National Park Service

8    can just do.

9          So one piece to raise the Court's attention or one

10   case I would draw to the Court's attention, in 2020, the 3rd

11   Circuit Court of Appeals issued the Gentile v. Securities and

12   Exchange Commission opinion that it specifically looked into or

13   not looked into, addressed the reservation of jurisdiction or

14   the reservation of matters that can be appropriately examined

15   through the Administrative Procedure Act.

16         And so, in that case, it looked at it's for the

17   Administrative Procedure Act, it's the reservation at 570 -- 5

18   USC 701(a)(2).

19         What the 3rd Circuit said is that that section, that

20   discretionary reservation is construed narrowly.  And it

21   includes action such as decisions to refrain from enforcement

22   or investigative activity, decisions implicating intelligence

23   and national security concerns, and the spending of lump sum

24   appropriations.

25         That category of discretion that is removed from the

1    purview of review under the Administrative Procedure Act is

2    wholly different than the actions that are issued here before

3    the Court.

4         We respectfully submit that doesn't -- that

5    discretionary exception does not apply here.  And that we have

6    a likelihood of success on the merits of our claims.

7         With that, and understanding we have the burden to

8    prove every element for a preliminary injunction, I would like

9    to turn to address the irreparable harm.

10        And to establish irreparable harm, we have to

11   identify an injury that is actual and imminent, not merely

12   speculative.  And that we have to show that the harm is

13   happening now that it's not in the indefinite future, but that

14   it is immediate and that it is irreparable.

15        Your Honor, I lost track of the numbers things I

16   started writing down is as our witness were testifying.  I

17   would simply submit the harm, the taking down of everything

18   that makes the building, that makes the windows, the walls, the

19   suggestion, you know, the President's House monument or

20   exhibit, whatever word we use for it, it is a ghost of a

21   building that allows insight into the past.

22        The reason it's built the way it is is so you have a

23   sense that a house stood here, but not just a house school

24   here.  People lived here.  And this is what it lived like.

25        I found it particularly striking when Mr. Gillison

1    was testifying about what happened when he watched Hercules be

2    performed as this is my job, this is what I'm doing.

3              And the vantage point into what life was like at the

4    time and contextualizing this place that is a ghost of a house

5    and making it real and making that lived experience real.

6              Those videos, that information is all critical to the

7    house having really any meaning because otherwise, it's an

8    interesting architectural phenomenon that you walk by and you

9    don't know why it's there.

10             It's essential to the President's House being the

11   President's House.  So in terms of irreparable harm, every day

12   that that's not there, people walk by and they don't know.  And

13   there is not a way for them to travel absent the information

14   being put back up.

15             There's not a way for them to travel to the site and

16   understand and have that very specific site experience of

17   looking down at the, you know, no one knew that the foundation

18   of the building was going to be there when they started

19   excavating, but it is and it adds incredible additional

20   architectural and curatorial value to the space.  That is

21   irreparable harm.

22             And further, I would note, and again, I think this is

23   something we can go into more detail in supplemental briefing,

24   but generally speaking, in preliminary injunctions on the

25   irreparable harm prong, the fact of there is some way this can

1    be rectified later is frankly usually in a connotation of

2    somebody can later seek money damages.

3        That's as I have litigated these cases at least this

4    is me standing here.  I should do more research, but generally

5    speaking, the premise in that type of irreparable harm is you

6    can sue for money after the fact because you've been hurt and

7    so then it is not irreparable.

8        Here, the irreparable is every person who passes by

9    and won't get the opportunity to learn, see, and feel what that

10   is, what President's House was meant to be, that is

11   irreparable.

12       I would also like to touch on the balance of the

13   harms and the public interest.  And this is an interesting case

14   because the public is on all sides of it.

15       We are the public, the federal government is the

16   public.  The public was intimately involved in the building of

17   the site and the attendance at various community meetings to

18   provide input on what the site should be.

19       So in each preliminary injunction case, the Court

20   must balance the competing harms of injury and must consider

21   the effect on each part of the granting or withholding of the

22   requested relief.

23       In exercising their sound discretion, courts of

24   equity should pay particular regard for the public consequences

25   in employing the extraordinary remedy of injunction.

1        And that I am reading from Winter v. National

2   Resources Defense Council, 555 U.S. at 7 or at 7.  And that's A

3   2008 Supreme Court case.

4        The United States cannot plausibly argue that it

5   would be harmed by restoration of an exhibit in the development

6   of which the sovereign participated.

7        And the United States cannot plausibly argue that the

8   public interest favors the removal of this collaboratively

9   developed exhibit and in contravention of its designation as an

10  Underground Railroad Network to Freedom site.

11       I also want to note that the United States is

12  incorrect that this application for relief represents the City

13  seeking to compel Government speech.

14       And counsel referenced the Pleasant Grove v. City

15  case.  That case arose in the context of a group of private

16  actors affiliated with a particular church going to a city I

17  guess municipality that owned a public park, petitioning to put

18  a monument with their specific religion precepts in the park.

19  The park contained various other monuments, one of which was a

20  10 commandments monument that had been there for 40 years

21       Pleasant Grove denied the request.  Those Plaintiffs

22  then sued and said that their First Amendment rights to equal

23  participation in a public forum were being impeded by the

24  government's refusal.

25       The Supreme Court's analysis of that case was

1    specific to the facts of that case in that it was a public park

2    wholly owned by the municipality at issue.

3            The Supreme Court also looked at what it meant to

4    have a public forum versus something that was a permanent

5    installation.

6            And it said in that case, where the government wholly

7    owns the site, that forcing the placement of different

8    religious precepts was in fact government speech.

9            That is not the space or the issue that's before the

10    Court.  The National Independence Historical Park has always

11    been a jointly collaboratively, all of those words we have said

12    so many times.

13            This space is not as purely federally owned space.

14    The space has a long history and a statutory history of overlay

15    of collaboration.  This is not a forced speech case.  It's

16    simply not.

17            Instead, it is a case where abrupt, painful, and

18    without notice removal of critical information that only came

19    to light -- we are just 24, 26 years past when this first came

20    to light.  This is still new information.  This is incredibly

21    important.

22            And we submit that the balance of harms in the public

23    interest and for all of the reasons and evidence and

24    participation by amici, all of this, amici, I can never

25    pronounce that word, all of it shows that the balance of harms

1    and the public interest strongly favor the entry of restraints

2    and the restoration of this site.

3              With that, I would ask that the Court enter temporary

4    restraints to stop any further destruction from occurring and

5    specifically order the preservation of the panels as they

6    exist.  And I look forward to a submission that will establish

7    why this site should be restored.

8              THE COURT:  Counsel, could you also tell me what the

9    City's position is on the status quo because in your complaint

10   and briefing, you did say we want the Court to preserve the

11   status quo?

12             MS. TAYLOR:  Yeah, well, and that's --

13             THE COURT:  And your request right now is a bit

14   different.

15             MS. TAYLOR:  It is different.  And so, Your Honor,

16   what I would say, again, we started briefing before they had

17   come down.

18             And so, to the extent the Court or certainly the

19   government needs a more clear pleading with more clear requests

20   for relief, we're happy to turn that around as quickly as

21   possible.

22             I certainly recognize what I have specifically argued

23   is a somewhat refined version of what we submitted necessarily

24   but in haste last Thursday.

25             THE COURT:  Well, it's a consideration because we do

1    like clarity --

2            MS. TAYLOR:  Uh-huh.

3            THE COURT:  -- in the legal pleadings.  And the

4    Government would have another chance to answer, respond to

5    that.  And that's only fair.

6            And we could get to the true issues, but I think the

7    evidence that was presented today has opened doors to a number

8    of issues that we might want more briefing on.  But I'd like to

9    give the parties an opportunity to actually amend pleadings if

10   they choose to.

11           MS. TAYLOR:  Yeah, Your Honor, we're happy to do

12   that.  And understanding this is an expedited matter of

13   significant concern, I think we could certainly get amended

14   application, it's Friday, maybe just as my team sits there so

15   they don't get too twitchy at me.  Could we by maybe Wednesday

16   morning have the updated application?

17           I would submit, Your Honor, that would just conform

18   to the arguments we've made today.  And the evidence --

19           THE COURT:  Wouldn't be anything new?

20           MS. TAYLOR:  -- would be the same.  But I would also

21   again renew the ask based on everything Your Honor heard today

22   and for the reasons that I have stated that at the very least,

23   a temporary restraint on any other further action is warranted.

24           It's going to stay cold.  It may be that there's no

25   opportunity to take further things down, but just in case, I

1    think that would be prudent and warranted by our submission and

2    the evidence before the Court.

3              THE COURT:  Well, rushing through amended pleadings,

4    additional briefing would not be necessary if there was a

5    simple agreement between the parties that no more removals will

6    occur, especially since I've been told by the parties that

7    there's a question of damage if it's attempted.

8              Not to forget that I need to have a joint examination

9    of the panels and information, even the videos that have been

10   removed, that I would like counsel to participate in or your

11   named representatives because we want to be sure we know what

12   we're dealing with.

13             That's appropriate and that can take place wherever

14   it is located, but first, I was Told It Was At The National

15   Constitution Center.  And then, today, I heard no, it's not

16   really.  It's in a building for the Park Service.

17             MS. TAYLOR:  Yes.

18             THE COURT:  Which is a party here.  So I'm not

19   content with that.

20             MS. TAYLOR:  Your Honor, and I would defer to counsel

21   for the United States on that.  I was just sharing my

22   understanding of it.

23             THE COURT:  Thank you very much.

24             MS. TAYLOR:  Uh-huh.  Anything further Your Honor?

25             THE COURT:  No, thank you.

1        MS. TAYLOR:  Thank you.

2        THE COURT:  Okay.  Let me get back to counsel for the

3   Defendants.  What can we do about a preservation order because

4   I am inclined to the status quo is how is it now as opposed to

5   status quo how was it a week ago or eight days ago?

6        But I need to see the panels.  And I'd like that to

7   be arranged through your client, who apparently does have

8   custody.

9        MR. IN DEN BERKEN:  So --

10       THE COURT:  Why was I told it was in National

11  Constitution Center?

12       MR. IN DEN BERKEN:  -- Your Honor, as I said twice on

13  the status conference call on Monday and as is reflected in the

14  affidavit of Mr. Simms, the sentence in that declaration is

15  they are in NPS custody and being stored at the National

16  Constitution Center.

17       I am not personally familiar with the exact --

18       THE COURT:  I don't know how that works.

19       MR. IN DEN BERKEN:  -- relationship with between the

20  location where they are stored and the National Constitution

21  Center.  What I do know is that Mr. Simms will refer to it as

22  at the National Constitution Center.

23       THE COURT:  Okay.

24       MR. IN DEN BERKEN:  There was never any

25  representation that they were in NCC custody.  To be very

1    clear, they are in custody and have been in Park Service

2    custody at all Park Service times.

3              THE COURT:  Well, they couldn't exactly grant custody

4    to something they may not particularly solely own, but I'm glad

5    to hear that.  Let's 'get that straight.  This is not a problem

6    for me.  I want though to facilitate my inspection.  And I'd

7    like it to be Monday.

8              MR. IN DEN BERKEN:  That will be possible, Your

9    Honor.

10             THE COURT:  Okay.  You set it up.  Tell counsel.

11   Amici can come in if want.  And we'll make sure we take

12   pictures.

13             MR. IN DEN BERKEN:  Certainly.

14             THE COURT:  And as to the amendment to the pleadings,

15   which I think is often a good idea in any case to add or drop

16   claims, clarify what those claims are, do you have any problem

17   with me setting up a schedule for that?

18             MR. IN DEN BERKEN:  It would be my great preference

19   that they amend because many of the arguments I heard today did

20   not appear in the briefs or the causes of action that are pled

21   currently, Your Honor.

22             THE COURT:  I think all of us need to have that

23   clarity.  I talked about rule of law, you know.  And that means

24   we have rules, we have laws, and we have understandings about

25   them.

1    And that applies to litigation materials as well as

2    everything else.  So we will be setting that up with you,

3    counsel, but I'd like to hear Monday morning at some point if

4    we're not snowed in again.

5    But I'd also like to be sure that nothing more will

6    change from right now until I have ordered, I have reached a

7    decision on the preliminary injunction about the removal of any

8    further materials.  Can you agree to that, counsel?

9    MR. IN DEN BERKEN:  I will have to confer with my

10   client, but my belief is that should be possible.

11   THE COURT:  I'd like that.  But on the other hand, I

12   can also enter an order to that effect.  And yet, I don't like

13   to have things escalate where they could be done in a

14   professional manner differently.

15   MR. IN DEN BERKEN:  I would ask for the opportunity

16   to consult with my client, but if there is not an ability to

17   come to an understanding like that, I will promptly inform the

18   Court.

19   THE COURT:  Okay, let us all know in writing what the

20   response is and I'll know then whether or not I have to enter

21   an order, because I will, all right.

22   Is there anything else from anyone?  I told you I

23   would decide this promptly, but I am going to give everyone a

24   chance to do what I just discussed with you.

25   And I do appreciate a most interesting case and

1   important case.  And I am happy to be working with you to reach

2   amicable resolutions and understandings that move us forward.

3   Right now, I've got a legal job to do and I'm going to do it.

4   All right?  Thank you, everyone.

5               MR. IN DEN BERKEN:  Thank you, Your Honor.

6               MS. GARCIA:  Thank you.

7           (Proceedings concluded at 3:47 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11           /s/ *Chris Hwang*

12    _____          February 3, 2026

13    Chris Hwang                  Date

14    Court Reporter

15

16

17

18

19

20

21

22

23

24

25