IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CITY OF PHILADELPHIA,

        Plaintiff,

    v.

DOUG BURGUM, SECRETARY OF THE
INTERIOR, *et al.*,

        Defendants.

Case No. 26-cv-434

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

DAVID METCALF
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

GREGORY B. IN DEN BERKEN
Assistant United States Attorney

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FACTS AND PROCEDURAL HISTORY ..............................................................2

I.      Background ...................................................................................................2

II.     Procedural History .....................................................................................3

LEGAL STANDARD ...........................................................................................4

ARGUMENT .....................................................................................................6

I.      This Court Lacks Jurisdiction ..................................................................6

      A.     The City Lacks Standing.................................................................6

      B.     Counts 1 and 2 Are Contractual Claims and Thus Barred by the Tucker Act.............................................................................................. 14

II.     The City Has Not Shown a Likelihood of Success on the Merits.......................... 19

      A.     The City Fails to State Cognizable APA Claims ......................................... 19

            1.     The City fails to challenge "agency action" under the APA. ............ 19

            2.     The alleged agency action that the City challenges here is not final under the APA..........................................................................20

            3.     The City challenges conduct committed to agency discretion by law. ....................................................................................... 21

      B.     The City's Ultra Vires Claim is Foreclosed ................................. 25

III.    The City Has Not Established Irreparable Harm ................................. 26

IV.    The Public Interest and Balance of the Equities Counsel Against Issuing an Injunction ..................................................................................28

V.     Any Further Injunctive Relief Should Be Stayed Pending Appeal ........................30

CONCLUSION...................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acierno v. New Castle Cty.,*
40 F.3d 645 (3d Cir. 1994) ............................................................................................. 5

*Adams v. Freedom Forge Corp.,*
204 F.3d 475 (3d Cir. 2000)......................................................................................... 27

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.,*
357 F.3d 62 (D.C. Cir. 2004) ....................................................................................... 14

*Almond Bros. Lumber Co. v. United States,*
721 F.3d 1320 (Fed. Cir. 2013) ................................................................................... 23

*Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield,*
890 F.3d 445 (3d Cir. 2018) ......................................................................................... 13

*Am. Sci. & Eng'g, Inc. v. Califano,*
571 F.2d 58 (1st Cir. 1978) .......................................................................................... 15

*Armstrong v. Exceptional Child Ctr. Inc.,*
575 U.S. 320 (2015) ...................................................................................................... 26

*Bennett v. Spear,*
520 U.S. 154 (1997)................................................................................................ 20, 21

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ...................................................................................................... 18

*Chemours Co. FC, LLC v. United States Env't Prot. Agency,*
109 F.4th 179 (3d Cir. 2024) ....................................................................................... 21

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)......................................................................................................... 6

*Coggeshall Dev. Corp. v. Diamond,*
884 F.2d 1 (1st Cir. 1989) ............................................................................................ 18

*Comm'n v. Texas,*
605 U.S. 665 (2025) ...................................................................................................... 26

*Davis Enters. v. U.S. E.P.A.,*
877 F.2d 1181 (3d Cir.1989)................................................................................... 22, 25

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518 (3d Cir. 2018)..................................................................5

*Ferring Pharms, Inc. v. Watson Pharms., Inc.*,
    765 F.3d 205 (3d Cir. 2014)..................................................................5

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*,
    830 F.3d 515 (D.C. Cir. 2016)..............................................................26

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ...............................................................19

*Guided Walking Tours v. Indep. Visitor Ctr. Corp.*,
    454 F. App'x 118 (3d Cir. 2011)....................................................22, 23

*Hahn v. United States*,
    757 F.2d 581 (3d Cir. 1985) .........................................................15, 18

*HAPCO v. City of Phila.*,
    482 F. Supp. 3d 337 (E.D. Pa. 2020) .........................................5, 26, 27

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ......................................................................22, 25

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015) ............................................................................11

*Horses of Cumberland Island v. Haaland*,
    No. 23-cv-1592, 2024 WL 5430835 (N.D. Ga. Nov. 8, 2024) .................24

*Indep. Equip. Dealers Ass'n v. E.P.A.*,
    372 F.3d 420 (D.C. Cir. 2004)..............................................................20

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985)................................................................17

*Kamdem-Ouaffo v. Task Mgmt. Inc.*,
    792 F. App'x 218 (3d Cir. 2019) ............................................................5

*Keller v. State Bar of Cal.*,
    496 U.S. 1 (1990) ................................................................................29

*Lance v. Coffman*,
    549 U.S. 437 (2007).............................................................................13

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)..............................................................................22

*Local 2855, AFGE (AFL-CIO) v. United States,*
  602 F.2d 574 (3d Cir. 1979) ........................................... 22

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...................................................... 7

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ................................................. 19, 20

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.,*
  823 F.3d 184 (3d Cir. 2016) ....................................... 12, 27

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) .................................................... 12

*Matal v. Tam,*
  582 U.S. 218 (2017) .................................................... 29

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) .................................................... 14

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) ....................................... 15

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ...................................................... 4

*Nken v. Holder,*
  556 U.S. 418 (2009) .................................................. 4, 29

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ...................................................... 20

*Penn. ex rel. Creamer v. U.S. Dep't of Agric.,*
  469 F.2d 1387 (3d Cir. 1972) ......................................... 28

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009) ............................................. 1, 29, 30

*Qureshi v. U.S. Citizenship & Immigr. Serv.,*
  No. 08-cv-2281, 2010 WL 1390846 (M.D. Pa. Mar. 31, 2010) ............ 18

*Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs,*
  343 F.3d 199 (3d Cir. 2003) .......................................... 22

*Reilly v. City of Harrisburg,*
  858 F.3d 173 (3d Cir. 2017) ........................................... 5

*Robbins v. U.S. Bureau of Land Mgmt.*,
    438 F.3d 1074 (10th Cir. 2006)..............................................................14, 18

*S. Broad St. Assocs.-Tenant, L.P. v. U.S. Dep't of Agric.*,
    No. 08-cv-4646, 2009 WL 301936 (E.D. Pa. Feb. 4, 2009)...........................17

*Sea-Land Serv., Inc. v. Brown*,
    600 F.2d 429 (3d Cir. 1979) .......................................................14, 15, 17, 18

*Sec. Sav. Bank, SLA v. Dir., Off. of Thrift Supervision*,
    798 F. Supp. 1067 (D.N.J. 1992) ............................................................... 18

*Qureshi v. Admin. Appeals Off. (AAO) of U.S. Citizenship & Immigr. Servs. (USCIS)*,
    408 F. App'x 611 (3d Cir. 2010)...........................................................17, 18

*Shapiro v. U.S. Dep't of Agric.*,
    No. 25-cv-998, 2025 WL 3473291 (M.D. Pa. Dec. 3, 2025) ................... 15, 17

*Sharp v. Weinberger*,
    798 F.2d 1521 (D.C. Cir. 1986) ...............................................................17

*Shurtleff v. City of Bos., Massachusetts*,
    596 U.S. 243 (2022) .................................................................................29

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ..................................................................17

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..............................................................................7, 12

*Sprague Elec. Co. v. Tax Court*,
    340 F.2d 947 (1st Cir. 1965) ................................................................... 15

*Star Alaska v. United States*,
    14 F.3d 36 (9th Cir. 1994).................................................................. 18, 27

*State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024) ................................................................5, 28

*Sustainability Inst. v. Trump*,
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) .............................26

*Town of Milton, Mass. v. FAA.*,
    87 F.4th 91 (1st Cir. 2023) ...................................................................... 12

*United States Conf. of Cath. Bishops v. U.S. Dep't of State*,
    770 F. Supp. 3d 155 (D.D.C. 2025)...........................................................17

*United States v. Miller,*
   145 S. Ct. 839 (2025) ................................................................ 14

*United States v. Texas,*
   599 U.S. 670 (2023) .................................................................... 6

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
   454 U.S. 464 (1982) .................................................................. 13

*Vera Inst. of Just. v. U.S. Dep't of Just.,*
   No. 25-cv-1643, 2025 WL 1865160 (D.D.C. July 7, 2025) ............ 17

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,*
   714 F.3d 186 (4th Cir. 2013) ...................................................... 19

*Vorchheimer v. Philadelphian Owners Ass'n,*
   903 F.3d 100 (3d Cir. 2018) ................................................. 10, 11

*Webster v. Doe,*
   486 U.S. 592 (1988) .................................................................. 22

*Wilderness Soc. v. Norton,*
   434 F.3d 584 (D.C. Cir. 2006) .................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .......................................................... 4, 5, 10, 16

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) ...................................................................... 29

## STATUTES

5 U.S.C. § 551(13) ........................................................................... 19

5 U.S.C. § 701(a)(2) ........................................................................ 21

5 U.S.C. § 702 ................................................................... 14, 19, 21

5 U.S.C. § 704 ................................................................................ 20

16 U.S.C. § 407n ..................................................................... *passim*

28 U.S.C. § 1346(a)(2) .................................................................... 14

28 U.S.C. § 1491(a)(1) .................................................................... 14

54 U.S.C. §§ 308301-04 .................................................................. 23

54 U.S.C. § 308302 ......................................................................... 26

## RULES

Fed. R. Civ. P. 65(b)(2)....................................................................................................4

## OTHER AUTHORITIES

8 Fed. Reg. 7,283 (dated May 14, 1943; published June 1, 1943) .....................................8

Aileen Clarke & Sam Morris, *Here Are the Signs the Trump Administration
    Removed from Independence Park*, PHILA. INQUIRER (Jan. 22, 2026),
    https://www.inquirer.com/news/philadelphia/inq2/independence-park-trump-
    signage-remove-presidential-house-20260122.html ..................................................27

H.R. Rep. No. 80-1819 (1948)............................................................................................8

Nat'l Park Serv., *Director's Order No. 2*,
    https://www.nps.gov/subjects/policy/upload/DO_2_1-11-2021.pdf
    (last visited Feb. 13, 2026) ......................................................................................24

Nat'l Park Serv., *Management Policies 2006*,
    https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf
    (last visited Feb. 13, 2026) ......................................................................................24

Nat'l Park Serv., *TractsNet Public 1.5*,
    https://arcg.is/0q90Lj1 (last visited Feb. 13, 2026) ....................................................9

S. Rep. No. 80-1622 (1948)................................................................................................8

*Temporary Restraining Order*,
    Black's Law Dictionary (12th ed. 2024) ......................................................................3

**INTRODUCTION**

The President's House Site is located at Sixth and Market Streets in Philadelphia and shows, through partial reconstruction of floors and exterior walls, the historic residence of Presidents George Washington and John Adams while Philadelphia was the capital of the United States. The President's House is part of Independence National Historical Park and is owned, managed, maintained, and operated by the National Park Service ("NPS"). As with any national park or museum, reasonable minds might differ about what to display in the limited space available. But this is fundamentally a question of Government speech. The Federal government "has the right to speak for itself" and "to select the view it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).

The Court should deny the City of Philadelphia's ("the City") amended motion for a preliminary injunction and temporary restraining order. First and foremost, the City is unlikely to succeed on the merits of this case because it lacks standing, has not identified any final agency action, and the Tucker Act deprives this Court of jurisdiction over claims that rely on contractual rights—which the City's claims do. Even on the merits, the City has no legal right to compel government speech based on agreements that have already expired and which, by their own terms, expressly transferred all ownership and control of the relevant exhibits to the Federal government. What's more, the City cannot meet its burden of showing irreparable harm. Defendants are preserving the exhibits at issue so they may be re-displayed at the conclusion of this litigation should the Court so order. Finally, the public interest and balance of the equities strongly weigh against issuing any injunction. Such interests are especially weighty where, as here, the City effectively seeks to compel the Federal government to engage in speech that it does not

wish to convey. The Court should therefore deny the City's motion for a preliminary injunction.

## FACTS AND PROCEDURAL HISTORY

### I.      Background

On January 22, 2026, Steven Sims—the then-Acting Regional Director of the NPS and Superintendent of Independence National Historical Park, which includes the President's House—was directed by the Acting Director of the NPS to remove the video and exhibits on the interior and exterior of the walls of the President's House. *See* ECF No. 27-1 (Declaration of Steven Sims) ¶ 4. Sims directed the Acting Superintendent of Independence National Historical Park to direct NPS staff to take this action. *Id.* ¶ 5. At or around 3:00 p.m., NPS employees removed all but one of the exhibits on the interior and exterior of the President's House walls using hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls. *Id.* ¶ 6. The removal took approximately two and a half hours. *Id.* NPS planned to remove the remaining sign once it obtained the necessary tools and weather conditions improved, *id.* ¶ 7, but those plans have been paused in light of the Court's restraining order (ECF No. 37 ¶ 5). The videos were turned off and the exhibits were removed. ECF No. 27-1 ¶ 8. They are in NPS custody and have been secured and placed in storage at the National Constitution Center, where they will remain pending the outcome of this lawsuit. *Id.*

The panels and video exhibit for the President's House project were created as a result of a cooperative effort between the City and the NPS. *See* ECF Nos. 36-3 to 36-6 (2006 Cooperative Agreement and amendments). The cooperative agreements underlying this effort provide that the exhibits were to be funded by the City and

donated to the NPS. *See, e.g.*, ECF No. 36-3 at Background Discussion & § 2; *see also* ECF No. 36-6 art. I.C. The agreements contain no covenant or promise by the NPS to maintain the exhibit in perpetuity. The City further waived any claim or property interest (including the right to use or receive compensation) for the project components that it donated to NPS. ECF No. 36-6 art. III.B.17. The land on which the exhibit sits is owned by the Federal government and subject to no lien by the City. *Id.* art. III.C.3. And the cooperative agreements, as amended, expired one year after May 1, 2009. *Id.* art. VI.

## II.    Procedural History

On January 22, 2026, the City of Philadelphia filed this case to challenge Defendants' removal of the President's House exhibits. *See* ECF No. 1. The City's complaint asserted three claims under the Administrative Procedure Act (*id.*), and the City simultaneously filed a motion for a preliminary injunction seeking an order (1) directing Defendants to restore the President's House Site to its status as of January 21, 2026; (2) enjoining Defendants from "taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site"; and (3) requiring Defendants "to take all necessary steps to ensure the safety, security, and preservation of any such items removed from the President's House Site on January 22, 2026." ECF No. 2 (Proposed Order) at 1.

Defendants filed their opposition to the City's motion on January 28 (ECF No. 27) and the Court held a hearing on the motion on January 30 (*see* ECF Nos. 40, 45-1). In a post-hearing order dated February 2, the Court directed the City to file an amended complaint and amended motion for a preliminary injunction on or before February 6 and instructed Defendants to respond to the amended motion on or before February 13. ECF No. 37. In that same order, the Court also restrained Defendants from any "further

3

removal and/or destruction of the President's House site . . . until further order of the Court." *Id.* ¶ 5; *see Temporary Restraining Order*, Black's Law Dictionary (12th ed. 2024). *But see* Fed. R. Civ. P. 65(b)(2), (d)(1) (describing mandatory contents and maximum duration of restraining orders).

The City filed its amended complaint (ECF No. 44) and amended motion (ECF No. 45) on February 6. Its amended complaint asserts four APA claims and an ultra vires claim. *See* ECF No. 44. The City's amended motion adds a request for a temporary restraining order that would bar Defendants from making any further changes to the President's House site, including "the installation of replacement materials, without the mutual agreement of the City of Philadelphia." ECF No. 45 at 1. And the amended motion adds the same request for relief with respect to the City's motion for a preliminary injunction. *Id.* at 2.

## LEGAL STANDARD

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Instead, injunctions "may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must establish that (1) "he is likely to succeed on the merits" of his claim; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors "merge when"—as here—"the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"A movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which

4

requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *HAPCO v. City of Phila.*, 482 F. Supp. 3d 337, 348 (E.D. Pa. 2020) (Rufe, J.) (cleaned up) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). The court considers the remaining two factors only if the first two factors are met. *Id.* at 348-49. But "[t]he failure to establish any element renders a preliminary injunction inappropriate." *Ferring Pharms, Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (cleaned up).

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *HAPCO*, 482 F. Supp. 3d at 348 (cleaned up). The requisite feared injury or harm must be *irreparable*—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *Id.* at 360 (emphasis added) (citing *Kamdem-Ouaffo v. Task Mgmt. Inc.*, 792 F. App'x 218, 221 (3d Cir. 2019)). And "[t]he movant[] must establish entitlement to relief by clear evidence." *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (citing *Winter*, 555 U.S. at 22); *see also Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024) ("Because 'a preliminary injunction is an extraordinary and drastic remedy,' the movant bears the burden of making '*a clear showing*.'" (citation omitted)).

Where—as here—the movant seeks "a mandatory preliminary injunction that will alter the status quo," that party "bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994).

**ARGUMENT**

This Court should deny the City's motion for a temporary restraining order and preliminary injunction because the Court lacks jurisdiction and the City is unlikely to succeed on the merits. In particular, the City lacks standing, filed suit in a court that lacks jurisdiction over the City's contractual claims, and has not asserted viable claims for relief. Further, the City's contractual claims fail on the merits because the agreements it cites are no longer in effect and by their express terms transferred all relevant ownership rights to the Federal government long ago. And the City's motion should be denied for the independent reason that it cannot show any injury, much less irreparable harm. Finally, the public interest and balance of the equities counsel against issuing injunctive relief here, where the City seeks to censor Government speech on a topic of national significance as the Federal government seeks to celebrate its 250th birthday. The City cannot compel the Federal government to convey a message against its will, and certainly not on the basis of inapplicable and expired agreements.

## I.    **This Court Lacks Jurisdiction**

### A.    **The City Lacks Standing**

Article III, Section 2 of the Constitution limits federal-court jurisdiction to "Cases" and "Controversies." A case or controversy exists only if a plaintiff has standing to sue—which is "a bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing doctrine "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system" and prevents "the judicial process from being used to usurp the powers of the political branches." *Id*. at 675-76 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

To establish standing, a plaintiff must show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To show an "injury in fact," the plaintiff must establish that it "suffered an invasion of a legally protected interest" that is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Id.* at 339 (cleaned up). An injury is concrete if it is "real" and "actually exist[s]," and an injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* at 339-40.

The City alleges numerous injuries in its amended submissions, but none suffices to establish an injury in fact.

*First*, the City contends that it was injured because Defendants allegedly violated the 1950 Agreement and the statutory provision underlying that agreement, 16 U.S.C. § 407n. *See* Am. Compl. ¶¶ 13-19, 77-83, 103, 110-113; Pl.'s Br. at 26-27, 33-34, 37-38. But that contention is based on the City's fundamental misreading of § 407n.

As relevant here, § 407n authorizes the Secretary of the Interior to enter into a cooperative agreement with the City "to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site . . . , in connection with the Independence National Historical Park." Section 407n further instructs that this agreement must specify "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, . . . except by mutual agreement" of the parties.

Section 407n thus distinguishes between "the Independence Hall National Historic Site" and "the Independence National Historical Park." Although § 407n says

that its cooperative agreements are "in connection with" the *Park*, it specifies that the cooperative agreement with the City is directed at the *Site*. And the mandatory "no changes or alterations" term is likewise limited to "the property within the Independence Hall National Historic *Site*." 16 U.S.C. § 407n (emphasis added).

Crucially, the President's House is *not* part of the "Independence Hall National Historic Site" referenced in § 407n.[1] Five years before Congress enacted § 407n, the Department of the Interior designated the "Independence Hall National Historic Site" as a national historic site under federal law. *See* 8 Fed. Reg. 7,283 (dated May 14, 1943; published June 1, 1943). That designation included a specific definition: "All those lots, pieces, or parcels of land which are now owned by the City of Philadelphia, located within the block bounded by Walnut, Fifth, Chestnut, and Sixth Streets, known as Independence Square, in the City of Philadelphia, Commonwealth of Pennsylvania." *Id.*

Congress relied on that definition in drafting § 407n. *See, e.g.*, H.R. Rep. No. 80-1819, at 8 (1948); S. Rep. No. 80-1622, at 6 (1948). The preamble of the 1950 Agreement—entered into pursuant to § 407n—also incorporates this definition of the relevant property. *See* ECF No. 36-1 at 1 (describing "the Independence Hall group of historic structures comprising Independence Hall, Congress Hall, Old City Hall, and associated historic objects, located in Independence Square in the City of Philadelphia, Commonwealth of Pennsylvania").

---

[1]    The City alleges that the "President's House is part of the buildings and grounds that comprise *Independence National Historical Site*," Am. Compl. ¶ 111 (emphasis added), but that exact term does not appear in § 407n or the 1950 Agreement.

So the "Independence National Historical Site" is limited to Independence Square:



Nat'l Park Serv., *TractsNet Public 1.5*, https://arcg.is/0q90Lj1 (last visited Feb. 13, 2026) (interactive map application; click "Zoom to" in bottom left "nps_tracts" window to view lot). But it does not cover the President's House site, which is located a block north on the corner of Sixth and Market Streets.[2] By extension, neither § 407n nor the 1950 Agreement covers the President's House site—and all of the City's assertions about purported violations of the 1950 Agreement and § 407n thus collapse.

*Second*, the City relies on the 2006 Cooperative Agreement and amendments to argue that it holds "a recognized property right in the public benefit that inured to the

---

[2]    It also makes sense that § 407n covers only Independence Square—because the City owns that land. Not so for the land on which the President's House sits, which is owned by the Federal government.

City . . . in the construction and contents of the President's House as it was fulsomely described in the contracting documents." Pl.'s Br. at 21; *see also id.* at 30 (asserting that this alleged "public benefit" is the City's "intangible property"); *id.* at 38 ("NPS's action has infringed or eviscerated an intangible property right of the City."); Am. Compl. ¶ 56. And it argues that the alleged "infringement" of this "intangible property right establishes the City's standing." Pl.'s Br. at 28. But these assertions cannot be squared with the plain terms of the agreements.

The City specifically agreed to "[c]ertify in writing that upon NPS' acceptance of the Project as complete, *all right, title, and interest* to any completed construction, improvements, installations, fixtures, or associated donations, *are free and clear of all debts, liabilities, or obligations*." ECF No. 36-6 (Third Amendment to 2006 Cooperative Agreement) art. III.B.16 (emphasis added). What's more, the City "*waive[d] any claim or right to any property interest*, including use rights, or to compensation for any Project components donated to NPS." *Id.* art. III.B.17 (emphasis added). Those express terms trump the City's contrary allegations. *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018) (if a plaintiff's "own exhibits contradict her allegations in the complaint, the exhibits control").

Put simply, nothing in the 2006 Cooperative Agreement or amendments suggests that the exhibit would stay in place in perpetuity or that the City would retain any authority over the exhibit (or any right to the exhibit whatsoever) after the project was completed. Quite the opposite. The 2006 Cooperative Agreement unambiguously provided, under a section titled "Ownership of Exhibit," that, "[u]pon completion of the Exhibit in accordance with this Agreement, ownership of the Exhibit shall transfer to the NPS." ECF No. 36-3 § 2 (quoted text highlighted in the City's filing). The same section

specified that "NPS ownership of the Exhibit shall survive any termination of this Agreement." *Id.* And a separate section titled "Management & Maintenance of the President's House Exhibit" provided that "NPS agrees that it shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, *interpret and administer* the Exhibit, which shall become property of the NPS in accordance with this Agreement." *Id.* § 4.a (emphasis added). Nor does the contract provide the City with any enforcement mechanism for any purported rights it claims here.

A host of other provisions further reflect the parties' agreement that the NPS would have complete control over the exhibit upon its completion—without any involvement by the City:

- "The Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS." ECF No. 36-6 art. I.C.

- The City agreed "to donate to NPS the Project identified in the Cooperative Agreement as amended. This donation is made by the City on its own volition and without compensation." *Id.* art. III.B.1

- "NPS will own and manage the commemorative work at the conclusion of the process." *Id.* at attach. A (Project Summary Sheet) § IV.4

- "The Project will be owned, maintained, managed, and interpreted by the NPS." *Id.* at attach. C (Project Development Plan) § B.

The agreements thus unambiguously establish that the NPS obtained complete and unconditional ownership of the exhibit. And ownership of property comes with the "rights to possess, use, and dispose of" the property. *Horne v. Dep't of Agric.*, 576 U.S.

350, 361-62 (2015). Here, the NPS's removal of the plaques was an exercise of those traditional ownership rights.[3]

*Third*, the City at various points invokes alleged injuries to the public. *See, e.g.*, Pl.'s Br. at 42 ("Every moment that the President's House remains in its current state, the City's citizenry . . . is denied access to the honest and accurate commemoration and representation that advocates fought long to recognize."); *id.* at 43 (same assertion with respect to "Philadelphia resident[s] or visitor[s]"). But the City cannot invoke the rights of the public to sue the Federal government. "[I]t is the United States, and not the state, which represents [citizens] as parens patriae, when such representation becomes appropriate." *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923); *see also Town of Milton, Mass. v. FAA.*, 87 F.4th 91, 96 (1st Cir. 2023) ("municipalities cannot assert that they have been injured because of an alleged injury to their residents"); *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 193 (3d Cir. 2016) (similar).

*Fourth*, while the City continues to allege a vague violation of the purpose of the National Underground Railroad Network to Freedom Act and has now added allegations about supposed agency-policy violations, the City fails to articulate any sort of particularized injury based on those specific alleged violations. *See Spokeo*, 578 U.S. at

---

[3]    The City now acknowledges that "the term of the 2006 Agreement and subsequent amendments has expired," but argues that it continues to impose relevant obligations based on the survival clause. Am. Compl. ¶ 58. The amended complaint does not actually specify these alleged surviving obligations, but the amended brief suggests that the City means the 2009 amendment's "Project Development Plan" and its terms about interpretation of the site. *See* Pl.'s Br. at 27, 30-31. Yet those general terms cannot plausibly be construed to trump the numerous specific provisions discussed above that gave NPS unqualified ownership and interpretive authority over the site.

339-40 (standing requires a "particularized" injury, meaning that it "must affect the plaintiff in a personal and individual way" (citation omitted)).

*        *        *

The City has not identified any invasion of a legally protected interest by Defendants. Its allegations about 16 U.S.C. § 407n and the 1950 Agreement are predicated on a fundamental misunderstanding of what they cover. As for the rights that the City invokes under the 2006 Cooperative Agreement and amendments, those either expired years ago or are contradicted by the agreements' express terms. And where a plaintiff's asserted injury depends on a contractual provision that it cannot enforce, dismissal for lack of standing is warranted. *See Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 455 (3d Cir. 2018).

In the absence of any enforceable statutory or contractual right, the City stands in the same position as any other member of the public who disagrees with the Government's curatorial decisions about what to display on exhibit. But as the Supreme Court has repeatedly clarified, members of the public lack standing to challenge government speech or compel the Federal government to speak a particular message. *See, e.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (no standing where only harm is "the psychological consequence . . . produced by observation of conduct with which one disagrees"); *Lance v. Coffman*, 549 U.S. 437, 441 (2007) (surveying the "lengthy pedigree" of courts' "refusal to serve as a forum for generalized grievances"). The City therefore lacks standing.

### B.    Counts 1 and 2 Are Contractual Claims and Thus Barred by the Tucker Act

The Federal government enjoys sovereign immunity. Federal courts thus generally lack jurisdiction over "suits against the United States absent Congress's express consent." *United States v. Miller*, 145 S. Ct. 839, 849 (2025). The APA provides a limited waiver of sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. But the APA's waiver "comes with an important carve-out": it does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.* One such limitation—the Tucker Act—is applicable here. Under the Tucker Act, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act "impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted).[4] And Congress has explicitly barred district-court jurisdiction over such claims. 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the

---

[4]    *See also Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (holding the same); *Sea-Land Serv., Inc. v. Brown*, 600 F.2d 429, 433-43 (3d Cir. 1979) (same).

United States founded upon any express or implied contract with the United States [unless it is for $10,000 or less].").

Here, although styled as APA claims, Counts 1 and 2 in the City's Amended Complaint are contractual and thus barred under the Tucker Act. A plaintiff may not maintain an APA claim where "the essence of the action is in contract"—and a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Court*, 340 F.2d 947, 948 (1st Cir. 1965)); *see also Sea-Land*, 600 F.2d at 433 (endorsing *Califano*'s reasoning). In *Sea-Land*, the Third Circuit rejected the plaintiff's attempt to obtain specific-performance-type relief on a government contract via APA-styled pleading. 600 F.2d at 433-34. And the Third Circuit has stressed that plaintiffs may not, by creative APA pleading, "circumvent limitations on district court jurisdiction created by the Tucker Act." *Hahn v. United States*, 757 F.2d 581, 589 (3d Cir. 1985).

To evaluate whether a plaintiff's claim sounds in contract, courts thus look to substance rather than labels. *See, e.g.*, *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *Shapiro v. U.S. Dep't of Agric.*, No. 25-cv-998, 2025 WL 3473291, at *4 (M.D. Pa. Dec. 3, 2025) (discussing analytical framework). Specifically, courts examine both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *see also Shapiro*, 2025 WL 3473291, at *4. Here, both prongs establish that Counts 1 and 2 are foreclosed by the Tucker Act.

First, the source of the City's alleged rights is fundamentally contractual. Indeed, the City admits that its Count 1 is actually a breach-of-contract claim. Am. Compl. ¶¶ 80-84; *see also* Pl.'s Br. at 23 (labeling Count 1 as the City's "Breach of Contract

Claim"), 26 (describing Count 1 as "the City's claim grounded in the cooperative agreements between the United States and the City of Philadelphia"). As for Count 2, although the City styles that claim as an APA claim for an alleged violation of the National Underground Railroad Network to Freedom Act, it repeatedly relies on contractual terms for its theory in support of that claim. *See, e.g*., Am. Compl. ¶¶ 98-100 (relying on 2009 amendment to 2006 Cooperative Agreement). The City even points to the 2006 Cooperative Agreement as the source of its alleged "intangible property *right*" underlying this claim. Pl.'s Br. at 28 (emphasis added); *see also id.* at 30 (invoking alleged "public benefit" derived from 2006 Cooperative Agreement in support of Count 2), 31 (invoking 2009 amendment to 2006 Cooperative Agreement in support of Count 2). And the City invokes the 1950 Agreement to argue that its claims do not challenge conduct committed to agency discretion. *Id.* at 36-37; *see also* ECF No. 45-1 (Jan. 30, 2026 Hr'g Tr.) at 154:15-155:7, 155:22-24 (invoking 2006 Cooperative Agreement for original APA claim allegedly based on National Underground Network to Freedom Act of 1998).

Second, the core remedy sought by the City is contractual. As the City acknowledges, it seeks specific performance. Pl.'s Br. at 23 n.2 (specifying "specific performance" as "the remedy sought here"); *id.* at 25 (arguing that "the City's claims based upon the several agreements . . . are solely limited to non-monetary specific performance"); *see also* Am. Compl. ¶ 84 (requesting order requiring Defendants' compliance with "the parties' contractual obligation"). And as the City also acknowledges, "specific performance is a contract remedy." Pl.'s Br. at 25. Such relief departs from the standard APA remedy of setting aside the agency's action or remanding for further consideration. The City seeks affirmative relief predicated on an alleged

contractual right—which confirms the contractual nature of the claims and precludes jurisdiction. *See, e.g.*, *Sea-Land*, 600 F.2d at 433-43 (APA does not waive sovereign immunity for claims that arise out of a contract and seek specific performance).[5]

The City offers two arguments in response. Neither withstands scrutiny.

First, the City argues (at 25) that its "contractual claims . . . do not implicate any monetary damages or recompense" but "are solely limited to non-monetary specific performance," and points out that the Court of Federal Claims cannot award specific performance. But the unavailability of that remedy in the Court of Federal Claims has no bearing on this Court's jurisdiction. *See, e.g.*, *Sea-Land*, 600 F.2d at 433; *4900 S. Broad St. Assocs.-Tenant, L.P. v. U.S. Dep't of Agric.*, No. 08-cv-4646, 2009 WL 301936, at *3 (E.D. Pa. Feb. 4, 2009) ("The fact that plaintiff may be unable to secure such relief in the Court of Federal Claims does not grant this Court jurisdiction to hear, as an independent action, a claim for relief that is part and parcel of a contractual dispute with the

---

[5]  *See also, e.g.*, *Qureshi v. Admin. Appeals Off. (AAO) of U.S. Citizenship & Immigr. Servs. (USCIS)*, 408 F. App'x 611, 615 (3d Cir. 2010) ("Because [petitioner's] promissory estoppel claim sought specific performance, not money damages, the District Court correctly concluded that this claim was subject to the Tucker Act and that the Act precluded jurisdiction over [petitioner's] claim." (citing *Sea-Land*, 600 F.2d at 432)); *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) (APA's waiver of sovereign immunity "does not run to actions seeking declaratory relief or specific performance in contract cases" because "the Tucker Act impliedly forbid[s] such relief" (citing cases)); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985) ("a complaint involving a request for specific performance must be resolved by the Claims Court"); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) ("Such a request for an order that the government 'must perform' on its contract is one that 'must be resolved by the Claims Court.'" (quoting *Ingersoll-Rand*, 780 F.2d at 80)); *Shapiro*, 2025 WL 3473291, at *6 (specific performance is a "classic contractual remedy" (citation omitted)); *Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-cv-1643, 2025 WL 1865160, at *13 (D.D.C. July 7, 2025) (plaintiff's specific-performance request "mark[ed] the claim as essentially contractual").

government."). And the unavailability of that remedy is not limited to the Court of Federal Claims: this Court cannot award specific performance either. *See Sea-Land*, 600 F.2d at 433.[6]

Second, the City (at 24-25) argues that the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), supports taking a "practical" approach to sovereign immunity to somehow find jurisdiction for the City's contract claims. But *Bowen* "did not involve a contract and it did not address the 'impliedly forbids' limitation on the APA's waiver of sovereign immunity" in § 702. *N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994); *see also Sec. Sav. Bank, SLA v. Dir., Off. of Thrift Supervision*, 798 F. Supp. 1067, 1078 (D.N.J. 1992). So *Bowen* has no bearing here.

*    *    *

The City cannot use APA labels to "circumvent limitations on district court jurisdiction created by the Tucker Act," *Hahn*, 757 F.2d at 589, and § 702's waiver does not apply to claims that sound in contract. Because Counts 1 and 2 are fundamentally contract-based and seek specific-performance-type relief, they fall within the Tucker Act's exclusive remedial scheme and must be dismissed for lack of jurisdiction.

---

[6]    *See also, e.g.*, *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) ("Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations."); *Robbins*, 438 F.3d at 1082 (adopting *Sea-Land*'s and *Coggeshall*'s holdings); *Qureshi v. U.S. Citizenship & Immigr. Serv.*, No. 08-cv-2281, 2010 WL 1390846, at *2 (M.D. Pa. Mar. 31, 2010) ("federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations" (citation omitted)), *aff'd sub nom.*, 408 F. App'x 611.

II.    **The City Has Not Shown a Likelihood of Success on the Merits**

A.    **The City Fails to State Cognizable APA Claims**

1.    **The City fails to challenge "agency action" under the APA.**

The City's amended complaint continues to challenge the NPS's removal of the exhibit panels at the President's House site. But the APA allows only for review of "agency action." 5 U.S.C. §§ 702, 704. The NPS's curatorial decisions are not "agency action" within the meaning of the statute.

Under the APA, a plaintiff "must identify some 'agency action' that affects him in the specified fashion." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). The APA carefully defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see id.* § 701(b)(2). And each of the key terms within that definition ("rule," "order," "license," "sanction," and "relief") is likewise defined. *Id.* § 551(4), (5), (8), (10), (11). Significantly, the APA does not authorize "general judicial review of the [agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, or cover "all conduct such as, for example, constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). After all, permitting judicial review of every decision made in the course of an agency's daily activities would bring the government to a standstill.

The City asserts that "[t]he removal of artwork and informational displays at the President's House site" qualifies as agency action under the APA. Am. Compl. ¶¶ 87, 104. But the NPS routinely revises or removes art or informational displays at its sites. This falls under the "wide variety of activities that comprise the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land*

19

*Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). Such actions do not qualify as a rule, order, license, sanction, or relief under the APA and are thus not "agency action."

To hold otherwise would subject nearly everything an agency does to APA review. *Cf. Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency" (Roberts, J.) (cleaned up)). This would subject every change to a Park sign, exhibit, pamphlet, interpretive display, or even landscaping to challenge in court. The City's view of the law cannot be squared with the Supreme Court's admonition that the APA does not permit "general judicial review of the [agency's] day-to-day operations." *Lujan*, 497 U.S. at 899; *see also id.* at 894 (APA does not provide for judicially managed "systematic improvement" absent final agency action); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004) (APA's limitations serve to prevent "injecting the judge into day-to-day agency management"). The City thus has not challenged cognizable "agency action" under the APA. The City's contrary legal interpretation would produce absurd consequences, potentially subjecting every curatorial decision—from displaying a painting to rotating a seasonal sculpture exhibit—to APA-style review.

### 2. The alleged agency action that the City challenges here is not final under the APA.

Review under the APA is further limited to "*final* agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). But the NPS's actions here do not qualify as "final agency action" either.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court articulated two necessary conditions for agency action to be final under the APA: "First, the action must

mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 178 (cleaned up). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177-78 (citations omitted). To satisfy the second condition, the agency's action generally must impose "obligations, prohibitions, or restrictions" or "give rise to . . . direct and appreciable legal consequences." *Chemours Co. FC, LLC v. United States Env't Prot. Agency*, 109 F.4th 179, 184 (3d Cir. 2024) (cleaned up).

Here, the City's claims fail under *Bennett*'s second condition. Nowhere does the City explain how the NPS's removal of the panels determined any rights or obligations for or caused legal consequences to the City. As explained above, the City lacks any statutory or contractual rights in light of 16 U.S.C. § 407n's inapplicability, the expiration of the agreements, and the transfer of custody and rights to the Federal government. Further, the Federal government remains at liberty to take down or reinstall these displays—or make any other curatorial decisions at this or other parks. But a decision to take down an exhibit—whether to conduct restoration, install a different artwork, or communicate a different message—is not final agency action subject to judicial review under the APA.

### 3.    The City challenges conduct committed to agency discretion by law.

Even if the removal of the panels qualified as final agency action, the City's claims would still not be cognizable under the APA. The APA's waiver of sovereign immunity in 5 U.S.C. § 702 does not apply (and courts thus lack jurisdiction over an APA claim) if the claim involves "agency action [that] is committed to agency discretion by law." 5 U.S.C.

§ 701(a)(2). And the conduct challenged here—the NPS's removal of exhibit panels—falls squarely within § 701(a)(2)'s carve-out for discretionary action.

Section 701(a)(2) precludes review where the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Section 701(a)(2) applies if judicial review would require the court to substitute its own judgment for the agency's judgment on matters committed to professional, managerial, or policy discretion, and where Congress has supplied no judicially manageable criteria. *Id.* at 830-32, 837-38; *see also Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (reaffirming *Heckler*'s "no meaningful standard").

The Third Circuit has further refined this standard and held that § 701(a)(2) applies if agency action (1) "involves broad discretion"; (2) "is the product of political or managerial choices that are not readily subject to judicial review"; and (3) does not "violate a constitutional, statutory, or regulatory command." *Const. Guided Walking Tours v. Indep. Visitor Ctr. Corp.*, 454 F. App'x 118, 122 n.2 (3d Cir. 2011) (cleaned up) (quoting *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 203, 205 (3d Cir. 2003)); *see also Davis Enters. v. U.S. E.P.A.*, 877 F.2d 1181, 1184 (3d Cir.1989); *Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574, 581 (3d Cir. 1979).

Consistent with this analysis, the Supreme Court has found agency action unreviewable where an agency exercised discretion over how best to advance broad statutory objectives. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (allocation of lump-sum appropriations was committed to agency discretion by law because it required a complicated balancing of factors that were particularly within an agency's expertise,

including proper ordering of its priorities); *see also Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013) (authorization for the U.S. Trade Representative to enter into agreements with foreign countries was committed to agency discretion in part because the negotiation and determination of international agreements "is a paradigmatic example of 'a complicated balancing of a number of factors which are peculiarly within the USTR's expertise" (cleaned up)).

Here, interpretive signage at the President's House involves discretion, is the product of managerial choices that are not readily subject to judicial review, and does not "violate a constitutional, statutory, or regulatory command." *Const. Guided Walking Tours*, 454 F. App'x at 122 n.2. Interpretive signage reflects judgments about visitor experience, educational framing, and narrative scope—all subjects within the discretion of the agency to address.

The City identifies no statute, regulation, or binding policy that requires the NPS to present a particular historical narrative, retain specific interpretive themes, or maintain signage. Although the City continues to invoke the National Underground Railroad Network to Freedom Act, 54 U.S.C. §§ 308301-04, that statute does not mandate that sites designated under its provisions have any interpretive component. Nor does the City offer any support for its theory that federal sites may not be altered once designated under that statute—which is refuted by the statute's text and the

relevant application materials.[7] And while the City now invokes various agency documents, none of those contains any legally enforceable standards either. The NPS's Management Policies, the Director's Order, and the "Foundation Document" that the City invokes (Pl.'s Br. at 34-36) all lack binding force and are purely internal management documents.[8] Such documents do not impose enforceable constraints on agency action. *See Horses of Cumberland Island v. Haaland*, No. 23-cv-1592, 2024 WL 5430835, at *11 (N.D. Ga. Nov. 8, 2024) (holding that 2006 NPS Management Policies were non-binding manual of internal guidance that could not support APA claim); *see also The Wilderness Soc. v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (similar).

---

[7]     *See, e.g.*, Nat'l Park Serv., *Application Instructions: National Underground Railroad Network to Freedom Application* (last updated Jan. 21, 2026), https://www. nps.gov/subjects/undergroundrailroad/application-instructions.htm#onthisPage-14 ("Historic sites and properties included in the Network are not bound by any legal requirements to comply with Federal historic preservation laws, based on their inclusion in the Network alone."); *see also* Nat'l Park Serv., *National Underground Railroad Network to Freedom Application and Partner Requests Instructions* (OMB Control No. 1024-0232) at 2, https://www.reginfo.gov/public/do/DownloadDocument?objectID=12 5173401 (last visited Feb. 13, 2026) ("Inclusion in the Network does not guarantee that a threatened site will be protected or that preservation will occur.").

[8]     *See, e.g.*, Nat'l Park Serv., *Director's Order No. 2* at § 2, https://www.nps.gov/ subjects/policy/upload/DO_2_1-11-2021.pdf (last visited Feb. 13, 2026) (explaining that the order "is intended only to improve the internal management of the NPS, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person"); Nat'l Park Serv., *Management Policies 2006* at 4, https://www.nps.gov/subjects/policy /upload/MP_2006_amended.pdf (last visited Feb. 13, 2026) ("The policies contained within this document are intended only to improve the internal management of the National Park Service; they are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.").

The absence of governing constraints means there is no meaningful legal standard by which a court can evaluate the NPS's interpretive judgment here. Indeed, the City does not contend that Congress mandated particular content, that the NPS's regulations require inclusion of specific historical topics, that the NPS violated a binding rule or adopted policy, or that the NPS misinterpreted its legal authority. And the City cannot evade § 701(a)(2) by labeling a discretionary decision "arbitrary and capricious"—because a claim is cognizable under § 706 only if the action is reviewable in the first place. *Heckler*, 470 U.S. at 828. Accordingly, this is exactly the kind of action that is the product of "managerial choices that are not readily subject to judicial review." *Davis Enters.*, 877 F.2d at 1184.

The City's reliance on expired contracts and inapplicable statutes does not alter this analysis. As discussed above, the 2006 Cooperative Agreement expired years ago, imposes no relevant continuing obligations, was not incorporated into statute or regulation, and expressly transferred all ownership and management authority to the NPS. And neither 16 U.S.C. § 407n nor the 1950 Agreement governs the President's House Site. These materials thus do not constrain agency discretion and do not constitute "law" for the purposes of § 701(a)(2). At most, they provide historical background—but they do not provide enforceable standards capable of guiding judicial review. And as discussed above, even if there were any relevant continuing contractual obligations, the Tucker Act precludes review in any event.

### B.    The City's Ultra Vires Claim is Foreclosed

The City's final claim—its new ultra vires claim—is likewise foreclosed. As the Supreme Court explained last year, ultra vires review is "strictly limited" and "applies only when an agency has taken action entirely 'in excess of its delegated powers and

contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted).

To assert a cognizable ultra vires claim, the City must allege that Defendants acted in "patent"—or "obvious"—violation of statutory authority, *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) (citing cases), and "contrary to a *specific* [statutory] *prohibition*," *Nuclear Regul. Comm'n*, 605 U.S. at 681 (cleaned up). But here, the City has alleged violations only based on statutory provisions that are either inapplicable (16 U.S.C. § 407n) or that do not even contain a prohibition (54 U.S.C. § 308302).

Ultra vires review also remains subject to "implied statutory limitations" like the Tucker Act. *See Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324-27 (2015); *see also Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) (citing *Armstrong* and observing that "it appears unlikely that Plaintiffs' ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended Plaintiffs' grants, would provide a detour around the Tucker Act"). The City invokes its purported "intangible property right," Pl.'s Br. at 38—which it derives from its alleged contractual rights—in support of its ultra vires claim. Accordingly, the Tucker Act separately forecloses the City's ultra vires claim.

### III.    The City Has Not Established Irreparable Harm

A litigant seeking injunctive relief must "'articulate and adduce proof of actual or imminent harm which cannot otherwise be compensated by money damages . . . to sustain its substantial burden of showing irreparable harm.'" *HAPCO*, 482 F. Supp. at 360 (citation omitted). "The preliminary injunction standard requires the plaintiff to

make a clear showing that 'it is more likely than not to suffer irreparable harm in the absence of preliminary relief.'" *Id.* at 360-61.

This time around, the City argues that irreparable harm exists here based on the President House exhibits' "tremendous cultural and emotional significance for the community." Pl.'s Br. at 39. Indeed, the City's arguments establish that its theory of irreparable harm is based entirely on alleged harm suffered by the City's residents and the public. *See, e.g.*, *id.* at 41-42 (relying on Philadelphia's population and visitors); *id.* at 42 ("Every moment that the President's House remains in its current state, the City's citizenry . . . is denied access to the honest and accurate commemoration and representation that advocates fought long to recognize."); *id.* at 43 (same assertion with respect to "Philadelphia resident[s] or visitor[s]").

But the City cannot rely on alleged injuries to its residents or the public in a suit against the United States. *See, e.g.*, *Maiden Creek*, 823 F.3d at 193. Rather, the City must show "that it specifically *and personally* risks irreparable harm." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (emphasis added). The City does assert (at 43) that it is personally "deprived of the opportunity to honestly and accurately tell its story during the unique opportunity afforded by the semiquincentennial," but that is plainly wrong. The City remains free to tell whatever story it wants—using its own property. And high-resolution photographs of the exhibits remain accessible on the internet.[9]

---

[9]    *See, e.g.*, Aileen Clarke & Sam Morris, *Here Are the Signs the Trump Administration Removed from Independence Park*, PHILA. INQUIRER (Jan. 22, 2026), https://www.inquirer.com/news/philadelphia/inq2/independence-park-trump-signage-remove-presidential-house-20260122.html.

The evidence further establishes that the extraordinary remedy of an injunction is neither necessary nor appropriate here.

First, as the Superintendent of the Park has explained, the exhibits are being held in storage and will remain there pending the outcome of this case. ECF No. 27-1 (Sims Decl.) ¶ 8. An injunction is thus not required to ensure the safety, security, and preservation of the removed exhibits.

Second, the removal of the exhibits is not irreversible. At the conclusion of this lawsuit, and if ordered to do so, the NPS could re-hang the exhibits and turn the television monitors back on. And although the Court has questioned "the integrity of the exhibits regarding their amenability to being restored to their original condition," ECF No. 39 at 1, the NPS has the exhibit designs and can create new copies of any potentially damaged exhibits should that become necessary. *See* Supplemental Declaration of Steven Sims (attached as Exhibit A) ¶¶ 3-4. In other words, any alleged harm from the removal of the exhibits is not irreparable. *See, e.g., Del. State Sportsmen's Ass'n*, 108 F.4th at 205 ("[C]hallengers have shown no harms beyond ones that can be cured after final judgment. That finding alone suffices to support the District Court's denial of a preliminary injunction." (citing *Penn. ex rel. Creamer v. U.S. Dep't of Agric.*, 469 F.2d 1387, 1388 (3d Cir. 1972) (per curiam))). This is independently fatal to the City's motion for a preliminary injunction.

## IV.     The Public Interest and Balance of the Equities Counsel Against Issuing an Injunction

Finally, the public interest and balance of the equities weigh strongly against the issuance of injunctive relief here. Where a plaintiff seeks preliminary relief against the Federal government, the last two factors—public interest and balance of the equities—

merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the City seeks extraordinary relief that would prohibit the Federal government from conveying its preferred message and, what is worse, compel the Federal government to speak a message that it does not wish to convey.

"A government entity has the right to speak for itself." *Pleasant Grove*, 555 U.S. at 467 (internal quotation marks omitted). In choosing what message to convey in limited display space, the Government must necessarily make decisions about what to include and what to exclude. *Matal v. Tam*, 582 U.S. 218, 234 (2017) ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others."). Inevitably, others may disagree with these decisions. But "[i]f every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in private sector, and the process of government as we know it radically transformed." *Keller v. State Bar of Cal.*, 496 U.S. 1, 12-13 (1990). "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove*, 555 U.S. at 468.

If the City disagrees with the Federal government's speech, the appropriate solution is political. "The Constitution . . . relies first and foremost on the ballot box . . . to check the government when it speaks." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022). But courts may not enjoin or compel the speech of co-equal branches of government. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"). The Government is "ultimately accountable to the electorate and the political process for its advocacy," and "[i]f the citizenry objects,

newly elected officials later could espouse some different or contrary position." *Pleasant Grove*, 555 U.S. at 468-69.

The City's arguments to the contrary (at 44-45) fail to grapple with these principles. Although the City acknowledges "that the federal government cannot be mandated to participate in speech to which it objects," it posits that this principle "does not apply to the facts of this case." Pl.'s Br. at 45. But it does. The City's entire case is predicated on the interpretive and symbolic importance of the President's House exhibits—in other words, *their message and expressive value*. And the City now seeks to compel the Federal government to engage in speech that it no longer wants to convey. Nothing prevents the City or any other State, local, or private entity from engaging in their own speech—using their own property. But granting its extraordinary request to compel the Federal government to speak would violate fundamental separation-of-powers principles.

For these reasons, the public interest and balance of the equities weigh strongly against issuing injunctive relief here.

## V. Any Further Injunctive Relief Should Be Stayed Pending Appeal

If the Court nonetheless issues any further injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at least administratively stayed for seven days to allow Defendants to seek an emergency expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

The Court should vacate its restraining order (ECF No. 37 ¶ 5) and deny the City's amended motion for a temporary restraining order and preliminary injunction. And because there is no subject-matter jurisdiction here, the Court should dismiss this case.

Dated:  February 13, 2026

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Gregory B. David*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Phone:    (215) 861-8200
Email:    gregory.indenberken@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 13, 2026, a true and correct copy of Defendants'
foregoing Opposition to Plaintiff's Amended Motion for Preliminary Injunction and
Temporary Restraining Order was filed electronically via the Court's CM/ECF system
and served via CM/ECF on all counsel of record.

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN