**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| CITY OF PHILADELPHIA,<br><br>Plaintiff,<br><br>v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR, *et al.*,<br><br>Defendants. | Civil Action No. 2:26-cv-434<br><br>Honorable Cynthia M. Rufe |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE
<u>AS PLAINTIFFS</u>**

Avenging The Ancestors Coalition ("ATAC") and The Black Journey LLC ("The Black Journey") (collectively, "Proposed Intervenors") submit this memorandum of law in support of their motion to intervene as plaintiffs (a) as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure or (b) alternatively, with this Court's permission under Rule 24(b)(1)(B) of the Federal Rules of Civil Procedure.

**<u>INTRODUCTION</u>**

The Trump administration is currently executing a coordinated effort to advance a false, alternative narrative about the history of the United States while dismissing and denigrating the experiences and contributions of Black people in that history. As part of this effort, on March 27, 2025, President Trump issued Executive Order 14253 ("Executive Order") entitled "Restoring Truth and Sanity to American History." [1] The Executive Order purports to remedy what it inaccurately characterizes as a "widespread effort to rewrite [America's] history" by directing

---

[1] Executive Order on Restoring Truth and Sanity to American History, Exec. Order No. 14253, 90 Fed. Reg. 14563 (Apr. 3, 2025).

Defendant Doug Burgum to ensure that public monuments, memorials, statues, and markers within the National Park System do not contain "content that inappropriately disparage Americans past or living (including persons living in colonial times)."[2]

Defendant Burgum issued Secretarial Order No. 3431 ("Secretarial Order"), which requires the Defendant Jessica Bowron, to implement the Executive Order by reviewing and removing "inappropriate content" within Defendant National Park Service's ("NPS") jurisdiction.[3] Pursuant to both orders, Defendants subsequently embarked on a nationwide review of NPS sites, including various national museums, parks, and exhibits.[4]

As part of this review, Defendant NPS flagged for removal portions of the President's House exhibit and memorial, "Freedom and Slavery in the Making of a New Nation" ("PH / Slavery Memorial"). The PH / Slavery Memorial "commemorates the site of the first official presidential residence and the people who lived there, including people enslaved by President George Washington,"[5] by highlighting the central paradox of freedom and slavery that co-existed at the nation's founding. *City of Philadelphia v. Burgum*, No. CV 26-434, 2026 WL 431943, at *1 (E.D. Pa. Feb. 16, 2026).

---

[2] *Id*. §§1, 4(iii).

[3] U.S. Sec'y of Interior, Order No. 3431 - Restoring Truth and Sanity to American History (May 20, 2025), https://www.doi.gov/document-library/secretary-order/so-3431-restoring-truth-and-sanity-american-history.

[4] Karin Brulliard & Brady Dennis, *Confidential Database Reveals Which Items NPS Thinks May 'Disparage' America*, Wash. Post (Mar. 2, 2026), https://www.washingtonpost.com/climate-environment/2026/03/02/national-parks-signs-censorship-slavery/ ("An internal government database reviewed by The Washington Post demonstrates the vast scope of the Trump administration's ongoing effort to revise or remove information on African American history.")

[5] Kyle Groetzinger et al., *Erasing History, Silencing Science*, NATIONAL PARKS CONSERVATION ASSOCIATION (Oct. 1, 2025), https://www.npca.org/articles/10871-erasing-history-silencing-science.

On the eve of the 250th anniversary of the birth of the United States—marked by the signing of the Declaration of Independence—Defendants circumvented requisite procedures and abruptly dismantled the PH / Slavery Memorial, prying dozens of interpretive panels off the walls of the exhibit with crowbars and hauling them away in a pickup truck. The removed panels contain information about slavery in Philadelphia, the brutality of the slave trade, the escape and emancipation of enslaved Black people, and the abolition of American chattel slavery. This removal occurred without warning or explanation, despite Defendant NPS's previous recognition—in prior administrations—of the critical history preserved by the memorial and the deliberative, collaborative process undertaken to create it. Defendant NPS now holds several panels from the PH / Slavery Memorial in the basement of the National Constitution Center, preventing the public from accessing this information at a critical time for reflection on our country's founding.

Proposed Intervenor ATAC is a grassroots organization that invested nearly a decade of organizing and public engagement to promote the development, realization, and use of the memorial. Proposed Intervenor The Black Journey is a tourism company focusing on oft-overlooked Black history in Philadelphia. Proposed Intervenors move to intervene so they may challenge Defendants' (a) removal of the interpretive panels from the PH / Slavery Memorial and (b) enforcement of the Executive and Secretarial Orders, as violations of their constitutional rights and the Administrative Procedure Act ("APA"). Defendants' actions implicate Proposed Intervenors' interests in preserving the accurate recounting of American history at the PH / Slavery Memorial by: preventing the erasure of slavery and its impact from the narrative of American history; protecting the fruits of ATAC's longstanding advocacy and investment in the memorial; and ensuring the inclusion of Black history in the public information at the President's House site.

Accordingly, Proposed Intervenors respectfully move for intervention as a matter of right under Rule 24(a)(2) because their motion is timely, they have significant rights and interests at stake, and those interests are not adequately represented by the City. Alternatively, Proposed Intervenors move for permissive intervention pursuant to Rule 24(b)(1)(B). If granted intervention, Proposed Intervenors will file and serve the complaint, attached hereto as Exhibit A.

## PROPOSED INTERVENORS

**Avenging the Ancestors Coalition** is a Black-led organization of historians, teachers, community leaders, religious leaders, elected officials, and community members. Headquartered in Philadelphia, Pennsylvania, ATAC was founded by Michael Coard in 2002 to persuade Defendant NPS and Independence Park to create a prominent memorial to the nine people held in bondage at the President's House site. Since its founding, ATAC has engaged in advocacy to create the memorial and use it for public education and commemoration, while also working to preserve and uplift the history of enslaved people on federal lands more broadly. ATAC seeks to intervene on behalf of itself and its members to ensure the full restoration of the PH / Slavery Memorial and the ongoing recognition of the people held in slavery at the President's House.

**The Black Journey: African-American Walking Tour of Philadelphia** is a walking tour company that is owned and was founded by a Black woman to highlight the frequently overlooked Black history of Philadelphia and the early United States, with a focus on Black people's role at our nation's founding. The Black Journey seeks to intervene on its own behalf to protect its business and to ensure that Black history, both in Philadelphia and across the nation, is preserved, accessible, accurately represented, and treated as documented, historical truths.

## BACKGROUND

In the late eighteenth century, the United States's first executive mansion—commonly referred to as "The President's House"—stood at the southeast corner of Sixth and Market Streets

in Philadelphia. President George Washington was known to have enslaved over 300 Africans at Mount Vernon during his lifetime, but few knew that he also held nine enslaved African descendants—Ona, Hercules, Moll, Giles, Austin, Richmond, Paris, Joe, and Christopher—at the President's House. Many have celebrated Washington for his prominent role in our nation's founding, such as presiding over the Constitutional Convention that produced a new government premised on liberty and freedom, yet his actions at the President's House directly contradict those ideals. To maintain the enslavement of the nine African descendants in his household, Washington deliberately evaded Pennsylvania's Gradual Abolition Act of 1780 by rotating them between his Mount Vernon plantation and the executive mansion, thereby preventing their legal emancipation.[6]

During plans in 2001 to move the Liberty Bell to Sixth and Market Streets, research revealed that the new site immediately faced what had been the slave quarters that were added to the President's House pursuant to Washington's orders.[7] Upon this discovery, Black Philadelphia residents formed ATAC to create a commemorative memorial what would share the stories of the nine people held in slavery by Washington at the President's House. Ex. B, Coard Decl. ¶¶ 5, 10. Historian and ATAC member Ed Lawler published an article explaining the historical significance of the site, observing that "[t]he last thing that a visitor will walk across or pass before entering

---

[6] Pennsylvania's Gradual Abolition Act of 1780 freed enslaved people after they had lived in the state for six consecutive months. *See* Penn. Hist. & Museum Comm'n, *An Act for the Gradual Abolition of Slavery – March 1, 1780*, https://www.phmc.state.pa.us/portal/communities/documents/1776-1865/abolition-slavery.html (last visited Mar. 30, 2026); *see also* Lindsay M. Chervinsky, *The Enslaved Household of President George Washington*, White House Hist. Ass'n, https://www.whitehousehistory.org/the-enslaved-household-of-president-george-washington#:~:text=But%20Washington%20was%20also%20the,passage%20of%20the%20thirteenth%20Amendment (last visited Mar. 30, 2026).
[7] Douglas Mooney, et al., *The Archeology of Freedom and Slavery: Excavations at the President's House Site in Philadelphia* (last updated Sept. 2023), https://npshistory.com/publications/inde/pres-house-excavations.pdf.

the Liberty Bell Center will be the slave quarters that George Washington added to the President's House."[8]

In 2002, after building public awareness of the site's history, ATAC Founder Mr. Coard delivered a petition signed by over a thousand people to Independence Park, urging NPS to build a commemorative memorial for the nine enslaved Africans. Coard Decl. ¶ 22. ATAC tirelessly lobbied local and federal officials—including every Black elected official in Philadelphia—to support the project financially. Coard Decl. ¶ 18. In 2003, then Mayor John Street responded to a letter from ATAC, explaining that ATAC's outreach brought the significance of the site to his attention. Coard Decl. ¶ 19. At the opening of the new Liberty Bell Center in 2003, then-Mayor Street announced the city of Philadelphia's ("the City") commitment of $1.5 million toward completion of a memorial at the President's House. Coard Decl. ¶ 24. In 2005, Congress appropriated $3.6 million. Coard Decl. ¶ 23.

In September 2005, the City, NPS, and Independence Park convened an oversight committee, which helped guide the project's design and development and ensure its ultimate success. Coard Decl. ¶ 24. At the request of Mayor Street, Mr. Coard served on the committee on behalf of ATAC. Coard Decl. ¶ 25. After seeking design proposals and receiving feedback from thousands of visitors about submitted proposals, the City and Independence Park announced the project's designers. Coard Decl. ¶ 31.

But for the grassroots efforts led by ATAC, there would be no memorial or exhibit today because there would have been no public awareness of the site's history and no promised investment of financial resources from the City, Congress, and NPS. Coard Decl. ¶¶ 33–34. In an

---

[8] Edward Lawler, *The President's House in Philadelphia: The Rediscovery of a Lost Landmark*, 127 Penn. Mag. of Hist. & Biography 5, 93 (2002), https://journals.psu.edu/pmhb/article/view/45510/45231.

April 2007 resolution, the Philadelphia City Council declared that "[t]here were no plans by the Interior Department, the [NPS], or [Independence Park] to acknowledge the sacrifice, struggle, and great economic contributions of those enslaved African descendants until [ATAC] initiated relentless community activism."[9] The resolution also highlighted the contributions of Mr. Coard, noting his "essential role in the . . . demand for the creation of a historic commemoration to the African descendants enslaved by President George Washington at America's first 'White House.'"[10]

On December 15, 2010, the open-air installation and exhibit "President's House: Freedom and Slavery in the Making of a New Nation" opened to the public. The PH / Slavery Memorial became the first commemoration of enslaved people within the National Park System. Coard Decl. ¶ 55; Ex. C Yancey Decl. ¶ 12. For over fifteen years, the PH / Slavery Memorial has welcomed thousands of visitors from across the globe each year. Coard Decl. ¶ 38. Tours offered by The Black Journey and numerous other tour companies visit the PH / Slavery Memorial daily, recognizing it as vital to the historical narrative of this nation. *See* Yancey Decl. ¶¶ 9, 12–13, 25. In fact, of the five live-guided tours that The Black Journey offers, three include visits to the PH / Slavery Memorial. Yancey Decl. ¶ 14. One of these tours is "The Original Black History Tour," which allows tourists to "[s]ee where the Fugitive Slave Act was passed in 1793" and "[h]ear about Martha Washington's enslaved handmaiden who emancipated herself."[11] The Black Journey's audio tour also includes a dedicated stop at the PH / Slavery Memorial, allowing tourists to engage with the site independently. Yancey Decl. ¶ 15. ATAC conducts regular programming at the site,

---

[9] Phila. City Council Res. No. 070281, Reg. Sess. (Pa. 2007).

[10] *Id.*

[11] The Black Journey: African-American Walking Tour of Philadelphia, https://www.blackjourneyphiladelphia.com/ (last visited Mar. 30, 2026).

including annual gatherings on President's Day; May 21, to mark Ona Judge's escape from slavery in 1796; July 4, to commemorate the role of enslaved people at the nation's founding; August 25, to commemorate the arrival of enslaved Africans to North America in 1619; and December 15, the anniversary of the exhibit's opening in 2010. Coard Decl. ¶ 43.

On March 27, 2025, President Trump issued Executive Order 14253. The Executive Order seeks to "restore Federal sites . . . to solemn and uplifting public monuments" and remove "divisive narratives that distort . . . shared history."[12] In furtherance of this purpose, the Executive Order directs Secretary Burgum to, among other things, ensure sites have no "descriptions, depictions, or other content that inappropriately disparage Americans past or living."[13]

Shortly thereafter, Secretary Burgum issued Secretarial Order No. 3431.[14] The Secretarial Order charges NPS Director Bowron with reviewing parks and sites for "images, descriptions, depictions, messages, narratives or other information (content) that inappropriately disparage[] Americans past or living."[15] Reportedly, over 400 parks and sites were flagged for review.[16] An NPS employee indicated that the identified sites were "mostly on slavery."[17] The PH / Slavery Memorial was among the exhibits flagged for potential removal. In response to this threat that risked upending over a decade of grassroots advocacy, on September 11, 2025, ATAC sent a letter

---

[12] Exec. Order No. 14253, 90 Fed. Reg. 14563 (Apr. 2, 2025).

[13] *Id.*

[14] U.S. Sec'y of Interior, Order No. 3431 - Restoring Truth and Sanity to American History (May 20, 2025), https://www.doi.gov/document-library/secretary-order/so-3431-restoring-truth-and-sanity-american-history.

[15] *Id.*

[16] Isabella Gomez Sarmiento, *Trump Wants to Restore Statutes and Monuments: Will That Happen?*, NPR (Apr. 1, 2025, 10:56 AM ET), https://www.npr.org/2025/03/28/nx-s1-5343613/trump-executive-order-smithsonian-monuments (reporting on a DOI email to NPR).

[17] Brulliard & Dennis, *supra* note 4.

to NPS, asking for a meeting to discuss the Executive Order. Coard Decl. ¶ 48. NPS never responded. Coard Decl. ¶ 48.

On January 22, 2026, NPS staff dismantled the PH / Slavery Memorial by removing interpretive panels with crowbars and shutting off five motion-activated displays. Coard Decl. ¶ 51; Yancey Decl. ¶ 18. The removed interpretive panels contained information about the nine enslaved people who lived at the President's House, Yancey Decl. ¶ 24; discussions on the history of the trans-Atlantic slave trade and the reality that roughly 12.5 million Africans were brought to America to provide forced labor within system of chattel slavery established in the United States, Coard Decl. ¶ 52; and information about the gradual abolition laws, the abolitionist movement, and the escape of Ona Judge. Coard Decl. ¶ 52; Yancey Decl. ¶ 29.

Shortly thereafter, the City filed suit against Defendants Department of the Interior ("DOI"), NPS, Burgum, and Bowron for violations of the APA. Compl., ECF No. 1. Specifically, the City alleges that Defendants violated the National Underground Railroad Network to Freedom Act of 1998, the statutory mandate in Title 16 Sections 407m and 407n, and Defendants' policy documents. Am. Compl., ECF No. 44 at 18–27. The City also brought an *ultra vires* claim. *Id.* at 27–28. On January 22, 2025, the City moved for a preliminary injunction to prevent further damage to the PH / Slavery Memorial or the removed interpretive panels. Mot. for Prelim. Inj., ECF No. 2. Proposed Intervenors submitted an amicus brief in support of the preliminary injunction, providing insight on the specific harms caused by Defendants' illegal conduct, particularly to Black people. *See* Mot. to File Amicus Br., ECF No. 19; Tr. of Prelim. Inj. Hr'g, ECF No. 45-1 at 113–120. This Court granted the City's motion for a preliminary injunction on February 16, 2026, Prelim. Inj. Order, ECF No. 54, ordering Defendants to "restore the President's House Site to its physical status as of January 21, 2026." Mem. Op., ECF No. 53. Defendants began reinstalling the

panels pursuant to the preliminary injunction. The Third Circuit granted an administrative stay of the preliminary injunction on appeal but ordered Defendants to "preserve the status quo as to the President's House as of" the order's entry. Emergency Stay Order, *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, No. 26-1348 (3d Cir. Feb. 20, 2026). Accordingly, Defendants paused re-installation. *See* Status Report, ECF No. 73 at 1, 3. With many of the panels still absent from the site, the harm to Proposed Intervenors is ongoing.

**ARGUMENT**

## I.  Intervention as of Right Under Rule 12(a)(2)

To be granted intervention as of right pursuant to Rule 12(a)(2), movants must demonstrate that (1) their motion is timely; (2) they have sufficient interest in the litigation; (3) disposition of the action may impede or impair that interest; and (4) the interest is not adequately represented by existing parties. *See In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005) (citation omitted). Courts interpret these elements in light of a "policy preference which, as a matter of judicial economy, favors intervention over subsequent collateral attacks." *Kleissler v. U.S. Forest Serv.*, 157 F. 3d 964, 970 (3d Cir. 1998) (quotation marks and citation omitted). Proposed Intervenors satisfy each of the four requisite elements.

**a.  Intervention is Timely and Will Not Prejudice Existing Parties.**

In assessing the timeliness of intervention, courts consider (1) the stage of the proceedings; (2) whether intervention would cause a prejudicial delay to existing parties; and (3) the reason for any delay by intervening party in filing its motion after receiving notice of the litigation. *Wallach v. Eaton Corp.*, 837 F.3d 356, 371–72 (3d Cir. 2016). These factors are "necessarily bound up in one another," and the timeliness inquiry is ultimately based on the "totality of the circumstances." *Id.* at 371. This Circuit exhibits "a general reluctance to dispose of a motion to intervene as of right on untimeliness grounds." *Id.* (quoting *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*, 701

10

F.3d 938, 949 (3d Cir. 2012)). Requests for intervention before any rulings on the merits are generally considered timely. *See, e.g.*, *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 370 (3d Cir. 1995) (finding a motion to intervene timely four years into litigation where parties engaged in "some written discovery and settlement negotiations . . . [but] no depositions [were] taken, dispositive motions filed, or decrees entered"); *see also Cmty. Vocational Schs. of Pittsburgh, Inc. v. Mildon Bus Lines, Inc.*, Civ. No. 09-1572, 2017 WL 1376298, at *4–6 (W.D. Pa. Apr. 17, 2017) (finding a motion to intervene to be timely despite filing seven years into litigation where parties were in the discovery phase, but there were no summary judgment motions filed or trial scheduled). Ultimately, the relevant question is: "what proceedings of substance on the merits have occurred[?]" *Wallach*, 837 F.3d at 375.

This case was filed less than three months ago. Thus far, proceedings have been limited to the City's Motion for Preliminary Injunction. *See* ECF No. 53 at 2. Put simply, "few legally significant events have occurred" in this litigation, so intervention will not delay subsequent action or cause any harm to the City or Defendants. *Cmty. Voc. Schs. of Pittsburgh, Inc.*, 2017 WL 1376298 at *5. Proposed Intervenors do not seek to influence past proceedings or otherwise prejudice the parties, and there has been no meaningful delay in filing this motion to intervene. Proposed Intervenors' motion to intervene, therefore, is timely.

### b. Proposed Intervenors Have Significant, Protectable Interests in the Restoration of the PH / Slavery Memorial.

Under Rule 24(a)(2), Proposed Intervenors must assert an interest that is "significantly protectable." *Donaldson v. United States*, 400 U.S. 517, 531 (1971). In the Third Circuit, such an interest must be legally cognizable and of more than a "general and indefinite character." *Commonwealth of Pennsylvania v. President United States of Am.*, 888 F.3d 52, 58 (3d Cir. 2018) (internal quotation marks and citation omitted). Accordingly, an applicant for intervention must

"demonstrate that its interest is 'specific to [the intervenor], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought.'" *Id.* (citing *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998)). The "polestar for intervention is whether the proposed intervenor's interest is direct or remote." *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pennsylvania*, 701 F.3d 938, 951 (3d Cir. 2012) (cleaned up). Proposed Intervenors possess multiple, independently sufficient interests in the PH / Slavery Memorial to warrant intervention.

*First,* the PH / Slavery Memorial is the product of ATAC's sustained labor and longstanding advocacy. ATAC's close relationship with the memorial confers a concrete stake in its continued existence. *See generally Kleissler*, 157 F.3d at 969–72 (recognizing that Rule 24 allows "public interest" parties to intervene on issues of significant concern to the plaintiffs but have "an immediate and deleterious effect on" the intervenors). ATAC played a key role from the outset—beginning with the discovery of the site's significance. Coard Decl. ¶¶ 13, 17–18, 22. In fact, historian and ATAC member Ed Lawler's article, *The President's House in Philadelphia: The Rediscovery of a Lost Landmark*, brought "national attention" to the history of the slave quarters at the site. *See* ECF No. 45-1 at 35.

ATAC was also instrumental in bringing the site to the attention of both the City and the federal government, leading to their eventual partnership to create the memorial. Coard Decl. ¶¶ 17–18, 22. ATAC was the first entity to publicly call upon NPS to establish a memorial and raised awareness of the site to then-Mayor John Street and his administration.[18] *See* Wilkerson Testimony, ECF No. 45-1 at 35–36, 39-41; *id*. at 40–41 (Joyce Wilkerson, Chief of Staff to Mayor, explaining

---

[18] Mr. Coard continued to raise public awareness around the importance of the site, publishing an article entitled "*The 'Black' Eye on George Washington's 'White' House,*'" in the Pennsylvania Magazine of History and Biography, calling for the site to honor the nine enslaved Africans.

that the administration was "very aware of the advocacy led by Avenging the Ancestors" and Ed Lawler); *id*. at 42 (noting "from the beginning, there was involvement by the public," including Ed Lawler and ATAC).

ATAC also led a sustained campaign to secure funding for the memorial, resulting in substantial public investment from local and federal actors. Coard Decl. ¶¶ 18, 23–24, 32. For example, ATAC delivered a petition to Independence Park signed by over one thousand individuals calling for the memorial's construction.[19] ATAC also sent letters to every Black elected official in Philadelphia, seeking their support for the project. In response to Mr. Coard's letter, Mayor Street committed $1.5 million in City funding to the project and created an oversight committee to guide its development. *See* ECF No. 45-1 at 39–41 (Wilkerson testifying about letter sent to Mr. Coard on behalf of Mayor Street, formalizing City's commitments). Approximately $5 million in government funding was secured for the memorial's creation, including $3.5 million in federal funding. *See* ECF No. 45-1 at 44.

Between ATAC's founding in 2002 and the site's opening in 2010, ATAC was embedded in the memorial's development, contributing expertise and oversight and organizing public engagement throughout its design and implementation process. Coard Decl. ¶¶ 5–6, 22-24, 26, 36. ATAC helped shape the memorial's core themes and design principles that were ultimately codified in agreements between NPS and the City. *See* ECF No. 45-1, at 46 (testifying that the public was "integrally involved" throughout the oversight process); ECF No. 1-2, at 81 (memorializing ATAC's involvement in the exhibit's selection process). Indeed, Mr. Coard, on behalf of ATAC, served as an official member of Mayor Street's oversight committee, where he

---

[19] Rebecca Yamin, *Digging in the City of Brotherly Love: Stories from Philadelphia Archaeology*, 51–52 (2008).

contributed expertise to ensure the accurate depiction of the enslaved individuals who lived at the site. Coard Decl. ¶ 25–26. City officials repeatedly acknowledged that "the whole project reflected close collaboration between the advocates representing the community, the historians investigating the facts, the federal government, [and] the local government." ECF No. 45-1 at 59; *see also id*. at 66–79 (noting "the public was always integral" to the project's development). Everett Gillison, Chief of Staff for Mayor Michael Nutter in 2010, identified ATAC and Mr. Coard as key contributors to the PH Slavery Memorial. *See* ECF No. 45-1 at 95.

Proposed Intervenors' interests are not speculative. At the preliminary injunction hearing, two of the three witnesses called by the City referenced ATAC and its founder, Mr. Coard, when describing the site's development and significance. *See* ECF No. 45-1, at 39, 95; *cf.* ECF No. 45-1, at 164–65. This recognition of ATAC's involvement demonstrates its substantial interest in the facts and legal claims at issue, as well as the concrete nature of ATAC's stake in the case's outcome.

*Second*, the PH / Slavery Memorial is integral to Proposed Intervenors' ongoing, mission-driven programs and activities. Courts routinely recognize a protectable interest when government action directly affects an organization's use of a particular site or its ability to carry out mission-based activities there. *See, e.g.*, *Kleissler*, 157 F.3d at 973 (finding timber companies had protectable interests in lawsuit challenging logging, in part, because their operations were dependent on timber contracts and the "continued existence may [have been] jeopardized" by the suit); *Shipyard Assocs., L.P. v. City of Hoboken*, No. CIV.A. 14-1145 CCC, 2014 WL 6685467, at *2–4 (D.N.J. Nov. 26, 2014) (granting intervention as of right to an organization dedicated to waterfront preservation in a suit challenging a municipal ordinance restricting riverside construction).

14

The PH / Slavery Memorial is a core component of ATAC's educational and commemorative programming. Since 2002, ATAC has gathered annually at the site on dates significant to the history of slavery and freedom associated with the site and, since December 2010, to commemorate the site's establishment. Coard Decl. ¶¶ 42–44, 57. Beyond annual commemorations, ATAC used the site for public education, community organizing, and historical interpretation. Coard Decl. ¶ 58. From March 2025 to January 2026, ATAC met at least twice weekly to prevent Defendants' threatened removal of the memorial, holding in-person rallies, virtual meetings, and other gatherings. Coard Decl. ¶¶ 49, 50.

Likewise, the PH / Slavery Memorial is essential to The Black Journey's business and its mission to preserve, interpret, and publicly disseminate Black history. Yancey Decl. ¶¶ 6–8, 12, 37–38. It is nearly impossible to present Black history during the colonial period to tourists without all of the memorial's interpretive resources and information about slavery at that time. Yancey Decl. ¶ 20–23. Since its inception, The Black Journey's tours have included the PH / Slavery Memorial. Yancey Decl. ¶ 12. Three of the five live, guided tours offered by The Black Journey spend a significant amount of time at the memorial, and its on-demand audio tour also includes a stop there. Yancey Decl. ¶ 14. The Black Journey has invested substantial resources in creating and marketing these tours. Yancey Decl. ¶¶ 24, 27. The ongoing removal of the memorial's interpretive panels fundamentally impairs The Black Journey's business operations, necessitating tour stoppages, additional paid training to discuss the removal, and modification of its audio and live guided tours. Yancey Decl. ¶¶ 21–23, 28–31, 35, 37.

The PH Slavery / Memorial is a physical site central to Proposed Intervenors' recurring educational events, tours, commemorations, organizing activities, and programming. Defendants' alteration of that site, therefore, directly impairs their ability to carry out core aspects of their

15

organizational missions—an interest courts repeatedly have recognized as significantly protectable under Rule 24(a). *See, e.g.*, *Am. Farm Bureau Fed. v. Env. Protection Agency*, 278 F.R.D. 98, 111 (M.D. Pa. 2011) (holding that environmental groups satisfied standard for intervention as of right in suit challenging EPA water quality standards); *Associated Dog Clubs of N.Y. State v. Vilsack*, 44 F. Supp. 3d 1, 2 (D.D.C. 2014) (granting intervention as of right to the Humane Society to defend regulations extending Animal Welfare Act licensing requirements to online pet dealers); *Herdman v. Town of Angelica*, 163 F.R.D. 180, 186–88 (W.D.N.Y. 1995) (allowing an environmental group to intervene as of right to defend a law regulating waste facilities).

### c.  Disposition of This Case Will Impair the Interests of Proposed Intervenors.

Disposition of this action will, as a practical matter, impair Proposed Intervenors' ability to protect their interests. *See supra* Section I.B. An applicant for intervention satisfies the impairment element of Rule 24(a)(2) when its interests are "in jeopardy in the lawsuit." *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1122 (3d Cir. 1992). Courts evaluate impairment by examining the "practical consequences" of the litigation. *Pennsylvania v. President*, 888 F.3d at 59.

This case will determine the legality of Defendants' removal of the interpretive panels and the scope of permissible relief relating to restoration of the site and potential alterations should Defendants be held liable. The Proposed Intervenors thus have legally protectable interests. Should Defendants prevail and consequently remove the PH / Slavery Memorial permanently, Proposed Intervenors stand to suffer not only from APA violations—but also constitutional violations related to the enforcement and implementation of the Executive Order and Secretarial Order. Even if formal claim or issue prelusion were contested, the precedential effect of an adverse ruling would significantly burden Proposed Intervenors' ability to vindicate their claims in separate litigation.

Accordingly, this Circuit "favors intervention over subsequent collateral attacks." *Kleissler*, 157 F. 3d at 970.

### d.  The City Cannot Adequately Represent Proposed Intervenors' Interests.

In the Third Circuit, a party's interests are inadequately represented "if they diverge sufficiently from the interests of the existing party." *Pennsylvania v. President*, 888 F.3d at 60. As the burden of proving inadequate representation is "minimal," *id.* , courts are "liberal in finding" the inadequacy requirement satisfied, recognizing that "there is good reason in most cases to suppose that the applicant is the best judge of the representation of [its] own interests." 7C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1909 (3d ed. 2025).

Although courts apply a presumption of adequate representation by a governmental entity, this presumption is not dispositive. *See Brody*, 957 F.2d at 1123. Governmental litigants must balance "numerous complex and conflicting interests," which are "necessarily colored by [their] view of the public welfare," and these obligations may limit their ability to prioritize narrower, constituent-specific concerns. *Kleissler*, 157 F.3d at 972–73. Thus, whenever a governmental party has such competing obligations, the burden of showing inadequate representation becomes "comparatively light." *Id*. at 972. Consistent with this principle, multiple courts have "concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003); *see also Pennsylvania v. President*, 888 F.3d at 62 (holding that religious nonprofit organization demonstrated inadequate representation by the federal government); *Am. Farm Bureau Fed.*, 278 F.R.D. at 111 (finding EPA could not adequately represent an environmental group's interests given its obligation to represent broad public concerns).

The relevant question, therefore, is whether the City can stand in to represent the interests of Proposed Intervenors. It cannot. When the interests of an aspiring intervenor are more specific

17

and personal than those of the government, "there is no reason to think the government will represent it." *Kleissler*, 157 F.3d at 972 (quoting *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996)). Proposed Intervenors do not seek to advance an abstract policy position. Instead, they are uniquely positioned to protect concrete interests directly implicated by the removal of the PH / Slavery Memorial—including their interests in maintaining the fruits of their advocacy, using the site for business and organizational purposes, and remedying the unique dignitary harm faced by Black people when their history is suppressed and censored by the federal government. *See supra* Section I.B.

The City must account for broad institutional, political, and policy considerations that extend beyond the interests of Proposed Intervenors. The City and Defendant NPS maintain numerous ongoing partnerships. The Liberty Bell—owned by the City but located within Independence Park, which is administered by Defendant NPS—is one example of the interdependent relationship between the two entities. ECF No. 45-1, at 38. The City also relies on federal funding to support a myriad of programs.[20] These partnerships may affect the City's strategic decisions in this case, including potential incentives to settle when Proposed Intervenors would not, due to their narrower interests.

Finally, Proposed Intervenors have standing to assert claims that the City cannot bring. Namely, Proposed Intervenors seek to challenge Defendants' attempts to remove the interpretive panels, as well as their implementation and enforcement of the underlying Executive and Secretarial Orders, as violating equal protection—a constitutional claim that the City cannot assert.

---

[20] Mier Rinde, *Trump's Grant and Contract Cuts in Philadelphia Approach $280 Million (And Counting)*, WHYY (May 15, 2025), https://billypenn.com/2025/05/15/trump-federal-cuts-philadelphia-research-health/ (noting that the city of Philadelphia received $2.8 billion in federal grants).

Proposed Intervenors are uniquely harmed by Defendants' attempts to target and erase historical facts significant to Black people, but not historical facts similarly significant to white people, thus amounting to race discrimination. Coard Decl. ¶¶ 53–54, 57; Yancey Decl. ¶¶ 33, 37–38. The City, who must represent "broader public interest[s]," cannot guarantee it will also represent the "parochial views" of Proposed Intervenors. *Pennsylvania v. President*, 888 F.3d at 61.

As an organization and business founded specifically to ensure access to Black history in Philadelphia, Proposed Intervenors have a significant interest in preserving the PH / Slavery Memorial. Because the City holds competing interests, there is no assurance that it will adequately advance, preserve, or protect the distinct interests of Proposed Intervenors as litigation proceeds.

## II.  Permissive Intervention Under Rule 24(b)

If the Court denies intervention as of right, it should nonetheless exercise its broad discretion to grant permissive intervention under Rule 24(b). Proposed Intervenors assert claims that share "a common question of law or fact" with the underlying action, and their participation would not "unduly delay or prejudice the adjudication" of the matter. Fed. R. Civ. P. 24(b). Proposed Intervenors moved promptly to intervene. *See supra*, Section I.A. Moreover, whether Proposed Intervenors share a common legal or factual issue with the main action is interpreted with "considerable breadth." *In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 333, 339 (E.D. Pa. 2004) (citation omitted). Here, their claims require resolution of the same core legal and factual questions raised by this action—the legality of Defendants' removal of the PH / Slavery Memorial.

Permissive intervention is appropriate where, as in this case, Proposed Intervenors' rights are directly affected by the outcome of the litigation and are "not identical" to those of an existing party. *Pa. Gen. Energy Co. v. Grant Twp.*, No. 14-209, 2015 WL 6002163, at *2–3 (W.D. Pa. Oct. 14, 2015), *aff'd*, 658 F. App'x 37 (3d Cir. 2016). As explained *infra* at Section I.C., Proposed Intervenors raise constitutional and statutory claims distinct from those of the City.

Permissive intervention is particularly appropriate here because Proposed Intervenors offer a "helpful, alternative viewpoint . . . that will aid the court in resolving [the City's] claims fully and fairly," as well as their own, separate constitutional claim. *Doe v. Christie*, 33 F. Supp. 3d 518, 524 (D.N.J. 2014); *see also Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 172 F.3d 104, 113 (1st Cir. 1999) ("The fact that the applicants may be helpful in fully developing the case is a reasonable consideration in deciding on permissive intervention."). Indeed, Proposed Intervenors have already proven the value of their participation through their contributions as amici curiae during the preliminary injunction proceedings and are able to offer even more aid to the Court in future proceedings. *See* ECF No. 45-1 at 5, 113–120; ECF No. 53 at 2; ECF No. 39.

This case presents issues of substantial public importance, including the legality of Defendants' actions pursuant to the Executive and Secretarial Orders that place hundreds of federal historic sites—in locations beyond Philadelphia—at risk of alteration and erasure. Permissive intervention will allow the Court "to profit from a diversity of viewpoints"—in this case, the viewpoint of Black community stakeholders with significant ties to the PH / Slave Memorial— and ensure full consideration of the distinct constitutional, historical, and ancestral interests at stake. *Franconia Minerals (US) LLC v. United States*, 319 F.R.D. 261, 268 (D. Minn. 2017).

## CONCLUSION

For all the foregoing reasons, Proposed Intervenors respectfully request that the Court grant intervention as of right under Rule 24(a) or, in the alternative, permissive intervention under Rule 24(b).

20

Dated: April 1, 2026                              Respectfully submitted,

                                                 /s/ *Cara McClellan*
Avatara A. Smith-Carrington*                     Cara McClellan
Kacey Mordecai*                                  Attorney ID: 331129
Victor Olofin*                                   Mary Catherine Roper
NAACP LEGAL DEFENSE &                            Attorney ID: 71107
EDUCATIONAL FUND, INC.                           Kate McNamara-Marsland, Certified
700 14th Street NW, Suite 600                    Legal Intern
Washington, DC 20005                             Nathalie Rincon, Certified Legal Intern
(202) 682-1300                                   PENN LEGAL ASSISTANCE
acarrington@naacpldf.org                         OFFICE
kmordecai@naacpldf.org                           3501 Sansom Street
volofin@naacpldf.org                             Philadelphia, PA 19104
                                                 (215) 746-2164
Alexandra S. Thompson*                           caralm@law.upenn.edu
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor                      *Pro hac vice application forthcoming*
New York, NY 10006
(212) 965-2200
athompson@naacpldf.org

*Attorneys for Proposed Intervenors*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2026, I caused the foregoing document to be filed with the Clerk of Court via CM/ECF. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Cara McClellan*
Cara McClellan