# EXHIBIT A

**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITY OF PHILADELPHIA,<br><br>        Plaintiff,<br><br>AVENGING THE ANCESTORS COALITION and THE BLACK JOURNEY: AFRICAN-AMERICAN WALKING TOUR OF PHILADELPHIA,<br><br>        Plaintiffs-Intervenors,<br>   v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>JESSICA BOWRON, ACTING DIRECTOR OF THE NATIONAL PARK SERVICE,<br><br>        and<br><br>NATIONAL PARK SERVICE,<br><br>        Defendants. | **Civil Action No. 2:26-cv-434**<br><br>Honorable Cynthia M. Rufe |

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

*"If a race has no history, if it has no worthwhile tradition, it becomes a negligible factor in the thought of the world, and it stands in danger of being exterminated."*
The Mis-Education of the Negro, Carter G. Woodson

## I.    INTRODUCTION

1.    Ona,[1] Hercules, Moll, Giles, Austin, Richmond, Paris, Joe, and Christopher. These

---

[1] Ona was often referred to as "Oney" by the Washington family; however, Ms. Judge referred to herself as Ona. Oney is used in this Complaint where cited material refers to her in that manner. *Ona     Judge,*     George     Washington's     Mount     Vernon,

are the names of the nine enslaved African descendants whom George Washington transported from his Mount Vernon plantation to a Colonial-era main house in Philadelphia. There, they would toil in what served as the executive mansion for a newly formed country.

2.      This executive mansion—commonly referred to as the "President's House"—stood at the southeast corner of Sixth and Market Streets. The President's House was emblematic of the young nation's hypocrisy. During his lifetime, George Washington, the first President of the United States, was lauded for his many contributions at our nation's founding—including his leadership of the Continental Army during the Revolutionary War and his role in presiding over the Constitutional Convention. His efforts contributed to the creation of a new democratic form of government, premised on the principles of liberty and freedom that were devised to thwart tyranny. Yet, at the same time, Washington faced intense criticism from his contemporaries about his enslavement of over 300 Africans at Mount Vernon.[2]  British essayist, Samuel Johnson, stated, "How is it we hear the loudest yelps for liberty among the drivers of Negroes?"[3] Edward Rushton, a British abolitionist, penned in a letter to Washington, "Shame! Shame! That man should be deemed the property of man, or that the name of Washington should be found among such proprietors."[4] Concealed from the public was the fact that Washington also held nine people in slavery at the President's House, a fact that was not widely recognized until centuries later.

3.      Not only did the first President enslave Africans, but Washington also went to

---

https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/ona-judge  (last visited, Mar. 26, 2026).

[2] *10 Facts About Washington and Slavery*, George Washington's Mount Vernon, https://www.mountvernon.org/george-washington/slavery/ten-facts-about-washington-slavery#:~:text=At%20the%20time%20of%20George,owned%20by%20the%20Custis%20estate (last visited Mar. 26, 2026).

[3] John Garrison Marks, *We've Never Agreed About George Washington and Slavery*, TIME (Jan. 23, 2026, 12:22 PM), https://time.com/7357382/george-washington-slavery-exhibit-philadelphia/.

[4] *Id.*

extreme lengths to retain them as his "property." Washington intentionally evaded Pennsylvania's

Gradual Abolition Act of 1780—which enabled enslaved people to petition for their freedom after

being in the state six months—by rotating the enslaved African descendants between his Mount

Vernon plantation and the President's House in Philadelphia every six months, thereby preventing

their legal emancipation.[5] In 1796, when Ona Judge made her daring escape from the President's

House in search of freedom, Washington "discreetly sent a federal customs officer to bring her

back, circumventing procedures laid out in the 1793 fugitive slave law he himself had signed."[6]

4.      Historians have long recognized this contradiction within the founding of the

United States: leaders of the American Revolution campaigned for liberty and freedom, including

freedom from tyranny—while imposing a rapidly expanding system of chattel slavery that relied

upon the forced labor of enslaved Black people to build the fledgling nation.[7] This foundational

paradox was laid bare in 2001 when historical research revealed that the new site for the Liberty

Bell was immediately facing what was once the slave quarters that Washington ordered added to

the President's House.[8]

---

[5] Despite being the "first extensive abolition legislation in the western hemisphere," the Act had important limitations and was drafted to gradually emancipate enslaved people without immediately making slavery illegal. *Gradual Abolition Act of 1780*, George Washington's Mount Vernon, https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/gradual-abolition-act-of-1780 (last visited Mar. 26, 2026).

[6] Jennifer Schuessler, *In Search of the Slave Who Defied George Washington*, N.Y. Times (Feb. 6, 2017), https://www.nytimes.com/2017/02/06/arts/george-washington-mount-vernon-slavery.html.

[7] *See, e.g.*, Edmund Morgan, *American Freedom, American Slavery: the ordeal of colonial Virginia* 6 (1975) (describing "the American paradox, the marriage of slavery and freedom").

[8] *See* Edward Lawler, Jr., *The President's House in Philadelphia: The Rediscovery of a Lost Landmark*, 127 The Pennsylvania Magazine of History and Biography 27–28 (2002), https://journals.psu.edu/pmhb/article/view/45510/45231 (last visited Mar. 26, 2026) (providing the conjectural floorplan of the President's House in Philadelphia and describing the servants' hall and the slave quarters added by George Washington in 1790); Independence Nat'l Hist. Park, *President's House Site*, Nat'l Park Serv., https://www.nps.gov/media/photo/gallery-item.htm?pg=3736095&id=69be07a6-155d-451f-6775-9799ea759c84&gid=68C49029-155D-451F-6769F4B1EFBC87A8 (describing how archeologists discovered the foundations of the

5.     Although it was widely known that George Washington held enslaved people at his home in Mount Vernon, the new research revealed a previously unknown fact: Washington also held people in slavery at the President's House, in Philadelphia—a city that hosted the first "anti-slavery" protest and was home to a strong abolitionist movement.[9]

6.     Upon discovery of these facts, Black Philadelphia residents formed Avenging the Ancestors Coalition ("ATAC"). Recognizing that the stories of Black people are often excluded from the official recounting of American history, ATAC campaigned to ensure that the stories of the nine people enslaved by Washington in Philadelphia would not be forgotten and commemorated at the President's House site.

7.     As a result of ATAC's advocacy, the City of Philadelphia ("City") and the National Park Service ("NPS") recognized the importance of the newly uncovered information about the nine enslaved people in the President's House and the need to tell the unvarnished truth about our nation's history. Thus, the City and NPS worked together, with significant public input, to design a plan for commemorating the nine people who were enslaved at the President's House.

8.     Members of ATAC were directly involved in the planning and execution of the memorial and exhibit at the President's House. Michael Coard, ATAC's founder, was selected by then-Mayor John Street to serve on the project's oversight committee, which engaged in a rigorous deliberative process that helped guide the project's design and development, and ensure its ultimate success.

9.     On December 15, 2010, the open-air installation and exhibit "President's House:

---

house during a dig).

[9] Michael D'Onofrio, *Slavery and Philly: Since arrival of first enslaved Africans, deep scars exist here, across Commonwealth*, WHYY (Aug. 20, 2019), https://whyy.org/articles/slavery-and-philly-since-arrival-of-first-enslaved-africans-deep-scars-exists-here-across-commonwealth/.

Freedom and Slavery in the Making of a New Nation" ("PH / Slavery Memorial") opened to the public.

10.     The PH / Slavery Memorial serves as the first commemoration of enslaved people within the National Park System. For over fifteen years, the site has welcomed thousands of visitors from across the globe.

11.     Tours offered by The Black Journey and other tour companies visit the PH / Slavery Memorial daily because they recognize the memorial as vital to the fabric of this nation's history.

12.     On March 27, 2025, President Trump issued Executive Order 14253 ("Executive Order") entitled "Restoring Truth and Sanity to American History."[10] The Executive Order aimed to remedy what it deemed to be a "widespread effort to rewrite [America's] history" by "replacing objective facts with a distorted narrative driven by ideology rather than truth."[11]

13.     To purportedly "restor[e] truth and sanity to American history,"[12] Section Four of the Executive Order directs the Secretary of the Interior to "determine whether [certain] public monuments, memorials, statues, markers, or similar properties . . . contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape ."[13]

14.     Shortly thereafter, Secretary of the Interior, Doug Burgum, issued Secretarial Order No. 3431 ("Secretarial Order"), charging the Director of NPS, Jessica Bowron, to implement the

---

[10] Executive Order on Restoring Truth and Sanity to American History, Exec. Order No. 14253, 90 Fed. Reg. 14563 (Apr. 3, 2025).
[11] *Id*.
[12] *Id*.
[13] *Id.*

Executive Order by reviewing and removing "inappropriate content."[14]

15.     Pursuant to the Secretarial Order, on January 22, 2026, Steven Sims, Superintendent of Independence National Historical Park ("Independence Park"), directed NPS employees, armed with wrenches and crowbars, to dismantle and remove all educational and interpretive panels and disable the five motion-activated video screens that were part of the PH / Slavery Memorial.

16.     NPS's actions are part of a coordinated effort by the Trump Administration to not only distort the past and manufacture an alternative narrative of the history of the United States, but also disparage and denigrate the stories and history of Black people in this country.

17.     Plaintiffs ATAC and The Black Journey (collectively, "Plaintiffs") bring this action for injunctive and declaratory relief against Doug Burgum, U.S. Secretary of the Interior; the U.S. Department of Interior; Jessica Bowron, Director of the National Park Service; and the National Park Service (collectively "Defendants") for violations of the Fifth Amendment to the U.S. Constitution and the Administrative Procedure Act ("APA"). Plaintiffs respectfully ask this Court to declare that the Executive Order, the Secretarial Order, and the removal of the PH / Slavery Memorial are unlawful; to vacate the Secretarial Order and the removal of the PH / Slavery Memorial; to require Defendants to restore the PH / Slavery Memorial to its original condition prior to implementation of the Executive Order and Secretarial Order; and to cease any additional efforts to remove or alter information regarding the nine enslaved African descendants held in bondage at the President's House.

---

[14] Secretarial Order 3431, Restoring Truth and Sanity to American History (May 20, 2025) ("Secretarial Order"), https://www.doi.gov/document-library/secretary-order/so-3431-restoring-truth-and-sanity-american-history.

## II.    PARTIES

**Plaintiffs**

18.    **Plaintiff City of Philadelphia (the "City")** is a municipal corporation and charter city organized and existing under the laws of the Commonwealth of Pennsylvania.

19.    **Plaintiff Avenging The Ancestors Coalition ("ATAC")** is a Black-led organization of historians, attorneys, concerned citizens, elected officials, religious leaders, media personalities, community activists, and registered voters. ATAC was founded in 2002 to persuade NPS and Independence Park to create a prominent slavery memorial at the President's House site. ATAC is headquartered in Philadelphia, Pennsylvania.

20.    **Plaintiff The Black Journey: African-American Walking Tour of Philadelphia ("The Black Journey")** is a Black-woman owned walking tour company, founded in 2019, to highlight the frequently overlooked Black history of Philadelphia and the early United States. The Black Journey offers various tours to Philadelphians and visitors from all over the globe. One of the tours offered is "The Original Black History Tour," which, among other things, allows tourists to "[s]ee where the Fugitive Slave Act was passed in 1793," "[h]ear about Martha Washington's enslaved handmaiden who emancipated herself," and visit the PH / Slavery Memorial.[15]  The Black Journey is headquartered in Philadelphia, Pennsylvania.

**Defendants**

21.    **Defendant Doug Burgum** is Secretary of the Interior and, as such, he is entrusted by Congress with management of the National Park System, acting through the Director of the National Park Service. *See* 54 U.S.C. § 100101(a).

22.    **Defendant Department of the Interior ("DOI")** is a cabinet-level agency that

---

[15] *The Black Journey: African-American Walking Tour of Philadelphia*, The Black Journey, https://www.blackjourneyphiladelphia.com/ (last visited Mar. 30, 2026).

"protects and manages the Nation's natural resources and cultural heritage; provides scientific and other information about those resources; and honors its trust responsibilities or special commitments to American Indians, Alaska Natives, Native Hawaiians, and affiliated Island Communities."[16]

23. **Defendant Jessica Bowron** is the Acting Director of NPS. Under the direction of the Secretary of the Interior, Defendant Bowron handles the supervision, management, and control of the National Park System. *See* 54 U.S.C. § 100302(a)(3).

24. **Defendant National Park Service ("NPS")** is a bureau of the Department of the Interior which manages the National Park System. The purpose of NPS "is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id*. § 100101(a).

## III.   JURISDICTION AND VENUE

25. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including the U.S. Constitution.

26. The Court has further remedial authority under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

27. Venue is proper under 28 U.S.C. § 1391(b) and (e)(1) because Plaintiffs reside in this district and each defendant is an agency of the United States or an officer of the United States sued in their official capacity.

## IV.   RELEVANT STATUTES FOR HISTORICAL AND CULTURAL SITES

28. Agency changes to sites within the National Park System, a collection of "433 individual units covering more than 85 million acres in all 50 states, the District of Columbia, and

---

[16] *About Interior*, U.S. Department of the Interior, https://www.doi.gov/about (last visited Mar. 31, 2026).

8

US territories," are governed by a detailed statutory and regulatory scheme.[17]

### A.  National Park Service Organic Act

29.     In 1916, Congress passed the National Park Service Organic Act ("Organic Act"), which established the National Park Service as an agency within the Department of the Interior. 54 U.S.C. §§ 100101-320303.

30.     Congress charged NPS with promoting and regulating the use of the National Park System "by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

31.     In 1978, Congress supplemented and further clarified the Organic Act to provide that NPS's "authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." *Id*. § 100101(b)(2).

32.     Under the Organic Act, NPS may not take any action that would "impair" the resources or values of units within the National Park System.

33.     In addition to the statutory framework, NPS's Management Policies, which interpret the Organic Act, "represent one of the most important tools available" to NPS and "[t]hrough their judicious and consistent application, . . . set a firm foundation for stewardship that

---

[17] *National Park System*, Nat'l Park Serv., https://www.nps.gov/aboutus/national-park-system.htm (last updated Feb. 2, 2026).

will continue to earn the trust and confidence of the American people."[18]

34.     Section 1.4 of NPS's Management Policies represents the agency's interpretation of the key management-related provisions, the most important statutory directive for the agency, provided by interrelated provisions of the Organic Act of 1916 and the General Authorities Act of 1970, including amendments to the latter law enacted in 1978.

35.     The Management Policies define an "impairment" as "an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values."[19] Whether an "impact" meets this definition "depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." *Id*.

36.     An "impact" is likely to constitute an "impairment" to the extent that it affects a resource or value whose conservation is "necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or identified in the park's general management plan or other relevant NPS planning documents *as being of significance*." Management Policies § 1.4.5 (emphases added).

37.     Park resources and values subject to the non-impairment mandate include, among other things, "cultural landscapes;" "ethnographic resources;" "structures and objects;" and "any

---

[18]     *NPS Directive System, Management Policies*, Nat'l Park Serv., https://www.nps.gov/subjects/policy/management-policies.htm (last updated Aug. 6, 2025); *see also* U.S. Dep't of the Interior, Nat'l Park Serv., *Management Policies 2006* § 1.4.5 (2006) ("*Management Policies*"), https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf.
[19] *Management Policies*, *supra* note 18, at § 1.4.5.

additional attributes encompassed by the specific values and purposes for which the park was established." *Id*. § 1.4.6.

38.     Before approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values. *Id*. § 1.4.7.

39.     In determining whether a proposed action could lead to an impairment, an NPS decision-maker must use their professional judgment. NPS Management Policies further outline that an NPS decision-maker must undertake "consultations required under section 106 of the National Historic Preservation Act . . . relevant scientific and scholarly studies;" "advice or insights offered by subject matter experts and others who have relevant knowledge or experience;" and consider "the results of civic engagement and public involvement activities relating to the decision." *Id*.

40.     When an NPS decision-maker becomes aware that an ongoing activity might constitute or lead to an impairment, they must investigate and determine if there is or will be an impairment. *Id*. If the proposed action could lead to or is an impairment of park resources and values, the action must not be approved or must be eliminated "as soon as reasonably possible." *Id*.

41.     NPS also has an obligation to conserve all park resources and values, which is independent of the separate prohibition on impairment, "and applies all the time . . . even when there is no risk that any park resources or values may be impaired." *Id*. § 1.4.3.

**B.  National Historic Preservation Act**

42.     In 1966, Congress enacted the National Historic Preservation Act ("NHPA"), 54

11

U.S.C. §§ 300301-307108 (Supp. II 2015), declaring "that it is a national policy to preserve for public use historic sites, buildings, and objects of national significance for the inspiration and benefit of the people of the United States." 54 U.S.C. § 320101.

43.    Under the NHPA, federal agencies are required to manage historic properties that are within their jurisdiction or control in a manner that considers the preservation of their historical, archeological, architectural, and cultural values, and to give special consideration to the preservation of those values for properties of national significance. *Id.* § 306102.

44.    Section 106 of the NHPA, codified at 54 U.S.C. § 306108, requires federal agencies to consider the effect of an "undertaking" on any historic property. *Id*. § 306108. The Section 106 "process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning." 36 C.F.R. § 800.1.

45.    Both "historic property" and "undertaking" have specific meanings under the NHPA. "[H]istoric propert[ies]" include certain structures, sites, or districts eligible for the National Register. 54 U.S.C. § 300308. An "undertaking" is defined as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a [f]ederal agency," including actions carried out by or on behalf of a federal agency. *Id*. § 300320.

46.    As part of the Section 106 process, regulations require agencies to consider an undertaking's "adverse effect" on historic properties. An adverse effect "is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or

12

association. *Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register*. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5 (emphasis added).

47.     The regulations provide several non-exhaustive examples of adverse effects including, but not limited to, "[p]hysical destruction of or damage to all or part of the property," *Id*. § 800.5(a)(2)(i); and "change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." *Id*. § 800.5(a)(2)(iv).

48.     To avoid, minimize, or mitigate adverse effects, the Section 106 process requires agencies to consult with the Advisory Council on Historic Preservation ("Advisory Council"). *See id*. §§ 800.4–800.6. In addition to the Advisory Council, the regulations provide for agencies to consult with a "State historic preservation officer," *id*. § 800.2(c)(1); "[r]epresentatives of local governments," 36 C.F.R. § 800.2(c)(3); and the "public," *id*. § 800.2(d), because "[t]he views of the public are essential to informed Federal decisionmaking in the section 106 process."

49.     Ultimately, "[t]he goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 C.F.R. § 800.1(a).

## V.     FACTUAL ALLEGATIONS

50.     From 1790-1800, when Philadelphia served as the second capital of the United States, a Colonial-era main house, located near the southeast corner of Sixth and Market Streets, served as the executive mansion of the newly founded United States.

51.     "The President's House," as it was commonly referred to in formal correspondence,

13

was occupied by the first two American presidents, George Washington and John Adams.

52.     Between 1790 and 1797, when George Washington and Martha Washington occupied the property, nine enslaved African descendants were brought from Mount Vernon to the President's House. As "our first president was guiding the experimental development of the young nation toward modern, republican government," these nine individuals endured chattel slavery at the President's House.[20]

53.     Washington kept enslaved African descendants in the President's House during his entire stay in Philadelphia.[21] In 1780, Pennsylvania passed the nation's first extensive abolition legislation, which gradually emancipated enslaved people and "prohibited non-residents of Pennsylvania from keeping their enslaved workers in the state longer than six months."[22] Washington capitalized on this loophole, by rotating the enslaved African descendants brought from Mount Vernon with other indentured servants every six months.

54.     The President's House relied upon the forced labor of the nine enslaved African descendants, who included Christopher (a body servant); Moll (a maid); Austin (a stable hand), Hercules (a cook); Hercules's son, Richmond, (a scullion); Paris and Giles (stable hands and postillions); Cyrus (a stable hand); and Ona (a body servant).

55.     Ona, a body servant for Mrs. Washington, escaped from the President's House to freedom in May 1796, settling in New Hampshire.[23] In March 1797, Hercules fled to freedom and settled in New York City.[24]

---

[20] *President's House Site: Enslaved People in the Washington Household*, Nat'l Park Serv., https://home.nps.gov/inde/learn/historyculture/enslaved-people.htm (last updated Nov. 29, 2023 ).

[21] Lawler, *supra* note 8, at 27–28.

[22] *Gradual Abolition Act of 1780*, *supra* note 5.

[23] ERICA ARMSTRONG DUNBAR, NEVER CAUGHT: THE WASHINGTON'S RELENTLESS PURSUIT OF THEIR RUNAWAY SLAVE ONA JUDGE (2017).

[24] *Id*.

14

56.    By the 1830s, almost thirty years after the death of Washington, most of the President's House had been demolished; little physical evidence of its existence remained;[25] and information regarding the nine enslaved African descendants held in bondage at the President House was nearly lost to history.

### A.  The Establishment of Independence National Historical Park

57.    In 1948, Congress enacted Public Law 80-795, codified at 16 U.S.C. §§ 407m-407s, to provide for the establishment of Independence Park.

58.    Independence Park was established for the purpose of preserving as a national historical park certain historical structures and properties of national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States.

59.    Since March 1988, Independence Park has been listed in the National Register of Historic Places. (No. 66000683).

60.    The President's House (formerly known as the "Executive Mansion") is near the corner of Sixth and Market Streets, in the first block of Independence Park.

61.    The President's House is listed as a "Historical Site" within Independence Park that "possess[es] significance for their contributing association with the funding and growth of the United States from 1774 to 1824 and with the lives of persons significant in that period."[26]

### B.  Memorializing the Nine African Descendants Enslaved at the President's House

62.    In the early 2000s, research revealed that the anticipated new site of the Liberty Bell Center overlapped with the former location of the President's House.

---

[25] *Id*. at 6.

[26] U.S. Dept. of the Interior, Nat'l Park Serv., *National Register of Historic places Inventory—Nomination Form*, Sect. 7 20-21 (1988), https://npshistory.com/publications/inde/nr-independence-nhp.pdf (last visited Feb. 15, 2026).

63.     In January 2002, the Pennsylvania Magazine of History and Biography published an article by historian Edward Lawler, who observed that "[t]he last thing that a visitor will walk across or pass before entering the Liberty Bell Center will be the slave quarters that George Washington added to the President's House."[27] Lawler's research and observation of the tension between the new Liberty Bell Center and the history of slavery at the President's House garnered national attention.

64.     Shortly thereafter, historian Gary Nash published an op-ed and gave multiple talks about the enslaved African descendants at the President's House to raise public awareness of the site's historical significance. On March 13, 2002, Nash observed in a radio interview that "millions of visitors are going to go into the Liberty Bell not knowing they are walking over the site of Washington's executive mansion, indeed walking over the slave quarters he built at the rear of the house. . . . We have here a conjunction of liberty and slavery on the same site!"[28]

65.      In response to the uncovered history of the President's House, Black Philadelphia residents established Plaintiff ATAC. ATAC was founded for the express purpose of campaigning for the creation of a memorial and exhibit at the site of the President's House, honoring the enslaved people whom George Washington held in bondage at the site ("Commemorative Project").

66.     On March 26, 2002, the General Assembly of Pennsylvania passed House Resolution No. 490, urging Defendant NPS "to erect a commemorative plaque in recognition of the history of the slave quarters located" at the President's House site and noting the "importance [of] maintain[ing] a permanent acknowledgement of the rich history of the affected area, especially

---

[27] Lawler, *supra* note 8, at 93.
[28]         The         President's         House         in         Philadelphia, https://www.ushistory.org/presidentshouse/controversy/index.php (last visited Mar. 2, 2026).

the history associated with the slave quarters." H.R. 490, 2001-2002 Gen. Assemb., Reg. Sess. (Pa. 2002).

67.     Shortly thereafter, ATAC founder Michael Coard, delivered a petition—signed by at least one thousand people—to Independence Park, urging Defendant NPS to build the Commemorative Project.

68.     In April 2002, NPS Chief Historian, Dwight Pitcaithley, wrote to Independence Park Superintendent Martha Aiken, urging her to consider including an interpretation of the President's House that juxtaposed the Liberty Bell with the lives of the Black people whom George Washington held in slavery at the site:

> The contradiction in the founding of the country between freedom and slavery becomes palpable when one actually crosses through a slave quarters site when entering a shrine to a major symbol of the abolition movement. . . . How better to establish the proper historical context for understanding the Liberty Bell than by talking about the institution of slavery? And not the institution as generalized phenomenon, but as lived by George Washington's own slaves. The fact that Washington's slaves Hercules and Oney Judge sought and gained freedom from this very spot gives us interpretive opportunities other historic sites can only long for. This juxtaposition is an interpretive gift that can make the Liberty Bell "experience" much more meaningful to the visiting public. We will have missed a real educational opportunity if we do not act on this possibility.[29]

69.     In July 2002, the Appropriations Committee of the U.S. House of Representatives submitted a report to explain the 2003 appropriation bill for Defendant DOI, which included an acknowledgement of the discovery "that George Washington and his household, including eight African American slaves, were quartered at the first Executive Mansion for six and one half years."[30] Given the historical significance, the Committee urged Defendant NPS "to appropriately

---

[29] Gary B. Nash, *For Whom Will the Liberty Bell Toll? From Controversy to Collaboration*, 21 THE GEORGE WRIGHT FORUM 39, 45 (2004), https://www.jstor.org/stable/43597891?seq=1.

[30] H. Rept. 107-564 - DEPARTMENT OF THE INTERIOR AND RELATED AGENCIES APPROPRIATIONS     BILL,     2003,     H.Rept.107-564,     107th     Cong.     (2026), https://www.congress.gov/committee-report/107th-congress/house-report/564.

commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy."[31]

70.     In 2005, Congress appropriated $3.6 million for Independence Park's "scenic enhancement and pedestrian walkways improvement project in conjunction with the Park's Executive Mansion Exhibit." 119 Stat. 1308, Public Law 109-59 (Aug. 10, 2005).

71.     In September 2005, the City of Philadelphia and Independence Park convened the President's House oversight committee to help guide the Commemorative Project's development and ensure its ultimate success.

72.     The City and Defendant NPS selected a team of community members to join the oversight committee, including Michael Coard, and representatives from other advocacy groups that advocated for the Commemorative Project.

73.     Shortly thereafter, Defendant NPS, in partnership with the City and Independence Park, distributed a request for qualifications ("RFQ") to announce "The President's House: Freedom and Slavery in Making a New Nation" and to invite artists and architects to submit a letter of interest for consideration. In the RFQ, Defendant NPS, the City, and Independence Park communicated that the RFQ "offers an opportunity to tell a story of national importance in an honest, inspiring, and informative way" and that Independence Park considered "this project to be one of the top interpretive opportunities that the National Park Service has to offer."[32]

74.     In 2006, several semi-finalists were named for the Commemorative Project. Defendant NPS, the City, and Independence Park had a shared understanding that public input was necessary to the development and vision of the exhibit at the President's House. To facilitate this

---

[31] *Id.*

[32] *President's House Design Competition RFQ*, THE PRESIDENT'S HOUSE IN PHILADELPHIA, https://www.ushistory.org/presidentshouse/plans/rfq.php (last visited Feb. 14, 2026).

input, the semi-finalists' design models were put on public display at the National Constitution Center and the African American Museum of Philadelphia. The oversight committee reviewed nearly 1,000 evaluation cards from visitors and posted them on the City's website.

75.    On February 27, 2007, the City and Independence Park announced the selection of the Commemorative Project's designers. In the announcement, Independence Park Superintendent Dennis Reidenbach stated that, with the commemoration to the nine people held in slavery by George Washington at the President's House, Independence Park "will be at the forefront of national parks that address the issues of freedom and slavery. [He] could not be more pleased with the opportunity this project offers to teach and remember."[33]

### C.  "President's House: Freedom and Slavery in the Making of a New Nation"

76.    On December 15, 2010, the open-air installation and exhibit, "President's House: Freedom and Slavery in the Making of a New Nation," opened to the public.

77.    Members of Plaintiff ATAC and employees of The Black Journey attended the opening.

78.    The PH / Slavery Memorial includes the structural skeleton of the President's House, made from bricks and other materials; five motion-activated video screens with stories depicting the lives of the nine enslaved African descendants held in bondage by Washington at the President's House; illustrated educational panels, crafted out of glass and porcelain; metal interpretive panels; a glass vitrine overlooking some remains discovered during the archeological dig; bronze footprints that symbolize the road to freedom; a wooden and glass memorial space, etched with tribal names and the places of origin of the millions of Africans who were brought to

---

[33] Press Release, City of Philadelphia and Independence National Historical Park, Finalist Team For President's House Selected (Feb. 27, 2007), https://www.ushistory.org/presidentshouse/news/pr022707.php.

America in bondage; and a granite wall etched with the names of the nine people whom George Washington held in slavery at the site: Austin, Christopher, Giles, Hercules, Joe, Moll, Ona Judge, Paris, and Richmond.[34]



[35]

79.    The PH / Slavery Memorial's educational and interpretive panels discuss the "Dirty Business" of slavery and the expansion of chattel slavery in a newly formed nation; shared the original ground plan for the President's House and how household labor was divided amongst enslaved African descendants brought from Mount Vernon, indentured servants, and paid laborers; highlighted the efforts of Ona and Hercules to both resist and escape slavery; and examined the formation of the new American government, its reliance on the labor of enslaved people, and the contentious debate over the location of the nation's capital.

80.    In 2017, Defendant NPS issued the Foundation Document for Independence Park

---

[34] Association for Public Art, The President's House: Freedom and Slavery in the Making of a New Nation (2010), https://www.associationforpublicart.org/artwork/the-presidents-house-freedom-and-slavery-in-the-making-of-a-new-nation/ (last visited Feb. 24, 2026).

[35] *Visiting the President's House Site*, Nat'l Park Serv., https://www.nps.gov/inde/planyourvisit/presidentshousesite.htm (last updated Feb. 29, 2024).

("Independence Park Foundation Document").[36]

81.    Every unit within the National Park System has a foundation document to provide basic guidance for planning and management decisions. Foundation documents are at the core of each unit's planning portfolio.

82.    Foundation documents include the following core elements: park purpose, specific reasons for establishing a particular park; significance statements, express why the resources and values of the park are important enough to justify national park designation; interpretive themes, connect park resources to relevant ideas, meanings, concepts, contexts, beliefs, and values; fundamental resources and values, "are features, systems, organisms, processes, visitor experiences, scenes, sounds, smells, or other attributes of the park that merit primary consideration during planning and management because they are essential to achieving park purpose and maintaining park significance" and other important resources and values.

83.    These components are "core" because they typically do not change over time.

84.    The Independence Park Foundation Document recognizes that the core components of Independence Park include more than Independence Hall and the Liberty Bell; the park also preserves and interprets many important resources associated with the establishment of the government of the United States.

85.    In the fundamental resources and values component of the Independence Park Foundation Document, Defendant NPS identified that "[a]rcheological investigations at the President's House Site revealed physical connections to the enslaved in President George Washington's household." Defendant NPS stated that "[t]his information was used to guide future

---

[36] U.S. Dep't of the Interior, Nat'l Park Serv., *Foundation Document: Independence National Historical Park Associated National Historic Sites and Memorials* (Sept. 2017), https://www.nps.gov/inde/learn/management/upload/INDE_FD_2017_508-compressed.pdf.

development at the site" and that "[b]ased on these discoveries, the park designed its first community-based exhibition at the President's House archeological site that interprets race and slavery in its historic context."[37]

86.    The Independence Park Foundation Document also highlights the centrality of "[t]he site of the President's House, where George Washington and John Adams and their households lived and worked during their terms as the first and second presidents of the United States, prior to Adams' move to the White House in 1800," especially "the paradox of the Washingtons bringing their enslaved people to work and live there."[38]

87.    Defendant NPS identified the "Paradox of Freedom and Slavery" as a significant statement for Independence Park:

> Seeking to win agreement for a new Constitution that would replace the Articles of Confederation, delegates to the Constitutional Convention postponed the discussion about slavery in America by stating that the importation of slaves would cease in 1808. Because this weak clause did not address the issues of slave ownership or the emancipation of individuals held in bondage, the paradox of a nation conceived in liberty but once bound by legalized slavery can be explored at Independence National Historical Park.[39]

88.    In 2022, the PH Slavery / Memorial was designated as a National Underground Railroad Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act.[40] Following the passage of the National Underground Railroad Network to Freedom

---

[37] *Id*. at 11.

[38] *Id*. at 5.

[39] *Id*. at 9.

[40] Pub. L. 105-203, 112 Stat. 678 (1998), codified at 54 U.S.C. §§ 308301-308304; *see also* https://www.nps.gov/subjects/undergroundrailroad/ntf-listings.htm (listing all Network sites, including President's House) (last visited, Jan. 22, 2026).

The purpose of the Act is "[t]o authorize the National Park Service to coordinate and facilitate Federal and non-Federal activities to commemorate, honor, and interpret the history of the Underground Railroad, its significance as a crucial element in the evolution of the national civil rights movement, and its relevance in fostering the spirit of racial harmony and national reconciliation." Pub. L. 105-203, 112 Stat 678 § 2(b)(2) (1998).

22

Act of 1998, the Network to Freedom program was created to honor, preserve, and promote the history of resistance to slavery through escape and flight. The application for recognition of the PH Slavery Memorial under the National Underground Railroad Network to Freedom Act details the importance of the site as the location where, in 1796, Ona Judge escaped from slavery, and where Washington signed the Fugitive Slave Act of 1793 into law. Under the Fugitive Slave Act, Ona Judge was considered a fugitive from justice, subject to recapture until her death. In 2022, Cynthia MacLeod, then Superintendent of Independence Park, signed the application for recognition of the PH Slavery Memorial under the National Underground Railroad Network Act.

## VI.    DEFENDANTS' ACTIONS AFFECTING CULTURAL AND HISTORICAL SITES

### A.  President Trump's Executive Order 14253

89.    On March 27, 2025, President Trump issued Executive Order 14253, entitled "Restoring Truth and Sanity to American History"[41]. The Executive Order aimed to remedy what it characterized as a "widespread effort to rewrite [America's] history," which purportedly "replac[ed] objective facts with a distorted narrative driven by ideology rather than truth."[42]

90.    The Executive Order warns of a so-called "revisionist movement" that casts the United States in a "negative light" by portraying the country as "inherently racist, sexist, oppressive, or otherwise irredeemably flawed."[43] According to the Executive Order, this effort to "rewrite history. . . disregard[s] the progress America has made and the ideals that continue to inspire millions around the globe."[44]

91.    The Executive Order fixates on race and consideration of its role in the history, culture, and identity of the United States. The Executive Order labels "interrogating institutional

---

[41] Exec. Order No. 14253, 90 Fed. Reg. 14563.
[42] *Id*.
[43] *Id*.
[44] *Id.*

racism" and the idea that "America is purportedly racist" as "corrosive ideology" that was advanced by the prior administration.

92.     The Executive Order also claims that there is pressure on Defendant NPS's park rangers to have "their racial identity . . . dictate how they convey history."[45]

93.     To purportedly "restor[e] truth and sanity to American history,"[46] Section Four of the Executive Order directs Defendant Burgum to: determine whether certain public monuments, memorials, statues, markers, or similar properties "have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;" and also "take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties . . . do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape."[47]

94.     Section Three of the Executive Order specifically addresses "Restoring Independence Hall," stating that Defendant Burgum "shall provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park, which shall be complete by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence."[48] Under the General Provisions, the Executive Order states that it "shall be implemented consistent with

---

[45] *Id*.
[46] *Id*.
[47] *Id*. at 14564.
[48] *Id*.

applicable law."[49]

### B. Defendant Burgum's Secretarial Order No. 3431

95.    On May 20, 2025, Defendant Burgum issued Secretarial Order No. 3431 ("Secretarial Order"). In the Secretarial Order, Defendant Burgum states that it is the purpose of the Secretarial Order to implement provisions of the Executive Order.[50]

96.    The Secretarial Order identifies the Organic Act as one of the Secretarial Order's "authorities," but does not explain how the Secretarial Order complies with, or effectuates, the mandates of the Organic Act.[51]

97.    The Secretarial Order does not mention the NHPA and does not provide any reason for departing from the requirements of that statute.

98.    Defendant Burgum directly quotes language from the Executive Order, reiterating that it is the administration's policy to "restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing."[52]

99.    In the Secretarial Order, Defendant Burgum reiterates the Executive Order's instructions by stating that the "natural and historical resources" managed by Defendant DOI "should accurately reflect American history and not partisan ideology."[53] Defendant Burgum emphasizes his responsibility, pursuant to the Executive Order, to "take action, as appropriate and

---

[49] *Id*. at 14565.

[50] Secretarial Order No. 3431, Restoring Truth and Sanity to American History 1 (May 20, 2025) ("Secretarial Order"), https://www.doi.gov/document-library/secretary-order/so-3431-restoring-truth-and-sanity-american-history.

[51] *Id*.

[52] *Id*.

[53] *Id*. at 2.

consistent with applicable law" to ensure that properties and other sites within Defendant DOI's jurisdiction "do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people."[54]

100.    Section Four of the Secretarial Order directs Defendant Bowron to "identify any infrastructure improvements, including deferred maintenance and restoration activities, necessary to improve the infrastructure of Independence National Historical Park, including Independence Hall; identify funding needed to complete any such projects or activities; and subject to available funding and consistent with applicable law and authorities, enter into any contracts or other agreements necessary to complete the projects or activities in such time as to allow for sufficient preparation for the celebration of the 250th anniversary of our Nation's birth on July 4, 2026."[55]

101.    In Section Five of the Secretarial Order, Defendant Burgum directs Defendant Bowron to implement Section Four "[c]onsistent with [the Executive Order] and governing laws and regulations." Defendant Burgum charges Defendant Bowron with conducting a review of changed or removed properties and, within 60 days, "concluding whether the alteration or removal of each property was made to perpetuate a false reconstruction of American history; inappropriately minimize the value of certain historical events or figures; or include any other improper partisan ideology."[56]

102.    The Secretarial Order also directs Defendant Bowron to review properties to identify what the administration deems to be inappropriate content:

Within 90 days of the date of this Order, each land management Bureau shall conduct a review of all public monuments, memorials, statues, markers, or similar properties on lands within its jurisdiction to identify whether any such properties contain images,

---

[54] *Id*.
[55] *Id*. at 2-3.
[56] *Id*. at 3-4.

descriptions, depictions, messages, narratives or other information (content) that inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature.[57]

103.    As part of the review of properties for inappropriate content, the Secretarial Order requires Defendant Bowron to remove and replace any content identified as inappropriate:

> [R]emove any content meeting the criteria identified in paragraph 1 or otherwise found to be inconsistent with the purposes of EO 14253. The relevant land management Bureau shall then take action to replace the removed content with content that focuses on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape, and is otherwise consistent with EO 14253. In developing appropriate content, the land management Bureau shall coordinate with the Office of Communications within the Office of the Secretary.[58]

104.    Section Six of the Secretarial Order directs Defendant Bowron to post signage throughout each property to allow for public input via QR code "as to the state of the property, its management, and its compliance with this Order."[59] The Secretarial Order prescribes the specific language to be included in the request for feedback—requesting that parkgoers flag, amongst other things, "any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features."[60]

### C.    Other Statements and Actions by President Trump and His Administration

105.    During President Trump's first term, he referred to the 1619 Project and similar educational studies as a "crusade against American history," "toxic propaganda," and "ideological poison."[61] The 1619 Project is long-form journalism from the New York Times that seeks to tell

---

[57] *Id*. at 4.

[58] *Id*.

[59] *Id*. at 4-5.

[60] *Id*.

[61] Archives, *Remarks by President Trump at the White House Conference on American History*, Trump White House (Sept. 17, 2020), https://trumpwhitehouse.archives.gov/briefings-

stories of the nation's founding through the lens of the arrival of the first enslaved Africans on the shores of Virginia. Trump further stated that the project "rewrites American history to teach our children that we were founded on the principle of oppression, not freedom." In the same speech, President Trump stated that individuals who support those projects view everything through the lens of race and seek to "impose a new segregation," which he would "not allow . . . to happen."[62]

106.    In January 2025, President Trump issued Executive Order 14185 titled Restoring America's Fighting Force, which prohibited the Department of Defense and the Armed Forces from using educational materials that describe America's "founding documents [as] racist or sexist."

107.    In August 2025, President Trump accused the Smithsonian Institution of focusing too much on "how bad slavery was"[63] and not enough on "[b]rightness" and the "future."[64] In a social media post, Trump wrote, "This Country cannot be WOKE, because WOKE IS BROKE. We have the 'HOTTEST' Country in the World, and we want people to talk about it, including in our Museums."[65] Several months later, in October, Trump stated that he would be amenable to erecting a statute honoring secessionist, commander of the Confederate Army, and proponent of slavery—Robert E. Lee.[66]

---

statements/remarks-president-trump-white-house-conference-american-history/.

[62] *Id.*

[63] Zolan Kanno-Youngs, *Trump Says Smithsonian Focuses Too Much on 'How Bad Slavery Was,'* N.Y. Times (Aug. 19, 2025); https://www.nytimes.com/2025/08/19/us/politics/trump-smithsonian-slavery.html; Raquel Uribe, *Trump says the Smithsonian focuses too much on 'how bad slavery was',* NBC News (Aug. 19, 2025), https://www.nbcnews.com/politics/donald-trump/trump-smithsonian-how-bad-slavery-was-review-museums-rcna225964.

[64] Kanno-Youngs, *supra* note 63.

[65] *Id.*

[66] Andrew Feinberg, *Trump 'OK' with DC statue honoring Civil War leader who fought for slavery: 'Lot of people in this room' agree,* Independent (Oct. 16, 2025), https://www.independent.co.uk/news/world/americas/us-politics/trump-ballroom-dinner-robert-e-lee-statue-b2846627.html.

108.    Statements made by President Trump and administration officials contemporaneously with the Executive Order and Secretarial Order confirm the Executive Order's focus on race, and its targeting of slavery, the Civil Rights movement, and other historical events and discussions pertaining to Black people that are disfavored by the Trump administration.

### D.  Defendants' Dismantling of the PH / Slavery Memorial

109.    Public concern grew as employees of Defendant NPS, acting in accordance with the Secretarial Order, began flagging sites with references to slavery for removal, which was originally scheduled to take place by September 17, 2025.[67]

110.    Removal did not occur until January 22, 2026, when Defendant NPS, suddenly and without warning, dismantled and removed all educational and interpretive panels and disabled the five motion-activated video screens that are part of the PH / Slavery Memorial.

111.    Shortly thereafter, the City filed a complaint and moved to preliminarily enjoin Defendants from dismantling and removing the PH / Slavery Memorial. *See* Compl., *City of Philadelphia v. Burgum,* No. 2:26-cv-00434 (E.D. PA Jan. 22, 2026); Pl.'s Mot. for Prelim. Inj., ECF No. 2.

112.    On January 28, 2026, Defendants filed an Affidavit from the Superintendent of Independence Park, Steven Sims, in *City of Philadelphia v. Burgum*. ECF No. 27-1.

113.    Steven Sims' role, as NPS Superintendent of Independence Park, "is to implement the mission of the National Park Service to 'preserve unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations,'" echoing the language of the Organic Act and its non-impairment mandate.

---

[67]TaRhonda Thomas, *Fears for Independence Mall as Trump orders removal of displays that 'disparage' American history*, 6ABC (Sept. 17, 2025), https://6abc.com/post/fears-independence-mall-trump-orders-removal-displays-disparage-american-history/17829883/.

*Id*. at 2.

114.    On January 22, 2026, Superintendent Sims received direction from Defendant Bowron "to remove the video and exhibits on the interior and exterior of the walls of the President's House," while keeping the "footprints in the concrete and the names on the Memorial Wall . . . as-is." *Id*.

115.    Accordingly, Superintendent Sims directed employees of Defendant NPS to remove "all but one of the exhibits on the interior and exterior of the President's House walls using hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls." *Id*.

116.    The metal interpretive panels, which Defendant NPS removed from the PH / Slavery Memorial, were designed through consultation with historians to capture the five themes identified under the cooperative agreement between the City and Defendant NPS. The panels include information about the history of the trans-Atlantic slave trade, the roughly 12.5 million Africans brought to America through the system of chattel slavery, the growth of slavery in Philadelphia, and the resistance to slavery through the abolitionist movement. Another removed panel discussed the Fugitive Slave Acts and the Three-Fifths Compromise.

117.    In addition to the removal of the educational and interpretive panels, employees of Defendant NPS disabled five motion-activated video screens, which depicted the lives of the nine people held in bondage at the President's House. *See* ECF No. 27-1 at 2.



118.    Defendant NPS stored the panels and materials in the basement of the National Constitution Center in Philadelphia. *Id*.

119.    On information and belief, Defendants did not make a reasoned determination as to whether their actions constituted an "impairment" that would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. *See generally*, Management Policies § 1.4.5.

120.    On information and belief, Defendants did not follow the Section 106 process for making any decisions or taking any actions at the President's House site that might have an "adverse effect" on the PH / Slavery Memorial.

121.    On information and belief, the removal of the educational and interpretive panels and disabling of the motion-activated video screens is part of an orchestrated effort by Defendants to censor, erase, destroy, and rewrite certain segments of American history, especially with respect to Black people in the United States. As part of this effort, Defendants are targeting historical and cultural sites that include information about Black people in the United States, slavery, and the

---

[68] Nick Kariuki, *'It's a damn shame': Park Service crews dismantle President's House exhibit on slavery*, Billy Penn (Jan. 22, 2026), https://billypenn.com/2026/01/22/presidents-house-exhibit-slavery-dismantled/.

civil rights movement for censorship, erasure, destruction, and inaccurate revision.

122. An inspection report of the removed exhibit materials noted that the displays are not destroyed but that certain panels show some damage. ECF No. 39 at 1.

123. Plaintiffs were present during the inspection of the exhibit materials stored in the National Constitution Center's basement, which took place on February 2, 2026.

124. Following this Court's order to restore the PH / Slavery Memorial to its status as of January 21, 2026, the day prior to the removal, Defendant NPS re-installed 16 of the 17 glass educational panels and activated four of the functioning motion-activated video screens on February 19, 2026.

125. The metal interpretive panels that were created in consultation with Defendant NPS historians have not been reinstalled.

126. The administration has asserted there is no administrative record concerning Defendant NPS's actions at the President's House site during the current administration, including the removal of exhibit materials that are part of the PH / Slavery Memorial. Hearing Tr., ECF No. 45-1 at 130 ("[T]here is no administrative record.").

127. On information and belief, Defendants plan to replace the educational and interpretive panels that are part of the PH / Slavery Memorial and change the content of the motion-activated videos in compliance with the Executive Order and the Secretarial Order.

### E. Defendants' Overall Plan to Erase, Censor, and Inaccurately Revise American History Pertaining to Black People.

128. Since President Trump issued the Executive Order, countless public monuments, memorials, statues, markers, or similar displays within the National Park System that discuss the contributions of white people in the United States have stood uncontested and without second thought as to whether "they inappropriately disparage Americans past or living" or "focus on the

greatness of the achievements and progress of the American people."[69] At the same time, Defendant NPS has unilaterally targeted cultural resources and interpretive materials that illuminate the hardships, achievements, contributions, and progress of Black people in the United States—including enslaved African descendants and celebrated Black historical figures—as "corrosive" to American identity, having already removed or with plans to remove them from public view without reasoned explanations based on credible facts and research.

129.    Following the issuance of the Executive Order and the Secretarial Order, Defendant NPS's personnel grappled with "how to tell stories about enslavement or the oppression of Native Americans without implicating the white Americans of those eras."[70] Defendant NPS flagged, for removal, materials in bookstores and giftshops that address slavery, civil rights icons like Malcolm X and the Freedom Riders, "and descriptions of methods used to control enslaved people."[71]

130.    In March 2025, Defendant NPS took down its webpage dedicated to the life and work of Black civil rights activist Pauli Murray, which highlighted their prolific writings at the intersection of race and gender, as well as discrimination they faced in education and employment during the Civil Rights Movement-era.[72] The webpage included information on Murray's influence on Supreme Court Justice Thurgood Marshall, Martin Luther King, Jr., and Supreme Court Justice Ruth Bader Ginsburg in the fight to protect civil rights for Black people and other

---

[69] Exec. Order No. 14253, 90 Fed. Reg. 14563.

[70] Heather Richards, *Burgum asked park rangers to flag negative US history. They're delivering*, Politico PRO (Jan. 15, 2025), https://subscriber.politicopro.com/article/eenews/2025/07/15/burgum-asked-park-rangers-to-flag-negative-us-history-theyre-delivering-00453403.

[71] *Id*. (according to: Letter from Jared Huffman et al, Member of Cong., to Hon. Doug Burgum, Sec'y of the Interior, U.S. Dep't of the Interior 2 (Aug. 6, 2025), https://democrats-naturalresources.house.gov/imo/media/doc/FINAL_Opposition%20to%20Censorship%20at%20National%20Park%20Sites.pdf.

[72] Neda Ulaby, *NPS takes down web pages dedicated to transgender activists and LGBTQ history*, NPR (Mar. 5, 2025), https://www.npr.org/2025/03/05/nx-s1-5318767/nps-lgbtq-transgender-history.

groups experiencing marginalization and discrimination.

131.    In April 2025, Defendant NPS removed, from its webpage about the Underground Railroad, a large image of Harriet Tubman, along with a quote in which she recounted her experience operating and facilitating the Underground Railroad for enslaved people seeking freedom.[73] The new page replacing Harriet Tubman's image and quote omits several references to slavery, as well as references to the Fugitive Slave Act of 1850,[74] a law requiring slave patrols to arrest Black people suspected of escaping slavery and guaranteeing federal assistance to enslavers who recovered the enslaved people who had escaped.[75] The updated webpage made no reference to Harriet Tubman besides a small commemorative stamp.[76]

132.    In September 2025, right before the expiration of the 120-day period during which the Secretarial Order mandated removal of any content conflicting with the Executive Order, federal officials at Fort Pulaski National Monument in Georgia ordered the removal of the "Scourged Back" image at national museums and historical sites.[77] "Scourged Back" is an internationally recognized portrait of a formerly enslaved man from Louisiana, as he sits with his

---

[73] Zoe Sottile, *National Park Service removes references to Harriet Tubman from Underground Railroad webpage*, CNN (Apr. 7, 2025), https://www.cnn.com/2025/04/06/us/national-parks-underground-railroad-harriet-tubman.

[74] *Id.*

[75] *See The Fugitive Slave Act (1850)*, Nat'l Const. Ctr., https://constitutioncenter.org/the-constitution/historic-document-library/detail/the-fugitive-slave-act-1850 (last visited Mar. 27, 2026).

[76] Sottile, *supra* note 73.

[77] Jake Spring & Hannah Natanson, *National Park to remove photos of enslaved man's scars*, Wash. Post (Sept. 25, 2025), https://www.washingtonpost.com/climate-environment/2025/09/15/national-parks-slavery-information-removal/; Oscar Holland, *'Scourged Back' exposed the horror of slavery. Now it's embroiled in America's censorship debate*, CNN (Sept. 18, 2025), https://www.cnn.com/2025/09/18/style/scourged-back-peter-trump-censorship; Maxine Joselow, *Park Service is Ordered to Take Down Some Materials on Slavery and Tribes*, N.Y. Times (Sept. 16, 2025), https://www.nytimes.com/2025/09/16/climate/trump-park-service-slavery-photo-tribes.html.

back posed forward to show its crisscross scars and welts from whippings by enslavers.[78] The image was widely disseminated during the American Civil War and became a defining photograph of the nineteenth century in support of abolition.[79] Defendants removed "Scourged Back" pursuant to the Executive Order.[80]

133.    On January 2026, Defendant NPS removed brochures from the Medgar & Myrlie Evers Home National Monument, partly because Evers' murderer, a white man, was described as "racist."[81] Defendant NPS made further modifications, including removal of information about Medgar Evers lying in a pool of blood after being shot by white supremacists and the connection between his assassination and his outspoken stance on civil rights for Black people.[82] The brochures, which Defendant NPS pulled from the site, accurately stated that Evers' murderer, Byron De La Beckwith, was "a member of the racist and segregationist White Citizens' Council."[83] De La Beckwith also belonged to the White Knights of the Ku Klux Klan in Mississippi—a notoriously violent group who crusaded against political rights for Black people.[84]

134.    At Manassas National Battlefield Park in Virginia, Defendant NPS ordered the removal of a sign criticizing the post-Civil War "Lost Cause" ideology, which "romanticized the Confederacy and denied slavery's central role in the conflict."[85] Defendant NPS also instructed its staff at the former home of Confederate General Robert E. Lee to "stop using a booklet that was

---

[78] Holland, *supra* note 77.

[79] *Id.*

[80] *Id.*

[81] Jerry Mitchell, *Medgar Evers' killer was a Klansman, but Trump administration says stop calling him a racist,* Miss. Today (Feb. 5, 2026), https://mississippitoday.org/2026/02/05/medgar-evers-killer-trump-says-stop-calling-him-racist/.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] Joselow, *supra* note 77.

35

designed to teach children about slavery."[86]

135.    Defendants' actions pursuant to the Executive Order and the Secretarial Order have caused the removal of content at NPS sites that discusses America's history of racial oppression. For example, Defendant NPS removed the exhibit "History Under Construction," from the Muir Woods National Monument, which provided information about the Coast Miwok and Southern Pomo peoples and how colonial violence contributed to their displacement.[87]

136.    Defendants have also targeted federal holidays that honor Black history. In December 2025, the Trump administration removed Martin Luther King Jr. Day and Juneteenth from the few select days when visitors to the National Park System can enter sites for free.[88] In its place, the administration added Trump's birthday as a fee-free day; Defendant DOI referred to the new fee-free dates, which no longer include Martin Luther King Jr. Day and Juneteenth, as "patriotic" days."[89]

137.    In 2025, President Trump commemorated Juneteenth by "complaining that there were too many non-working holidays in America."[90] In contrast, he issued proclamations commemorating Father's Day, Flag Day and National Flag Week, and the 250th anniversary of the Battle of Bunker Hill, which are not among the 11 annual federal holidays but nevertheless advance Trump's preferred version of United States history.[91]

---

[86] *Id.*

[87] Olivia Heber, *Muir Woods exhibit becomes the first casualty of White House directive to erase history*, SFGATE (July 22, 2025), https://www.sfgate.com/california-parks/article/muir-woods-national-monument-history-erased-20781301.php.

[88] Alana Wise, *National parks' fee-free calendar drops MLK Day, Juneteenth and adds Trump's birthday,* NPR (Dec. 6, 2025), https://www.npr.org/2025/12/06/g-s1-101090/national-parks-fee-free-calendar-mlk-juneteenth.

[89] *See id.*

[90] Kanno-Youngs, *supra* note 63.

[91] Erica L. Green, *How Trump Treats Black History Differently Than Other Parts of America's Past*, N.Y. Times (June 20, 2025), https://www.nytimes.com/2025/06/20/us/politics/trump-black-history-federal-holidays.html.

138.    On March 2, 2026, The Washington Post published an article discussing an internal government database maintained by Defendant NPS containing submissions from park managers across the National Park System flagging displays and materials with "partisan ideology," descriptions that "disparage" Americans, or materials that stray from a focus on the nation's "beauty, abundance, or grandeur."[92]

139.    On information and belief, the vast majority of the information flagged for potential review and removal by Defendants discuss slavery.

140.    The Executive Order, the Secretarial Order, and Defendant NPS's removal of the educational and interpretive panels and disabling of the motion-activated monitors discussing slavery that are part of the PH / Slavery Memorial are part of Defendants' larger effort to censor, erase, and inaccurately revise the history and contributions of Black people in the United States.

### F.  Plaintiffs' Harms from Defendants' Actions at the President's House Site

141.    The Executive Order, Secretarial Order, and Defendants' removal of the educational and interpretive panels that are part of the PH / Slavery Memorial at the President's House site causes ongoing injury to Plaintiffs.

*Avenging The Ancestors Coalition*

142.    ATAC was formed with the mission to urge the City, Defendant NPS and Independence Park to agree to the creation of a Commemoration Project that would later become the PH / Slavery Memorial.

143.    Since the opening of the PH / Slavery Memorial in 2010, ATAC has remained actively engaged with the PH / Slavery Memorial.

---

[92] Karin Brulliard & Brady Denis, *Confidential database reveals which items NPS thinks may 'disparage' America*, Wash. Post (Mar. 2, 2026), https://www.washingtonpost.com/climate-environment/2026/03/02/national-parks-signs-censorship-slavery/.

144. For example, ATAC monitored conditions at the memorial, communicating with government entities regarding maintenance and preservation issues, including problems with the memorial's digital monitors and recurring condensation affecting display components.

145. ATAC organizes events and programming at the PH / Slavery Memorial and facilitates community use of the memorial for educational and commemorative purposes. Each year, on December 15, ATAC commemorates the opening of the memorial. ATAC also gathers annually at the site on several other dates of historical significance to enslaved people, in recognition of the paradox between the nation's founding ideals of liberty and freedom and the reality of slavery that the site represents. These annual gatherings include President's Day; May 21 (to mark Ona's escape in 1796); July 4 (to commemorate the role of enslaved people at the nation's founding); and August 25 (to commemorate the first arrival of enslaved Africans in 1619 to the land that later became the United States).

146. These regular events are central to ATAC's mission because they create opportunities to engage a broad range of stakeholders—including community members, students, tourists, and public officials—in confronting the site's history and its contemporary significance. In doing so, ATAC ensures the stories of the enslaved individuals are preserved, understood, and carried forward across generations.

147. Following issuance of the Executive Order and Secretarial Order, ATAC suffered organizational harm as a result of ATAC's need to divert resources to assess the impact of the Executive Order and Secretarial Order, respond to community concerns, and prepare for anticipated changes to the PH / Slavery Memorial by Defendants.

148. Prior to the Executive Order, ATAC held monthly general body meetings. From March 2025 to January 2026, however; ATAC met at least twice weekly to organize and respond

38

to the Executive Order and Secretarial Order, which threatened the removal of the PH / Slavery Memorial. These efforts directly diverted time and resources from ATAC's core programming.

149. ATAC also expended organizational resources on advocacy, including coordinating rallies in opposition to the anticipated removal or alteration of the PH / Slavery Memorial by Defendants. These rallies were central to mobilizing community members, educating the public, and organizing responses to any potential removal of the memorial.

150. Because the Executive Order and Secretarial Order created significant uncertainty regarding the continued availability and integrity of the PH / Slavery Memorial's educational and interpretive materials, ATAC's ability to plan programming, coordinate events, and encourage public engagement with the site was impaired.

151. As the anticipated removal of the PH / Slavery Memorial approached, ATAC sent a letter to Defendant NPS and Independence Park requesting a meeting regarding the Executive Order and the PH / Slavery Memorial, hoping to engage in conversation about the anticipated removal. ATAC did not receive a response from Defendants.

152. On January 22, 2026, without any notice, Defendant NPS dismantled and removed all 34 educational and interpretive panels and disabled the five motion-activated video screens that were part of the PH / Slavery Memorial. While some of the educational panels were later restored pursuant to this court's order granting preliminary injunctive relief, the majority of the interpretive panels have not been reinstalled.

153. Defendants' removal of the interpretive panels at the PH / Slavery Memorial continues to cause ongoing organizational and associational harm to ATAC. Defendants' removal of the panels impedes ATAC's ability to access accurate and complete information about American history at the President's House site, impairing ATAC's mission and the organization's

ability to function. ATAC's members regularly visit, use, and engage with the PH / Slavery Memorial for educational, commemorative, and advocacy purposes. Due to the absence of interpretive panels, the President's House site no longer reliably conveys the history that the PH / Slavery Memorial was specifically designed to present and preserve.

154.    Since Defendants' removal of the exhibit, ATAC continues to expend organizational resources to explain the historical significance of the President's House to the public, including at meetings, protests, and in email communications. Additionally, ATAC continues to hold regular meetings, circulate press releases, and organize protests.

155.    Defendants' actions have also caused significant dignitary harms to ATAC and its members by undermining the organization's longstanding efforts to preserve, protect, and expand public recognition of the lives of the enslaved African descendants commemorated at the President's House site. The removal of the panels diminishes the visibility and acknowledgment of these individuals and erases the historical narrative that ATAC works to preserve, protect, and celebrate.

156.    This harm is particularly acute given the President's House's historical significance. The PH / Slavery Memorial was intentionally designed to present the nation's founding ideals of liberty and independence alongside the reality that enslaved African descendants were held in bondage at the President's House. The removal of the interpretive panels distorts that historical narrative and undermines the site's core purpose. Depriving members of ATAC the ability to experience the memorial within the full historical context, causing informational and cultural injury.

157.    Defendants' removal of the panels diminishes the visibility and recognition of enslaved individuals whose lives are central to the full historical context in which the President's

House is interpreted. As the nation approaches the 250th anniversary of the founding, a moment of heightened public engagement with American history, ATAC relies on the PH / Slavery Memorial to provide an accurate account of that history—one that includes the reality of enslavement at the President's House site, as well as Philadelphia's central role in shaping both the Fugitive Slave Act and the Gradual Abolition Act. ATAC's planned programming, including its annual July 4 gathering, depends on the continued integrity and accessibility of the memorial.

158. ATAC continues to suffer associational harm and these harms are particularly acute for members of ATAC who are Black. For generations, African American communities have resisted the dehumanizing legacy of slavery by preserving and honoring a collective history, which was ruptured when chattel slavery shattered familial and communal bonds. Defendants' actions disrupt that ongoing effort and undermine the recognition of that history at the President's House site. The PH / Slavery Memorial is the only place within the National Park System that acknowledged the presence of enslaved people held in bondage at the President's House by our nation's first president. The callous removal of this history by Defendants is degrading, distressing, and dehumanizing. Defendants' actions also send a message that the history of slavery and the lives of the Black people connected to that history are unimportant and should be excised from discussions on American history within the National Park System.

159. Defendants' removal has also impaired ATAC's ability to engage in cultural and spiritual practices that honor its members' ancestors, including gatherings and commemorative activities at the site, such as the offering of libations. By eliminating core interpretive elements of the PH / Slavery Memorial, Defendants have disrupted ATAC's ability to maintain these historical and cultural connections.

160. The Executive Order and Secretarial Order also undermines advocacy efforts. For

41

example, ATAC uses the PH / Slavery Memorial project as a model for broader advocacy. Members have worked to identify other historic sites—particularly on federal land—where the history of enslaved African descendants remain unrecognized.

161.    These harms are further compounded by the fact that the PH / Slavery Memorial is the result of nearly a quarter century of sustained advocacy, maintenance efforts, and collaboration among ATAC, the City, and Defendant NPS. Defendants' actions undermine ATAC's mission through the erasure of interpretive materials that are the result and foundation of ATAC's advocacy.

162.    ATAC's injuries are ongoing. Each day that the interpretive panels remain absent from the President's House site, ATAC is denied the ability to access essential historical and interpretive material, impairing ATAC's ability to rely on the PH / Slavery Memorial for educational, commemorative, and advocacy purposes.

***The Black Journey***

163.    The Black Journey is a private walking tour company dedicated to the preservation, interpretation, and public dissemination of Black history through place-based educational tours and audio experiences in Philadelphia. The Black Journey's work centers historically-accurate narratives that reflect the lived experiences of Black people in America and their foundational role in the development of the United States, with a primary focus on Philadelphia's colonial history.

164.    The Black Journey was founded in 2019 by Raina Yancey, a Black woman, and the daughter of Dr. Victoria Ward Yancey, a former NPS Park Ranger who worked at the Independence Park. As a young girl, Raina Yancey often visited Independence Park, long before there were any references to the history of Black people and their connection to the President's House.

42

165.    The Black Journey serves approximately 500 visitors annually, including students, educators, residents, and cultural tourists.

166.    The Black Journey offers five live-guided tours, three of which include a visit to the PH / Slavery Memorial. The PH/Slavery Memorial is central to The Black Journey's tour designs given the location's national significance and the importance of the historical and archeological information available at the site. As a result, The Black Journey spends a substantial amount of time at the PH / Slavery Memorial and treats the site as foundational in its tours when sharing information about Black history in Philadelphia with tourgoers.

167.    The Black Journey's audio tour includes a dedicated stop at the PH / Slavery Memorial, extending access to this history for individuals who engage with the President's House independently or outside of scheduled tour times.

168.    The audio tour was developed in reliance on the availability of interpretive materials at the site.

169.    The live-guided tours and audio programming related to the PH / Slavery Memorial are integral to The Black Journey's educational mission, as well as the public's understanding of the role of enslavement at the founding, and how people in the highest levels of American government participated in the "dirty business." For example, many visitors learn on The Black Journey's tours that President George Washington held African people in slavery at the President's House by subverting gradual abolition laws. Many of these tourgoers were previously unaware that people were enslaved and forced to live and labor at the President's House.

170.    A tour guide with The Black Journey was at the PH / Slavery Memorial when Defendant NPS's workers pried the memorial's interpretive panels off the walls. The interpretive panels provided educational materials including information about the nine enslaved people that

Washington brought to the President's House during his presidency.

171.    Due to the removal of the interpretive panels at the PH / Slavery Memorial, The Black Journey had to devote additional time and financial resources to train tour guides on how to discuss the removal of the panels. The Black Journey was also forced to adjust tour routes.

172.     The Black Journey's business and daily work are harmed by the removal and alteration of interpretive materials at the PH / Slavery Memorial.

173.    While sixteen of the PH / Slavery Memorial interpretive panels were re-installed at the President's House, over eighteen panels are still missing, resulting in the erasure of important context. For example, the interpretive panels that remain missing include discussions of the slave trade in Philadelphia, the abolitionist movement, and the story of Ona Judge's escape from slavery. Until the PH / Slavery Memorial is restored, The Black Journey must provide ongoing paid training to ensure that tour guides remain up-to-date on the history of the President's House and the PH / Slavery Memorial, including the ongoing controversy.

174.    If Defendants do not restore the PH / Slavery Memorial, The Black Journey will be forced to re-record its audio tour, which will require writing a new script, securing studio time to record the script, and commissioning an audio production company to edit the new material and finalize the new audio tour. This will cause significant economic harm, including lost profits resulting from suspension of the audio tour to allow for re-recording.

175.    The Black Journey is committed to ensuring that Black history is preserved, accessible, and accurately represented. Actions that erase or distort documented historical truths, including Defendants' removal of the interpretive panels that are part of the PH / Slavery Memorial harms The Black Journey and impairs core functions of the business.

176.    The Black Journey has staff who regularly visit the PH / Slavery Memorial, bring

44

students, educators, and members of the public to the memorial, and rely on the information available at the President's House site. Defendants' actions materially undermine The Black Journey's ability to carry out its educational programming through its tours and have caused staff to divert time and resources towards redesigning its tours and materials during a critical time when people across the world are visiting Philadelphia and seeking to experience the tours offered by The Black Journey.

177.   Black customers who wish to learn about their history, and who seek out The Black Journey's tours in order to educate themselves, are especially harmed by the targeted removal of history about Black people at the President's House site.

178.   Additionally, The Black Journey's Black employees, who comprise the majority of its workforce, have experienced emotional distress and dignitary injuries from the removal of and attack on the PH / Slavery Memorial. These employees have observed Defendants treat historical information about Black people differently than the history of white people, as demonstrated by Defendants' removal of only the history, culture, and lived experiences of Black people from the narrative of this nation's founding and its connection to the President's House. Black customers are uniquely impacted by the removal of their history, while history involving white historical figures at the site remains undisturbed. This harm is particularly acute since American chattel slavery stripped enslaved people of their names and separated them from their families. Thus, the inability to access ancestral history is a compounding harm to Black tourgoers and descendants of enslaved people more broadly.

179.   The Black Journey is similarly concerned about other historical and cultural sites with information about Black people, which are within Defendants' control. The Black Journey fears that the removal of this information at the President's House and other sites perpetuates an

archaic perspective that Black people and their experiences are irrelevant to the history, culture, and identity of America. The Black Journey was created to combat such false and inaccurate white supremacist narratives, birthed during Slavery and sustained through the Redemption period and Jim Crow.

## VII.    CLAIMS FOR RELIEF

<u>**Count One**</u>
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Without Observance of Procedure Required by Law**
**National Historic Preservation Act, 54 U.S.C. §§ 300301-307108**
*All Plaintiffs Against All Defendants*

180.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

181.    Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

182.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. §§ 551(1), 701.

183.    The APA authorizes this Court to hold unlawful and set aside agency action that is "without observance of procedure required by law." 5 U.SC. § 706(2)(A).

184.    The Secretarial Order and the removal of the educational and interpretive panels and the disabling of the motion-activated video screens that are part of the PH / Slavery Memorial constitute final agency actions subject to judicial review. Each of these independent actions marks the "consummation" of the agency's decision-making process, and each action is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

185.    Section 106 of the NHPA requires that, prior to approving an undertaking, federal agencies "take into account the effect of the undertaking on any historic property."

186.    The President's House is listed in the National Register of Historic Places.

46

187.    Under the NHPA and its implementing regulations, an "undertaking" is defined as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency."

188.    The NHPA and its implementing regulations require federal agencies to consider an "adverse effect" to historic properties when engaged in an "undertaking." 36 C.F.R. § 800.5.

189.    Defendants' removal of the educational and interpretive panels and disabling of the motion-activated video screens that are part of the PH / Slavery Memorial was an "undertaking."

190.    Defendants carried out an "undertaking" that had an "adverse effect." Specifically, removal of the PH / Slavery Memorial has an adverse effect because it alters the property's feeling and its association with Black history, which diminishes the President's House site's significance as a site acknowledging the enslavement of nine African descendants by Washington around the time of our nation's founding. *See* 36 C.F.R. § 800.5(a)(1), (a)(2). Moreover, during the removal process, the "integrity of the property's . . . design, setting, materials, workmanship, feeling, or association" was also diminished. *See id*. § 800.5(a)(1).

191.    The regulations implementing Section 106 are mandatory. A federal agency proposing an undertaking must: (a) determine and document the area of potential effects; (b) identify and evaluate historic properties that may be affected; (c) assess whether the undertaking will have adverse effects on those properties; and (d) consult with the State Historic Preservation Officer, the Advisory Council on Historic Preservation, local governments, and other consulting parties to avoid, minimize, or mitigate adverse effects, typically through a Memorandum of Agreement or other binding instrument. *See* 36 C.F.R. §§ 800.4–800.6.

192.    Defendants proceeded with the "undertaking" at the President's House site, including removal of the educational and interpretive panels and the disabling of the motion-

47

activated video screens that are part of PH / Slavery Memorial, without complying with Section 106's process beforehand.

193.    Defendants' failure to comply with Section 106 renders their actions in connection with the PH / Slavery Memorial "without observance of procedure as required by law." 5 U.S.C. § 706(2)(D).

**Count Two**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**National Historic Preservation Act, 54 U.S.C. §§ 300301-307108**
*All Plaintiffs Against All Defendants*

194.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

195.    Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

196.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. §§ 551(1), 701.

197.    The APA authorizes this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 USC. § 706(2)(A).

198.    The Secretarial Order and the removal of the educational and interpretive panels and the disabling of the motion-activated video screens that are part of the PH / Slavery Memorial constitute final agency actions subject to judicial review. Each of these independent actions marks the "consummation" of the agency's decision-making process, and each action is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

199.    Agency action is arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" it seeks to address. *Dep't of Homeland Sec. v. Regents of the*

48

*Univ. of California*, 591 U.S. 1, 20 (2020) (citation omitted). "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id*. at 30 (internal quotation marks and citation omitted).

200.     Section 106 of the NHPA requires that, prior to approving an undertaking, federal agencies "take into account the effect of the undertaking on any historic property."

201.     The President's House is listed in the National Register of Historic Places.

202.     Defendants' removal of the educational and interpretive panels and disabling of the motion-activated video screens that are part of the PH / Slavery Memorial are "arbitrary" and "capricious," within the meaning of 5 U.S.C. § 706(2)(A).

203.     For example, Defendants did not consider the "adverse effects" which include, but not limited to, "[p]hysical destruction of or damage to all or part of the property," 36 C.F.R. § 800.5(a)(2)(i), and "change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance," *Id*. § 800.5(a)(2)(iv), in removing the educational and interpretive panels and disabling the motion-activated video screens that are part of the PH / Slavery Memorial.

204.     Defendants acted arbitrarily and capriciously by failing to consult with the Advisory Council, "State historic preservation officer," *id*. § 800.2(c)(1); "[r]epresentatives of local governments," 36 C.F.R. § 800.2(c)(3); and the "public," *id*. § 800.2(d), because whose views "are essential to informed Federal decisionmaking in the section 106 process."

205.     Defendants failed entirely to "engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

49

**Count Three**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious, Abuse of Discretion, Not in Accordance with Law**
**National Park Service Organic Act, 54 U.S.C. § 100101 et seq.**
*All Plaintiffs Against All Defendants*

206.     Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

207.     Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

208.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. §§ 551(1), 701.

209.     The APA authorizes this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.SC. § 706(2)(A).

210.     The Secretarial Order and the removal of the educational and interpretive panels and the disabling of the motion-activated video screens that are part of the PH / Slavery Memorial constitute final agency actions subject to judicial review. Each of these independent actions marks the "consummation" of the agency's decision-making process, and each action is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

211.     The duty of a court reviewing agency action under the "arbitrary and capricious" standard is to ascertain whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

212.     Agency action will be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

50

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

213.    Defendant Burgum's Secretarial Order is in direct conflict with Congress' mandate under the Organic Act to Defendant NPS "to leave [the National Park System] unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

214.    Defendant NPS's Management Policies interpret the Organic Act.

215.    The Secretarial Order requires the review and removal of content from properties within the National Park System for "inappropriate content" and specifically calls for removal of any content "otherwise found to be inconsistent with the purposes of EO 14253."

216.    The Secretarial Order does not contemplate whether the review and removal of content from properties within the National Park System for "inappropriate content" is an "impairment" that "would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." Management Policies § 1.4.5.

217.    The Secretarial Order does not contemplate whether the review and removal of content from properties within the National Park System for "inappropriate content" would affect a resource or value whose conservation is "necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or identified in the park's general management plan or other relevant NPS planning documents *as being of significance*." *Id*. § 1.4.5 (emphasis added).

218.    The Secretarial Order does not require an NPS decision-maker to consider the

51

impacts of the review and removal of content from properties within the National Park System for "inappropriate content" and determine, in writing, that the activity will not lead to an impairment of park resources and values. *Id.* § 1.4.7.

219. The Secretarial Order directly contravenes Congress' mandate that Defendant NPS's "authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." 54 U.S.C. § 100101(b)(2).

220. Defendants' removal of the educational and interpretive panels and disabling of the motion-activated video screens that are part of the PH / Slavery Memorial are in direct conflict with Congress' mandate under the Organic Act to Defendant NPS "to leave [the National Park System] unimpaired for the enjoyment of future generations." *Id.* § 100101(a).

221. Defendants' removal of the educational and interpretive panels and disabling of the motion-activated video screens that are part of the PH / Slavery Memorial constitute an "impairment" in violation of Congress' mandate to Defendant NPS not to take any action that would "impair" the resources or values within Independence Park.

222. The PH / Slavery Memorial is identified by Defendants in the Independence Park Foundation Document and other relevant NPS planning documents as being of significance.

223. The PH / Slavery Memorial is a resource and value subject to the non-impairment mandate.

224. Defendants failed to collect "advice or insights offered by subject matter experts and others who have relevant knowledge or experience" and consider "the results of civic

engagement and public involvement activities relating to" whether the Secretarial Order, removal of the educational and interpretive panels, and disabling of the motion-activated video screens that are part of the PH / Slavery Memorial could lead to an impairment.

225. Defendants' removal of the educational and interpretive panels and disabling of the motion-activated video screens that are part of the PH / Slavery Memorial, and the Secretarial Order are "arbitrary" and "capricious," within the meaning of 5 U.S.C. § 706(2)(A), because Defendants failed entirely to "engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). Defendants' actions were executed without a reasoned explanation, relied on factors that Congress did not authorize it to consider, failed to consider important aspects mandated by Congress, and disregarded material facts and longstanding reliance interests.

226. Defendants' removal of the educational and interpretive panels and disabling of the motion-activated video screens that are part of the PH / Slavery Memorial, and the Secretarial Order are also an "abuse of discretion," within the meaning of 5 U.S.C. § 706(2)(A), because the management discretion that Congress granted to Defendants is limited by the statutory requirement that Defendants ensure park resources and values remain unimpaired. Here, Defendants failed, entirely, to consider any impacts of their actions, let alone avoid impairments.

227. The Secretarial Order and Defendants' removal of the educational and interpretive panels and disabling of the motion-activated video screens that are part of the PH / Slavery Memorial are "not in accordance with law," within the meaning of 5 U.S.C. § 706(2)(A).

228. Defendants' actions were not taken for "the protection, management, and administration of the System units," were not "conducted in light of the high public value and integrity of the System," and were "exercised in derogation of the values and purposes for which

the System units have been established." *See generally* 54 U.S.C. § 100101(b)(2).

## Count Four
### Violation of the Fifth Amendment
### Equal Protection Component of the Due Process Clause
### *All Plaintiffs Against All Defendants*

229.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

230.    The Fifth Amendment's Due Process Clause prohibits the federal government from "engaging in discrimination that is so unjustifiable as to be violative of due process," which is construed to contain an equal protection component. *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 316 (3d Cir. 2001).

231.    Equal protection of the laws is violated by authorities' selective enforcement of "a facially neutral law or policy" so that it is "applied differently on the basis of race." *Doe ex rel. Doe v. Lower Merion Sch. Dist.,* 665 F.3d 524, 543 (3d Cir. 2011) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)).  In order to prevail on a selective enforcement claim, Plaintiffs must show: (1) they were "treated differently from another, similarly situated [group], and (2) "that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right." *Jewish Home of EPA v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012).

232.    An Equal Protection violation need not rest "solely on . . . discriminatory purposes" or even have a discriminatory purpose that is "dominant" or "primary."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("*Arlington Heights*").  Indeed, if a discriminatory purpose is, at least in part, a motivating factor in the decision, judicial deference is no longer justified. *Id*.  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266.

233.    Equal protection of the laws is violated by authorities' selective enforcement of "a facially neutral law or policy" so that it is "applied differently on the basis of race." *Doe,* 665 F.3d at 543 (citing *Yick Wo*, 118 U.S. at 373–74).  In order to prevail on a selective enforcement claim, Plaintiffs must show: (1) they were "treated differently from another, similarly situated [group], and (2) "that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right." *Jewish Home of EPA v. Centers for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012).

234.    The task of assessing a state actor's motivation requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including analysis of several non-exhaustive factors: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) administrative history, including "contemporary statements by members of the decision making body." *Arlington Heights*, 429 U.S. at 266–68.  Discriminatory statements by the President that were "repeated over time," "not isolated occurrences," and in "close temporal proximity" to executive officials' actions can be considered as evidence of the officials' own discriminatory intent. *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 862 (N.D. Cal. 2025), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) (collecting cases).

235.    Section 4(a)(iii) of the Executive Order and the Secretarial Order were promulgated and/or implemented by Defendants, at least in part, with the purpose of discriminating against Black people. Both the Executive Order and the Secretarial Order were created to censor, erase, and exclude Black people and the history of Black people in this country from interpretations of

American history, American identity, American culture, and America's founding at sites within the National Park Service. Moreover, Defendants' decision to remove components of the PH / Slavery Memorial has the desired effect of erasing Black people and their history from public narratives of American history, identity, and culture, so as not to "disparage" white people.

236.    The history of the Executive Order, Secretarial Order, and Defendants' decision to remove components of the PH / Slavery Memorial; the sequence of events leading up to them; and the contemporaneous statements and actions of President Trump and officials in his administration raise a strong inference of a discriminatory purpose.

237.    The known and reasonably foreseeable discriminatory impact/effect of the Executive Order, Secretarial Order, and Defendants' decision to remove components of the PH / Slavery Memorial regarding Black people, among other factors, raise a strong inference of a discriminatory purpose.

238.    The Executive Order, the Secretarial Order, and Defendants' decision to remove components of the PH / Slavery Memorial *bear more heavily on Black people* because museums, historical sites, exhibits, photos, websites, and other displays that showcase slavery or the history and lived experiences of Black people are specifically singled out and flagged for review and exclusion because they are purportedly "disparaging" or "corrosive" to the American identity.

239.    An internal government database demonstrates that the vast majority of information and materials flagged for revision or removal in compliance with the Executive Order and Secretarial Order discusses slavery and Black people in the United States.[93] Accordingly, the implementation of the Executive Order and Secretarial Order were "applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal

---

[93] *See also* Brulliard & Dennis, *supra* note 92.

discriminations between persons in similar circumstances" in violation of equal protection. *Yick Wo*, 118 U.S. at 373–74.

240.    Both the Executive Order and the Secretarial Order target information and depictions of slavery and other forms of racial oppression that are uniquely related to Black people while preserving contemporaneous displays about white people, including enslavers. Thus, the removal of information and depictions that uniquely pertain to Black people—for purportedly being "disparaging" or "corrosive"—creates a stigma about Black people that is experienced disproportionately, if not exclusively, by Black people.

241.    The exclusion of Black people from the narrative of America's history and heritage is particularly acute with respect to the PH / Slavery Memorial due to the dearth of public spaces in the United States that actively inform and educate the general public about the role of chattel slavery at the founding of the United States, let alone the lives of the nine Black people held in bondage by the first president of the United States, George Washington. Thus, although people of all races visiting the PH / Slavery Memorial encounter exhibits—seemingly "in an identical manner"—that present an inaccurate and incomplete account of American history by suppressing information about Black people, "the reality is . . . the . . . impact [of the removal] falls on the minority" because the history of white people has not been erased or excluded or placed at risk of erasure or exclusion. *Hunter v. Erickson*, 393 U.S. 385, 391 (1969).

**Count Five**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right**
***All Plaintiffs Against All Defendants***

242.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

243.    Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

57

244.   Defendants include "agenc[ies]" under the APA. 5 U.S.C. §§ 551(1), 701.

245.   The APA authorizes this Court to hold unlawful and set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

246.   The Fifth Amendment's Due Process Clause "contains an equal protection component" that prohibits the federal government from invidiously discriminating between individuals or groups. *Washington v. Davis*, 426 U.S. 229, 230 (1976).

247.   Equal protection of the laws is violated by both (1) "a facially neutral law or policy [that is] applied differently on the basis of race" and (2) "a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact. *Doe*, 665 F.3d at 543 (citing first *Yick Wo*, 118 U.S. 356 (1886) and then *Arlington Heights*, 429 U.S. 252 (1977)).

248.   First, the Secretarial Order and Defendants' decision to remove educational and interpretive panels and the disabling of the motion-activated video screens that are part of the PH / Slavery Memorial were enforced selectively to erase depictions of slavery and other forms of racial oppression that are uniquely related to Black people, amid a stark pattern where the vast majority of signs, exhibits and other materials flagged for potential review and removal by Defendants pursuant to the Executive Order and the Secretarial Order discuss slavery.

249.   Second, this pattern of discriminatory effect involving materials that uniquely concern Black people, along with contemporary statements by Defendants that evince an intent to erase and censor truthful representations of Black history, and departures from the procedures required by law under the Organic Act and the NHPA raise a strong inference that the Secretarial Order and Defendants' decision to remove components of the PH / Slavery Memorial were motivated, at least in part, by discriminatory intent.

58

250.    In either case, the Secretarial Order and Defendants' decision to remove the PH Slavery Memorial contravene Plaintiffs' right to Equal Protection under the Fifth Amendment of the U.S. Constitution, constituting an act "contrary to constitutional right" that violates the APA. 5 U.S.C. § 706(2)(B).

## VIII.    REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

1.    Declare that Defendants' removal of the educational and interpretive panels and disabling of five-motion activated monitors that are part of the PH / Slavery Memorial is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2);

2.    Declare that the Secretarial Order is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2);

3.    Declare that Defendants' removal of the educational and interpretive panels and disabling of five-motion activated monitors that are part of the PH / Slavery Memorial, the Secretarial Order, and the Executive Order violates the Fifth Amendment to the United States Constitution;

4.    Vacate and set aside any and all orders, directives, instructions, and/or determinations by Defendants and/or their agents, employees, representatives, successors, or any other person acting directly or indirectly in concert with them that permitted and/or required the removal of the educational and interpretive panels and disabling of five-motion activated monitors that are part of the PH / Slavery Memorial;

5.    Order Defendants to return the PH / Slavery Memorial to its original condition,

59

including, without limitation, repairing any damage resulting from its removal;

6.    Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them from removing or altering the PH / Slavery Memorial from the President's House for the next five years;

7.    Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them from enforcing and/or implementing the Secretarial Order and Executive Order;

8.    An order awarding Plaintiffs' cost of suit and reasonable attorneys' fees and expenses, pursuant to any applicable law; and

9.    Such other relief as this Court deems equitable, just, and proper.

Dated: April 1, 2026

Respectfully submitted,

/s/ *Cara McClellan*

Cara McClellan
Attorney ID: 331129
Mary Catherine Roper
Attorney ID: 71107
Kate McNamara-Marsland, Certified Legal Intern
Nathalie Rincon, Certified Legal Intern
PENN LEGAL ASSISTANCE OFFICE
3501 Sansom Street
Philadelphia, PA 19104
(215) 746-2164
caralm@law.upenn.edu

Avatara A. Smith-Carrington*
Kacey Mordecai*
Victor Olofin*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
acarrington@naacpldf.org
kmordecai@naacpldf.org
volofin@naacpldf.org

Alexandra S. Thompson*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
athompson@naacpldf.org

*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs-Intervenors*

60