**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITY OF PHILADELPHIA,<br><br>            Plaintiff,<br><br>        v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR, *et al.*,<br><br>          Defendants. | Civil Action No. 2:26-cv-434<br><br>Honorable Cynthia M. Rufe |

**SUPPLEMENTAL BRIEF REGARDING STANDING IN SUPPORT OF
MOTION TO INTERVENE AS PLAINTIFFS BY
AVENGING THE ANCESTORS COALITION AND THE BLACK JOURNEY LLC**

In accordance with the Court's May 21, 2026 Order (Dkt. 99), Avenging The Ancestors Coalition ("ATAC") and The Black Journey: African-American Walking Tour of Philadelphia ("The Black Journey") (collectively, "Proposed Intervenors"), submit this supplemental brief to address their Article III standing to assert the claims and relief set forth in their Proposed Complaint.

**<u>INTRODUCTION</u>**

Proposed Intervenors have standing to assert their claims and pursue the relief they seek. *First*, Proposed Intervenors must demonstrate Article III standing only to the extent that they seek relief beyond that sought by the existing parties. *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017); *Wayne Land & Mineral Group, LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020). Proposed Intervenors readily satisfy that requirement and need not establish independent standing to seek the same relief as the City, including the restoration of the PH / Slavery Memorial and a prohibition on further unlawful alterations. *Second*, in any event,

Proposed Intervenors independently satisfy Article III and have standing to seek that same relief. *Third*, Proposed Intervenors also have standing to pursue additional relief not sought by the City— namely, to enjoin Defendants' enforcement and implementation of the Executive Order and the Secretarial Order—because both directives have caused, and continue to cause, independent injuries to Proposed Intervenors. The Proposed Complaint and supporting declarations plausibly allege that Defendants' actions impair Proposed Intervenors' organizational missions, interfere with their core activities, and inflict concrete dignitary harms on ATAC's members—injuries that are traceable to the challenged conduct and likely to be redressed by the relief that Proposed Intervenors seek. That is more than sufficient to establish standing. *See Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 76–78 (3d Cir. 1998).

## ARGUMENT

Constitutional standing has three elements: (1) a party "must have suffered an 'injury in fact'—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," and the Court may "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* at 561 (alteration in original). A proposed intervenor, meanwhile, need not establish "independent Article III standing" to seek the same relief as an existing party; a proposed intervenor needs standing only to seek additional independent relief. *Little Sisters of the Poor Saints Peter & Paul Home v.*

*Pennsylvania*, 591 U.S. 657, 674 n.6 (2020). Proposed Intervenors easily satisfy these requirements.

## I.    Proposed Intervenors Have Standing to Bring Their Claims Seeking Restoration of the PH / Slavery Memorial.

As a threshold matter, some of the injunctive relief sought by Proposed Intervenors is identical to that sought by the City: requiring Defendants to restore the President's House site to its status quo ante by restoring the panels, displays and exhibits that were previously in place, and to enjoin further unilateral alterations absent compliance with governing law. *See* Dkt. 44 at 29. Accordingly, Proposed Intervenors need not establish "independent Article III standing" to seek the same relief. *Little Sisters*, 591 U.S. at 674 n.6. Regardless, Proposed Intervenors have independent standing to seek that relief.

### A.    Injury-in-Fact

#### 1.    ATAC and The Black Journey Have Suffered Their Own Injuries-in-Fact.

There is no dispute that Defendants removed educational and interpretive components of the PH / Slavery Memorial at the President's House site. As a result, Proposed Intervenors have suffered injuries to legally protected interests that are both concrete and particularized.

*First*, Defendants' actions have "directly affected and interfered with [Proposed Intervenors'] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *United States v. Aion Mgmt., LLC*, No. CV 23-742 (GBW), 2025 WL 843620, at *6 (D. Del. Mar. 18, 2025) (finding an intervenor had established injury sufficient for Article III standing when "Defendants' actions harmed Intervenors' ability to perform their work"), *reconsideration denied*, No. CV 23-742 (GBW), 2025 WL 1770791 (D. Del. June 26, 2025). In alleging an injury-in-fact, even an "identifiable trifle" is sufficient to confer Article III standing. *In re Johnson &*

*Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 287–88 (3d Cir. 2018) (internal citations omitted). Here, Proposed Intervenors' allegations more than satisfy this standard, demonstrating that activities central to their organizational and business missions have been "perceptibly impaired." *FDA*, 602 U.S. at 395 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

Defendants' removal of the interpretive and educational panels has impaired, and continues to impair, both organizations' operations. It has impaired ATAC's activities and programming. As a result of Defendants' unlawful actions—which undermine the organization's longstanding and ongoing efforts to preserve, protect, and expand recognition of the enslaved people memorialized at the President's House site—ATAC must now divert its limited resources to explaining the historical significance of the PH / Slavery Memorial to its members and the public, including at meetings, protests, and in email communications. Proposed Compl. ¶¶ 156–157, Dkt. 81-2; Coard Decl. ¶¶ 49–50, Dkt. 81-3. The removal also undermines ATAC's broader advocacy efforts, which use the PH / Slavery Memorial as a model for expanding access to interpretive materials on slavery at sites within the National Park System. Proposed Compl. ¶¶ 159–160; Coard Decl. ¶ 14. Defendants' removal of the memorial's interpretive and educational panels also disrupts The Black Journey's business operations, necessitating tour stoppages, additional paid training of tour guides to discuss the removal, and modification of its audio and live guided tours. Yancey Decl. ¶¶ 21–23, 28–31, 35, 37, Dkt. 81-4.  These burdens and costs imposed by Defendants' alteration of the memorial give rise to a cognizable injury-in-fact. *Fair Hous. Council*, 141 F.3d at 76.

*Second*, the PH / Slavery Memorial is integral to the mission of both organizations, and the removal of the educational and interpretive components has interfered with Proposed Intervenors' "advocacy business[]," *FDA*, 602 U.S. at 395, by affecting core activities and frustrating the ability

4

of both organizations to carry out that work. "[W]here discriminatory practices have perceptibly impaired an organization's ability to carry out its mission, there can be no question that the organization has suffered injury-in-fact." *Fair Hous. Council*, 141 F.3d at 76 (quoting *Havens Realty*, 455 U.S. at 378). ATAC was formed to advocate for the establishment of the PH / Slavery Memorial, and its work did not end with the opening of the exhibit. ATAC's ongoing educational and commemorative programming is centered on the exhibit. Since 2002, ATAC has gathered annually at the site on dates significant to the history of slavery and freedom associated with the site and, since December 2010, to commemorate the site's establishment. Coard Decl. ¶¶ 42–44, 57. ATAC also uses the site for public education, community organizing, and historical interpretation. *Id.* ¶ 58. Defendants' removal of the exhibit at the PH / Slavery Memorial interferes with and undermines the core mission and work of ATAC, "establishing and ensuring the continued use of a memorial to the nine people held in slavery at the President's House," because the removal of the educational and interpretive panels diminishes the visibility and recognition of the enslaved people whose lives are central to the full historical context in which the President's House site was created. *Id.* ¶ 49. Additionally, ATAC uses the PH / Slavery Memorial as a model for ATAC's broader advocacy, which ATAC has been forced to suspend and redirect as it addresses Defendants' changes at the President's House site—further impeding ATAC's ability to do its work. Proposed Compl. ¶¶ 153–162; Coard Decl. ¶ 49. Likewise, the PH / Slavery Memorial is essential to The Black Journey's business activities and its mission to preserve, interpret, and publicly disseminate Black history. Yancey Decl. ¶¶ 6–8, 12, 37–38. Without all of the memorial's interpretive and educational components, The Black Journey cannot present the full history of Black life, enslavement, and resistance in the manner its business activities and mission require. Yancey Decl. ¶ 20–23. Indeed, The Black Journey's tours are built around Black history in Old

City–specifically centered around the PH / Slavery Memorial. Yancey Decl. ¶ 13. These allegations are sufficient to plead an injury-in-fact.

### 2.    ATAC Has Standing to Bring Suit on its Members' Behalf.

"Absent injury to itself, an association may pursue claims solely as a representative of its members." *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3d Cir. 2002). ATAC has associational standing because (1) ATAC's members would otherwise have standing to sue in their own right; (2) the interests ATAC seeks to protect are germane to its purpose; and (3) neither the claims asserted nor the relief sought requires the participation of individual members in the lawsuit. *See id.* (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 433, 443 (1977)).

First, ATAC satisfies the first element of associational standing because its members would otherwise have standing to bring this suit in their own right. ATAC's members have suffered dignitary harms as a result of the removal of the educational and interpretive components of the PH / Slavery Memorial, which the Proposed Complaint alleges was based on discriminatory intent. Dignitary harm is itself a penalty and "qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake." *In re Johnson & Johnson*, 903 F.3d at 289–30. As the Third Circuit has noted, such an injury can also stem from "perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community" for those individuals "who are personally denied equal treatment solely because of their membership in a disfavored group." *Hassan v. City of New York*, 804 F.3d 277, 290 (3d Cir. 2015) (citing *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984)).

As ATAC has explained, Defendants' actions have caused significant dignitary harms to its members by undermining its members longstanding efforts to preserve, protect, and expand

6

public recognition of the lives of the enslaved African descendants commemorated at the President's House site. Coard Decl. ¶¶ 5–6, 13, 42–44, 58. The removal of the panels diminishes the visibility and acknowledgment of these individuals and erases the historical narrative that ATAC's members work to preserve, protect, and celebrate. *Id.* ¶ 52, 56. The removal of the interpretive panels distorts that historical narrative and undermines the site's core purpose. *See Id.* ¶ 56. It deprives members of ATAC of the ability to experience the memorial within its full historical context, causing informational and cultural injury. *See id.* ¶¶ 156–157.

These harms are particularly acute for members of ATAC who are Black. For generations, Black communities have resisted the dehumanizing legacy of slavery by preserving and honoring a collective history, which was ruptured when chattel slavery shattered familial and communal bonds. *See* Coard Decl. ¶ 54. Defendants' actions disrupt that ongoing effort and undermine the recognition of that history at the President's House site. The PH / Slavery Memorial was the only place within the National Park System that acknowledged the presence of enslaved people held in bondage at the President's House by our nation's first president. *Id.* ¶ 55. Defendants' callous removal of this history is degrading, distressing, and dehumanizing. *Id.* ¶ 53. Defendants' actions also send a message that Black history, particularly the history of slavery and the lives of the Black people connected to that history, are unimportant and should be excised from discussions about American history within the National Park System. *Id.* Although people of all races who visit the PH/Slavery Memorial encounter the same altered exhibit—which now presents an inaccurate and incomplete account of American history by omitting information about Black people—"the reality is" that the "impact [of the removal] falls on the minority." The history of white people has not been put at risk of erasure or exclusion. *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). Second, ATAC's members' injuries resulting from Defendants' removal of the educational and interpretive

components of the PH / Slavery Memorial and implementation of the Secretarial Order and Executive Order are "germane" to ATAC's purpose. *Pa. Psychiatric Soc.*, 280 F.3d at 283. ATAC's mission is centered on the creation, maintenance, and continued historical relevance of the PH / Slavery Memorial for educational and commemorative purposes. Proposed Compl. ¶¶ 142, 145–146. The preservation and future existence of the stories of the enslaved individuals held at the site are impeded by removal of the educational and interpretive panels. As an organization with approximately 300 active members who are committed to creating and maintaining a memorial at the President's House site that foregrounds the history of slavery and the lives of the nine people that George Washington held in bondage there,  Coard Decl. ¶¶ 5, 7–8, ATAC "surely maintains an interest in ensuring that its members" have access to and benefit from the educational and interpretive panels removed from the site that explain this history. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986). Additionally, the Executive Order and Secretarial Order undermine ATAC's advocacy efforts. ATAC uses the PH / Slavery Memorial project as a model for broader advocacy, and ATAC's members have worked to identify other historic sites—particularly on federal land—where the history of enslaved African descendants remains unrecognized. Proposed Compl. ¶ 160.

Lastly, the participation of ATAC's individual members is not required because ATAC's claims or the relief that it seeks do not "require an individualized inquiry for each association member" and instead will be generally applicable to all of ATAC's members. *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 422 (3d Cir. 2020). Because the results of the litigation for one of ATAC's members will "necessarily be so" for another, ATAC meets the final part of the associational standing test. *Id*. at 422.  ATAC may thus assert injuries-in-fact suffered by its members.

In sum, these injuries are "concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump v. New York*, 592 U.S. 125, 131 (2020). They are real-world harms that the Proposed Intervenors have suffered and will continue to suffer so long as the PH / Slavery Memorial lacks the educational and interpretive panels and video displays that have been removed by Defendants.

### B.    Traceability and Redressability

To establish standing, an injury must be "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560–61). Those requirements are met here.

Proposed Intervenors' injuries result directly from Defendants' removal of the PH / Slavery Memorial, which the Proposed Complaint alleges is unlawful. Before Defendants dismantled the PH / Slavery Memorial, Proposed Intervenors used the site regularly for their public education, advocacy, business, and commemorative activities. Those activities centered on, and depended upon, the site as a whole, including the essential educational and interpretive components that Defendants removed.

Specifically, Proposed Intervenors allege that on January 22, 2026, Superintendent Sims received direction from Defendant Bowron "to remove the video and exhibits on the interior and exterior of the walls of the President's House," while keeping the "footprints in the concrete and the names on the Memorial Wall . . . as-is." Proposed Compl. ¶ 114. Shortly thereafter, Superintendent Sims directed employees of Defendant NPS to remove "all but one of the exhibits on the interior and exterior of the President's House walls using hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls." *Id.* ¶ 115. In addition to removing the educational and interpretive panels, employees of Defendant NPS disabled five motion-activated video screens, which depicted the lives of the nine

people held in bondage at the President's House. *Id.* ¶ 117. As Proposed Intervenors allege, the removal of the PH / Slavery Memorial was the result of Defendants' campaign to selectively erase depictions of, and interpretive materials discussing, slavery and other forms of racial oppression that are uniquely related to Black people—creating a stigma about Black people that is experienced disproportionately, if not exclusively, by Black people. *Id.* ¶¶ 121, 128–129, 140. The alleged harms discussed are therefore fairly traceable to Defendants' impermissible removal of the PH / Slavery Memorial, which was based, at least in part, on Defendants' racially improper motives.

Finally, it is "'likely, as opposed to merely speculative,' that [Proposed Intervenors'] alleged injury will be redressed by a favorable decision" that would restore the site and prevent its further or future unlawful destruction. *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016).

Accordingly, Proposed Intervenors have standing to bring their claims seeking restoration of the PH / Slavery Memorial.

## II.    Proposed Intervenors Have Standing to Bring Their Claims Seeking An Injunction Against The Enforcement and/or Implementation of The Secretarial Order and the Executive Order.

Proposed Intervenors have standing to seek the additional relief that the City does not seek—namely, to enjoin Defendants from enforcing and implementing the Secretarial Order and Executive Order. Specifically, Proposed Intervenors challenge the Secretarial Order as a final agency action that is unlawful under the APA and both the Secretarial Order and the Executive Order as unconstitutional under the equal protection component of the Fifth Amendment to the U.S. Constitution. Both the Secretarial Order and the Executive Order have caused, and continue to cause, Proposed Intervenors' injury in fact that is redressable by the relief that they seek.

10

### A.    Injury-in-Fact

Proposed Intervenors have suffered injuries to their legally protected interests that are both concrete and particularized as a result of the Secretarial Order and the Executive Order. First, the removal of the educational and interpretive components of the PH / Slavery Memorial was a direct result of the Executive Order and the Secretarial Order, so the concrete injuries to Proposed Intervenors—the expenditure of additional resources required to respond to the removal of the PH / Slavery Memorial, the frustration of their ability to pursue their missions, and the dignitary harms that ATAC's members have suffered as a result of that removal—are also fairly traceable to the Executive Order and the Secretarial Order. *See supra* Section I.A.

Second, as with the removal of the PH / Slavery Memorial exhibit, the discriminatory nature of the Executive Order and the Secretarial Order, standing alone, provides an injury-in-fact by causing harm to ATAC's members. That the Executive Order and the Secretarial Order have targeted content concerning slavery, the Civil Rights movement, and other historical events and discussions pertaining to Black people for erasure is painful for members of ATAC, especially Black members of ATAC. Proposed Compl. ¶¶ 158, 160.

The Secretarial Order and Executive Order impose a cognizable injury by singling out the very history that ATAC's members exist to preserve, denigrating the significance of that history, and burdening their ability to engage with and commemorate it on equal terms with other historical narratives within the National Park System that have not been targeted for removal or alteration. Again, "[d]iscriminatory classification is itself a penalty" and "qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake." *Hassan*, 804 F.3d at 290.

### B.    Traceability and Redressability

As with Proposed Intervenors' challenge to the removal of the educational and interpretive components of the PH / Slavery Memorial, the injuries are "fairly traceable to the challenged

11

conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560–61).

First, Proposed Intervenors' injuries are traceable to the Secretarial Order, in which Defendant Burgum emphasizes his responsibility, pursuant to the Executive Order, to "take action, as appropriate and consistent with applicable law" to ensure that properties and other sites within Defendant DOI's jurisdiction "do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people." Proposed Compl. ¶ 99. In Section Four of the Secretarial Order, Defendant Burgum directs Defendant Bowron to "identify any infrastructure improvements, including deferred maintenance and restoration activities, necessary to improve the infrastructure of Independence National Historical Park, including Independence Hall; identify funding needed to complete any such projects or activities; and subject to available funding and consistent with applicable law and authorities, enter into any contracts or other agreements necessary to complete the projects or activities in such time as to allow for sufficient preparation for the celebration of the 250th anniversary of our Nation's birth on July 4, 2026." *Id.* ¶ 100. Additionally, Defendant Burgum directs Defendant Bowron to review properties to identify what the administration deems to be inappropriate content and, as part of the review of properties for inappropriate content, the Secretarial Order requires Defendant Bowron to remove and replace any content identified as inappropriate. *Id.* ¶¶ 102–103.

Proposed Intervenors' injuries are further traceable to the discriminatory purpose and implementation of the Secretarial Order and the Executive Order. As alleged in the Proposed Complaint, both the Executive Order and the Secretarial Order were created to censor, erase, and

exclude Black people and the history of Black people in this country from interpretations of American history, American identity, American culture, and America's founding at sites within the National Park System. *See, e.g.*, Proposed Compl. ¶ 235. Defendants' decision to remove components of the PH / Slavery Memorial has the desired effect of erasing Black people and their history from public narratives of American history, identity, and culture, supposedly so as not to "disparage" white people. *Id.* This discriminatory treatment gives rise to stigmatic and dignitary harms that are borne most acutely by Black people and by organizations like Proposed Intervenors whose missions center on preserving and presenting that history. Proposed Intervenors have alleged that their injuries are "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560–61).

## **CONCLUSION**

For all the foregoing reasons, Proposed Intervenors have Article III standing to pursue their claims.

Dated: June 4, 2026

Avatara A. Smith-Carrington (*pro hac vice* pending)
Kacey Mordecai (*pro hac vice* pending)
Victor Olofin (*pro hac vice* pending)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
acarrington@naacpldf.org
kmordecai@naacpldf.org
volofin@naacpldf.org

April N. Williams (*pro hac vice* pending)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
april.williams@wilmerhale.com

Ryan Chabot (*pro hac vice* pending)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ryan.chabot@wilmerhale.com

Respectfully submitted,

/s/ *Mary Catherine Roper*
Cara McClellan
Attorney ID: 331129
Mary Catherine Roper
Attorney ID: 71107
PENN LEGAL ASSISTANCE
OFFICE
3501 Sansom Street
Philadelphia, PA 19104
(215) 746-2164
caralm@law.upenn.edu

*Attorneys for Proposed Intervenors*

14

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2026, I caused the foregoing document to be filed with the Clerk of Court via CM/ECF. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/ *Mary Catherine Roper*
Mary Catherine Roper